Exhibit 1

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF FLORIDA
 2                    GAINESVILLE DIVISION
 3              CASE NO.:  1:19-cv-00227-AW-GRJ
 4
 5
      SARAH DIEKMAN, an individual,
 6
           Plaintiff,
 7      vs.
 8    THE UNIVERSITY OF FLORIDA BOARD OF
      TRUSTEES, AS THE PUBLIC BODY CORPORATE
 9    OF UNIVERSITY OF FLORIDA,
10         Defendant.
      _____/
11

12

13

14

15   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF SARAH DIEKMAN

16                 Wednesday, June 17, 2020
                    10:05 a.m. to 5:01 p.m.
17            Location:  Via Videoconference

18              Stenographically Reported By:
                 Diane Fowler, Stenographer
19                 (via videoconference)

20

21

22
      Job No: 141337
23

24

25
```

Sarah Diekman
June 17, 2020

---

Page 2

```
1   APPEARANCES:
2
3
4       APPEARING ON BEHALF OF THE PLAINTIFF (via
        videoconference):
5
6           Alexander Degance Barnett, P.A.
            1500 Riverside Avenue
7           Jacksonville, Florida  32204
            904-345-3277
8           david.chauncey@adblegal.com
9       BY:  DAVID E. CHAUNCEY, ESQUIRE
10
11
12      APPEARING ON BEHALF OF THE DEFENDANT (via
        videoconference):
13
14          Unice Salzman Jensen, P.A.
            1815 Little Road
15          Trinity, Florida  34655
            727-723-3772
16          asalzman@unicesalzman.com
17      BY:  ANDREW J. SALZMAN, ESQUIRE
18
19
20
        ALSO PRESENT: Ashley Taylor, Videographer (via
21                    videoconference)
22
23
24
25
```

---

Page 3

```
1               INDEX OF PROCEEDINGS
2   WITNESS                                      PAGE
3
4   SARAH DIEKMAN
5
        Direct Examination by Mr. Chauncey        6
6
7
8
    CERTIFICATE OF REPORTER                      265
9
    CERTIFICATE OF OATH                          266
10
    READ AND SIGN LETTER                         267
11
    ERRATA SHEET                                 268
12
13
14
15               EXHIBITS
16
    Exhibit     Description                      Page
17
18  Exhibit 1   Response to Interrogatories       15
19  Exhibit 2   2015-2016 Residency Training      65
                Manual & Acknowledgement
20
21  Exhibit 3   3/18/13 Letter of Offer          107
22  Exhibit 4   Evaluations composite            119
23  Exhibit 5   Delinquent duty hour list        140
24  Exhibit 6   12/3/14 Letter from Sarah        141
                Diekman to Regina Bussing
25  Exhibit 7   Milestone scores - Sarah Diekman 145
```

---

Page 4

```
1               EXHIBITS
2
    Exhibit     Description                      Page
3
4
5   Exhibit 8   Composite                        150
6   Exhibit 9   Composite                        167
7   Exhibit 10  9/3/15 letter from Jacqueline    173
                Hobbs to Sarah Diekman
8
    Exhibit 11  CCC meeting minutes composite    182
9
    Exhibit 12  12/4/15 dismissal letter         184
10
    Exhibit 13  PRITE scores                     186
11
    Exhibit 14  Grievance Procedure              190
12
    Exhibit 15  Composite                        190
13
    Exhibit 16  Appeals documents                194
14
    Exhibit 17  ACGME Common Program             195
15              Requirement
16  Exhibit 18  EEOC Notice of Discrimination    199
17  Exhibit 19  UF parking map                   199
18  Exhibit 20  E-mail composite                 205
19  Exhibit 21  E-mail composite                 205
20  Exhibit 22  Accomodation Request Form        206
21  Exhibit 23  ADA Grievance Procedure          212
22  Exhibit 24  Regulations of the University    241
                of Florida
23
    Exhibit 25  12/23/15 E-mail                  ---
24
    Exhibit 26  1/13/16 Psychological            243
25              Diagnostic Interview
```

---

Page 5

```
1               EXHIBITS
2
    Exhibit     Description                      Page
3
4
5   Exhibit 27  7/11/16 Psychological            244
                Evaluation
6
    Exhibit 28  Mayo Clinical medical records    251
7
8       (REPORTER'S NOTE: All documents were sent to
    Phipps Reporting electronically. A digital exhibit
9   sticker was placed on the documents which were marked
    during the proceeding.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Sarah Diekman
June 17, 2020

Page 6

1  Thereupon,
2  the following proceedings began at 10:05 a.m.
3       THE VIDEOGRAPHER:  We are now on the record,
4  and the time is 10:05 a.m.  This is the video
5  deposition of Sarah Diekman in the matter of Sarah
6  Diekman versus The University of Florida Board of
7  Trustees.  This deposition is being held on
8  Wednesday, June 17th, 2020.  The videographer is
9  Ashley Taylor, and the court reporter is Diane
10  Fowler, both in association with Phipps Reporting.
11       Will counsel please announce their
12  appearances for the record.
13       MR. SALZMAN:  Andrew Salzman for plaintiff,
14  Sarah Diekman.
15       MR. CHAUNCEY:  David Chauncey, representing
16  the University of Florida.
17       THE STENOGRAPHER:  Ma'am, if you'd raise your
18  right hand, I'm going to place you under oath.
19       THE WITNESS:  I do.
20       Can you -- did you hear me?
21       MR. CHAUNCEY:  Yes.
22       MR. SALZMAN:  Yes.
23       THE WITNESS:  Okay.
24       MR. CHAUNCEY:  You did good.
25                 DIRECT EXAMINATION

Page 7

1  BY MR. CHAUNCEY:
2       Q.  Dr. Diekman, thank you so much.  Did you
3  understand the oath that you just took?
4       A.  Yes, sir.
5       Q.  Great.
6       Have you ever taken a deposition before?
7       A.  Yes, sir.
8       Q.  When -- when did you take a deposition?
9       A.  In the workmen's comp hearing also against your
10  client, sir.
11       Q.  Okay.  Have you ever taken a deposition by
12  Zoom?
13       A.  No, sir.
14       Q.  Okay.  This -- this is my first time taking a
15  deposition by Zoom due to the circumstances that we're
16  under, so we can kind of forge through this together
17  here.
18       Have you taken any medication in the last
19  24 hours?
20       A.  Yes, sir.  I take medications every day.
21       Q.  Okay.  What medications have you taken?
22       A.  I take midodrine in the morning, Florinef, and
23  propranolol.
24       Q.  Can you -- are you able to spell that for the
25  court reporter.

Page 8

1       A.  Yes.  So midodrine is M-I-D-R-O-N-I-N (sic).
2  Florinef is F-L-O-R-I-N-E-I-F (sic).  And propranolol is
3  P-R-O-N-O-L-O-L (sic).  At least that -- I mean, I -- I
4  am dyslexic; so to be certain of the spellings, I'd have
5  to look them up.
6       Q.  Okay.  Well, thank you for giving us your --
7  your best try there.  That's -- that -- I know that's
8  very helpful for the court reporter.
9       Have you -- so what -- what are each of those
10  medications?  What do -- what do they do?
11       A.  So they're all related to my heart condition
12  and my dysautonomia.  So the propranolol makes sure that
13  my heartbeat doesn't go too fast.  The midodrine and the
14  Florinef maintain my blood pressure.
15       Q.  Okay.  And have you taken any -- have you
16  ever -- have you had any alcohol or anything like that
17  today?
18       A.  No, sir.
19       Q.  Did you sleep well last night?
20       A.  Yes.
21       Q.  Okay.  Is there any reason why you don't feel
22  competent to testify today?
23       A.  No, sir.
24       Q.  Okay.  So for us today, we are in the -- the
25  comfort of our own offices and homes.  But don't feel

Page 9

1  obligated to see this as an endurance test or anything
2  like that.  If you need to take a break, please let me
3  know.  And we can take five-minute break, ten-minute
4  break.  We can also take a -- a short break to get some
5  food around lunchtime as well.  So if you need a break,
6  you just need to go to the restroom or anything like
7  that, do not hesitate to let me know.
8       A.  Okay.  Thank you.  Just -- yeah.  In that vein,
9  my medications do make me need to use the restroom
10  fairly often.  And I need to take a medication around
11  noon.  So if we can take a quick lunch break.  I really
12  only need like 15 minutes, but -- to take my medication
13  and eat something.
14       Q.  Okay.  Yeah, we'll take a little longer than
15  that anyway.
16       A.  Okay.
17       Q.  But if you need to take a break, just let me
18  know.
19       A.  Thank you.
20       Q.  So as we move on here, just listen carefully to
21  my questions.  If you answer it, then I'm going to
22  assume that you understood the question that I was
23  asking.  But if you need me to clarify, just let me
24  know --
25       A.  Yes, sir.

1    Q.  -- that I'm not making sense at that moment;
2  you need me to clarify.
3         The ground rules, sort of generally.  For the
4  court reporter's benefit, if you could say yes or no
5  when you're answering a question rather than uh-huh or
6  nuh-uh.  That's -- that's just for the benefit of the
7  court reporter and -- and the record.
8    A.  Understandable.
9    Q.  Right.
10        When I ask a question, answer it.  And if I ask
11 a follow-up question, just take a moment to stop and --
12 and listen to what I'm saying.  Sometimes, especially in
13 the Zoom, it's kind of hard with potentially talking
14 over one another.  And so -- and if -- if you could, we
15 should only have one person talking at a time.
16    A.  Okay.
17    Q.  So if -- if -- at that point, if -- if we're
18 ever talking over each other and I'm beginning to talk,
19 just take a second and listen to me talk.
20    A.  Okay.
21    Q.  Your counsel may have some objections during
22 this.  Unless he directs you not to answer a question,
23 you should answer every question as we move forward.
24    A.  Okay.
25    Q.  And I'm sure Andrew will pipe up if he has

1  something, but, for the most part, he's just going to be
2  establishing that for the record.
3         For Zoom as well -- this is kind of an original
4  situation having to do these Zoom depositions.
5  Typically, if we were in person, you would be able to
6  talk to your -- your attorney at breaks.  So you can
7  talk to your attorney at breaks, but while you're under
8  oath and we're on the record, don't communicate with
9  anybody.
10    A.  Okay.
11    Q.  So make sure -- I know sometimes you could get
12 a text message, or get something --
13    A.  A call.
14    Q.  -- that's going on, or a chat, or something
15 like that if something is on.  Just make sure that --
16 that you're not communicating with anybody during this.
17    A.  Okay.
18    Q.  And as I was kind of mentioning to you off the
19 record, as we go through exhibits, I'm going to try to
20 share my screen.  If you have any problems seeing the
21 screen, just let me know and I can -- I'll -- I'll be
22 saying what exhibit will be on anyway, but -- but
23 hopefully you -- you'll -- your counsel sent you over
24 the -- the link to all of the -- the exhibits at that
25 point.  So if you have a problem seeing anything, just

1  let me know, and I can make sure that -- that I take
2  time to -- to go through things so you can lo --
3    A.  Yeah, I'm not su -- I don't think I've seen the
4  exhibit, so -- I mean, I'll have to look at them now.
5    MR. SALZMAN:  You should have -- I sent it
6    over and Christina sent it over, so I -- I don't
7    know if you've had a chance to at least -- it's in
8    a DropBox format.
9       THE WITNESS:  I -- I --
10 BY MR. CHAUNCEY:
11    Q.  If -- If you have problems --
12    MR. SALZMAN:  But we just did it.
13    THE WITNESS:  Oh.  Oh, okay.
14 BY MR. CHAUNCEY:
15    Q.  If you have problems, then we can go to that.
16 But we're going to be using the share screen anyway.
17    A.  Okay.  Good.
18    Q.  So there are going to be some sensitive
19 questions and -- and things that we get into today.  But
20 this is my only opportunity to ask you questions.  So I
21 apologize in advance if there's anything that -- that --
22 that is sensitive nature.
23    A.  I understand.
24    Q.  And then did you bring any papers with you
25 today, or notes, or documents that you reviewed before

1  the deposition?
2    A.  No, sir.
3    Q.  All right.  For the record, Dr. Diekman, what
4  is your legal name?
5    A.  Sarah Jean Diekman.
6    Q.  And what is your age today?
7    A.  Thirty-six.
8    Q.  What's your address?
9    A.  ████████████████.  I'm sorry.  I just
10 moved. ████████████████.
11    Q.  And where did you grow up?
12    A.  I grew up in Indiana.
13    Q.  Where did you go to high school?
14    A.  Boone Grove High School in Hebron, Indiana.
15    Q.  All right.  When did you graduate?
16    A.  2002.
17    Q.  Have you ever been married?
18    A.  No.
19    Q.  Do you have any kids?
20    A.  No, sir.
21    Q.  Have you had any serious significant others
22 over the past six years?
23    A.  I -- I don't know what you'd consider serious.
24    Q.  Okay.  I --
25    A.  I was not engaged.  There was no formal --

Sarah Diekman
June 17, 2020

**Page 14**

1 probably nothing --
2    Q.   Okay.
3    A.   Yeah.  No common-law marriages and no tenants
4 in common.
5    Q.   Right.
6         What is your current employment?
7    A.   I just graduated as a student of law school.
8    Q.   All right.  And what -- what is your employment
9 history?  Could you take me back from the time that you
10 graduated from high school, what employment history
11 you've had.
12   A.   Oof.  I honestly won't -- I --
13   Q.   To the best of your recollection.
14   A.   Okay.  I remember my first job was a -- a
15 grocery packer.  Think I was 14.  Child labor laws in
16 Indiana; I don't know.  And you can work for less than
17 minimum wage.  Then I worked in the mall for a while.
18 When I was a teenager, I was also a lifeguard.  And for
19 a while I had a job in -- an odd job inventorying
20 airplane parts for resale.  You have to keep track of
21 all their paperwork.  And it's actually a really
22 tightly-regulated industry, airplane parts.
23   Q.   Was that after you graduated from high school?
24   A.   Yeah.  I actually think that was in between med
25 school.

**Page 15**

1    Q.   Okay.
2    A.   Yeah.
3    Q.   Anything else?
4    A.   I think my medical school hired me for a while
5 as an anatomy tutor.  I've been paid intermittently,
6 small amounts, to speak at medical conferences.
7    Q.   What have you spoken about?
8    A.   Policy, how physicians can effect change on a
9 policy level, as far as, like, legislation, advocacy,
10 you know, using government for advocacy and -- which is
11 a way the physicians aren't as used to.  We're -- we're
12 trained more on direct patient care.
13   Q.   Any other employment?
14   A.   I'm sorry, not that I can re -- recall.
15   Q.   Okay.  So I'm going to mark -- what was
16 premarked as Exhibit 1 will be marked as Exhibit 1,
17 defense Exhibit 1, which are the interrogatories that --
18 that were provided to you.
19        (Exhibit 1 was marked for identification.)
20 BY MR. CHAUNCEY:
21   Q.   And so I'm going to try to share my screen
22 right now.  Can you --
23   A.   Okay.
24   Q.   -- see it?
25   A.   Yes.

**Page 16**

1    Q.   All right.  We're in business.
2    A.   I'm sorry.  The address needs to be updated now
3 because I moved recently.
4    Q.   No problem.
5         All right.  So you'd mentioned, 16, that you
6 were a full-time law student.  Have you -- you've
7 graduated now?
8    A.   Yes, sir, this month.
9    Q.   Where did you go to school?
10   A.   Florida A&M.
11   Q.   So why did you decide to go to law school?
12   A.   Honestly, it was because of what happened to me
13 at the University of Florida.  I didn't want it to
14 happen to anyone else, so I decided to study law.
15   Q.   How much were your tuition fees at FAMU?
16   A.   I think 15 approximately.
17   Q.   Did you get --
18   A.   Maybe 14 --
19   Q.   Did you get any --
20   A.   -- a year.
21   Q.   -- scholar --
22   A.   That's the tuition.
23        Yes.
24   Q.   I'm sorry.
25        THE STENOGRAPHER:  Wait.

**Page 17**

1        THE WITNESS:  I'm sorry.
2        THE STENOGRAPHER:  I'm sorry.
3    A.   Fourteen thousand -- I'm sorry.  $14,000 a year
4 I think is the tuition.
5 BY MR. CHAUNCEY:
6    Q.   Did you get any scholarships?
7    A.   No, sir.
8    Q.   Why did you decide to go to FAMU over other law
9 schools?
10   A.   There was a few reasons.  I decided -- one
11 is -- was practical in that I was in a very destitute
12 financial situation, and FAMU was very close, which is
13 why I investigated in the first place.  But, ultimately,
14 I did get an 80 percent scholarship to Berry, which also
15 would have been physically very close.  So I would have
16 pretty much been able to go there for very little cost.
17        But I decided on FAMU because of its history.
18 FAMU was shut down because of segregation in the 1960s
19 and has had to fight for its reputation to reopen in the
20 early 2000s.  Their faculty is extremely diverse.
21   Q.   Did --
22   A.   And really --
23   Q.   Did --
24   A.   -- believe in the mission of public health.  So
25 that's why I ultimately chose FAMU.

Sarah Diekman
June 17, 2020

1    Q.   Okay.  Did you get in to any other law schools?
2    A.   I got -- Berry was the only other school I
3  applied to --
4    Q.   Okay.
5    A.   -- because of my physical limitations, you
6  know, but between my disability and my financial
7  constraints, at the time I did not think I could manage
8  a cross-country move at that particular time.  So I
9  applied to schools -- tho -- only those two schools
10  because I thought that I could handle that physically.
11    Q.   Okay.  Were -- were you living in Orlando at
12  the time?
13    A.   I was living in Ocala at the time.  I moved
14  from Gainesville to Ocala because Ocala has a very low
15  cost of living.  And it was close enough that, you know,
16  with the help of my family I could physically move
17  myself without, you know, having to pay expensive
18  movers, and then move into a house that was very
19  affordable.
20    Q.   How much --
21    A.   And so from Ocala to Orlando is commuting
22  distance.  And, actually, my parents lived even closer
23  to Orlando, so many times I would stay with them to
24  commute to law school because it was even closer.
25    Q.   Have your parents supported you financially

1  through law school?
2    A.   Yeah.  I would say -- I mean, I've taken out
3  student loans, but -- which is, you know, the bulk of my
4  financial support.  But it would be unrealistic to say
5  that I could have done this without -- without support
6  from my parents.
7    Q.   How much money per year have your parents
8  provided you in financial support while in law school?
9    A.   That's hard to estimate because it's not like
10  they're just giving me simple sums.  It's more like I
11  stay at their house and eat their food.
12    Q.   We'll -- so we'll simplify it.  How about just
13  financial support from some sort of payments for
14  things?  We'll not include food or you just hanging out
15  at their house.  Have they paid any tuition for you?
16  Have they paid any -- any other bills or anything to
17  that effect?
18    A.   My tuition all came from student loans.
19         Bills, yeah, like random bills that might come
20  up on my house, even test-prep stuff to get into law
21  school.  I mean, I -- I had a school settlement from the
22  workers' comp, but that really went to pay my medical
23  bills.  I mean, I've ha -- actually, that would be the
24  largest -- what my parents have paid more is the medical
25  bills that I've had over the last five years.  That

1  would be the largest source of financial support.
2  Between copays and coinsurance and that is thousands of
3  dollars.  I've had to have surgeries.  That would
4  have -- that would be the largest financial support.
5    Q.   Are we talking over $10,000?
6    A.   Maybe right around there.  Probab -- probably
7  le -- prob -- well, no, probably ten.
8    Q.   Okay.
9    A.   I mean, I know how it is to -- like, I tend to
10  be optimistic when it comes to finances.  But -- but
11  realistically it's -- it's probably at least ten.
12    Q.   Right.
13         What did you get on the LSAT?
14    A.   A 152.
15    Q.   Okay.
16    A.   Definitely could have been better, but it was
17  good enough.
18    Q.   All right.  So what --
19    A.   I --
20    Q.   -- are your plans now that you're leaving --
21  you've graduated from -- from law school.  What are
22  your -- what are your plans professionally at this
23  point?
24    A.   Yeah.  So because I -- so I -- I did rather
25  well in law school and was kind of able to use this to

1  restore my academic reputation a little bit.  And so I
2  have gotten a position at Johns Hopkins, and I will be
3  starting there in July, July 1.
4    Q.   What's that position?
5    A.   In -- so it's a co-position in occupational and
6  environmental health, and then as a student in their
7  masters of public health program.
8    Q.   Okay.  Is that -- let's see.  So when did you
9  apply to that program?
10    A.   In the fall, sir.
11    Q.   Okay.  So you've had this plan for a while to
12  potentially continue your education?
13    A.   Actually, no.  It was -- well, I guess it
14  depends on what you mean to continue my education.  When
15  I went to law school, my -- my plan was to work as a
16  lawyer.  To continue my education really only came up
17  because a friend of mine was in an occupational
18  environmental residency at a different school, and he's
19  an MD/JD, too.  He told me this field has a lot of
20  overlap because they do a lot of workers' comp, and
21  regulation, testifying before Congress.  So there's --
22  so actually having a JD is useful.
23         And he had started a program, and he was having
24  a lot of success, really liked it.  And so he suggested
25  that I apply to that program, which I did.  And then I

Sarah Diekman
June 17, 2020

---

Page 22

1  just cast a broader net, and it worked out the -- the
2  way it worked out.
3       But that -- that really only started this past
4  fall.  So less than a year ago.  My -- my plan in going
5  into law school was, and still is -- I mean, I want to
6  be a plaintiffs' attorney, but maybe not full time.
7       Q.  So what do you want to use the degree that
8  you'll be getting from Johns Hopkins to do?
9       A.  So it's -- occupational environmental health is
10 about workplace safety.  So it still is in the same vein
11 I want to make sure that workers don't get hurt at work,
12 that preventable injuries are prevented.  And that's
13 what occupational health is.
14      Like many people, I didn't even know this was a
15 specialty.  It's actually -- they -- they joke about it
16 on the interviews that it's a -- one of the best-kept
17 secrets of medicine, that it even is a specialty.  So
18 yeah, we get to treat workers' injury, which I -- I had
19 experience, actually, as a patient, so I have some idea
20 of what the process is like to be a patient.  And then
21 we also work with OSHA and NIOSH.
22      So a lot of what we're seeing nowadays when we
23 talk about the return-to-work guidelines, a -- a lot of
24 those actually go through occupational and environmental
25 health.  And NIOSH certifies a lot of the equipment we

Page 23

1  use.  So kind of in the -- you know, just that whole
2  field.
3       Q.  All right.  So where did you go to college?
4       A.  I went to --
5       Q.  Undergrad.  Sorry.
6       A.  Pardon?
7       Q.  I said undergrad.  Where did you --
8       A.  I --
9       Q.  -- go to undergrad?
10      A.  I went to Purdue University.
11      Q.  All right.  So you're a Boilermaker?
12      A.  I sure am.
13      Q.  And so from undergrad, can you tell me your --
14 all of the different programs, education-wise, that you
15 have -- have attended.
16      A.  Yes, sir.  From undergrad, I went to -- I did a
17 year postbac because I had not originally been premed.
18 I thought I was going to do a psychology PhD.  And I
19 still had some prerequisites in order to apply to
20 medical school that I had to fulfill.  So I took my
21 graduation at the regular time, but then I still had to
22 take things like general chem, like organic chemistry,
23 physics.  So I did those.  That took a year.  And then I
24 did a Master's, which is through IUPUI, so -- which is
25 the -- the combined campus of Indiana and Purdue.

Page 24

1       Technically, my degree is from Purdue.  But if
2  you ask Indiana for my transcripts, they will also give
3  you a transcript of the -- that Master's, so -- however
4  they work it out.  But anyways it's a -- it was a
5  Master's of Science at IUPUI.
6       And then I did --
7       Q.  Was there a specialty in that Master's of
8  Science or --
9       A.  Biology.  Sorry.
10      Q.  Okay.
11      A.  Sorry.  Yeah.
12      Q.  Go on.
13      A.  And the -- sorry.  My -- my Bachelor's Degree,
14 to get specific, is in psychology with a concentration
15 in behavioral and neuroscience and a minor in biology.
16      Q.  All right.  So after you went to IUPUI, what
17 was your next step?
18      A.  Then I went to medical school at Indiana, at
19 the university.
20      Q.  Okay.
21      A.  It's an allopathic degree M.D.
22      Q.  Was your plan the entire time to go from that
23 Master's of Science and Bio at -- at IUPUI to medical
24 school?
25      A.  Yes, sir.  Absolutely.

Page 25

1       And -- and, actually, it was the -- the
2  advisors, the admission's office at the medical school,
3  that recommended me to do that Master's.  I went down
4  there for a consultation.  I wasn't sure that I was a
5  good enough candidate.  And they said if you're, you
6  know, unsure that you've proven yourself enough, then
7  take this Master's program because we know how rigorous
8  it is.  And if you can succeed in this Master's program,
9  then the admissions counsel will take you seriously.
10      Q.  All right.  Did you get in to any other medical
11 schools?
12      A.  Not that I know of.  I actually wasn't reading
13 the rejection letters.  I was having a family member
14 read them for me truth be told.
15      Q.  There you go.  That's a way of doing it.
16      A.  Yeah.
17      Q.  Have you ever filed any grievances or any
18 complaints at any of these other schools that you
19 attended?
20      A.  I did have -- I don't know if it would qualify
21 as a grievance.  I did request a disability
22 accommodations at Indiana School of Medicine.
23      Q.  Did -- were you pleased with the accommodations
24 when you were at Indiana University School of Medicine?
25      A.  Yes, once I got their attention.  So, I mean, I

Sarah Diekman
June 17, 2020

Page 26

1  did hire a lawyer, and he wrote a letter.  And then once
2  he did that, I got my accommodations and it was -- it
3  was nothing.
4       Q.    Did you --
5       A.    I -- I don't I mean it wa -- I mean, it was --
6  there was no drama.  There was no problem.  I just got
7  the accommodations and that wa -- that was that.
8       Q.    Well, do you remember what accommodations you
9  received at Indiana Universities (sic)?
10      A.    They gave me extra time on tests and a little
11  bit of extra tutoring.
12      Q.    Anything else?
13      A.    Not that I recall, sir.
14      Q.    Who -- what was the name of the lawyer that you
15  hired for --
16      A.    Oh, my goodness.
17      Q.    -- (inaudible).
18      A.    I have no clue.  I could try and -- he really
19  just did a letter for me, so I don't have even any court
20  filings or anything.
21      Q.    Right.  So --
22      A.    I mean, I can try to produce that for you.
23  Indiana --
24      Q.    How --
25      A.    -- may have it.

Page 27

1       Q.    All right.  How did you -- how did you meet
2  him?
3       A.    Oh, that was just a pure Internet search.  And,
4  actually, it was quite hard to find a lawyer willing to
5  help somebody who was in graduate school with
6  disabilities accommodation.  I mean, that was my first
7  experience that actually -- once you get to a certain
8  level, you're almost punished for having a disability
9  and overcoming it because no one's really familiar with
10  the process.  And there's not even a lot of attorneys
11  who deal with it.
12      Q.    Did you receive accommodations at any of the
13  other institutions that you had attended previous to
14  medical school?
15      A.    No.  I believe no.  And if there was, I -- I
16  don't recall.  But I -- well, I mean, when I was in
17  elementary school -- you know, so going way back - I
18  failed my -- the Indiana exam.  You know, I think it's
19  the ISTEP.  You know, I -- down here I think we have the
20  FCAT or whatever.  The ISTEP in Indiana when I was --
21  this -- so this is, like, first grade.  I failed that,
22  the reading portion.
23            So I was put into, you know, remedial, special
24  education.  And right around third grade, when I
25  actually -- so with those kind of things and learning to

Page 28

1  read, then once I kind of got the mechanics of reading,
2  then I moved up into, you know, whatever they call those
3  gifted and talented programs.  So, like, my ability to
4  comprehend language was good, but the physical act of
5  reading for me is -- is difficult because I -- I truly
6  do have dyslexia, so --
7       Q.    What is your accomm -- so the accommodation that
8  you had in elementary school had to do with the
9  dyslexia?
10      A.    Yes, sir.
11      Q.    Okay.  Was there anything else that they
12  accommodated you for?
13      A.    No.  No.  And after that, I really didn't
14  receive any accommodations.  My parents thought it was
15  best if I didn't request.  They -- they thought it was
16  best to not have that kind of interference.  They
17  didn't -- they didn't want me to get accommodations for
18  anything.  So it was only that little bit in first
19  grade, maybe first through third grade.
20      Q.    Did you share that opinion, even in college
21  and -- and -- and in some of your educational
22  experiences?
23      A.    I actually did not understand -- because I was
24  a child when this happened to me.  So what was I, like,
25  six years old, six, seven, eight years old .  I didn't

Page 29

1  understand that I had to go to a different class because
2  of a learning disability.  This was all kind of shielded
3  from me.
4       Q.    Right.
5            So --
6       A.    So --
7       Q.    -- as you went through school, say in undergrad
8  or -- or in your Master's program, did you ever consider
9  getting an accommodation for your dyslexia?
10      A.    I -- so what -- the narrative that had been
11  told to me was that I really should just work harder at
12  everything I do.  So I didn't really understand what was
13  happening with me or any rights I might have, anything
14  like that, until I got to medical school and learned
15  more about it.  I got a -- neuropsychologic testing, so
16  the full battery, you know, my whole brain on a piece of
17  paper, which, again, diagnosed me with dyslexia.  And I
18  brought them in all my childhood papers, you know.
19            So then I re-looked, and I thought, wow, you
20  know, I remember something, having trouble reading when
21  I was a child.  And I investigated, and I realized it
22  was much bigger than anyone had let on to me, that I had
23  a very serious problem.  And I had just been kind of
24  left to myself to deal with it and -- which I -- I --
25  you know, my academics suffered.  There was a lot of

Sarah Diekman
June 17, 2020

---

Page 30

1  things that suffered.  And it was always told that I was
2  just lazy, and it was my fault, and --
3        So once I got the neuropsychologic testing, and
4  it really was laid out on a piece of paper by
5  professionals that I absolutely have a disorder of
6  reading, dyslexia, then I started advocating for myself,
7  you know, because now I'm an adult; I'm not six years
8  old anymore.
9    Q.   Right.
10       And so was that the only thing that you were
11  accommodated for when -- at Indiana University was just
12  the dyslexia?
13   A.   So I started having physical -- because I --
14  because also my health issues started when I was at
15  Indiana.  So I don't -- I'm just struggling with the
16  language.  Is this technically an accommodation, sick
17  leave, whatever you want to call it.
18       A lot of stuff happened in my last two year --
19  two to three years of medical school.  I got extremely
20  sick in my third year with an undiagnosed illness.  It
21  took a long time to diagnose it.  So this was a huge
22  problem.  I lost a tremendous amount of weight.  I was
23  having trouble breathing, some -- multiple ER visits.
24  So I did take a -- leave of absence to try and get
25  that diagnosed.

---

Page 31

1        And then during that time I also got diagnosed
2  with the POTS.  So it -- it really was kind of two
3  separate illnesses.  So I have vocal cord dysfunction,
4  which makes it -- when that is flaring up -- like,
5  you -- you can die from that.  So your vocal cords just
6  essentially spasm closed so you can't move air.  It's
7  like someone is strangling you.  And if they don't open
8  up again, you know, you'll -- you'll pass out.  And
9  hopefully they relax and you don't die.  So that was the
10  first thing.
11       And then that actually flared up the postural
12  orthostatic tachycardic (sic) syndrome, which I have had
13  for probably most of my life.  I had my first tilt table
14  test when I was, like, nine years old.  That's -- one of
15  the cardiologists I sent you is my childhood
16  cardiologist.  But -- but at that time, they didn't have
17  a clear diagnosis for me.  So the second illness really,
18  really flared up the problem with my heart.  And then
19  I -- I had to seek out somebody who really could
20  diagnose and tell me what was going on with my heart.
21  So I went to the Mayo Clinic, which are some of the best
22  diagnosticians in the world.  And they diagnosed me with
23  postural orthostatic tachycardic syndrome.
24       So then bringing that back to Indiana, I'm -- I
25  can't remember if I requested spec -- I -- you know

---

Page 32

1  what, I did.  I did request specific accommodations
2  because, like, one of the tests we take is an OSCE.  And
3  I had had trouble because they have these typing
4  stations.  It's just a computer in a hallway, and you
5  stand and you type.  And if I stand still -- so I'm
6  fine, like, if I'm walking or if I'm sitting.  But if I
7  stand still, then the blood -- my heart can't pump the
8  blood back up to my brain, back up to the heart.  So
9  then I'll pass out.  So they gave me a chair for the
10  OSCEs.
11       And then I think an informal accommodation was
12  the rotation I was on -- the rotations I was on for the
13  remainder of my time there, because I didn't have that
14  much time left at Indiana I finally got a diagnosis,
15  they would let me sit.  So they -- you know, I was
16  allowed to sit in chairs so I wouldn't pass out.  I
17  didn't -- I don't think I had to request a formal
18  accommodation for that.  I could be wrong, but not that
19  I remember requesting anything.  People just did it
20  because it seems like a -- I guess the decent thing to
21  do.
22    Q.   So did you apply for a formal accommodation at
23  all concerning the -- what I guess became the POTS or
24  the -- the other disorders that you were experiencing?
25  Did you -- was there something that was applied for with

---

Page 33

1  the -- the chair?
2    A.   I don't think so.  I -- I honestly -- I could
3  be wrong about that.  Whatever it was, whether it was
4  formal or not, it didn't get any resistance and people
5  were supportive.  So tha -- that's why I can't recall
6  because it was a nonissue.
7        I got more resistance before I had an actual
8  diagnosis and people thought I -- you know, whatever.
9  But once I actually had a diagnosis, I -- I don't
10  remember there being any problems with Indiana.
11   Q.   Okay.  But you did apply -- the one thing you
12  did apply for was related to the dyslexia?  There were
13  accommodations that you applied for due to the dyslexia?
14   A.   Yes.  I got extended time on my tests.
15   Q.   Okay.  All right.
16   A.   And some tutoring.  They let me have some
17  sessions with some of the instructors or supervisors.
18  If I felt like I needed some clarification on things,
19  they let me have those and I wasn't, like, punished, you
20  know.  There was no, oh, Sarah needed extra
21  instructions.  Like, they gave me the instructions
22  without punishing me for getting it.
23   Q.   Have you ever, even in a -- in a workplace
24  situation accused anyone of harassment, or
25  discrimination, or anything like that previously?

