# Exhibit 2

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF FLORIDA
 2                    GAINESVILLE DIVISION

 3              CASE NO.:  1:19-cv-00227-AW-GRJ

 4


 5
       SARAH DIEKMAN, an individual,
 6
             Plaintiff,
 7     vs.

 8     THE UNIVERSITY OF FLORIDA BOARD OF
       TRUSTEES, AS THE PUBLIC BODY CORPORATE
 9     OF UNIVERSITY OF FLORIDA,

10             Defendant.
       _____/
11

12

13

14

15   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF SARAH DIEKMAN

16                   Friday, June 19, 2020
                     2:02 p.m. to 3:35 p.m.
17              Location:  Via Videoconference

18              Stenographically Reported By:
                 Diane Fowler, Stenographer
19                  (via videoconference)

20

21

22
       Job No: 143023
23

24

25
```

Sarah Diekman
June 19, 2020

Page 2

1    APPEARANCES:

2

3

4        APPEARING ON BEHALF OF THE PLAINTIFF (via
         videoconference):

5

6            Alexander Degance Barnett, P.A.
             1500 Riverside Avenue

7            Jacksonville, Florida  32204
             904-345-3277

8            david.chauncey@adblegal.com

9        BY:  DAVID E. CHAUNCEY, ESQUIRE

10

11

12   APPEARING ON BEHALF OF THE DEFENDANT (via
     videoconference):

13

14           Unice Salzman Jensen, P.A.
             1815 Little Road

15           Trinity, Florida  34655
             727-723-3772

16           asalzman@unicesalzman.com

17       BY:  ANDREW J. SALZMAN, ESQUIRE

18

19

20

         ALSO PRESENT: Alex Rampone, Videographer (via

21                     videoconference)

22

23

24

25

---

Page 3

1                  INDEX OF PROCEEDINGS

2    WITNESS                                    PAGE

3

4    SARAH DIEKMAN

5

         Direct Examination by Mr. Chauncey      5

6

7

8

     CERTIFICATE OF REPORTER                      79

9

     CERTIFICATE OF OATH                          80

10

     READ AND SIGN LETTER                         81

11

     ERRATA SHEET                                 82

12

13

14

15                    EXHIBITS

16

17   Exhibit        Description                  Page

18   Exhibit 29     2/18/16 Deposition of Sarah   70
                    Diekman

19

20   Exhibit 30     2013-2014 Residency Training  71
                    Manual & Acknowledgement

21

22   (REPORTER'S NOTE: All documents were sent to Phipps
     Reporting electronically. A digital exhibit

23   sticker was placed on the documents which were marked
     during the proceeding.)

24

25

---

Page 4

1    Thereupon,

2    the following proceedings began at 2:02 p.m.

3            THE VIDEOGRAPHER:  All right.  We are now on

4    the record, and the time is 2:02 p.m.  This is the

5    video deposition of Sarah Diekman in the matter of

6    Sarah Diekman versus The University of Florida

7    Board of Trustees.  This video -- I'm sorry.  This

8    deposition is being held via Zoom on June 19,

9    2020.  And the videographer is Alex Rampone, and

10   the stenographer is Diane Fowler, both in

11   association with Phipps Reporting.

12           Will counsel please announce their

13   appearances for the record.

14           MR. SALZMAN:  Andrew Salzman on behalf of

15   plaintiff, Sarah Diekman.

16           MR. CHAUNCEY:  Dave Chauncey on behalf of

17   defendant, University of Florida.

18           THE STENOGRAPHER:  If you'd raise your right

19   hand, I'll place you under oath.

20   Thereupon,

21               SARAH DIEKMAN,

22   The Deponent, was duly sworn, upon her oath, was

23   examined and testified as follows:

24           THE WITNESS:  I do.

25           THE STENOGRAPHER:  Thank you.

---

Page 5

1                  DIRECT EXAMINATION

2    BY MR. CHAUNCEY:

3        Q.   Dr. Diekman, just for the record, thank you

4    again for fitting us in today.

5        A.   Thank you.

6        Q.   From where we had left off, I think we were

7    talking -- we were in the -- the -- from our previous

8    deposition there -- on Wednesday, to which this is

9    continued, we were talking about the -- the complaint,

10   and I was -- I was going through the complaint with you

11   a little bit.  So I'm going to just share my screen

12   again.

13       A.   Okay.

14       Q.   And hopefully we will get through this as

15   quickly as possible.

16       A.   Sounds good.

17       Q.   All right.  Can you see my screen here?

18       A.   Yes, sir.

19       Q.   All right.  So from my records at least,

20   we're -- we're at this spot where we had left off.

21           So in -- in paragraph 19 of the amended

22   complaint, it says during the hot months of June, July,

23   August, and September 2014, plaintiff's POTS was

24   aggravated due to the heat.

25           So when -- when did you get your initial

Sarah Diekman
June 19, 2020

Page 6

1  parking pass with the University of Florida as an
2  accommodation?
3       A.   So it is a little bit confusing because
4  initially, when I first got employed there, which would
5  be 2013, I had a handicapped placard, and they gave me
6  the parking pass.  But that was the pass that was
7  essentially useless.  It was -- it was not essentially;
8  it was useless because it was a worse parking spot than
9  everyone else got.
10      So I complained to the parking office, and they
11 said that was the spot that I get.  And as you can
12 imagine, I was a new intern, so, you know, patient
13 safety and learning my responsibilities were at the
14 forefront of my mind.
15      Q.   Right.
16      A.   So I didn't fight with the parking place
17 endlessly.  And during that time I was just -- because I
18 had a State of Florida handicapped parking placard, I
19 can park in regular handicapped spots.  So that's where
20 I was parking during that time.
21      The real --
22      Q.   All right.
23      A.   -- problem arose one year later when they got
24 rid of most of those public access handicapped spots to
25 make way for the new medic (inaudible).  That's when the

Page 7

1  handicapped parking became a real issue.
2       So yes, I started in 2013, but it really was
3  not -- the -- the true problem started at -- at --
4  during this time that you noted.
5       Q.   Okay.
6       THE STENOGRAPHER:  I'm sorry.  You said they
7  were building the new medical what?  It broke up.
8  I'm sorry.
9       THE WITNESS:  A new medical school.
10      THE STENOGRAPHER:  Thank you.
11 BY MR. CHAUNCEY:
12      Q.   So it wasn't really until June, July, August of
13 2014, that's when you started parking at the spot that
14 was assigned to you?
15      A.   I didn't start parking -- 'cause I -- I was
16 never better off to park in that spot.  That spot was
17 worse than the regular spots.  So the choice was either
18 regular spots or public-access handicapped spots.  The
19 school started ticketing me, giving me parking tickets
20 for the public-access handicapped spots because I was an
21 employee.
22      Q.   But when -- when did you start parking over in
23 the area assigned to you as a handicapped parking space?
24      A.   I could never park there.  I told the
25 handicap -- I -- I told the parking garage -- not

Page 8

1  garage, like, the parking office that, you know,
2  numerous phone calls to them, saying that the spot they
3  gave me was useless.  Like, just because you paint a
4  picture of a wheelchair on a spot does not make it
5  accessible.  If that spot is two miles away from your
6  destination, it doesn't matter how many wheelchair
7  pictures you post on it, it's -- it's not -- it's not
8  making it accessible to a disabled person.  It's the --
9       Q.   All right.
10      A.   -- distance the disabled person has to go that
11 makes it accessible.
12      Q.   Right.
13      So -- but they had deemed it as a -- as -- as a
14 reasonable accommodation for you and -- and they had
15 provided that to you at that time?
16      A.   Yeah, I --
17      MR. SALZMAN:  Objection --
18      Wait.  Hold on.
19      Object to the form.
20      You can go ahead and answer.
21 BY MR. CHAUNCEY:
22      Q.   Did -- did they -- did they tell you that that
23 was a reasonable accommodation for parking?
24      A.   I'm not sure of the exact language they used.  I
25 mean, I was a pretty unsophisticated party at the time,

Page 9

1  so I wouldn't have been paying attention to, you know,
2  precisely what --
3       Q.   Did they provide it as an -- as an
4  accommodation for parking?
5       A.   Yes, sir.  But I informed them that I was
6  better off without this, quote, accommodation.  I mean,
7  it's further away than the regular spots.  I -- I don't
8  know how else I can say it.
9       Q.   Right.
10      We -- we -- I've shown you a map previously.
11      A.   Yes.
12      Q.   Just the thi -- just so we're kind of clear
13 on -- on all that.
14      A.   Yes, sir.
15      Q.   Previously -- so this is just a Google map.
16 Not -- not putting this into evidence or anything like
17 that, but just so we kind of have a better
18 understanding.
19      A.   Sure.
20      Q.   So -- so you -- you would have been parking, I
21 believe you'd said, somewhere around in this area
22 initially?  This is where the parking was provided you
23 initially?
24      A.   Yes.  And it was up a hill.  So that's
25 something you can't quite notice in the picture is that

Sarah Diekman
June 19, 2020

Page 10

1  that is uphill.  And if you also will notice that it's
2  exposed to the sun.
3       So because I'm temperature sensitive, it's not
4  just purely the distance.
5       Q.  Uh-huh.
6       A.  It's also the climate control that's a problem
7  for me.  If it's not shaded -- so if they had a -- you
8  know, if it was shaded and climate controlled, I could
9  walk much further.
10      Q.  Okay.
11      A.  But I can't -- in the -- so that's also part of
12  the problem with this spot they have right there because
13  it is in the sunlight, really close to the asphalt of
14  the street, extremely hot, uphill.
15      Q.  Okay.  An -- and then where would you have
16  entered into the University of Florida Health Center
17  here, if you were walking from, say, over here where the
18  parking was?
19      A.  Yes.  So -- and -- and of note, there's two --
20  the University of Florida is one destination, and then
21  you also have the VA across the street.
22      Q.  Right.
23      And the VA is down -- right here?
24      A.  Yes, sir.
25      Q.  So this --

Page 11

1       A.  Yes.
2       Q.  -- building's the VA across the street?
3       A.  Yes, sir.
4       Q.  And this would have been the parking area that
5  they had assigned yet (sic).  So where would you
6  normally have entered into at the University of Florida
7  Health Center there?
8       A.  So I would go in -- I wish I could show you
9  where my finger is pointing.  So right by Mallory --
10  Mallory Road there.
11      Q.  Right here?
12      A.  Yeah.
13      And then, actually, if you follow that up a
14  little closer to State Road 24, where you --
15      Q.  Okay.
16      A.  -- kind of see that arc of cars, there's an
17  entrance right there.
18      Q.  So you would have walked down to here to --
19      A.  Yes.
20      Q.  -- get into the building typically?
21      A.  Yes.
22      And so then the remainder of the walk was
23  climate controlled, because that's really what I need
24  for my disability is the climate.
25      Q.  Where -- where was your office located in -- in

Page 12

1  the building?
2       A.  Oh.  So it -- the inlet to the office is, I
3  believe, all the way back there.  So do you see where
4  the Brain Institute is?
5       Q.  Yeah.  This would be the Brain -- Brain
6  Institute --
7       A.  It's --
8       Q.  -- right over here.
9       A.  Yes.  And then it's right by Baby Gator.  So I
10  think Baby Gator is up -- you can -- on the picture
11  we're looking at, a little bit down, a little bit to
12  the -- to the -- my right.
13      Q.  Okay.
14      A.  I think that is the actual office.
15      Q.  Okay.
16      A.  If you can -- to come from the outside, I think
17  that is the entrance.
18      Q.  Would it have been in the -- the hospital here,
19  or would it have been by the McKnight Center right here?
20      A.  There is a complex tunnel system that can get
21  you from the Brain -- we -- we just called it the Brain,
22  can get you from there to that office, but it's -- it's
23  pretty convoluted.
24      Q.  Okay.
25      A.  You have to take a lot of elevators.  There's

Page 13

1  no -- it's not a laid out pathway.  So you have to have
2  had somebody who knows specifically that pathway
3  instruct you to what it is.  And it's so complex that
4  most people would just -- they just walk outside because
5  they don't have the temperature intolerance that I do.
6  It's much easier -- because if you look at it, I mean,
7  it's not that far of a distance.
8       Q.  Right.
9       A.  You know, if I could do it, I would just much
10  rather walk that because it's -- it's a short distance.
11  But in the July sun in the middle of the day in Florida,
12  it's -- I -- I mean, my body just won't tolerate it.
13      Q.  So your office is right here around the
14  McKnight Brain Institute.  And then there were ways to
15  go through tunnels, and you would have -- to where you
16  would be working at?
17      A.  Well, I'm the consult service.
18      Q.  Okay.
19      A.  So to be clear, none of this is my office.  I
20  assume you're talking about the consult service's
21  office.
22      Q.  Right, where you would have originally been
23  based when -- when you arrived.
24      A.  Right.
25      Q.  Okay.

Sarah Diekman
June 19, 2020

Page 14

