# Exhibit 10



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945
(352) 594-1818 Fax

August 1, 2014

Drs. Fayad, Ginory, and I met with Dr. Sarah Diekman, PGY-2, on July 29, 2014 at 5 PM in my Shands GME office. Drs. Fayad (C/L attending) and Ginory (C/L Director/Attending) had expressed on several occasions throughout this July C/L rotation to me by e-mail that Dr. Diekman was not performing as expected. First, she did not seem to know her patients very well on rounds. Dr. Fayad gave her specific mid-rotation feedback on this, and she has improved some on this aspect of her performance per Dr. Fayad.

The second area of concern was poor note quality. This has been an ongoing concern that has been expressed in the past by Dr. Ginory during the intern year as well as from several senior residents at the end of her intern year. Feedback has been given in writing and in person multiple times by Drs. Ginory and Fayad. Major areas of concern were using the wrong template, a lot of spelling errors, and lack of specific content. I was provided with a sample progress note from this month. The note needed editing, but the major problem I saw was that the note really did not convey what was going on with the patient. It did not provide any review of psychiatric symptoms. In addition, the MSE was not very descriptive and did not match the patient's diagnoses.

We discussed these issues with Sarah. She said she had been using a dictation software to help her with note writing due to her dyslexia. This obviously was not helping so she has stopped using it. Drs. Fayad and Ginory suggested that she copy and paste her note into Word from Epic and do spell check. Dr. Ginory suggested that she use the dictionary function for words that are not commonly used such as drug names. Dr. Ginory expressed a lot of concern about her frequent misspelling of drug names. Sarah seemed pleased with these suggestions.

In talking about the note content, Sarah said that her main issue is time management. She struggles with starting her notes, then getting interrupted, then going back to notes to finish. We discussed the importance of coming in early when it is more quiet and less busy so she can focus and get her notes prepped for the day, and then she can just add in the plan later. I also suggested that she ask one of her peers also on service but who had been on the service for 2 months prior and had more experience on C/L to give her some advice on how to navigate the service better.

After the meeting, Drs. Fayad, Ginory, and I discussed how it was not clear that she was "getting" what we were conveying to her. Her affect did not show a sense of concern about



**Exhibit**

**9**

S. Diekman 6/17/2020

UF/Diekman 000372

this issue or that she planned to make a change. We will continue to monitor her performance.

*Jacqueline A. Hobbs, MD, PhD*

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


Addendum:

I e-mailed Drs. Fayad and Ginory for an update this today on Dr. Diekman's performance the last 2 days of the rotation. They both expressed that her notes were somewhat better than previously.

*Jacqueline A. Hobbs, MD, PhD*

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


October 17, 2014

Dr. Diekman called out sick today (a Friday). Though not a VA holiday, it is Homecoming (a UF employee but not clinical holiday) leading into the weekend. The PA had been off all week on the VA team, so the team was left without coverage. She said she assumed the PA would be there even though she had not been all week. Speaks to professionalism in my mind.

*Jacqueline A. Hobbs, MD, PhD*

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


October 31, 2014

Dr. Diekman called out sick today (a Friday). This caused major coverage issues at the VA today. I also heard that she and another resident were planning a Halloween party tonight.

She sent me the following e-mail at 11:50 AM:

"Dr. Hobbs,

Is there a time we can meet next week to discuss some issues surrounding my chronic medical conditions and work? I am really struggling. Not having my parking pass and working 3 rounds of night float during the worst time of year for me has really taken a tole. I thought my health would be better by now but it continues to worsen.  I am having to call off frequently and it is not fair to the chiefs and the people who have to cover for me. I will have a discussion with my one of my doctors today but I am maxed out on most of my medications and have been getting side effects from the high doses I am already on.  I think I may have to take a medical leave of absence.  I don't know what else to do.

Sarah"

I responded with the following:

"Hi, Sarah, sorry you are not feeling well. Why don't you call me either this afternoon or this weekend after you have talked to your doctor.

Thanks,

Dr. H"

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


November 24, 2014

I met with Dr. Diekman today in my GME office at 9 AM. Dorothy McCallister, Program Coordinator, joined us by speaker phone.

Dr. Diekman began by saying "I think I need to transfer residencies." She went on to explain that she feels disillusioned about the workload and that she thought it would not be as heavy as it is. She feels that there is too much coverage of other residents (who are out on leave) required of her.

She said that the only way that she can prepare for calls or long shifts is to take extra Florinef and get extra electrolytes. She said that she has not been able to remain compliant with physical therapy (PT) that she needs to do to be healthy. She said that if she does go to PT, it takes her 2 days to recover before she "can stand up".

She did produce a doctor's statement (dated 11/20/14) today that has been added to her file. This statement said that she would "benefit from adhering to the physical therapy which may last about an hour to 2 hours per day and a closer parking spot to the hospital to avoid heat as a trigger of her symptoms". I confirmed that Dr. Diekman has had her parking issues addressed.

Dr. Diekman stated that she is "too sick and can't catch up", that she "can't work extra hours" and that she has been "worried since the start of residency" that something like this would happen. She had told me in a previous conversation and re-confirmed today that even when she is on "lighter" rotations, she is not able to comply with her PT.

I discussed with her that several faculty and I have had issues with her clinical work performance, and I questioned whether her illness may have contributed to less than optimal performance. She agreed with this. I suggested that she take a medical leave to allow her more time to concentrate on her recovery including going to PT on a regular basis so that she can come back to work in a better state of physical health and hopefully better able to work to the expected level. She also agreed to this. We discussed that we will plan on her being out starting now (she was already scheduled to be off this afternoon from clinic) through the end of December.

Dr. Diekman gave me verbal permission to call her doctor, Danielle K. Panna, MD, if further information is needed.

I later discussed this plan for medical leave with Dr. Mahla. He agreed to go forward as leave with pay. He suggested talking to her doctor about this plan. I called and left a message to call me back. I also informed Dr. Diekman that I will discuss the leave with her doctor. Dr. Mahla also suggested that when she comes back that given her condition that we discuss the possibility of part time instead of full time to allow proper accommodtions.

*Jacqueline A. Hobbs, MD, PhD*

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


December 12, 2014

I talked with Dr. Panna a few days ago and let her know of the planned medical leave for Dr. Diekman. She said that she felt that was a good plan for helping her to get her condition under control so she can return to work under better circumstances. I asked that Dr. Panna work with Dr. Diekman to assist her in her care plan.

*Jacqueline A. Hobbs, MD, PhD*

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


December 18, 2014

I spoke with Sarah Diekman by phone today to check in with her to see how she is doing. She said that she has been doing okay but had not been able to do as much as she would like for her

condition because her uncle had unexpectedly passed away recently, so she was grieving. I expressed my condolences.

I let Sarah know that I had spoken with her MD, Dr. Panna, to let her know of the medical leave. Sarah said she also sees a cardiologist/electrophysiologist.

The purpose of this call was to also let Sarah know that we could work with her on a part-time return to work if that would be more conducive. For example, I suggested that she could come back and work her 2 weeks of night float and then be off for 2 weeks. I said part-time could either be temporary or for a longer period, just depending on how she was doing. She said she thinks she will come back full time but will think about it and get back to me. I asked her to "sleep on it" and get back to me in 1-2 days as I will need to make arrangements for coverage in the latter 2 weeks of January. She said she would let me know.

