# Exhibit 19

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Mr. Charles M. Deal<br>General Counsel<br>**UNIVERSITY OF FLORIDA**<br>123 Tigert Hall<br>P.O. Box 113125<br>Gainesville, FL 32611 | **Diekman J. Sarah** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**510-2015-05065** |

### NOTICE OF CHARGE OF DISCRIMINATION
(See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act (Title VII)     [ ] The Equal Pay Act (EPA)     [X] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)     [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **25-DEC-15** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [X] Please respond fully by **25-DEC-15** to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by   **10-DEC-15**
to   **Marvin Frazier, ADR Coordinator, at** (305) 808-1839
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| **FERNELLA PETERS,**<br>Enforcement Supervisor | **Miami District Office**<br>**Miami Tower, 100 S E 2nd Street** |
|---|---|
| EEOC Representative | **Suite 1500** |
| Telephone   **(305) 808-1877** | **Miami, FL 33131**<br>**Fax: (305) 808-1855** |

Enclosure(s):   [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race   [ ] Color   [ ] Sex   [ ] Religion   [ ] National Origin   [ ] Age   [X] Disability   [ ] Retaliation   [ ] Genetic Information   [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **November 25, 2015** | **Ozzie L. Black,**<br>**Acting District Director** | *Ozzie L. Black* |

**Exhibit**
**18**
S. Diekman 6/17/2020

UF/Diekman 000009

Enclosure with EEOC
Form 131 (11/09)

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA.  These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge.  (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below).  Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action.  The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected.  The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes.  The Equal Pay Act contains similar provisions.  Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.  Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you.  If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

UF/Diekman 000010

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 510-2015-05065 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Diekman J. Sarah | ▉ | ▉ |

| Street Address | City, State and ZIP Code |
|---|---|
| ▉ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| UNIVERSITY OF FLORIDA | 500 or More | (352) 392-2477 |

| Street Address | City, State and ZIP Code |
|---|---|
| 903 West University,  Gainesville, FL 32608 | |

Received  NOV 13 2015

EEOC Miami District Office

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|

DISCRIMINATION BASED ON:
☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 04-01-2015 | 09-08-2015 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a qualified individual with a disability. I began my employment with the University of Florida as a Psychiatry Resident Physician on July 1, 2013. I report to Dr. Jaqueline Hobbs. I have requested and been denied a reasonable accommodation. Following my request for an accommodation I have been subjected to unwarranted discipline and increased supervision. My supervisor has discussed private medical information regarding my disability with my peers, and other employees.

No reason has been given to me for the treatment I have endured.

I believe I have been discriminated against because of my disability, in violation of Title I of the Americans with Disabilities Act of 1990, as amended (ADAAA).

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 11/12/2015  *Date*          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*  11/12/2015 |

UF/Diekman 000011

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 510-2015-05065 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Diekman J. Sarah** | ▉ | ▉ |

Street Address          City, State and ZIP Code

▉

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **UNIVERSITY OF FLORIDA** | **500 or More** | **(352) 392-2477** |

Street Address          City, State and ZIP Code

**903 West University,  Gainesville, FL 32608**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address          City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ xRETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **07-01-2013**   Latest **5-02-2016**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a qualified individual with a disability. I have the medical condition of Postural Orthostatic Tachycardic Syndrome and two learning disorders: Disorder of reading(DSMIV) and ADHD(DSMIV). I was employed with University of Florida as a Psychiatry Resident Physician on July 1, 2013 and terminated May 2, 2016 and originally filed with EEOC in Sept/Oct 2015. While an employee, I requested and was denied reasonable accommodations. Following my request for an accommodation and later my reporting to EEOC, FCHR and internal grievances, I was subjected to unwarranted discipline, increased supervision, hostile work environment with assault, denied access to medical care after assault, defamation of character including fraud to defame/ harm and psychologic torture. I was denied career/ educational material, resources and opportunity because of my disability. I was fined for using my state handicap parking permit in public stops on campus and I was forced to park farther away from the site than the able bodied employees. I was denied an employee parking pass for failing to comply with these treatment. My supervisor intentionally created conditions to worsen by medical conditions in an effort to retaliate against me for reporting to EEOC, FCHR, and internal channels. My supervisor misrepresented private medical information regarding my disability with my peers, and other employees in attempts to defame my character and retaliate against me. The failure to accommodate resulted in severe physical injury. I was terminated because of my disability, retaliation for reporting(including workman's comp)and my gender. FMLA protected days were specifically listed as reasons for my termination. My former employer **continues** to harass me, including calling job prospects and disclosing protected information about my disability and disclosing that I reported violations to the aforementioned bodies. Because I am female, I was also subjected to sexual harassment by multiple male supervisors which I reported in internal channels. I was retaliated

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>Original 5/18/16<br><br>5/14/18          [signature]<br>Date          Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

UF/Diekman 000017

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **510-2015-05065** |

| **Florida Commission On Human Relations** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

against and increasingly harassed after making these complaints.  Because I am a female, I experienced increased work load, less opportunity for promotion/career advancement, defamation of character and hostile work environment. A reduction in pay was a condition of accommodations for me but not for a male with reduced hours for a disability. I was fired before receiving the reduced paycheck.I have been discriminated against because of my disability, in violation of the ADA, the equal pay act & civil rights act of 1964

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>Original 5/18/16<br><br>5/14/18 _____<br>Date          Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

UF/Diekman 000018

May 22, 2018

**Via PDF email**

Maximilian C. Feige
Federal Investigator
U.S. Equal Employment Opportunity Commission
EEOC- Miami Field Office
100 SE 2nd Street, Suite 1500
Miami, FL 33131

     Re:    **Sarah Diekman v. University of Florida**
                **EEOC Charge No.: 510-2015-05065**

Dear Mr. Feige:

The following shall serve as my response to your correspondence to the Respondent's Position Statement, as well as include new information that is relevant to this matter.

