# Exhibit 24

## ADA GRIEVANCE PROCEDURE
University of Florida

The University of Florida has adopted an internal grievance (Title II §35.107) procedure for prompt and equitable resolution of complaints alleging any actions prohibited by the U.S. Department of Justice regulations implementing Title II (public, state and local government) of the Americans with Disabilities Act.  Title II states, in part, that "no otherwise qualified disabled individual shall, solely by reason of such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in programs or activities sponsored by a public entity.

All ADA complaints, excluding those filed against the ADA Coordinator, should be addressed to:

Kenneth J. Osfield, Ed. D.
ADA Coordinator
Americans with Disabilities Act Office
916 Newell Drive
Gainesville, FL  32611
(352) 392-1591 (V), 711 (TDD/TTY)

Exhibit 23
S. Diekman 6/17/2020

All ADA complaints filed against the ADA Coordinator should be addressed to:

Institutional Equity and Diversity Office
UF Human Resources
903 West University Ave
Gainesville, FL  32611
(352) 392-2477 (V)
or call through the Florida Relay Service 711 (TDD/TTY)

1. All complaints should be filed in writing, contain the name and address of the person(s) filing it and briefly describe the alleged violation.

2. A complaint should be filed within 180 days (Title II §35.170) after the complainant becomes aware of the alleged violation.  (Processing of allegations of discrimination, which took place before this grievance procedure was in effect will be considered on a case-by-case basis.)

3. An investigation, as may be appropriate, shall follow the filing of the complaint. The investigation shall be conducted by either the ADA Coordinator or the Institutional Equity and Diversity Office, depending upon the nature of the grievance.  These rules anticipate informal but thorough investigations, affording all interested persons and their representatives an opportunity to submit evidence relevant to a complaint.

4. A written determination as to the validity of the complaint and a description of the resolution shall be issued by either the ADA Coordinator or Institutional Equity and Diversity Office, and a copy will be forwarded to the complainant no later than fifteen (15) working days after its filing.

5. The ADA Coordinator shall maintain the files and records of the University of Florida, relating to complaints filed.

University of Florida, ADA Office - (Original 01/26/92, updated, 11/07/94, 12/7/94, 1/5/95, 1/26/95, 2/8/95, 4/14/97, 04/05/14)

UF/Diekman 002943

**ADA GRIEVANCE FORM**

| | |
|---|---|
| Name: | ███████████████ |
| Address: | ███████████████ |
| | |
| Phone: | ███████████ |

Please provide a complete description of your grievance.

Complaint:




Please attach additional pages as needed.


**This form can be submitted as an email attachment with the steps below.** The form will go to the ADA Coordinator, University of Florida, 916 Newell Drive, for all ADA grievances.
1. In the upper left-hand corner of the Internet Explorer browser window
   Click on File, then Save As on a local drive to keep a copy
   Click on File, then Send Page by Email
2. In the newly opened email window,
   Type osfield@ufl.edu in the TO field
   Click Send

*For all ADA Coordinator grievances, return this form to the Institutional Equity and Diversity Office, Human Resources, 903 West University Ave, Gainesville, FL  32611.

Upon request, for persons with disabilities, assistance will be provided in completing this form.  Contact the Americans with Disabilities Act Office, 916 Newell Drive, (352) 392-1591 (V), 711 (TDD/TTY).

University of Florida, ADA Office - (Original 01/26/92, updated, 11/07/94, 12/7/94, 1/5/95, 1/26/95, 2/8/95, 4/14/97, 04/05/14)

UF/Diekman 002944

Timeline:

July 2014 – Email stating beneficial schedules for those who do not call out sick. Standard schedules were distributed for the upcoming year. Schedules were never firm and assignments were changed without consideration for doctor's visits. Doctor visits were cancelled, changed or missed due to the fluctuating schedule. When this situation was brought to the attention of the director no accommodations were received.