Sarah Diekman
June 17, 2020

Page 34

1    A.   Not outside of the University of Florida, no.
2    Q.   So tell me a little bit why -- why psychiatry?
3  How did you end up initially in psychiatry?
4    A.   So my ultimate plan with psychiatry was I
5  wanted to take care -- I -- of actually healthcare
6  workers who were impaired by addictions.  That was
7  always my interest.  And the University of Florida touts
8  itself as a really strong addictions-centered program.
9  So I wanted to -- and a program that really believes
10 that addiction is a medical condition and not a
11 character flaw.
12       And I always just saw tremendous value in
13 keeping healthcare workers working and living their best
14 potential because, you know, for every healthcare worker
15 that's working, you help hundreds, if not thousands, of
16 patients.  So that's what I -- and -- and Florida touts
17 as one of its crown jewels its -- its Florida Recovery
18 Center, its addiction-focused program.  And the chair,
19 at the time, of the psychiatry department was very
20 addictions focused.
21    Q.   Who was that?
22    A.   Dr. Gold.
23    Q.   Okay.  And so were there other specializations
24 that you were considering after medical school?
25    A.   I considered pediatrics, pretty much the same

Page 35

1  route, because I wanted to do pediatric addictions also.
2  People thought I was a little -- you know, I don't know.
3  Not everyone likes dealing with teenagers, and I wanted
4  to deal with teenagers with addiction problems.
5        But I -- the more that I looked at it -- so I
6  did a lot of pediatric rotations.  I was intending to go
7  that route first.  And we just weren't getting enough
8  underlying training in psychopharmacology, which is
9  pretty important for addictions.  So I decided to go
10 with the psychiatry route.
11    Q.   What got you interested in helping people with
12 addictions?
13    A.   A couple of things.  Maybe the -- the most
14 recent one was I grew up in -- in a town that was hit
15 really hard by the opioid crisis.  My high school prom
16 date died of an overdose.
17       We had -- I mean, we went to a small school.
18 This is a small school, in the middle of a cornfield,
19 and the Midwest; you know, classic America.  And we -- I
20 mean, there was only, I think, 150 kids in our class,
21 and we had, like, a dozen die of opiate overdose.  I
22 mean, when they're 19, 20 years old, whole families;
23 like, all the children they had dying.
24       And I just always saw it as -- like, I mean,
25 these people are my friends.  And I saw them as having

Page 36

1  untreated depression, as having untreated underlying
2  illnesses, as, looking for something and really needing
3  help.  And, actually, Porter County, where our high
4  school was located, at the time was ninth in the nation
5  per capita for heroin deaths.  So even though we're a
6  rural community for the per -- per capita numbers, way
7  up there.
8    Q.   Did the death of your prom date and, I mean,
9  just having friends who were passing away, did that take
10 a toll on you at all?
11    A.   I mean, it hurt my heart.
12    Q.   Did you -- did you -- were you depressed by it
13 or anything like that?
14    A.   No.  I wouldn't say I was depressed by that.
15 I guess I felt it more like a societal failure, like
16 these are forgotten people, and it made me want to -- to
17 do something about it.
18    Q.   Did you suffer from any depression as a -- from
19 the time you were in high school, college, anything like
20 that?
21    A.   Yeah.  So my history with -- so we would --
22 let's say depression and anxiety.  The history is a
23 little complicated by the fact that I probably ha --
24 that I had POTS all of this time, and the symptoms can
25 overlap, so -- and they can also cause each other.  So

Page 37

1  POTS' symptoms can cause depression; depression can
2  flare-up POTS.  So it's hard to say.
3        I will say that when treating POTS, mood gets
4  much better, but no, I -- I definitely -- it would be
5  inaccurate to say I never had any episodes of mild
6  depression and anxiety, even through adolescence,
7  college.
8        There was one episode in college that -- sorry,
9  it's kind of hard to talk about because I actually
10 experienced a -- a sexual assault.  I was drugged.  And
11 what I know now about my illness is that drug is the
12 kind of thing that sets off the POTS and makes it much
13 worse.  So, at the time, I thought I was just depressed,
14 but, actually, I was also experiencing a POTS flare
15 because of the drug that I had been given.
16       So, I mean, no doubt there's actual depression
17 there, but there were physical symptoms and -- and the
18 POTS that also gives you the feeling of can't get out
19 of -- you know, it's a profound fatigue, a -- I mean,
20 the fatigue being the biggest thing.  You can't tolerate
21 doing any of the things that make you happy in life.
22 And so, you know, that is closely linked to depression.
23 So there's overlap.
24    Q.   Did you report the sexual?
25       And I'm so sorry --

Sarah Diekman
June 17, 2020

Page 38

1    A.   Thank you.
2    Q.   -- for your experience.
3         But did you end up --
4    A.   (Inaudible.) --
5    Q.   -- reporting that --
6    A.   (Inaudible.) --
7    Q.   -- to the police --
8    A.   I --
9         THE STENOGRAPHER:  Wait.  Wait.  I'm sorry.
10   You're overlapping.
11        MR. CHAUNCEY:  I'll -- I'll --
12   BY MR. CHAUNCEY:
13   Q.   Did -- did you end up reporting the sexual
14   assault to the police?
15   A.   No, absolutely not.
16   Q.   Did that sexual assault cause a pretty extended
17   depression for you?
18   A.   There was one semester that was really bad, and
19   I'm -- again, with also the POTS symptoms having been
20   flared by the -- the chemical that he gave me, which I
21   didn't know at the time -- you know, I -- at the time, I
22   would have told you pure depression.  But now what I
23   know -- but, I mean, it doesn't -- doesn't matter.
24        But there was a -- one semester that I'd say
25   was completely gone.  I adopted an animal, and that

Page 39

1    really helped me.
2    Q.   Do you need a moment?  We could take a break.
3    A.   Thank you.  No, I'm okay.
4    Q.   Okay.
5    A.   After I got that animal, it -- I was -- I was
6    able to function and get back on track.
7    Q.   Is -- did that event cause any PTSD or
8    lingering effects for you?
9    A.   Actually, no.  I would not say that I got PTSD
10   from that event.  I didn't.
11   Q.   What -- what events have you gotten PTSD from?
12   A.   Purely the events at University of Florida.
13   Q.   Did -- ha -- have you ever had any other events
14   while at UF that were of an assault nature or anything
15   like that?
16   A.   You mean, like, a -- totally outside of the
17   employment?
18   Q.   No, just did anybody assault you while you were
19   at the University of Florida?
20   A.   Well, there was -- I mean, I -- the issue
21   and -- and -- that I reported.
22   Q.   Which was?
23   A.   The VA, that it -- okay.  I'm -- I'm sorry.
24   Okay.  So as -- as stated in the complaint, there was
25   a -- a attending in the ER that -- so he, at first,

Page 40

1    was -- you know, nothing that you -- just -- just stuff
2    like jokes, like, oh, they're letting women into med
3    school now, and he'd call me Marilyn Monroe instead of
4    my name, and make me come down to the ER instead of
5    taking phone recommendations.  And then he'd, like,
6    touch my shoulder and my knee and just -- not take
7    recommendations from me, make me call my male attendings
8    and say, you know, sometimes you just have to hear it
9    from a man.  So I mean that is what it is.
10        But there was one night where he really did
11   scare me because he -- he just kind of seemed to be
12   escalating with the -- you know, making excuses for me
13   to come down to the ER to touch me or -- well, I don't
14   know!  I can't speak to his motives.  But those things
15   correlated, right?  I'd come down to the ER, he'd touch
16   me.  And I don't mean -- I -- I mean, you know, just
17   things, like, shoulder, knee.  I don't mean it in the --
18   when we say touched me, a lot of times we think
19   genitals.  That's -- that's not what I'm saying.
20        So I was in the call room one night, and I
21   don't even know how he knew I was there.  And he had no
22   reason to be there.  And he came into the call room
23   and -- I mean, first of all, just having someone open
24   the door just scared the crap out of me.  And, like, I
25   almost fell back in my chair.  So as -- he was, like --

Page 41

1    he was coming towards me, and I moved back.  And you
2    know how, like, a rolly chair, like if you move it back
3    too fast on a carpet it'll, like, catch, and then you'll
4    almost fall?  And that actually startled both of us.
5    And he kind of stopped approaching me.  And then he just
6    said something to me and left quickly.  But his demeanor
7    before that whole startled thing really, really made me
8    feel uncomfortable.
9         So I notified Dr. Hobbs, Dr. Thorn, Dr. Welch,
10   who were the -- the VA side of things, and then the
11   chiefs that I don't want to be alone with this person
12   because, I mean, like, I don't know, maybe I'm just
13   imagining this, maybe it's not really as ba -- maybe I
14   shouldn't feel uncomfortable in the situation, and it's
15   just like my trauma kicking up or something like that.
16   But --
17   Q.   Dr. Diekman, what -- what was this individual's
18   name?
19   A.   Syfert.
20   Q.   All right.  Syfert.  How do you spell that, if
21   you know?
22   A.   I am not sure.
23   Q.   And where did -- where did he work?
24   A.   The VA.
25   Q.   All right.  So he was an employee of the VA?

Sarah Diekman
June 17, 2020

Page 42

1    A.   Yeah.
2    Q.   Was he an employee of the University of
3  Florida?
4    A.   I don't think so.
5    Q.   Okay.
6    A.   But I had discussed this incident with HR at
7  the University of Florida.  They did like some
8  investigation into it later.  Later, like a year later.
9    Q.   What did the investigation -- what were -- what
10 were the findings of the investigation?
11   A.   Just, like, nothing.
12   Q.   So was -- so the -- the extent of the touching
13 that he did to you was on your knee and your shoulder?
14   A.   Right, nothing more.
15   Q.   And then he just sort of startled you that night.
16 Was there anything else that he did that would --
17   A.   No.  So --
18   Q.   -- be (inaudible) an assault?
19        THE STENOGRAPHER:  Wait.  Wait.  Wait.
20        I'm sorry.  I didn't get the end of the
21   question.
22 BY MR. CHAUNCEY:
23   Q.   Was there anything else that he did that --
24 that -- because you'd described it earlier as an
25 assault.  Was there anything that he did that -- that

Page 43

1  would -- that would be -- that you would consider an
2  assault?
3    A.   Well, I -- or an actual battery.  I mean,
4  assault being, you know, the apprehension of a harmful
5  or offensive contact, yeah, I did a -- you know, like
6  using assault in the pure legal way.  The -- the
7  immediate apprehension, yes.
8        But no, there was no sexual battery.  And --
9  and if it had just -- the -- the huge problem then
10 started because I reported it because I -- I thought
11 I -- this can't get any worse.  I'm afraid that this is
12 getting worse.  And, like, I mean, he's barging into my
13 sleeping quarters.  Like, no one else is here.  We're in
14 this cement building; like, no one's going to hear me
15 yell.  And maybe it's just my imagination, I don't know,
16 but why do I have to be alone with this person?  Can't
17 there be a chaperone?  Can't there be someone else?  You
18 know, why -- why do we have to be alone together?
19        And that's what I asked Dr. Thornton, Hobbs,
20 and, at the time, the -- the chiefs because the chiefs
21 change every year.
22   Q.   And what -- what was done?  Was -- was anything
23 done?
24   A.   Oh, no.  My -- the only thing that was done was
25 that everyone I complained to, my grades got lower from

Page 44

1  them.
2    Q.   Were -- was your schedule changed to not
3  coincide with the individual?
4    A.   No.  I mean, as it happened -- because when I
5  was on shifts later at the same place, it just so
6  happened that I didn't end up ha -- like, having to work
7  with him much, praise God.  But that was not from any
8  actual administrative function.  That was just the grace
9  of God.
10   Q.   Do you know that for sure?
11   A.   The -- because the VA coordinators would have
12 had to ask me what my schedule was when they were
13 coordinating his schedule.  And no one ever asked me.
14 So unless they had another mechanism to -- to make sure.
15 But, I mean, I think I did deal with him a little bit,
16 like -- but it was not on -- it was on, like, a little
17 bit of the earlier shifts or -- yeah, so I -- I can't be
18 sure.  You know what, I shouldn't say that I'm sure.
19 But it didn't seem -- no one assured me.  If they did
20 something deliberate to protect me, they didn't let me
21 know.  So that I didn't know that I was actually being
22 protected.
23   Q.   Okay.  So you don't know if Dr. Thornton spoke
24 to somebody at the VA, for example, and told them not to
25 schedule you at the same time?

Page 45

1    A.   I don't know that.  I do know he spoke to
2  someone at the VA because later he would tell me that I
3  was a complainer, and I sounded like his ex-wife
4  because -- and that if I stopped complaining so much, I
5  probably could get along with people better.
6    Q.   He said that to you about what?
7    A.   About this.
8    Q.   About this event that you're --
9    A.   Yeah.
10   Q.   -- talking about the -- the -- concerning --
11   A.   He --
12   Q.   -- Syfert --
13   A.   -- (inaudible.)
14   Q.   -- going --
15        THE STENOGRAPHER:  Wait.
16        MR. CHAUNCEY:  I'm sorry.
17 BY MR. CHAUNCEY:
18   Q.   -- concerning Syfert going into the -- the room
19 that you were in?
20   A.   The way I took it was it was less about
21 what -- what -- what Syfert had done and the fact that I
22 was complaining.  He was more upset by the fact that I
23 was saying something than anything that had been done.
24 He didn't ask me any details.  He just said that people
25 would like me more if I stopped complaining so much.

Sarah Diekman
June 17, 2020

Page 46

1    Q.   All right.  Let's -- let's take a step back and
2    let's -- let's talk about just sort of what -- what is a
3    residency program?
4    A.   Okay.  So a residency program is your first job
5    after medical school.  It is the -- the training -- your
6    specialty training.  To become Board certified, each
7    specialty has a certain number of years that are
8    required for you to finish.  To become Board certified,
9    all the states have different requirements as far as a
10   minimal licensing requirement that they've adopted, you
11   know, to their state medical board.  So in the United
12   States, the most lenient states require a minimum of one
13   year of residency training, which is ACGME accredited.
14   So the ACGME is the accrediting body for residency
15   training.
16        But some states, take New York for example,
17   this was part of the reason they were having even some
18   difficulty recruiting, you know, during the recent
19   crisis because they require three years minimum of a
20   residency training to get a state license even if you're
21   not Board certified.  So if you're not Board certified,
22   there's all kinds of -- every state, of course, has its
23   own restrictions, subject to free speech limitations, on
24   how you can describe yourself when advertising for your
25   medical business if you have a -- a medical license and

Page 47

1    are practicing.
2    Q.   What are -- what are the rules in the State of
3    Florida?
4    A.   Florida, I think, is two years.  I'm not sure
5    though.
6    Q.   And so what -- what is the residency selection
7    process like?
8    A.   So the residency selection process is what's
9    known as the match.  It's been compared -- like
10   economists have compared it to -- the closest other
11   system is the sorority/fraternity match system.  And it
12   is unique in that it creates this binding contract that
13   is quite a bit different than -- than normal contact
14   law.  But there's been antitrust challenges to the whole
15   thing, and so far they've held up.
16        So what happens is during the -- the match
17   season, you, as a candidate, fill out the application.
18   You know, you list all your accomplishments, all that
19   stuff.  And then you -- there's a certain number of
20   schools they let you apply to for a given price, 20 --
21   let's just say 20.  I -- I have no idea if that's the
22   actual number.  And then after that, each school you
23   have to pay -- I think you buy them in bundles; you
24   know, you have to pay 70 bucks for the next ten schools
25   and stuff.  So you can send out a lot of applications.

Page 48

1        Then those schools, some of those schools, will
2    send you back an invitation for an interview.  So you go
3    and interview at the schools that have given you an
4    invitation.  And the -- so that's kind of rinse and
5    re -- repeat for the whole match season.
6        Then it's time to make the match list.  And
7    just like the sorority/fraternity process, you rank them
8    and they rank you.  The algorithm is set up to give
9    preference to the upcoming residents.  So they have a
10   little bit more power over the match.  And at the -- and
11   then on match -- well, not on match day.  But before
12   match day, once the lists are submitted, the magic
13   algorithm happens, and you get one university.  You get
14   one choice.
15        And if you don't take that choice, you cannot
16   negotiate, try to get into another school.  You're stuck
17   with the one you -- the one you've got.  I think you can
18   reject it and go through the whole thing the next year.
19   That's extremely rare because of cultural issues with
20   the whole thing.  Yeah, so in general --
21        And -- and so once you've matched at a place,
22   all you can do is hope that the things they told you
23   about their program are true.  They write the contract.
24   You have no ability to change the contract at all.  So
25   it's really a contract of adhesion.  And -- I mean, they

Page 49

1    show you the contract ahead of time, but -- there are so
2    many considerations going on.  I -- I don't think
3    everyone even really understands what all these
4    contracts mean.  But you have no ability to negotiate
5    anything in your contract.
6        So you match somewhere, you sign that contract
7    if you want to practice medicine at all.  And there you
8    go.  You're at that place for the next three to
9    seven years.
10   Q.   And -- and this is part of your education?
11   A.   It's the specialty training, but you're paid to
12   do it.  It's a -- a form of employment.  The
13   residencies, they have unions.  University of Florida's
14   workers are not unionized, but there are multiple
15   residency unions throughout the country.
16   Q.   Did you preference UF?
17   A.   I did.
18   Q.   And it was your top preference?
19   A.   It was, based on what they told me the schedule
20   was and their interest in addictions.
21   Q.   Who did you --
22   A.   I wanted --
23        Oh, sorry.
24        It was important to me to find a school that --
25   I did not want to ask for any disability accommodations.

Sarah Diekman
June 17, 2020

Page 50

1  I did not.  So I wanted to find a place that, with their
2  schedule as it is, I would not have to ask for any
3  accommodations.  And if UF didn't lie about what their
4  schedule actually is, I would not have had to ask for
5  accommodations.
6       Q.   Who did you speak with when you were visiting
7  University of Florida concerning schedules and things
8  like that?
9       A.   Interviewing -- well, certainly Dr. Hobbs.  I
10 think she interviews all her candidates.  Then some of
11 the -- I can't remember the name of the senior resident
12 at the time because they leave as soon as we get there,
13 so we really don't know them.  And then some of the --
14 the junior residents, I think Jordan Brown and -- I'm
15 sorry.  The names are escaping me right now.
16      Q.   No problem.
17           Did --
18      A.   I'm sorry.
19      Q.   Did you visit Gainesville in person?
20      A.   Yes, sir.
21      Q.   Did you like Gainesville?
22      A.   I did.
23      Q.   What did you like about it?
24      A.   It's a college town.  I liked that.  I really
25 liked the Florida Recovery Center.  It seemed really

Page 51

1  focused on -- on treating people, making people better,
2  and -- I mean, the -- the town largely lives around the
3  university, and I like that.  If -- I -- I think
4  universities are wonderful, and it's great if they're
5  the heart blood of the town.  I thought that was
6  exciting.
7       Q.   Did -- did you not like something about
8  Gainesville?  Was there anything that -- going into it
9  that was a negative?
10      A.   You know, I didn't know about how bad the
11 traffic is.  I mean, we -- and we interview in December.
12 So noticing some of the things, like how far away the
13 parking is compared to the heat, those were  thi -- but
14 I didn't know that.   So to say that -- did I know,
15 like, before the interview?  No.
16      Q.   So what --
17      A.   You know, first dates, it's all great in the
18 beginning.
19      Q.   Right.
20           So what was told to you about the schedule that
21 you heard on your visit to UF?
22      A.   Yeah.  So that rotations were regularly eight
23 to five, eight to four, that there was a lot of
24 electives and flexibility.  That I'd definitely be able
25 to work at FRC, and that we -- that the call was

Page 52

1  minimal.  We were able to take vacation time and sick
2  time, and nobody gave you crap, like -- because you're
3  contracted for, you know, a certain number of sick days,
4  certain number of vacation days and -- and that's how it
5  was, and it wasn't a problem.  And I thought, wow, I can
6  work with that; that's great.
7       Q.   What did you do for fun while you were in
8  Gainesville?  Did you go out to Midtown, Downtown?  Did
9  you have hobbies?
10      A.   So, you know, my -- my POTS sometimes can limit
11 me more than my spirit.  What my spirit wants to do and
12 what my heart needs to do are two different things.
13 Occasionally I was well enough to go out, and I loved
14 those times, usually with our colleagues, which is
15 great.
16           On an average weekend, I had a little dog, and
17 I did a lot of gardening with her, music.  But, you
18 know, I really didn't have a lot of free time because,
19 honestly, most of my time was taken up by doing -- I
20 have a -- a -- I have to do physical therapy all of the
21 time to continue to function with POTS.   If -- if I
22 don't do it, then I will become immobilized.  I will
23 become bedridden.
24           So as boring as it sounds, in many ways that --
25 that's hobby number one is the physical therapy, which,

Page 53

1  in large part, is doing Pilates, exercising.  So where
2  someone it might be just regular exercise, for me it's
3  physical therapy, because if I don't do it, catastrophic
4  things will happen to my health.
5       Q.   Have there been times over the past six years
6  that you have been completely immobilized for a period
7  of time?
8       A.   Six years?  I'd have to count.
9           So the time when I was really immobile was when
10 I was 27.  So that, I guess, would be nine years.  That
11 was before it was diagnosed.
12      Q.   Okay.
13      A.   So that was when it got really, really bad.
14 And I finally got a diagnosis.  So since -- and I told
15 my doctor, I am going to be the best patient you ever
16 had.  Like, if I fail the treatment, it's not for the
17 lack of trying.
18           So I do all of the recommendations religiously.
19 And so I was able to get my level of functioning back.
20 So no, I mean, there's times where I've had flares, so
21 it's -- it -- many people are more familiar with
22 muscular sclerosis, which is also an autoimmune -- has
23 autoimmune components, how it can wax and wane.  And
24 there can be times where you can't -- you know, can't
25 tolerate the heat for as long, the extreme fatigue.

Sarah Diekman
June 17, 2020

Page 54

1    So that's why I try everything I can to not
2  upset the POTS so that I don't get into a flare where I
3  really am challenged to -- to function.  I wouldn't
4  describe that as complete immobilization though because
5  I still can get out of bed; I still can make food for
6  myself.  Like, when I was completely immobilized, I -- I
7  was literally crawling to the bathroom and living on
8  Ensure because I could har -- I couldn't get out of my
9  bed, like really.  Even going to the bathroom was a huge
10 challenge.  So when I say immobilize, that's -- that's
11 what I'm describing.
12     Q.   So have there -- there been -- there -- there
13 have been other times where you have been barely
14 functioning though?
15     A.   Yes.  Yes.
16     Q.   What -- what times have you been barely
17 functioning, say, since -- since you started the
18 resident program in July of 2013?
19     A.   So the first year was pretty smooth.  The only
20 thing that ha -- you know, at -- right at the end of
21 that first year was the VA thing where I really felt
22 uncomfortable and I asked for help.  And so other than
23 that, it was totally smooth sailing.  And that -- that
24 was kind of at the end.  It's -- the -- even ta -- you
25 know, what Thornton said to me was more into the second

Page 55

1  year.
2       Also in the second year -- so the first year,
3  the overall synopsis of the first year was good.  My
4  grades -- or the feedback, the scores were good.  I was
5  fine.  My comments were good.  Everything was good.  So
6  in the second year -- and remember, our calendar years
7  start in July.
8       So right before then, I think, sometime in that
9  summer -- though, of course, summer is the worst here in
10 Florida.  And because I can't be in heat for prolonged
11 periods, it affects my heart and I'll go into, like,
12 long runs of tachycardia, I had trouble getting a
13 handicapped parking spot the first year.  They assigned
14 me a spot, but it was further away than the regular
15 parking spots.  You know --
16     Q.   What --
17     A.   -- just --
18     Q.   Okay.  So -- so during this period, just -- and
19 we'll -- we'll get into the some of the -- the parking
20 issues upcoming, but --
21     A.   Oh, okay.
22     Q.   -- was -- was there a time that you were, I
23 mean, basically unable to function well during all that
24 time, during your time at the University of Florida and
25 since?

Page 56

1     A.   Well, because of the parking spot thing, yeah,
2  that really -- that really hurt me.  And then the
3  retaliation from -- you know, because I reported the
4  parking spot thing.  And Dr. Hobbs got really angry that
5  I had done that.  The chiefs got really angry that I had
6  done that.  So they started giving me other people's
7  assignments, other people --
8     Q.   Okay.
9     A.   And so I wasn't able to do my physical therapy
10 and all the things I'm supposed to do, then I did get
11 sick.  Then I really did get sick.
12     Q.   So during that year or -- or how -- how long
13 were you at -- in that state physically?
14     A.   It's hard to say because it's a
15 waxing-and-waning thing, and they never truly relented
16 on me.  It definitely got -- I mean, there was a period
17 of time it got worse, worse; and then it was less bad,
18 but I certainly was not well.  I certainly was not what
19 I was the year before because they continued to put me
20 into situations that they knew would make me sick.  So
21 yes, I kept getting sick.  They knew it would, and it
22 did.
23     Q.   And during that time and -- and, generally, was
24 that the whole year that you were in a place where you
25 could barely function?

Page 57

1       MR. SALZMAN:  I'm going to object to --
2     A.   I --
3       MR. SALZMAN:  -- the the --
4       Go ahead and answer, Sarah.
5     A.   I would ne -- I mean, bare -- I struggle with
6  the word barely.  I certainly was fighting to maintain
7  my functioning.
8     Q.   So how would you describe that?  I mean, were
9  you -- what type of symptoms were you dealing with at
10 that point?
11     A.   So frequent runs of tachycardia.  So once my
12 heart gets going -- so I had a rapid beat.  It can beat
13 at you know, 130 miles an hour, it can stay -- miles an
14 hour -- 130 beats per minute.  I'm sorry.  It can
15 sustain that for 30, 40 minutes, which is extremely hard
16 when you're at work, you come to work, so while you're
17 -- because your heart beating like that -- I mean, you
18 never can be sure that it isn't going to lead to a heart
19 attack, that it isn't going to lead to heart failure, it
20 isn't going to -- so while you're maintaining that
21 heartbeat, you're sweaty, your hands are shaking.  Your
22 body is in a cholinergic overdrive.  It's devoting a
23 bunch of resources to that heart rate.  So and what --
24 this was caused -- I mean, the main times this was
25 happening at UF was because of the parking spot.

Sarah Diekman
June 17, 2020

Page 58

1   That's why I bring up the parking spots because this was
2   a direct result of not -- so I'd walk in, and then it
3   would take me an hour to catch my breath because I'm
4   going into these tachycardic runs.
5       Q.   Could you have --
6       A.   And --
7       Q.   Could you have taken a bus, or a Gator Lift, or
8   something that could have taken you from your parking
9   spot to work?
10      A.   No, not that I'm aware of.
11          And I -- and I was talking to -- when I talked
12  to -- so months later, the disability office, they did
13  have a solution.  I mean, they -- they had a solution.
14  But I had to deal with this all summer because Dr. Hobbs
15  told me to not go to any outsiders, that, you know, she
16  is in charge of the residency, and anything that happens
17  with residents is for her and --
18      Q.   Do you have any -- do you have any e-mails or
19  any evidence of that?
20      A.   Of -- I don't think so, not of that one.
21  But -- only when we had the ACGME, but that was a
22  separate thing where -- not talking to residents.
23          So there -- there absolutely was a solution.  I
24  was just not allowed to access it.
25      Q.   Are there any other times that you have been in

Page 59

1   that similar state physically since the point that you
2   were at the University of Florida?
3       A.   Like with the pretty significant POTS flare?
4       Q.   Yeah, where you -- where you were -- you were
5   saying barely functioning.
6       A.   Well, that -- I mean, I continued to be pretty
7   sick for the remainder of my time there.  But it wasn't
8   by accident.  I mean, every time I would go to Dr. Hobbs
9   or any of the people on my rotations, Dr. Ginory,
10  Dr. Fayad, the chief residents, they would tell me to
11  quit complaining and actually give me more work to do
12  and more of the situation if --
13          So it -- it really was a difficult situation
14  because I didn't want to ask for something because I
15  knew I would get more of it.  If I said I can't go on
16  the burn unit, it gives me tachycardia, then I got
17  all -- then I had to go on the burn unit -- then --
18  more.
19      Q.   So during -- so during your --
20      A.   (Inaudible.)
21          THE STENOGRAPHER:  I'm sorry?
22  BY MR. CHAUNCEY:
23      Q.   During your second and third year at UF, you
24  described that as you were barely functioning
25  physically?

Page 60

1           MR. SALZMAN:  Object to the form.
2       You can answer.
3       A.   I was having a great deal of difficulty
4   functioning physically.
5   BY MR. CHAUNCEY:
6       Q.   Okay.
7       A.   There were days -- I mean, if -- if there
8   were -- I would call off sick if I was -- I -- I think a
9   day that I would describe as barely functioning
10  physically would be a day I think I'd call off sick for
11  because, I mean, you always have to consider patient
12  danger.
13          And that was another thing that Dr. Hobbs told
14  us she punished us for.  She did send out e-mails about
15  that, about how you better be sick enough to call off
16  sick or she would put professionalism letters in your
17  file.  The chief resident wrote letters about that, too,
18  that if you're sick, you will have to make up sick days
19  with twice as much call.
20      Q.   So since you left the University of Florida,
21  have you had similar levels of POTS at any point?
22      A.   I mean, I had a little time of recovery, you
23  know, in the proceeding -- and I had postconcussive
24  syndrome because the end of my University of Florida was
25  me getting a concussion and --

Page 61

1       Q.   How did that happen?
2       A.   I was -- I was in a hot room and I syncopized.
3   And I had a head strike on the floor, so --
4       Q.   Did -- did -- so you just fell, or did somebody
5   hit you or --
6       A.   No, no one hit me.
7       Q.   Okay.  So -- so tell me a little bit, then,
8   about how many residents were in your co -- your cohort
9   or your starting group there when you started at UF?
10      A.   I believe it was eight.  I wouldn't bet my life
11  on that.  I think it was eight.
12      Q.   Was it a pretty diverse group, or how would you
13  describe it?
14      A.   Three of the residents were graduates of
15  univers -- I think three were University of Florida
16  graduates, and other people came from Tennessee, and
17  Arkansas, me from Indiana.  I think Emory in Georgia.
18  So I guess kind of a Midwestern, Southern group.  And, I
19  mean, a little diverse.
20      Q.   Were they racially diverse?
21      A.   I don't know if the racial breakdown would have
22  reflected the population that we cared for, but it
23  certainly wasn't an inexorable zero situation.  I mean,
24  we did have some people of different racial backgrounds.
25      Q.   How many -- do you recall how many female

Sarah Diekman
June 17, 2020

Page 62

1   versus male residents were in your cohort?
2       A.   So I think it was five to three; five females,
3   three male.
4       Q.   Okay.  Did you get along with the -- the other
5   residents?
6       A.   At -- at least -- yeah, in the start.  I mean,
7   it made it hard after a while because, you know, the
8   chief residents would eventually start actually telling
9   people things about me, both the other residents and
10  supervisors, telling them that I was lying about my
11  disability, that I'm just lazy, I'm trying to get out of
12  work.
13      Q.   Did you have --
14      A.   I'm (inaudible) --
15      Q.   -- any --
16      A.   (Inaudible.)
17      Q.   Did you have --
18           THE STENOGRAPHER:  Wait.
19  BY MR. CHAUNCEY:
20      Q.   -- (inaudible) --
21           THE STENOGRAPHER:  I didn't hear the end of
22  your answer.
23  BY MR. CHAUNCEY:
24      Q.   Did you have any close friends in the residency
25  program?

Page 63

1       A.   I had some friends, yeah.
2       Q.   Who were your close friends, that you would
3   consider a close friend in the residency program?
4       A.   Krista Pinard and Dan Whitten -- Whitter.
5       Q.   And were you expecting the residency program to
6   be difficult?
7       A.   Oh, I think all residency programs are
8   difficult.
9       Q.   What skills are you expected to have when you
10  enter a residency program?
11      A.   So, you know, general medical skills, taking a
12  history and physical exam on a patient.  There are --
13  there are national exams that test these.  And then the
14  residency also tests us for them upon entrance so that,
15  you know, if you have a problem with it, then they can
16  make a remedial program.
17      Q.   And what skills -- what skills would you
18  consider most important, then, entering into a residency
19  program?
20      A.   You know, I -- I feel like my judgment here
21  probably isn't as important as, I mean, truly a program
22  director's.  I'm -- I'm sure --
23      Q.   Well, in your opin -- in your opinion, I mean,
24  is -- what -- what skills were most important to have
25  entering into the residency program?

Page 64

1       A.   Well, we are left alone with patients at night,
2   so to be able to triage and assess when patients really
3   are in danger, and to be able to do a physical exam and
4   translate that -- that message to someone who's not
5   onsite.
6            I mean, attending always -- they can come in.
7   They're always free to drive in and see the patients
8   themselves, but they would prefer not to.  So they would
9   prefer to be able to trust your description of the
10  situation, even if they don't agree with maybe the
11  diagnosis or the treatment.  If you can adequately
12  describe the situation, they can change the -- the
13  treatment plan without having to come in.
14      Q.   All right.
15      A.   And then you have to be able to execute that
16  treatment plan.  If they don't thi -- if you're not
17  executing the treatment plan, then, again, they -- they
18  have to come in and do it themselves.
19      Q.   And why do they prefer not to do it themselves?
20      A.   I can't speak for everyone's motives, but I
21  think most people would rather be at home than be at
22  work.
23      Q.   Okay.  So let's mark this one.  I'm going to
24  pull up another exhibit.
25           MR. CHAUNCEY:  Let's mark this as the

Page 65

1   defendant's Exhibit 2.
2            (Exhibit 2 was marked for identification.)
3   BY MR. CHAUNCEY:
4       Q.   Hopefully --
5       A.   Do you --
6       Q.   -- this will pop -- pop up.
7       A.   Do you mind if I take a quick break?
8            MR. CHAUNCEY:  Yeah, we can take a --
9            THE WITNESS:  Bathroom --
10           MR. CHAUNCEY:  -- five-min --
11           THE WITNESS:  -- break?
12           MR. CHAUNCEY:  -- five-minute break.
13           THE WITNESS:  Yes.
14           MR. CHAUNCEY:  Okay.  That's fine.  We'll
15  take a five-minute break.
16           THE WITNESS:  Thank you.
17           MR. CHAUNCEY:  Okay.
18           THE VIDEOGRAPHER:  Going off the record.  The
19  time is 11:36 a.m.
20           (A recess was taken from 11:36 a.m. to 11:44
21  a.m.)
22           THE VIDEOGRAPHER:  We are back on the record.
23  The time is 11:44 a.m.
24  BY MR. CHAUNCEY:
25      Q.   All right.  Dr. Diekman, so I'm going to show

Sarah Diekman
June 17, 2020

Page 66

1  you -- can you see what's on my screen right now?
2      A.  Yes, sir.
3      Q.  All right.  So I know we're kind of limited by
4  the technology, but have you ever seen this before?
5      A.  Yes, sir.
6      Q.  Can you tell me what it is.
7      A.  This is the policies manual.
8      Q.  Okay.  Policies manual for what?
9      A.  University of Florida.
10     Q.  All right.
11     A.  The department of psychiatry.
12     Q.  All right.  And is this something that you
13  would read at one point or another or look through while
14  you were a resident?
15     A.  Yes.
16     Q.  And for this one, at least, what I'm pulling up
17  is from the year 2015, 2016.  Were you a -- a resident
18  during the year 2015, 2016?
19     A.  Yes.  Yes.
20     Q.  And would you have had to sign that you
21  received sort of the -- the documents within this and
22  the -- for the -- for the entire GME for the college
23  of -- of medicine?
24     A.  No.  I -- I -- I don't recall, other than when
25  we first -- maybe during our orientation we signed a lot

Page 67

1  of stuff.  I don't --
2      Q.  Okay.
3      A.  -- recall signing another one the second year.
4      Q.  Okay.  You would have signed one just the first
5  year you think?
6      A.  Yeah.  But, see, it's weird because that date
7  says 2013, and the policy manual says 20 -- the date of
8  my signature says 2013, and that policy manual says '15,
9  '16.
10     Q.  Right.  We have the policy manuals for '13,
11  '14, '15 into '16.
12     A.  Okay.
13     Q.  So you would have read, though, at one point,
14  the policies during your first year and at least signed
15  signifying that you had read those policies?
16     A.  That would make sense.  I mean, so we were
17  pretty much -- it's pretty much one of these things that
18  you -- you sign or you don't work, even though many of
19  the policies that are in those manuals aren't followed
20  by the faculty.  It's kind of a -- a pick-and-choose
21  book.  Even if you look at the 2013 one, they're
22  describing faculty who is the faculty on the consult
23  service, and those faculty weren't even there anymore.
24  They're saying they're Board certified in somatic
25  medicine.