```
 1      A.   So I actually didn't work on the consult --
 2  that consult service, I think, for a year.  I was mostly
 3  at the VA.
 4      Q.   Okay.  And then when you were working at
 5  the -- the UF Shands Health Center, what -- which
 6  building would you have typically been working in seeing
 7  patients?
 8      A.   We serviced the entire health center.
 9      Q.   Okay.  So would a -- would a majority of your
10  work been done in the actual hospital?
11      A.   Well, actually, right where your arrow is, is
12  right around where the consult service office is --
13      Q.   Uh-huh.
14      A.   -- I think.
15      Q.   Okay.
16      A.   In (inaudible) there.  So we go --
17           THE STENOGRAPHER:  I'm sorry.  What there?
18           THE WITNESS:  In -- in the basement there.
19  BY MR. CHAUNCEY:
20      Q.   Okay.  So the basement of the -- the hospital
21  building?
22      A.   Yeah.  Right where your arrow was.
23      Q.   Okay.
24      A.   By Baby Gator.  And sometimes they want -- some
25  of the attendings have offices in the Brain, so they
```

Page 15

```
 1  want you to walk back to the Brain instead of the Shands
 2  consult room.
 3      Q.   Okay.
 4      A.   So that's where we go to do our administrative
 5  things --
 6      Q.   Okay.
 7      A.   -- like looking to patients -- sometimes the
 8  attendings want to round there, sometimes they want to
 9  round in the ER in the patient's room.  But we would see
10  patients anywhere, from the burn unit to the ER, any
11  tower, anyplace because we're a consult service, so it's
12  the entirety of the Shands Hospital.
13      Q.   All right.  When you were at the end of -- of
14  your tenure with -- with UF, where -- where was the
15  office that you fell in on December 3, 2015?
16      A.   Oh, that was in a patient's room.
17      Q.   Okay.  And where -- where would that have been
18  in -- in the UF medical campus here?
19      A.   It was -- I honestly don't remember.  It
20  probably was in one of the towers.
21      Q.   Okay.
22      A.   Yeah.
23      Q.   Okay.
24      A.   But -- yeah, I'd have -- I mean, I don't think
25  I even have the records as far as -- you know, because
```

Page 16

```
 1  I'm not keeping any stuff with any patient information
 2  on it.
 3      Q.   Right.
 4           Dr. Diekman, wa -- was there construction at
 5  the time at UF Health in the McKnight Brain Institute?
 6      A.   I honestly don't remember.
 7      Q.   Okay.
 8      A.   I -- I know they took away the handicapped
 9  parking spots to start construction, but I don't
10  remember if they were just marking it off or when -- the
11  timeline of that.
12      Q.   Right.  Right.
13      A.   Sorry.  I don't really know.
14      Q.   And then so June, July, August, September, when
15  was it that you asked UF officially -- I guess here it
16  says through the UF's legal department, but ended up
17  working with UF's legal department, their ADA office to
18  get another parking spot?
19      A.   Yeah, so that would be approximately at the end
20  of that time period.  And this is an approximate time
21  period.  It could have potentially been October.  It was
22  somewhere around the -- the -- you know, the hot months
23  of summer.
24           Now I had informed UF, I had talked to the
25  parking department, my supervisors, Ginory, Fayad,
```

Page 17