She thanked me for the consideration of such accommodations of her schedule.

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training


December 21, 2014

Sarah called me on 12/19/14 to let me know that while she appreciated the possibility of part time that she does not feel it is necessary. She plans to work full-time starting January 1, 2015.

Jacqueline A. Hobbs, MD, PhD
Assistant Professor
Director, Residency Training



**College of Medicine**
Department of Psychiatry                                        PO Box 100256
Residency Training                                             Gainesville, FL 32610-0256
                                                               (352) 294-4945 Phone

September 11, 2015

Per Dr. Diekman's probation letter, she has several deadlines to meet. This is an update on the progress to date. Her probation officially began 9/04/15.

Per the letter instructions (under Professionalism, Reporting instructions), Sarah is to send an e-mail to me with a copy to Dorothy every day when she arrives and when she leaves the hospital:

AM reporting (completed): Sept. 8, 10, and 11.
AM reporting (not completed): Sept. 4
Note: Sept. 7 was a holiday, and Sept. 9, Sarah called out sick.

PM reporting: Sarah has not complied with this requirement.

Under Patient care, bullet 4, she was to submit a pre-rounding checklist to me for review and comment by 9/8/15. She has not complied with this to date.

She was also to contact me about setting up weekly meeting times with dates confirmed by 9/8/15. She has not complied with this to date. Because she has not done this, she also has not reviewed the required 1 note with me this week. In addition, I confirmed with Dr. Ginory that she has not reviewed 1 clinic note, as required, with her.

I will plan to meet with her on 9/16/15 to discuss these issues further.

*Jacqueline A. Hobbs*

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine

*The Foundation for The Gator Nation*
An Equal Opportunity Institution



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

September 15, 2015

Dr. Ginory (Associate Program Director) and I met with Dr. Diekman today in my office (Springhill Medical Office Building) at 4 PM. The meeting lasted about 15 minutes.

I reminded Sarah that her probation letter has certain deadlines/requirements that she must meet. I highlighted in yellow for her the due dates and some of the specific deficiencies. I gave her the highlighted copy.

Update on AM reporting (completed): Sept. 14 and 15. She did not copy Dorothy. I reminded her at today's meeting.

PM reporting: Sarah had not complied with this requirement to date. I reminded her today at our meeting to do so. She complied this evening (and copied Dorothy).

Under Patient care, bullet 4, she was to submit a pre-rounding checklist to me for review and comment by 9/8/15. She has not complied with this to date. I reminded her about this at today's meeting. She replied that "Dr. Werner yelled at me and told me not to see patients on my own." I told her that pre-rounding can just be chart review. Dr. Ginory and I discussed reviewing notes from overnight (including nursing), seeing if patients required PRNs, gathering any new lab results, etc.

She has an individualized learning plan due by 9/18/15. I gave her a printed copy of the milestones today to assist her. I also told her that they are available online.

Since she has not set up a meeting time, I told her that I would meet her every Wednesday after lectures (around 5 PM). I reminded her to drop off a note for me to review when she comes over for lectures so I can review and provide feedback. I also instructed her to tell Dr. Ginory (by e-mail if she prefers) which clinic note she should review. Dr. Ginory will either provide feedback via e-mail or in person.

Our next meeting will be 9/23/15 after lectures around 5 PM.

*Jacqueline A. Hobbs*

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine

*The Foundation for The Gator Nation*
An Equal Opportunity Institution

Addendum 09/16/15:

Sarah also asked about some of our program initiatives to link milestones to our curriculum. I told her in the meeting yesterday that she can follow this progress via our GEC Minutes that will be sent out in the next few days.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

September 24, 2015

Dr. Averbuch and I met with Dr. Diekman at 5:15 PM today at my MOB office. She brought a discharge instruction note for me to review. I told her that I would review it and give her feedback at our next meeting. She also brought her pre-rounding checklist which was very complete and thorough. She reviewed it with us. We asked her a few clarifying questions that she answered acceptably. The checklist was acceptable as presented.

I went over a random clinic new patient eval note with her. I had made some comments on it and gave her those comments (I have a copy for scanning). The note was satisfactory. I gave her some pointers, mainly teaching points.

I told her that I was aware of the PSRs she filed regarding safety and working relationship with Dr. Werner. I said that I am investigating this further. In terms of safety, I assured her that there were efforts ongoing to improve safety on the unit. In fact, a team is being formed to develop a plan to continually improve unit safety. In terms of the allegations that Dr. Werner was yelling at her, Sarah said that she understands that in the heat of a dangerous moment, she could understand that someone would yell or even curse. I asked her if there had been any issues with Dr. Werner this week such as yelling at her. Sarah said no. I will look into other allegations that Dr. Werner may have said other inappropriate statements that could be seen as hostile or intimidating. I have already coached Dr. Werner to use a gentle and calm approach with Sarah as she seems to respond better to that. Dr. Diekman said that she is working mostly with Dr. Blotner this week and that she feels safe on the unit.

I asked her to identify what she would like to accomplish next for her remediation plan. She said she will work on the milestone individualized learning plan (ILP) and bring to the next meeting. She said she has the notes from the GEC minutes that were sent to all residents and that she thinks that will be helpful. I told her the ILP does not have to be perfect, that we will likely work on it over several sessions.

Our next meeting will be 9/23/15 after lectures around 5-5:15 PM.

*Jacqueline A. Hobbs*

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine

*The Foundation for The Gator Nation*
An Equal Opportunity Institution

September 25, 2015 addendum:

This is to add some notes for this past week in terms of Dr. Diekman's compliance with her probation remediation plan.

It should be noted that the pre-rounding checklist was over 2 weeks late.

I also told Dr. Diekman in the meeting yesterday that I would be working with her on her guided reading during next week's meeting. Because of her objection to reading, I have suggested a board review DVD that we have available in the office. She seemed pleased with this suggestion.

Update on AM reporting (completed): Sept. 16, 17, 18, 21, 22, 24, 25

PM reporting (completed): Sept. 17, 21, 22
(not completed): Sept. 16, 18, 24

Note: Called out sick on morning of Sept. 23. Our weekly meeting had to be rescheduled for the next day (9/24).

Dr. Diekman brought in sick leave/MD notes today and gave them to Dorothy McCallister. I have reviewed these and approve.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry                                          PO Box 100256
Residency Training                                               Gainesville, FL 32610-0256
                                                                 (352) 294-4945 Phone

September 30, 2015

Dr. Averbuch and I met with Dr. Diekman at 5:15 PM today at my MOB office. It should be noted that last week's meeting notes had indicated that our next meeting would be on 9/23/15. That was an error; it should have read 9/30/15.

I gave Sarah a copy of my review of her discharge instruction note that she gave me last meeting. There were no major issues. I just asked her for clarification on one medication indication.

Sarah brought some information (handwritten notes) for her individualized learning plan for the milestones. She has determined that she will use some assessments from the ACGME to assist. We discussed a plan for her to have her attendings and other team members (social work, nursing, etc.) to fill out the assessments to help determine her strengths and weaknesses. We discussed that she will need to do 1-4 (more would be even better, but 1-4 minimum) for various types of assessments. I asked her to send me electronic discussions of the plan once more formalized. Sarah also suggested that she do a case conference and perhaps a journal club on the topics of professionalism and communication. I told her that I would ask the VA faculty about having her do a case conference and that I would look for possible dates for her to do a journal club. I think this is a very good initial plan, and I look forward to seeing this unfold.