The University of Florida Gainesville Campus (UFG) has acknowledged that Dr. Diekman is a disabled individual as defined by the Americans with Disabilities Act. UFG claims that they honored all of Dr. Diekman's request for accommodations. This is false. Dr. Diekman's disorder, Postural Orthostatic Tachycardic Syndrome (POTS), is exacerbated and triggered by environmental factors, including: heat, time of day, dehydration, sleep deprivation, posture, and prandial status. Despite their knowledge of Dr. Diekman's diagnosis, UFG allowed supervisors to retaliate against Dr. Diekman for requesting for accommodations. The illegal behavior of the supervisors continued unimpeded, even after reported to multiple high-ranking officials at UFG. UFG ignored the vast majority of Dr. Diekman's requests for reasonable accommodations, but occasionally granting Dr. Diekman permission to eat, take medication and have a set work schedule, when it was convenient for UFG. Simply put, the work hours, eating, and taking medication were not protected and UFG failed to accommodate her reasonable requests. Further, even though UFG refused to protect Dr. Diekman from working past her requested schedule, they responded by planning to decrease her pay as if they had implemented the protected schedule. In other words, Dr. Diekman would be working the same amount of time, but she would be paid less. This is evidenced by UFG's written response to Dr. Diekman's final accommodation request.

Despite the aforementioned failures to accommodate, UFG took appropriate measures in eventually granting Dr. Diekman's request for a handicap parking space. This action slightly reduced the amount of retaliation that her supervisor was allowed to exert on her for filing civil rights and ADA complaints. The reason for this request was that, due to the excessive heat and humidity that is common in Florida, Dr. Diekman was unable to safely walk from her vehicle to her place of employment, as POTS impairs her ability to walk in hot weather. The consequences to Dr. Diekman of walking in the heat and humidity were actual and caused Dr. Diekman to fall and suffer leg contusions as well as sustained tachycardia with subsequent symptoms of heart palpitations, diaphoresis, tremulousness, weakness, fatigue, near-syncope, nausea, and cognitive delay for approximately an hour after completing her walk from the parking spot into work.

Mr. Maximilian Feige
May 22, 2018
Page 2

When Dr. Diekman began her employment at UFG she requested a handicap parking space for the main campus of Shands/VA of UFG.  For the main campus, Dr. Diekman was assigned a "handicap" parking space, however, it was further away from her work site than the typical employee parking space and did not allow Dr. Diekman to safely access her place of work.  (The other clinical sites, including Shands Vista and Shands Towerhill typically did not present a parking problem for Dr. Diekman). Dr. Diekman informed the parking directors of this issue, but her parking assignment continued to be a barrier to accessibility.  In addition, the parking directors presented barriers to achieving the handicap spot because of Dr. Diekman's rigid and laborious schedule as commanded by UFG.  Dr. Diekman informed her supervisors, including the chief residents and Dr. Hobbs of this barrier to access. Dr. Diekman was told it was her own responsibility to resolve the problem and no exceptions or alterations in her work environment or schedule would be made to accommodate the effect of the long walks in the heat or the need for protected time to access the parking director building.

During her first year of employment, Dr. Diekman only gained safe access to her place of work by parking in the public handicap spots with her State of Florida handicap placard.  Unfortunately, near the beginning of her second year of employment, many handicap spots on the main campus were eliminated to make room for the new medical school.  Dr. Diekman again pleaded with the parking directors for access to a handicap spot which would provide her with safe access to her place of work.  The delay in any meaningful action was significant.  During the hottest months of 2014, (June, July, August and September), Dr. Diekman had to choose between receiving parking tickets, her health, and/or retaliation from her supervisor for calling in sick.  Dr. Diekman had been warned by her supervisor, Dr. Hobbs, to stop complaining about the parking issue and acquire a 'team player attitude'.

Dr. Diekman's increasingly poor health, forced her to contact the UFG legal department. Fortunately, this contact, resulted in a parking space that fully accommodated Dr. Diekman's disability.  Unfortunately, Dr. Hobbs informed Dr. Diekman verbally, that Dr. Diekman should not have gone to the legal department.  According to Dr. Hobbs, what happens to psychiatry residents should be the exclusive purview of the psychiatry department. According to Dr. Hobbs, she alone was to control the work environment of the residents and Dr. Diekman had made a "mistake" by contacting an outsider. Dr. Hobbs decided that the chief residents would now be assigned to deal with Dr. Diekman's "poor attitude."

Dr. Diekman suffered direct consequences for contacting the UFG legal department.  Soon after this contact, Dr. Diekman was subjected to an hour-long discussion on attitude improvement by Dr. San Chang.  Dr. Diekman was forced to stand for this discussion, which she informed Dr. Chang would possibly result in syncope and certainly result in near syncope and other symptoms of POTS. Dr. Chang responded that Dr. Diekman was being punished for contacting an outsider and she should consider this before ever acting in such a way again. He explained that if Dr. Diekman were to disobey him and sit down, he would immediately bring a professionalism complaint to the Clinical Competency Committee (CCC).  Dr. Diekman feared for her career and obeyed Dr. Chang with resulted in tachycardia, near-syncope, heart palpitations, diaphoresis, tremulousness, weakness, fatigue, near-syncope, cognitive delay and nausea.