- See email #1

November 2014 – Holiday calls.  Type of calls and duties were explained and verified in July.  Resident voiced concerns with having two holiday calls in one month in addition to regular weekend calls.  Resident was assured these holiday calls would be VA coverage only.  (Veteran's Day & Post-Thanksgiving Friday).  Administration was notified if the call duties were changed without adequate notification, this could be a potential health concern.

- See email #2
- See email #3
- See email #11
- See email #15
- See email #16
- See email #17

Veteran's Day Call 2014 – Resident received a text message 9 hours before Veteran's day call at 8am stating resident was to be covering two hospitals contrary to previous assurances that this call would only involve the VA hospital.  Due to late notification, resident was unable to appropriately prepare for the call including medications and physical therapy, to sustain her health.  On the way home from her shift, resident was symptomatic from her chronic medical conditions, and she could not safely operate her vehicle.  Fortunately no permanent adverse event occurred.  However, a significant flair of her underlying disease resulted.  Resident notified administration including chief residents and the program director of her physical health concerns and requested changes be made to the schedule.  The resident did not request a change that involved a reduction in the amount of work assigned, rather requested the timing of the next holiday call be changed so that further health deterioration did not result.

- See email #4
- See text message (Adrienne)

Oct/November 2014: Director is notified, by Sarah that the inconsistent and fluctuating schedule had aggravated her physical disability to the point where a severe escalation of medications was required and physical therapy needed to be increased.

-see email #12

Post-Veteran's Day Nov 2014 – Resident experienced an exacerbation of her disease resulting in increased dosages of medications to try and compensate.  Resident was preparing to do the post-

Thanksgiving holiday shift involving the original schedule of one-hospital coverage.  Resident was told a week in advance that her duties would not be what was discussed in July, and as with the holiday the week prior, she would be covering multiple facilities.  Resident expressed that given the current state of her health, she would not be able to perform this increased amount of work load given the short notice.  During this time, the resident continued to express concerns to the residency director about her health.  The program director responded that if she could not perform every duty requested by the chiefs and Dr. Hobbs, without any accommodations, she cannot work at all.  At this time, Dr. Hobbs acknowledged that the month of December was an elective rotation month, which would allow Sarah time to engage in physical therapy and doctor's appointments to regain her health.

It came to the attention of the chief residents that of the two people assigned to the holiday call, one was not necessary.  The chief resident had the opportunity to switch this resident to another holiday call in the future, allowing for better symptom control of her disease.  He instead chose to give a vacation day to the other resident.  After Sarah continued to express that she was sick, she was informed that she would have to provide more coverage duties on this day.  The extent of the coverage that was assigned, in effect, violated policies of workloads for residents.  The chief resident was instructed to address this scheduling violation.

Pre-Thanksgiving week November 2014- Discussions continued with the residency director regarding Sarah's health and the schedule as well as concern for retribution from the chiefs.  An additional problem arose when the chiefs demanded Sarah not attend a physical therapy appointment in order to provide coverage for another resident who was taking a vacation day.  Sarah expressed that this would lead to deteriorating of her physical therapy and violate the previously agreed upon schedule with the program director, Dr. Hobbs.  The residency director supported the chief's behaviors and actions and stated again, either Sarah could perform any and every duty requested by the chiefs or she could not work at all.  Given these circumstances, Sarah had no choice but to take an immediate medical leave to address her deteriorating medical condition.

- See email #5
- See email #13
- See email #14


Defamation of Character 2014-2015 – This resident was told by multiple other residents, who are willing to provide statements, that the chief residents provided slanderous comments stating that Sarah's medical condition was factitious and described what medical condition she claims to suffer from.  There were many statements that Sarah was lazy and trying to get other residents to do her work for her.