Page 68

1      Q.  All right.
2      A.  No, they're not.  They just weren't.  So there
3  was a lot of inaccuracies.
4      Q.  Okay.
5      A.  In the --
6      Q.  Dr. Diekman, let me -- let me point you to the
7  mission statement here.  The mission statement says that
8  the purpose of the department of psychiatry residential
9  training program at the University of Florida is to
10  provide an educational and scholarly envir --
11  environment that will train qualified and competent
12  individuals in the field of psychiatry and enable them
13  to become certified by the American Board of Psychiatry
14  and Neurology.
15         So is -- is -- was -- is sort of the goal to be
16  able to go through this educational program.  And then
17  is there a board or some sort of test that you have to
18  take at the end?
19     A.  Well, this is -- it's not a pure educational
20  program.  I mean, they are billing us -- or they're --
21  sorry.  We are getting paid.  It's more like a -- their
22  residency model is built off of an apprenticeship model.
23     Q.  Right.
24         But do --
25     A.  The --

Page 69

1      Q.  -- do --
2      A.  -- origin.
3      Q.  Do you take a -- do you take a board or
4  something at the end of your program --
5      A.  Yes, sir.
6      Q.  -- to then become certified?
7      A.  Yes, sir.
8      Q.  Okay.  So -- so it's a educational program that
9  you're also in a -- sort of an apprentice; is that what
10  you were saying?
11     A.  Right.  It really is an -- an apprenticeship
12  model.  The -- the origins of it were very
13  apprenticeship origins.  Now we have some more national
14  organizations that set up standards and police things --
15     Q.  Right.
16     A.  -- nationally.
17     Q.  It's similar to a clinic that you --
18     A.  We get a --
19     Q.  -- (inaudible) --
20     A.  -- (inaudible.)
21         THE STENOGRAPHER:  Wait.  Wait.  Wait.  Wait.
22     I'm sorry.  One at a time, please.
23  BY MR. CHAUNCEY:
24     Q.  It's similar to a clinic that you would have
25  done in law school?

Sarah Diekman
June 17, 2020

Page 70

1          MR. SALZMAN:  Object to --
2     A.   I'm --
3          MR. SALZMAN:  -- the form.
4     A.   -- I'm --
5          MR. SALZMAN:  Go ahead and answer.
6     A.   Yeah, depending.  I mean, some of those clinics
7  are for educational credits.  More like a fellowship.  I
8  mean, you know, there's -- you can do a -- a fellowship
9  with the Southern Law -- Southern Poverty Defense Fund.
10  Like they ha -- ACLU has fellowships, more like one of
11  those where you are actually functioning in the role,
12  but the expectation is that the role will give you a lot
13  more training than a normal first-year spot.
14  BY MR. CHAUNCEY:
15     Q.   Okay.  So this describes it as -- if you look
16  right here, at the very top, it says, a graduate medical
17  education is based on the principle of progressively
18  increasing levels of responsibility in caring for
19  patients under the supervision of the faculty.
20          I mean, do you -- do you agree that that's sort
21  of what we're talking about is -- is that they're
22  teaching you, and then you're getting more independent?
23  I mean, ha -- would you agree with that?
24     A.   Yeah.  I think that's fair, yeah.
25     Q.   And so your -- your -- are you getting more

Page 71

1  independence as you go in the program?
2     A.   That is, in theory, how it's -- how it's set
3  up.
4     Q.   So it says here that the faculty members
5  closely monitor the progress of each resident in
6  acquiring the skills necessary for advancement to the
7  next level of training.  And then in their evaluation of
8  a resident's progress, faculty members consider such
9  factors as clinical experience, fund of knowledge,
10  diagnostic abilities, clinical judgment, interpersonal
11  communication skills, professionalism, and the
12  application of various treatment modalities.
13          Does -- does -- does that statement reflect
14  your experience of what the faculty were looking for
15  in -- in the program?
16     A.   It reflects what they say they did.  But I
17  think, you know, to get the full picture of what was
18  happening was the class that came in after mine had   a
19  -- they actually -- I mean, we had concerns that we
20  weren't getting enough supervision, but we didn't --
21  we -- we just simply accepted that was the way it was.
22          But the class after us complained that -- when
23  you read this, this makes you believe that you will
24  actually have access to the attending physician, that
25  the attending physician will actually be seeing patients

Page 72

1  with you, they will be available for emergencies, and --
2          For instance, at one of the hospitals, the
3  Shands Vista hospital, the attendings would come see
4  patients in the morning, and then there was no one there
5  for the rest of the day, so -- for emergencies, for
6  anything.  And this is a very little level of
7  supervision to -- because if you look at -- it should be
8  in here, this book, and then it should also be in the
9  ACGME definitions of supervision.
10          You have direct and indirect supervision.  So
11  when you're describing in words that they will get --
12  where -- wherever you just re -- read me that they will
13  get, you know, close supervision, that's a direct
14  supervision.  And that's defined as the attending
15  actually being in the room with you, not on the phone.
16  The phone is indirect supervision.
17     Q.   So apart --
18     A.   And --
19     Q.   -- from --
20     A.   -- that's what was happening.
21     Q.   A -- apart from some definitions that you're
22  referring to, did -- did -- I mean, was there more
23  supervision in your first year than, say, in your second
24  year?
25     A.   Well, because we really got a lot of indirect

Page 73

1  supervision from the start, we started off with -- with
2  a -- very little supervision.  After the -- the second
3  year -- or, sorry, the first year's complaints, when
4  I -- during the time period that I was in my second
5  year, then they did change the schedule so that there
6  would be an attending onsite for the whole day.  So then
7  there was more supervision, direct supervision.  But by
8  that time I was a second year.
9     Q.   Okay.  And can you explain a little bit about
10  the difference between -- it says in -- if you can see
11  my mouse, it says a -- a rotating internship in
12  psychiatry and then neurology rotations.  Can you tell
13  me the difference between what -- what a -- a neurology
14  rotation would be in comparison to a psychiatry rotation
15  there.
16     A.   So psychiatry -- since I was in a psychiatry
17  program, that would be hosted by my home in -- my home
18  program.
19     Q.   Okay.
20     A.   Neurology is a separate department.  We're
21  required to do neurology rotations, but we are -- what's
22  the word -- like a visiting resident there.  We're off
23  service.  So that -- it -- it's not -- it's not really
24  under a -- their leadership is kind of separate.  We're
25  really visitors on that rotation.

Sarah Diekman
June 17, 2020

Page 74

1   Q.   Okay.  So but in that, it says here that after
2   completing your neurology rotations, residents are
3   expected to be able to perform a complete neurological
4   exam, generate a differential diagnosis.
5        Is -- so were you put into a situation where
6   you had to go through a neuro -- neurology rotation to
7   be able to meet these goals here?
8   A.   Yes.
9   Q.   Okay.  And tell me a little bit about -- so
10  what's the difference between an inpatient and
11  outpatient psychiatry service?
12  A.   So inpatient are patients that are in a closed
13  unit.  So you -- you can't just freely come and go.  And
14  they're under a much more direct medical care.  So even
15  if they're not talking to the psychiatrists at any given
16  moment, they're taken care of by many faculty staff
17  members.  There are psychiatry techs on the unit.  There
18  are psychiatry nurses.  There are physical therapists,
19  psychologists.  So they're receiving a multitude of
20  therapies in a short period of time.
21  Q.   Right.
22  A.   In outpatient, you -- this is what most us are
23  familiar with.  When you go see your doctor, you
24  schedule your appointment.  You go to their office for a
25  certain amount of time, usually longer visits for

Page 75

1   psychiatry.  You -- you see them, and if any medications
2   need to be adjusted, then you adjust them.
3   Q.   Okay.  It says here, it says, through their
4   experiences in primary care, residents sharpen their
5   skills in performing a history and physical, generating
6   a differential diagnosis, and ordering and conducting
7   appropriate tests, analyzing test results, conducting
8   emergency assessments and considering interventions.
9        I -- I mean, did you believe that it's
10  important to gain the experience to, as it says here,
11  sharpen your skills to be effective in -- in the
12  residency?
13  A.   Yeah.  Absolutely.
14  Q.   And what's didactic teaching?  It mentions that
15  down here.  Can you -- can you explain that to me.
16  A.   So didactic is teaching that is the kind of
17  teaching we would think, you know.  When you think of
18  formal teaching, and if you say teaching, in most
19  people's minds, this is what would come to mind, where
20  someone stands in front of the room, chooses the topic.
21  So, you know, say this -- you know, X disorder, and
22  let's run down the latest guidelines on X disorder; how
23  is it presented; how do we take care of it.  And so it's
24  traditional teaching --
25  Q.   Would you --

Page 76

1   A.   -- instead of --
2   Q.   -- describe it as a lecture?
3   A.   Yeah.  Yeah.
4   Q.   Okay.  And so how -- how often were you
5   expected to go through didactic teaching?
6   A.   Well, my schedule was different beca -- at
7   least in the third year because Dr. Hobbs didn't want me
8   to go to the didactics anymore.
9   Q.   What about in your first year?
10  A.   In the first year, we were doing -- I think
11  that was when we were on the noontime didactics.
12  Q.   And what -- and --
13  A.   I would -- I would have to refer back to the
14  schedule.
15  Q.   Okay.  Did they provide you a schedule at the
16  beginning of the residency, in -- say in this program or
17  other documents?
18  A.   I think there might have been a syllabus, but
19  as far as what would happen week to week in a structured
20  curriculum, I don't recall that.
21  Q.   Okay.  It says in here -- let's see.  Down here
22  it says, residents must demonstrate good clinical
23  judgment in their assessment of crisis and understand
24  when to ask for help.
25       Is this -- is that an important aspect to -- to

Page 77

1   being a successful resident?
2   A.   Yes.
3   Q.   All right.  The next page it talks about here
4   that there were some supervisory requirements for
5   residents that were put into place in 2011 through the
6   ACGME.  It says -- first one here is that there's --
7   A.   I'm sorry to interrupt.  Can you move it down
8   just a little bit for me, please.
9   Q.   Down or up?
10  A.   The way you're going.  Perfect.
11  Q.   Yeah.  Right --
12  A.   Thank you.
13  Q.   -- here.
14  A.   Perfect.
15  Q.   Can you see that better?
16  A.   Yes.  Thank you.
17  Q.   All right.  It says here that there are several
18  competencies.  The ability and willingness to ask for
19  help when indicated.  Is -- is that a competency that
20  you think is important to a residency program?
21  A.   Yes.  And you'll see there that they mention
22  direct supervision.  So if an attending leaves -- if an
23  attending leaves the site and then is supervising a
24  resident by phone or some other remote communication,
25  they are engaging in indirect supervision.

Sarah Diekman
June 17, 2020

Page 78

1    Q.   All right.
2    A.   So they --
3    Q.   So -- so --
4    A.   -- are, through their actions, saying that the
5  resident has achieved these things.
6    Q.   Okay.  So for year one now, you want to be able
7  to have these four competencies.  So gathering an
8  appropriate history is -- would you consider that a
9  necessary piece to being successful in the residency
10  program?
11    A.   Yes.
12    Q.   What about the ability to perform an -- an
13  emergent psychiatric assessment, is -- is that also
14  something that would be necessary to being successful in
15  the residency program?
16    A.   Yes, sir.
17    Q.   And four there, it says, presenting patient
18  findings and data accurately to a supervisor who has not
19  seen the patient.  Is that also something that you need
20  to be able to be successful in -- in the residency
21  program?
22    A.   Yes, sir.
23    Q.   So to complete your first year, this PGY1,
24  would you need to be able to demonstrate all these
25  things to be able to move forward in the residency

Page 79

1  program?
2    A.   That's how I read it.  But this is more
3  specific towards the indirect and direct supervision.
4  So they're saying that you can't -- you can't move from
5  direct to indirect supervision without tho -- without
6  having been competent at those things.
7    Q.   All right.  So to --
8    A.   So --
9    Q.   -- to be able to move from -- from less -- from
10  I guess more supervision to less supervision, more
11  independence, you need to be able to do those things?
12  Was -- is that an accurate --
13    A.   Yes, sir.
14    Q.   -- representation?  Okay.
15    A.   That's why I bring up the significance that for
16  most of the time they were supervising me via phone.
17    Q.   So PGY2, is -- does that just represent the
18  second year of the residency program?
19    A.   Yes, sir.
20    Q.   It says here that -- that individuals in the
21  second year of the training are expected to perform the
22  duties learned in the first year more independently,
23  that's sort of what we were just talking about, and may
24  supervise the routine activities of medical students.
25         Did you -- did you ever supervise any medical

Page 80

1  students?
2    A.   Yes, sir, quite -- quite a lot.
3    Q.   So did you get more independent, as this talks
4  about, from your first year to your second year from any
5  supervisors?
6    A.   We had a lot of independence in our first year,
7  so I would say the margin was small because --
8    Q.   Be -- be --
9    A.   -- we already were doing a lot of on-phone
10  supervision from the beginning.
11    Q.   Right.
12         But did you get more independence in your
13  second year than your first year?
14    A.   Some.
15    Q.   Okay.  It says here, again, it says that
16  second-year trainings are afforded greater autonomy in
17  their assessment and treatment of pat -- patients.  Was
18  that -- was that your experience in your second year,
19  that you had a little more autonomy?
20    A.   Yeah.  I mean, there were some teams that I
21  would see all the patients all morning.  The attending
22  would never come in, and I'd just run the whole list
23  with him on the phone.  And he would -- he would take my
24  total assessment for it, my treatment plans, so --
25    Q.   All right.

Page 81

1    A.   -- I believe that's what they're talking about
2  there.  I mean, they're not looking at the patients.
3  They're not telling you how to treat the patients.
4  They're just agreeing with what you did.
5    Q.   Right.
6         So this -- do you see what I have highlighted
7  here?
8    A.   Yeah.
9    Q.   Okay.  It says, upon completion of the second
10  year, residents should have a mastery of the basics of
11  both -- of patient care in both the inpatient and
12  outpatient settings.
13         You had been -- been talking to me about what
14  those two things are, the inpatient and outpatient
15  settings.  Is -- is this -- I mean, do you agree with
16  that, that -- to be able to be successful by the end of
17  your first -- or the end of your second year that you
18  need to be able to have mastery in -- in the basics in
19  both the inpatient and outpatient settings?
20    A.   Maybe the basics of the outpatient, but it --
21  it was a struggle to -- because the only -- Dr. Hobbs'
22  response to my request for accommodations was to take me
23  off the schedule for a month.  Then I lost a lot of
24  clinic time.  I -- I didn't want to come off the
25  schedule.  I just wanted a modified schedule.

Sarah Diekman
June 17, 2020

Page 82

1    Q.   So --
2    A.   So I lost some clinic time.  And then it -- it
3    led to a lot of cancellations and just really gave me an
4    entirely different clinic experience.  So I guess it
5    depends on what you consider basic.
6    Q.   All right.  So your -- so but to --
7    A.   Yeah.
8    Q.   -- to show mastery of the inpatient, outpatient
9    basics, that's -- that's something that the -- the
10   faculty is going to assess; is that accurate?
11   A.   Yes.  And --
12   Q.   Okay.
13   A.   -- they assess it for everybody.  So, I mean, I
14   think the only way you can be objective about it is to
15   compare, you know, one person's -- like, if you look at
16   objective measures of one person or another; otherwise,
17   they can say whatever they want.
18   Q.   All right.  This says -- here it says that
19   residents should demonstrate continued sophistication
20   and acquisition of knowledge and skills as well as
21   further ability to function independently.
22         So I -- I mean, are you supposed to be building
23   upon the experience, and the knowledge, and the skills
24   year after year as you work your way through the
25   program?

Page 83

1    A.   Yes, sir.
2    Q.   And would you describe the third year as
3    supposedly being more independent than the second year?
4    A.   Well, my third year was completely different
5    than everyone else's.  Where everyone else receives
6    additional training, they se -- receive a week-long
7    training and go to clinic, then they receive hour-long
8    supervision, and educational lectures, -- and
9    psychotherapy, Dr. Hobbs said I was not allowed to do
10   any of those things.
11   Q.   Do you -- do you believe --
12   A.   Yeah.
13   Q.   -- so do you believe that you had -- because
14   you're -- you're just talking being about how the -- the
15   second year and the third year you were -- where you
16   were restricted a little bit in some of those things
17   that you just mentioned.
18   A.   Uh-huh.
19   Q.   Do you believe that you had mastery in the
20   outpatient and inpatient aspects of things that -- that
21   we just talked about after your second year?
22   A.   Well, the second year I don't -- I struggle
23   with the word mastery.  The second year is suppose to be
24   an introduction.  You only see patients in the clinic
25   for a half a day per week.  In the third year is where

Page 84

1    you gain your mastery because you see clinic patients
2    100 percent of the time for a full year.
3    Q.   Okay.
4    A.   So you gain your mastery in the third year.
5    The -- the second year is -- is an introduction to the
6    clinic.
7    Q.   The --
8    A.   And the third year is also accompanied by the
9    educational support, the didactic support to make you
10   good in outpatient.  Because prior to that, you're
11   really only getting inpatient didactics.
12   Q.   So -- so really the goal of your second year is
13   to get mastery of the basics of the inpatient and
14   outpatient services?
15   A.   Yeah.  Well, you've done a lot more inpatient,
16   so you should be better at the inpatient stuff.  But
17   you've just been introduced to the outpatient stuff, so
18   very (inaudible) there.
19   Q.   Do you believe that you had mastery --
20         THE STENOGRAPHER:  I'm sorry.  I didn't hear
21   the end -- the end of your answer broke up.
22         THE WITNESS:  Oh, so very basic there.
23         THE STENOGRAPHER:  Thank you.
24   BY MR. CHAUNCEY:
25   Q.   Do you believe that you had mastery of the

Page 85

1    basics of the inpatient and outpatient services at the
2    end of your second year?
3    A.   I mean, mastery is such a -- I like to hold
4    myself to a level that we always can improve.  But was I
5    performing at the level of my colleagues?  Yes.
6    Q.   Okay.  So at the end of the third year, the
7    goal is -- says here is at the completion of the third
8    year, residents should be prepared to assume the role of
9    clinical chief or -- on selected services.
10         So you -- so by the end of the third year, you
11   should be able to be the chief of the residents; is that
12   what that's saying?
13   A.   Not everybody becomes a chief.
14   Q.   Should you be able to do it if you were called
15   upon?  Is that kind of the goal?
16   A.   Yeah, I guess that would be a -- an admirable
17   goal.
18   Q.   Okay.  And who were the chiefs your first year
19   while you were at UF?
20   A.   So Ana Turner.
21   Q.   And Ana is a male or female?
22   A.   A female.
23   Q.   Okay.  Is there anybody else that first year
24   who was a chief?
25   A.   There was, but I'm struggling with the name.  I

Sarah Diekman
June 17, 2020

Page 86

1  think it was Heraz (phonetic).
2      Q.  And that second person you're thinking about,
3  was -- was that person a male or female?
4      A.  A male.
5      Q.  Okay.  And then second year, who were the
6  chiefs?
7      A.  San Chang.
8      Q.  Okay.
9      A.  And Adrienne Eisner.
10     Q.  Okay.  And San Chang, was he a -- was -- was
11  that person a male or female?
12     A.  Male.
13     Q.  And Adrienne Eisner, male or female?
14     A.  Female.
15     Q.  Okay.  Third year, who were your chiefs?
16     A.  Jordan Brown and Mark Ettensohn.
17     Q.  Jordan Brown a male or female?
18     A.  Male.
19         There were also clinic chiefs, but I'm not
20  exactly sure who they were.  I'd have to --
21     Q.  Okay.
22     A.  -- double-check.  So there's two more chiefs
23  for each year.  But since I was not on the main clinic,
24  all the -- you know, so I only ever had a one day -- one
25  half-day clinic, I really didn't interact with them so

Page 87

1  I -- and -- I mean, I knew -- knew them at the time, but
2  this is four years ago.
3      Q.  Right.
4         So this is a -- this is a block schedule
5  diagram.  Would this have been sort of a -- a general
6  schedule of your rotations; is that what this is?  Can
7  you explain what -- what we're looking at.
8      A.  Okay.  Can you lower it a little bit, please.
9  Yeah.  Okay.
10         Sorry.  I can't quite see year one.  If you
11  could just lower --
12     Q.  Yeah, I'll -- I'll zoom into year one then for
13  a second and zoom back out.  Can you see that?
14     A.  Yes.
15     Q.  So -- so can you tell me when -- when it says
16  institution, are there different institutions that --
17  that you would go to?
18     A.  Yeah.  I think maybe what they mean by
19  institution is Shands or the VA.  I think it looks like
20  Shands is one and the VA is two since neuro and internal
21  medicine are labeled as two's, and the VA is where those
22  happen.
23     Q.  Let's see.  There -- there is -- see
24  institutions.  All right.  So there's Shands Hospital at
25  the University of Florida, and then North Florida/South

Page 88

1  Florida (sic) Veterans Health System.  Is that --
2      A.  Yeah.
3      Q.  It says -- would the ins -- so is institution
4  site two, that's, like -- that's the VA; is that right?
5      A.  Yeah.
6      Q.  Okay.  So you're kind of rotating between those
7  for your different blocks that it talks about up here?
8      A.  Yes, but -- elective one through six.  Jerry --
9  I don't see where forensics is on here.
10     Q.  All right.  You're -- you're mentioning --
11     A.  (Inaudible.)
12     Q.  You're mentioning?
13         THE STENOGRAPHER:  I'm sorry?
14         MR. CHAUNCEY:  I'm sorry.
15         THE WITNESS:  Just lots of other rotations
16     that people went on that are not included in this
17     schedule.
18  BY MR. CHAUNCEY:
19     Q.  Okay.  You were mentioning that there's very
20  little outpatient in your second year.  And -- and your
21  third year there's a lot more outpatient.  Is -- is that
22  reflected here on this chart?
23     A.  Yes, sir, that is reflected there.
24     Q.  Okay.  So it's just a little bit of outpatient
25  there that -- are they trying to just expose you to

Page 89

1  outpatient in your second year?  Okay.
2         THE STENOGRAPHER:  I'm sorry.  I didn't hear
3     an answer.
4         THE WITNESS:  Yes.
5         THE STENOGRAPHER:  Thank you.
6  BY MR. CHAUNCEY:
7      Q.  Take you to another page here.  Actually, let
8  me ask you.  So go all the way back up.  So would there
9  be different rotations that would be described say --
10  and let's just pull up one that you might have some
11  experience with.  Says neurology, two months PGY1 year.
12  Did you do neurology for two months when you were a
13  PGY1?
14     A.  I think did I one month as a -- as a one and
15  one month as a two.
16     Q.  Okay.  And did you ever look at a document like
17  this that sort of shows what you're -- where you're
18  supposed to be at, I guess, what you're supposed to know
19  similar to what is provided in -- in this document?
20     A.  Yes, I -- I -- are you saying have I, like,
21  looked -- they usually give you some expectations and
22  et cetera of the rotation.
23     Q.  So it says here, it says, like, medical
24  knowledge, know the signs, symptoms, other
25  manifestations.  Are these goals that you should --

Sarah Diekman
June 17, 2020

Page 90

1    or -- or sort of different, I guess -- I don't know,
2    sort of the level that you should be at by the time you
3    leave that -- that rotation?
4        A.   I think that's fair, yeah.  That's how I
5    understand it.
6        Q.   Before every single rotation, you would be able
7    to see what you're supposed to know by the end of the --
8    the rotation?
9        A.   Yes.
10       Q.   Okay.
11       A.   But, like, some of these, I mean -- yes, I --
12   sometimes the -- book doesn't get as updated.  And,
13   you know --
14       Q.   Okay.
15       A.   -- we're looking at the -- I guess the 2015,
16   '16 version.  So you do your best to read the manual.
17       Q.   Right.
18       A.   Because, you know, some things become
19   inaccurate.  So you try to --
20       Q.   So it talks about here this -- it talks about
21   professionalism.  It says that all residents are
22   expected to comply with the standards of professional
23   conduct established by the hospital.
24            What hospital is it referring to; do you know?
25       A.   I -- well, I think we're always required to

Page 91

1    conform to UF standard because when we're at the VA we
2    are visitors from UF.  And I think when we're at the VA
3    we have to conform to both hospital standards, the VA
4    and the University of Florida.
5        Q.   Can you describe what those standards of
6    professional conduct are for, I guess, both hospitals?
7        A.   The general -- you know, pro -- professionally
8    executing your duties, caring for your patients,
9    advocating for your patients, communication with your
10   colleagues and other teams, presenting yourself in a --
11   you know a clean, tidy fashion, and making sure your --
12   your patient receives appropriate medical care.
13       Q.   All right.  Talks about here communication,
14   distribution of mail, e-mails, pagers.  It says that all
15   residents and fellows in the department of psychiatry
16   are issued a beeper at the beginning of their residency
17   fellowship.  Can you explain what that beeper is used
18   for.
19       A.   We get paged.  That's the main way to
20   communicate with residents.
21       Q.   Okay.  It says --
22       A.   I mean, our own people would probably call the
23   cell phone, for someone from our own department.  But
24   when they list how to get a communication from a consult
25   team, they'll put your pager number up there because the

Page 92

1    pagers tend to work better, even if you -- there's parts
2    of the hospital that get horrible cell service, if none.
3    You know, you've got firewalls there, underground,
4    heavy, heavy walls.  So cell service can be quite
5    spotty.  And the pagers tend to do a little bit better.
6        Q.   Right.
7            And it says here that the resident is
8    responsible for ensuring that the beeper is functional,
9    and has a charged battery, and is on during duty hours.
10   Is -- is -- was that your understanding at that point
11   when you were at the University of Florida?
12       A.   Yeah.  I mean, the challenge is, is that you
13   can test the pager and it'll beep and look like it's
14   testing, but then sometimes they drop pages.  And then
15   all you can do is you've got to call and try and get it
16   replaced.  But, like, they had a problem on the Shands
17   consult service, I wasn't on there, I had nothing to do
18   with it where it kept dropping calls.  And Krista Pinard
19   had to -- eventually the attendings started carrying the
20   pager because they were -- the pages weren't coming
21   through.  And then after that they decided to take it
22   and just swap it out for a new one because looking at
23   it, there was nothing you could find that was wrong.
24   You would test it, the -- you could put a new battery in
25   it, it was fine, and --

Page 93

1        Q.   Did you ever -- did you ever have problems with
2    your pager?
3        A.   Oh, yeah.  I think we all did.
4        Q.   When you did, did you call Dorothy McCallister,
5    as it says here, or what did you do?
6        A.   I can't remember what I -- I -- I know I -- I
7    certainly replaced that battery a couple of times and --
8    I can't remember if we swapped it out or not.
9        Q.   Right.
10       A.   I sure asked the chiefs about it and what I
11   should do.
12       Q.   So this -- this section here, it says call
13   responsibilities, can -- can you kind of describe to me
14   what -- or I guess how call schedules and
15   responsibilities worked at UF while you were there.
16       A.   Yeah.  So --
17            Sorry.  I'm trying to read this to see if this
18   is accurate.
19            Okay.  So if -- yeah, see you have to complete
20   two years of call.  Okay.  This first -- first paragraph
21   is just talking about how many years of call, not as
22   much the types of call.
23       Q.   Okay.  Can you describe to me the types of
24   call.
25       A.   So -- all right.  It's been a while.  And they

Sarah Diekman
June 17, 2020

Page 94

1  changed them around a little bit.
2         So one might consider -- we can start with
3  night float.  One might consider night float to be call.
4  It could be considered call or a rotation.  So you're
5  just there for, like, 12 hours at night.  You're the --
6  the night person.  So you take care of everything on the
7  Shands and VA side.
8         It's kind of important to note that there is
9  quite a physical distance with the other hospital.
10  Shands Vista is up there by Springhill.  So they don't
11  have those covered by the same resident because it's not
12  realistic to think that you could get from one hospital
13  to the 'nother.  But the VA and Shands are right across
14  the street from each other.  So the night floater will
15  cover them both.
16        And so they pretty much have all the duties at
17  night, which usually is fine.  You know, usually at
18  night it's slow.  But you could get unlucky and have
19  three things happen at once, and you're the only one
20  there.  So then you have to do some triaging.  It's just
21  the luck of the draw.
22        So you're taking care of all the patients on
23  the ward, which is I think 60.  Sixty patients on the VA
24  ward are your responsibility, and then anything that
25  comes into the Shands ED, the VA ED, or any consults on

Page 95

1  the inpatient units from the entire hospitals of both
2  those two hospitals.
3     Q.   Is -- is there a difference between doing the
4  night float and then being on call?
5     A.   So when you're on night call, you do exactly
6  that same thing.  So the night floater gets one day off
7  a week, and then the night call comes in and does all
8  those things.
9     Q.   So is the -- is -- is the night floater, is
10  that person in a -- a rotation to be the night --
11    A.   Yeah.
12    Q.   -- floater?
13    A.   Yeah.  We wouldn't really call it call.  I just
14  explained it just to kind of give you an idea because
15  then our night call person will be doing the exact same
16  things.  But since it's just once and they're in a
17  different rotation at that time, they're on call --
18    Q.   Right.
19    A.   -- while doing the same job.  So that's one
20  type of call.
21    Q.   Okay.
22    A.   And then you have the wards.  Now I'm not sure
23  how they're doing it now.  This is how they did it for
24  most of the time when I was there.  These call schedules
25  shifted several times.

Page 96

1         So the wards, you have one resident that goes
2  over to the VA, and they see all 60 patients at the VA.
3  And they write the notes on 60 patients.  And they staff
4  them with a weekend attending.  So it's not the main
5  team's attending.
6         So they go around, they see -- you know, check
7  in with the patients, make sure there's not any
8  problems, and they follow the plan.  They look at what
9  the weekday team wanted them to do, and then they
10  execute on that plan for the weekend.  And then they
11  staff it with the attending and write the note using the
12  weekday's -- the information given to them from the
13  weekday plan because rounding on 60 patients, you know,
14  you can't be.
15        Changing the diagnosis.  It take -- you know,
16  an hour to give a meaningful interview to a patient.  So
17  you just take the weekday's diagnosis unless there's a
18  problem.  And --
19    Q.   Does --
20    A.   -- if any --
21    Q.   Does everybody do these call -- have these call
22  responsibilities out of the residents?
23    A.   Yeah, while I was there.
24    Q.   Okay.  And -- and that's what we were talking
25  about, while you were there.

Page 97

1         And then would everybody do this night float at
2  some point, too, that you'd mentioned?
3    A.   Yes.
4    Q.   Okay.  So here it talks about how residents
5  should make contact with the attending on call at some
6  time during that business day and prior to four p.m.
7  Is that -- was that your understanding while you were a
8  resident?
9    A.   Su -- well, some of the attendings would tell
10  you not to do that.  They would get annoyed if you
11  called them too much.  If they were in the middle of
12  clinic and you didn't have anything meaningful -- so you
13  would just try to find a -- a way to just say hello,
14  that you're on call with them tonight.  But most of the
15  time they would tell you not to do that the next time
16  because it was bothersome to them.
17    Q.   You would -- you would try to -- says here
18  remain up-to-date, so that you would do that, whether it
19  was calling or I guess there was an internal website,
20  you just had to make sure that you were -- that you were
21  remaining up to date with the call schedule as a --
22    A.   Oh, yeah.
23    Q.   -- resident?
24    A.   Yeah.  Yes.  There is, like, one internal
25  website, and that thing's gospel.  If there's a problem

Sarah Diekman
June 17, 2020

Page 98

1    with that, we all got problems.
2        Q.  Okay.
3            THE WITNESS:  Do you mind if we -- can we
4    take a lunch break --
5            MR. CHAUNCEY:  Yeah.
6            THE WITNESS:  -- now?
7            MR. CHAUNCEY:  Let's do -- why don't we do a
8    half-hour lunch break.  We'll be -- we'll resume
9    at one p.m.
10           THE WITNESS:  Okay.
11           THE VIDEOGRAPHER:  Going off the record.  The
12   time is 12:29 p.m.
13           (A recess was taken from 12:29 p.m. to 1:02
14   p.m.)
15           THE VIDEOGRAPHER:  We are back on the record.
16   The time is 1:02 p.m.
17   BY MR. CHAUNCEY:
18       Q.  All right.  Dr. Diekman, this document goes
19   through a few other things, talks about duty work hours.
20   What's your understanding of what the duty work-hour
21   policy was while you were there at the University of
22   Florida?
23       A.  So for first year, not to exceed a -- 80-hour
24   week, and I think ten hours off in between shifts.
25       Q.  Okay.  And then faculty evaluations, it says

Page 99

1    here that the faculty complete electronic evaluations
2    via New Innovations for each clinical rotation.  And
3    then it says, this will -- at the very bottom here, this
4    will include a review of the resident's performance
5    during the final period of training, will verify that
6    the resident can practice psychiatry independently.
7            Is that your understanding is that they --
8    again, that they're trying to review to see if you could
9    practice independently as you moved through the program?
10       A.  That is the intention of those guidelines, yes.
11       Q.  Okay.  Let's see.  Medical records and
12   documentation, talks about here that -- that notes --
13   well, let -- let me ask you.  Are -- are -- are notes an
14   important aspect of the residency program in -- in -- in
15   having a positive review?
16       A.  Yes.  Notes are what drives billing, and
17   billing is an -- extremely important to this residency
18   program.  And notes provide patient safety and
19   documentation to other providers for how things are
20   going.  So notes are very important.
21       Q.  And was it your understanding, at the time when
22   you were with the University of Florida, that -- that
23   all notes must be dictated immediately after the case is
24   completed, all student entries and verbal orders must be
25   countersigned within 24 hours, was -- was that what you

Page 100

1    understood the policy to be at that point?
2        A.  No.  There were other policies written with a
3    48-hour deadline in -- in the clinic manual that we were
4    given.
5        Q.  All right.
6        A.  And, one, we're not given dictation software.
7    I requested dictation software as part of my disability
8    for dyslexia.  So if they're saying dictation, then
9    that's just an inaccuracy, can't be done.  I wish it
10   could be done.  It would have helped me be able to
11   complete my notes.  But that's not available.
12       Q.  This said that -- says all discharge summaries
13   must be completed and dictated within 48 hours after the
14   discharge, effective 1/5/09.  Is that what you're
15   talking about in -- in 48 hours?  Well, is -- is that
16   ki -- is that what you were discussing as having --
17   making sure that you'd completed the discharge effective
18   (sic), or were you talking about something else?
19       A.  Yeah, we were given a separate manual for
20   clinic.  We're given multiple manuals.  So you'd have to
21   get the clinic manual from that year, so from the 2014.
22       Q.  But it is your understanding that taking timely
23   notes was a very important part of the program?
24       A.  Absolutely.  And the policies and practices of
25   the program were that people would do the best job they

Page 101

1    could.
2            There was many times when I was on call and I
3    needed to -- you know, we got a call about a patient,
4    and whoever was taking care of the patient hadn't
5    completed their note yet.  So I had to call them and ask
6    them.  And -- I mean, people would not complete their
7    notes.  There were times they had seen the patient a
8    week ago, and the note wasn't complete.  So I had to
9    talk to them personally to get their advice.  So --
10       Q.  Were --
11       A.  Even if it is written down in the policies and
12   procedures manual, that was not what was being practiced
13   in -- in practice in --
14       Q.  Were --
15       A.  -- reality.
16       Q.  Were you ever tardy on your notes?
17       A.  It would depend on what standard you're using.
18           So Dr. Hobbs decreased the amount of time that
19   I had to complete my notes compared to other residents.
20   So where other places in the residency manual and
21   residents were allowed to complete notes within, like,
22   36 hours, I had to do mine the same day, so -- and even
23   if I did do that, then she would -- she'd always create
24   more stringent guidelines for me.  So if I cleared the
25   mark, she would move the bar up higher.

Sarah Diekman
June 17, 2020

Page 102

1    Q.  So you're saying that -- that this policy
2  wasn't what was -- you were held to, that all notes must
3  be dictated immediately, all student entries and verbal
4  orders must be countersigned within 24 hours, that the
5  discharge summaries be done within 48 hours, that this
6  wasn't what you were held to?
7    A.  No.  And that -- the way that policy's worded
8  isn't even possible.  Must be dictated immediately never
9  happens in the institution.  That's an inaccurate -- I
10  mean, this is part of the problem of having policy books
11  that nobody pays atten -- that nobody is actually
12  following because we did not have dictation software
13  that at least the residents were able to use.
14    Q.  You know for a fact that it never happens?
15    A.  I asked for dictation software as an
16  accommodation.  So if they had it, then they lied to me
17  about not being able to use it.
18    Q.  Do you -- do you know for a fact that all --
19  that people do not -- nobody completes their notes
20  immediately after the case is completed and that nobody
21  does their summaries within 48 hours?
22    A.  No, some -- some people --
23        MR. SALZMAN:  Wait.
24    A.  -- do.
25        MR. SALZMAN:  Wait.  Wait.  Wait.