```
 1  Hobbs, and the chief residents, I informed all of them,
 2  I asked them all for help, I told them all that I needed
 3  an accommodation, that I was having tachycardia every
 4  day.  And I mean, this could have long-term, permanent
 5  effects on my health.  If not --
 6      Q.   Right.
 7      A.   -- acutely, you can have a heart attack.
 8      Q.   Right.
 9      A.   And this was seriously affecting my health.
10  And they, you know, told me to stop complaining, and be
11  a team player, and all that business.
12      Q.   Do you recall if anybody directed you to -- to
13  the ADA office --
14      A.   I --
15      Q.   -- (inaudible) --
16           THE STENOGRAPHER:  Wait.  I didn't hear the
17  end of the question or the answer.
18  BY MR. CHAUNCEY:
19      Q.   Do you recall if anybody directed you to the
20  ADA office to get a --
21      A.   I --
22      Q.   -- parking spot?
23      A.   Sorry.
24           Absolutely not.
25      Q.   Do you remember if anybody directed you from
```

Sarah Diekman
June 19, 2020

Page 18

1  the program to the transportation department to get the
2  issue taken care of?
3      A.   I think they might have said you have to talk
4  to parking about parking issues.
5      Q.   Okay.
6      A.   Yeah.
7           But I already was.  I mean, that was my
8  response I am talking to parking about parking
9  issues.
10     Q.   Right.
11     A.   And this is affecting my health.  Like, I am
12  having -- I -- I'm really rather scared.
13     Q.   Right.
14     A.   And -- and so finally --
15     Q.   At the --
16     A.   -- (inaudible) --
17     Q.   -- bottom here --
18          I'm sorry, Dr. Diekman.
19          At the bottom here says that Dr. Hobbs further
20  stated that the chief residents would be assigned to
21  deal with the plaintiff's poor attitude.   Do -- do you
22  have any evidence that she stated this?
23     A.   Other than my testimony, I don't know.  But she
24  may have said that to other people in the -- in the
25  department.

Page 19

1      Q.   Okay.  Do you have any documents or any other
2  evidence of it?
3      A.   I've requested the e-mails between Hobbs and
4  the chief residents at that time.  I haven't received
5  them.
6      Q.   Okay.  Doc -- it says Dr. Hobbs warned the
7  plaintiff to stop complaining about the parking issued
8  and acquire a team player attitude.
9           Do you have any evidence that she said this to
10 you?
11     A.   Other than my testimony, no.  This was -- that
12 was verbal.
13     Q.   All right.
14     A.   I think.  But -- but even if you read some of
15 my reviews it talks about my attitude.
16     Q.   Now in paragraph 21 it begins to talk about
17 Dr. Chang.  It says, soon after the contact Dr. Chang
18 subjected the plaintiff to an hour-long discussion on
19 attitude improvement.  The plaintiff was forced to stand
20 during the hour-long lecture, despite her informing
21 Dr. Chang that standing would aggravate the POTS.
22     A.   Right.
23     Q.   Could you tell me a little bit about this.
24     A.   Yeah.  So this was really pretty bad.  So he
25 showed up at the VA.  This was after I went to the legal

Page 20

1  counsel.  And he, you know, said that he needed to have
2  a discussion with me about -- about my attitude and my
3  professionalism.
4           And some of what he said I can't honestly
5  remember because I was so sick because he made me stand
6  in a -- a pretty hot room.  And I -- I asked him if I
7  could sit down.  And he said that he would bring it to
8  the -- to the CCC if I did.  So I didn't.
9      Q.   Okay.
10     A.   And, honestly, I mean, it really was just him
11 running down why I'm a bad resident.  And I told him
12 multiple times, like even now, I'm feeling really,
13 really sick because you're making me do this.
14     Q.   Do --
15     A.   And he -- you know, he's, like, this is -- this
16 is a -- a reward session, like, you are being
17 punished.  So, like --
18     Q.   Do -- do you have any evidence that he said
19 that you were being punished?
20     A.   I don't think so.  I mean, other -- other than
21 my testimony?  I don't --
22     Q.   Do you -- do you have any evidence that -- that
23 he forced you to stand during this conversation?
24          MR. SALZMAN:  I'm -- I'm going to object to
25          the form, Dav -- just for clarification, David.

Page 21

1          MR. CHAUNCEY:  Yes, sir.
2          MR. SALZMAN:  Your -- your -- just so -- as
3  we go forward, when you ask those questions,
4  you're discounting her own testimony when you're
5  asking for --
6          MR. CHAUNCEY:  And I -- I understand.  I --
7  I'm --
8          MR. SALZMAN:  No.  No.
9          MR. CHAUNCEY:  (Inaudible.)
10         MR. SALZMAN:  No.  I'm not --
11         MR. CHAUNCEY:   (Inaudible) for the record.
12 But I'm asking --
13         THE STENOGRAPHER:  Wait.
14         MR. CHAUNCEY:  -- for --
15         THE STENOGRAPHER:  Gentlemen.  Wait.
16 Gentlemen, I can only get one of you.
17         MR. SALZMAN:  No, I'm not -- I'm not
18 criticizing.  I just wanted the record to reflect
19 that --
20         MR. CHAUNCEY:  Right.
21         MR. SALZMAN:  -- your question is in addition
22 to her testimony.
23         MR. CHAUNCEY:  Right.  No.  And, of course,
24 your testimony will be in the record.
25         MR. SALZMAN:  Right.  Okay.

Sarah Diekman
June 19, 2020

Page 22

1     MR. CHAUNCEY:  I'm just wondering if there's
2  anything else.  That's really what I'm asking.
3     A.  Yeah, as for this specific one, I mean, he did
4  later, in December, write that e-mail about people who
5  call off sick will have to work double call, and if you
6  call off then, you know, it'll be a professionalism --
7     Q.  What --
8     A.  -- violation.  So it's -- it's --
9     Q.  When he --
10    A.  -- not just --
11    Q.  -- wrote that e-mail, Dr. Diekman --
12    THE STENOGRAPHER:  You're overlapping.  I
13  didn't get the end of her answer or the beginning
14  of your question.
15    MR. CHAUNCEY:  At -- she wa --
16 BY MR. CHAUNCEY:
17    Q.  Dr. Diekman. I'll -- I'll just move forward
18  there.
19        When -- when she -- when he -- when he e-mailed
20  that, was that to you directly?
21    A.  That was to everyone.  It was -- that was the
22  general.  I just bring it up because it's consistent.
23    Q.  Were -- were you working at the time when he
24  sent that e-mail?
25    A.  I mean, I wasn't specifically on a shift, but

Page 23

1  this was maybe halfway through my tenure at UF.
2     Q.  Were you on leave at the time?
3     A.  Yeah.  It was, like, the day before I came off
4  leave.
5     Q.  Okay.  And when -- what day did you come off
6  leave?
7     A.  I think -- so the last day was December 31st.
8     Q.  Okay.  Let's see.
9     A.  Which I'll, again, reiterate that I did not
10  want to be on leave, that I wanted accommodations.  And
11  so that --
12    Q.  Says December -- should say -- says right here
13  December 29th, chief resident Dr. Chang released an
14  e-mail stating a new policy was in effect, giving easier
15  schedules and less work for people who do not call in
16  sick.
17    A.  I'm sorry.  So I was wrong about that date by
18  the two --
19    Q.  Okay.
20    A.  -- days.
21    Q.  Yeah.  No.  No.  No.  Okay.
22    Q.  Okay.  Let's see.  So you talk about here that,
23  at this point, that you -- you feared for your career,
24  and you requested to leave work early due to the onset
25  of symptoms, but that Dr. Chang said that if you left

Page 24

1  that he would report you to the CCC.  This is paragraph
2  22.
3        Do you remember -- was it that -- was that the
4  same day that he spoke to you and --
5     A.  Yes.
6     Q.  -- (inaudible) you sick?
7     A.  Yes.  This is the same incident.
8     Q.  Okay.  On top of your testimony here today, do
9  you have any evidence of this?
10    A.  I don't think so.  He may have sent a follow-up
11  e-mail or something, but I don't --
12    Q.  Okay.  It says here, in 23, it says that --
13  that Dr. Chang and Dr. Hobbs continued to engage in
14  actions with which would negatively impact the
15  plaintiff's health, including assigning the plaintiff to
16  physically grueling work rotations, last-minute schedule
17  changes, and transferring another resident's workload to
18  her.
19        Typically, is the residency program pretty
20  grueling in its work rotations?
21    A.  I would not say typically.  And, specifically,
22  the grueling rotations I'm speaking of were the consult
23  rotations.  And in order to graduate by the ACGME
24  requirements, you only need to do two consult rotations.
25  I believe if you count mine, it's nearly a year's worth

Page 25

1  of consult rotations.  So I had far exceeded what was
2  necessary.  And I also far exceeded the average.
3     Q.  How do you know --
4     A.  And -- and when I --
5     Q.  -- that you far exceeded the average --
6     THE STENOGRAPHER:  Wait.
7  BY MR. CHAUNCEY:
8     Q.  -- at UF?
9     A.  Because I looked at the schedule, and I counted
10  how many everyone else had done.  If you -- if you look
11  at the schedule that UF has, I mean, you can just count
12  up over the years how many consult rotations.  And the
13  consult rotations are the most physically grueling.  And
14  when -- when I say grueling, I don't mean intellectually
15  grueling, I mean physically grueling.
16    Q.  Okay.
17    A.  Because you're experiencing frequent
18  temperature changes, you are going into a room that you
19  don't have control of.  I mean, there's academic
20  articles written about this.
21    Q.  Uh-huh.
22    A.  About how there may not be a place to stand,
23  and so it's a constant flux of -- of -- environmental --
24  not hazards but challenges.
25    Q.  Right.

Sarah Diekman
June 19, 2020

Page 26

1    A.   And for someone with POTS, those challenges are
2  a lot more than --
3    Q.  Okay.
4    A.   -- somebody without POTS.
5    Q.  Right.
6        Let -- let me ask you.  Di -- did -- do
7  last-minute schedule changes happen to everyone?
8    A.   I mean, the law of probability they do.  But as
9  an accommodation, I asked to not have last-minute
10  scheduling changes.  And I would purposely volunteer
11  when somebody needed a shift covered and --
12        For instance, once Chris Ong had hand foot, and
13  mouth -- hand, foot and mouth virus exposure, coxsackie
14  exposure, and he needed someone to cover a shift.  And I
15  was feeling well that day, and I said, I will take it
16  because I know there's days that I can't cover at the
17  last minute, so let me do my time now when I'm
18  physically having a good day.
19        So that's what I tried to do be -- because the
20  problem with these last-minute scheduling changes is I,
21  a lot of times, have to take special medications.  I
22  have volume load, you know, drink extra electrolytes to
23  make sure --
24    Q.  Doc -- Dr. Diekman, did -- at this point, had
25  you formally requested an accommodation for last-minute

Page 27

1  schedule changes?
2    A.   It would just de -- depend on what you mean
3  formally.  I had notified my supervisors and -- so
4  multiple supervisors, including the chief residents, who
5  were primarily doing the schedule, and Dr. Hobbs.
6  Between the three of them, they have almost complete
7  control over the schedule.  I had inform them in no
8  uncertain terms that I was requesting this accommodation
9  for disability.
10    Q.  Okay.  But you hadn't contacted the ADA office?
11    A.   Yeah, not through the ADA office, nor did they
12  redirect me to the ADA office to say that the reason
13  they weren't going to accommodate it was because I
14  hadn't asked through the ADA office.  They just simply
15  called me a complainer.
16    Q.  Did -- when it talks about transferring other
17  residents' workload to you, what is that about?
18    A.   So there was sometimes discharge summaries, or
19  other stuff, especially at the VA --
20    Q.  Uh-huh.
21    A.   -- that's what Dr. Chang really did was he