In terms of further note review, Sarah did not bring me one. She asked if she could e-mail me the information on which one to review in the record. I said that was fine. I also reminded her to send one to Dr. Ginory as well which she has not done to date. She said she would. She asked what kind of note she should send me. I told her to send either a new H&P or discharge summary (not instructions). She asked if she should send a note that she thought was her best or one she had questions on. I said we want to review both types but that she should tell us up front which one she is sending (and what questions she has).

I gave Sarah her guided reading assignment. I told her that I had talked with Dr. Ken Osfield (from the ADA office) and that he agreed that there was no reason not to give her reading assignments. I told her that he also said she can contact him for information on resources for technology to assist her with audio reading. Dr. Averbuch asked her how she had managed reading during medical school. She said (and I can vouch for this as a graduate of Indiana University myself) that they audio-taped every lecture and made them available to students. Interestingly, she immediately noted that the reading assignments that I had given her were related to the cases that were noted in her probation letter. She said that she has several journal articles to support her decisions (she had shown these to Dr. Bussing in her grievance meeting with her; I have not seen the articles). What I find interesting is that she can read and comprehend the journal articles but not the textbook assignments? I told her that I want her to

read a standardized textbook to continue to assist building her knowledge base for standardized testing that may differ from practical clinical knowledge. The reading assignments will be posted in New Innovations journal assignments. She will be prompted to write a short summary of the reading.

I also went over an issue that was brought to my attention about Sarah allegedly not seeing patients yesterday afternoon that came in before 5 PM. She said she was not aware of these patients. I had spoken to a nurse, Patty Hedley, who said that she had had a lot of trouble reaching Dr. Diekman, had finally talked to her yet the patients had not been seen by Sarah. The patients were not seen until the night float resident, Dr. Bolis, came in at 7 PM. I also let Sarah know that the other unit resident, Dr. Natasha Clark, had given the nurses Dr. Diekman's name as the resident to call for coverage since Natasha was on short call (per an e-mail from Dr. Clark). Dr. Diekman then produced text message where Dr. Clark had said that the nurses must have been calling the wrong person but didn't tell Sarah that she had given her name to the nurses. Though it may be hard to determine what actually happened, I reiterated to Sarah that it is her responsibility to cover new patients until 5 PM. She agreed wholeheartedly. Nurse Hedley is supposed to send me a written report of her perspective later tonight.

Our next meeting will be 10/08/15 at 5:15 PM.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

October 14, 2015

Dr. Averbuch and I met with Dr. Diekman at 4:45 PM today at my MOB office. We also met last Thursday (10/08/15) at 5:15 PM at my MOB office. I will summarize both meetings herein.

On 10/08/15, I discussed a random clinic note review with Sarah. We talked about not using non-standard abbreviations. Also, one of the most pressing issues is inconsistencies throughout the note. For example, she wrote in the interval history that the patient was on Cymbalta 60 but actually the Cymbalta dose was increased to 60 mg at that encounter. She had also stated that the patient's Atarax was PRN, but she had ordered it as standing. We also discussed not using "boilerplate" information in the template unless pertinent to the encounter and only if properly edited for the encounter. Hand notes were made on the note and given to Sarah. A copy was kept for our records.

At today's meeting (10/08/15), Dr. Averbuch reviewed a random clinic note with Sarah. He noted some similar issues to what I had brought up with some inconsistencies and boilerplates. I reviewed the inpatient note that she had brought to me from last meeting. This note was very well written. I found very few errors besides a few spelling errors. I did talk to her about better defining the justification for hospitalization.

I suggested that Sarah think about how she can be more consistent with her work and do the kind of quality work that I witnessed in the inpatient note. She remarked that when she feels less pressures and has time as well as when she is feeling healthy, she does much better. We talked about how she will need to be cognizant about her work choice when she goes into practice. She said she plans to look for a very consistent type of work in the future. Sarah said she will think more about how she can be more consistent in her notewriting.

I did let Sarah know that I talked with Dr. Holbert today about her performance. He noted that she has some really good days and can good work. He said she picked up on a laryngeal dystonia that others had not seen, and he was impressed. He also noted that she sought supervision from a pharmacist on how to does a long-acting injectable. He thought she handled that well in discussing with the pharmacist and him.

Sarah also brought up a concern about possibly having to be on service with Dr. Werner on Friday when Dr. Holbert is out (this is not 100% sure to happen). She said that she understands she needs to be able to work with different attendings, but she feels that some of the recent interactions with Dr. Werner are still raw in her mind. I reassured her that I have given feedback to Dr. Werner. However, we can also ensure that the chief resident is present during rounding that day. Sarah agreed that this would be helpful and sufficient.

*The Foundation for The Gator Nation*
An Equal Opportunity Institution

Our next meeting will be 10/20/15 at 5:15 PM.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

October 27, 2015

Dr. Averbuch and I met with Dr. Diekman at 5:15 PM on Thursday, October 22, at my MOB office. Our meeting had to be rescheduled to this date because Dr. Diekman had called out sick for 10/20/15.

At this meeting I reviewed the inpatient H&P that she had brought me at our previous meeting. There were multiple errors. Please see file copy of comments/revisions made directly on the note. The most important feedback was that there were several inconsistencies throughout the note. We discussed that her lack of consistency is a major issue for her as a physician and one that she must correct in order to continue and to maintain patient safety.

The previous H&P that I had reviewed was nearly flawless. I asked her to explain this inconsistency in her work. She said that it had a lot to do with how much time she had to devote to some notes over others. She also noted that her chronic medical condition hinders her consistency.

Sarah did not bring another note for me to review as required by her probation letter/remediation plan. I reminded her to review her letter frequently and ensure that she follows the plan consistently and completely.

She said that she had sent out some evaluations re: milestones to various staff. She said that she is using this as part of her learning plan. I have not seen any of these documents to date.

Update on AM/PM reporting in/out for duty:

AM/in
Reported:
9/16
9/17
9/18
9/21
9/22
9/23 (called out sick)
9/24
9/25
9/28
9/30
10/1
10/5 (called out sick)
10/8

10/9
10/12
10/13
10/14
10/15
10/16
10/19
10/20 (called out sick)
10/21
10/22
10/23
10/26
10/27

PM/out
Reported:
9/17
9/21
9/22
9/23 (called out sick)
9/25 (not exact/delayed)
9/28
9/29
10/5 (called out sick)
10/8
10/9
10/13
10/16
10/19 (called out sick)
No reporting since 10/19 except for today 10/27 (called out sick for rest of afternoon).

To date, Sarah has not contacted Dr. Ginory to review any of her clinic notes which was required in her probation letter.

Our next meeting was scheduled for today 10/27/15 at 5:15 PM; however, Dr. Diekman had a meeting at around 1:30 PM with Dr. Dixon. She sent an e-mail at 3:08 PM stating that the traveling across town had flared her chronic illness and that she was calling out sick for the rest of the day. It should be noted that she had told her attending, Dr. Holbert, before noon today that she had a meeting with Dr. Dixon at 1 PM and that she would be gone for the afternoon (or for most of the afternoon). She had also sent a text to the chief residents yesterday stating that she had a meeting with Dr. Dixon at 2 PM and would be out until about 3:30 PM. I will need to reschedule our meeting, likely to Friday afternoon.