Mr. Maximilian Feige
May 22, 2018
Page 3

After this debilitating and humiliating punishment, Dr. Diekman requested to leave work. Dr. Chang responded that a CCC report would follow if she did. Dr. Chang and Dr. Hobbs continued to engage in actions they knew would negatively impact Dr. Diekman's health, including assigning Dr. Diekman to unusually physically grueling work rotations, last minute scheduling changes, and transferring of the workloads of other residents unto Dr. Diekman. Witnesses are available to verify these events.

The lack of accommodations and the choices of the supervisors worsened Dr. Diekman's chronic medical condition. Additionally, near the beginning of 2015, Dr. Chang sent an email to the residents stating that calling in sick would be considered a professionalism violation. Such violations would be reported to the CCC. Indeed, this is exactly what happened with Dr. Diekman and what is cited in UFG's EEOC position statement. Because her accommodations were denied and her superiors responded by given her a schedule they knew would increase her symptoms, Dr. Diekman was forced to call in sick during the worst POTS "flair-up" days. Dr. Diekman firmly believes that she would have been able to work during these flair-ups or the flair ups may not have occurred, if there had been reasonable accommodations. It is important to note that UF lists sick days as a reason for termination in Dr. Diekman's termination document. This is either a breach of contract, as she was entitled to 10 sick days per year or a violation of FMLA.

Despite the warnings of her supervisors to not contact "outsiders," Dr. Diekman went through the designated channels at UFG to request accommodations. Amongst other problems was a cyclical allocation of responsibility. After Dr. Diekman had filed an ADA grievance, Mr. Ken Osfield, an ADA coordinator, responded in writing that it was Dr. Diekman's responsibility to advocate directly to her supervisor, Dr. Hobbs. Upon learning this, Dr. Hobbs responded, verbally and in writing that it was not her responsibility to make an accommodations plan with Dr. Diekman, instructing her to talk to Mr. Osfield. Again, Dr. Diekman contacted Mr. Osfield, who after great delay and further physical injury to Dr. Diekman, stated that Dr. Diekman must directly advocate to her supervisor without his input. Dr. Diekman again contacted her supervisor who again was delayed in responding, which again caused physical injury. Dr. Hobbs again responded by stating that she would not deal with Dr. Diekman directly and would only take instruction from Mr. Osfield. Dr. Diekman pointed out this cyclical problem to both parties without any response. Dr. Diekman further reported this cyclical problem to Dr. Regina Bussing, the department chair and Dr. Lisa Dixon, the designated institutional officer (DIO). Both of these upper-level supervisors directed Dr. Diekman back to Dr. Hobbs and made no efforts to solve the problem. This passage of responsibility continued without resolution until Dr. Hobbs terminated Dr. Diekman.

In their statement, UFG claims that Dr. Diekman was not progressing adequately in her training to meet the definition of "otherwise qualified." This is proven untrue by multiple facts including the following:

(1) The timeline of events shows that each request for accommodation or reporting of a civil rights violation was followed by a poor performance review. Dr. Diekman did not have a poor performance review that was independent of a civil rights compliant or accommodation request.

00364264.DOCX

Mr. Maximilian Feige
May 22, 2018
Page 4

The first poor review was in the spring of 2014 following a complaint she made to Dr. Joseph Thornton about an attending physician at the Veterans Association (VA) intruding into Dr. Diekman's call room/ sleeping area without permission or clinical need.  Dr. Diekman feared she was going to be sexually assaulted/ battered by this male supervisor, as this was the pinnacle of multiple escalating incidents of unwanted touching, requests for physical contact by the supervisor, and sexually degrading remarks by the supervisor.  Dr. Diekman request a chaperone and to never be alone with this supervisor.  Dr. Thornton responded by saying Dr. Diekman reminded him of his "ex-wife" and she should learn how to 'get along better with others.'  Dr. Diekman reported the events to Dr. Ana Turner and Dr. Hobbs.  Dr. Turner responded with an email acknowledging that she had spoken with Dr. Thornton and Dr. Hobbs, and no action would be taken, but perhaps if the situation worsened it might be "reported."  A short while later, Dr. Diekman received a negative review from Dr. Thornton.  This was Dr. Diekman's first negative review.  This contradicts UFG's EEOC position statement which indicates that Dr. Diekman received consistent negative reviews in her second year that were unrelated to retaliation.  This was the only negative review in the second year.  Dr. Diekman further reported the original incident and what she perceived to be retaliation for reporting to Dr. Lisa Dixon.  Dr. Diekman was then interviewed by human resources personal whom assured Dr. Diekman that this would not happen to any other residents.

(2) While Dr. Diekman was employed with UFG, two witnesses submitted statements on her behalf, stating that her performance was equal to that of her peers and that they believed poor reviews were retaliation and discrimination.  Both of these witnesses are currently board-certified physicians who previously worked closely with Dr. Diekman.

(3) The CCC purports itself to be in compliance with Accreditation Council for Graduate Medical Education (ACGME) standards which, if true, would bolster UFG's claim that Dr. Diekman was not "otherwise qualified" for her position as a PGY 3 psychiatry resident. The ACGME creates the guidelines on which UF claims to have based its entire assessment of her qualifications for continued employment. However, the facts show that UFG did not follow multiple rules set out by the ACGME for the CCC.  This is evidenced by the minutes of the CCC and attendance records, as well as the ACGME's handbook which is publicly available on its website. An example of the plethora of violations is the ACGME requirement that three members of the committee work with the person who is being evaluated, in order to prevent reliance on rumors as the basis of critical promotional, training, and employment decisions. The ACGME sets out that evaluators should be consistent over the course of the meetings so that an accurate assessment may be established. If UFG was, in fact, using the CCC for something other than pretext to fire Dr. Diekman, UFG would have followed the guidelines.  It is apparent that the goal of the program director, Dr. Hobbs, was to create a pretextual reason to fire Dr. Diekman, rather than accommodate her disability and civil rights complaints. Therefore, UFG's reliance on the CCC's decision is undermined by its own failure to appropriately use the CCC.