    -witnesses are available and will sign sworn statements

    - Text message from chief can be retrieved-stating I am faking illness to take "vacay"

March 2015 – Sarah experienced a death in her family in which she took emergency leave for two days. The chief resident provided coverage for one of these days. Two weeks later, two simultaneous events occurred. First, Sarah was asked to leave the Brain Stimulation Unit prior to the end of the rotation because the chief resident informed the residency director of performance issues involving Sarah. Sarah was then informed there would be a meeting on this performance on the BSU with Sarah, the Program Director, and the Assistant Program Director, Dr. Averbuch. Given previous experiences with the program director, Sarah contacted the Human Resources department and employee relations in an attempt to get a representative to the meeting with her. Due to the short notice of the meeting, employee relations was not able to attend. They assured Sarah that any retribution or inappropriate behavior that occurred at the meeting could be addressed by them. They also voiced if Sarah felt uncomfortable she should request the meeting to be rescheduled. When Sarah arrived to the meeting, instead of two people, there were five people in the room. Two of these individuals were the chief residents, and one secretary. Given that both of these chief residents had slandered Sarah to her colleagues and accused her of falsifying her medical information, Sarah immediately asked that the meeting be rescheduled so that a representative could be present. The residency director refused this and proceeded to mandate that Sarah sit and listen to the criticism of the chiefs in addition to her own. After this meeting, Sarah felt the only way to persevere her health would be to immediately transfer residency programs, as Dr. Hobbs expressed that no accommodations could or would be made for her health conditions. The program director also stated that Sarah needed to show certain performance correction involving clinic notes. If the corrections were not made, it was stated that the resident would not be advancing to clinic in a few months. Sarah reached out to the interim chair of the psychiatry department, requesting that adequate supervision be provided to learn the correct templates and documentation, as well as computer skills. The supervision was then provided and after 1.5 hrs of time from the chief residents, the corrections were observed from this resident's work and documented.

    -see email #6

    -see email #7

In addition, Sarah was given 36 hour notice that her schedule would be changing from one that would allow for doctor's appointments to one that would not. Sarah then requested assistance from the ADA office in regards to these concerns. The resident's schedule was changed back to its original rotation where she was allowed to attend appointments.


February 2015 – An email was sent by the clinic scheduler on February 24 listing Diekman as one of the upcoming PGY-3 for clinic. Approximately 2.5 weeks after intervention from the ADA office( April 27) the same scheduler sends an email with Sarah no longer in the pgy 3 group but now with the rising pgy-2.

    -see email #8

    - see email #9

3rd year clinic: Approximately 2.5 weeks after the April scheduling change was intervened upon by the ADA office, Sarah received notification that despite having made the requested corrections to her clinic notes and having successfully disproven 100% of the allegations against her from the chief resident for the performance on the BSU and receiving excellent marks from her official supervision on the BSU, she was informed that she would not be receiving a 3rd year clinic experience. In fact the entire structure of her residency would be different from her same year colleagues and every other resident in the department. Despite needing more practice in clinic and other residents having the opportunity to have this experience, Sarah will be separate into a unique and untested timeline. The entire department is now being informed that this is because of poor performance. There are no provisions or guidelines being put forth to adjust the grading structure to fit the new structure. Sarah will be denied elective opportunities afforded to all other residents due to this scheduling change. It will limit career and learning opportunities and reduce the chances of her passing her board exam.

- See contract given to Sarah by residency director

Additionally Sarah was denied the use of her educational leave days to present a poster she co-authored at the 2015 American Psychiatric Association. Being accepted as a presenter is an honor and a resume booster. Attending the conference is an important educational opportunity. She was denied the used of her education days in May because she had taken a sick leave in Nov/Dec.