Page 103

1        Objection.  It's a compound question.  Can
2  you ask them individually.
3        MR. CHAUNCEY:  Yeah, let's -- let's ask them
4  individually.
5  BY MR. CHAUNCEY:
6    Q.  So you had said that -- that -- that, generally
7  that those policies never happened.  So --
8    A.  Dictation.  Specifically, the sentence you're
9  reading from the manual says must be dictated.
10    Q.  All right.  But the -- all notes must be
11  dictated immediately after the case is completed, so
12  that --
13    A.  (Inaudible) --
14    Q.  -- never happens?
15    A.  -- not possible because no one's dictating.
16        THE STENOGRAPHER: I'm sorry your question --
17  your answer broke up.
18        THE WITNESS:  Sorry.
19    A.  It -- dictation immediately after is not
20  possible because we are not given the program to
21  dictate.  So the manual is -- is inaccurate.  I guess
22  what the manual means to say is it probably means to say
23  written within that time period.  Dictation should
24  probably be replaced by written.
25        This is often what we had to do with the manual

Page 104

1  is -- because there was, you know, many things that are
2  inaccurate.  So you'd just replace it with the word
3  of -- of what's actually happening, a -- a workaround.
4  BY MR. CHAUNCEY:
5    Q.  And --
6    A.  So written within --
7    Q.  -- (inaudible) --
8    A.  -- 24 hours, yes, many people were able to
9  write their note within 24 hours; but many people
10  didn't.  And I know this because I took phone calls on
11  their patients, and they had incomplete notes.
12    Q.  You're --
13    A.  (Inaudible.)
14    Q.  You're familiar, as well, with -- with the
15  promotion and termination policy while you were at the
16  University of Florida?
17    A.  Yes.
18    Q.  Okay.  Your under -- it was your understanding
19  at the time that you were on a one-year contract that
20  could be terminated?
21        MR. SALZMAN:  Objection.
22        You can go ahead and answer.
23        MR. CHAUNCEY:  Well -- well, I'll -- I'll
24  rephrase.
25  BY MR. CHAUNCEY:

Page 105

1    Q.  Was it your understanding that you were on a
2  one-year contract?
3    A.  That is -- now, I mean, I can't separate my
4  understanding that I have now as a law student versus
5  what I had when I signed that.  So when you go to a
6  program, they promise you four years.  They tell you
7  that that one-year contract is just a formality.  That's
8  just how we do it.  It's state law.
9        You know, you're really here -- you sign up for
10  the four years.  And, importantly, you give up your
11  opportunity to go somewhere else for four years.  And
12  it's catastrophic if you don't perform all four years of
13  the four-year contract.  So as a contract matter, it's a
14  year-to-year thing.  But as something like a promissory
15  estoppel, where I had a very reasonable expectation that
16  this was a four-year employment, like, in total to
17  prepare me to be a psychiatrist, that is absolutely what
18  every resident believes when they are signing that, and
19  that the year-to-year contract status is just a
20  formality.  And you give up all your other options,
21  banking on one program keeping to that promise.
22    Q.  All right.  Well, what I'm going to show you
23  next is the actual contracts that you signed with the
24  University of Florida.  Can you identify what this is.
25        I'm sorry, Dr. Diekman.  Did -- did you --

Sarah Diekman
June 17, 2020

Page 106

1    A.   Oh, no.  It -- it's not showing yet.
2         MR. SALZMAN:  We don't see it, David.
3         MR. CHAUNCEY:  Oh, you don't see it.
4         THE WITNESS:  No.
5    BY MR. CHAUNCEY:
6    Q.   Here.  I'm sorry.  My apologies.
7    A.   That looks like it's trying.  There you go.
8         MR. SALZMAN:  There you go.
9         MR. CHAUNCEY:  All right.  Great.
10        THE WITNESS:  Yeah.
11   BY MR. CHAUNCEY:
12   Q.   Can you identify what this is.
13   A.   Yeah, that does look like the first-year
14   contract.
15   Q.   Let's see.  Do you recognize your signature
16   here?  Did you sign here?
17   A.   Yes.
18   Q.   All right.  This is the -- can you identify
19   what this document is?
20   A.   That looks like that is the second-year
21   contract.
22   Q.   All right.  It's March 3, 2014.
23        MR. CHAUNCEY:  And I'm sorry, court -- to --
24   to -- Diane, thi -- this is -- will be marked
25   as defendant's Exhibit 3.

Page 107

1         THE STENOGRAPHER:  Yes, sir.
2         (Exhibit 3 was marked for identification.)
3    BY MR. CHAUNCEY:
4    Q.   And that's your signature at the bottom of this
5    as well?
6    A.   Yes, sir.
7    Q.   And then can you identify this document as
8    well.
9    A.   '15.  That looks like the PGY3 year contract.
10   Q.   Okay.  And this was February the 5th, 20 --
11   2015 is what it says it was provided to you.
12   A.   (Inaudible.)
13   Q.   We're going to actually go through this
14   contract just really, really briefly.
15   A.   Okay.
16        MR. SALZMAN:  David, just -- just for the
17   record, are you doing this as a composite?
18        MR. CHAUNCEY:  Yeah, This is just one -- one
19   exhibit is the three -- three contracts.
20        MR. SALZMAN:  Got you.
21   BY MR. CHAUNCEY:
22   Q.   So in here talks about, again, graduate medical
23   education program.  We discussed sort of your thoughts
24   on that already.  But it says right here that you must
25   be able to perform the essential functions of the

Page 108

1    specialty and meet the academic standards of the
2    curriculum.
3         Wa -- was that your understanding when you were
4    signing this contract, that you had to perform essential
5    functions of the -- the specialty?
6    A.   The essential functions of the specialty, yes.
7    I think that Dr. Hobbs had unique ideas of what the
8    essential functions were that would vary from what the
9    majority of psychiatrists would deem to be the essential
10   functions.
11   Q.   There are some responsibilities here.  It says
12   to provide safe, effective, compassionate patient care,
13   commensurate with the resident's level of advancement,
14   responsibility, competence, and general supervision of
15   appropriately privileged attending teaching staff; to
16   participate fully in the educational and scholarly
17   activities of the program as required, you assume
18   responsibility for teaching and supervising other
19   residents.
20        What -- what's your understanding of what it is
21   to -- to participate fully in the educational and
22   scholarly activities of the program?
23   A.   To -- to do what I'm asked, what -- there are
24   quality improvement days, so that would probably be
25   considered the main scholarly activity of the program.

Page 109

1    Even in this final year, they did ask me to supervise
2    junior residents to teach them how to take call.  That
3    would be my understanding of -- of that.  You know,
4    there's just a lot of little things --
5    Q.   Okay.
6    A.   -- that happen around an office --
7    Q.   Do you --
8    A.   -- that you show someone.
9    Q.   I'm sorry.  Do -- do you -- do you think that
10   you fully participated, as it talked about there, in
11   the -- in the program?
12   A.   Yeah.
13   Q.   Okay.  Right here it talks --
14   A.   I mean --
15   Q.   -- about --
16   A.   I was very -- I was very sick at the ti -- I
17   mean, when -- here, the -- during this period of time, I
18   was very sick.  And this is --
19   Q.   All right.
20   A.   -- also the period of time where the chief
21   residents have done everything they can to defame my
22   reputation, telling me -- people, like, I'm --
23   experienced a lot of retaliation during this time.
24   Being put on schedules that we know are going to make me
25   sick.  I have been banned from the didactics.

Sarah Diekman
June 17, 2020

Page 110

1    Q.   Do -- do you --
2    A.   For --
3    Q.   Do you --
4    A.   It -- it's --
5    Q.   Do you believe --
6    A.   -- very difficult --
7    Q.   Do you believe that you weren't able to
8    participate in the program during that?
9         MR. SALZMAN:  Object to the form.
10        You can answer.
11   A.   I took care of the patients that I was given.
12   And none of my patients got hurt.  I mean, they -- you
13   know, we have all this documentation of all these
14   dangerous things that happen, et cetera.  There was
15   never a root cause analysis for any of my patients where
16   I had to attend.  There was actually once where I caught
17   other people's errors, but I kept my patients safe.
18   BY MR. CHAUNCEY:
19   Q.   Do -- are -- are you saying to --
20   A.   I mean, that's the --
21   Q.   -- the --
22   A.   -- number one job of a doctor.
23   Q.   Did you not have errors while participating in
24   the program?
25   A.   Signif -- material errors?  Material errors,

Page 111

1    no.
2    Q.   Okay.
3    A.   Not material.
4    Q.   All right.  So here it talks about case
5    documentation, documentation of clinical experiences,
6    cases, or procedures as mandated by the residency review
7    committees, residents who do not maintain accurate case
8    documentation may not advance to the next level of
9    training or be allowed to complete their program until
10   compliance is achieved.
11        Is -- is that your understanding of -- of what
12   was expected of you during your residency?
13   A.   The custom and culture in this residency was
14   that most residents would just catch up on their duty
15   hours at the end of their rotations or semesters.
16   Whatever it says there, what everyone is doing is
17   catching up on their duty hours after a certain number
18   of them have -- have passed.  That was the custom,
19   culture, adopted practices, and no one got punished for
20   that.  So if I'm being punished for that, that would
21   make me unique in being punished for something that
22   everyone else was doing.
23   Q.   You're saying that other people would have been
24   violating --
25   A.   Majority --

Page 112

1    Q.   -- (inaudible) as well --
2    A.   Majority.
3         THE STENOGRAPHER:  Wait.  Wait.  I didn't
4    hear the question.
5    BY MR. CHAUNCEY:
6    Q.   I was just saying so you -- you believe that
7    there -- that other people were violating this contract
8    as well?
9    A.   That specific portion.  When you're talking
10   about the -- the documenting the duty hours and what
11   time period, I'm saying that most people would not do it
12   same day.  They would let it collect in a bundle and
13   fill them all in at once.
14   Q.   And you un -- did you understand when you had
15   signed this contract that there was procedures for
16   suspension, nonrenewal, dismissal, and appeal?
17   A.   When I signed that, I did not fully appreciate
18   those.  But I don't think that that actually
19   resulted -- I mean -- or I don't think things would have
20   turned out any different if I had fully appreciated
21   that.  But no, I mean, I -- I think to unders -- I think
22   it -- it took me going to law school to understand what
23   those things meant.
24   Q.   Right.
25   A.   I don't think I understood them back then.

Page 113

1    Q.   You were mentioning how you were paid.  Is it
2    accurate, as this contract states, that you -- were you
3    paid a stipend?
4    A.   Yes, sir.
5    Q.   So were -- were you paid a salary?
6    A.   I honestly don't know how to distinguish from
7    a -- a stipend from a salary.  We're paid via federal
8    funds.  The graduate medical education residency
9    programs are paid through federal funds.
10   Q.   Okay.
11   A.   And those are distributed to the school and
12   given to us.
13   Q.   So -- but according to this contract, one way
14   or another, you agree you were paid a stipend by the
15   University of Florida as part of their residency
16   program?
17        MR. SALZMAN:  Object -- object to the form.
18        You can answer.
19   BY MR. CHAUNCEY:
20   Q.   Were you paid a stipend by the University of
21   Florida in the residency --
22        MR. SALZMAN:  I -- I'm still going to object
23   to the form.
24        MR. CHAUNCEY:  Okay.
25        MR. SALZMAN:  You can answer.

Sarah Diekman
June 17, 2020

Page 114

1  BY MR. CHAUNCEY:
2      Q.   You can answer.
3      A.   I -- I really don't know enough about the
4  definition -- a difference between a stipend and a
5  salary to answer in any meaningful way.  I got paid from
6  them.  I know that money comes from federal money.
7      Q.   Down here it talks about the Americans with
8  Disabilities Act.  It says the University of Florida,
9  under guidelines of the ADA and 504 federal
10  legislations, is required to make reasonable
11  accommodations to know --
12          THE STENOGRAPHER:  Wait.  I'm sorry.  I'm
13      sorry.  Is required to make?
14          MR. CHAUNCEY:  It says it right here.
15  BY MR. CHAUNCEY:
16      Q.   It says, is required to make reasonable
17  accommodations to the known physical and mental
18  limitations of otherwise qualified individuals with
19  disabilities.  For assistance, contact the UF ADA
20  office, and gives a number.
21          Did you know that you were supposed to contact
22  the -- the UF ADA office to get an accommodation when
23  you started with the University of Florida?
24      A.   So when I first started, I did not need an
25  accommodation.  The -- the res -- the chief residents

Page 115

1  that were on at the time -- because the chief residents
2  have a lot of control over the scheduling.  And they
3  pretty much did the schedule as they said they would
4  when we were recruited.  And I knew that that would mean
5  that I wouldn't need accommodations.
6          And then also the -- the oddities with the
7  parking spaces, there were still -- because I have a
8  state-issued handicap placard, and I -- and there were
9  some spaces available.  And I was parking in those
10  spaces without a problem the first year.  So I did not
11  have any need for disability accommodations for the
12  first year.
13      Q.   Okay.  Did you contact --
14      A.   So --
15      Q.   -- the UF ADA office when you did need an
16  accommodation?
17      A.   Wu -- by the time I did need an accommodation,
18  I was not thinking about the employment contract that I
19  had signed.  This -- you know, this contract was hidden
20  away in some desk office.  Now that I'm a lawyer, I --
21  well, I'm not a lawyer; I haven't passed the bar.  Now
22  that I have some legal education, I would have thought
23  about this differently.  That might have been one of the
24  first places that I went.
25          Me being a normal citizen, I Googled it.  I

Page 116

1  Googled, who do I talk to for issues -- well, I actually
2  went to the parking -- I mean, what I was having a
3  problem with was the parking garage.  So that's who I
4  asked.  I -- I contacted the parking garage and told
5  them I have a disability, and you guys have made changes
6  with the parking; how I do go about addressing my
7  disability.  I wish they would have redirected me at
8  that time.  So -- I mean, that was -- that was one of
9  the -- the first times.
10          There was another time when I -- how I
11  ultimately got to that office was I was -- I felt that I
12  was being harassed for having a disability by one of the
13  new chief residents.  And so I just Googled harassment
14  at University of Florida reporting.  And that took me to
15  HR, and HR was, like, you know, we're not quite the
16  office, like, you need to go to the disability office.
17      Q.   Okay.
18      A.   So that's how then I -- I got there.
19      Q.   All right.  And then it -- was it at -- your
20  understanding at the time that you had 15 days of annual
21  leave?
22      A.   Is this the sick leave, or vacation, regular
23  leave?
24      Q.   A -- accrue 15 days of -- of annual leave.  It
25  then says --

Page 117

1      A.   Yes.
2      Q.   -- that you have -- you accrue ten days of sick
3  leave.
4          Is it your understanding that you had 15 total
5  days of annual leave?
6      A.   Yes, sir.
7      Q.   And then was it your -- also your understanding
8  at the time that you had ten sick days?
9      A.   Well, it was my understanding before I came to
10  the program.  But after we'd come to the program, you
11  know, we're -- now we're committed and we can't leave,
12  then Dr. Hobbs and the chief residents made it very
13  clear, and there are e-mails that say, you know, we are
14  not expected to use these sick days.  And if we use
15  these sick days, it will be a professionalism violation.
16      Q.   Did you use all your sick days in your second
17  year of -- of residency?
18      A.   I -- I think so.  I think between the first and
19  the second I would -- yeah, I mean, I -- I think I used
20  them all that year, but mostly because she wanted me to
21  come off the schedule for December.
22          I was asking for a modified time schedule in
23  December.  I -- this was after the prolonged parking
24  incident.  And I was quite sick and had to catch up on
25  my physical therapy.  And I asked can I just come off

Sarah Diekman
June 17, 2020

Page 118

1  the call schedule for one month, and I will do FRC --
2  well, I was already scheduled for FRC, which was the
3  rotation that I had come to UF for, so I was extremely
4  excited to do it.  It was what I really wanted to do.
5  And she said, I don't have use for 75 percent of a
6  resident; you're either all the way off the schedule or
7  you're all the way on.  You can come back on the
8  schedule when you're totally unimpeded.
9        And I, again, emphasized to her how I really
10  just needed a controlled schedule, that I -- I just
11  needed to get out of work at five, and then I can do my
12  physical therapy and then I can be recovered after that
13  month and then come back on to the schedule.  And she
14  said no.  And -- and I also expressed that I would have
15  concerns about my clinic patients then starting to
16  cancel clinic when I get back if I'm gone for such a
17  long time.  I had many concerns.  And she said not --
18  Q.    Did you --
19  A.    -- possible (inaudible), you don't get to be
20  part of a resident, so you have to come off the schedule
21  completely.
22  Q.    Dr. Diekman, did --
23  A.    That's what I did.
24  Q.    -- did she offer you part time?
25  A.    No.  She said -- the next month she did offer a

Page 119

1  part-time.  But for the first month she said no, it is
2  100 percent off the schedule or it is nothing.
3        So they used up -- I'm not quite sure how
4  they -- they used up a lot of days for that.  You -- you
5  would have to ask Dorothy McCallister on the actual math
6  for that.
7  Q.    All right.  What I'm showing you now is going
8  to be marked as a defendant's Exhibit 4.
9        (Exhibit 4 was marked for identification.)
10  BY MR. CHAUNCEY:
11  Q.    Can you identify what you see here.
12  A.    This is an evaluation from Dr. Khurshid.
13  Q.    And just so everyone's aware, this is just --
14  this is going to be -- this document is all of your
15  evaluations, Dr. Diekman, so --
16        MR. CHAUNCEY:  So Mr. Salzman, just so you
17        have an -- an idea of that.  And you can follow
18        along, too, if -- since I -- I'd sent this to you.
19  BY MR. CHAUNCEY:
20  Q.    You had mentioned that you had a really good
21  first year; is that correct?
22  A.    Yeah.
23  Q.    And I think that's -- that's shown here.  You
24  were getting pretty good reviews.
25        So what was the difference between the first

Page 120

1  year and the second year?
2  A.    At the end of the first year, I -- I notified
3  Dr. Hobbs, Dr. Welch, Dr. Thornton, and the chief
4  residents about the incident with Dr. Syfert.  And then
5  around the same time the University of Florida removed
6  many of the -- just the general handicapped parking
7  spaces.  There used to be a lot more handicapped parking
8  spaces, but they were building a new medical school and
9  so they removed them.  And if I parked in any of the
10  remaining ones I was getting tickets, saying that I was
11  not allowed to park in the handicapped spots because I
12  was an employee.
13        And so I, again, complained to parking.  I'd
14  notified my supervisors, Dr. Ginory, Dr. Fayad, the
15  chief residents, and Dr. Hobbs.  And they all told me
16  that I was just being a complainer, wanting special
17  treatment.  And I told them, all of them, that this was
18  seriously affecting my heart, that I get prolonged
19  tachycardia from this.  I mean, they're doctors, that --
20  they know what that means.
21  Q.    Did --
22  A.    They know.
23  Q.    Did the University of Florida give you a
24  parking spot?
25  A.    During this time, when I complained to my

Page 121

1  supervisors, and they said, you know, this is our
2  problem, you keep it in-house, and I had mentioned that
3  I wanted to bring it to the chief counsel because I
4  thought they might do something about it, they told me
5  to not go to outsiders.
6  Q.    But did --
7  A.    An --
8  Q.    But did -- did the -- had the University of
9  Florida given you a parking spot at this point?
10  A.    Oh, I mean, yeah, initially they had given me a
11  handicapped parking spot like a long time ago, a year
12  ago, but it was further away than the regular spots
13  and -- and didn't meet my doctor's requirements.  So, I
14  mean, I would -- I was better off to park where everyone
15  else parked.  I mean, just because a park -- a -- a
16  handicapped parking spot has a disabled thing on it
17  doesn't mean that it helps you.  If it -- if it's
18  further away, it's not really a handicapped spot.
19        So final -- and I tried.  I tried so hard to
20  just grin and bear it.  I would walk in.  It was like I
21  was having a heart attack every single day.  My legs
22  were weak.  I was falling down.  It was so awful.  And
23  finally I thought I -- I mean, I know they told me not
24  to talk to outsiders, but, like, I'm going to -- I go --
25  I -- I might die.

Page 122

1      Q.   Did --
2      A.   So --
3      Q.   Did anybody suggest to you a wheelchair, an
4  electronic wheelchair?
5      A.   No.  They suggested that I stop complaining.
6  That was the -- the tantamount that I -- I stop
7  complaining.  There would be -- later on an electronic
8  wheelchair was suggested, but that's almost a year from
9  the time that we're talking about now.
10     Q.   Okay.
11     A.   That was in, like, the final set of
12  accommodations the -- that was suggested.
13          So I went to Ryan Fuller.  I sent an e-mail to
14  Ryan Fuller, the chief counsel at UF.  And -- and this
15  was after months.  I mean, this was after months.  And I
16  was so terrified because I know -- in our department, if
17  you don't listen to Dr. Hobbs, then -- then bad things
18  happen to you.  And I knew that.  But I thought I --
19  like, I'm going to -- I'm going to die.  I -- I
20  really -- this is -- this is my heart.  Like, it's --
21  what can I do.
22          So I contacted the chief counsel, and he said,
23  oh, yeah; oh, my God, we'll get you a spot.  So he
24  e-mailed me to the right people, and they got me a spot
25  right away.  And then the spot was wonderful.  That

Page 123

1  part was absolutely awesome.
2          But then --
3      Q.   Did -- did --
4      A.   -- I got so much anger back from Dr. Hobbs, and
5  the chief residents, and everybody for going to an
6  outsider, that's when the retaliation really went to a
7  next level.
8      Q.   So did -- did you request a parking spot from
9  the ADA office at that point?
10     A.   At that point, yeah.  That's who I think
11  Ryan -- Ryan Fuller, the chief -- I mean, he's the chief
12  counsel of the university, right?  He sent me to the
13  appropriate place.
14     Q.   All right.  Do you have any evidence that they
15  were -- they told you not to go to outsiders?
16     A.   Like a written-down evidence, like --
17     Q.   Yeah --
18     A.   -- (inaudible) --
19     Q.   -- any -- any statements, any documents,
20  anything?
21     A.   I don't think so, no, just my own testimony.
22     Q.   Okay.  We had talked a little bit about --
23  you'd made an allegation in your complaint concerning
24  what you were discussing of -- of having, I guess,
25  doctor -- is it Syfert?

Page 124

1      A.   I think so.
2      Q.   Syfert.
3          So you mentioned that the -- the -- I guess
4  that you -- that you had not gotten a negative review.
5  It says, in paragraph 17 here -- let me show it to you
6  in -- in this -- this is in the -- the amended
7  complaint.  Says, shortly after this incident, the
8  plaintiff received her first negative review from
9  Dr. Thornton.
10          Let me ask you, are you saying that your first
11  negative review ever was from Dr. Thornton?
12     A.   I'm not positive, but I think that was -- no,
13  maybe not the first one because there wa -- around the
14  same times there was problems on -- because this whole
15  parking thing -- it's a little convoluted because the
16  parking thing, unfortunately, was happening at the same
17  time as this.
18          So I was on rotation with Fayad and Ginory, who
19  also were irritated at me because I kept asking them for
20  help with the parking situation.
21     Q.   Okay.  So Fayad and Ginory were also involved
22  in this parking retaliation against --
23     A.   Yeah.
24     Q.   -- you?
25     A.   Yeah.

Page 125

1      Q.   Okay.  So the -- this is your evaluation from
2  Sarah Fayad.  And this is July the 1st, 2014, to
3  July the 31st, 2014.  And what -- what is this rotation
4  that you're on in this?
5      A.   This is Shands consults, which also happens to
6  be the most physically rigorous rotation in the whole
7  residency.  This is the rotation where you're most
8  likely to be on the burn unit, hot rooms.  Sometimes the
9  team walks through the hot stairs.  So I was having --
10  so --
11     Q.   Does --
12     A.   (Inaudible.)
13     Q.   Does everybody go through this -- this
14  rotation?
15     A.   They do maybe one time, but not -- not as many
16  times as I went through it.
17     Q.   So it says here you got a one out of five here.
18  And this is for psychiatric evaluation.  It says, at
19  times, Sarah struggled with getting a detailed history
20  that was appropriate for her current PGY level.
21          Do you agree with that review at that time?
22     A.   No.  Do I agree with the review?  No.  I get
23  that the attending was annoyed at me because perhaps she
24  viewed me as less useful than the rest of her residents
25  because I was having a lot of tachycardia.  I had to

Sarah Diekman
June 17, 2020

Page 126

1  take breaks.  I had trouble breathing.  I would ask the
2  team to take the elevator instead of the stairs, lots of
3  things that she really did not want to do.  So I
4  understand that she didn't like me and that -- the --
5  the parking issue I kept asking her for is just one more
6  thing that she has to do on her very busy plates.  And
7  so that I -- I am an annoyance to her in asking her for
8  that.  That's not something she wants to spend her time
9  doing.  Like, I get it.
10      Q.  Did you --
11      A.  But --
12      Q.  Did you feel unable to do this rotation because
13  it was so physically grueling?
14      A.  No.  This rotation was very physically tortuous
15  for me.  But was I actually able to get the diagnosis
16  and treatment to these patients and communicate our
17  recommendations to the team?  Yes, I was able to do
18  that.
19      Q.  All right.  She -- she says here that you
20  struggle to identify what was actually going on
21  diagnostically with the patient.  She would leave out
22  key pieces of information that were readily available to
23  the medical chart, such as consultant's notes, labs,
24  radiological findings.  Her diagnosis were not always
25  appropriate given the information available.  As she is

Page 127

1  a PGY2, I expected her to be able to formulate much of
2  this in a better way.
3          Again, do you disagree with what she's saying
4  here?
5      A.  I think the main thing to -- that is confusing
6  about what she wrote down and what she did is that she
7  has the opportunity to amend every one of my notes.  So
8  to see whether or not these comments are just vindictive
9  or whether or not they reflect her actual actions, you
10  have to look at her addendums to the notes.  And her
11  addendums to the notes say, I agree with Dr. Diekman's
12  plan, I sign off on this plan.  She's not adding this
13  type of information.
14      Q.  Do --
15      A.  If this was real, if she really believed this
16  information was not there, then she has a -- a legal and
17  ethical duty to add it to the chart, to add it in the
18  addendum and to correct the notes.
19      Q.  Do you --
20      A.  So you have to --
21      Q.  -- (inaudible) --
22      A.  -- actually look for the notes to --
23      Q.  De --
24      A.  -- see (inaudible) --
25      Q.  Dr. Diekman, do you believe that -- that

Page 128

1  Dr. Fayad was discriminating against you?
2      A.  Yeah, I think she was -- I think were
3  retaliating.  I think she was angry that I had
4  requested, in her mind, special treatment and that I was
5  being like a diva.
6      Q.  So she gives you level one here, level one
7  here, level two, level two.  And then she, in the end,
8  says, Sarah was pleasant to work with and polite, but I
9  am concerned about her clinical performance.  Her
10  documentation is poor, and she frequently did not come
11  to rounds prepared, even when there were very few
12  patients she was responsible for.  She needs to work on
13  her time management, knowledge of medications, treatment
14  options, and different diagnoses.  She seemed to have a
15  difficult time incorporating feedback into her
16  performance, though she did readily receive feedback.
17          So your -- so is it your testimony that she was
18  not being honest in this assessment?
19      A.  It could have been her emotions.  She could
20  have believed what she was saying, but I think her
21  emotions or her -- her -- because this is a subjective
22  assessment.  I think her subjective assessment is
23  clouded by her anger at me for repeatedly requesting
24  accommodations and then asking her -- you know, asking
25  the team to take the elevator or and -- instead of the

Page 129

1  stairs, which slows things down.  And I think that it --
2  it was all tainted.
3      Q.  This is another review.  This one is from
4  doctor -- is it Gen -- is it Ginory?
5      A.  Ginory.
6          This is --
7      Q.  Ginory.
8      A.  -- the same rotation.  Fayad and --
9      Q.  Fi --
10      A.  -- Ginory are on the same -- this is the same
11  period of time, same --
12      Q.  And --
13      A.  -- (inaudible) --
14      Q.  Are doctor -- is Dr. Fayad a -- female?
15      A.  Yes.  They both are.
16      Q.  They both are.  Okay.
17          So she gives you -- comments at the end, let's
18  see wha -- let's see.  She gives comments.  She gives
19  you level one, level two, level one, level one.
20          Did -- and you believe in the same way, that
21  she was not being honest in giving you this assessment?
22      A.  I can't say if she was being dishonest, but I
23  can't say if she was thinking objectively.  It may have
24  just been subconscious resentment for me and my
25  requests.  I -- I don't want to say that I know that

Page 130

1  she's lying.  But --
2      Q.   Okay.
3      A.   -- I -- I think that there was resentment
4  for the --
5      Q.   What --
6      A.   -- requests that I had made.
7      Q.   And what -- what was the resentment over?
8      A.   I kept bringing the parking spot issue --
9      Q.   Okay.  The -- the parking issue.  Okay.
10     A.   Yeah.
11     Q.   And --
12     A.   And then when I would come in, in the morning,
13 no matter how early I would come in, it would --
14     Q.   Dr. Diekman --
15     A.   -- still --
16          Yes?
17     Q.   I'm so sorry.  So for us to get through this,
18 if -- if I begin talking, can --
19     A.   Sure.
20     Q.   -- can you just let me talk --
21     A.   Absolutely.
22     Q.   -- and so we can try to get through this --
23     A.   Yes.
24     Q.   -- for everyone's time?
25     A.   I got you.

Page 131

1      Q.   So this one's from Dr. Thornton.  He also gives
2  you level one, level one; critical deficiencies, zero.
3  Level one, level one, level one.  And then he just says
4  Dr. Diekman has good fund of information and an interest
5  in patients.  She has significant challenges with her
6  organizational work habits and interdisciplinary
7  professional interactions.  Her coping strategies in
8  documentation need close supervision.
9          What was his reason for giving you this
10 negative review?
11     A.   I mean, the only thing that changed in between
12 the times when he gave me all the positive reviews and
13 this one was my complaint against Dr. Syfert.  So
14 Thornton is on the VA side of things.  And so when I had
15 a problem with the ER VA doctor, I complained to him,
16 Dr. Turner, Dr. Hobbs, and -- I think Dr. Turner because
17 she was the chief at the time.
18     Q.   Would -- would he --
19     A.   I --
20     Q.   -- have been involved in the parking issue?
21     A.   No, not -- he has nothing to do with the
22 parking issue.  This was -- when he would discuss with
23 me and my ability to get along with other people, he was
24 referring to Dr. Syfert and that --
25     Q.   Okay.

Page 132

1      A.   -- complaint.
2      Q.   So -- so you -- you're saying that he was
3  influenced by the situation with Dr. Syfert?
4      A.   Yes, sir.
5      Q.   Okay.  This is done by -- this is another
6  evaluation.   Who -- who is Leonardo Rodrigues?
7      A.   He does the -- mostly the drug detox team
8  and -- and inpatient on the VA side.
9      Q.   Okay.  And he gave you a three for one, a two
10 for another, a three, a one, a two, a one, a one.
11          Was he influenced by the parking issue?
12     A.   I don't -- well, not directly.
13          So at this point in time -- and this is
14 something that UF has gone on the record and said that
15 is absolutely unacceptable, not okay, is that the
16 residents, after the parking issue -- so this was after
17 the parking issue --
18     Q.   Okay.
19     A.   -- that the chief residents, after the parking
20 issue, started going around to the -- my colleagues and
21 the attendings, telling them that I was lying about
22 having a disability to --
23     Q.   Do you have any evidence of that?
24     A.   Well, yeah.  So, actually, at the time, I filed
25 a grievance with the disabilities office.  And I had two

Page 133

1  witnesses come forward.  And they went on --
2      Q.   When --
3      A.   -- the --
4      Q.   When did you file that grievance?
5      A.   (Indicating.)  In the spring.
6      Q.   Okay.  So that's well after this?
7      A.   Right.  But -- so they're documenting what they
8  saw --
9      Q.   Okay.
10     A.   -- in -- so -- so they're attesting that this
11 happened --
12     Q.   What -- what --
13     A.   -- in the --
14     Q.   So --
15     A.   -- spring.
16          So they're saying that the chief residents were
17 telling people in the department that I didn't actually
18 have a disability, that I was just lazy and trying to
19 get out of work --
20     Q.   Dr. Diekman --
21     A.   -- so they could --
22     Q.   -- is --
23     A.   -- really come back hard on me.
24     Q.   Are -- are -- are you saying that Leonardo
25 Rodrigues was influenced by the chief residents talking

Sarah Diekman
June 17, 2020

Page 134

1  about you?
2      A.   Yes.
3          So San, one of the chief residents, was on at
4  the VA at that time talking to all of the attendings.
5  And --
6      Q.   But --
7      A.   -- UF did do an internal investigation of this
8  and found and, what's the word, ruled that this type of
9  behavior from the chief residents was absolutely
10  unacceptable and could not be tolerated.  They -- they
11  did find that the -- that what the chiefs had done as
12  far as disparaging me was absolutely unacceptable.
13      Q.   Wa -- was there an in -- investigation of that
14  issue?
15      A.   Yeah.  Osfield investigated, and his conclusion
16  was that what the chiefs had done was unacceptable,
17  can't be tolerated.
18      Q.   Okay.  An -- and you do mention in -- in the
19  complaint, you mention -- is it Dr. Chang pretty
20  frequently.  Who is the other -- who is the other chief
21  at the time?
22      A.   Eisner.
23      Q.   Wha -- how come she was not mentioned in the
24  complaint?
25      A.   Probably just for lack of space or whatever

Page 135

1  hap -- I mean, Eisner was doing stuff, too, so --
2      Q.   So you're saying Ei -- Eisner was -- was also
3  engaging in this activity --
4      A.   Yes.
5      Q.   -- (inaudible) Dr. Chang?
6      A.   Yes.
7          THE STENOGRAPHER:  Wait.  I didn't hear the
8  question or the answer.
9          MR. CHAUNCEY:  I asked her that -- whether
10  Dr. Eisner was also engaging in the activity that
11  she was just mentioning, and she says yes.
12          THE WITNESS:  I'm sorry.  Can I just take a
13  five-minute, like, really short --
14          MR. CHAUNCEY:  Yeah.  Take a five-minute
15  break.  That's fine.
16          THE WITNESS:  (Inaudible) a hurry.  I'm
17  sorry.
18          MR. CHAUNCEY:  No problem.
19          THE WITNESS:  (Inaudible.)
20          MR. CHAUNCEY:  Go for it.
21          THE VIDEOGRAPHER:  We're going off the
22  record.  The time is 1:50 p.m.
23          (A recess was taken from 1:50 p.m. to 1:54
24  p.m.)
25          THE VIDEOGRAPHER:  We are back on the record.

Page 136

1          The time is 1:54 p.m.
2          THE WITNESS:  Thank you for the break.
3          MR. CHAUNCEY:  No problem.
4  BY MR. CHAUNCEY:
5      Q.   So doc -- Dr. Diekman, the -- so can the same
6  be said that there's some sort of animus due to the
7  parking with Dr. Holbert?
8      A.   I would not -- I mean, I don't know what
9  Dr. Holbert was tol -- like, at that point, because any
10  rotations that I was on with him were kind of late in
11  the -- in the whole situation where I had already had to
12  come off for -- come off the schedule --
13      Q.   Right.
14      A.   -- which --
15      Q.   This -- this rotation was -- here, it looks
16  like it was from the 1st of January 2015 to the 31st of
17  January 2015.
18      A.   Right.  So that was right after I had to come
19  off the schedule.  I know that the -- so I -- I really
20  am only speculating here, that the chief residents were,
21  at this time, heavily engaged in telling the attendings,
22  the residents that I -- it was all just a farce, and I
23  really was well, and that I was just trying to get out
24  of things.  So I don't know.  I don't know what kind of
25  bias he is experiencing or not.