22  would give me other residents' discharge summaries to
23  do.  It's their work, but he would just say I had to do
24  it.
25    Q.  Did your work ever go to any other residents?

Page 28

1    A.   Not that I'm aware of.
2    Q.  Okay.  It says here that plaintiff was informed
3  in July 2014 by a chief resident for the defendant that
4  people who do not complain will be rewarded.
5        Who is the chief resident that said this to
6  you?
7    A.   I'm sure that it was Dr. Chang.  But in
8  addition, it may have been Dr. Eisner as well.
9        Can I make a correction on the question right
10  before that, when you asked if any other residents had
11  done any work for me?
12    Q.  Yeah.
13    A.   The -- the answer is no outside of what would
14  be expected.  So if I was sick or, you know, off duty,
15  then it would be appropriate for whatever resident was
16  covering to do the work of that service.
17    Q.  Were you --
18    A.   So I --
19    Q.  Were you sick often during this period?
20    A.   Yeah.
21    Q.  So there would have been a lot of other
22  residents that would have been doing that work while you
23  were sick?
24    A.   I don't know what you can -- I'll err on the
25  side and say yes.

Page 29

1    Q.  Okay.  You talk about Dr. Chang -- Chang was
2  making mistakes in your schedule.  Can you talk a little
3  bit about what you're referring to there.
4    A.   So there was one particular incident that
5  really, really was bad for me.  So he had put me on the
6  schedule for one of the easier call types, and then, at
7  the very last minute -- I can't remember if it was the
8  morning of or the night before, but at the last minute
9  changed me to the hardest call shift that we had.  And I
10  told him I don't think -- be -- because POTS is a
11  relapsing and remitting condition, and I was in a
12  relapsing episode of it because this was after the
13  summer of walking through the heat all summer.  So my
14  POTS was in a very bad, bad state.  And I said I can't
15  handle this rotation right now; this one is too
16  physically grueling, excuse me, without more notice.  I
17  have to take extra medication, and specifically the
18  Florinef.
19        So the Florinef is a mineralocorticoid, and it
20  causes you to retain fluids to increase your blood
21  volume.  So I have to drink a bunch of Gatorade, take
22  the Florinef.  And this all takes time.
23    Q.  Right.
24    A.   And then I have to make sure I get a ton of
25  sleep.  It's -- really my sole focus is to get through a

Sarah Diekman
June 19, 2020

Page 30

1  shift like that.  So I need warning --
2      Q.   Dr. --
3      A.   -- and --
4      Q.   -- Diekman, did -- did -- did Dr. Chang have
5  knowledge of all these different aspects that came --
6      A.   Absolutely.
7      Q.   -- into play with your POTS?
8      A.   Absolutely.
9      Q.   Had this -- had you formally let them know or
10 requested accommodation for that to let them have a --
11 an understanding of your -- your situation?
12     A.   I very clearly notified Dr. Chang and
13 Dr. Hobbs.  And I think all the chief residents were
14 copied.  I think you copy the general chief resident
15 account, so if one knows, the other one knows.
16          They had been absolutely notified in -- in no
17 uncertain terms.  And they did not redirect me to the
18 ADA office and tell me that if I was requesting this,
19 that -- or the only way they would obey that request was
20 through the ADA office.
21     Q.   Okay.  Talked to you about the leave of absence
22 issue.
23          And -- and did Dr. Hobbs provide you with --
24 with the opportunity of being accommodated to have a --
25 a leave of absence?

Page 31

1      A.   So that was not an accommodation that I was
2  requesting.
3      Q.   Right.
4      A.   What I was requesting was -- because this
5  was -- this was after the incident we were just talking
6  about.  And I got extremely sick on that call shift.
7  I -- I don't think it ended until one in the morning,
8  and I almost drove my car off the road.  It was
9  really -- I was very unwell.
10          So I requested not to have call for a month.  I
11 did not want to come off the schedule because I know
12 coming off the schedule causes future performance
13 problems, such as patients canceling clinic appointments
14 because if they don't have their provider there, then
15 they'll tend to cancel appointments.  And it just causes
16 a general disruption in your reputation and your
17 training.  And that was what I was afraid of.  So I did
18 not want to come off the schedule.
19          Plus, that month was the FRC, and that was the
20 reason I came to the University of Florida.  That was
21 the rotation that I was the most looking forward to.
22     Q.   Right.
23          We -- and we had discussed that.  Let me -- let
24 me ask you about this next paragraph.  It says that
25 Dr. Hobbs informed the plaintiff that she could not be a

Page 32

1  psychiatrist if she needed accommodations, special
2  treatment.
3          When did she say this to you?
4      A.   I think during that meeting leading up to that
5  December time off.  And so that's what she said
6  verbally.  What she reflected in her writing was that I
7  couldn't return to work until I can work -- work
8  unimpeded.
9      Q.   Right.
10     A.   So -- without accommodations.  And she did
11 write that down.
12     Q.   At this --
13     A.   (Inaudible.)
14     Q.   -- time, could you have continued to work
15 without accommodations?
16     A.   No.  I needed accommodations to continue to
17 work, yes, sir.
18     Q.   Okay.  And is it -- is this statement also from
19 that same meeting?
20     A.   Yes.  So you have the -- you know, the verbal,
21 what she said, and then also what she wrote down about
22 not returning until I was unimpeded, which -- given her
23 verbal explanation of not being able to be a
24 psychiatrist if I needed special treatment.
25     Q.   Okay.

Page 33

1      A.   I think this means without accommodations.
2      Q.   Talk to me -- thi -- this -- this complaint,
3  harassment complaint, what was the nature of the
4  harassment complaint that you filed with the defendant's
5  HR office?
6      A.   So at the time, this was really a desperate
7  attempt for me to really -- I just wanted the disability
8  accommodations.  But my lack of understanding of the
9  law, I thought that I -- that this would be categorized
10 as, like, harassment.
11     Q.   Right.
12     A.   This really was more like retaliation for
13 requesting disability accommodations.  But I -- you
14 know, unsophisticated and -- and didn't know how to word
15 it.
16     Q.   Right.
17     A.   But I knew that I was going to suffer very
18 serious harm without something, and I desperately needed
19 Dr. Chang to stop doing what he was doing to me.
20     Q.   Were you also complaining about Dr. Eisner at
21 the time?
22     A.   Dr. Eisner was not as overt about what she was
23 doing to me.  I think it was a little bit later that I
24 found out how much she was defaming me behind my back
25 wa -- when other residents came forward to say that

Sarah Diekman
June 19, 2020

---

Page 34

1 Dr. Eisner would -- would say to them, in front of
2 attendings, that I was lying about having a disability,
3 that I was just lazy, that it was all just a --
4 non-professionalism.
5 **Q. Did -- you say in paragraph 25 -- we had**
6 **mentioned that -- that Dr. Chang was changing your**
7 **schedule, making mistakes. Did Dr. Eisner do similar**
8 **things with you?**
9 A. I honestly can't say who had control because
10 those duties are distributed amongst the two of them.
11 **Q. Okay.**
12 A. So as far as who actually made final
13 decisions -- I associated a lot of this with Dr. Chang
14 because he was the one sending out the e-mails, he was
15 the one, you know, coming to me personally and -- and
16 informing me of the scheduling changes. But how much he
17 may have been the messenger of the situation, I would
18 have no way of knowing between the two of them.
19 **Q. All right. And -- and in this statement,**
20 **actually, it says that -- that -- that Dr. Hobbs told**
21 **you that if the plaintiff could not do everything that**
22 **was asked of her without becoming sick, then she should**
23 **take a leave of absence until she could return and**
24 **perform all required duties unimpeded.**
25 **At -- at that time, could you perform all of**

---

Page 35

1 the required duties?
2 A. Given that they were saying that the required
3 duties included standing in a hot room for, you know,
4 unlimited amount of times, last-minute swing shifts, and
5 skipping meals, not being able to take my medications on
6 time, no, I could not do those things.
7 **Q. Okay. Were there other duties that you just**
8 **felt like you couldn't do at that point?**
9 A. I mean, I guess walking to the parking space,
10 if they're including that. Yeah, I mean those things,
11 because without those things, then I become tachycardic,
12 and it's extremely -- you know, it's like having a heart
13 attack every day.
14 **Q. All right.**
15 A. (Inaudible.)
16 **Q. Would that then impact your ability to do the**
17 **other required duties?**
18 A. I think it slowed me down.
19 **Q. So on March 31, 2015, was this the first**
20 **time that you -- you spoke to Dr. Osfield about**
21 **accommodations?**
22 A. That sounds right. I'm not positive, but
23 approximately, that's -- and that's a reasonable date,
24 yeah.
25 **Q. How did you come to know to -- to contact the**

---

Page 36

1 ADA office?
2 A. So, actually, because of the complaint I filed
3 against Dr. Chang. Once HR or whoever dealt with it,
4 they talked to me, and they said it really sounds like
5 what you're asking for is disability accommodations.
6 This is not the right office. And what you're really
7 filing isn't -- it -- it sounds like you're not so
8 concerned with how he treats you as much as just wanting
9 to take your medications. So you need to go to the ADA
10 office.
11 **Q. And from this conversation on March 31st and**
12 **your accommodations that you sought, did UF provide you**
13 **with some accommodations?**
14 A. Yeah, somewhere in that springtime, I think,
15 that -- that's right. Once Osfield got involved, at
16 least the first month was good. But as Hobbs told me
17 that -- you know, she said you can file for
18 accommodations all you want, but I change your schedule
19 every month, so, you know --
20 **Q. Do you --**
21 A. -- (inaudible) --
22 **Q. -- have any evidence she said that to you other**
23 **than your testimony?**
24 A. Oth -- no, not other than my testimony.
25 So she said I can just keep changing your

---

Page 37

1 schedule, and you'll never keep up with the
2 accommodations. I can just delay long enough, and
3 you'll be done with the rotation before you even, you
4 know, get the paperwork done.
5 So the first month was fine because we got all
6 the paperwork done, and Osfield was involved and it was
7 great. But as you can see the communications between
8 Osfield and her over the summer, once I got onto that
9 Shands consult service -- I mean, there were other
10 problems because Hobbs was telling other attendings
11 things about me to -- like, Suryadevara, telling her to
12 criticize -- to -- to let her know anything I did wrong,
13 big or small, whether it's something she normally would
14 report or not; she wanted to know everything.
15 But then one day it really came to a head on
16 the Shands consult service, and I --and I e-mailed
17 doc -- or I e-mailed Osfield, asking him, you know, to
18 engage in the -- good faith accommodations process.
19 And he said, you've got to learn to advocate for
20 yourself; you've got to contact Dr. Hobbs.
21 Dr. Hobbs was across the country at some
22 conference and didn't e-mail me back for several days.
23 And between her and Osfield, it goes back and forth for
24 several days, just like she said it would. You know,
25 she controls the schedule, and she can run out the

---

Sarah Diekman
June 19, 2020

Page 38