*Jacqueline A. Hobbs*

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

October 30, 2015

Dr. Averbuch and I met with Dr. Diekman at 4:30 PM today at my MOB office. Our meeting had to be rescheduled to this date because Dr. Diekman had called out sick on 10/27/15.

At this meeting I discussed some feedback from Dr. Holbert about Sarah's performance on the psychotic disorders unit (East). He noted that she had made some improvements on her development of treatment plans. He also said she had developed a good working relationship with the nursing staff on the unit. His major feedback was that he feels that she does not always follow attending directions in an efficient and timely manner. He felt that she does not always sense or respond to the imminence or urgency of clinical situations that put her into precarious and dangerous situations. I gave her an example where she did not leave the unit when he asked her to due to a patient becoming focused on her and getting more agitated as a result of her presence. Sarah explained that sometimes she may not realize how imminent/urgent the intent of his advice. She also said that on one occasion she was getting different directions from the attending and the nursing staff. We discussed how important it is for her to keep working on this issue, learning more about how to handle patient agitation and ensure safety, and to improve communication with her attendings and staff. We discussed the important of seeking clarification when she does not understand instructions. (Of note, not following direction has been an ongoing concern of faculty and noted in the probation letter.)

I reviewed one of her notes with her (see scanned copy of handwritten notes). This was a recent new patient H&P in the outpatient clinic. The note in general was adequate. The main issues I highlighted were that she had not documented time criteria for the diagnoses she made, and she had an incomplete biopsychosocial formulation.

Finally, we discussed a couple of complaints from a peer resident that Sarah was passing her work on to him (please see e-mail regarding this complaint for full details) instead of doing it herself. He relayed that she was basically taking advantage of him to do her work. Sarah became visibly upset. She said that other residents get away with these things all the time. She also said that she just is not physically able to work the long hours required by some of her rotations, and she is not able to stay physically healthy enough. In addition, she said that some residents have been unduly influenced by previous residents who have spoken negatively about her disability.

Dr. Averbuch and I reiterated the importance of good communication with fellow residents. For example, the resident felt she passed off an admission to him at 4 PM because Sarah said she had too much work to finish. He got upset when he saw her leave the hospital shortly after 5 PM and he was still doing the admission she passed to him; she got done sooner than expected because the transfer she was working on got cancelled. I suggested to Sarah that perhaps she could have gone and explained to Camilo that she got done early and offer to help him. She countered that he had less work in general than she did and again

that she just could not work such long hours. We noted to Sarah that her next rotation starting on Monday is lighter in workload and hours, so she should get some reprieve. However, we did remark that we cannot guarantee in general that her hours as a resident physician will be 8-5 every day. Some rotations require longer hours.

In terms of how her illness is perceived, she mentioned that residents say that she is "lazy" and a "diva". Dr. Averbuch and I discussed that we are not in a position to talk to residents about her medical condition without her permission, so we are not sure how to best help her and other residents' perceptions. She said she wanted to think about how we could best help her in this situation and with the perception. We said we are willing to help, but she must guide us in how best to do so. I also reiterated that she can work on communication with her colleagues as well.

Our next meeting is scheduled for 11/03/15 at 5:15 PM.

*Jacqueline A. Hobbs*

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine

UF/Diekman 000402



**College of Medicine**
Department of Psychiatry                                    PO Box 100256
Residency Training                                         Gainesville, FL 32610-0256
                                                          (352) 294-4945 Phone

November 3, 2015

Dr. Averbuch and I met with Dr. Diekman at 5:15 PM today at my MOB office. Our meeting was brief.

We discussed her recent e-mail regarding her request to open encounters before the patient arrives so that she can prep her notes and be better prepared to present. The outpatient chiefs, Drs. Davidson and Mathur, met with Sarah earlier this afternoon and answered her questions. Dr. Davidson will e-mail a summary of that discussion.

I asked her how her new rotation (MHICM) is going. She said that it is going well. She said the schedule is more flexible.

Based on our conversation at our last meeting regarding her work hours/conditions, I also reiterated that Sarah needs to discuss any accommodations she feels she needs with Dr. Ken Osfield in the ADA office.

We (Dr. Averbuch and I) ended our meeting by going to Sarah's office to look at a patient chart that she had questions about.

Our next meeting is scheduled for 11/10/15 at 5:15 PM.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

November 17, 2015

Dr. Averbuch and I met with Dr. Diekman at 5:15 PM today at my MOB office. We did not meet last week due to conflicts with Dr. Averbuch's teaching schedule and my illness.

Dr. Averbuch began by reviewing 2 of Dr. Diekman's clinic notes from 11/3/15 encounters (please see scanned copies of handwritten notes). The main issues with the notes were that the HPIs are too long and need to be broken up into more than one big paragraph to ease readability. He also noted that she had too much detail of past psychiatric history in the HPI as well as in interval history for a return. Dr. Diekman countered that she had been told by consult attendings in the past that she lacked detail so that is why she put the detail. I reminded her that the feedback from consult attendings was that her interval histories lacked current illness details, not past details.

There were also multiple typos in her notes. This same issue was noted by Dr. Ginory (she gave me 2 notes from 11/10/15 that she had reviewed). Dr. Diekman has been using a dictation software, but she said that because of her dyslexia, she cannot proof her work properly. She said that she is now using a reader software to assist her with editing.

Dr. Averbuch also noted in a return note that Dr. Diekman had copied too large an amount of direct information from someone else's note.

I would note that Dr. Diekman is still making errors that we have talked about previously. For example, we had discussed on more than one occasion to be careful with using "boilerplate" information for informed consent for medications in her notes as some of the information is not relevant or had not been edited properly. She had continued to do this on one of the 11/3/15 notes. She does not always do this. Again, this is an inconsistency in her work.

Another feedback given was to provide more rationale in her treatment plans for why she is giving or not giving certain treatments or making certain changes. She sometimes does this but again is not consistent.

I asked Dr. Diekman how her MHICM rotation is going, and she said it is going smoothly. She is to give a presentation to the team later this week. She said that she is still considering writing a case report.

Our next meeting is scheduled for 11/24/15 at 5:15 PM.

*Jacqueline A. Hobbs*

Jacqueline A. Hobbs, MD, PhD, DFAPA

*The Foundation for The Gator Nation*
An Equal Opportunity Institution

UF/Diekman 000404

Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine

UF/Diekman 000405



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

November 23, 2015

Dr. Ginory and I met with Dr. Diekman at 4:30 PM today at my MOB office. We had to reschedule due to Dr. Averbuch being on leave and per Dr. Ginory's schedule.

I reviewed 3 of her clinic notes: 1 new evaluation from last week, 1 return from last week along with the note just prior to that one on 9/14/15. Please see scanned copies of the notes with my handwritten comments.

For the 11/19/15 new eval, the most concerning issue was that 3 sections of the note had been removed and therefore not done. These included the PMH, full medication list, and allergies. Upon review with Dr. Ginory, it was determined that a previous new eval she had reviewed also had these sections missing. A major reason this came to my attention in this note was that the patient had a bp reading of 159/89 at the visit, and was started on Effexor which can further increase systolic bp. There should have been documentation of whether the patient has a h/o hypertension, whether she was on any anti-hypertensive medications, and a plan for how to further deal with this issue. There was also no documentation of review of lab testing, none was ordered, and there were no lab values posted in Epic. This is a major omission for a new patient. There was also an inconsistency in the HPI v. the Assessment that was noted.