(4) UFG had the option to extend the length of Dr. Diekman's training. Having this option available undermines UFG's argument that they could predict the future and knew Dr. Diekman would not obtain graduate level skills by the end of the 4th year. UFG could have assessed Dr. Diekman at the end of the 4th year and if her skills were lacking, extended her

00364264.DOCX

Mr. Maximilian Feige
May 22, 2018
Page 5

_____

residency. UFG's argument relies on their ability to predict the future and an incorrect premise that they would have no reasonable options at the end of 4 years, if Dr. Diekman was unqualified at that time. UFG relies heavily on minor mistakes in notes made by Dr. Diekman. It is widely acknowledged that minor mistakes are part of the residency learning process. UFG fails to compare Dr. Diekman to similarly situated peers and instead compares her to an orchestrated level of perfection. These levels of perfection are evidenced by the short addendums to Dr. Diekman's notes. Addendums are opportunities that the supervisors have to correct the errors in the notes of residents. If Dr. Diekman was truly learning less than her peers, the addendums to her notes across the duration of her employment should be substantially different than her peers. UFG has not presented evidence of this, but rather relies on an overall feeling that Dr. Diekman's notes were so outside of the norm for a resident in training that it was impossible to teach her how to correct them. Furthermore, UFG altered Dr. Diekman's deadlines to artificially force performance failures. Dr. Diekman was given less time than her peers to complete notes and if she succeeded, then her time was further reduced. Additionally, the chief residents were taxed with the responsibility for teaching residents how to appropriately write clinic notes. The chief residents did not distribute the educational resources equally, and Dr. Diekman was deprived of instruction until she brought the issue to the ADA coordinator. It does not appear that UFG disputes that when Dr. Diekman was given instruction on how to do the note, she performed.

(5) Dr. Diekman was told directly by Dr. Hobbs that her disability would disqualify her from graduation and working as a psychiatrist. Dr. Hobbs' bias toward disabilities is further evidenced by her assessments of Dr. Diekman. In writing she equates disability with a lack of clinical knowledge and skill, proving that she based Dr. Diekman's termination on her disability and was not accurately assessing if Dr. Diekman was a "otherwise qualified individual."

(6) Dr. Diekman was held to higher performance standards than similarly situated peers on the National PRITE Exam. This exam is the only objective annual measure of performance of psychiatry residents at UF. Dr. Diekman consistently performed well on this exam. Her male peers were promoted to leadership positions, despite performances that were the worst amongst the group. Beyond the PRITE and the NBME Step 3 Exam, the rest of performance in psychiatry residency at UFG is the opinion of the attendings and supervisors. The attendings and resident match ups are scheduled and selected by Dr. Hobbs. The PRITE is written and graded outside the control of Dr. Hobbs. As such, the PRITE Exam and the Step 3 Exam are the only objective measures of Dr. Diekman's performance while at UFG. The scores of her exams compared to her classmates clearly demonstrate that Dr. Diekman's clinical knowledge was well within the acceptable standards of UF. The university promoted individuals with lower scores, graduated individuals with lower scores, and waved expressed conditions on contracts to continue to employ individuals with lower objective performance than Dr. Diekman. Dr. Hobbs and Dr. Robert Averbuch made a pre-textual performance standard for Dr. Diekman via a test score minimum to which her peers were not held.

(7) Dr. Diekman's performance records were backdated after her termination. Scores that she had received in her 2nd year of employment before the bulk of the retaliation had begun were changed. UFG changed records, approximately fifteen to sixty days after Dr. Hobbs terminated

Mr. Maximilian Feige
May 22, 2018
Page 6

---

Dr. Diekman. An unknown individual with administrator access to UFG's New Innovations account altered the records. Altering these scores benefited UFG by changing the timeline and made it appear that Dr. Diekman had not achieved graduate level performance on multiple milestones as a PGY 2. UFG's claim is bolstered by these altered records because it makes it appear that there was no correlation between Dr. Diekman's ADA and sexual harassment complaints and her performance scores. However, Dr. Diekman has proof that the grades were altered subsequent to termination. Therefore, the second-year scores, as cited by UFG's EEOC position statement were not a legitimate reason for termination. The altering of the scores is an attempt by UFG to cover up the real reason that Dr. Diekman was terminated. Dr. Diekman possesses a printed copy of the records approximately 14 days after Dr. Hobbs opted to terminate her. If Dr. Hobbs' decision had been based on the scores, it should have been based on the scores which were present at that time. The lowering of grades after the decision to terminate points to a cover up of the true reason for Dr. Diekman's termination which was her request for accommodation, retaliation, etc.

(8) In the last five years, there have been different outcomes (forgiveness) for similarly situated peers with substantially worse performance issues. Of note, those who were forgiven for performance issues are nearly exclusively nondisabled males. Examples of this forgiveness include, but are not limited to the following examples:

-Dr. Daniel Pietras threatened to "blow up" the department and kill his boss in December 2015. Dr. Pietras was returned to clinical duty that month and will graduate this summer as a psychiatrist.

-In the fall of 2015 Dr. Wagdy Khalil forced medical students to forge notes for him. An offense such as this is expressly outlined in the employment contract as grounds for immediate termination. UFG waved this expressed condition for him and allowed him to immediately return to clinical duties. Dr. Khalil displayed further had performance issues that were forgiven by the CCC and he will be graduating this summer.