-see email #10

Sarah's complaint includes defamation of character and violation of HIPAA by supervisors via misrepresenting medical conditions amongst the department.  Multiple scheduling changes in scheduling were made without regard for the physical disability even though the residency director was aware of the need for accommodations and subsequent physical harm.  From July 2014 to Dec 2014 Sarah experience significant worsening of her chronic medical condition as a result of harassment and intentionally/ knowingly harmful efforts by supervisors under the direct supervision of residency director.  The director then put resident into a double bind: being punished for calling in sick and also telling her that she should not work when she is sick.   An environment of retribution for calling in sick was escalated and supervised by residency director.  This included emails describing the work ethic of those who call in sick and also punishing those who called in sick via punitive scheduling changes.  After calling in for a family death in March, Sarah received a punitive schedule change for the month of April.  Even after informing the residency supervision that this would cause her to either miss doctors' appointments or sacrifice all her vacation and sick leave time.  After the ADA office became involved and allowed resident to return to previously scheduled rotation, the resident experienced retribution in the form of a scheduling change that would separate her from her classmates and deprive her of equal learning opportunity.  This was done under the guise of academic remediation.  The validity of this can be discredited by the concrete change in schedule being justified by changing reasons.  Originally it was problems on the BSU  inpatient rotation that meant that the resident needed to perform more inpatient rotations.  The claims made against the resident were intensely biased and false.  They were successfully disproven.  A second issue that was named was the notes in clinic.  An issue which the resident has attempted to gain superivision an instruction for throughout the year, but due to hostile work environment has not been able to.  The relationship between these clinic notes and the schedule was posed to Sarah as a "pre-probation " correction that needed to be correct by the end of April to advance to the 3rd yr. clinic.  There is evidence that this statement was a manipulation to force Sarah into compliance to correct as resident shortage.  There is a producible witness who was told that Sarah would not be in the clinic and would be the fix in the schedule, only 3 days after this 30 day corrective period began.  The result should not have been deemed at that time, according to what was told to Sarah.  Additionally the clinic schedule showing Sarah was being separated was released 3 days before the "trial" period was set to end.  Additionally, after insisting on teaching resources the described deficits were made with 1.5 hours of instruction.  This instruction was previously not available as the chiefs were neglecting their duties, one of which was to instruct residents on these matters.  It was only after the department intern chair became involved and insisted that education be provided that education was provided.  The chiefs previously said they were performing this duty.  This is a deception which is substantiated by witnesses with similar experience.   A last compliant involves discrimination on the basis of taking medical leave in December prohibiting Sarah from using her educational leave time for an educational and career advancement opportunity in May.   Sarah co-authored and paper and was accepted at the American Psychiatric Association meeting.  She was denied participation be she had taken approved medical leave.  This leave was only necessary after a medical condition was exacerbated by scheduling errors and harassment from supervisions in the fall (see attached timeline).   The APA is a learning opportunity with lectures and teaching that in greatly lacking in this program which is currently under ACGME investigation for its poor education resources.  The APA conference would have been an opportunity to compensate for the education that UF is lacking.  The opportunity was denied to Sarah

because she took a medical leave.   In the past residents only had to miss the APA conference if they were needed at UF to cover the mandatory services.  Sarah was not used to cover any services and asked several times what services she would be covering during this time.  She was held from the educational and career boosting opportunity for the sole reason of having a medical condition that was worsened by the harassment, neglect and retribution of supervisions in the fall. (See attached timeline)

Request for reparation:

1. A letter from residency director composed with supervision from ADA office to the department explaining that harassment for medical conditions is damaging behavior and a disability or medical condition is not the same as a "lazy attitude" or "poor work ethic".  Also superiors talking to subordinates about a medical condition is prohibited
2. Restoration of Sarah to her cohort class
3. ADA and disability harassment training for department supervisors, administration and any attending physicians grading or supervising residents.



**Business Affairs**
Division of Environmental Health & Safety
ADA Compliance

Building 179
PO Box 115055
Gainesville, FL 32611-5055
352-392-1591
352-846-1045 Fax
711 TDD
www.ehs.ufl.edu

June 2, 2015

Dr. Sarah Diekman

Dear Dr. Diekman,

I have reviewed your ADA complaint which was filed on May 22, 2015 and have the following feedback for you. I met with Dr. Jacqueline A. Hobbs (Director, Residency Training Program – College of Medicine) and Dr. Averbuch (Associate Director, Residency Training Program – College of Medicine) on May 28, 2015 to discuss the many issues you raised in your ADA complaint.