Page 137

1      Q.   Right.
2      A.   But I can't a -- point to anything particular.
3  And I would have to look at the evaluations he gave to
4  me compared to other residents as well to see even --
5  you know, looking at them in a vacuum, I have no idea
6  what they mean.  Looking at other residents' val --
7  evaluations would give more meaning to them.  So --
8      Q.   Is --
9      A.   -- nothing in particular.
10      Q.   Is Tessy Korah a male or female?
11      A.   A female.
12      Q.   Was she involved at all in the parking issue?
13      A.   No.
14      Q.   Is there a reason why she gave you all twos on
15  this evaluation?
16      A.   I mean, what we've been told about milestones
17  is that -- is that even -- that these are judged as
18  absolute values.  The way the ACGME puts it out for
19  these milestones is that graduation level is somewhere
20  between a three and a four, that you're not really
21  supposed to achieve a five by graduation level, that a
22  five is an expert level, that these are ultimate
23  milestones.
24      Q.   Okay.  Is --
25      A.   So that it -- it really -- a three or a four

Sarah Diekman
June 17, 2020

Page 138

1  should be in your fourth year of residency what you're
2  aiming for.
3      Q.  Okay.  An -- and Dr. Turner, did -- was
4  Dr. Turner also involved in the parking issue?
5      A.  I did report it to -- not the -- not the
6  parking.  I'm sorry.  I -- so I get con -- a little
7  confused with Dr. Turner because she was our chief
8  resident the first year --
9      Q.  Uh-huh.
10     A.  -- and then she was hired by the VA for years
11 two and three.  So I worked with her in two very
12 different roles.  So I have to take a moment to think
13 about which role she was functioning in --
14     Q.  Okay.
15     A.  -- for the question that you're asking me.
16     Q.  Right.  Right.
17         But le -- let me ask you --
18     A.  On --
19     Q.  -- are any --
20     A.  -- (inaudible) --
21     Q.  -- of these evaluations --
22         THE STENOGRAPHER:  Wait.  Wait.  Wait.  Wait.
23     Wait.  I -- I didn't hear.
24 BY MR. CHAUNCEY:
25     Q.  Do -- do any of these evaluations have to do

Page 139

1  with your performance rather than some sort of animus?
2      A.  I mean, I think -- I -- I'm sorry.  Okay.  So
3  this is Turner during 7/14/15, is that right?  Because
4  sometimes the date they're submitted and the date
5  they're for is different.  7/14/15.
6      Q.  Yeah.  This was --
7      A.  Yeah.
8      Q.  Yeah.
9          This was --
10     A.  This --
11     Q.  -- during April the 1st to April the 30th,
12 2015.
13     A.  Yeah.  So during this time I worked with her,
14 she actually did one of my individual.  So aside from
15 these general type of reviews, you can also do an
16 in-depth assessment of a resident interviewing a patient
17 to see if they are up to the level.  And both -- sh --
18 she did  one of me this -- that semester, and also
19 Dr. Hobbs and Dr. Bruijnzeel did a joint one of me a
20 while before.  And everyone passed me for those.
21     Q.  Okay.
22     A.  So during this time she -- she passed me on
23 what is supposed to be a very rigorous exam.
24     Q.  Right.
25     A.  So I -- I -- you'd have to show me more of

Page 140

1  this, the two --
2      Q.  Okay.  In the interest of time, we'll come back
3  to this.  But this is a -- document that was sort of a
4  delinquent duty-hour list.  Have you ever seen this
5  before?
6      A.  No, I haven't seen it.
7      Q.  Okay.
8      A.  So I'm assuming this is whether or not we're --
9  we're entering them -- entering in our duty hours or
10 not.
11     Q.  Right.
12         And you have a -- a lot more delinquent duty
13 hour lists than anybody else that's on this list.
14     A.  Yeah, I'm definitely number one; no doubt.
15 But, I mean, as you can see in this list, this is a
16 cultural thing in the department where it's not taken
17 seriously.  And once they tell us to get our duty hours
18 up to -- to date, then all of those who are delinquent,
19 we take care of them.
20     Q.  All right.  What I'm going to show you next --
21         MR. CHAUNCEY:  That was defendant's Exhibit 5
22     marked.
23         (Exhibit 5 was marked for identification.)
24         MR. CHAUNCEY:  This is going to be
25     defendant's Exhibit 6 as marked.

Page 141

1          (Exhibit 6 was marked for identification.)
2  BY MR. CHAUNCEY:
3      Q.  This was a letter that you wrote to
4  Dr. Bussing.  This is on December the 3rd, 2014.  It --
5  it talks about here that -- that you're asking for leave
6  with pay beginning on December 1, 2014, through
7  December 31, 2014.  Wa -- was that the actual time that
8  you took leave?
9      A.  Yes.  This request was granted.
10         Now this request was not my idea.  I would like
11 to say that what I wanted was to not leave.  What I
12 wanted was to continue working with accommodations.  But
13 Dr. Hobbs said, I have no use for part of a resident;
14 you have to either do everything or be off the schedule.
15     Q.  And did you --
16     A.  So this is what she offered me was to use all
17 the sick days and any time off that I could gather for a
18 month because what I was asking for was a month without
19 call, which they --
20     Q.  Was this --
21     A.  -- have done for other residents before.
22     Q.  Was this --
23     A.  Other residents have gotten that.
24     Q.  Was this on top of your other sick days that
25 you accrue?

Sarah Diekman
June 17, 2020

Page 142

```
1    A.   Sorry.  Rephrase.
2         Q.   Was -- was this addit -- this leave for a month
3    on top of, in addition to, the sick days that you had?
4         A.   They did not have to dip into any FMLA.  Is
5    that what you're -- would that -- is that --
6         Q.   Well, so they -- this -- this leave that you
7    asked for here, this was -- this was on top of your sick
8    days that you had accrued already?  Like, you had -- we
9    had talked about previously that you got ten sick days.
10   So this --
11        A.   Yeah.  And -- and I guess they can use future
12   ones in something like this.  This is something that I
13   think you guys are going to depose Dorothy.  This is
14   where Dorothy really knows more about this than me.
15   That I -- I think they used forward sick days.  But if
16   for some reason I had been fired or quit before I
17   actually earned those, then I'd have to back-pay them.
18   But as long as I continued working -- they -- they
19   advanced me sick -- I think -- I think they advanced me
20   sick and vacation days.  I think this is all of it.
21        Q.   Okay.  Is --
22        A.   But this was not what I wanted.  I wanted --
23   the -- the whole rotation reason I came to UF was to
24   work at FRC.  This was my FRC month.  This was my
25   moment.  This was what I really wanted to do.  And I
```

Page 143

```
1    just needed to not be on call that month so I could
2    catch up on my physical therapy, get my POTS under
3    control.  They had given --
4         Q.   Do --
5         A.   -- other residents months without physical
6    therapy (sic).  But --
7         Q.   Doc --
8         A.   -- Hobbs said no --
9         Q.   Dr. Diekman --
10        A.   -- you're 100 percent on or off.
11             THE STENOGRAPHER:  Wait.
12   BY MR. CHAUNCEY:
13        Q.   Dr. Diekman, it says here at the bottom, it
14   says, at this time I have expended all of my accrued
15   vacation and sick leave and will use one day of advanced
16   sick leave through the end of November.
17             So at this point, is it your understanding that
18   you had used all of your vacation and sick leave before
19   try -- before being granted this month of leave with
20   pay?
21        A.   Yeah.  But from what -- how I was explained --
22   'cause, honestly, I had Dorothy or maybe it was someone
23   else send me this template.  This was all a template.
24   This was not my words because I didn't understand what I
25   should write.  So they sent me a template and I signed
```

Page 144

```
1    it.
2         Q.   Okay.
3         A.   I understand my residency periods will be
4    extended the number of days -- okay.  So for any days, I
5    guess, that are not accounted for, then they were going
6    to extend my residency the length of those days.
7         Q.   Okay.  An -- and it wasn't your words to say,
8    despite closely following medical recommendation, I've
9    not regained functionality while working clinical
10   rotations?
11        A.   I'm pretty sure not.  Yeah, I -- I -- I would
12   have to go back and look at the drafts, but I --
13        Q.   Are you --
14        A.   -- it was unclear to me what I needed to
15   present to do -- I mean, I was desperate.  I was a
16   totally helpless, desperate person.  So these people are
17   giving me a way to take care of my body, to take care of
18   my heart for a month.  And I would have done anything
19   they said.  I was desperate.
20        Q.   This is your --
21        A.   So they --
22        Q.   This is --
23        A.   -- sent me the most template --
24             Oh, yeah, they sent me a template.  I signed
25   it.  I --
```

Page 145

```
1         Q.   Okay.  So --
2         A.   I would have signed away my first child.  I was
3    so desperate.
4         Q.   Just -- just so we're clear for the record,
5    is -- is this your signature?
6         A.   Absolutely, sir.  Absolutely.
7         Q.   Okay.  So what -- what I'm going to show you
8    next is going to be marked as defendant's Exhibit 7.
9             (Exhibit 7 was marked for identification.)
10   BY MR. CHAUNCEY:
11        Q.   This is the milestone -- well, can you identify
12   what -- what this document is or --
13        A.   This looks like one version of the milestones.
14   I have another version of the milestones that actually
15   changes later, that gets --
16        Q.   Okay.
17        A.   -- altered after they terminate me.
18        Q.   Okay.  But from what you can tell, is -- is
19   this an accurate representation of -- of your milestone
20   scores?
21        A.   It's actually really hard to say because there
22   would be -- thank you for that.  But even looking at
23   them closely -- because on different documents there
24   would be different numbers.
25             So one of the things that, at the time, nobody
```

Sarah Diekman
June 17, 2020

Page 146

1   made much of a fuss over was that Dr. Hobbs was not
2   following the ACGME standards of giving us two annual
3   reviews per year and categorizing and carefully going
4   over these milestones.  So there's a lot of -- of
5   mismatch when it comes to the recordkeeping and when we
6   got these milestones.  If you look at the length of time
7   that I was there and the number of annual reviews that I
8   had, it -- it is way less than someone who should have
9   been having two annual reviews per year.  So they were
10  very, very lax when it comes to the recordkeeping and
11  their responsibility to be fulfilling ACGME standards
12  when it comes to the milestones.
13      Q.   All right.  Generally, though, I mean, were
14  your milestone scores low during when this --
15  December 2014?
16      A.   Actually, no.  Many of my -- if you go to -- we
17  have different records.  We have different records that
18  show that my milestones were of a three, some of a four.
19  And those are graduation levels if you look at the
20  ACGME.  And those were all backdated and changed after
21  they chose to fire me and more than a month after they
22  chose to fire me.  So it could not have been the basis.
23  And I mean not just the milestones from that year, from
24  the years before the -- the record totally changed.
25      Q.   Do you have any evidence of that?

Page 147

1       A.   Yeah.  I have a video of -- my -- my attorney
2   has it.
3            MR. CHAUNCEY:  I -- I haven't seen video,
4   Andrew, of -- is -- is there a video.
5            MR. SALZMAN:  I -- I -- if we haven't sent it
6   over, I'll find out where it is.
7            MR. CHAUNCEY:  Okay.
8            THE WITNESS:  Yeah, we can get that to you.
9   BY MR. CHAUNCEY:
10      Q.   There's a -- and what's the video of?
11      A.   So the video of -- and granted I -- I do feel,
12  like, very conspiratorial having done the video, but it
13  was the best I could do.  I didn't know what else to do.
14  So I had, for some miracle, a voice in my head had told
15  me as soon as I found out that I was being terminated to
16  print out my records.  So I printed them all out.  That
17  was sometime, like, before Christmas, around Christmas,
18  something like that.  So I have the milestones scores
19  there.
20           And then -- now I don't know when they changed.
21  But I do know that I looked at them maybe 40 days later,
22  and, granted, when I looked at them the first time I had
23  already been fired.  Right?  So could not have formed --
24  these grades could not have been the -- so these grades
25  were the basis of my termination.  Then some 60 days

Page 148

1   later I looked at them again and they had changed.
2   Anything above a three had been eliminated.  And I
3   printed out a copy of that.  I printed out -- well, I
4   already had the first copy.  And then I've also taken
5   videos of the printed copy that I had and the printed
6   cop -- or -- of the computer screen.  Because I'm
7   horrible with computers, I don't know any of this
8   forensics.  Stuff, so I just tried to document it in any
9   way I possibly could.
10      Q.   Okay.  So you have a video of the previous
11  documents, but do you have the -- the printout of those
12  documents?
13      A.   Salzman has them.
14      Q.   Okay.
15      A.   The -- the actual physical documents he has.  I
16  have a video of me looking at those physical documents,
17  looking back to the computer screen, looking back to the
18  physical documents.  I try to look at the timestamp on
19  my computer.  I mean, this is really me doing all this
20  stuff I saw on TV because I don't know anything.  I
21  think I might have looked at a newspaper, tried to give
22  you a date stamp because I don't know how to do any of
23  this.
24      Q.   Right.
25      A.   So I did the best I could.  The -- the videos

Page 149

1   kind of do seem a little bit wow, but I -- I didn't know
2   how -- you know, I'm not a computer forensics
3   specialist.  But I did know what was in front me was
4   pretty important, that those grades had been changed,
5   and they had been changed after I had been fired.  So
6   could not have been the reason they fired me.  They were
7   covering something up.
8       Q.   Ha -- had they -- are you sure that they had
9   put in your milestone scores into whatever system by the
10  time that you had been provided a termination letter?
11      A.   Right.  So I would think with an open mind,
12  okay, these PGY3 -- so they fired me in year three.  And
13  I think, okay, three -- well, turns out they all, you
14  know -- you know, decided that I'm the worst ever.  So
15  they have a right to change the third-year scores.  They
16  decided in the third year that I'm horrible, they want
17  to fire me; I think that's fair.  You know, you can
18  change the third-year scores.
19           The problem is they changed the second-year
20  scores.  And those are historical.  I was not in the
21  second year.  The second-year scores are what the
22  second-year scores are.
23      Q.   Okay.  So let's move forward a little bit from
24  here.
25      A.   Okay.

Sarah Diekman
June 17, 2020

Page 150

1    Q.   I've got what is going to be marked as
2  defendant's Exhibit 8.
3         (Exhibit 8 was marked for identification.)
4  BY MR. CHAUNCEY:
5    Q.   And so there's -- there's a series of e-mails.
6  Some of them include you; some of them don't.
7         Here's an e-mail I wanted to ask you about.
8  This is on July 11, 2014.  You're talking about how
9  Dr. Fayad previously sort of had an animus against you
10 due to the parking incident.  I just wanted to ask you
11 if you have any recall of this situation on July 11th.
12 It just says -- and this is from Dr. Fayad to Dr. Hobbs.
13 This says, just wanted to let you know that I met
14 yesterday with Sarah to discuss her performance on
15 con -- consults.  Many of her notes have been
16 indecipherable and difficult to read.  For instance, in
17 one note she stated that the patient had a history of
18 schizophrenia 910.  Not sure what 910 meant, and she is
19 not either.  She has -- she was also on -- she was (sic)
20 also unusual wording throughout the note that did not
21 make sense.  She told me she had dyslexia and is a -- is
22 using a dictation software to help with this.
23        Do you -- do you recall meeting with her about
24 this incident?
25    A.   I don't -- I would have to actually see the

Page 151

1  specific note that she's talking about.
2    Q.   Okay.
3    A.   I would have to actually see it.
4    Q.   All right.  So this is from Adrienne Eisner.
5  And you were mentioning that Dr. Eisner was one of the
6  chiefs?
7    A.   Uh-huh.
8    Q.   Is that -- that's a yes?
9    A.   Yes, sir.  I'm sorry.
10   Q.   Okay.
11   A.   Yes.
12   Q.   No, you're good.  You're good.
13        She talked about how -- this is on August the
14 25th, 2014, that she wanted -- that she was letting
15 Dr. Hobbs know that at the end of her lecture that you
16 walked in when we all got up from sitting and -- and you
17 saw -- that she saw you signing in for the lecture.  She
18 actually looked at me and said hello and took the sheet
19 and signed it.  It is needless to say I was speechless
20 and I didn't believe that she was actually doing that.
21        Do you recall this incident?
22   A.   I honestly don't.  During that time, I was
23 really dealing with so many health issues and trying to
24 function with, you know, my severe tachycardic syndromes
25 all the time.

Page 152

1         But this is Dr. Eisner who was spreading lies
2  about me.  Like, we -- we -- UF has confirmed that, that
3  she was saying things to faculty members that were not
4  true.  UF, in the ADA office, did not dispute it.  They
5  said this --
6    Q.   Okay.
7    A.   -- behavior is condemned, so --
8    Q.   Doc -- Dr. Diekman, do you -- can you tell me
9  who -- what this person's name is?
10   A.   Oh, Dr. Bruijnzeel.
11   Q.   Okay.  And Dr. Bruijnzeel, she mentions --
12 sends another e-mail to Dr. Hobbs saying, I wanted to
13 let you know that I'm on call with Diekman, and she
14 continues to be disorganized and unable to present
15 clinical information about a patient in a coherent
16 manner.  It's like talking to somebody with expressive a
17 -- aphasia and trying to guess what they're talking
18 about.
19        Do you re -- recall, in around October, just
20 having issues with Dr. Bru -- Bru -- is it Bruziel
21 (phonetic)?
22   A.   Bruijnzeel.
23   Q.   Bruijnzeel.
24        Do you recall having issues with
25 Dr. Bruijnzeel?

Page 153

1    A.   I do.  It was -- sorry.  This is actually
2  really embarrassing for me.  Because of -- you know, so
3  there's times when my breathing is -- is -- like if my
4  tachycardia is really bad, it might -- like, I have to
5  catch my breath for a second.  And almost every time
6  that I talked to Dr. Bruijnzeel she would, for lack of a
7  better word, make fun of me.  She -- she would say that
8  I sounded like an idiot, and she'd asked me, like, why
9  are you talking that way.  And I would tell her I have a
10 heart problem.  And she was -- I don't re -- even
11 remember exactly what she'd say to that, but it was
12 something like, you've got to get it under control
13 because you sound like an idiot.
14   Q.   Was -- was she influenced by this -- the
15 parking issue?
16   A.   I don't think so.  I think this was just -- I
17 don't know because Dr. Bruijnzeel is kind of -- I don't
18 know how tight she is with anybody.  There's no direct
19 link.  I think she just didn't like the way I talked.
20   Q.   Okay.
21   A.   And I would explain to her that, you know, I
22 have a heart condition and -- and a lot of times when I
23 staffed wi -- with her overnight because she was at
24 the VA.
25   Q.   Uh-huh.

Sarah Diekman
June 17, 2020

Page 154

1    A.   So my dysautonomia is really bad in the
2  morning.  And sometimes my heart is just beating.  I to
3  take a moment.  And I'm trying not to, you know,
4  like -- like, (indicating), like pant on the phone.  So
5  I take a moment, say the words, catch my breath in
6  between the words because, to me, that's the most
7  professional way to deal with it.  And I told her that.
8  But she -- like, no amount of explaining -- and -- and I
9  had explained this to other attendings.  You know, we do
10 work with a lot of attendings, like 30 or 40 people take
11 call with us.  And everyone was fine with it, but she --
12 it -- it really -- I just felt so embarrassed.  I felt
13 so embarrassed that my, you know, inability to talk like
14 she thought I needed to, to sound intelligent -- it was
15 humiliating.  It was absolutely humiliating.  I --
16    Q.   Dr. Diekman --
17    A.   -- (inaudible.)
18    Q.   -- who's Joel Fernandes?
19         THE STENOGRAPHER:  Wait.  I'm sorry.
20 BY MR. CHAUNCEY:
21    Q.   Doc --
22         THE STENOGRAPHER:  You were over speaking.
23 BY MR. CHAUNCEY:
24    Q.   Dr. Diekman, who's Joel Fernandes?
25    A.   So Dr. Fernandes went to either -- I think he

Page 155

1  was with us in residency for two years.  So when he
2  would have written that, I think that was, like, his
3  first month as an attending.  I could be wrong.  I could
4  be a year off.  But he was definitely a resident while I
5  was a resident, a few years ahead of me.  But then he
6  became an attending.
7         So I -- I -- I don't have any particular
8  explanation for -- for Fernandes.  You would have to
9  compare him to all the other residents and what he wrote
10 about the other residents because a lot of people
11 complained.  I don't think that, honestly, Joel had any
12 problem with my disability or anything like that.  I
13 think he just -- I -- I -- I think he was just pretty
14 dem -- like, he had certain expectations of all
15 residents, so I would read his comments for all
16 residents.  I don't think he had anything to do -- any
17 problem with the disability or anything like that.
18    Q.   Okay.  Do -- do you recall he says whe -- when
19 on call in August, there was a P2 (sic) who I was told
20 was not to taking his medications as --
21         THE STENOGRAPHER:  Wait.  I'm sorry.  Can you
22    repeat that.
23 BY MR. CHAUNCEY:
24    Q.   It says, when on call in August, there was PT
25 who I was told was not taking his medications.  I

Page 156

1  specifically asked if the PT meant his psychotropics,
2  medical meds, or both.  And she, referring to
3  Dr. Diekman, told me, all -- although I suspect this was
4  not specified.  The next day the PT's BP and glucose
5  were running dangerously high because he was taking his
6  medical meds, not just his psych meds.
7         Do you remember an incident like that?
8    A.   I mean, you'd have to consult the records
9  because, I mean, it's one thing what the patients tell
10 us, but it's another thing what they're doing, so --
11 and -- and you'd also have to see how many times that --
12 that -- whether Joel was treating me similarly to his --
13 to the similarly-situated peers.  I don't know.  He was
14 a new attending, or maybe I was just that bad.  I don't
15 know.  But I'd have to look at actually what happened
16 with that patient.
17    Q.   Okay.  This is a situation on November the
18 23rd, 2014.  This was -- do you remember getting this
19 e-mail from Dr. Hobbs?  It's --
20    A.   No.  I have to read this one.
21         Okay.  But here it says the patient was not
22 seen because of a phone issue.
23         Actually, I do think I remember it because --
24    Q.   Okay.
25    A.   -- I think I got -- yeah, this e-mail was sent

Page 157

1  to me.
2    Q.   Uh-huh.
3    A.   And I thought, how am I -- like, am I supposed
4  to be clairvoyant?  I -- if there's a phone issue, so I
5  can't see the patient, how -- how can I -- I mean, this
6  was the point of time where everything was just being
7  blamed on me.  So whether it made sense or not, I -- I
8  take care of the patients that I know of.  But I can't
9  psychically sense -- need to document all calls in my
10 sign-out.  But this patient wasn't -- I didn't get
11 notice of the -- the call.
12    Q.   Okay.  Here's an e-mail from Dr. Thornton to
13 Dr. Hobbs.  It just says, I'm in receipt of a letter --
14 this is in March 9, 2015.  I'm in receipt of a letter
15 from the chief of staff office citing inappropriate
16 copy/paste in the medical records.  Dr. Sarah Diekman is
17 cited by the compliance office for two instances of
18 copy/paste in two records, on 12/15/2015 and 12/16/2015.
19 She is cited for the copying assessment, psychiatric
20 diagnosis, medical diagnosis, psychosocial problems from
21 one patient's record and pasting it into another.
22         Do you have any recollection of this occurring?
23    A.   Yes, sir.
24         So this goes back to our description of our
25 duties while we were on call.  So this would have been a

Sarah Diekman
June 17, 2020

Page 158

1  weekend ward call.  And during the weekend ward call,
2  one resident is taking care of 60 patients, which are
3  normally allotted to four-patient teams.  And each team
4  will have an attending and a psychiatric resident on
5  that.
6          So on the weekend, the main job is to make sure
7  that no emergencies happen.  If the weekday team had any
8  special requests, that you take care of those over the
9  weekends, and that it just -- nothing bad happens
10  looking in on the patients because we can't perform a
11  full psychiatric exam.
12          I mean, to re-diagnose somebody takes an hour.
13  And you do the math.  There's only 24 hours in a day.
14  There's 60 patients on the unit.  So it would take 60
15  hours to re-diagnose the patients.  So that's not what
16  we're supposed to do.  We're supposed to take the
17  previous team's diagnosis, copy and paste it over to the
18  weekend notes.  And there's a standard format, and the
19  format says that we copy and paste it from the weekdays'
20  notes.
21          And there was a computer problem, and this one
22  copy and pasted the wrong diagnosis, like, into the
23  wrong patient's notes.  So that's why they let us know
24  to correct it.
25      Q.  And is --

Page 159

1      A.  (Inaudible) corrected.
2      Q.  Is that dangerous for the patient?
3      A.  I mean, it could be potentially, yeah.  I'm not
4  going to lie about it.  But I'm not the only one who did
5  this.  I mean, this -- this happened.  And this
6  incident, I was not the only one.
7      Q.  Okay.  Did -- did the --
8      A.  No one else got fired.
9      Q.  Did this happen to you other times?
10      A.  No.  This was the incident.
11      Q.  Okay.
12      A.  Or at least that I know of.
13          Are you talking about copy and pasting in
14  general or is this specific?
15      Q.  Let's talk about copy and pasting in general.
16      A.  Okay.  That's a different question.
17      Q.  Did -- did you copy and paste in general?
18      A.  Yes, as did everyone else in the program.
19      Q.  Okay.  Was -- was that against the regulations
20  provided by the program?
21      A.  It is not.  It is not against the regulations
22  from CMS.  It is not reg -- against the regulations from
23  the office of the inspector general.  It is just --
24  it's standard practice.
25          Now unverified copy and pasting regulations,

Page 160

1  that's -- I mean, that's a problem.  Like, if you're
2  putting something in the chart that you didn't do, or
3  something in the chart that is inaccurate, saying
4  something is part of the history and it's not.
5      Q.  Dr. Diekman, this is an e-mail from a Christine
6  Martin.  Do you know who Christine Martin is?
7      A.  I think she was the clinic -- yeah, I think she
8  was, like, the -- clinic coordinator.
9      Q.  In this e-mail, she's asking Dr. Ginory and
10  Dr. Hobbs to remind you to check your e-mails about late
11  patients, saying that you didn't respond to a late
12  patient that walked in.
13          Do you recall this incident on March 17, 2015?
14      A.  So what time?  So this would be at 10:30.
15      Q.  Yeah, so it would have been the day before on
16  March 16th.
17      A.  Yeah.  See it -- it depends on what time she
18  sent me the e-ma -- I mean, of course I check my e-mail.
19  But you have to understand that Dr. Hobbs -- and this
20  was part of the reason she designed my schedule the way
21  she did so that I would encounter problems, and then
22  she'd have an excuse to say I was performing badly.
23          She put my clinic day on Mondays, which is the
24  latest day to try and get out of the Shands VA side of
25  things because the -- one, the taf -- traffic is

Page 161

1  terrible.  Trying to get up to the other side of town to
2  Springhill will take you 45 minutes in traffic.  And
3  so you have to be there by a certain time.
4          And then, meanwhile, you're over at the Shands
5  side.  And if you have your people at the Shands side
6  giving me a ton of patients, keeping me super busy, and
7  then also giving me discharge summaries -- so that's the
8  problem with why a -- a Monday clinic is the hardest is
9  because even if you happen to get lucky and you're on an
10  inpatient service, so you're close to the physical
11  office, you still have discharge -- all the discharge
12  summaries from over the weekend to write.  So you have a
13  lot of work to get done by 12:00 p.m., in order to get
14  to the clinic on time.  So it's everything you can do.
15          And if those attendings on the other side want
16  to give you the one extra patient and not give it to the
17  other person who has nothing else to do, then you have
18  to finish the one extra patient, you're in such a rush.
19  Then you have to physically drive across town, get
20  there, and then the clinic is mad because they're
21  double-booking patients for me, and they're saying that
22  in this time where I'm rushing across town that I should
23  have noticed that they --
24          So they made a mistake.  They made a mistake
25  double-booking patients, which is against policy.  They

Sarah Diekman
June 17, 2020

Page 162

1 made a mistake, and they're saying it's my fault they
2 made a mistake because I should have caught it during
3 this time that I'm rushing across town because they're
4 giving me more patients on the first part of the day and
5 then more patients on the second part of the day.
6     Q.   Dr. Diekman --
7     A.   And --
8     Q.   -- this e-mail's from March 20th of 2015.  This
9 is from Adrienne Eisner to you.  Do you recall this
10 e-mail?
11     A.   I'd have to look at this e-mail.
12     Q.   It says it's about sign-outs.  It says, I
13 wanted to bring up some suggestions about your
14 sign-outs.  It says, except for today's sign-out, I
15 don't see anything in them updated, medications,
16 current, trading up or down.
17         What -- is a sign-out?
18     A.   So a sign-out is the way that one resident
19 communicates to another.  As --
20     Q.   And did --
21     A.   -- as -- so in order to know how to take care
22 of that patient on the night shift, et cetera.
23         So I ran all my sign-outs by -- so Adrienne was
24 not on that service anymore, except for a couple of days
25 when I was out for a funeral.

Page 163

1     Q.   Uh-huh.
2     A.   She came back.  And actually those days she did
3 some stuff wrong, which then she blamed on me.  I took
4 my sign-outs from Dr. Solomon, who's the attending.  So
5 I ran the sign-outs by Dr. Solomon, and he told me what
6 to do with the sign-out --
7     Q.   Okay.
8     A.   -- on his service.
9     Q.   And this situation, she's saying that she spent
10 45 to 60 minutes deleting, correcting, and adding on the
11 sign-out.  So you're saying --
12     A.   I asked Dr. Solomon about that, and he said he
13 disagreed with Adrienne's version of doing sign-outs,
14 and that he would like me to do them a different way.
15     Q.   Okay.  So he -- the -- the attending asked you
16 to do it a different way than --
17     A.   Yeah.
18     Q.   -- what --
19     A.   You'd -- you'd have to interview Dr. Solomon.
20     Q.   Okay.  This e-mail's from Dr. Hobbs to you on
21 March 21, 2015.  It says that there's a message from New
22 Innovations saying that -- that you have been struggling
23 with some administrative tasks, that you hadn't -- let's
24 see.  It says down here that there was a notice that was
25 sent because you had been assigned a checklist through

Page 164

1 New Innovations to complete the training model titled
2 use of nursing communications by house staff, and it
3 hadn't been completed.
4         Do you remember this incident?
5     A.   I don't, but that's probably just some --
6 something I needed to do.  And then I did it because --
7 yeah, needed to be done.  And I should have done it
8 before she sent me that mir -- reminder, but I didn't.
9     Q.   This is a few days later, on March 26, 2015.
10 It says -- this is from Dr. Hobbs to you.  It says,
11 Sarah, upon review of your New Innovations case log, it
12 appears that you have not logged any cases to date.
13 Even with your time off, you should have logged over
14 500 cases by now.  Please attend to this immediately.
15         Can you explain what a New Innovations case log
16 is.
17     A.   This is just -- so you go over all the patients
18 that you've seen, and it's a little bit like the more
19 you've seen, the more busy you've been, so the harder it
20 is to log them.  So if you've been taking care of a lot
21 of patients, it's hard to track them --
22     Q.   Uh-huh.
23     A.   -- or, you know, do all the -- the cases.  But
24 this -- I mean, this is fair.  I needed to -- I needed
25 to get on there and update it.  So I did.

Page 165

1     Q.   Is this a pretty serious issue?
2     A.   No.  If it was a serious issue, then it
3 wouldn't be as common as it is.  Every -- like, it's
4 very common for people to get behind on their case logs.
5 And it's -- I mean, and that's why they only check in on
6 us annually to see if -- if we've done them annually.
7 If it was serious, they'd be checking once a month or
8 they would be assigning us time to do it.
9         I mean, this is just something that, between
10 all these other duties they're giving us, we're just
11 supposed to find free time to do this.  If it was
12 serious, they would be giving us protected time.
13     Q.   Okay.  Let's -- let's see.  There's one more
14 that we'll discuss here.  It says here -- this is from
15 Dr. Ginory.  This is on March 30th.  It says that
16 there's a note that you wrote from 11/10/2014 that you
17 sent to Dr. Averbuch instead of Dr. Holbert, which he
18 never rerouted.  I just did.  But this is what she typed
19 in the patient record.
20         And this is, I guess, an example of what you
21 wrote, copied and pasted, author type, resident status,
22 signed, sensitive note, I'm not sure how to change the
23 co-signer at this point.  I've been trying for the last
24 half hour.  Will call people tomorrow to help me.  Sorry
25 about that.