```
 1   clock.  And that's exact -- I mean, she's not wrong.
 2   She was right.  She could and she did.
 3        So I -- I got sick.  I had to call in days that
 4   I wouldn't have had to call in.  And I just had to work
 5   service the best I could with the problems.
 6        Q.   Tell me -- tell me a little bit about this
 7   communications meeting, I guess, or maybe it's just an
 8   e-mail that you had with Dr. Dixon on May 12, 2015.
 9        THE STENOGRAPHER:  I'm sorry.
10        A.   Yeah.
11        THE STENOGRAPHER:  May what?
12        MR. CHAUNCEY:  I just asked her to -- to tell
13   me a little bit about the -- the communication
14   that she had with Dr. Dixon on May 12, 2015.
15        A.   So I had filed an anonymous complaint -- okay.
16   So after the meeting with Osfield, we have the one month
17   of peace in the springtime where Osfield comes in, we
18   work it out; Dr. Hobbs tells Dr. Turner, who's the
19   attending on the service, that they have to make
20   accommodations.  And so on the surface it seems like
21   everything's fine.
22        You know, Hobbs had already given me this
23   warning that I won't be able to keep up with Osfield
24   forever and she can change my schedule from month to
25   month, and I'll never be able to keep up with her.
```

Page 39

```
 1        So I think around then I filed a grievance for
 2   retaliation, and I have e-mailed the ACGME.  So the
 3   grievance -- I filed an internal grievance, and then I
 4   filed a grievance with the ACGME, which is the
 5   accrediting body --
 6        Q.   Right.
 7        A.   -- for graduate medical education.  And
 8   although it was an anonymous complaint, I guess
 9   Dr. Dixon figured that I was the one who had sent it
10   because she sent me this e-mail because she knew that I
11   was having -- you know, making these disability
12   complaints.  So then she sends me this e-mail stating
13   that it's too bad someone filed the complaint, that
14   hopefully -- or that it would have just been so nice to
15   have had time to address their concerns head-on.
16        So I took that as a little bit of a threat and
17   also a little bit hopeful.  So I --
18        Q.   Was --
19        A.   -- (inaudible) --
20        Q.   Was this a different complaint than the one
21   that -- that you filed later, or was this the same
22   complaint?
23        A.   This is different.
24        Q.   Okay.
25        A.   Because I withdrew this one.
```

Page 40

```
 1        Q.   Okay.
 2        A.   Because I -- you know, I -- I felt pressured,
 3   but I thought -- there was a part of me that also felt
 4   hopeful that maybe she was stating this in good faith
 5   and maybe she really did want to help.  So I withdrew
 6   it.  And the part of me that was fearful told her that I
 7   withdrewed (sic) it.
 8        And as far as I know, she did not send that
 9   e-mail to anyone else; it was only sent to me.  I could
10   be wrong about that.  But I asked my fellow residents,
11   and no one else had gotten it.  So --
12        Q.   Okay.
13        A.   -- that made me pretty certain that she had
14   identified me as the complainer to the ACGME.
15        Q.   All right.  I mean, do you believe anything
16   negative happened to you as a -- result of that by
17   Dr. Dixon?
18        A.   Well, I mean, Dr. Dixon ultimately decided
19   whether or not to take Dr. Hobbs -- you know, Dr. Dixon
20   is one of the people I appealed to.
21        Q.   Right.
22        A.   Stone may have been cast no matter what I did.
23        Q.   And this is the -- May 28, 2015, that you
24   talked with Dr. Hobbs, and Dr. Averbuch, and Ken
25   Osfield, and it seems like a sort of interactive process
```

Page 41