Sarah said that she was not sure why the sections were left out of her note template. She said that she thought it might be due to her using Word and the reading software, that transferring the templates to them may have deleted these pre-populated sections. She also asked if she could make her own template because she likes to do a paragraph for the social history instead of the bulleted items. We told her that by not using the standard template, she would miss out on any updates that are made to the template. We surmise that she has already made her own template and that is why those sections got cut out by mistake. This would constitute poor practice.

I discussed that she needs to be more rigorous in her use of DSM-5 diagnoses and recording procedures. She should also be more specific in documenting the formulations of medications prescribed.

Other more minor but continuing issues despite feedback are typos (the need to proof her work more carefully), the need to split the HPI into smaller and more readable paragraphs, and not leaving items blank.

The major issues with the return notes were that they were under-coded. We went over the proper coding. The 11/17/15 encounter note was also late (note done by the end of the next business day). It was completed on 11/19/15 at 17:47 (note was started on 11/17/15 at 16:15). She said that this is the only note that has been late and was due to her being sick

*The Foundation for The Gator Nation*
An Equal Opportunity Institution

UF/Diekman 000406

that day. She had strangely asked the outpatient chief resident, Dr. Mathur, to sit in on her patient encounter because she was not sure if she could finish the encounter due to cough. She did complete the encounter. She had not listed her dx/codes on her billing sheet. We asked if she knew what to do in terms of obtaining her dx codes from Epic and placing them on the sheet. She said she did not completely understand this process. We described it to her. We have also asked the chiefs to sit with her and teach her this. This process has been in place for over 2 months now, but once again, she does not seem to catch on to new processes or even know when to ask for help. There were other inconsistencies in the note that are pointed out on the scanned copy of the note.

The other note from 9/14/15 was also under-coded. She coded a 99212 but should have been a 99213 (I previous wrote 99214 but realized it should have been a 99213 when she described the encounter to me). She only listed one dx on the billing sheet, leaving off another. The code was actually wrong. It should have been 300.02 or F41.1, but she put 300. Other comments are noted on the scanned copy. There were basically more typos and some inconsistencies. Dr. Averbuch may have reviewed this note a while back as well, so the comments are similar.

I asked if she had any questions, but she did not. I asked how she is coming along with her required assignments. She said that she is "in a state of perpetually being behind". She said that she hopes to catch up over Thanksgiving break. She is on leave Nov. 25-30. She said this is her first real time off in a long time.

I reminded her to carefully review her probation letter and her checklist assignments to make sure she is completing all items and in a timely fashion. She does not appear to be particularly concerned about the probation letter items. It is most unexpected but has been this way throughout.

Dr. Ginory once again informed me that Sarah had never contacted her to review any of her notes as required in her probation letter.

Our next meeting is scheduled for 12/01/15 at 5:15 PM.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

November 30, 2015

I reviewed Dr. Diekman's outpatient notes for timeliness over the weekend. I found several late notes (posted after the end of the next business day).

- *Outpatient notes were late on:*

  - *9/21/15 (3 notes)*
  - *9/28/15 (2 notes)*
  - *10/12/15 (2 notes)*
  - *10/19/15 (5 notes)*
  - *10/26/15 (5 notes)*
  - *11/03/15 (3 notes)*
  - *11/10/15 (2 notes)*
  - *11/17/15 (2 notes)*

In our last meeting on 11/23/15, when I discussed with her that the note I reviewed with her was late, she stated to me that those (from 11/17/15) were the only notes that had been late. There were obviously others.

I have cancelled the meeting for 12/01/15 due to the probationary period being over on Friday. I have let Dr. Diekman know that we will meet on Friday at 3 PM.

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine



**College of Medicine**
Department of Psychiatry
Residency Training Program

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945
(352) 594-1818 (fax)

December 4, 2015

Sarah Diekman, MD
PGY-3 Psychiatry Resident
PO Box 100256

Re: Decision regarding your probation

CCC members:
Jacqueline Hobbs, MD, PhD (Vice Chair and Core Program Director)
Robert Averbuch, MD (Core Program Associate Program Director)
Jody Brown, MD (Child and Adolescent Fellowship Program Director)
Dawn Bruijnzeel, MD (Faculty)
Brian Cooke, MD (Faculty)
Almari Ginory, DO (Core Program Associate Program Director)
Richard Holbert, MD (Faculty)
Lisa Merlo, PhD (Director Psychotherapy Training)
Mariam Rahmani, MD (Child and Adolescent Fellowship Associate Program Director)
Uma Suryadevara (Core Program Associate Program Director; VA Site Director)
Rajiv Tandon, MD (Vice Chair and VA Service Chief)

The Clinical Competency Committee (CCC) met monthly during your probationary period to review your performance. Written and verbal evaluations from faculty, chiefs, peers, and other staff (such as nurses or administrative) were considered.

The CCC discussed the remediation plan that was outlined in your probation letter. Below are the findings of the committee:

**Develop an individualized learning plan (ILP):**
- **Address each of the milestones (PROF1.1/A, PROF2.1.3/B, PROF2.2.3/C, PC1.1.1/A, PC1.1.2/B, PC1.2.1/A, PC1.3.2/A, PC2.1.1/A, PC2.1.2/A, PC2.2.1/A, PC3.1.1/A, PC5.1.1/A, PC5.2.1/A, ICS2.1.1/A, MK2.2.1/A, MK5.1.1/A) in need of improvement. Do this after reviewing the specific language of the milestones, assessing your current level of functioning, specifying the next "steps" to be achieved in each milestone over the course of your probation, and outlining specific actions to achieve those milestone goals. This learning plan must be developed in collaboration with Dr. Hobbs and**

*The Foundation for The Gator Nation*

An Equal Opportunity Institution

UF/Diekman 000409

**an associate program director(s) and submitted in final form to us, in writing, by September 18, 2015.**

- o *You made some initial efforts on your ILP on 9/30/15, but your compliance with this component was deficient in terms of completion and time as it was neither completed by the due date nor as of 11/29/15.*

- **Review the expectations that were reviewed with all residents and that all residents signed at the beginning of this academic year. You will be held to these standards, unless superseded by this document.**

- o *Not discussed (this was considered up to you to complete on your own).*


**Patient care:**
- **Follow all attending/senior resident/chief instructions/recommendations and document all appropriate information in a timely manner as appropriate to the rotation and task. If there is any doubt about what a suitable turnaround time would be, then you must clarify with the appropriate supervisor. Tardiness in your work due to misunderstandings of expectations is not acceptable; it is up to you to seek clarification. Any delays in your work must be immediately cleared with the faculty member.**

  - o *The main concern that faculty have with your performance is continued inconsistency. Faculty feel that they must supervise every aspect of your work. There is a lack of trust that you will complete all patient care tasks as instructed and in a timely fashion. They feel that they must follow behind you and ensure work is done, correct errors, or even complete work that was assigned to you. For example, there are orders that you did not complete on patients or that needed correction by the attending in the inpatient setting. There were also consultations that you did not follow up on as expected. Therefore, the level of supervision for you is greater than that expected of a mid-to-late-year intern; this is not what is expected of an approximately mid-year third-year resident. The faculty are not seeing you take graded and progressively greater responsibility for patient care; therefore, they do not see you having the ability to enter the unsupervised practice of medicine/psychiatry even with the current time remaining in your training.*