-In 2016 Dr. Ahmed Qureshi was promoted to chief resident after leaving the consult service in 2014 in the middle of a shift because there was "too much work." His female colleague, Dr. Laura Tait, had to perform his work in addition to her own work. Dr. Quershi received support and understanding from Dr. Hobbs and will be graduating this summer.

-In 2014 and 2015, UFG twice waved an express condition of the employment contract for three nondisabled male physicians who had failed the National Board of Medical Examiners (NBME) step 3 exam. The employment contract stated that residents would not be promoted to the PGY 3 position if the exam had not been passed. Three male residents had not passed the exam but were promoted to the PGY 3 position. Further at least two of them again failed to pass the exam by the PGY 4 year. The condition was again waved, and the male residents were promoted to graduate level PGY 4.

In order to continue paying the residents with ACGME/Federal funds, and allow them to graduate on time, Dr. Hobbs forged the rotation schedule to make it appear that the residents were meeting the ACGME/Federal requirement for clinical hours when, in fact, these male residents were in Illinois taking the PASS program for step 3 for six to eight weeks. This

Mr. Maximilian Feige
May 22, 2018
Page 7

allegation is proven by the annual program review where Dr. Hobbs attempts to justify the promotion of the male residents despite not passing the Step 3 by stating that they will be attending the PASS program in the fall. The PASS program has responded to inquiry about its programs for the Step 3. All Step 3 programs are in Illinois and at least 6-8 weeks, thus rendering it impossible for these residents to be in Florida caring for patients, as is required by the ACGME/ Federal rules for residency funding, under the Consolidated Omnibus Budget Reconciliation Act of 1986, Balance Budget Act 1997. The program director, Dr. Hobbs, put the names of the residents on the clinical rotation schedule and represented to the department/ACGME/federal government that they were in Florida when they were in fact in Illinois taking a course to improve their odds of passing the Step 3 exam. Dr. Diekman passed the step 3 exam as a PGY 1 on the first attempt.

Dr. Diekman never had to receive additional supervision while on call. Dr. Hobbs alleges that she had to be supervised "more" than other residents. This assertion is undermined by the fact that there was an increased supervision option, which was exercised for at least 2 male residents, and was not exercised for Dr. Diekman. The increased supervision is when a second resident is double scheduled with the first resident, meaning that the second resident would come to the clinical site and perform an additional clinical assessment because the first resident's assessments had created patient safety issues. If Dr. Hobbs' and Dr. Averbuch's allegations against Dr. Diekman were true, a second resident would have been scheduled for her shifts and the attending physician would have visited the clinical site to assess the patient themselves. No such issue occurred. Instead the attendings, relied on Dr. Diekman's reporting of findings over the telephone when on call or after the attending left the site.

There are procedures and patient safety meetings after near misses in patient care, such as those UFG claims Dr. Diekman created. However, Dr. Diekman never was asked to attend any patient safety meetings, thus meaning there is no basis for UFG's claims that Dr. Diekman was a patient safety risk. An example of a patient safety risk, and the subsequent record that results, occurred with Dr. Camillo Leal in the fall of 2015. Dr. Leal missed a diagnosis of vocal cord dystonia while he was working the night shift. Vocal cord dystonia is a life-threatening emergency. At the beginning of her shift, Dr. Diekman recognized and diagnosed this condition and the patient was rushed for treatment. As a result, Dr. Leal was required to participate in a patient safety meeting because he had placed a patient's life in danger by missing the diagnosis. Additionally, he was forced to participate in another patient safety meeting after a patient went missing due to his lack of care. Dr. Hobbs continued to praise Dr. Leal for his patient care and awarded him the Golden Humanitarian Award, despite two incidents within three months that triggered official patient safety review meeting. In her duration at UFG, Dr. Diekman was never asked or forced to account for her actions in a patient safety meeting. Dr. Hobbs' is attempting to portray that Dr. Diekman was a danger to patients, however, if this was true a second resident would have overseen all of her interviews and phone calls and she would have participated in multiple patient safety meetings to explain actions that resulted in danger to the patients. Neither of these things happened with Dr. Diekman, however it did happen with nondisabled male colleagues who UFG continues to employ and promote.

Mr. Maximilian Feige
May 22, 2018
Page 8

(9) The performance record of Dr. Diekman was damaged by false statements made by her supervisors to her colleagues and other supervisors. Dr. Tait reported to UFG that she was told by a supervisor that Dr. Diekman's illness was a fiction created by Dr. Diekman because Dr. Diekman was lazy. Dr. Elizabeth Stein reported to UF that a rumor had been started with the encouragement of supervisors, alleging that Dr. Diekman was not caring for patients. Dr. Diekman was told by Dr. Tonia Werner that Dr. Hobbs had given her instructions to punish Dr. Diekman for "complaining about her disability." Due to this outrageous conduct, Dr. Diekman asked Dr. Hobbs', in writing, in the ADA grievance, to release a statement to the department to correct these rumors, as she felt that these rumors would affect her performance evaluations. Dr. Hobbs refused to take any steps to correct the misinformation spread by Dr. Diekman's supervisors. Further, the minutes from the CCC meeting prove that other evaluators were concerned that an adequate plan for Dr. Diekman's disability was not being made. Additionally, Dr. Hobbs misrepresented to the committee that Dr. Diekman was receiving appropriate accommodations and alluded to Dr. Diekman having a drug problem for which the Physician Rehabilitation Network (PRN) should be considered. PRN is for professionals who are addicted to drugs and alcohol. PRN does not treat neurologic and cardiac conditions such as POTS.