The first issue we discussed was your concern that you were being separated from your PGY3 cohort and placed in the PGY4 rotation. During the meeting on May 20, 2015 you shared with me your appointment letter that Dr. Hobbs had sent to you (April 29, 2015 letter). Unfortunately I was not able to give the letter much time during our meeting and it wasn't until after our meeting that I was able to fully read it. The letter states that you will be in the PGY3 rotation on a ½ day basis and you stated that you would be in the PGY4 rotation for the academic year. Yes, you will be taking part in the PGY4 rotation but only on a part time basis. The Clinical Competency Committee met on March 18, 2015 and it was determined by the faculty that due to "significant performance deficiencies and errors, both inpatient and outpatient, that Dr. Sarah Diekman will not progress to the full-time outpatient clinic experience this coming academic year. It was felt that the full-time outpatient experience requires a much higher level of responsibility and independence for patient care than what Sarah is ready for and that she would benefit from further rotations on inpatient and consult-liaison psychiatry as well as the higher level of supervision afforded by these rotations (attending oversight, nursing, etc.). In addition, Sarah will rotate on other required rotations such as forensic and child psychiatry to further broaden her experience and knowledge base. She will continue to have a half-day per week outpatient clinic to sharpen her skills to better prepare her for the full-time outpatient experience that she will pursue in in her final year in the program (PGY-4). Sarah will still progress July 1, 2015 to the PGY-3 level. She will simply have a delay in the full-time outpatient clinic experience. She remains in good standing with the program." (Taken from email note from Dr. Hobbs to Dr. Osfield, June 2, 2015.) Please note the last section where it states you remain in good standing in the program. This information was relayed to you on March 31, 2015 in an in-person meeting and further relayed in a May 1, 2015 letter.

The next issue I discussed with them was your request to attend the APA program and present your paper. Dr. Hobbs denied your request because she felt like you had already been away too

*The Foundation for The Gator Nation*
An Equal Opportunity Institution

UF/Diekman 002951

much and going away to the conference would mean that much more time away from your program. They believe that because you have been out you could not afford to miss more work for a conference. Based on my discussion with Dr. Hobbs she was within her right to deny your request.

I also discussed the emails from Dr. San Kuo Chang and the discussion about your medical condition by Dr. Eisner to other residents in the program. I informed Dr. Hobbs that these types of behaviors cannot be tolerated. The result is that there will be an ADA Training Program for Psychiatry's leadership team (faculty and chief residents) on July 7, 2015 from 12-2pm. The program will be presented by Mr. Jim Gorske (Director of the Disability Resource Center) and me (ADA Compliance Officer). During the program we will both address the basics of ADA and the Rehabilitation Act of 1973 (section 504), the importance for record confidentiality and the procedures for accommodating students and staff with disabilities at the University of Florida.

Finally I recommended that Dr. Hobbs meet with you to discuss your concerns and give both you and Dr. Hobbs and opportunity to start fresh. You have two more years in the program and it is crucial that you voice your concerns about your status in the program and give Dr. Hobbs a chance to respond and explain why they have you split in the two different programs. As noted earlier in this letter "you are in good standing with the program".

As to your reparation requests I have the following responses:
1. There will be an ADA Training Program on July 7, 2015 for the Psychiatry Leadership Team (faculty and chief residents included). During this program both Mr. Jim Gorske (Director of Disability Resource Center) and I will address harassment, medical confidentiality, and accommodating students and staff with disabilities.
2. As it stands now you will still be with your PGY3 cohort for 50% of the program. The department leadership have evaluated you and it their professional opinion that this will allow you to improve on some of the skills that have been assessed as lacking.
3. Your request for an ADA training program has been approved and as noted in #1 above will take place on July 7, 2015.

I have met with Dr. Hobbs on two separate occasions (April 2, 2015 to discuss your accommodation request; and May 28, 2015 to discuss the complaint) and have found her to be very welcoming and forthcoming. Based on the emails you have shared with me I know there are issues in the Department and it is my belief that I will be able to educate the leadership in the department during the ADA session on July 7 about appropriate treatment for students and staff with disabilities. I strongly recommend that you make an appointment with Dr. Hobbs to go over your concerns with her.

Sincerely,

Dr. Kenneth J. Osfield
ADA Compliance Office

Cc:     ADA file (Diekman)