Sarah Diekman
June 17, 2020

Page 166

1        Do you remember writing that note?
2      A.   I do not, specifically, that note, but I
3  remember this whole kind of sequence of events.  This
4  was after Adrienne and Chang, so this was after the
5  parking stuff.  And they told me that they are not going
6  to help me with any questions that I might have.  And
7  this was one of the things where I really needed a chief
8  resident to tell me how to do this, how to do this
9  correctly.
10        When I finally badgered one of them enough to
11  help me, then they told me how -- they -- they advised
12  me wrong.  And the -- that was the best training I could
13  get was just in -- in desperation, like begging somebody
14  to show me how to do this stuff with the computers,
15  because it's a complicated computer system, and you only
16  know if somebody else taught you.  They learned it from
17  someone else and -- so they either refused to help me at
18  all or then when they'd help me, they would direct it --
19  they would direct me to do something incorrect.  And
20  that -- after a while, I realized that's what they were
21  doing.  So I tried calling IT to -- directly.  And
22  sometimes IT directly could help me resolve some issues,
23  but some of them they were, like, you've got to ask your
24  departments how you're supposed to do this, like, there
25  should be someone training you; why isn't there someone

Page 167

1  training you.
2      Q.   Okay.  So what I'm going to show here is --
3        MR. CHAUNCEY:  Mark this as defendant's
4  Exhibit 9.
5        (Exhibit 9 was marked for identification.)
6  BY MR. CHAUNCEY:
7      Q.   This is a letter -- well, this is actually a
8  note that was taken by Dr. Hobbs on August the 1st,
9  2014.  It talks about how you had met with Dr. Fayad,
10  Dr. Ginory, and that you had discussed your poor note
11  quality.
12        Do you remember meeting with them on July 29,
13  2014?
14      A.   Yes, sir.
15      Q.   What -- what was that meeting about?
16      A.   They did talk about my notes.
17      Q.   What -- was there -- were their criticisms
18  fair?
19      A.   I -- I do think that some of the criticisms
20  were fair, yeah.  And, I mean, as odd as it is, you'll
21  see in -- I -- there's a later e-mail from Fayad in
22  which -- I think in the e-mail she tells me the next
23  year that my notes have improved a lot.  And then when
24  it comes to the official -- when it comes to the
25  official record, she says they're horrible, so --

Page 168

1      Q.   Did you --
2      A.   I don't know.  I tried to take their -- their
3  recommendations.
4      Q.   Did -- did you -- did you mention in -- in that
5  meeting, as it says here, that -- that you -- your main
6  issue was time management?
7      A.   Oh, yeah.  And, I mean, this is -- this is
8  where we would get into the discussion of my disability.
9  And I'd say, you know, I have to take breaks when you
10  send me into the burn unit.  I cannot go into the burn
11  unit in those hot temperatures.  I cannot walk in the
12  team -- because I have to sit down and recover
13  physically.  I mean, my heart is at sustained
14  tachycardia for prolonged periods of time.  I can't just
15  sit down and write a note.  I have to catch a breath.
16  My body has to cool down.
17      Q.   Did -- on -- on October 31, 2014, there's a
18  note here that talks about how you had called out sick
19  but that you were planning a -- a Halloween party for
20  that night.  Did -- do you recall that?
21      A.   I don't recall that.
22      Q.   Okay.  There's a note here as well from
23  Dr. Hobbs that's from an e-mail that she says that you
24  wrote that just says, Dr. Hobbs, is there a time we can
25  meet next week to discuss some issues surrounding

Page 169

1  chronic medical conditions at work.  I'm really
2  struggling not having my parking pass, and working three
3  rounds of -- of night float during the worst time of the
4  year has really taken a toll.  I thought my health would
5  be better by now, but it continues to worsen.  I'm
6  having to call off frequently, and it is not fair to the
7  chiefs and to the people that have to cover for me.  I
8  will have a discussion with one of my doctors today, but
9  I am maxed out on most of my medications.  I think I
10  might have to take a medical leave of absence.  I don't
11  know what else to do.
12      Q.   Do you remember sending that to Dr. Hobbs?
13      A.   I don't remember it, but it certainly sounds
14  accurate, yes.  I mean, I -- I remember reaching out
15  in -- in desperation, yeah.
16      Q.   So was it your idea to take a medical leave of
17  absence?
18      A.   I could see why you would think that from
19  reading this, but in our conversation -- so you have to
20  understand that my only experience in getting any sort
21  of reprieve time for medical conditions was, in medical
22  school, taking a medical leave of absence.  And that's
23  when I got diagnosed.  And, you know, it's kind of a --
24  it's -- it's like the -- the panic button.
25        But during our conversation, I brought up

Sarah Diekman
June 17, 2020

Page 170

1   multiple times, and I thought it was a good thing, that
2   I wanted to work, that I wanted to stay on the schedule,
3   that I had concerns that this would affect my -- my
4   professionalism view in the whole residency, that people
5   would think less of me if I came off the schedule, that
6   my patients would cancel and not come back to my clinic
7   if I wasn't there to take care of them. Those were all
8   things that I offered.
9       So those -- I mean, those were my real
10  requests. And this was my last request, the -- the most
11  desperation of all requests was that I just -- I don't
12  think that I can carry on. I have to do the physical
13  therapy, but I can do the physical therapy and work if
14  only you take me off the call schedule. I can work the
15  eight to five schedule. I'm so excited, actually, to
16  work on that rotation. That's why I came to this
17  school. Please don't take me off the rotation. And she
18  said, I have no use for part of a resident. You're
19  either unimpeded or you're off the schedule.
20      Q.   Dr. Diekman, are -- are the -- being on call,
21  is that part of the program?
22      A.   You have to do two years of call, yes.
23      Q.   Okay. So if she took you off call, is -- is
24  that not fulfilling the program?
25      A.   I could have made up the call the month

Page 171

1   after -- I could have made up the call.
2       Q.   Okay. She writes in a note here on --
3       A.   And --
4       Q.   -- on --
5       A.   And -- I'm sorry to interrupt. But she has
6   done that for other residents. I mean, that's why I
7   know it's possible. When the one resident threatened to
8   blow up the VA and kill his boss, and he wasn't allowed
9   over there anymore, they let him keep working his
10  daytime rotation; he just wasn't allowed on call for a
11  little while 'til they worked that out.
12      Q.   Do you know that for sure?
13      A.   You'd have to check your own records for sure,
14  but I definitely, in good faith, know that this
15  happened.
16      Q.   You know that what happened, that --
17      A.   That in December of 2015 a resident was taken
18  off the rotation for threatening to -- to cause
19  physical harm to the VA and his supervisor --
20      Q.   You know --
21      A.   -- to --
22      Q.   You know that through firsthand knowledge?
23      A.   I wa -- I was not a witness. This would be
24  hearsay knowledge, yeah. But --
25      Q.   Was that --

Page 172

1       A.   -- your --
2       Q.   Was that --
3       A.   I --
4       Q.   -- a rumor?
5       A.   No. Your records certainly have that as -- as
6   firsthand knowledge. You can get that as firsthand
7   knowledge.
8       Q.   But did -- did you hear that as a rumor?
9       A.   Well, he was taken -- the only direct knowledge
10  I have was he was taken off our call schedule and kept
11  on the daytime schedule.
12      Q.   Okay. Dr. Hobbs has a note here where she says
13  she spoke to you on December 18, 2014. And it says that
14  she -- that -- it says, the purpose of this call was to
15  also let Sarah know that she could work with her on --
16  that we could work with her on a part-time return to
17  work that would be more conducive.
18      Do you recall that?
19      A.   I do. And at that time, I didn't need it. But
20  in two months -- because I had just been off for a
21  month, and I didn't need to be off for a month. What I
22  really needed was 75 percent time.
23      Q.   Okay.
24      A.   And by 75 percent time, I just needed to have
25  my workday begin and end at protected times and not have

Page 173

1   fluxes in my schedule so that I could take my
2   medications and do my physical therapy.
3       Q.   Okay. What I'm going to mark next is the
4   defendant's Exhibit 10.
5       (Exhibit 10 was marked for identification.)
6   BY MR. CHAUNCEY:
7       Q.   Dr. Diekman, do you recall this letter from
8   Dr. Hobbs? I know you don't have it right in front of
9   you, but --
10      A.   Yeah, but I can see what you're putting up.
11      Q.   This is a -- September 3, 2015, a probation
12  letter?
13      A.   Absolutely.
14      Q.   Okay.
15      THE WITNESS: Do you mind, can we take, like,
16  a -- just a -- a really quick break?
17      MR. CHAUNCEY: Yeah, that's fine.
18      THE WITNESS: Just a minute. I'm sorry.
19      MR. CHAUNCEY: No problem.
20      THE VIDEOGRAPHER: We're going off the
21  record. The time is 2:47 p.m.
22      (A recess was taken from 2:47 p.m. to 2:53
23  p.m.)
24      THE VIDEOGRAPHER: We are back on the record.
25  The time is 2:53 p.m.

Sarah Diekman
June 17, 2020

Page 174

1    BY MR. CHAUNCEY (cont'g):
2        Q.   All right, Dr. Diekman.  So -- so you were just
3    mentioning before we went off the record that you recall
4    getting the -- the probation letter from Dr. Hobbs.  Did
5    you -- I guess what was your reaction to getting the
6    probation letter?
7        A.   This is the one I signed in spring, right?  Can
8    you -- can you show me the -- the date of this one,
9    please.
10       Q.   This one's in September the 3rd.
11       A.   Oh, okay.  Okay.  Yeah.
12       Q.   There was a -- there was a pre-probation letter
13   as well, I believe, that they had sent you --
14       A.   Yeah.
15       Q.   -- is that correct?
16       A.   Which is not part of their policy.  I mean,
17   that's part of that whole, do they follow the handbook
18   stuff, because I looked to the handbook to compare any
19   of this.
20       Q.   Well --
21       A.   And it was --
22       Q.   In that letter, and I can find that letter as
23   well.  I mean, were -- were they just warning you that
24   you co -- that if you continued to perform poorly that
25   you could go on to probation?

Page 175

1        A.   It wasn't just a warning.  It was a warning and
2    a punishment.  They rearranged the entire rest of my
3    schedule in a punitive way.  So it was a warning, but it
4    was also a -- a judgment.
5        Q.   All right.
6        A.   So then she -- so prior to this, my attendings
7    on the rotations that I was trying -- or that I was on
8    were telling me, oh, Sarah, Dr. Hobbs called me and
9    warned me about you and told me to report everything
10   that you were doing, whether it was big or small,
11   whether it was something that I would normal -- normally
12   report or not.  And --
13       Q.   Okay.
14       A.   -- so I thought, okay, that doesn't sound
15   great, but what can I do, just keep doing your job;
16   that's all you can do.  And so I kept doing my job.  And
17   then this happened in, yeah, September.
18       Q.   Did -- did the probation letter -- I mean, does
19   it provide for different things that you needed to
20   change in your performance?
21       A.   Honestly, the -- the most of this probation
22   letter is -- is just pure pretext.  I -- I can't say
23   that an -- much of this is -- this is really, like, what
24   she asked the attendings to do, to send her the small
25   stuff, whether it's stuff that they would normally send

Page 176

1    her or not.  This is -- this is really just a
2    compilation of tiny de -- tiny things that -- that
3    everybody does and -- and normally no one would pay any
4    attention to.  And -- so just an excuse.
5            And then this was also at the end of the day
6    when I really needed to eat, I was hypoglycemic, and I
7    really -- I told her, I need to eat something before I
8    can properly read this.  And she said, you're not
9    getting out of this room without signing this, and just
10   sign it.  It -- you're only signing it and -- now,
11   having been trained in the law, I'm completely
12   embarrassed that I did this.  But she's, like, if you're
13   signing it, it doesn't mean that you're agreeing to what
14   it says.  It just acknowledges that you received it.
15       Q.   Right.
16       A.   But this is not -- but, I mean, this probation,
17   I -- I think they're trying to put this forth as, like,
18   a modification of the contract that I agreed to.  And
19   she -- it -- it was, like, you sign this or you don't
20   have a job anymore.  And I said, I really think that I
21   should have a lawyer look this over.
22            And there was another time -- there were
23   several meetings where I asked to have counsel present,
24   and they said no way.  Then I asked for an impartial
25   witness.  I said, fine, not a lawyer, but I want

Page 177

1    somebody who is not just totally involved in this
2    department and all the politics here.  I just want an
3    independent person.  And I wrote multiple e-mails with
4    that.
5        Q.   Okay.
6        A.   Just, please, just a witness, can we please
7    have a witness to what is happening in these rooms.
8    Because what they say they're doing is not what they
9    are -- what they do.
10       Q.   Did -- did this letter lay out certain
11   objectives that you needed to meet to stay in the
12   program?
13       A.   I -- honestly, what this letter mostly -- I
14   mean, so certainly on paper this lays out a --  bunch of
15   things.  Subjective requirements.  Can you scroll
16   through it a little bit.
17       Q.   Yeah.  Yeah.  I mean, this is the top.
18       A.   I think it --
19       Q.   Talks about here some -- this goes through some
20   different issues that they -- they're alleging that you
21   had, errors in medical orders, failing to take ownership
22   of patients, patients' care, and then list out specific
23   instances, poor --
24       A.   (Inaudible.) --
25       Q.   -- quality --

Sarah Diekman
June 17, 2020

Page 178

1    A.   -- we're --
2    Q.   -- talking about some of the --
3         THE STENOGRAPHER:  Wait. Wait. You're
4    talking at the same time. I'm sorry.
5         THE WITNESS: Sorry.
6    BY MR. CHAUNCEY:
7    Q.   Go on, Dr. Diekman.
8    A.   Yeah.  So the specific instances are all
9    amalgamations of -- that result to a falsehood.  Like,
10   they need to actually produce those patients.  I mean,
11   they have to produce the patients' charts because this
12   is not a fair representation of the specific incidences.
13        I think at some point -- this is the one where
14   they say if I improve, if I don't improve, I will or
15   won't continue on probation.  Is this the one --
16   Q.   This -- this is --
17   A.   -- I think at the end?
18   Q.   -- at the end, basically.  I believe that it
19   provides you with your rights.  It says that they're
20   enclosing the procedures for a grievance to appeal this
21   decision and then basically provide you that.
22   A.   Which I did.  I -- I aggrieved.
23   Q.   Well -- well, what was --
24   A.   (Inaudible.)
25   Q.   -- the result of that?

Page 179

1    A.   Pardon?
2    Q.   What was the result of your -- your grievance?
3    A.   Oh, we trust Dr. Hobbs, whatever she --
4    whatever she wants goes.
5    Q.   Okay.
6    A.   But -- but see there at the other -- oh, it
7    left for a second.  But you see they have the three
8    months -- here's the problem.  They still didn't even
9    follow -- even though this whole thing, this whole
10   pretextual -- I mean, at this point, just really not
11   coinciding with reality anymore, they say that if -- if
12   I improve for the first three months, then I'll get
13   another three months.  If I stay the same, then I think
14   they'll cut me then.  If I get worse, they'll cut me
15   then.
16        But the concern is, is the last rotation I
17   have, he describes me as improving.  And Dr. Hobbs had
18   given me some verbal feedback from him.  She said, oh, I
19   talked to -- to Dr. Yaz, and he said you were the worst,
20   totally the worst.  And so I wrote back Dr. Yaz and I
21   said, Dr. Yaz, you just gave me feedback today and --
22   and you didn't say that I was the worst.  You said that
23   I had improved -- like, I'm worried that there's a
24   communication discrepancy.  And he wrote me back and
25   said, yes, Sarah, you've improved.  You continue to

Page 180

1    improve.  That's what I'm going to write in my
2    evaluation.
3    Q.   Who --
4    A.   So then -- that was a pretty clear instance of
5    Dr. Hobbs taking directly someone's feedback and
6    absolutely altering it.
7    Q.   Who -- who is this that you are referring to?
8    A.   Dr. Yaz, Yazdanpanah, was the last physician I
9    worked with.
10   Q.   Okay.
11   A.   And so according to this, if I improved at all,
12   they were supposed to give me another three months.  And
13   Yaz's feedback said that I improved.  So they -- they
14   even defied this modification of the contract.
15   Q.   Okay.  Does it say that you -- I mean, does it
16   say that you're going to improve in one of the -- one of
17   the -- the -- I guess the -- the resident periods, or is
18   it --
19   A.   It says if --
20   Q.   -- through the --
21   A.   -- during the --
22   Q.   -- through the --
23   A.   -- probation --
24   Q.   Through the three months, right?
25   A.   If, during the probationary period you fail to

Page 181

1    improve your performance or your performance worsens --
2    Q.   All right.
3    A.   -- you will be dismissed.
4    Q.   All right.  So I got a few more evaluations.  I
5    mean, you can tell me what you think about what they
6    wrote for you in this.  Let's see.  This is Dr. Fayad
7    again.  She gave you one, one, zero, one, one, zero, and
8    then provide you -- saying that you had struggled during
9    the rotation.
10        The next was Dr. Ginory, one, one, one, one,
11   one.  Dr. Welch, he provided a zero, zero, one, one,
12   zero.
13   A.   And of note, this was the month that Dr. Welch
14   accused me of a patient's safety incident --
15   Q.   Right.
16   A.   -- I had nothing to do with.  And by this time,
17   I -- I think this was when I had a lawyer, and I'd
18   smartened up a little bit.
19        So I went to HR and I said, I'm being accused
20   of hurting a patient that I didn't touch, that --
21   Q.   Okay.
22   A.   -- I didn't see, that I didn't have anything to
23   do with.
24   Q.   Dr. Diekman, in the interest of time, I'm going
25   to --

Sarah Diekman
June 17, 2020

Page 182

1    A.    Oh.
2    Q.    -- move on, but --
3    A.    Okay.
4    Q.    This is a -- it --
5          MR. CHAUNCEY:  I'm going to mark this as
6    defendant's Exhibit 11.
7    A.    Sure.
8          (Exhibit 11 was marked for identification.)
9    BY MR. CHAUNCEY:
10   Q.    This is just all the CCC meeting notes.
11   A.    Okay.
12   Q.    Have you seen these before?
13   A.    Yeah.
14   Q.    Okay.  I'm just going to skip down to the --
15   A.    Of note, the CCC, the way that they hold these
16   meetings is -- I think a lot of times Dr. Hobbs is the
17   chair, and she speaks first, which is a violation of
18   ACGME standards.  The --
19   Q.    Okay.
20   A.    -- the program director --
21   Q.    Well, let's --
22   A.    Yeah.  So they're not following procedure in
23   these.  That's all I'm --
24   Q.    Well, we -- we will -- let's -- I -- I'm -- if
25   you could provide me that -- that, we can certainly look

Page 183

1    at that.  But --
2    A.    Yeah.
3    Q.    -- the -- this is on a -- 11/24/15, and this is
4    a discussion of you from Dr. Holbert's written
5    evaluation, like -- is this the person that you were
6    referring to, Dr. --
7    A.    Yeah.
8    Q.    -- Yazdanpanah?
9          Says he described her as professional in her
10   interaction.  He indicated she gave a decent performance
11   on the rotation, encouraged her to work on her
12   organizational skills and keeping a schedule for chart
13   documentation.  There is an instance reported that when
14   this attending was absent that Dr. Diekman did not
15   follow up or contacting the attending who was covering.
16         So, I mean, it doesn't sound like they were
17   saying that Dr. Yazdanpanah was giving you a -- a
18   negative -- a super negative review.  But they did make
19   a determination in here that, let's see, that she's
20   operating at the same sub-par level as pre-probation.
21   Patients' safety is a primary concern.  She can not
22   perform at a level required of the resident assigned to
23   a continuous outpatient clinic experience, even after
24   extra experience on the wards.
25         You know, I mean, is it -- and they voted

Page 184

1    unanimously out of this group, Dr. Hobbs, Bruijnzeel you
2    were speaking of earlier, Dr. Cook, Dr. Ginory,
3    Dr. Holbert, Dr. Ramani, Dr. Suryadevara?
4    A.    Yeah.
5    Q.    Are you -- are -- are you alleging that -- that
6    they all were retaliating against you or discriminating
7    against you?
8    A.    Well, I don't know Dr. Ramani.  I -- I may have
9    staffed with her on call, not sure.  Brian Cook also
10   didn't work with him.  I'm alleging, at the minimum,
11   they did not follow ACGME procedures to remove a
12   resident.
13   Q.    Okay.
14   A.    If you have had a recent positive review from
15   an attending, they're supposed to be present at a
16   dismissal hearing, so Yazdanpanah should have been
17   there.
18   Q.    Okay.
19   A.    And also Dr. Tessy Korah should have been
20   there.
21   Q.    Doc -- Dr. Diekman, I'm -- and I'm going to
22   send you -- I'm -- or I'm going to provide right here
23   what is going to be defense Exhibit 12.
24   A.    Okay.
25         (Exhibit 12 was marked for identification.)

Page 185

1    BY MR. CHAUNCEY:
2    Q.    It is the dismissal letter that they sent you.
3    They kind of go line-for-line from the probation
4    letter --
5    A.    Sure.
6    Q.    -- and discuss this.
7          Do you recall seeing this --
8    A.    Yes, sir.
9    Q.    -- this letter that was -- was letting you know
10   that you were not going to be renewed?
11   A.    Yes, sir.
12   Q.    Okay.
13   A.    Not not renewed.  They were firing me before
14   the expiration of my contract.
15   Q.    Okay.  So, let's see, it says in here -- well,
16   we can assess that.  But I -- I believe that they --
17   this is stating that you were not going to be renewed.
18   But --
19   A.    They -- I did not receive a paycheck for June,
20   so I was terminated.
21   Q.    Okay.  Did you work during the month of June?
22   A.    No.
23   Q.    Did you work during the month of May?
24   A.    No.  I was on administrative leave for some of
25   this.

Sarah Diekman
June 17, 2020

Page 186

1    Q.   Okay.  Did you work from the time this letter
2  occurred all the way to May?
3    A.   I was on administrative leave.
4    Q.   Okay.  And what was that administrative leave
5  for?
6    A.   I was just appealing the decision.
7    Q.   (Inaudible.)
8    A.   But they --
9    Q.   What --
10   A.   They had explained to me that it was a
11 termination and not a nonrenewal.
12   Q.   Okay.
13   A.   And yeah, I mean, the only reason I re -- I had
14 any additional time there was for the appellate process.
15   Q.   I'm going to show you what is -- if we have
16 time, we'll come back to that, but --
17   A.   Okay.
18   Q.   -- what is ex -- Exhibit 13, which are your
19 PRITE scores.
20        (Exhibit 13 was marked for identification.)
21 BY MR. CHAUNCEY:
22   Q.   I know that you had mentioned this.  I just
23 wanted to put this into the record.
24        Do you -- do you recall seeing these PRITE
25 scores?

Page 187

1    A.   Yes, sir.
2    Q.   Okay.  And this final PRITE score, what -- what
3  is this percentage here for the U.S. general site,
4  third-year residents for the psychiatry, what did you
5  score?
6    A.   So that's of the nation, but --
7    Q.   (Inaudible.)
8    A.   -- I was more interested with my
9  similarly-situated peers because it's not really fair to
10 compare me to the nation in an employment case.  It's --
11   Q.   Well, it --
12   A.   So that was the real --
13   Q.   Doctor --
14   A.   (Inaudible.)
15   Q.   -- Diekman --
16   A.   -- fire me (inaudible) --
17        THE STENOGRAPHER:  Wait.  Wait.  Wait.  Wait.
18   Q.   One -- I'm sorry.  One at a time, please.
19 BY MR. CHAUNCEY:
20   Q.   Dr. Diekman, the court'll determine the
21 fairness of those things.  I --
22   A.   Okay.
23   Q.   -- just want to know what -- what --
24   A.   Sure.
25   Q.   -- the --

Page 188

1    A.   Okay.
2    Q.   -- what the scores are.
3        So this is a -- you scored a 52 percentile, is
4  that where I'm -- I'm on your --
5    A.   (Inaudible) year resident --
6    Q.   Okay.
7    A.   -- yes.
8        THE STENOGRAPHER:  Wait.  I'm sorry.  I
9  didn't hear the end of your question.
10       Ma'am, you have to let him finish his
11 question, please.
12 BY MR. CHAUNCEY:
13   Q.   It -- so this -- you -- did -- what -- what is
14 your score on this psychiatry portion of the -- the
15 PRITE exam here?
16   A.   A 52 percentile for U.S. third-year residents.
17   Q.   Right.
18       And then what is yours for the neurology?
19   A.   A -- a 16th percentile for third-year U.S.
20 residents.
21   Q.   Okay.  And -- and was -- was this under what
22 they had wanted you to get in the probation letter if
23 you recall?
24   A.   Well, that's a absolute mechanism of pretext
25 because you can see three people scored lower than me --

Page 189

1    Q.   Okay.
2    A.   -- for neurology, and five people scored lower
3  than me for psychiatry.
4    Q.   Do --
5    A.   And they were not held to those standards.
6    Q.   Do you --
7    A.   So they knew if they made these artificial
8  standards that then they could --
9    Q.   Dr. Diekman --
10   A.   -- make up a reason to fire me.
11   Q.   Dr. Diekman, I know it's really tough on Zoom
12 doing this because the -- the -- with the sound and the
13 way things are, but I'm -- I'm going to go try to jump
14 here.  I know that -- that you've got things to say, but
15 we're trying to get through this as -- as much as
16 possible.  I know this is --
17   A.   Okay.  I'm sorry.  I'll chill out.  I'll chill
18 out.
19   Q.   No, you're good.
20       So the -- the three people though were -- do
21 you know if those three people were on probation at the
22 time?
23   A.   I have no idea.
24   Q.   Okay.
25   A.   But I do have reason to believe they were

Sarah Diekman
June 17, 2020

Page 190

1   mostly non-disabled males.
2       Q.   Okay.
3       A.   At least two of them.
4       Q.   So this we're going to mark as de -- defense
5   Exhibit number 14.
6            (Exhibit 14 was marked for identification.)
7   BY MR. CHAUNCEY:
8       Q.   This is just simply the GME policies at UF.
9   I'm going to get back to this if we have some time.  But
10  I'm going to put this into the record.
11           Have you seen these before?  I know it's
12  difficult on Zoom once again.
13      A.   Yeah.  I --
14      Q.   It's pol --
15      A.   I imagine I've read through them.
16      Q.   Okay.
17      A.   Yeah, I probably read through them I -- unless
18  they're --
19      Q.   All right.
20      A.   -- (inaudible.)
21      Q.   So this is going to be defense exhibit fif --
22  or this is going to be defense Exhibit 15.
23           (Exhibit 15 was marked for identification.)
24  BY MR. CHAUNCEY:
25      Q.   This is a -- you were talking about the ACGME.

Page 191

1   Did you file a complaint against the un -- the
2   University of Florida --
3       A.   Yes.
4       Q.   -- concerning the ACGME and them not following
5   standards?
6       A.   I did, sir, yes.  That was co-signed by
7   another resident.
8       Q.   Okay.  And have you ever seen this response to
9   the University of Florida?
10      A.   I actually don't think I have.  I was
11  disappointed in the amount of paperwork as -- that they
12  actually returned to me.
13      Q.   All right.
14      A.   Okay.
15      Q.   So this is the response that they provided to
16  the University of Florida, closing the -- closing any
17  investigation on it.  And that they said that the review
18  committee determined that the program's response to the
19  complaint satisfactorily addressed the allegations, and,
20  therefore, no action is required.
21           So you -- you were talking about a lot of the
22  ACGME policies that they weren't following.  Do you have
23  any knowledge why the ACGME didn't act upon any of those
24  if they were actually not being followed?
25      A.   I mean, it is the ACGME.  And this was 16 --

Page 192

1       Q.   This was 15.  I'm gonna -- I flip-flopped --
2       A.   Yeah.
3       Q.   -- two -- on -- on -- and this -- this next
4   one's going -- to come is going to be 16.  But this one
5   actually is 15 now.
6       A.   Oh, this is the first one?  Because I withdrew
7   one complaint because Dr. Dixon had pointed to me as
8   possibly having --
9       Q.   Oh.
10      A.   -- a --
11      Q.   This -- this is --
12      A.   -- (inaudible) and -- and --
13           THE STENOGRAPHER:  Wait.
14      A.   -- saying that it would be better for me --
15           THE STENOGRAPHER:  Having what?  I'm sorry.
16  Having what?
17      A.   Oh, she sent an e-mail to me saying that it
18  probably would be in the best interest of whoever had
19  given the complaint to withdraw it.  And I was the only
20  person that I know of who had sent in the complaint, so
21  I -- I felt rather threatened, and I --
22  BY MR. CHAUNCEY:
23      Q.   Let's --
24      A.   -- withdrew the complaint.
25      Q.   Dr. Diekman, I believe --

Page 193

1       A.   The first one.
2       Q.   -- the complaint --
3       A.   I don't know --
4       Q.   This complaint states that it was filed on
5   April the 18th, 2016.  That would have been --
6       A.   Yeah, now that's the one I probably did then.
7   But you said you did have a second one.
8       Q.   I -- I don't have -- no, I don't have a second
9   one.  I apologize.
10      A.   Oh, okay.  Then -- then that's my bad.  That's
11  my misunderstanding.
12           I withdrew --
13      Q.   Okay.
14      A.   -- the second one and sent them -- I'm sorry.
15  I withdrew the first one.  I sent them a second one.
16      Q.   Okay.  So you also appealed the decision of the
17  CCC?  Do you --
18      A.   (Inaudible.)
19      Q.   -- recall writing this?
20      A.   Yes.
21           THE WITNESS:  Do you mind if I just -- I just
22  have to grab a beverage.  I don't --
23           MR. CHAUNCEY:  Yeah.  That's fine.  We can --
24  we --
25           THE WITNESS:  (Inaudible.)

Sarah Diekman
June 17, 2020

Page 194

1    MR. CHAUNCEY:  These Zoom depos are fun.
2    MR. SALZMAN:  Yeah.
3    THE WITNESS:  I -- I'm sorry.
4    MR. CHAUNCEY:  Zoom mediations are fun, too.
5    THE WITNESS:  Yes.
6    A.   So that's -- that is my appeal.
7         Now during this time, it has to be taken with a
8  grain of salt, I was suffering from postconcussive
9  syndrome.  I was on the medication Elavil, which
10 disrupts your cognition.  So this -- this was a very
11 cognitively-challenging time for me.
12        MR. CHAUNCEY:  Okay.  And in -- in case I
13   didn't say, this -- this is going to be marked as
14   defense Exhibit 16.
15        (Exhibit 16 was marked for identification.)
16 BY MR. CHAUNCEY:
17   Q.   So you appealed to Dr. Bussing; is that
18 correct?
19   A.   Yes.
20   Q.   And then you appealed to Dr. Dixon?
21   A.   Yes.
22   Q.   Okay.  Did you appeal to Dr. Good?
23   A.   Yes.
24   Q.
25        Okay.  And is -- is -- is this the response

Page 195

1  that you remember getting from Dr. Good?
2    A.   I -- I can't recall for sure.  I really have
3  such poor -- it certainly looks like something he might
4  have sent.  But, honestly, I had such bad postconcussive
5  syndrome, you could put me any -- you could put anything
6  in front of me signed by Dr. Good and I would say it --
7  it looks --
8         MR. CHAUNCEY:  This is going to be marked as
9    defense Exhibit 17.
10        (Exhibit 17 was marked for identification.)
11 BY MR. CHAUNCEY:
12   Q.   Is this -- do you recall seeing this?  I will
13 scroll through it because I know --
14   A.   Okay.  So, yeah, disability.  11/12.  Yeah.
15 Okay.  Oh, okay.  So this looks like maybe my amended
16 version to them.
17   Q.   Did -- so you -- this says it's filed on the --
18 let's see.  This is May 14, 2018.  I know that there's
19 another one in here that was filed on November the 12th,
20 2015.
21   A.   Yes.  They expedited that one and offered to
22 mediate, but the University of Florida did not agree to
23 mediate.
24   Q.   And then you added, after that, on -- on May
25 the 14th, 2018, additional retaliation and sex

Page 196

1  discrimination?
2    A.   Yes.
3    Q.   Okay.
4    A.   My original one was just focused on getting
5  accommodations.  All I wanted to do was work that job
6  without dying.  I -- seriously.
7    Q.   So the -- the -- the EEOC doesn't have --
8  didn't have record of the one that was filed on the
9  18th -- or May 18, 2016.  What -- what happened to that
10 charge?
11   A.   They offered to mediate.  And then I updated
12 it, I guess, once something new happened.
13   Q.   Is there any evidence that you submitted this
14 charge at any point?
15        MR. SALZMAN:  Wi -- which one are you
16    referring to?
17        MR. CHAUNCEY:  The one from -- one from May
18    the 18th, 2016.  Because I'm seeing -- the only
19    charges I see is one from May the 14th, 2018, and
20    one from November the 12th, 2015.
21 BY MR. CHAUNCEY:
22   Q.   This was your response to it but --
23        Do you recall filing that --
24   A.   (Inaudible) --
25   Q.   -- charge?

Page 197

1    A.   -- one?
2    Q.   On May the -- on May the 18th, 2016.
3    A.   Yes, I'm sure that there was two filed because,
4  honestly, these were some of the scariest things I've
5  ever done in my life.  It took all the courage I have in
6  my soul to file the first one and then update it.  So I
7  know that that happened.
8         I can -- I can review any records I have and
9  Mr. Salzman --
10   Q.   Yeah, we -- we haven't seen an actual filing.
11 We -- we had a -- we reviewed the documents.  This is
12 one of the documents from the investigative log.  And it
13 shows that you filed something on the -- November the --
14 or spoke to them on November the 4th, 2015, November the
15 25th, 2015, and --
16   A.   Yeah.
17   Q.   -- then --
18   A.   (Inaudible) be the first one, right?
19   Q.   That was the --
20        THE STENOGRAPHER:  I'm sorry.  I didn't hear
21    you.
22   A.   So -- so that would be the first one?
23 BY MR. CHAUNCEY:
24   Q.   That -- so that seems to be the first one then
25 that they were unable to contact you until something

Sarah Diekman
June 17, 2020

Page 198

1    occurred on the a -- on April the 17th, 2018.
2         A.   Yes.  Summary by mail, it says there, because I
3    did, I sent them a summary by mail.
4         Q.   On -- so -- but you had said that there's --
5    there's a -- listed about how it's on the -- again, on
6    May 2016 that you had sent them something.  However we
7    don't --
8         A.   That was --
9         Q.   -- have any --
10        A.   (Inaudible.)
11        Q.   -- record of that?
12        A.   (Inaudible) looking at -- this is the first
13   one.
14             Oh, you're saying the second one there's no
15   record of?
16        Q.   Yeah, the second one there's no record of.
17             THE WITNESS:  Mr. Salzman, I think there was
18             some hiccup with that this spring, but then you
19             got it sorted out because I sent you the e-mail
20             so -- showing you that --
21   BY MR. CHAUNCEY:
22        Q.   Doc -- Dr. Diekman, I -- I can talk to -- to --
23   to Mr. Salzman about it potentially after.
24             But you don't have any recollection yourself of
25   filing that in May 2016?

Page 199

1         A.   Oh, I definitely filed in May 2016.  The -- the
2    EEOC contacted me during my 1L year finals, saying that
3    they almost defaulted on my case because they weren't
4    sure where the paperwork was.  And I said, oh, you
5    definitely got it.  And then we found it.  I was in
6    contact with Salzman and everybody, and we got it
7    straightened out.
8         Q.   Okay.  We -- we don't have any record of that.
9    But --
10        A.   Okay.
11        Q.   So that would be something that we would
12   definitely like to get -- take a look at.
13             I'm going to -- just to put into the record,
14   this will be marked, I believe, as defense Exhibit 18.
15             (Exhibit 18 was marked for identification.)
16   BY MR. CHAUNCEY:
17        Q.   These are just ACGME program -- common program
18   requirements.
19             One -- one thing I wanted to ask you --
20             MR. CHAUNCEY:  This is what I'm going to mark
21        as defense Exhibit 19, if it pops up.
22             (Exhibit 19 was marked for identification.)
23   BY MR. CHAUNCEY:
24        Q.   This is a map of the University of Florida.
25        A.   Okay.

Page 200

1         Q.   So when it comes to the parking issue -- here's
2    Shands.
3         A.   Yeah.  Okay.  I can see that good.
4         Q.   Where -- where are --
5         A.   Here's Archer.
6         Q.   Yeah, this is Archer Road.  This is Center,
7    Newell.  Where -- where were they a -- where was your
8    original parking spot at?
9         A.   Where's the VA?  So find the --
10        Q.   (Inaudible) right here.
11        A.   -- intersection of Archer and the VA.
12        Q.   VA is right here.  The VA hospital would be
13   just south of Archer Road here.
14        A.   Oh, I see it.  Okay.  Okay.  So -- and then
15   Shands is -- I see it right here.
16        Q.   Shands is right here.
17        A.   Yeah.
18             So can I start with where the normal parking
19   is?  Just because it's --
20        Q.   Sure.
21        A.   -- (inaudible) --
22        Q.   Tell me where the normal parking is.
23        A.   So normal parking for residents is either this
24   C -- no, I think it's Shands Medical Plaza B.
25        Q.   Okay.

Page 201

1         A.   See that guy?
2         Q.   Shands Medical Plaza B?
3         A.   It's, like, down -- I'm terrible with
4    directions.  If you go to the -- to the left of where
5    you are right now.
6         Q.   Oh, you're talking about over here?
7         A.   Yes.  I --
8         Q.   Okay.
9         A.   -- think -- I think that's the regular one.
10        Q.   Okay.
11        A.   And then where they had me -- and, mind you,
12   where I'm trying to work, you know, we got Shands, we
13   got the VA right there --
14        Q.   Right.
15        A.   -- so -- is way up here by -- you see
16   engineering?
17        Q.   Okay.
18        A.   The engineering's got all these nice
19   handicapped spots.
20        Q.   Uh-huh.
21        A.   Yeah, like up there.  Up a hill.
22        Q.   Okay.  Okay.  So this is -- so this is where
23   they had you initially parking?
24        A.   Yeah, somewhere up there.
25        Q.   Okay.  So in this -- where this handicapped

Sarah Diekman
June 17, 2020

Page 202

1   spot is --
2       A.   And --
3       Q.   -- here?
4       A.   And this is not shaded.  This is an estimate.
5       Q.   Okay.
6       A.   I'm estimating.
7            So it was somewhere up in this area, up this
8   hill, which is all in direct sunlight.
9            So my bigger problem is with temperature.  I
10  could walk a much longer place (sic) if -- if it was all
11  indoor, then I could walk.
12      Q.   Okay.
13      A.   But it's -- it's the lack of climate control.
14  If I'm going to be in an unclimate-controlled (sic)
15  area, then the walk has got to be short.
16      Q.   Okay.
17      A.   So it was up there.  So farther away than the
18  normal spots.
19      Q.   Okay.  You know that for sure?
20      A.   I mean, I did not have an -- a -- a property
21  assessor assess it for me.  But it was easier to park in
22  the regular spots than the handicap spots.
23      Q.   Where did they -- where did they move you to?
24      A.   So where they moved me to -- and it seems like
25  such a small move, but I promise you for all the world

Page 203

1   it made such a big difference.  So you see those two
2   purple buildings?
3       Q.   Uh-huh.
4       A.   The -- the dark-shaded purple building, the
5   closest to Center Drive --
6       Q.   This one?
7       A.   Yes, correct.
8       Q.   So you moved from here to here?
9       A.   Uh-huh.  They gave me a spot in there.  There
10  was an elevator.  So I always could take the elevator.
11  I didn't have to take the stairs.  Like, I'll take the
12  stairs if it's cool because I have to work on my
13  physical fitness.  That's part of my thing.  But if I'm
14  overheated, it's very important to not do that.
15      Q.   Right.  Okay.
16           The --
17      A.   Sorry.  I just -- one second.
18           Okay.  I had to take a reflux medication.
19           Well, what was really great about that spot is
20  that, you can see, it is right across the street from
21  the VA.
22      Q.   Right.
23      A.   So even the amount of time that you have to
24  tra -- and they gave me a single designated parking
25  spot.  So I didn't have to walk across the hot pavement.