```
 1   meeting.  And from that meeting, they refused two-thirds
 2   of your accommodation requests, is -- can you describe
 3   that a little bit, how that meeting went.
 4        A.   Yeah.  So part of -- I mean, a large part of my
 5   concern was that they were moving me to -- they were
 6   keeping me on the schedule, the rotating hospital
 7   schedule, instead of staying in the clinic, where the
 8   clinic is climate controlled, you're in a single room
 9   all day.  So really, it's much more ideal for POTS.  And
10   they were using all kinds of pretextual excuses for this
11   such as the things that I had told them would be a
12   problem if she took me off the schedule in December,
13   that it would lead to patient cancellations, it would
14   cause disruptions in -- in my learning of the clinic.
15        And so that was one of my requests.  And if not
16   the clinic, just some service where I wouldn't have to
17   be in -- in varying environments all the time.
18        Q.   Okay.  But they -- did UF provide you with
19   accommodations from this process?
20        A.   They had been planning on changing my schedule
21   at the last minute for that month and --
22        Q.   Do you have -- do you have any evidence of
23   that, that they were planning to change your schedule?
24        A.   I think it's -- I think it's in the records of
25   that meeting because that was the one accommodation that
```

Sarah Diekman
June 19, 2020

Page 42

1  they gave me was they didn't do that one month
2  last-minute scheduling change.
3      Q.   Okay.  And it says that two-thirds of the
4  plaintiff's ADA requests were -- were denied.  Were
5  there other ADA requests for accommodation that you
6  received?
7      A.   I would have --
8           Oh, that I received?  Not that I can recall.
9      Q.   Okay.  At this point, how -- how was your
10 health at this point?
11     A.   Poor.
12     Q.   Had the parking spot helped?
13     A.   It did help.  But the problem is, is that --
14 I mean, because then it switched from the parking spot
15 to the retaliation.  So there was definitely the
16 potential -- if only they had just, like, left me alone
17 and treated me like any other resident, I probably could
18 have recovered.  But it was the retaliation.  And then
19 the chiefs would do additional stressors on me where
20 they would intentionally -- because we're very reliant
21 on the chiefs to teach us the computer systems,
22 especially that year where we're in clinic for the first
23 time.  So the clinic systems are extremely different.
24 And the chief wouldn't help me because they were doing
25 all this retaliation business.  So it was an ex -- so

Page 43

1  there's all these added stressors.  So it was -- I -- I
2  could have gotten better.  It was better to have that
3  parking spot there.  That parking spot was great.  But
4  once you take the stressors of the retaliation, it
5  really didn't leave any room for me to recover.
6      Q.   If you didn't have that parking spot at that
7  point, would it have been even more difficult?
8      A.   Yeah.  I think -- honestly, if I didn't have
9  the parking spot, and with the level of retal -- like,
10 what they were doing to me, I -- I think I would have
11 become bedridden.  I don't -- I think I would have
12 reached the -- you know, because the severest stage of
13 POTS is you're immobile.  You can't get out of bed.
14 I -- I think I would have reached that.
15     Q.   It says here, in paragraph 41, it says that you
16 complained to Dr. Hobbs, and Dr. Ginory, and
17 Dr. Bussing, and that their responses to the plaintiff's
18 complaints were an accommodation plan that Dr. Ginory,
19 plaintiff's direct supervisor, failed to follow.
20          So is this a different plan than had been
21 mapped out in May, after that May 28th meeting?
22     A.   Well, yeah.  Because the problem is, as
23 Dr. Hobbs said, she can just keep changing my schedule.
24 So every month the accommodations from the last month
25 will no longer be applicable.

Page 44

1      Q.   Did --
2      A.   So --
3      Q.   Did Dr. Ginory -- so did Dr. Ginory
4  intentionally try to not follow the plan?
5      A.   She certainly listed some of my accommodation
6  requests -- or some of the accommodations as -- like, in
7  my review were listed as negatives against me.  So, for
8  instance, the accommodation they gave me was sticking me
9  in this far-away office in one of the Shands towers.
10 And then Gin -- and I said this is going to cause
11 difficulty with me communicating with -- with the team
12 because they're in one room, and I'm in another room,
13 and it's going to cause coordinating problems.  And
14 that's exactly what she wrote on my review.  So I --
15     Q.   Had you want -- had you wanted that
16 accommodation?
17     A.   This is, like, a -- a rock and a hard place
18 situation.  What I wanted was to -- I thought it would
19 be best to not be on the Shands consult service during
20 the hottest month of the year.  So I asked to be on the
21 service a few months later, when it wouldn't be so hot
22 and I would be able to walk more easily to where the
23 team room was.  But they said no way, we're not changing
24 what month that you're on the service.  So we'll give
25 you this room in the tower.  And I said, there's --

Page 45

1  there's -- the addiction fellows are in that room, so
2  I'm going to have to compete with them for computers and
3  telephones.  The pager doesn't work well there and
4  neither does the cell service.  So we -- you know, I
5  just have these concerns.  And --
6      Q.   Why -- why didn't the pager work well there?
7      A.   I -- I have no idea.  The mysteries of -- but,
8  I mean, it's just -- they're solid walls.
9      Q.   Right.
10     A.   The hospitals have lots of different --
11          So these were just all concerns that I had
12 ahead of time.  And instead of addressing them, they
13 just said, this is what you get, you know --
14     Q.   All right.
15     A.   -- just deal with it.  So that's what I did.
16 But then my reviews come out, and they put all these
17 things as negatives about me.  So --
18     Q.   Dr. Ginory did?
19     A.   Yes.
20     Q.   Okay.
21     A.   So I guess this --
22     Q.   Let me ask you about -- let me ask you about
23 paragraph 44 here.  You talked about plaintiff raised
24 concerns about policy of defendants concerning billing
25 that was fraudulent.  What -- just briefly what --

Sarah Diekman
June 19, 2020

Page 46

1   what -- what is that about?
2       A.   So Dr. Ginory instructed us to put diagnoses on
3   patients.  And this is in an e-mail.  So if a patient
4   had delirium, which means that their -- that their
5   primary illness is a systemic medical illness and not a
6   primary psychiatric illness, so that's supposed to go
7   higher up.  But she instructed us that every patient we
8   saw needed a billable diagnosis.  So we always would
9   come up with some primary psychiatric diagnosis, always.
10      Q.   Okay.
11      A.   And I thought that would lead to patient safety
12  issues, and ultimately it did.  When I was not on the
13  service, Dr. Ginory -- a -- a patient of hers almost
14  died because of this practice.
15      Q.   In August 2015 it says you attended a lecture
16  as an aud -- auditory learner.  Despite that her
17  classmates were attending the lecture, plaintiff was
18  asked to leave.  Dr. Hobbs stated despite the fact that
19  plaintiff was allegedly ac -- academically deficient,
20  that she had made the educational schedule and subject
21  to changes that she so deemed.
22           Tell me a little bit about that incident that
23  you allege.
24      A.   Yes.  So my colleagues, upon entering the third
25  year, which is normally the clinic year, and that's

Page 47

1   really what I wanted because it was the
2   climate-controlled environment, and I thought that, you
3   know, if I wasn't having daily tachycardia that I, you
4   know, could really be my best self at work.  An -- yeah.
5   So they get a week long -- for starters, they get a
6   week-long instruction in orientation on how to perform
7   well in the clinic.  And I was forbidden to go to that
8   week-long block.  That was the first thing.  And yet she
9   told the attendings that I should be compared to my
10  colleagues in the exact same way.  So they were getting
11  training that I wasn't, and I was supposed to be
12  performing at their same level.
13           Then there was, additionally, a weekly
14  didactics and psychotherapy training that they received.
15  And that's what this incident was.  So I showed up
16  because it was on my schedule.  So this was two things.
17  This was a really humiliating experience and really
18  awful for my education, the training portion of this
19  job.
20           So she -- she said I was not allowed to go to
21  those training sessions, that those were for my
22  classmates, and I would get them later.  And I asked
23  her --
24      Q.   Did she give a reason?
25      A.   Because I would get them later because she

Page 48

1   makes my schedule, and she had already informed me that
2   she can do whatever she wants with my schedule.
3       Q.   Were you behind your classmates at that point
4   due to the leave and all the sick days?
5       A.   I don't know what you mean by behind.
6       Q.   Were you -- were you -- were -- were you not
7   at -- had you not put in the same amount of time as
8   your -- as your fellow students in that she wanted you
9   to -- to -- to do some more work before you reached that
10  point?
11      A.   Clinically, I would have been one month behind
12  them.
13      Q.   Okay.
14      A.   But if she, in good faith, wanted me to have
15  better education, this -- she should have wanted me to
16  attend these lectures.  This would have been the way to
17  make me a better resident.  This was actually
18  educational, where a lot of the clinical rotations are
19  just about doing work, making sure everything is done so
20  that they can bill for the patients and do that.  It's
21  not necessarily the growing as a psychiatrist side of
22  things.  You -- that's what those sessions were designed
23  for.
24           They also got books.  She --
25      Q.   Right.

Page 49

1       A.   -- didn't give me the book either.  So I don't
2   know in what universe you can say you're trying to
3   educate somebody, give them extra education, and you
4   don't give them books that you --
5       Q.   Let me --
6       A.   -- give to the colleagues.
7       Q.   -- as you -- you say here that Dr. Hobbs later
8   informed the plaintiff that if she -- if she had not
9   been in so much trouble, then she would have been
10  allowed to attend the lecture.
11           Do you -- do you have -- other than your
12  testimony, do you have any evidence that she said this?
13      A.   No, nothing in addition, sir.
14      Q.   Okay.  Give me one second.
15      A.   Sure.
16      Q.   So 51 you talk about the milestone scores.
17  That -- that's the -- the printout that you had provided
18  us previously --
19      A.   Yes.
20      Q.   -- where you allege that she had -- that --
21  that your grades had been changed?
22      A.   Yeah, the milestone.
23      Q.   Okay.
24      A.   Yeah, anything above a three was removed
25  because a three is generally -- like, according to the

Sarah Diekman
June 19, 2020

Page 50

1  ACGME, is considered graduate -- graduating level.
2      Q.  When you talk about walking off the job in the
3  middle of a shift because there was too much work,
4  talking about a similarly-situated male employee.  Who
5  is that in regard to?
6      A.  (Inaudible.)
7          THE STENOGRAPHER:  It broke up.
8          THE WITNESS:  Oh, I'm sorry.  A -- Ahmed
9      Kareshi (phonetic).
10 BY MR. CHAUNCEY:
11     Q.  Okay.  It says here that although male
12 residents only made up 20 percent of the workforce, they
13 were routinely scheduled for easier rotations.  Is
14 the -- are the easier rotations -- is that just in your
15 opinion?
16     A.  Well, no.  So if you look at UF's own version
17 of their annual reviews, you can find the rotations that
18 the residents document as the best rotations.  And if
19 you look at those rotations, you will --
20     Q.  Does -- does everybody go through the same
21 rotations in the end?
22     A.  No, sir.
23     Q.  Does everybody go through each rotation?
24     A.  No, sir.
25     Q.  Okay.

Page 51

1      A.  Now when we're recruited to the program, they
2  tell us something different.  They tell us that we'll
3  all gets six months of electives, which is actually an
4  ACGME requirement, which is also something they did away
5  with from me.  And they actually had violated ACGME
6  rules with the amount --
7      Q.  And why do you -- why do you think that -- so
8  you say 20 percent of the workforce was the males.  Why
9  do you think that -- I guess you'd be saying Dr. Eisner,
10 and Dr. Hobbs, and Dr. Bussing, and Dr. Dixon would be
11 scheduling men for easier work than females when they're
12 all female?
13     A.  I couldn't speak to anyone's intent or
14 motivation.  I just look at numbers.
15     Q.  Okay.  So you don't know that they actually
16 were intending to discriminate against women in the
17 program?
18     A.  No.  I would just -- I -- I -- using the
19 statistics that tell a story.
20     Q.  Did you ever fail a rotation?
21     A.  I guess that last one where I worked three
22 da -- but it wasn't like a real fail -- I mean, there's
23 no -- when she sent out my transfer letter when I was --
24     Q.  Uh-huh.
25     A.  -- attempting to get another program, there

Page 52

1  weren't any failed rotations on there.  The last one
2  was, like, incomplete.
3      Q.  When -- when did you try to transfer?
4      A.  I tried to transfer to UF Jacksonville
5  actually.
6      Q.  Uh-huh.
7      A.  Their program director knows Dr. Hobbs, so he
8  was willing to overlook her comments --
9      Q.  Okay.
10     A.  -- and hire me.  But then someone called the
11 dean above him and blocked my hiring.
12     Q.  When was this?
13     A.  Somewhere around the -- the summer.  So it was
14 when I was recovering from the postconcussive syndrome.
15 I wasn't sure how quickly I'd be able to work.  But he
16 had actually himself had postconcussive syndrome and was
17 rather sympathetic and said that we could wean me onto a
18 gradual schedule there.
19     Q.  All right.  You say here Dr. Tonia Werner was
20 told by Dr. Hobbs to punish the plaintiff for
21 complaining about her disability.
22         Other than your testimony, do you have any
23 other evidence that she said this to Dr. Werner?
24     A.  I don't ha -- I've requested e-mails, any
25 e-mails between Hobbs and Werner, but I haven't received

Page 53

1  any.
2      Q.  Okay.  And -- let's see here.  So you talk
3  about here that -- in 57, that you exhausted all your
4  administrative remedies; is that correct?
5      A.  Yeah.  I was working with the human resources
6  at the time because, you know, I had a head trau -- I
7  had a traumatic brain injury from the --
8      Q.  Right.
9      A.  -- fall.  So I was relying on the guidance of
10 UF, specifically the human resources department, to
11 direct me to all the levels of appeal.
12     Q.  Right.