    - ▪ *"I have sent numerous emails and discussed this resident at length with the residency training director and the chief residents. She is a lovely person, but there are issues with her ability to function at the level she is at. The largest issue is that she does not follow through on things that she asked to do. This then requires everyone else to check up behind her." (from September 2015 inpatient attending evaluation)*

  - o *Faculty have noted that you are often unaccountable to accepting feedback and inflexible in your thinking. You also at times cannot properly assess patients and*

*adjust your interaction with them. For example, on inpatient in October, you were noted to smile and stare at psychotic patients who were becoming very fixated on you thus increasing their level of agitation. This put you, the team, and the patient at increased danger. On one occasion, you were asked repeatedly by the attending, nursing, and the social worker to leave the unit. It was only after the social worker led you from the unit that you actually left. I discussed this feedback with you, but you still felt you did not understand what you had done wrong.*

o *There was an incident in the early probationary period where you failed to verbally report a possible patient sexual assault to a higher authority for several days. You had documented in the medical record late on a Friday of a long holiday weekend but failed to call your attending. It was only on rounds on Tuesday morning that this was discovered. This led to a delay in mandatory state reporting and investigation. Feedback was documented in writing on 9/08/15. You did subsequently follow up as was requested by the hospital and Dr. Hobbs.*

o *It was noted that in the outpatient clinic, the presentation that you give of the patient frequently does not match what the attending sees on their evaluation. It gives the perception that you have either a very limited or a pre-conceived view of the patient that limits your ability to see the whole picture/overall perspective of what is going on with the patient. It was also noted that you frequently describe patients as "complicated" when there is often only one problem or treatment issue to address resulting in the perception you are unable to accurately assess patients at the level of a PGY 3.*

- **Arrive with enough time to prepare for rounds. The expectation is that you will have adequately reviewed your patients' charts and can answer attending questions on rounds.**

  o *You arrived as expected with some exceptions (see below).*

- **During this 3-month period, you will not work with medical/PA students.**

  o *You complied with this.*

- **Delineate a pre-rounding checklist. This checklist should be submitted to Dr. Hobbs for review and comment by September 8, 2015.**

  o *You completed this assignment, but you were deficient in timeliness as you turned this in on 9/24/15 (>2 weeks late).*

- **You will carry/complete an equivalent workload expected for a PGY-3 resident: up to 12 patients per day.**

  o *It was noted in your October inpatient rotation evaluation that you had "significant difficulty in grasping the acuity and severity of patient presentations".*

- o *"She often was giving conflicting messages to families and they would give permission for medications and then immediately retract it when they would speak to nursing. The information on her sign out sheet was often not up to date and accurate. As an example, one patient who is being held for a state hospital bed continues to say that she may go home with her friend first." (from September inpatient attending evaluation)*

    - *Dr. Hobbs also reviewed your sign outs early in the probationary period and found significant errors as well. This feedback was given to you on 9/01/15.*

- o *There was a Critical Deficiency in Treatment Planning and Management in your inpatient rotation evaluation.*

    - *"She has significant difficulty recognizing the acuity and severity of patient presentations in many cases. She often misses the overall presentation of the patient. She, at times, becomes focused on one aspect of the patient which is not pressing at the time thus leading to missing crucial issues with the patient." (from October 2015 inpatient attending evaluation)*

    - *"…She has deficiencies in clinical skills. She has great difficulty in seeing the whole picture of patients. She has difficulties identifying dangerous from non dangerous patients. The treatment plans she provided were good at times but not addressing the critical issue(s) at other times. She did not place orders in the chart that we had spoke about on a few occasions." (from October 2015 inpatient attending evaluation)*

        - *Because you have difficulty determining the level of dangerousness of patients or how to interact with these patients appropriately, there is a perception that you are not at the proficiency level expected to manage this population which puts you and the patient in jeopardy not just in the inpatient, but also in any patient care setting. Faculty felt that they had to directly supervise you with some patients because they did not feel your ability to gauge proper patient care is adequate.*

- o *There were days on inpatient where your attending asked you to see and familiarize yourself with all patients, yet you would not see some of them. For example, in October (after a PRITE session), your attending reported that he had asked you to see and get to know all 8 patients on the unit one afternoon. You only saw 6 of the 8 and offered no reasonable explanation why you did not see the other 2.*

**Interpersonal and communication skills:**
- **Complete all notes on the day of service. Discharge summaries are due within 48 hours or on the day of discharge if the patient is transferring to a skilled nursing**

**facility. Faculty will be checking your notes periodically and will provide feedback regarding the quality of your notes and areas for improvement.**

- *Late outpatient notes during your inpatient rotations.*

  - *Outpatient notes were late on:*

    - *9/21/15 (3 notes)*
    - *9/28/15 (2 notes)*
    - *10/12/15 (2 notes)*
    - *10/19/15 (5 notes)*
    - *10/26/15 (5 notes)*
    - *11/03/15 (3 notes)*
    - *11/10/15 (2 notes)*
    - *11/17/15 (2 notes)*

    - *This violates the terms of your probation as well as the expectations signed by you (as described above).*

- **There will be random review of your notes done by the program directors to ensure quality and improvement.**

  - *This was completed by Drs. Averbuch, Ginory, and Hobbs on a consistent basis.*

  - A major concern was a recent finding (11/23/15) that your outpatient new evaluation notes had 3 missing elements that are fundamental requirements: Past Medical History (PMH), Current Medications, and Allergies. This is a patient safety concern. For example, you recorded a systolic blood pressure of 159 on a patient for whom you started Effexor, a medication known to potentially increase systolic blood pressure. There was no documentation of whether the patient had any history of hypertension, any plan for monitoring, or the rationale for choice of Effexor in the context of hypertension. This was discussed with you.

  - A second major concern is inconsistency in your notes. There were examples of contradictory information in different sections of the same note. This is confusing and could lead to medical errors. You also leave items blank or do not complete sentences or sections at times. This was discussed with you on 10/8/15, 10/14/15, 10/22/15, 10/30/15, 11/17/15, and 11/23/15.

  - A third major concern is very frequent typos and syntax errors that make interpretation of content difficult for others. Some of the errors are not at the level of quality that we would want other professionals or our patients to see in the medical record. There is a lack of proofreading of your work prior to signoff. Many examples were discussed with you on 10/8/15, 10/14/15, 11/17/15, and 11/23/15.

- o Another concern is your diagnostic coding. Examples of billing under-coding as well as incorrect code for the diagnosis were noted. Not using DSM-5 diagnoses was noted as well. This was discussed with you on 11/23/15.