(10) The assessment of performance of Dr. Diekman was skewed because Dr. Hobbs altered Dr. Diekman's scheduled and then told her supervisors that she should perform as if her schedule was not altered.

(11) The evaluations favored non-disabled males because they were given the easier rotations. This is evidenced by the schedule and the annual report that states that residents preferred Vero Beach and NETFSH rotations.

(12) Dr. Diekman never failed a rotation. If her performance had truly been unsatisfactory she should have passed the rotation and her residency would have been extended. UFG made Dr. Diekman repeat the physically difficult rotations in retaliation for filing a disability complaint. UF knew these rotations exacerbated Dr. Diekman's health conditions and forced her work them more than any of her similarly situated peers, as well as making her work them at the time of year when she would be exposed to the highest environmental temperatures.

(13) If Dr. Diekman was truly unqualified to care for patients and write notes, Dr. Almari Ginory would have not left Dr. Diekman alone with the patient, told Dr. Diekman to continue to assess the patient alone after Dr. Ginory left the clinical site, and entrusted Dr. Diekman to write the note for the final patient on day that Dr. Ginory voted for Dr. Diekman's termination. Supposedly, Dr. Ginory had such concern for Dr. Diekman's performance that she left the clinical site to vote to have her terminated. If Dr. Ginory truly feared for the patient's safety, she should have done the entire assessment and note herself instead of planning on relying on Dr. Diekman's work while voting to fire her.

(13) The notes that Dr. Hobbs and Dr. Averbuch refer to in all the relevant documentation were minimally altered by attendings. In order to accurately assess Dr. Diekman's performance, the addendums need to be compared to other residents, instead of the subjective standard of perfection that Dr. Hobbs and Dr. Averbuch have created solely for Dr. Diekman.

00364264.DOCX

Mr. Maximilian Feige
May 22, 2018
Page 9

_____

(14) Dr. Diekman was considered to be qualified for a PYG 3 position by Dr. Steven Cuffe, whom is a program director and psychiatry department chair. Dr. Cuffe read Dr. Hobbs' defamatory and false "program director letter." The program director letter is a requirement for all ACGME residencies and, as such, Dr. Diekman has no option but to request one from Dr. Hobbs. Dr. Cuffe read her scathing letter describing Dr. Diekman as having no skills as a psychiatrist. Dr. Hobbs listed Dr. Diekman's milestones as zero across the board. This represents that Dr. Diekman has the skills of a medical student or worse. This is in conflict with the milestone records kept in New Innovations. Despite the scathing and untrue letter prepared by Dr. Hobbs, Dr. Cuffe was prepared to hire Dr. Diekman. Although he was aware of Dr. Hobbs and the contents of the program director letter, Dr. Cuffe opened this position for Dr. Diekman only and did not interview any other candidates. The final step was to have the position approved by the dean. Dr. Dixon, the DIO of UFG called the DIO of the second institution to block Dr. Diekman's hiring. This is evidence that Dr. Diekman was "otherwise qualified" in the expert opinion of Dr. Cuffe, an accomplished psychiatrist who heads his department, directs a psychiatry residency program and serves on the prestigious review committee of the ACGME. Based on these actions, it is apparent that Dr. Dixon and Dr. Hobbs demonstrated their intentions to maliciously hurt Dr. Diekman by interfering with the opportunity Dr. Diekman had to start a new residency where she would be able to receive reasonable accommodations as Dr. Cuffe already agreed to all the accommodations requests that UFG supervisors had refused.

(15) Dr. Hobbs did not intend for Dr. Diekman to successfully complete the "probation" program. Dr. Hobbs' intent was to fire Dr. Diekman and the probation program was the attempt to make it look legitimate. The ACGME instructs program directors to put residents on probation before firing them to avoid lawsuits (see ACGME CCC handbook and Residency Director handbook.) Dr. Hobbs actions mirror the ACGME instructions very closely. According to Dr. Hobbs, the "probation" was established to improve Dr. Diekman's skills. The reality of this probation was that Dr. Hobbs denied Dr. Diekman access to lectures and educational materials which her PGY 3 peers enjoyed. Dr. Diekman informed Dr. Bussing in writing that she was barred from attending the lectures and this would interfere with her performance scores because the attendings were told to compare Dr. Diekman to her peers. Dr. Diekman's peers were getting educational material that Dr. Diekman was denied. Dr. Bussing ignored the complaint. Nonetheless, Dr. Diekman continued to request that Dr. Hobbs' grant her access to the lectures because Dr. Diekman is dyslexic and the lectures suit her learning style better than reading. Dr. Hobbs responded that Dr. Diekman needed to learn to read better and continued to base all of Dr. Diekman's probation assignments around the skills that are inherently lacking in dyslexia. As a psychiatrist, Dr. Hobbs has an expert understanding of dyslexia. Dr. Hobbs was well aware that by assigning lengthy reading assignments to Dr. Diekman, Dr. Diekman would struggle to finish the assignments and would not be able to learn. In other words, Dr. Hobbs knew that the reading assignments would be a waste of Dr. Diekman's time as compared to attending the lectures that the similarly situated peers attended. Dr. Diekman repeatedly requested access to the lectures and materials that were suitable learning materials for someone with dyslexia. All requests were denied and sometimes a new assignment was given as a punishment for making the request. In conclusion, Dr. Hobbs, Dr. Bussing, Dr. Dixon and Dr. Averbuch compare Dr. Diekman to perfection to establish that she is not "otherwise qualified." UFG did not hold her similarly situated peers to this same standard. The performance standards outlined in UF's reasons for

Mr. Maximilian Feige
May 22, 2018
Page 10

termination are pre-text to cover up the true retaliatory and illegal nature of Dr. Diekman's termination.