Page 204

1   Again, I hate asking for this stuff so much because
2   it's, like, such diva stuff, which is not my
3   personality.  But it is just how my body reacts to
4   things.
5            So not being able to have to walk across the
6   hot pavement, just the short distance, boop, right into
7   the elevator, down, across the street, into the air
8   conditioning of either building, was awesome.  I mean,
9   once they gave me the parking spot, it was absolutely
10  awesome.
11      Q.   This -- what we're marking as defense
12  Exhibit 20 is e-mail that you had provided us from
13  Dr. Osfield and -- between him and Ronald Fuller.
14           (Exhibit 20 was marked for identification.)
15  BY MR. CHAUNCEY:
16      Q.   And this was about sending you to garage two,
17  which is what we just looked at, garage two, and said
18  that -- and Ken Ful -- Ron Fuller, who's the one who, I
19  guess, is with transportation and parking, did you ever
20  speak with him?
21      A.   I don't know.  I thought Fuller -- or maybe
22  there's another Fuller that I thought was -- was
23  counsel.
24      Q.   Okay.
25      A.   Not sure.  Not -- not sure.  Sorry.

Page 205

1       Q.   So they provided you with the accommodation to
2   garage two at that point?
3       A.   Yes.
4       Q.   Okay.
5       A.   What they did was awesome.  If that could have
6   happened without the retaliation afterwards, it would
7   have just been great.  I could have just gone about my
8   job.  I feel like I could have really been a great
9   employee.
10      Q.   This is what we'll mark as defense Exhibit 21.
11           (Exhibit 21 was marked for identification.)
12  BY MR. CHAUNCEY:
13      Q.   This is an e-mail you wrote to Dr. Osfield.
14  And this is concerning a -- seeking accommodations.  You
15  say in here that you should have contacted him earlier.
16  Why didn't you contact him earlier at -- in the ADA
17  office before March the 30th, 2015?
18      A.   I was always balancing the fear of retaliation,
19  because I had already experienced retaliation, versus
20  the fear of my own body.  And when the fear of my own
21  body ex -- exceeded my fear of Dr. Hobbs, then I
22  contacted him.  Because I -- I already knew what would
23  happen to me.  And it was going to be a great deal of
24  pain.  But, you know, you reach the point where you just
25  simply haven't -- you don't have a choice.

Sarah Diekman
June 17, 2020

Page 206

1  Q.  Right.
2       So you didn't actually apply -- well, let me
3  ask you.  Did you apply for an accommodation with the
4  University of Florida before March 30, 2015?
5  A.  Oh, yeah.  For the handicapped parking space?
6  Q.  Other than the handicapped parking space, did
7  you apply for an accommodation with the University of
8  Florida before this date?
9  A.  Well, it depends on how you ask for apply.  I
10 notified my supervisors multiple time -- my supervisors
11 were well aware that I needed accommodations.  I --
12 Q.  Did --
13 A.  -- asked --
14 Q.  Did you request -- you requested an
15 accommodation with your supervisors?
16 A.  But what they were saying was that it's not
17 really a request unless I go through the formal
18 channels.
19 Q.  Right.
20 A.  But they were very well aware.
21 Q.  This is what we'll list as defense Exhibit 22.
22      (Exhibit 22 was marked for identification.)
23 BY MR. CHAUNCEY:
24 Q.  Do you recall seeing this e-mail -- or this
25 form?

Page 207

1  A.  Yeah.
2  Q.  So this -- these forms are your disability
3  request forms for an accommodation.  Within it it's
4  listed that standing for more than ten minutes without a
5  place to sit, eating and hydrating, changing rotations,
6  call or shifts with less than 12 hours, essential
7  functions, did you fill this in?
8  A.  I don't think so.
9  Q.  Did -- did Dr. Osfield fill this in from what
10 you know?
11 A.  I think so.
12 Q.  Okay.  And then you made requests for 24-hour
13 notification for a call schedule change, 72-hour
14 notification for a night shift change, schedule change,
15 at least one-month notice of a rotation schedule change,
16 a postponement of the change of April schedule to allow
17 for previously-scheduled doctors' appointments.  Is
18 that --
19 A.  That sounds like what I asked for at the time,
20 yeah.
21 Q.  Okay.  And this is the -- well, did you meet
22 with Dr. Hobbs and Dr. Osfield about these?
23 A.  Yes, sir.
24 Q.  Okay.  And what was the resolution from that?
25 A.  Well, I -- I mean, that month got taken care

Page 208

1  of.  But, you know, outside the room Dr. Hobbs let me
2  know that it -- that my entire rotation schedule was in
3  her control, that it didn't -- that I could request
4  accommodations for a single month, but that she controls
5  my schedule.  And I'd never be able to catch her, and
6  that I can request something, and all she has to do is
7  delay and the rotation will be over before you even --
8  you know, so it's -- I'm just better off to walk away
9  now.
10 Q.  Okay.  Did they provide you any of the
11 accommodations you sought?
12 A.  Well, this month they did, yeah.
13 Q.  And you had to --
14 A.  Because Osfield was there.  I mean, she felt
15 the pressure of Osfield there.  She -- she called the
16 attendings, I'm sure you'll interview them, the --
17 Turner and Welch, who were on that month, and they'll
18 tell you, oh, yeah, she called, and she told us we had
19 to follow accommodations.  But that -- she knew that was
20 just one month.  And that's what she told me this is
21 just one month.  You can't keep up with me because I can
22 do this every month.  You'll never ca -- you can't
23 outpace me.
24 Q.  She said that to you?
25 A.  Yes, sir.

Page 209

1  Q.  Do you have any evidence that she said that to
2  you?
3  A.  Just my testimony.
4  Q.  Okay.  This is another accommodation that you
5  sought.  This is from 11/12/2015.  Do you recall seeking
6  this accommodation?
7  A.  Yes.
8  Q.  Okay.  Do you remember what the result of this
9  was?
10 A.  This one they offered to pay me less to do the
11 same job and -- I think -- they wanted me to buy a
12 scooter, a very expensive scooter, like, either 20
13 grand, or have a Rollator.  But the problem is -- so I
14 checked with infection control, and I would have been
15 violating the hospital policies to have the Rollator as
16 they suggested.
17      This all could have been -- this all could have
18 been fixed if they just put me on the same schedule as
19 my classmates.  The only reason any of these
20 accommodations even existed was because they took me out
21 of cycle, away from my classmates.  My classmates all
22 had these accommodations.
23      So they told me to buy this expensive Rollator,
24 which I did.  But then I find out from infection control
25 that I will be violating the hospital's policy because

Sarah Diekman
June 17, 2020

Page 210

1  they told me to put food in the bottom of the Rollator,
2  roll it to all the patients' rooms -- so can you imagine
3  dragging food from one patient's room to another is
4  really bad for infection control in a hospital.
5      **Q.   Why -- why did you need to have food in the**
6  **Rollator?**
7      A.   Because they couldn't say that they could
8  promise me -- I asked for 15 to 20 minutes to eat lunch
9  and take my medication.  And they said that's
10 impossible; you'll have to eat your lunch on the run.
11 So stick it in the bottom of your Rollator and keep
12 seeing patients, and eat it in the hallway, which is
13 also a JCAHO violation.  So that -- that was because
14 they could not give me protected food time at lunch.  So
15 that's why I needed the Rollator with the food that
16 would be an infection control violation.
17     And -- oh, so then I asked to work 75 percent
18 time.  Again, with saying that -- like, can I have an
19 eight to five job that just stops there.  You can Pay me
20 less money, extend my residency.  Can I just work the --
21 that hours so then I can go home, do my physical
22 therapy, hydrate, do all the stuff to maintain my
23 functioning, and then I can keep going.
24     And it was, again -- well, here they put a
25 different spin on it.  They said, okay, fine, you can

Page 211

1  work eight to five.  But if there's more things to do,
2  then you have to stay over, which that's -- already was
3  our schedule.  Our schedule already is eight to five,
4  and if there's more stuff to do, then you have to stay
5  over.  So there was no protections, no accommodations.
6      What they did do was say, despite the fact that
7  we're not giving you any protections or accommodations,
8  we will cut your salary to 75 percent time.  So do the
9  same work, and we'll give you 75 percent of what you
10 were making before.  That was the accommodation.
11     **Q.   And were those the only two accommodations that**
12 **you filed with the UF ADA office?**
13     A.   I mean, they did not grant -- do you want me to
14 read the --
15     Oh, I'm sorry.  Those two sets of requests?
16     **Q.   Yeah, those two sets of requests.  You're --**
17     A.   Those were --
18     **Q.   -- (inaudible) --**
19     A.   -- the only two formal sets of requests.  But,
20 like, I mean, there is e-mails, there were
21 conversations.  But if you're going to go from a
22 strictly formal, that would be -- those would be the
23 formal requests.  But there was multiple communications.
24 And they were very much on notice about this very early
25 on.

Page 212

1      And they -- they really did have to go out of
2  their way to make a problem.  If they had just
3  stuck with the way things -- with the schedule they had
4  promised me instead of retaliating against me, I
5  wouldn't have even a -- had to ask for accommodat --
6  maybe the parking spot.  I would have had to ask for the
7  parking spot no matter what.  But most of the problems
8  were because of the retaliation.  Otherwise, I would
9  have been fine.  I could have just done that job.
10     **Q.   Okay.**
11     A.   Just --
12     **Q.   Let's --**
13     A.   -- taken care of patients.
14     **Q.   So this is also a --**
15     MR. CHAUNCEY:  I'm going to -- to mark as
16 defense Exhibit 23, I believe.
17     (Exhibit 23 was marked for identification.)
18 BY MR. CHAUNCEY:
19     **Q.   This is the ADA grievance that you filed with**
20 **Dr. Osfield.  Let's see if there's a date on it.**
21     A.   Oh, I think you -- oh.
22     **Q.   I don't see a date on this.  But I know that he**
23 **responded on June the 2nd, 2015, here, and went through**
24 **basically the result of -- of what you were discussing.**
25     **Do you remember -- do you remember filing this**

Page 213

1  grievance?
2      A.   Yes, sir.
3      **Q.   Generally, what was it over?**
4      A.   The retaliation.  You know, so after I -- the
5  things we've talked about previously, after I
6  reported -- I think this probably focused mostly on
7  the -- the disability request.  But it -- it sure
8  doesn't make anyone like you to have asked for support
9  with sexual harassment either.  But I think most of this
10 was about disability.
11     **Q.   Did -- so I'm going to go back to the**
12 **complaint.  I'm trying to get through everything as**
13 **quickly as I can.**
14     A.   (Inaudible.)
15     **Q.   I'm hoping --**
16     A.   I'm talking --
17     **Q.   -- to get --**
18     A.   -- (inaudible) -- I know --
19     **Q.   -- through everything.**
20     A.   (Inaudible.)
21     **Q.   I can't promise you, but I'm trying to -- to be**
22 **able to -- to do this as quickly as possible.**
23     **Let me go back here.  I might have to -- you**
24 **know what, I'll just reopen it.**
25     **Unfortunately, this is -- this is my first time**

Sarah Diekman
June 17, 2020

Page 214

1  taking a Zoom deposition, so -- I don't know if Andrew's
2  taken --
3          MR. CHAUNCEY:  Have you taken any of these?
4          MR. SALZMAN:  Hearings, mediation; not
5  deposition.
6          MR. CHAUNCEY:  Yeah, this is -- this is just
7  like an added layer of -- of bureaucracy, we'll
8  say, to this.  But anyway --
9          THE WITNESS:  Just love that.
10         MR. CHAUNCEY:  But --
11         MR. SALZMAN:  You're doing a good job.
12         MR. CHAUNCEY:  Hey, man, we're getting
13  through this.  We're getting through this.
14  BY MR. CHAUNCEY:
15     Q.   So is this -- this is the com -- the amended
16  complaint that you had filed.  And, you know, we -- we
17  had discussed a little bit about Dr. Thornton and what
18  you're alleging within that.
19          You have a couple different counts here
20  concerning sex discrimination, one under the Florida
21  Civil Rights Act and one under Title VII.  And you
22  state, plaintiff restates and alleges the facts that you
23  have in -- in the facts section, where it says,
24  plaintiff's sex was a motivating factor that caused
25  defendant to retaliate against the plaintiff and

Page 215

1  terminate her employment.  Moreover, she would not have
2  been discriminated and/or terminated but for this
3  unlawful motive.
4          So what -- what, exactly, are you alleging was
5  in violation of the Florida Civil Rights Act and Title
6  VII in discrimination based on sex?
7     A.   Well, two things really.  So the retaliation
8  for my complaint about Dr. Syfert.  I don't even know
9  if -- you know, I will -- I'm sure anybody would argue
10  back that I have a history of sexual trauma, so maybe I
11  misread the situation and overreacted.  And I think
12  that's, you know, arguable.  But I don't think that my
13  request to -- to -- the fact that I report and asked for
14  support from my supervisors and just asked that someone
15  else that -- to not be left alone with this person.  And
16  then to experience retaliation for that, I think that's
17  retaliation based on -- on sex.
18     Q.   So -- well, first -- well, we can talk about
19  the retaliation count for a second.  But this is saying
20  that you were discriminated against based upon sex.  Do
21  you allege that there were others that were treated
22  better in that type of situation concerning their sex?
23     A.   Yeah, I don't know of any males who Dr. Syfert
24  burst into their room and -- I mean, I think there's --
25  you have in your discovery letters from the VA ER where

Page 216

1  they named two males and say how great they were to work
2  with.  But this is -- this is quid pro quo-type sexual
3  discrim -- I mean, he's -- or maybe not.  I don't know.
4  I was --
5     Q.   He -- he --
6     A.   His cornering me alone --
7     Q.   What did --
8     A.   -- in a room, I'm fearing sexual violence
9  and --
10         THE STENOGRAPHER:  Wait.  I'm sorry.  I
11  didn't hear.  You broke up and --
12  BY MR. CHAUNCEY:
13     Q.   Doc -- Dr. Diekman, I -- I'm sorry.  You can go
14  on.
15     A.   I mean, I was in fear of sexual violence, and I
16  reported that.  And instead of just, you know,
17  de-escalating the situation, maybe giving me another --
18  giving a chaperone and then that being the end of it,
19  instead I was punished for reporting my fears --
20     Q.   That --
21     A.   -- of sexual violence.
22     Q.   Dr. Diekman, that -- and that goes -- it --
23  that's -- that's an allegation for the retaliation.
24  But -- but are there -- can you point to any
25  similarly-situated individuals or any direct

Page 217

1  discrimination based upon sex as the -- as your sex as
2  the reason for your termination?
3     A.   The other thing would be that during the time
4  where I was really under the -- you know, all this
5  pre-probation and stuff, that Dr. Averbuch appor --
6  approached me and expressed -- and this was after a long
7  history of him commenting about my clothes, and my hair,
8  and my skin, and always offering to staff patients with
9  me, and tu -- and, again, with the touching the
10  shoulders.
11     Q.   Do you have any evidence of any of that?
12     A.   I mean, just other people who were in the
13  clinic who would have seen it.
14     Q.   Can you name some individuals who would have
15  seen --
16     A.   Laura Tait.  She had the same clinic day as me.
17     Q.   Anybody else?
18     A.   I can't think of an -- I'm not sure who actual
19  had the same clinic day as me.
20     Q.   And so you're alleging that Dr. Averbuch
21  would -- what -- what are you alleging Dr. Averbuch did?
22     A.   Well, that was how it was in the beginning.
23  But once I was on -- I don't know.  When -- once word
24  was getting around that -- that Hobbs wanted -- Hobbs
25  was trying to get rid of me, he approached me and

Sarah Diekman
June 17, 2020

Page 218

1  counseled me that Hobbs was trying to get rid of me and
2  that I could use a friend on the CCC committee, and that
3  we should get closer, and that we should go out sometime
4  and spend, like, outside time.  And I just said, you
5  know -- I made up that I had a boyfriend, I don't even
6  think I did, maybe I did, and just said, you know, I --
7  I can't really do that and -- he said, you know, let me
8  know if you change your mind.
9         And he even -- there's a letter that -- that we
10  got from your guys' discovery about how he thinks that I
11  should be on probation so that him and I can spend more
12  time together.  That's -- that's from UF.  Like, we had
13  to request that from you guys.  So that should be in my
14  file as far as what Averbuch wrote about why I needed to
15  be on probation.  Because I had never even been on a
16  rotation with him.  I occasionally would staff patients
17  with him in clinic when he was there, but -- yeah.
18     Q.   So what are you -- what are you alleging when
19  it comes to Dr. Averbuch and your termination?
20     A.   I think he wanted to -- well, he -- he invited
21  me to go out with him and spend personal time with him.
22  And he linked that to the clinical competency's
23  decision, and that he was on the Clinical Competency
24  Committee, and that he could make a difference for me.
25  But it was clearly conditional on me going out with him.

Page 219

1     Q.   Are you a -- a -- alleging that that is -- was
2  re -- retaliatory?
3     A.   I think that's probably more of ex -- ex -- I
4  think he was exploiting my vulnerability and -- and
5  doing a quid pro quo.  I think he saw me as someone who
6  had very few options, and he would exploit his situation
7  as the assistant program director.
8         I mean, he's -- he had had sexual relations
9  with people in my position before.  He's married to one
10  of them.  And then it's my understanding that he had
11  also made similar propositions to medical students and
12  had -- and that's why he's no longer the (inaudible)
13  director for the medical students.
14         THE STENOGRAPHER:  I'm sorry.  The what
15  director?
16         THE WITNESS:  The clerkship director for the
17  medical students.
18         THE STENOGRAPHER:  Thank you.
19  BY MR. CHAUNCEY:
20     Q.   Do you have evidence of any of that?
21     A.   You'd have to verify it with your own records.
22  I mean, these are -- these are things that people in the
23  department talk about, but, you know, these are private
24  recor -- like, we don't get these outside of a court of
25  law.  We don't -- we -- we don't get these.  Your client

Page 220

1  has these records.
2     Q.   Do you know of anybody that was treated who's
3  a -- who is a similarly-situated individual who was
4  treated better than you concerning what you're alleging
5  with sex?  Is there -- is there -- are there males that
6  were treated better than you that are similarly situated
7  to you?
8     A.   Oh, yeah.  I mean, the -- the promotions
9  rate -- I mean, you look at the promotions rate before
10  we filed the EEOC complaint -- I mean, I don't count
11  whatever they -- you know, they do stuff differently
12  after you bring them into court and start -- but the --
13  the promotions rate for men was almost 100 percent.
14     Q.   Okay.
15     A.   And women was, like, 20.
16     Q.   What -- what promotions rate are you talking
17  about?
18     A.   To chief resident.
19     Q.   And when you were at the University of Florida
20  your first year and your second year, what -- what was
21  the ratio of male to female on chief residents?
22     A.   So --
23         THE STENOGRAPHER:  I'm sorry.  You broke --
24  the question broke up.
25  BY MR. CHAUNCEY:

Page 221

1     Q.   When you were at the University of Florida,
2  what was the ratio of male to females during your first
3  and second years?
4     A.   The first and second years.  My recollection is
5  that -- and I -- and I can't remember the names.  Chief
6  residents was one female and three males.
7     Q.   Your first --
8     A.   And then --
9     Q.   -- year or which -- which year are you
10  speaking?
11     A.   First year.
12     Q.   Your first year was -- was one female and three
13  males?
14     A.   Yes.
15     Q.   How many chief residents are there normally?
16     A.   Four.  But there's, like, the two main ones --
17  see I forget who was the clinic chiefs because in our
18  first year, we don't have any interaction with the
19  clinic chiefs.
20     Q.   Okay.  I'm -- I'm going to ask just one -- one
21  more time for you.  Is there anybody that was treated --
22  that you could point to that's -- that was treated
23  better than you in a simila -- in -- in a
24  similarly-situated position that went on probation, that
25  was --

Sarah Diekman
June 17, 2020

Page 222

```
 1      A.   Oh, okay.
 2      Q.   -- treated (inaudible) -- or different
 3  situations that was treated better than you?
 4      A.   Yeah.
 5           So Daniel Pietras, you know, he was getting a
 6  lot of spotty -- at least from the residents.  I don't
 7  know what the attendings thought of him, but the
 8  residents were giving him a lot of spotty reviews.  And
 9  then he threatened to blow up the VA and his boss.
10      Q.   Do -- do you have -- I know I might have asked
11  this before.  Do you have any evidence of that?
12      A.   You have to -- we have to request it from you
13  guys.  I mean, I can't --
14      Q.   I don't -- I don't believe we have anything
15  about him blowing up a -- wanting to go blow up a VA.
16      A.   Then we have to get his file because he was
17  taken off the service.  Like, while I was still there,
18  he was not allowed on the VA grounds at all.  He was not
19  allowed to touch the grounds.  And several other
20  residents were told that if they see him coming, that
21  they should first scan his hands to look for a weapon
22  and then run the other way, protecting their neck.
23      Q.   And how was he treated better than you?
24      A.   He had the one month where he was not allowed
25  at the VA.  And I don't know what counseling or whatever
```

Page 223

```
 1  happened.  And then he was rehire -- re -- rehired and
 2  graduated successfully.
 3      Q.   Do you know what his reviews were?
 4      A.   I don't know.  But I consider threatening to
 5  kill your colleagues and innocent strangers to be a very
 6  serious offense.
 7      Q.   All right.  And -- and, again, you don't have
 8  any evidence of that though?
 9      A.   I -- your -- your client holds --
10      Q.   I -- I -- Dr. Diekman, I'll -- I'll -- I --
11  I -- I understand that there may be records out there,
12  but you have no evidence of that?
13      A.   No, because -- and I don't --
14      Q.   Okay.
15      A.   -- think --
16      Q.   That's all --
17      A.   -- I'd even be allowed to hold those myself.
18      Q.   That's --
19      A.   But --
20      Q.   They --
21      A.   -- but if --
22      Q.   -- is there -- are there any --
23           THE STENOGRAPHER:  Wait.  Wait.
24  BY MR. CHAUNCEY:
25      Q.   -- other --
```

Page 224

```
 1           THE STENOGRAPHER:  Wait.
 2  BY MR. CHAUNCEY:
 3      Q.   -- similarly --
 4           THE STENOGRAPHER:  Wait.
 5  BY MR. CHAUNCEY:
 6      Q.   Dr. Diekman, are there any other
 7  similarly-situated people, individuals, comparators that
 8  you can name?
 9      A.   So there was another resident, Wagdy, I think
10  is his name, and he was forcing medical students to
11  write his notes for him.  And -- now there's different
12  things you can -- like, CMS has different standards as
13  far as copy and paste, what you can and can't do.  But
14  certainly it is fraud to force someone to use your
15  log-on information and type notes as is -- if it is your
16  own.
17           And the med students felt very uncomfortable to
18  be coerced into this fraudulent behavior.  And they
19  complained.  They filed formal complaints about him.
20  They reported the supervisors who -- they reported to
21  the supervisors, and then the supervisors did nothing,
22  and then they reported those supervisors.
23      Q.   And was he -- do you know if he was disciplined
24  in any way?
25      A.   He gradu -- he graduated.
```

Page 225

```
 1      Q.   But do you know --
 2      A.   (Inaudible.)
 3      Q.   -- if he was disciplined?
 4      A.   I -- I don't know.
 5      Q.   Do you know what his reviews were?
 6      A.   No, sir.  Those are confidential.
 7      Q.   Do you know -- did he -- was he on probation at
 8  any point?
 9      A.   I have no idea.
10      Q.   Okay.  Can you name anyone else that you'd
11  consider a -- a similarly-situated comparator?
12      A.   I mean, I really would have to see everyone's
13  files.  Like, it's -- it's not fair to -- because --
14  well, I mean there's other -- you know, (inaudible) if
15  we're -- I do know that there were first-year residents
16  who had such bad patient outcomes that they were not
17  allowed to work their shifts any -- alone anymore.  And
18  they had chief residents have to come in and actually
19  work the shift with them.  Which, if you read my file,
20  sounds like what happened with me.  But I assure you
21  that has actually never happened with me.
22           If patients were actually getting hurt, you
23  send someone in to --
24      Q.   Do you --
25      A.   -- actually watch what's happening.  And that
```

Sarah Diekman
June 17, 2020

Page 226

1  was -- that happened twi -- with two --
2      Q.   Do --
3      A.   -- residents.
4      Q.   Dr. Diekman, do you have any evidence of that?
5      A.   Again, you have to get the -- you have to get
6  the reports from --
7      MR. CHAUNCEY:   David (sic), can you provide
8  us any names of the alleged comparators?
9      A.   Well, it was -- it was Jenny Davis, Dr. Jenny
10 Davis who was asked to supervise them.  So you would
11 ask -- have to ask her who it was she was asked to
12 supervise.  And she was asked to keep it secret.
13     Q.   Is there anybody else that you'd consider a
14 similarly-situated comparator to yourself?
15     A.   There was also three male, nondisabled men who
16 had not passed their step one.  We're supposed to pass
17 our step one in the first two years.  And if we don't,
18 then it is up to Dr. Hobbs whether or not she wants to
19 give you a third-year contract.  She went ahead and gave
20 one of them a chief resident spot, even though he had
21 not --
22     Q.   Do you --
23     A.   -- (inaudible) --
24     Q.   -- know their names?
25     A.   Yeah.  So this is Vic Vaka.

Page 227

1      Q.   Can you spell that if you know.  If not --
2      A.   V-I-C, V-A-K-A.
3      Q.   And --
4      A.   Oh, Anan Patel (phonetic), I think.  Something
5  like that.  Anan Patel.
6      Q.   Okay.
7      A.   And I can't remember the third one.  But
8  they're not -- but by contract, you can only be promoted
9  to the PGY3 year if the program director gives you
10 special permission to do so.  And she did, and they --
11     Q.   What -- what are you saying that they were
12 giving special permission for?
13     A.   They did not pass their -- their step three.
14 It's a --
15     Q.   How --
16     A.   -- national license --
17     Q.   How --
18     A.   -- (inaudible) --
19     Q.   -- do you know that?
20     A.   Because they told me.
21     Q.   Okay.  So these three -- tho -- so Mr. Patel,
22 and who was the other individual?
23     MR. SALZMAN:   She --
24     A.   I think --
25     MR. SALZMAN:   -- said Vaka.

Page 228

1      A.   Oh, yeah.  Vic Vaka.  Yeah.
2  BY MR. CHAUNCEY:
3      Q.   Vic Vaka.
4           And there was one more that you were mentioning
5  though?
6      A.   Yeah.   I -- it might have been Rakesh.
7           It's also mentioned, if you get UF's annual
8  review, the annual review cites that three PGY3s have
9  not -- because this puts the accreditation of the
10 program in danger, that three PGY3s have not passed the
11 step three.  And so Dr. Hobbs lets them progress to the
12 three, even though that is something that she's supposed
13 to very carefully consider not doing.
14     Q.   Did -- were any of these individuals placed on
15 pre-probation or probation to your knowledge?
16     A.   Not to my knowledge, but I -- I have no idea.
17     Q.   Do you --
18     A.   They had --
19     Q.   -- know --
20     A.   -- given --
21     Q.   Do you know any of their reviews, or what their
22 milestone scores are or anything like that?
23     A.   I do not.
24     Q.   Okay.
25     A.   I do not.

Page 229

1           But this is one of the few objective standards
2  we have.  You know, so you can always -- with the
3  subjective standards, people can say whatever they want;
4  it's a subjective standard.  This is one of the few
5  objective standards.  I passed it in my first six
6  months.  It's an objective standard.  It's not whether
7  or not someone likes you or not.  It's a pure clinical
8  knowledge test.
9      Q.   Do -- do you have any other comparators
10 that -- that you believe were treated better than you
11 based upon sex?
12     A.   I mean, just if you look at the frequency of
13 males, they often received the good rotations.  And you
14 can tell that they were the good rotations because, in
15 UF's own documentation of the annual review, it says
16 which rotations people liked.  It was those.  And if you
17 looked who got them, it was, like, 70 percent male.  If
18 you look how often women worked night flow, it was,
19 like, 30 percent more.  I mean, those -- those are just
20 some numbers.
21     Q.   So you're just saying that generally men were
22 treated better than women in the program?
23     A.   Yeah, in general.  I don't know if that's
24 the -- the crux of my claim though.  I mean, I think
25 what happened with Averbuch was more of a quid pro quo

Sarah Diekman
June 17, 2020

Page 230

1  kind of thing and just retaliation for not doing what he
2  wanted.
3     Q.  We're -- we're talking about the -- the -- the
4  sex discrimination though currently, that you were
5  terminated due to your sex, not the retaliation.
6        So is there-- there any other direct evidence
7  that you have that you were terminated due to your sex?
8     A.  You can also look at who has been fired from
9  the program over the years.  I -- I know of at least
10  another female.  I'm not sure I know of any other -- of
11  any male that's been fired.
12     Q.  Okay.  Is there any other evidence that you
13  have of -- that -- that you were terminated due to your
14  sex?
15     A.  Not that I can recall at this time.
16     Q.  Okay.  And are there any similarly-situated
17  comparators to -- to you that you believe were treated
18  better than what you've already mentioned?
19     A.  No.  I -- I think this covers most of it.
20     Q.  Okay.  Are there any similarly-situated
21  individuals based upon -- that you were discriminated
22  against based upon your -- your disability?
23     A.  Oh, yeah.
24        THE WITNESS:  I'm sorry.  Can I -- can I go
25     to the washroom really quick.