13     A.  And I was told the final level was the dean.
14     Q.  Right.
15         This letter that you received here, we had talk
16 about -- oh, there we go -- April 27, 2016.  The -- this
17 is the letter that -- that Dr. Goode re -- rejected
18 your -- your appeal to him.
19         It says down here, it's highlighted, and I just
20 highlighted it, that a judicial review of this final
21 university decision pursuant to the Florida Rules of
22 Appellate Procedure 9.190, applicable to review of a
23 quasi-judicial decision for administrative body not
24 subject to the Administrative Procedures Act by filing a
25 petition for certiorari review within 30 days of the

Sarah Diekman
June 19, 2020

Page 54

1 final university decision. And this was the final
2 university decision?
3        Do you -- do you remember reading that?
4     A.   Again, I had a traumatic brain injury at the
5 time. And, to me, anything with the word judicial in it
6 to me meant lawsuit, EEOC. So I can't speak to what I
7 would -- would have -- how I would have read it. But I
8 was relying on the good faith of the HR department at
9 the University of Florida and --
10     Q.   Okay.
11     A.   -- the EEOC. I filed --
12     Q.   That --
13     A.   -- (inaudible) EEOC --
14     Q.   So during this period, April, May, June period
15 of 2016, you were still dealing with the postconcussive
16 syndrome?
17     A.   Yes, sir. It resolved a -- about a year later.
18     Q.   Okay. So --
19     A.   I was petty symptomatic for a year.
20     Q.   So are there a lot of things that you just
21 don't remember from this period?
22     A.   In the springtime it was the worst becau -- and
23 I was having to take the medication Elavil, which is
24 pretty notorious for causing, you know, cognitive
25 challenges. But once I was able to tolerate and control

Page 55

1 the headaches with, like, Ibuprofen and -- and not on
2 Elavil, I think I switched to Effexor, which is also
3 a -- an antidepressant, but it also treats chronic pain
4 and --
5     Q.   And you said that -- and you said that that
6 was -- you -- you recovered -- it was about six months
7 later from this?
8     A.   I think the -- the most debilitating symptoms
9 were about six months. Then I started being more
10 functional. That's when I started preparing for law
11 school. So I was able to do, you know, all the LSAT
12 prep. I mean it was challenging, but I started to, you
13 know, tolerate work. And I used that to -- to prep
14 for -- you know, get all the law school application
15 stuff ready.
16     Q.   All right.
17     A.   And I, you know, obviously was able to do that.
18     Q.   What -- what year did you begin law school, or
19 what semester did you begin law school?
20     A.   2017.
21     Q.   Was that spring of 2017 or fall of 2017?
22     A.   So I took the LSAT kind of, like, a month after
23 the year anniversary.
24     Q.   Okay.
25     A.   You know, approximately a year from the -- the

Page 56

1 date of the head strike. I took the LSAT a month or
2 two -- two months after that, maybe three months --
3     Q.   Uh-huh.
4     A.   -- after that. But, you know, approximately a
5 year.
6     Q.   Let me ask you, do you recall if you passed or
7 failed Dr. Welch's final rotation?
8     A.   I think he said that I -- in his comments, he
9 said that I failed it, but --
10     Q.   Okay.
11     A.   -- it -- the record doesn't read that way,
12 so --
13     Q.   Okay.
14     A.   I -- they may have disregard it because he
15 actually accused me of a patient error that was totally
16 his fault. And I brought it up to HR and made them
17 investigate the whole thing. He first blamed it on
18 another female, then he tried to blame it on me, but --
19     Q.   Okay.
20     A.   -- I had nothing to do with the patient. I had
21 nothing to do with the incident. And then, actually,
22 they stopped scheduling me with -- with Dr. Welch
23 because it was so clear that he was targeting me in
24 outrageous ways.
25     Q.   All right. Talks about here that -- that you

Page 57

1 suffered but continue to suffer emotional damages as
2 well as mon -- as well as monetary damages. Can you
3 talk a little bit about what -- what you allege are your
4 current emotional damages as a result of this.
5     A.   Yes, sir. So -- and, I mean, the -- you know,
6 of course the worst was in the beginning. But I have
7 PTSD.
8     Q.   Are you still -- do you still take medication
9 for depression or PTSD?
10     A.   I have only a rescue medication now --
11     Q.   Okay.
12     A.   -- for really rare occasions if I have, like,
13 an overwhelming reexperiencing.
14     Q.   Okay.
15     A.   But I'm happy to say that that is much more
16 rare.
17     Q.   When was the las -- when was the last time that
18 happened to you?
19     A.   Within the -- I mean, preparing for this
20 deposition is not easy, like, knowing that I have to
21 relive and go through all this stuff.
22     Q.   Right.
23     A.   So probably in the last couple weeks.
24     Q.   Okay.
25     A.   But before that, not actually for months.

Sarah Diekman
June 19, 2020

1    Q.   All right.
2    A.   But I have gone through full treatment for
3  PTSD.  I went through EMDR, which is the eye movement
4  desensitization and preprocessing.  You may have heard
5  it for, like, a -- combat veterans.
6    Q.   Uh-huh.
7    A.   This is the mainstay of treatment for PTSD.
8  Medications really only help so much.  EMDR is the gold
9  standard.
10    Q.   Are -- are you still seeing a mental health
11  counselor?
12    A.   Yes, sir.
13    Q.   Okay.  How --
14    A.   Not as often as I would like, but, honestly,
15  it's a financial thing.
16    Q.   Right.
17         How often are you seeing --
18    A.   In -- in the last year, I maybe see her once
19  every six months.  I would love to see her once a month,
20  but I just can't afford it.
21    Q.   Okay.
22    A.   In the beginning, I think there was a time
23  where I was seeing her twice a week.
24    Q.   How long were you paid by the University of
25  Florida?  What was your -- what was your final time you

1  received payment --
2    A.   I think when --
3    Q.   -- (inaudible) --
4         THE STENOGRAPHER:  I'm sorry.  I didn't hear
5  the question.  It broke up.
6  BY MR. CHAUNCEY:
7    Q.   When -- when was the final time you received
8  payment from the University of Florida?
9    A.   Once a doc -- or Dean Good submitted his final
10  judgment on my appeal --
11    Q.   Okay.
12    A.   -- was the end.
13    Q.   And how -- how much did you receive for the
14  workers' compensation settlement that you had?
15    A.   Am I allowed to say that?  I thought I wasn't
16  supposed to -- I thought that was --
17         MR. SALZMAN:  You can in this -- in this
18  setting, yes.
19         THE WITNESS:  I can?  Oh, okay.
20    A.   So I think it was, like, 17 or 18,000.
21  BY MR. CHAUNCEY:
22    Q.   Okay.  Yeah, that's just -- that's just -- it's
23  just for damages calculation, nothing more.
24         Okay.  And who -- who's your primary care
25  doctor currently?

1    A.   Currently my primary care is Dr. Hutchins.
2    Q.   How often do you see Dr. Hutchins?
3    A.   Every couple months or so.  It's actually
4  really a great setup because she's direct patient
5  primary care.  So her way of billing allows me to see
6  her for extended periods of time when I see her.  So she
7  can take care of all my problems and I don't have to
8  visit her every other day so that she can keep billing.
9    Q.   Okay.
10    A.   And -- and then she also is more available to
11  take care of things remotely.  So I'm happy to say that
12  she takes care of my medical issues without me having to
13  be in there every other week, which is, you know,
14  debilitating in itself.
15    Q.   Did you miss any mortgage payments or any other
16  car payments as a result of any of your allegations for
17  the University of Florida?
18    A.   I didn't miss any payments, but I had to sell
19  my house.
20    Q.   Okay.  How much did you --
21    A.   Before -- I was --
22    Q.   -- sell your house for?
23    A.   -- going to miss some payments if I didn't sell
24  that house.
25    Q.   How much did you sell your house for?

1    A.   I think 215.
2    Q.   Did you come into any other assets after you
3  left University of Florida?
4    A.   Not really.  My parents bought a house in
5  Ocala, and that's where I lived for the next four years.
6  They -- they bought that.
7    Q.   During law school you -- you had lived with
8  your parents?
9    A.   Well, I -- Ocala and with my parents.
10    Q.   Okay.
11    A.   Because the parents were so much closer to the
12  law school.  So a lot of times during the weekdays I
13  would stay at their place, and then --
14    Q.   Did your parents purchase the house in Ocala
15  that you lived in?
16    A.   Yes.
17    Q.   Okay.  And then did they have another house in
18  Orlando that you also would stay at, at times?
19    A.   Later.  Later.
20         Originally they purchased the Ocala house.  And
21  they were living in Arizona at the time.  So originally
22  they purchased the Ocala house to have something in
23  Florida.  And then, plus, I would have someplace to
24  live, too.
25    Q.   Uh-huh.

Sarah Diekman
June 19, 2020

Page 62

1    A.   And then decided they wanted to move here, and
2  then the Ocala house would just be extra while I needed
3  it, and then sell it at the end of law school.
4    Q.   Okay.  Did you get -- did you sell the Ocala
5  house?
6    A.   Yes.
7    Q.   Did you get the proceeds from the -- the Ocala
8  house sale?
9    A.   No.
10   Q.   No?
11   A.   No.
12   Q.   Okay.  Going to show you -- it's from one of
13 the exhibits that we had shown you on the -- on
14 Wednesday.  Hopefully this -- there we go.
15        Do you ever recall seeing this -- one of the
16 GME policies -- and that was in the handbook that I'd
17 shown you on -- on Wednesday.  Do you ever recall seeing
18 this, the guidelines for --
19   A.   I --
20   Q.   -- technical standards (inaudible) --
21   A.   I might have.  But like I said --
22        THE STENOGRAPHER:  Wait.  Guidelines for
23        what?  I'm sorry.
24        MR. CHAUNCEY:  Says the guidelines for
25        technical standards for residency training.

Page 63

1  BY MR. CHAUNCEY:
2    Q.   You -- you were saying, Dr. Diekman?  I'm
3  sorry.
4    A.   Yeah.  I -- I might have, but so often the
5  guidelines were incompatible with the reality of and the
6  adopted policies and practices.  You could always read
7  them with a grain of salt.  An -- and a lot of times
8  we'd read them and say --
9    Q.   Right.
10   A.   -- jeez (inaudible) --
11   Q.   Up here it says that in the GME policy --
12        THE STENOGRAPHER:  Wait.  Wait.  Wait.  I'm
13        sorry.  I didn't hear the end of her answer.
14        THE WITNESS:  Oh, we would say, jeez, we wish
15        this was what was happening.
16 BY MR. CHAUNCEY:
17   Q.   So in the -- in this policy, it says that this
18 is -- the sponsored institution supports the concept of
19 reasonable accommodations to individuals with
20 disabilities accepted to graduate medical education.
21 Kind of goes through, each program may have specialized
22 skills necessary to complete the program.  The college
23 of medicine has adopted the following technical
24 standards for medical school admissions, and these forms
25 should be to develop specialty specific technical

Page 64

1  standards (sic).  One of those is behavior and social
2  attributes.  A candidate must possess the emotional
3  health, but it also says down here that a candidate must
4  be able to tolerate physically taxing workloads and to
5  function effectively under stress, and must being able
6  to adapt to changing environments, to display
7  flexibility, and to learn to function in the face of
8  uncertainties inherent in the clinical problems of many
9  patients.
10        Had -- had you ever read this before?
11   A.   I'm not familiar with this.
12   Q.   Okay.
13   A.   And, you know, nor was it in the employment
14 contract, this level of specifics as far as essential
15 job requirements.
16   Q.   Right.
17   A.   And I don't know what year this handbook was
18 written because --
19   Q.   This -- let's see.  Actually, I'm moving very
20 slowly, but let's see when it was -- last time it was --
21 February the 12th, 2015, was the last time they had
22 updated it.
23   A.   So they wrote that --
24   Q.   Or last -- last reviewed --
25   A.   -- (inaudible) --

Page 65

1    Q.   -- last reviewed and (inaudible) --
2        THE STENOGRAPHER:  I'm sorry.  You were
3        talking over each other.
4        MR. CHAUNCEY:  I said last reviewed and
5        approved on February 12, 2015, so --
6    A.   So this was even written after they started
7  retaliating.
8  BY MR. CHAUNCEY:
9    Q.   Well, it -- it may not have been written.  I --
10 I -- we can -- we can go get those documents from
11 previous to it.
12   A.   Yeah.
13   Q.   A lot of them -- a lot of them are just
14 reviewed and sort of sent on once again.
15        I think a majority of these were updated in
16 2011 it said, but --
17   A.   I main --
18   Q.   Sorry.  Go on.
19   A.   I maintain that their accepted policies and
20 practices are not in alignment with that because --
21   Q.   Okay.
22   A.   -- no other resident had to work as many
23 consult services as I did.  They --
24   Q.   With -- with -- let me ask you this.  Do you --
25 do you think generally that the residency system that's

Sarah Diekman
June 19, 2020

Page 66

1  in place in medical education is -- is a bad system?
2      A.   You mean all residencies nationally?
3      Q.   Yeah, just the residency system itself.  I
4  mean, the way that it all works --
5      A.   It's a very --
6      Q.   -- (inaudible) --
7      THE STENOGRAPHER:  Wait.  You were -- you
8  were overlapping.  I didn't hear the end of the
9  question.
10 BY MR. CHAUNCEY:
11     Q.   I said did -- did -- do you think that the
12 residency system generally is sort of a bad system or
13 unfair?
14     A.   I think it's imperfect, but -- you know, and, I
15 mean, I -- I work with researchers who -- who -- you
16 know, we do all kinds of research on gender, and racial
17 disparities, and in -- inequities amongst the residency
18 system, and burnouts.  And there are parts of it that
19 are great, and there are people who have wonderful
20 experiences in residency.  And then there are people who
21 get sexually assaulted by their supervisor, report it,
22 and then their career is over.
23     Q.   Right.
24     A.   So -- and that's not okay.  But --
25     Q.   If --

Page 67

1      A.   -- but there are --
2      Q.   I'm sorry, Dr. Diekman.  Did -- did you -- I --
3  I know you had published some websites and things like
4  that.  One of those was justice in medicine.  Is that
5  right?
6      A.   Uh-huh.
7      Q.   What -- what was the purpose behind that
8  website?
9      A.   To try and improve public health and humanity
10 in the medical training system.  We -- I don't know if
11 you're aware, but physicians top the charts when it
12 comes to suicide, and mental health issues are extremely
13 prevalent amongst physicians.  And, you know, for -- we
14 already have a shortage of doctors in this country.
15     Q.   Okay.