- **Review at least 1 note per week on Wednesday afternoon directly with Dr. Hobbs or her designee. It will be your responsibility to print the note and give it to Dr. Hobbs or her designee. Over the course of a one-month rotation, you should provide at least 1 H&P, 1 subsequent/progress note (if applicable to service), 1 discharge summary (if applicable to service), and 1 discharge instruction (if applicable to service) for review. In addition, you will review at least 1 clinic note per week with Dr. Ginory. All notes should be hand signed as reviewed and turned into Dr. Hobbs. Absolutely no "cutting and pasting" will be tolerated.**

  - o *Your compliance with this was deficient in terms of completion and time.*

    - ▪ *You brought me a discharge instruction note to review on 9/24/15.*

    - ▪ *You brought me an inpatient H&P (new eval) to review on 10/08/15.*

    - ▪ *You brought me an inpatient H&P (new eval) to review on 10/14/15.*

    - ▪ *No further notes were provided to me for review as required on a weekly basis during the probationary period.*

    - ▪ *You never asked Dr. Ginory to review your clinic notes despite being reminded on 9/15/15 and 9/30/15 to do so.*

    - ▪ *Copy/paste was much reduced, but there were still examples where lack of proper editing could have led to errors and confusion. In one note, you copied a very large block of information from another note that was deemed inappropriate. This was discussed with you on 11/17/15.*

**Medical knowledge:**
- **Maintain a score no lower than the 30th percentile on both sections (Psychiatry and Neurology) of the PRITE.**

  - o *Scores were not available at this time.*

  - o *It was noted that in general you have a basic medical knowledge and can handle uncomplicated patients in uncomplicated situations. However, it was noted on evaluation that:*

    - ▪ *"She has difficulty with demonstrating the application of her basic medical knowledge in clinical practice." (from inpatient attending evaluation)*

- **By November 30, 2015, complete a guided reading, as assigned by Dr. Hobbs. This reading will consist of several assignments from the 11th edition of Kaplan and Sadock *Synopsis of Psychiatry*. If you do not have this book, please**

**purchase it with your book allowance. Tracking of your progress will be via New Innovations Checklist/Journal assignment.**

- o *The following were your reading assignments and due dates:*

  - ▪ *Book: Kaplan&Sadock Synopsis of Psychiatry, 11th ed.*

  - ▪ *pp. 396-398, Treatment of panic disorder, due October 14, 2015*

    - • *Your compliance with this was deficient in terms of completion and time.*

    - • *As of 12/03/15, this was not completed (>7 weeks late)*

  - ▪ *pp. 697-704, Delirium, due October 28, 2015*

    - • *Your compliance with this was deficient in terms of time because you completed it on 11/16/15 (3.5 weeks late).*

    - • *Your summary contained several errors in terms of typos/syntax which made it difficult to read and truly evaluate the quality of the information summarized.*

  - ▪ *pp. 630-632, Alcohol withdrawal/Delirium (stop at Alcohol-induced persisting dementia), due November 4, 2015*

    - • *Your compliance with this was deficient in terms of completion and time.*

    - • *As of 12/03/15, this was not completed (>4 weeks late).*

  - ▪ *pp. 1026-1027, Quetiapine (Seroquel), due November 11, 2015*

    - • *Your compliance with this was deficient in terms of completion and time.*

    - • *As of 12/03/15, this was not completed (>3 weeks late).*

  - ▪ *pp. 993-994, Mirtazepine (Remeron), due November 18, 2015*

    - • *Your compliance with this was deficient in terms of completion and time.*

    - • *As of 12/03/15, this was not completed (>2 weeks late).*

  - ▪ *pp. 358-359, DSM-5 Diagnostic Criteria for Bipolar I Disorder, due November 30, 2015*

    - • *Your compliance with this was deficient in terms of time because you completed it on 12/01/15 (1 day late).*

▪ *It was difficult to understand your sense of priority/time management for completion of your remediation plan, particularly the above readings. This gives the perception that you were spending some time on catching up on some of the readings that were assigned much earlier in the academic year or some that were assigned more recently for all residents. It is unclear why you would not focus on the requirements of your probation letter first, especially after several reminders to review your letter/plan (reminders given in weekly meetings on 9/15/15, 10/22/15, and 11/23/15). No explanation was provided to why you did not complete this task.*

- *Example: You completed the reading on verbal de-escalation (assigned 9/3/2015) on 11/16/15.*

**Professionalism**
- **Reporting instructions:**

  o **Sept: Vista East—Arrive to work by 6:30 AM; leave no earlier than 5 PM.**

    ▪ *Inconsistent performance: you complied with the arrival time required by the attending. Because you did not comply consistently with checking out with your attending or your daily checkout with Dr. Hobbs/Ms. McCallister, it is difficult to determine your compliance with the 5 PM requirement.*

  o **Oct:  Visit East—Arrive to work by 6:30 AM; leave no earlier than 5 PM.**

    ▪ *Inconsistent performance: you complied with the arrival time required by the attending. Because you did not comply consistently with checking out with your attending or your daily checkout with Dr. Hobbs/Ms. McCallister, it is difficult to determine your compliance with the 5 PM requirement.*

  o **Nov: VA ER—Arrive to work by 8 AM and leave no earlier than 8 PM.**

    ▪ *After discussion and agreement by you, your rotation was switched to the VA MHICM. It was noted by treatment team members that you arrived later than required at times, and this caused the team to be late for travel to off-site/start of their day.*

  o **Send an e-mail to Dr. Hobbs (with copy to Dorothy McCallister) when you arrive in the hospital and when you depart from the hospital.**

    ▪ *Your compliance with this was deficient.*

      - *Arrival check-in compliance: 70%*

      - *Departure check-out compliance: 27%*

      - You had to be reminded to copy Ms. McCallister.

- o **Check in/out with your attending or senior team member each day.**

  - ▪ *Faculty members of the CCC reported that this did not occur on a regular basis.*

  - ▪ *"I have asked Dr. Diekman to call and sign out with me on a daily basis prior to leaving. She did not call yesterday. She called today at 2:00pm staying that she was signing out because she had lecture. As we ran the list, it became apparent that the only thing she had done since we finished rounding at 9AM this morning was to leave a message for one patient's family and update her sign out sheet (which still contains errors). She attempted at times to present information the social worker had garnered as information she had obtained. It was only when she was questioned as to why she did not write a note about speaking to the FACT team that she acknowledged that she had not. When I questioned her with regards to what she had been doing for the past 4 hours she stated that she was getting ready for a meeting with Dr. Bussing this afternoon. When I asked what it was that she had to prepare for this meeting that took up so much of her time, she stated it was confidential and that she would relay to Dr. Bussing that I had a concern. I am again expressing my concern that having her on the unit with an attending who will be new to the inpatient service starting on Monday is not an advisable plan. He will be focused on his responsibilities and not able to provide enough supervision to know what she should be doing or is doing. I believe this is placing the patients and the new attending at risk." (feedback provided by e-mail from inpatient attending on 9/16/15)*

- o **If you leave early or come late, you will communicate your absences via email and take the appropriate vacation, or sick leave.**

  - ▪ *You complied with communicating your absences during this period. You called out >5 days during your probationary period.*

    - • 9/09/15 call out for day

    - • *9/23/15 call out for day (this was a weekly meeting day with the Program Directors)*

    - • *10/05/15 (Monday) call out for day*

    - • *10/20/15 call out for day (this was a weekly meeting day with the Program Directors)*

    - • *10/27/15 call out for 3-5 PM (this was a weekly meeting day with the Program Directors)*

    - • *11/09/15 (Monday) call out for day*

- *11/13/15 call out for 11 AM-12 PM sick leave*

- *11/23/15 call out for ? hours sick leave (no leave form so exact time not known)*

- *11/24/15 call out for ? hours sick leave (no leave form so exact time not known)*

- *These were communicated by e-mail.*

- *You are frequently late by weeks to months on turning in your leave slips and doctor's notes. Multiple reminders have been given by Ms. McCallister, Program Coordinator.*