With regard to the essential function of the job, the following items need to be considered:

(1) Some of Dr. Diekman's requested accommodations were rejected by UFG as being "essential functions" of the job. However, at the time of her request, all of her PGY 3 peers were working in conditions that fulfilled the list of requests. UF needed only to put Dr. Diekman in a similar work environment as her peers to accommodate her disability. Instead she was scheduled on the most physically grueling rotations. These rotations included the most exposure to temperature fluctuations and the least access to a chair for Dr. Diekman to utilize. By way of her written ADA request, UFG was aware that temperature fluctuations and not the inability to sit were major triggers for Dr. Diekman's physical disability. It was the opinion of Dr. Ginory and Dr. Hobbs that these were "essential functions" of the job. If this were true, the similarly situated peers would also be required to perform them. Instead, the rest of the PGY 3 class was in the climate-controlled clinic with full time access to chairs, close parking, and ergonomically adjustable work stations.

In the spring of 2015, Dr. Diekman was told by Dr. Hobbs that she was not allowed to work in the clinic as a punishment for taking too many sick days and requesting accommodations. Dr. Diekman informed Dr. Hobbs of the negative effect this would have on her physical disability. Dr. Hobbs responded that Dr. Diekman needed to "improve her attitude" or she would get the CCC committee to fire her. Dr. Hobbs misrepresented in writing that the reason for the change in Dr. Diekman's schedule was because of patient cancellations in the clinic and computer storage issues which the chief residents had misadvised her on. It is important to note that the patient cancellations were result of UFG's handling of Dr. Diekman's Nov/ Dec 2014 disability request. At that time, UFG refused to take her off the call schedule, as they later did for Dr. Petrias, thus preventing Dr. Diekman could consistently participate in her physical therapy to restore her failing health. This refusal by Dr. Hobbs to accommodate Dr. Diekman would have involved three changes on the December schedule. Because of Dr. Hobbs' refusal to accommodate, Dr. Diekman's only option was to completely stop working for 30 days and to return when she was unimpeded by her health issues. Dr. Diekman explained to Dr. Hobbs that she would always have the same physical disability and require some accommodations to function to which Dr. Hobbs responded that she had better change her attitude.

Dr. Diekman reluctantly stopped working for the month of December 2014, thus resulting in a disruption in her clinic appointments. Patients had to be rescheduled with other providers and appointments were missed, directly leading to the patient cancellations that Dr. Hobbs is attempting to use to legitimize the retaliatory scheduling change. The patient cancellations were a direct result of Dr. Hobbs choices, not Dr. Diekman's. Therefore, the assertion that Dr. Diekman was not qualified to work in the clinic is pretext to cover the true retaliatory and malicious motives behind the separation of Dr. Diekman from her class and scheduling her on physically grueling rotations.

Diekman/UF 000094

Mr. Maximilian Feige
May 22, 2018
Page 11

Leadership within the department made it clear verbally and in emails that schedules would be used to punish or reward behavior that supervisors liked. It fits well within those parameters that Dr. Hobbs would purposely give Dr. Diekman a physically grueling schedule to punish her for behaviors that Dr. Hobbs discouraged such as being sick. Dr. Stein submitted a witness statement to UFG stating that calling in sick was considered by Dr. Hobbs to be an undesirable behavior.

(2) A second residency, headed by Dr. Cuffe was willing to hire Dr. Diekman and honor all of her accommodation requests because Dr. Cuffe believed that Dr. Diekman could perform the essential functions of the job. Dr. Dixon spoke to Dr. Cuffe's superior and Dr. Diekman's hiring was blocked, depriving Dr. Diekman of the opportunity to prove that she can excel at completing the essential functions of a PGY 3 resident when given accommodations and unbiased evaluations.

(3) UFG grossly misrepresented the duties of the job when hiring residents. The "Day in the Life," the schedule section, and the handbook section of the UFG psychiatry website is UFG's representation of the schedules of psychiatry residents. Dr. Diekman's accommodation requests fit within what UFG advertises the duties of the job to be. Further, Dr. Tait and Dr. Stein will provide witness statements establishing that Dr. Hobbs' asserted pressure on residents to misrepresent the working conditions within the department and will establish a pattern of behavior showing that Dr. Hobbs' consistently lied about issues instead of actually addressing the problems within her department. Additionally, Dr. Averbuch should not have overseen Dr. Diekman's employment future. Multiple female residents and medical students expressed to Dr. Diekman, that she was not alone in feeling that he was making sexually inappropriate advances on subordinates but feared retaliation if they reported them. UFG has not responded to Dr. Diekman's request of any records of previous disciplinary action that Dr. Averbuch might have received for sexual harassment. Dr. Diekman continues to request the documents and asks that the EEOC also request them. UFG did release a letter via a public record request from Dr. Diekman, stating that Dr. Averbuch specifically wanted to work with Dr. Hobbs's in instituting probational proceedings against Dr. Diekman because he believed he should be spending more time with Dr. Diekman. Dr. Diekman expressed to Dr. Hobbs, Dr. Dixon, and Dr. Bussing that Dr. Averbuch made requests to spend personal time with her and she did not think he should be supervising her. Her concerns were ignored, and she was told that his clinical expertise would not be questioned and in short, she needed to receive a good report from him. After Dr. Diekman was placed on probation, Dr. Averbuch pressured Dr. Diekman with increased directness to spend personal time with him or expect a bad report from him, which would be the death blow to her employment of UFG. Dr. Diekman continued to decline to spend personal time with Dr. Averbuch and just as he said he would, he gave her a bad report. Finally, Dr. Diekman was terminated after experiencing a traumatic brain injury due to UFG's failure to accommodate. Despite Dr. Diekman's request to only work in climate-controlled environments without any infection control gowns that would restrict ventilation, with protected time to take medication and eat, Dr. Diekman was forced into repeated and prolonged situations that worsened her physical disability. The final event was being ordered into a room with these exact condition by Dr. Ginory with the result being exactly what Dr. Diekman had informed UFG the result of exposure to these conditions would be. Dr. Diekman experienced a syncopal episode.