Page 231

1        MR. CHAUNCEY:  Yeah, we can take a -- a
2     minute break, or let's -- we'll -- we will take a
3     break.  Go off the record.  Will -- we will wait
4     for you to return.
5        THE WITNESS:  Okay.
6        THE VIDEOGRAPHER:  We're going off the
7     record.  The time is 4:07 p.m.
8        (A recess was taken from 4:07 p.m. to 4:09
9     p.m.)
10        THE VIDEOGRAPHER:  We are back on the record.
11     The time is 4:09 p.m.
12  BY MR. CHAUNCEY:
13     Q.  So Dr. Diekman, can you provide any comparators
14  when it comes to your disability discrimination claim?
15     A.  That's -- so I'm having a little challenge in
16  answering that because I feel like it encompasses nearly
17  everyone, you know, because most people didn't have to
18  ask for accommodations.  And -- and I was told that I
19  was going to be punished for asking for accommodations.
20  I just was kind of separated out from the pack if you
21  will.  I -- I'm struggling for better words to describe
22  it.
23     Q.  Okay.
24     A.  Everyone else kind of got to go along their
25  normal trajectory, and I kept being given additional

Page 232

1  tasks, prohibited from attending educational material,
2  prohibited from academic opportunities, such as
3  presenting at the APA.  So it's kind of like there was
4  everyone else and then there was me.
5     Q.  Okay.  After your injury on December 3rd, were
6  you ab -- and -- and you'd explained previously that you
7  had -- that you had had a concussion and some other
8  issues.  Were you able to work at all during the period
9  of -- from December 3rd 'til May of 2016?
10     A.  I wasn't functioning very well during that
11  period.  I can't remember when my trip to the Mayo
12  Clinic was.  I went to see a neurologist at the Mayo
13  Clinic to have them check me out because I was possibly
14  going to be able to get a position at the UF
15  Jacksonville program.  And I wanted them to check me
16  out.  You know, of course, I don't ever want to put
17  patients in a position to get hurt.  I wanted to make
18  sure that I was cognitively okay and just see.
19        He ran a battery of tests on me, MRIs, and
20  assessed me cognitively, and felt that a reduced work
21  schedule would allow me to come back and care for
22  patients safely.
23     Q.  Do you believe that you could have at that
24  point?
25     A.  Yes.  And, actually, the program I applied to,

Page 233

1  the -- the chair, the department chair, had also just
2  suffered postconcussive syndrome around the same time,
3  and he was taking care of patients.  So it -- it made me
4  feel like it could be done.  I mean, albeit, you know,
5  an -- and as the neu -- neurologist wrote, if the amount
6  of headaches increases, then she has to reduce the
7  amount of work hours, and a -- you know, titrate the --
8  the amount of time coming back.
9     Q.  As for your -- well, are -- do you have any
10  other -- any other com -- any specific comparators
11  that you can provide when it comes to disability
12  discrimination or not -- nobody specific?
13     A.  Yeah, I don't think anyone specific.  I -- I
14  think I was more specific in -- in being the odd man
15  out.
16     Q.  Okay.  So you were mentioning the retaliation
17  discussion.  Is it -- and you have a -- two counts of --
18  of retaliation.  Let's see, one based upon Title VII.
19  What -- what are you alleging in -- in this retaliation?
20  Is this related to Dr. Averbuch, is that who you're
21  alleging or what -- what is -- what is the allegation
22  that you're making for retaliation under Title VII?
23     A.  Yeah, the -- the retaliation would be for both.
24  The -- the -- the request for a chaperone or just some
25  help at the VA, just to have somebody kind of -- you

Sarah Diekman
June 17, 2020

Page 234

1  know, just not to be alone with this person during the
2  night hours or have him not come into my bedroom alone,
3  reporting that so that -- being retaliated for that
4  reporting.  And then yeah, telling Dr. Hobbs about the
5  pressure that Averbuch was putting on me with this whole
6  suspension, him making decisions that -- it didn't seem
7  fair that he would be making those types of advances and
8  also be making crucial decisions about my career or
9  future.
10      Q.  Do -- do you have any evidence that you spoke
11  to Dr. Hobbs, or alerted Dr. Hobbs, or reported to
12  Dr. Hobbs about some sort of, I guess, sexual -- I -- I
13  don't even know what you would call it, I mean, right
14  now but of harassment sorts that you're alleging with
15  Dr. Averbuch?
16      A.  I think that was all verbal, so yeah, just my
17  testimony.
18      Q.  And did you tell Dr. Hobbs?
19      A.  Pretty much what I -- what I just said now,
20  that I didn't feel comfortable, was there anyone else
21  who could supervise because he has been pressuring me to
22  go out with him and linking it to his position on the
23  Clinical Competency Committee.  And her response was
24  that I'm a complainer who can't get along with people.
25      Q.  Are you alleging or -- are you alleging that

Page 235

1  the reason why you were terminated was because of
2  Dr. Averbuch, I guess we'd call it, was he -- well, how
3  would you describe what he was doing, flirting or --
4  making, you said, quid -- quid pro quo?  What -- what --
5      A.  Yeah.  I mean, I don't think he, alone, had the
6  power to do anything, but I -- I think that the
7  assessment -- he's the assistant program director, so
8  the Clinical Competency Committee will take his
9  assessment directly or indirectly and -- it's just one
10  of -- of many voices, but they would take a -- an
11  assistant program director's -- if they objected
12  strongly, you know, the -- he -- he could have saved me.
13  Let's put it --
14      Q.  Okay.
15      A.  -- that way.
16      Q.  Did -- and --
17      A.  But if it had gone the other way and he wanted
18  to save me, he probably could have.
19      Q.  Dr. Diekman, did he cause you to be fired?
20      A.  But it wasn't -- it wasn't just him.  I mean, I
21  think he spotted that I was in a weak position, and I
22  think that's why he approached me.  I don't know if he
23  would have approached me if I wasn't already on the
24  chopping block.
25      Q.  Okay.  So do you believe that he caused you to

Page 236

1  be fired, Dr. Averbuch?
2      A.  Contributing factor.
3      Q.  Okay.  Do you believe that -- that the incident
4  with Dr. Syfert caused you to be fired?
5      A.  Contributing factor.
6      Q.  Okay.  What do you believe caused you to be
7  fired?
8      A.  I mean, I think they all contributed.  I think
9  the largest contributor was my disability.  I think if I
10  had a different body, if I could just have just not had
11  to ask for the things that I had to ask for, if I could
12  have just been a different person who could just do
13  these things without asking for accommodations, I
14  don't -- I don't -- I don't think it would have added up
15  to what it did.  But I think really that was ultimately
16  what just made me someone they didn't want to have
17  around.
18      Q.  Okay.  So in your count six here you said
19  retaliation under the Florida Civil Rights Act.  Are --
20  are -- are you alleging sex -- sexual harassment?  It
21  says, prohibits sexual harassment, sex discrimination.
22  What -- what are you saying that you were retaliated
23  against under the Florida Civil Rights Act?
24      A.  I think just the same.
25          THE WITNESS:  Mr. Salzman, I -- I don't -- I

Page 237

1  don't know.  Were we adding any -- I thought
2  that's just kind of a duplicate where -- where
3  state and federal law just overlap.
4          MR. SALZMAN:  I'm not allowed to respond.
5          THE WITNESS:  Oh, okay.
6  BY MR. CHAUNCEY:
7      Q.  Yeah, that --
8      A.  I don't think there's anything unique in that
9  allegation.  I think it's just the overlap of state and
10  federal law.
11      Q.  Right.
12          Well, in -- in your allegations though are
13  you -- are you to assert retaliation under sexual
14  harassment or is this for -- for -- for complaining
15  about sexual harassment, or is this a count under the
16  ADA or that -- are you trying or -- says involved in the
17  ADA, or is this under your disability that you're --
18  that you complained some -- about your discrimination
19  based upon the ADA?
20      A.  I -- I think both, involving ADA and sexual
21  harassment complaints.  Yeah, because of the complaints.
22  So yeah, retaliation.  I -- I really do believe the bulk
23  of this was retaliation.  I mean, there was a few
24  primary things.
25          So Bruijnzeel certainly did just degrade the

Sarah Diekman
June 17, 2020

Page 238

1    way I talked to my face.  That was some direct, but --
2         Q.   Do you believe that between Dr. Hobbs, as a
3    female who's your supervisor, Dr. Ginory, who was female
4    who's a supervisor, between then Dr. Bussing and then
5    Dr. Dixon that they were discriminating against you
6    based upon your sex?
7         A.   I mean, I don't think they had any sexual
8    proclivities towards me.  I believe they allowed the men
9    who were sexually harassing me to do that.  And then
10   when I complained, I think they retaliated against me
11   for making a complaint.
12        Q.   How many times did Dr. Averbuch talk to you
13   about wanting to hang out more?
14        A.   That was really an escalation towards the end.
15   He had alway -- for a long time he had done things like
16   talking about my hair, and my skin, and the dresses that
17   I wear, and jumping in front in clinic to staff my
18   patients.  I mean, literally asking me for hair advice,
19   how I -- how to dye his hair and what he should do.  But
20   once I actually was in trouble, like, all this
21   pre-probation stuff -- as I say, once I was marked for
22   death, that's when he started being more bold.
23        Q.   What did he -- what did he do?
24        A.   With the --
25        Q.   When you -- when you say he's being --

Page 239

1         A.   (Inaudible) ordering me --
2         Q.   -- bold, what -- what are you referring to when
3    you're saying that he became more bold?  What did he do
4    that was more bold?
5         A.   So finding me in clinic, cornering me, talking
6    to me, asking me if I have a boyfriend and -- but then
7    escala -- I mean, none of that was the worst of -- the
8    worst of it was saying finally that, you know, Hobbs has
9    really got it out for you.  The Clinical Competency
10   Clinic -- Committee is going to make decisions about
11   you, and you really could use a friend over there.  And I
12   can be that friend.  Like, we should spend more time
13   together and make that happen.  And I said, you know,
14   that's nice, but I just don't feel comfortable with
15   that.  I have a boyfriend; I don't think he'd liked
16   that.
17        Q.   Is it -- is it your testimony, though, that
18   then you reported this to Dr. Hobbs?
19        A.   Yeah.  I told Dr. Hobbs that, yeah.
20        Q.   That he had said that to you?
21        A.   Not with him around though because he -- at
22   that point, he was around her a lot.  But there was --
23   because, you know, at that point, there was a lot of
24   interaction.  So I did find some time to say, look,
25   Dr. Averbuch is -- is making connections between the

Page 240

1    Clinical Competency Committee and me going out with him,
2    and I don't feel comfortable.  I mean, this man is
3    married.  He's married to a former resident.  I don't --
4    I don't feel comfortable with this.
5         Q.   Do you believe that the cause of your
6    termination was because you reported discrimination or
7    some wrongful act due to your disability?
8         A.   Yeah.  The disability, I think that was the
9    main -- I think -- I -- I -- and I think especially
10   after the office of the disability actually made
11   Dr. Hobbs do some stuff differently, that she actually
12   had to restructure the one month, I -- she -- I mean,
13   she told me, she said, you can do this one month, but I
14   control your whole schedule; and I can keep changing
15   them and changing them.  And you'll never catch me.
16   You'll never get what you need fast enough because I --
17   because I make the schedule.  And you might as well just
18   quit now.
19        Q.   So are you alleging that if not for the ADA
20   situation that you would have continued on in the
21   program?
22        A.   It's har -- I'd have to be in their minds
23   honestly.  I mean, the different ways that they disliked
24   me or what I -- I do get a sense that the ADA was the
25   bulk of it, but I can't -- I couldn't tell you for sure.

Page 241

1         Q.   All right.  All right.  Trying to get through
2    all this.  I got definitely a few more exhibits I just
3    wanted to -- to present, and then I will want to go
4    through a couple more documents here.
5              MR. CHAUNCEY:  So I'm trying, Andrew.  Just
6    -- just so you know, I'm trying to --
7              MR. SALZMAN:  Hey, I -- David, I understand.
8         Do what you gotta do.
9    BY MR. CHAUNCEY:
10        Q.   So this is going to be marked as defense
11   Exhibit 24.
12             (Exhibit 24 was marked for identification.)
13   BY MR. CHAUNCEY:
14        Q.   This is a -- have you ever seen this,
15   Dr. Diekman?
16        A.   No, or maybe they gave it to me in a packet or
17   something, but --
18        Q.   Okay.  You've -- but you don't -- you don't
19   believe that you've seen this exact document?
20        A.   No, sir.
21             Can you guys still hear okay?  They're mowing
22   the lawn out here.  Is this all right?
23             MR. SALZMAN:  Yeah.
24             MR. CHAUNCEY:  Yeah.  You're -- you're good,
25        Dr. Diekman.

Sarah Diekman
June 17, 2020

Page 242

BY MR. CHAUNCEY:

1   Q.   Let me ask you, did Dr. Syfert, the -- the
2   individual from the VA, did you have any additional
3   issues with him after you allegedly reported to
4   Dr. Thornton, Dr. Hobbs about the incident with him?
5   A.   So luckily it just seemed like he was on a
6   different schedule.  I only had one more rotation where
7   I could have contacted him.  And who knows, maybe they
8   designed it that way, or maybe it was pure luck.  I sure
9   had the anxiety of seeing him every day.  So if they
10  had it every day, they didn't totally spare me.
11  They could have told me so I would have not had the
12  angst.  But I didn't have -- if he was there, it was
13  only one or two incidents.  And I was kind of able to
14  make friends with a nurse or somebody to -- to hang
15  around with me.  And it was survivable.
16  Q.   Okay.  And did you ever file an official
17  complaint with the University of Florida based upon that
18  incident?
19  A.   Yeah.  Like a year later, the HR department was
20  investigating our department, and I made mention of it.
21  And so they sent me down to HR to talk about it.
22  Q.   Did you ever make an official allegation in
23  compliance with this -- with this regulation here, an
24  official complaint about the Dr. Averbuch situation?
25

Page 243

1   A.   No.  After what I had experienced is that
2   official complaints only get you much worse pain, I did
3   not think I could survive another round of retaliation
4   at that point.
5   Q.   I'm going to attach -- or this is going to be
6   marked as defense Exhibit 26.
7   (Exhibit 26 was marked for identification.)
8   BY MR. CHAUNCEY:
9   Q.   This is -- I don't know if you can see this.
10  This is kind of --
11  A.   Okay.
12  Q.   -- difficult to see.
13  MR. SALZMAN:  Wow.
14  BY MR. CHAUNCEY:
15  Q.   Yeah, this -- this is -- this is your -- some
16  of these medical records --
17  A.   Yeah, this is my psychologist's notes.
18  Q.   Dr. Buckley, yeah.  It's --
19  A.   Yeah.
20  Q.   -- it's difficult to read.
21  I'm also going to give you what is exhibit --
22  will be marked as exhibit --
23  MR. CHAUNCEY:  What -- what was the last
24  exhibit I put out, Diane?
25  THE STENOGRAPHER:  Twenty-six, I believe.

Page 244

1   MR. CHAUNCEY:  Twenty-six.
2   This will be 27.
3   (Exhibit 27 was marked for identification.)
4   BY MR. CHAUNCEY:
5   Q.   This is from Evelyn Jones.
6   A.   Yes. (Inaudible.) --
7   Q.   Dr. Diekman, did you ever see Evelyn Jones?
8   A.   Yes, for many years.
9   Q.   Okay.  How many years did you see her?
10  A.   Until this year.  So, like, four years.
11  Q.   Okay.
12  A.   Hard to believe I was 32 when we started.  She
13  actually graduated from the University of Florida
14  psychiatry, so the same program.
15  Q.   Right.
16  She -- she mentions that you -- that you're
17  suffering from PTSD; is that right?
18  A.   Yes, sir.
19  Q.   And she gives a couple different reasons.  And
20  I was going to ask you about it.  There's a -- the
21  reasons she provides from -- this is dated on July the
22  11th, 2016.  She says there was an attack.  It says
23  forced into closed room to eval a violent semi-pro
24  athlete?
25  A.   Yes, sir.

Page 245

1   Q.   Do you -- do you recall -- it says -- and then
2   it says who attacked her, attacking an attending,
3   resulting in concussion.  What -- what -- what is --
4   what is this in regards to?
5   A.   Okay.  Well, there was no concussion.  That's
6   not accurate.  But this was during the end of my tenure
7   at UF.  And one of the attendings who, as she told me,
8   had been informed by Dr. Hobbs to punish me and get me
9   out of program was --
10  Q.   What attending is that?
11  A.   Warner.
12  Q.   Okay.
13  A.   And so she -- this patient had -- had attacked
14  multiple people.  He actually ended up with criminal
15  charges, like, on one of the nurses during this same
16  hospitalization because he was routinely attacking
17  females.  And she told me that I either go in that room
18  or that she would get me fired immediately.
19  So I went in the room, and he attacked me.  And
20  he was a semi-pro soccer player.  So he pinned me
21  against the wall.  And I guess there's some, like, dance
22  that the people who are familiar with this -- but they
23  do this, like, intimidation dance.  It's like a New --
24  New Zealand thing, I think.
25  Q.   Yeah.

Sarah Diekman
June 17, 2020

Page 246

1    A.   He was doing that and spit -- he spit in my
2  eyes.  And then, you know, for whatever reason he let me
3  go.  And I stumble out of the room.  And, you know, I'm
4  starting to, like -- I mean, first shock, then I'm
5  wondering if I should -- you know, like, my eyes, what
6  kind of infectious disease contact did I just get.  And
7  Dr. Warner, who was not one to hold cuss words, looks at
8  me and is, like, what the F are you doing, like, we have
9  patients to see.  There's some more re -- somewhere
10  there -- because I wrote a report to HR about this that
11  would give you, like, you know, the more fresh details
12  of the whole thing.  But she definitely cussed at me and
13  told me to get going, and that I needed to round on
14  these patients, and I was not going to be going to
15  employee health.
16    Q.   Okay.  Do you know when this occurred roughly?
17    A.   That occurred in October of 2015 -- or the
18  fall, the fall of 2015.
19    Q.   This is different than the December 3rd
20  concussion that you had?
21    A.   Right.
22         Yeah, no patient attacked me in that.  That was
23  just the room was really hot.  The things that I had
24  been requesting, you know, not to go in hot rooms, and
25  with the garments, and the prolonged stan -- like, no

Page 247

1  chairs, the prolonged standing.  And it all caught up to
2  me.
3    Q.   What -- so is this the -- the number-one
4  trigger of your PTSD?
5    A.   No, but that was a -- I mean, that's a -- that
6  was a big one on a -- to feel so physically weak and
7  have somebody so physically strong attack you, and you
8  know it's dangerous.  And then to have your boss make
9  you choose between your livelihood or put your life in
10  danger.
11         I mean, I really have not, honestly, been able
12  to fully process that one.  That's still something that
13  I'm working toward with my psychiatrist to fully --
14  because we do EMDR, the -- eye motion reprocessing.
15  And that one is still one that -- that is not totally
16  all better yet.
17    Q.   Okay.  What -- what is she mentioning with
18  clothes, can't -- can't look at -- where -- can --
19  can -- can you provide any --
20    A.   Oh, you know what, probably at that time I
21  think there was a lot of clothes in my closet that were
22  triggers, like I couldn't wear them.  They just reminded
23  me of this whole experience and everything.  But that's
24  a lot better now.  That's a -- that's a nonissue.
25    Q.   And then number three here says, broke up -- I

Page 248

1  can't exactly make that out, but it says that he
2  reminded her of the -- and I --
3    A.   Yeah, I -- I was --
4    Q.   -- (inaudible) --
5    A.   dating somebody, and he did remind me --
6  like, there was, like, a moment, like, physically he
7  reminded me of this guy.  Not that he, like, beat me or
8  anything, but I couldn't -- I couldn't continue on.  It
9  was just stirring up too much feelings.  So I had never
10  had anything like that before where -- you know, people
11  come up behind me in a grocery store or something, and I
12  never would -- would check people out and, like, think
13  about them.  But there was -- I would find myself, you
14  know, noticing people's size, noticing how fast they
15  moved, noticing if they were moving towards me, that
16  kind of hypervigilance.  I did have those, and -- and it
17  did affect some relationships.
18    Q.   Did -- were these, at this point, the main
19  triggers of your PTSD in July of 2016?
20    A.   Oof, I don't know if they were the main --
21  there was a lot of triggers.  I co -- the -- these were
22  the ones that she's focusing on for this appointment.
23  There was a lot of sense of powerlessness, of -- of not
24  being able to provide food for myself, not being able to
25  have a career.

Page 249

1    Q.   Okay.
2    A.   Going to law school helped that a lot, you
3  know, just really redesigning, doing something.  But
4  there was a lot of triggers.
5    Q.   So this -- this is a little harder to read, but
6  were you -- this is in January --
7    A.   Uh-huh.
8    Q.   -- (inaudible) 2016.
9         THE STENOGRAPHER:   I'm sorry.  The date
10  again?
11         MR. CHAUNCEY:  January 13th, 2016.
12  BY MR. CHAUNCEY:
13    Q.   This seems to -- and I honestly can't make out
14  a solid amount of this.  However, you -- maybe you could
15  provide some commentary on it.  I believe this says
16  something about pa -- passive suicidal -- I -- I --
17  something --
18    A.   Oh --
19    Q.   -- to that effect?
20    A.   Yeah, probably passive suicidal ideations.
21  Yeah, I think that would be fair.
22    Q.   Okay.
23    A.   Where, like, I didn't really want to kill
24  myself, but also not wanting to live.
25    Q.   Okay.  What does panic Stockholm syndrome mean?

Sarah Diekman
June 17, 2020

Page 250

1    A.   Oh, I guess she's saying that -- well, I mean,
2  we all know Stockholm syndrome, where you have a
3  captor --
4    Q.   Right.
5    A.   -- and you start to believe.  And I -- I -- I
6  think that was some of it because, you know, I did start
7  to believe some of the terrible things they'd say about
8  me and just, like, how worthless and helpless I was at
9  everything.
10         So it -- it -- it look a little bit of therapy
11  to unincorporate that.  And honestly, going to law
12  school helped, too, to actually be able to perform well
13  on tests and -- it kind of undid some of this feeling of
14  myself just being such a problem, such a toxic,
15  horrible, useless human being.
16    Q.   Was that at all -- the Stockholm syndrome, was
17  that all related at all to the attack that you had had?
18    A.   Well, I think the whole thing.  And I -- and I
19  men, even many institutions, when an employee gets
20  attacked, they're treated as if they're valuable to the
21  institution.  They go to occupational health.  They're
22  treated for their injuries.  They're actually addressed
23  as if someone cares about their health.
24         So it wasn't just that a patient attacked me.
25  It's that I didn't matter, that I was totally just

Page 251

1  disposable to this institution.  I was just there to do
2  some work for them, and they really didn't care if I
3  lived or died.
4    Q.   We're going to attach this as defense
5  Exhibit 28.
6         (Exhibit 28 was marked for identification.)
7  BY MR. CHAUNCEY:
8    Q.   This is that -- what you were talking about
9  concerning the Mayo Clinic.
10    A.   Yes.
11    Q.   Have you seen this before?
12    A.   Yeah, I think I have.
13    Q.   Okay.  And he's just discussing some of the
14  concussion situation that you were under.  And so that
15  concussion was from your fall; is that correct?
16    A.   Yes, sir.
17    Q.   And at this point, in March -- this was done
18  March 1, 2016.  Since lo -- loss of consciousness and
19  fall, she has not returned to work and has been left
20  with lingering postconcussive syndrome, which includes
21  headache, light and noise sensitivity, difficulty with
22  concentration, attention, multi-tasking, organizing, and
23  sequencing.
24         I mean, how bad was -- was that a -- attack
25  that caused that level of issues for you?

Page 252

1    A.   The initial?
2    Q.   Yeah, the -- the attack that would have
3  caused -- wha -- this concussion syndrome that -- that
4  was putting you in -- in this sort of situation.
5    A.   Yeah, I didn't think it was bad enough to cause
6  anything.  I thought that this was going to be, like, a
7  one day headache and -- I mean, I -- I lost
8  consciousness.  I totally hit the ground without any
9  protection at all.  And I didn't think it was going to
10  be anything.
11         I have since read about it because I kept
12  having these prolonged symptoms.  And, actually, it's
13  fairly common to have head strikes to the floor lead to
14  quite persistence (sic) and -- difficult symptoms,
15  nagging symptoms for quite a while, and they can
16  sometimes last for even longer.  I'm so grateful that
17  really within a year they had totally resolved.  Thank
18  you, Jesus.
19    Q.   He says in here -- he recommended an MRI of the
20  brain.  Did you end up getting an MRI?
21    A.   Uh-huh.
22    Q.   He says, at this juncture, I would favor
23  deferring cognitive testing until the six-month mark.
24  She is still early in the recovery phase.
25         So, I mean, did you deal with this for a while

Page 253

1  after?
2    A.   I did.  His concern about -- so I had
3  mentioned, I think at some point, or maybe I called him
4  back, because he was worried that cognitive testing --
5  because of, like, my advanced education, cognitive
6  testing is not very reliable, that you actually have to
7  do something more difficult.  And I talked with him
8  about going to law school, and he said that would be a
9  great form of cognitive testing because if you can
10  perform well in such a cognitively-demanding program,
11  then you know that you're okay.
12         So, I mean, aside from the other reasons I
13  wanted to go, it was also a reassurance that my brain
14  was okay cognitively because the -- the cognitive tests
15  only reach a certain level of, you know, training of
16  thought and stuff.  So he had concerns on -- on whether
17  or not it would be useful on me.
18    Q.   Right.  Right.
19    Q.   Okay.  Let's -- let's try to go through some of
20  the remaining allegations just in the complaint at
21  least.  Make sure that -- that we -- we have an
22  understanding of that.
23         We talked about Dr. Thornton.  Do you have any
24  evidence that he said to you that you reminded you (sic)
25  of his ex-wife?

Sarah Diekman
June 17, 2020

Page 254

1    A.   Evidence, like a -- like a writing or
2  something?
3    Q.   Yeah.  Writing, witness, anything?
4    A.   I don't think there was anyone around.  I mean,
5  I think he would just frequently say disparaging things
6  about his ex-wife.  But that particular one I don't
7  think so.
8    Q.   Are you alleging here that he referred
9  to somebody as Miss Monroe?
10   A.   That was Syfert.  Syfert.
11   Q.   Syfert was the one that --
12   A.   Yeah.  Yeah.
13   Q.   -- referred to Miss Monroe.
14      THE STENOGRAPHER:  Wait.  I'm sorry?
15      MR. CHAUNCEY:  Syfert is the one that
16      referred to is what she just said.
17  BY MR. CHAUNCEY:
18   Q.   Correct, Dr. Diekman?
19   A.   Yes.  Syfert would call me Miss Monroe.
20   Q.   And that -- was it also Syfert who said
21  sometimes you need to hear it from a man?
22   A.   Yes.  Yes.
23   Q.   Okay.  And Dr. Thornton's only -- the only
24  thing that you're alleging here is that he said that you
25  reminded him of his ex-wife?

Page 255

1    A.   Well, after I complained about Dr. Syfert,
2  after I reported to him because -- because Thornton has
3  some authoritative position over there.  And I said, you
4  know, Syfert scared me; he burst into myself dress -- my
5  sleeping room.  I don't feel comfortable.  Can I have a
6  chaperone.
7       And at first I thought he might be okay, he
8  might be nice.  He said I'll talk to him.  But then
9  there was a delay.  And then when I came back on the
10 service the next time, he was, like, you really need to
11 get along with people better.  You are complaining all
12 the time.  You sound like my ex-wife.
13   Q.   Did -- did anything cause you to complain to
14 Dr. Thornton in particular other than that he had some
15 influence at the VA?
16   A.   Well, he's the supervisor.  So I complained to
17 Thornton, Welch, and Turner, and Hobbs.  And there is an
18 e-mail from the -- that one should be in the bunch where
19 Turner acknowledges that she is keeping Hobbs and
20 Thornton in the loop, and she says, we'll have a low
21 threshold for reporting.  So I don't know what -- now,
22 looking back on it, I don't know what a low threshold
23 for reporting is.  I already reported.
24   Q.   Did -- did Dr. Thornton speak to you first, or
25 did you seek to him first when you ended up reporting

Page 256

1  the issue?
2    A.   Oh, I can't recall, sir.  I'm sorry.
3    Q.   When did you -- it says the -- plaintiff
4  reported the sexual harassment and retaliation to
5  defendant's human resources.
6       When did you report it to human resources?
7    A.   So that was actually way later, after -- almost
8  so late that it was unrelated because they were
9  investigating the department for other stuff.  And I
10 mentioned this, and she said, oh, whoa, well, then we
11 need to send you down to human resources.  And I'm,
12 like, I haven't seen that guy in a year; you know, I
13 don't work that service anymore.  She said, nope, you
14 need to go down there.
15   Q.   Do you --
16   A.   And I was, like, okay.
17   Q.   Do you know if Dr. Thornton and Dr. Syfert are
18 friendly?
19   A.   I couldn't -- they -- they -- I'm not in their
20 circle of friends, so I don't know.
21   Q.   Okay.  Is there -- is there a reason why you
22 think that there was some sort of retaliation due to
23 this?
24   A.   Well, they do have to work a -- a lot, so --
25 around together a lot.  And I --

Page 257

1    Q.   All right.  What --
2    A.   -- I never know.  Sometimes people just don't
3  want to be bothered.  The -- the main thing that
4  everyone in -- in all of these things just called me a
5  complainer.  I think they just don't appreciate people
6  complaining.  To everyone just -- I -- I'm a complainer.
7  And I really hate being a complainer.  Honestly,
8  it's --
9    Q.   So are -- do you believe that Dr. Thornton was
10 trying to guard Dr. Syfert somehow from getting in
11 trouble?
12   A.   Yes.
13   Q.   Okay.
14   A.   At first I didn't think that that's how it was.
15 I -- I thought he might protect the resident on his
16 service.  At first he seemed nice.  But once he talked
17 to -- to Syfert and there was a little bit of time on
18 it, it took a 180, and I was clearly the problem.  So I
19 don't know if Syfert was the only one he talked to or
20 what.  But in his analysis of the situation, I was -- I
21 was the problem.  But I -- I couldn't tell you the
22 motivations or anything.
23   Q.   All right.  So you say here that Dr. Chang
24 subjected you to an hour-long discussion on attitude
25 improvement.  Do you -- what -- what was this

Sarah Diekman
June 17, 2020

Page 258

1  conversation about?
2      A.   This was one of the worst.  So this was after
3  the parking incident.  So this was at the VA.  And he
4  pulled me aside and said that Dr. Hobbs had sent the --
5  him there to talk to me about my attitude, and that I
6  had gone to outsiders about the parking spot, and that I
7  should not have gone to outsiders, and that they were
8  going to need to come up with a punishment.
9           And at some point during this, I mean, I asked
10 him to sit down because part of the VA is open air, so
11 it's open to the outside.  So you're getting heat there.
12 And I told him I need to sit down, like, if we're going
13 to talk about this.  And he's, like, don't you get it,
14 you are being punished.  No one cares about what you
15 want.  Either you are going to stand here, or I will
16 call the professionalism committee right now.  So --
17     Q.   Did --
18     A.   -- I stood there.  And I honestly can't even
19 remember what the second part of what he said was
20 because I was just -- like, my heart was pounding so
21 much, and I was just sweating profusely.  And my
22 dysautonomia was just out of control.
23          It was, you know, about me and being a team
24 player, and listening.  And they were going to have to
25 come up with a new plan for me because I was so

Page 259

1  disobedient.  But -- but the specifics of it I -- are
2  very hard to tell because I was truly, really, really
3  suffering from a very high heart rate and just -- my
4  body was in overdrive just -- just to -- to survive.
5      Q.   Did -- did anybody witness this conversation
6  between you?
7      A.   I mean, there's nurses all around.
8      Q.   Did you provide any witnesses to it?
9      A.   Uh-uh.
10     Q.   Is there any documentation of it?
11     A.   I think he might have sent an e-mail to Hobbs
12 that he talked to me at the VA that day.
13     Q.   Did he say that he was punishing you?  Was
14 that, like, a -- is that a quote?
15     A.   Yeah.  Like to me?
16     Q.   Yeah.
17     A.   Yeah.  He said -- I mean, he may have even --
18 because he used that word pretty frequently.  There was
19 an e-mail in December.  I'd have to look at it.  But the
20 one about where -- about punishing people for taking
21 time off.  He may have used that word in saying that any
22 time off you take, you -- for being sick, you will be
23 punished with double call.
24          They -- and Dr. Hobbs had released a statement
25 earlier, an extensive statement about, like, how sick is

Page 260

1  sick enough, and really the expectation is that no one
2  calls in sick around here.  There was a lot of focus on
3  being -- on -- on not being sick in this program.  It
4  was a big-time focus.
5           And that's part of what Elizabeth and Laura
6  Tait attested to with that grievance with Dr. Osfield
7  where Osfield determined that San Chang and Adrienne
8  Eisner's behaviors were inappropriate and can't be
9  tolerated because --
10     Q.   Was --
11     A.   -- they --
12     Q.   -- Adrienne Eis -- was Adrienne Eisner involved
13 in any of these conversations that you're alleging here?
14     A.   Well, not this -- not this specific one, but
15 she -- she was -- I mean, the ones we talked about
16 previously.  And she was the one -- she definitely -- I
17 think they both did.  She definitely went around and
18 told people that I did not actually have dysautonomia,
19 that I was just lazy and just trying to get out of work.
20 And the attendings, you know, should watch out and
21 consider that in the grading and consider that in the
22 professionalism, so --
23     Q.   You had talked about Ms. Tait.  You had
24 provided Ms. Tait, Laura Tait, as a potential witness.
25 What -- what are you -- what does she know exactly that

Page 261

1  would provide, I guess, evidence to -- to your
2  allegations?
3      A.   Oh, just a witness to a lot of these verbal
4  conversations.
5      Q.   Can -- can you provide more detail as to what
6  she would have witnessed?
7      A.   I honestly can't be sure about which ones.  I
8  mean, she provided her statement at the time.  And she
9  left the program and -- because of her -- her own fears,
10 so I don't know what she would be able to say or not say
11 about that.
12     Q.   Is -- is there any specific instance that she
13 would have witnessed that would corroborate your
14 allegations?
15     A.   I think the things that are already on the
16 record that -- that Dr. Osfield has -- or has --
17 Dr. Osfield kind of investigated the whole thing.  I had
18 sent him some documents, too, that -- some documents
19 that contradicted some of the things that Adrienne
20 Eisner said and some of the things that were said about
21 me when I was on the BSU unit.
22          I brought him documents showing that it could
23 not have possibly been me, just like I had to bring over
24 documents from the VA to HR another time showing that,
25 again, they are trying to say that I was the one who

Sarah Diekman
June 17, 2020

Page 262

1  made this mistake, and it could not possibly have been
2  me. I wasn't even -- I mean, if I was anywhere in the
3  building, they would blame a mistake on me. So I had to
4  go and prove that it wasn't.
5      Q.  What -- what does Dr. Elizabeth Stein know?
6      A.  Pretty much the same thing. I -- I mean, I
7  think the bulk of what they know they put forth in their
8  statement to UF. And so that would be in the disability
9  grievance.
10     Q.  Okay. But no -- does she have anything
11 specific to corroborate your current allegations?
12     A.  I don't know. You'd have to ask her. I --
13 I -- about the specific --
14     Q.  Okay. So I know we're running up against time.
15 We've got about a minute left here before 5:00. We may
16 have to just take maybe a little bit more time after
17 this, not today, if we don't need to, but it --
18 potentially another day.
19         MR. CHAUNCEY:  If that's agreeable to you,
20     Andrew. I don't think I need that much more time,
21     but there are some -- some additional questions.
22     I know you need to get out of the here at 5:00 is
23     what you had told me.
24         MR. SALZMAN:  Right.
25         THE WITNESS:  I would want to do it today if

Page 263

1  that's possible.
2          MR. SALZMAN:  I -- yeah, I'm -- I -- I'm --
3  I'm up against the wall timewise.
4          THE WITNESS:  Okay.
5          MR. SALZMAN:  I'm already late for one, and I
6  got another one right after it.
7          THE WITNESS:  Okay.
8          MR. CHAUNCEY:  Right. Okay.
9          Well, and -- what we can do -- and you need
10 to leave right now, Andrew, is that the deal?
11         MR. SALZMAN:  I actually have to go on to
12 another Zoom meeting right now.
13         MR. CHAUNCEY:  Okay. Well, for now, then,
14 with the potential to -- to potentially find just
15 a small amount of time, Dr. Diekman, by Zoom here,
16 maybe another day -- I don't know what your
17 schedule looks like this week. I'll communicate
18 with your -- your counsel --
19         THE WITNESS:  Okay.
20         MR. CHAUNCEY:  -- about that. But just --
21 just to maybe go through the remainder of this
22 complaint and a -- maybe go through a couple other
23 of these documents that I just skipped through.
24         THE WITNESS:  Okay.
25         MR. CHAUNCEY:  But for right now, we can go

Page 264

1  off the record and -- sort of with the continuance
2  (sic) that we might continue on here in the next
3  couple days here, pending discussion between
4  counsel and I.
5          THE WITNESS:  Okay.
6          MR. SALZMAN:  Sounds good.
7          THE WITNESS:  Sound good.
8          THE VIDEOGRAPHER:  This ends today's
9  deposition of Sarah Diekman. We're going off the
10 record. The time is five p.m.
11         (The following occurred on the record but off
12 the videotaped portion of the record.)
13         THE STENOGRAPHER:  Are you ordering? Don't
14 go. Hang on one second.
15         Are you ordering?
16         MR. CHAUNCEY:  We're going to order, yes.
17         THE STENOGRAPHER:  Would you like a copy?
18         MR. SALZMAN:  I'll need a copy, yes.
19         And we'll -- we'll put her down for a read.
20         (Thereupon, the proceedings concluded at 5:01
21 p.m.)
22
23
24
25

Page 265

1              CERTIFICATE OF REPORTER
2
3  THE STATE OF FLORIDA )
4  COUNTY OF LEE        )
5
6
7          I, Diane E. Fowler, Stenographer, certify
8  that I was authorized to and did remotely
9  stenographically report via Zoom the videotaped
10 deposition of SARAH DIEKMAN, pages 1 through 264; that
11 a review of the transcript was requested; and that the
12 transcript is a true and complete record of my
13 stenographic notes.
14         I further certify that I am not a relative,
15 employee, attorney, or counsel of any of the parties,
16 nor am I a relative or employee of any of the parties'
17 attorney or counsel connected with the action, nor am
18 I financially interested in the action.
19         DATED this day, June 30, 2020.
20
21
22
23         _Diane E. Fowler_
23         Diane E. Fowler, Stenographer
24
25 JOB NO:  141337

Sarah Diekman
June 17, 2020



Page 266

CERTIFICATE OF OATH

1
2
3  THE STATE OF FLORIDA )
4  COUNTY OF LEE        )
5
6
7
8
9      I, Diane E. Fowler, the undersigned authority,
10  certify that SARAH DIEKMAN remotely appeared before me
11  via videoconference and was duly sworn on
12  June 17, 2020.
13      Signed this day, June 30, 2020.
14
15
16
17
18
19  _____
    Diane E. Fowler, Stenographer
20  Notary Public - State of Florida
    My Commission No. GG973057
21  My Commission Expires:  April 19, 2024
22
23
24  JOB NO:  141337
25

Page 267

1  June 30, 2020
2  Sarah Diekman c/o
   ANDREW J. SALZMAN, ESQUIRE
3  Unice Salzman Jensen, P.A.
   1815 Little Road
4  Trinity, Florida  34655
5  IN RE:  Diekman vs The University of Florida
   CASE NO.:  1:19-CV-00227-AW-GRJ
6
   Please take notice that on June 17, 2020, you gave
7  your deposition in the above cause.  At that time you
   did not waive your signature.
8
   The above-addressed attorney has ordered a copy of
9  this transcript and will make arrangements with you to
   read their copy.  Please execute the Errata Sheet,
10  which can be found at the back of the transcript, and
   have it returned to us for distribution to all
11  parties.
12  If you do not read and sign the deposition within 30
   days, the original, which has already been forwarded
13  to the ordering attorney, may be filed with the Clerk
   of the Court.
14
   If you wish to waive your signature now, please sign
15  your name in the blank at the bottom of this letter
   and return it to the address listed below.
16
   Very truly yours,
17
18  Diane E. Fowler, Stenographer
   Phipps Reporting, Inc.
19  1551 Forum Place, Suite 200-E
   West Palm Beach, Florida 33401
20
   I do hereby waive my signature.
21
22  _____
   SARAH DIEKMAN
23
24
   JOB NO:  141337
25

Page 268

1          ERRATA SHEET
      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
2      IN RE: Diekman vs The University of Florida
          CASE NO. 1:19-CV-00227-AW-GRJ
3
   WITNESS:  SARAH DIEKMAN    TAKEN:  06/17/2020
4
5  PAGE   LINE      CHANGE      REASON FOR CHANGE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
20      Under penalties of perjury, I declare that I
   have read the foregoing document and that the facts
21  stated in it are true.
22 _____  _____
   Date              SARAH DIEKMAN
23
24
   JOB NO:  141337
25