16     A.   So, I mean, this is why I wanted to go into
17 addictions and --
18     Q.   Did you -- I'm sorry.  I've got some limited
19 time here.
20     A.   I'm sorry.
21     Q.   But did you -- did you ever have any other
22 websites that you published?
23     A.   I was part of a -- a nonprofit.
24     Q.   Okay.  At the end of medical school, did
25 you -- did you pass your Step 2 clinical skills before

Page 68

1  going to the University of Florida?
2      A.   No.  Actually, I had requested accommodations
3  for my disability because that is also a test where you
4  have to stand and -- so that's a -- a physical test.  So
5  you have to stand and see patients and rotate through
6  their rooms.
7      Q.   Right.
8      A.   And the first go-round, they would not let me
9  take my medications, so --
10     Q.   Did you --
11     A.   -- I had physical problems during that test and
12 I didn't past it.  The second time
13 they accommodated me because I was ready to bring a
14 lawyer onboard and -- and bring a fit because all I
15 needed was --
16     Q.   The -- you -- so -- so you had -- or did you
17 have issues with the clinical test as well at Indiana
18 University College of Medicine?
19     A.   All my issues were related to my diagnosis of
20 POTS.  So that actually started in my third year.
21     Q.   Uh-huh.
22     A.   And Indiana, their doctors did not correctly
23 diagnose me ever actually.  So I had to go to the Mayo
24 Clinic, which you may or may not know is, like --
25 recently was ranked the best hospital in the world, at

Page 69

1  least the Rochester one.
2      Q.   Right.
3      A.   (Inaudible) Arizona.  And so they actually
4  diagnosed me with POTS.  And then once I received POTS
5  treatment, my rotations improved.
6      So, I mean, the Indiana -- the rotations I had
7  problems with, it put me on academic probation.  And
8  once I went to the probation committee and told them
9  this is what's happening with me physically, they
10 accepted that and they said okay, you know, take care of
11 yourself physically, and we'll provide you support to
12 catch up.  And that's fine.  That's not what we're
13 trying to flunk out med students for.
14     Q.   Doc -- Dr. Diekman, do you -- do you recall
15 having weekly meetings with Dr. Hobbs after you went on
16 probation?
17     A.   Yeah.
18     Q.   And do you recall -- were you able to make all
19 those meetings when -- for -- with Dr. Hobbs?
20     A.   I mean, sometimes there are scheduling
21 challenges because -- and I think, you know, the thing
22 is, is the schedules were not under my control.  Whose
23 control they were in was Dr. Hobbs'.
24     Q.   Right.
25     A.   So she could put me on a busy rotation that she

Sarah Diekman
June 19, 2020

---

Page 70

1   knows I would have trouble getting off of and then say,
2   Sarah doesn't show up to these meeting on time.  But
3   then if I left any patient care, if there was something
4   going on with the patient and I had to ask another
5   resident to take care of it, she would punish me for
6   that.
7       Q.   Right.
8       A.   So I was faced with a no-win situation, which
9   was entirely in her control, which --
10      Q.   Right.
11      A.   -- is exactly what she had warned me that she
12  was capable of doing.
13      Q.   Let me show you this.  This is what we'll list
14  as -- I think it's -- it's defense Exhibit 29.
15          (Exhibit 29 was marked for identification.)
16  BY MR. CHAUNCEY:
17      Q.   This is just the department of psychiatry
18  residency manual from 2013, 2014.  Are -- are -- can you
19  identify this?  Do -- do you remember seeing this
20  before?
21      A.   Yes.
22      Q.   Okay.
23      A.   Yes.
24      Q.   And this -- this is the one that you would have
25  signed that we talked about on Wednesday?

---

Page 71

1       A.   Yes, sir.
2       Q.   Okay.  Let's see here.  Guess this will be
3   defense Exhibit 30.
4           (Exhibit 30 was marked for identification.)
5   BY MR. CHAUNCEY:
6       Q.   Do you recall at all being deposed on
7   February 18, 2016?
8       A.   Oh, yes.
9       Q.   Okay.
10      A.   I'm sorry.  I thought we were looking at the
11  manual.
12      Q.   No.  Yeah.  No, you're good.  This is --
13  this --
14      A.   Okay.
15      Q.   -- is definitely different.
16          So I just wanted to -- to -- to -- I know you
17  can't read through all of this.  I mean, it's there.
18  It's --
19      A.   Sure.
20      Q.   But -- but you -- you do recall and -- and can
21  identify that this is a -- a transcript of your --
22      A.   Yes.
23      Q.   -- deposition from that date?
24      A.   That looks right, yes.
25      Q.   All right.  Did you ever take a day off from

---

Page 72

1   the residency and -- and go to the beach?
2       A.   No, sir.  And, honestly, my health at the
3   time --
4       Q.   Uh-huh.
5       A.   -- to go to the beach -- no one with POTS is
6   trying to go to the beach.
7       Q.   Right.  Right.
8       A.   Like, I mean, not unless it was a vacation day
9   or anything.  But I don't think I ever went to the beach
10  while I was a resident there, period.
11      Q.   All right.  But you never actually went to a
12  beach during your time at UF?
13      A.   I wouldn't bet my life on it, but --
14      Q.   Okay.
15      A.   -- I mean, it takes a lot mentally.  Actually,
16  my family has a hard time getting me to the beach
17  because of all the heat things.
18      Q.   Right.  Okay.
19      A.   I mean, there are days, but I -- I mean, I'm
20  not saying I never go to the beach.  But I have to be
21  able to, like, get in the water right away.  I have to
22  have an umbrella.  There are -- it's just -- it's like
23  bringing a baby to the beach.  You know, it's not just a
24  simple thing.  I'm like a big baby.
25      Q.   Have -- have you ever filed for bankruptcy?

---

Page 73

1       A.   No, sir.
2       Q.   All right.  This is frozen on me so that's
3   unfortunate.  But let's see if I can pull up this --
4           This has some highlighting on it, but do you
5   recall meeting with Dr. Hobbs on August the 1st, 2014,
6   and -- actually, do you recall meeting with Dr. Fayad,
7   and Ginory, and Dr. Hobbs on Aug -- August the 1st,
8   2014?
9       A.   Specifically, no, but I'm --
10      Q.   Okay.
11      A.   -- sure it happened.  At this point, she was
12  having me, you know, all -- like, there was a lot of
13  meetings going on.  Let's just say --
14      Q.   Right.
15      A.   -- that, a lot of meetings.
16      Q.   We've got two minutes left, but did -- do you
17  recall them talking to you about spelling errors in your
18  notes, that -- is that anything that ever happened?
19      A.   Yeah.  Sure.  Were there spelling errors in the
20  notes?  Yeah.  Had I asked for help with that given the
21  fact that I'm dyslexic?  Again, with -- I had earlier
22  requested either dictation software or --
23      Q.   Right.
24      A.   -- some method --
25      Q.   You've got --

Sarah Diekman
June 19, 2020

Page 74

1  A.  -- for ex --
2  Q.  I'm sorry.  Just -- just with the time we've
3  got -- I'm so sorry.  But it says, Sarah said her main
4  issue is time management.  I think you'd talked
5  (inaudible) --
6        THE STENOGRAPHER:  I'm sorry.  You broke up.
7  BY MR. CHAUNCEY:
8  Q.  It says here that Sarah said her main issue is
9  time management.  But you -- you had -- you had -- we
10  had mentioned that previously, but -- but was that --
11  was that accurate?
12  A.  It -- I mostly had problems with time
13  management because of how sick I was being made every
14  single day.
15  Q.  Uh-huh.
16  A.  And the additional tasks I was given, like --
17  Q.  Right.
18  A.  I -- I probably would have done much better
19  with time management if --
20  Q.  Uh-huh.
21  A.  -- I wasn't experiencing such retaliation.
22  Q.  All right.  Do you remember meeting with
23  Dr. Hobbs -- I guess this is when you started meeting on
24  a -- a weekly basis on September the 15th, 2015?
25  A.  Uh-huh.

Page 75

1  Q.  Okay.  And, I mean, were your meetings with her
2  good or -- or what -- what -- I mean, what were they
3  like?
4  A.  I mean, it would just go over every grammatical
5  error, you know, the Oxford comma.  I mean, literally
6  the debates about the Oxford comma.
7  Q.  Right.
8  A.  And, you know, just absolutely any criticism
9  that could be had about a note.
10  Q.  Right.
11     Did you --
12  A.  Whether or not it's comparable to other
13  people's work was immaterial.  The com -- I was expected
14  to deliver perfection.
15  Q.  Do you recall having a meeting that was
16  scheduled for September 24th or September 23rd, and then
17  you had to call out so they had to reschedule it?
18  A.  So I don't know why she thinks -- so this is --
19  again, this is during the time where I was requesting
20  FMLA.  So I was in the process of getting FMLA because
21  Hobbs was telling me she's going to punish me for having
22  sick days.
23  Q.  Okay.
24  A.  And in --
25  Q.  This was during your probation, your --

Page 76

1  A.  Yeah.
2  Q.  -- (inaudible) --
3  A.  But I didn't know why probation was --
4        THE STENOGRAPHER:  Wait.  Wait.  You were
5  talking over each other.  I didn't hear the end of
6  his question.
7  BY MR. CHAUNCEY:
8  Q.  That's -- you were -- that's when you were to
9  get FMLA was during your probation?
10  A.  Yes, be -- because Hobbs was saying she was
11  going to -- that I wasn't allowed to take sick days
12  anymore and, like --
13  Q.  Had you run out of sick days?
14  A.  No, I hadn't, which was also a challenge in
15  a -- in navigating the FMLA thing because I still had
16  contracted four sick days.
17  Q.  Okay.  So it says here on October 27th that you
18  had called out sick on 10/20/15, and the -- the meeting
19  had to be rescheduled.  Are -- do you recall that?
20  A.  I don't, sir.  But, I mean, again, they were
21  intentionally running me into the ground, so -- and I
22  knew that everything I had to do was perfect.  So if I
23  was sick, I had to call out sick.
24  Q.  Right.
25        MR. CHAUNCEY:  Okay.  Well, I see it's 3:34.

Page 77

1  So at this point, I have no further questions.
2  Counsel, do you have any questions.
3        MR. SALZMAN:  I have no questions.  We will
4  put her down for a read.
5        THE WITNESS:  For what?
6        MR. CHAUNCEY:  She said -- he said that
7  she -- he -- he's going to allowed you to read
8  the -- the deposition transcript.
9        THE WITNESS:  Oh.  Oh, okay.
10        MR. CHAUNCEY:  All right.  And I believe,
11  Diane, I'd -- I'd already told you that I was
12  going to order it, so --
13        THE STENOGRAPHER:  Yes.
14  Alex?
15        THE VIDEOGRAPHER:  Yeah.  And I'm sorry, You
16  said order for the transcript.  How about the
17  video?
18        THE STENOGRAPHER:  Are we off the record?
19        MR. CHAUNCEY:  No, I don't -- actually, I
20  don't think we are.  No.
21        THE VIDEOGRAPHER:  I'm -- I'm sorry.  Which
22  one was that, no to the record or no to the video?
23        MR. CHAUNCEY:  I believe we're still on the
24  record right now, right?
25        THE VIDEOGRAPHER:  Yes.  I just wanted to get

Sarah Diekman
June 19, 2020

---

Page 78

1  the -- the answer to that real quick.
2      MR. CHAUNCEY:  We'll -- we'll take -- I'll
3  take the videos as well, yes, the video it --
4  itself.
5      THE VIDEOGRAPHER:  Okay.  No problem.  With
6  that, we are off the record.  The time is
7  3:35 p.m.
8      (The following occurred on the record but off
9  the videotaped portion of the record.)
10      THE STENOGRAPHER:  Did you want a copy,
11  Mr. Salzman?
12      MR. SALZMAN:  Yes.
13      THE STENOGRAPHER:  Thank you.
14      MR. SALZMAN:  Of the -- the transcript.
15      THE STENOGRAPHER:  Yes.  Thank you.
16      (Thereupon, the proceedings concluded at 3:35
17  p.m.)
18
19
20
21
22
23
24
25

---

Page 79

1              CERTIFICATE OF REPORTER
2
3  THE STATE OF FLORIDA )
4  COUNTY OF LEE        )
5
6
7      I, Diane E. Fowler, Stenographer, certify
8  that I was authorized to and did remotely
9  stenographically report via Zoom the videotaped
10  deposition of SARAH DIEKMAN, pages 1 through 78; that
11  a review of the transcript was requested; and that the
12  transcript is a true and complete record of my
13  stenographic notes.
14      I further certify that I am not a relative,
15  employee, attorney, or counsel of any of the parties,
16  nor am I a relative or employee of any of the parties'
17  attorney or counsel connected with the action, nor am
18  I financially interested in the action.
19      DATED this day, July 3, 2020.
20
21
22
23      *Diane E. Fowler*
24
25  JOB NO:  143023
        Diane E. Fowler, Stenographer

---

Page 80

1              CERTIFICATE OF OATH
2
3  THE STATE OF FLORIDA )
4  COUNTY OF LEE        )
5
6
7
8
9      I, Diane E. Fowler, the undersigned authority,
10  certify that SARAH DIEKMAN remotely appeared before me
11  via videoconference and was duly sworn on
12  June 19, 2020.
13      Signed this day, July 3, 2020.
14
15
16
17
18
19      *Diane E. Fowler*
        Diane E. Fowler, Stenographer
20      Notary Public - State of Florida
        My Commission No. GG973057
21      My Commission Expires:  April 19, 2024
22
23
24  JOB NO:  143023
25

[Notary stamp: Notary Public State of Florida / Diane E Fowler / My Commission GG 973057 / Expires 04/19/2024]

---

Page 81

1  July 3, 2020
2  Sarah Diekman c/o
   ANDREW J. SALZMAN, ESQUIRE
3  Unice Salzman Jensen, P.A.
   1815 Little Road
4  Trinity, Florida  34655
5  IN RE:  Diekman vs The University of Florida
   CASE NO.:  1:19-CV-00227-AW-GRJ
6
7  Please take notice that on June 19, 2020, you gave
   your deposition in the above cause.  At that time you
   did not waive your signature.
8
   The above-addressed attorney has ordered a copy of
9  this transcript and will make arrangements with you to
   read their copy.  Please execute the Errata Sheet,
10  which can be found at the back of the transcript, and
   have it returned to us for distribution to all
11  parties.
12  If you do not read and sign the deposition within 30
   days, the original, which has already been forwarded
13  to the ordering attorney, may be filed with the Clerk
   of the Court.
14
   If you wish to waive your signature now, please sign
15  your name in the blank at the bottom of this letter
   and return it to the address listed below.
16
   Very truly yours,
17
18  Diane E. Fowler, Stenographer
    Phipps Reporting, Inc.
19  1551 Forum Place, Suite 200-E
    West Palm Beach, Florida 33401
20
   I do hereby waive my signature.
21
22  _____
    SARAH DIEKMAN
23
24  JOB NO:  143023
25

---

Sarah Diekman
June 19, 2020

```
                                              Page 82
1                      ERRATA SHEET
          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
2          IN RE: Diekman vs The University of Florida
                 CASE NO. 1:19-CV-00227-AW-GRJ
3

    WITNESS: SARAH DIEKMAN    TAKEN: 06/19/2020
4
5  PAGE    LINE      CHANGE       REASON FOR CHANGE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
20          Under penalties of perjury, I declare that I
   have read the foregoing document and that the facts
21 stated in it are true.
22 _____ _____
   Date                  SARAH DIEKMAN
23
24
   JOB NO:  143023
25
```