- **Maintain a professional demeanor and attitude with all faculty, peers, staff, and students. Minimize distractions and side conversations during clinical and teaching rounds. Faculty, peer, and 360 degree evaluations will be monitored for lapses.**

  o *"She does not instill confidence in any of her treatment team members including nurses, social work and utilization review as well as the other physicians." (from September inpatient attending evaluation)*

  o *Resident peer evaluations over the last 5 months revealed concerns in the following areas (rating scale: 1=Poor, 2=Fair, 3=Good, 4=Very Good, 5=Excellent):*

    ▪ *Works effectively with others as a member of a health care team—83% of those who completed evaluations of you rated you as poor to fair (the two lowest possible scores).*

    ▪ *Demonstrates a commitment to ethical principles—half of those who completed evaluations of you rated you as fair.*

    ▪ *Demonstrates an investigatory and analytic thinking approach to clinical situations—about one-third of those who completed evaluations of you rated you as fair.*

    ▪ *Locates, appraises, and assimilates evidence from scientific studies related to their patient's problems—about one-third of those who completed evaluations of you rated you as fair.*

    ▪ *Uses information technology to manage information, access on-line medical information, and support their own education—At least 1 peer resident rated you as fair.*

    ▪ *Creates and sustains a therapeutic relationship with patients—At least 1 peer resident rated you as fair.*

- ▪ *Demonstrates sensitivity and responsiveness to patients' culture, age, gender, and disabilities—at least 1 peer resident rated you as fair.*

  o *Peer residents and nurses also noted that you sometimes did not return phone calls/pages or complete work that should have been covered by you during the afternoons on inpatient. This happened on at least 3 occasions that were reported to me.*

  o *It was reported by a MHICM (November rotation) team member that you spent a significant amount of time (hours) talking with another team member about non-patient-related topics instead of attending to patient care issues.*

- **Maintain respect for all patients. Patient complaints as well as faculty and 360 degree evaluations will be monitored for lapses.**

  o *See above resident peer evaluations.*

**In addition to the above, you will meet with Dr. Hobbs (and an associate program director) weekly.**

- *You complied with this requirement.*

**You will be responsible for scheduling these meetings (contact Dr. Hobbs) and should have dates for the next 3 months confirmed no later than September 8, 2015.**

- *You did not comply with this requirement. You did not take responsibility for scheduling these meetings as required in your probation letter, when meetings were missed due to calling out for duty, Dr. Hobbs initiated all meeting times and rescheduling.*

**During these meetings, we will review and assess your ongoing professional performance and your overall progress. These meetings will assist you in meeting the expectations of your probation, assist in developing your skills in self-assessment and facilitate the successful completion of probation and progression to graduation from residency. Progress in the above competency areas will be measured by verbal and written feedback received by Dr. Hobbs from program faculty, chiefs, other peers, and staff.**

- ▪ *You did engage in the process of reviewing your notes, and were largely receptive to feedback. However, it was felt that your performance is neither proactive in these meetings nor in meeting the terms of your probation letter/remediation plan.*

**At the next regularly scheduled meeting of the CCC in December 2015, the committee will evaluate your progress. One of three actions will follow from that meeting:**
- **With significant improvement in your performance, you will be returned to good standing in the program and the probationary period will end.**

- With some improvement in your performance, but not to where you should be for a PGY-3 resident, the probationary period may be continued for another 3 months (January-March).

  - If your probationary period is continued for an additional 3 months, you must regain good standing by the regular meeting of the committee in March. Failure to do so will result in dismissal from the training program here at the University of Florida.

- If, during the probationary period, you fail to improve your performance or your performance worsens, you will be dismissed from the Psychiatry training program here at the University of Florida.

The CCC determined at its final meeting of your probationary period that your performance did not improve significantly, and you failed to meet the majority of the requirements of your remediation plan. Therefore, the CCC unanimously agreed to your dismissal from the University of Florida Psychiatry training program.

As with any adverse action, you have the right to appeal this decision of the Clinical Competency Committee and the Program Director. I am enclosing a copy of the appropriate procedure (Grievance procedure) to appeal this decision. Briefly, your first appeal is to the Department Interim Chair (Dr. Bussing). If the decision is upheld, the next appeal would be to Dr. Lisa Dixon, our Associate Dean for Graduate Medical Education. If she upholds the decision, the next appeal would be to Dr. Michael Good, College of Medicine Dean. His decision is final.

Sincerely,

Jacqueline A. Hobbs, MD, PhD, DFAPA
Vice Chair for Education
Residency Program Director


I have received a copy of this memorandum and understand its contents.  My signature does not mean that I concur with its contents. I have also received a copy of the University of Florida College of Medicine Grievance Procedures that I may use to appeal this probation.

Sarah Diekman, MD
Resident in Psychiatry



**UF** | UNIVERSITY *of*
**FLORIDA**

College of Medicine
Department of Psychiatry
Residency Training

PO Box 100256
Gainesville, FL 32610-0256
(352) 294-4945 Phone

April 29, 2015

Sarah Diekman, MD,
PGY-3 Psychiatry Resident
University of Florida College of Medicine

Dear Dr. Diekman:

This letter serves to document more clearly the plans for your PG-3 and -4 years. Given that there were some significant deficiencies in your performance particularly in your medical record keeping (e.g. significant copy/paste, incorrect note template usage) and unusually low patient volumes in your half-day clinic, the Clinical Competency Committee and clinic directors concluded that while you may continue your progression to the PGY-3 level starting July 1, 2015, you are not ready to progress to the full-time continuous outpatient experience. The full-time continuous outpatient experience carries with it a significantly higher case load as well as a significantly higher level of independence and patient care responsibility. Instead, to best suit your level of progress, you will be assigned to inpatient and consult-liaison rotations that provide a continued higher level of oversight and supervision. During the PG-3 year, you will also be assigned to rotations that will allow you to complete any requirements such as forensics and child and adolescent psychiatry. In addition, you will continue your half-day continuity clinic throughout the year. It is anticipated that by the following year, you will be able to progress to the continuous outpatient experience. Here is a summary:

> July 1, 2015-June 30, 2016 (PGY-3): Inpatient, C/L, Subspecialty requirements in monthly rotations; half-day continuity clinic

> July 1, 2016-June 30, 2017 (PGY-4): Continuous outpatient experience (MOB)

Sarah, we want to fully recognize that, with increased supervision and oversight, you have been responsive to feedback and have made some improvements over the last month. Examples include better use and discrimination of clinic note templates, improved quality/content/compliance of notes, and appropriate requests for help. Things to continue to improve on are your ability to handle a larger case load more efficiently, managing your clinic patient load to meet the expectations set by the clinic director, improving time management, enhancing your efficiency with all patient care duties including timeliness of notes (e.g. clinic notes completed no later than end of next business day), and becoming more self-directed as a resident clinician. Please continue to look to your chief residents and faculty supervisors to assist you when you have any questions or concerns.

*The Foundation for The Gator Nation*
An Equal Opportunity Institution



EXHIBIT
*13*

UF/Diekman 000078

We continue to be fully invested in your progress and look forward to a successful year ahead.

Sincerely,

Jacqueline A. Hobbs, MD, PhD, DFAPA
Assistant Professor
Vice Chair for Education
Director, Residency Training Program
University of Florida College of Medicine

Acknowledged:

_____

Sarah Diekman, MD

UF/Diekman 000079