Diekman/UF 000095

Mr. Maximilian Feige
May 22, 2018
Page 12

_____

This syncopal episode resulted in post-concussive syndrome, a neck and shoulder injury, visible facial contusions and the suspension of Dr. Diekman's driver's license.  UFG has yet to produce the documents to prove the timeline, but it is Dr. Diekman's belief that Dr. Ginory, Dr. Hobbs and the rest of the CCC, learned of the injury and immediately voted to terminate Dr. Diekman.

Sincerely,

Sarah J. Diekman, M.D.

00364264.DOCX

Diekman/UF 000096

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Sarah Diekman** ▮▮▮▮▮▮ | From: **Miami District Office**<br>**Miami Tower, 100 S E 2nd Street**<br>**Suite 1500**<br>**Miami, FL 33131** |

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **510-2015-05065** | **MAXIMILIAN FEIGE,**<br>**Investigator** | **(305) 808-1821** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Niza Santo Wright*  ———————————————————————  AUG 06 2019

Enclosures(s)

Michael J. Farrell,
**District Director**

*(Date Mailed)*

cc: | **Respondent Representative**<br>**Ryan Fuller, Senior General Counsel**<br>**University of Florida**<br>**123 Tigert Hall**<br>**P.O. Box 113125**<br>**Gainesville, FL 32611** | **Charging Party Representative**<br>**Adam Edmundson, Esq.**<br>**Unice Salzman Jensen, P.A.**<br>**Patriot Bank Building, Second Floor**<br>**1815 Little Road**<br>**Trinity, FL 34655** |

Diekman/UF 000080

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

<u>**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**</u>

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➢ **Only one** major life activity need be substantially limited.

➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

Diekman/UF 000081



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Miami District Office**

Miami Tower
100 SE 2nd Street, Suite 1500
Miami, FL 33131
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Miami Status Line:  (866) 408-8075
Miami Direct Dial:  (305) 808-1740
TTY (305) 808-1742
FAX (305) 808-1758
Website:  www.eeoc.gov

Sarah Diekman
c/o Adam S. Edmundson, Esq.
Unice Salzman Jensen, P.A.
Patriot Bank Building
1815 Little Road, Second Floor
Trinity, Florida 34655

Re:   Diekman v. University of Florida
       510-2015-05065

Dear Ms. Diekman:

The Commission has received the Employer's responses to the above referenced charges of employment discrimination.  We have analyzed your case and determined that there is little likelihood that we will be able to develop the evidence required to support your allegations of discrimination under the Americans with Disabilities Act, Amendments Act of 2008 (ADAAA), as amended and Title VII of the Civil Rights Act of 1964, as amended.

Accordingly, the case will be dismissed, in keeping with the Commission's Priority Charge Handling Procedures, designed to assure the Commission's limited resources are directed towards the cases that have a higher probability of success.

The decision to dismiss your case does not exonerate the employer and does not mean your charge is not valid.  The dismissal will simply state that we have no evidence to support your allegations that there was a violation of federal law.  The process of investigating charges of employment discrimination is a very narrow one that focuses on the illegal aspects of employment decisions.  Although we may encounter many practices that appear to be unfair, our investigative authority is limited to those factors which are illegal under the laws we enforce.

Enclosed is the signed DISMISSAL AND NOTICE OF RIGHT TO SUE.  You will have **90 days** after receipt of the notice to file a private suit in federal or state court.  For additional information and clarification, please contact the Investigator assigned to the charge, Investigator Max Feige by calling (305) 808-1821 or by email at max.feige@eeoc.gov.

Sincerely,

AUG 06 2019

Michael J. Farrell
District Director

Diekman/UF 000082

# INVESTIGATIVE LOG     T-5

| CHARGE NUMBER 510-2015-05065N | CHARGING PARTY, Diekman J. Sarah | RESPONDENT UNIVERSITY OF FLORIDA |
|---|---|---|

| DATE | LOG ENTRIES | PRINT LAST NAME, FI | INT |
|---|---|---|---|
| 9/28/2015 | *Intake mail received in Miami Office. Given to Supervisor on _____* | *Bamc* | *Bamc* |
| 10/28/15 | Entire docs general. File to System Rever. "30 by" | | |
| 11/4/15 | Docket (30-day) 60-day | | |
| 11/25/15 | 13! forms Ucfo to Mays; 20 to Fedex | | |
| 9/28/17 | Unable to leave a message | mat | |
| 4/17/18 | Sent PS Summary by Mail | MAF | |
| 5/9/18 | CP contacted me, provided that there is an attorney also stated that there is another charge | | |
| 5/10/19 | Uploaded Form 5 (A) on teleworking day, contacted R for Email left VM | | |
| 6/13/19 | Sent amended Mot? | mat | |
| 7/15/19 | Recd PS | mat | |
| 1/7/19 | Sent RFI | mat | |
| 8/2/19 | Emailed CYR DI info, recd RFI Response | mat | |