# Exhibit 30

## <u>DECLARATION OF DR. JACQUELINE A. HOBBS</u>

I am Dr. Jacqueline A. Hobbs, a citizen and resident of Alachua County, Florida, over the age of 18.  I am competent to testify to the facts below and do so from personal knowledge and under penalty of perjury.

1.  I am currently the Vice Chair for Education and Residency Training Director for the University of Florida ("UF") College of Medicine's Department of Psychiatry.

2.  I graduated from Indiana University School of Medicine in the M.D./Ph.D. program with my graduate work in microbiology and immunology. I completed my residency in Psychiatry at UF. Upon completion of my residency, I joined the faculty of the UF Department of Psychiatry.

3.  In 2019, I was recognized with the "Service Award" by the Florida Psychiatric Society, the "Outstanding Program Director" by the UF College of Medicine Department of Psychiatry and the Model Curriculum Award by the American Association of Directors of Psychiatric Residency Training Curriculum Committee.

4.  In 2017, I was recognized as the Practitioner of the Year by the Florida Psychiatric Society. Furthermore, I have been recognized as an Exemplary Teacher at the UF College of Medicine in 2010, 2012, and 2014.

5.  I am passionate about teaching and helping to form the next generation of medical professionals. I attempt to work with all of my residents to help them to succeed and become competent doctors.

6.  The philosophy of education in our residency program and in graduate medical education at the UF College of Medicine is based upon the principle of progressively increasing levels of responsibility and independence in caring for our patients as residents advance in the program.

7.   Faculty members closely monitor the progress of each resident in acquiring the skills necessary for advancement to the next level of training. In their evaluation of a resident's progress, faculty members consider such factors as clinical experience, fund of knowledge, diagnostic abilities, clinical judgment, interpersonal and communication skills, professionalism, and the application of various treatment modalities. Residents are evaluated by faculty members and compiled into Milestone Scores.

8.   Each level of training, or postgraduate year (PGY), is defined by a set of competencies that the resident is expected to master. Upon achieving these standards, residents are afforded greater degrees of independence in patient care, at the discretion of the faculty. At all times, however, faculty remains ultimately responsible for all aspects of patient care.

9.   Therefore, effective care and safe treatment are of the utmost importance. Often, our doctors and residents are treating mentally ill, unstable and potentially dangerous patients, so it is very important that procedures are followed for the safety of both our residents and our patients.

10. The Department of Psychiatry Residency Program Manual provides examples of the schedules that residents have, duty hours, on call requirements and the skill/knowledge/attitude objectives of the rotations.

11. Likewise, the UF College of Medicine had a policy that outlined the essential functions of its residency programs. It states that: "In general, individuals must have abilities and skills in five categories: observations, communication, motor, intellectual, behavioral and social." The policy describes, under Behavioral and Social Attributes, that: Candidates must be able to tolerate physically taxing workloads and to function effectively under stress.  They must be able to adapt to changing environments, to display flexibility, and learn to function in the face of

uncertainties inherent in the clinical problems of many patients." This policy accurately describes the essential functions of the residency program.

12. During their PGY1 year, faculty and senior level residents closely supervise residents. Time is equally divided between a rotating internship and psychiatry outlined in the program manual. Through their experiences in primary care, residents sharpen their skills in performing a history and physical, generating a differential diagnosis, ordering and conducting appropriate tests, analyzing test results, conducting emergency assessments, and considering interventions.

13. The medical record, through patient notes entered by medical professionals, is a critically important document. It is essential that the information in the record be accurate, timely and pertinent to the care of the patient. All notes must be completed immediately after the case is completed. All student entries and verbal orders must be countersigned within 24 hours. The program director is periodically provided with a list of residents with delinquent records.

14. Our policies state that failure to resolve these delinquencies promptly will result in suspension of clinical duties. All patient discharge summaries must be completed and dictated within 48 hours after discharge. It is important that the patient notes and discharge summaries be accurate and up to date in case the patient has an emergency or other issue come up in which accurate and up to date notes are vital to patient care.

15. Individuals in the second year (PGY2) of training are expected to perform the duties learned in the first year more independently and may supervise the routine activities of medical students. Second-year residents spend the majority of their clinical time in the outpatient setting. Second-year trainees are afforded greater autonomy in their assessment and treatment of patients. Residents develop psychotherapy skills through both didactics and case supervision.

16. In the emergency setting, residents develop greater skills in rapid assessment and disposition of patients. While on call, residents are afforded greater autonomy and develop confidence in their acute management of psychiatric patients. This makes on call experience vitally important to resident education.

17. All residents in the Department of Psychiatry are issued a beeper at the beginning of their residency. The resident is responsible for insuring that the beeper is functional, has a charged battery and is on during duty hours or while on call.

18. Residents should build upon their skills and utilize knowledge acquired from study. Through the supervision of medical students, residents develop greater teaching skills. Residents complete a yearlong didactic and clinical experience. Upon completion of the second year, residents should have a mastery of the basics of patient care in both the inpatient and outpatient settings.

19. In the third year, residents should be capable of managing the full spectrum of psychiatric disorders with both biological and psychotherapeutic modalities. Residents should demonstrate continued sophistication in the acquisition of knowledge and skills as well as further ability to function independently in evaluating patient problems and developing a plan for patient care.

20. In the outpatient setting, residents learn to apply more advanced techniques in psychotherapy and hone their psychopharmacology skills through experience. On the inpatient services, residents are given greater autonomy and encouraged to assume a leadership role in the treatment team.  Residents are encouraged to teach trainees and medical students as a means of stimulating their own academic progress.

21. As a psychiatric consultant, the PGY3 resident learns the elements of an appropriate response to consultation in conjunction with a faculty supervisor. The third-year trainee draws

upon his/her experiences and knowledge to assist other services in the management of psychiatric patients.  Residents at this level are also given supervisory responsibilities with trainees on call. It is expected that the third-year resident be adept in the use of the literature and routinely demonstrate the ability to research selected topics and present these to the team. At the completion of the third year, residents should be prepared to assume the role of clinical chief on selected services.

22. Individuals in the fourth post-graduate year assume an increased level of responsibility as the chief or senior resident on selected services. Residents at this level may assume greater administrative responsibilities and pursue electives in areas of sub-specialization. The senior resident can apply a full range of psychiatric treatments and should continue to develop an individual style of practice. The fourth year is one of senior leadership and the resident should be able to assume responsibility for organizing their service and supervising junior residents and students.

23. Two Chief Residents in their fourth year are appointed and serve as the primary liaison between the resident body and the administration. Chief residents also assign residents to monthly rotations and on call schedules.

24. After medical school, resident applicants are matched with residency programs in a process where both residency programs and residents rank the other. Even with the resident matching, we prioritize the recruitment of a diverse group of residents each year.

25. I first met Dr. Diekman during the recruiting process for the residency. I found her very likable.

26. Dr. Diekman failed her clinical rotation and USMLE Step 2 CS test at the end of her medical school tenure at the University of Indiana College of Medicine. However, she was able

to eventually pass the rotation and the test in order to join the UF Department of Psychiatry residency program.

27. Dr. Diekman began her residency at UF on July 1, 2013.  For her cohort, UF accepted five female residents and three male residents.

28. Due to the stress, hours, training and emergency situations, it is common knowledge that medical residency programs are considered very difficult programs of study in order to prepare residents for their careers as doctors.

29. Dr. Diekman and all other residents executed a "Letter of Offer to Residents" ("Offer Letter") which outlined many of the responsibilities, conditions of residency, leave, procedures for grievances and dismissal from the program.

30. The Letter of Offer to Residents explicitly stated that a resident should contact the "UF ADA Office at 392-7056" if seeking "reasonable accommodations to the known physical and mental limitations of otherwise qualified individuals with disabilities."

31. We attempt to make sure we promulgate all of our policies to our residents and do so with our ADA accommodations policy. Dr. Diekman and all residents signed Offer Letters and agreed to the policies when starting the program.

32. Dr. Diekman was also provided the UF Department of Psychiatry Residency Program Training Manual ("Program Manual") which provided more detail of the subjects discussed in her Offer Letter and a synopsis of the residency program curriculum.  On June 27, 2013, before starting the program, Dr. Diekman signed and agreed that she "received a copy" of the Program Manual and Graduate Medical Education policies "or are aware of where to locate this information AND that you are responsible for the contents."

33. Dr. Diekman had a relatively uneventful first year in the residency program. However, we began to see signs early that she was struggling with some tasks.

34. On October 31, 2013, I was alerted by Dr. Almari Ginory ("Dr. Ginory") that Dr. Diekman had deficient patient notes and had used the wrong template for her patient notes on three occasions. I reviewed the notes and counseled Dr. Diekman in her patient note taking especially with improving her rationale for patient decisions.

35. On December 18, 2013, I was again alerted that Dr. Diekman was deficient in two patient notes and instructed Dr. Diekman to complete her deficient notes.

36. In May 2014, I received some significant feedback on Dr. Diekman's performance from faculty attendings and residents including deficient and incomplete patient notes and failing to check in with attendings.

37. On May 28, 2014, Dr. Ginory copied me on an email to Dr. Diekman. In the email, Dr. Ginory provided the call logs of the unanswered calls or pages for consults to Dr. Diekman on several occasions. Dr. Diekman failed to respond to these pages or calls.

38. In and around June 1, 2014, Dr. Diekman failed to staff child cases while on call. I was alerted that Dr. Diekman failed to answer her pager once again. After the incident, I spoke with Dr. Diekman who stated that she was sorry for what seemed like poor performance. Dr. Diekman explained that she was going through a lot personally and that it is not the norm for her. Chief Resident Dr. Adrienne Eisner was upset due to Dr. Diekman's failure to respond to her pages. However, I encouraged her to speak with Dr. Diekman and try to help her.

39. On July 11, 2014, Dr. Sarah Fayad ("Dr. Fayad") sent me an email documenting Dr. Diekman's failure to know what was going on with her patients in rounds as she was missing big issues such as what medications the patient was taking, why they were admitted and what is

wrong with them. As a result, Dr. Diekman was excused from her rounds on two separate occasions. In the email, it stated that Dr. Diekman expressed that she "just doesn't take the time to thoroughly review" the files. Dr. Fayad wrote, "Her performance is very poor." There were also issues once again with her notes. This email once again raised issues that were very concerning to me at the time.

40. On July 29, 2014, I met with Dr. Diekman. Dr. Fayad and Dr. Ginory were present at the meeting. The meeting was generally about her performance issues during her most recent rotation. We discussed with Dr. Diekman many of the issues with her deficient and tardy patient notes. Dr. Diekman expressed that her biggest issue was time management. She did not raise any issues related to parking concerns or her health. She did speak about her dyslexia. I summarized the meeting for my files on August 1, 2014.

41. There were additional concerns sent to me by email on August 16, 20, and 25 concerning Dr. Diekman's performance including Dr. Diekman failing to respond to six pages/calls and poor presentations of patients.

42. On September 15, 2014, Dr. San Chang, one of the two chief residents at the time, wrote me an email documenting that Dr. Diekman failed to complete her progress notes on six patients for the day. Furthermore, Dr. Diekman made a mistake with a medication order and did not complete a discharge order on time.

43. In and around October 2014, I first remember hearing about Dr. Diekman having a parking issue. She had contacted the General Counsel's office which forwarded the issue to the ADA office. The ADA office was taking care of the issue for Dr. Diekman.

44. On October 18, 2014, Dr. Dawn Bruijnzeel sent me an email stating that Dr. Diekman continues to be disorganized and unable to present clinical information about patients in a coherent manner.

45. On October 24, 2014, Dr. Fayad sent me an email with unsatisfactory discharge summary. I responded to Dr. Fayad encouraging her to provide Dr. Diekman with direct feedback. I also explained that I believed that Dr. Diekman had the talent to do well and would speak to her about her performance issues.

46. On October 17 and 31, 2014, Dr. Diekman called out sick causing major coverage issues for those working due to being shorthanded.

47. On October 31, 2014, Dr. Diekman emailed me stating, "Dr. Hobbs, Is there a time we can meet next week to discuss some issues surrounding my chronic medical conditions and work? I am really struggling. Not having my parking pass and working 3 rounds of night float during the worst time of year for me has really taken a tole. I thought my health would be better by now but it continues to worsen.  I am having to call off frequently and it is not fair to the chiefs and the people who have to cover for me. I will have a discussion with my one of my doctors today but I am maxed out on most of my medications and have been getting side effects from the high doses I am already on.  I think I may have to take a medical leave of absence.  I don't know what else to do."

48. This was the first time that Dr. Diekman or myself mentioned a leave of absence. On the same day, I responded with "Hi, Sarah, sorry you are not feeling well. Why don't you call me either this afternoon or this weekend after you have talked to your doctor."

49. On November 9, 2014, Dr. Joel Fernandez emailed me stating that Dr. Diekman's notes were limited and incomplete. He also explained that Dr. Diekman mistakenly told him a patient

was taking all of the medications prescribed but the patient was not. This resulted in the patient's blood pressure and glucose running dangerously high. Dr. Diekman also failed to transfer medications on a patient which was also very dangerous.

50. By this point on November 9, 2014, I had at least three sit-down discussion with Dr. Diekman to go over concerns. The complaints from attendings and residents had added up to a point that I was very concerned for her both professionally as a resident and personally.

51. On November 20, 2014, I was cc'd on an email from Dr. Ginory to Dr. Diekman alerting Dr. Diekman that her patient notes were once again delinquent from the previous week.

52. On November 23, 2014, I emailed Dr. Diekman about an issue in which she failed to respond to a page for a consult. As a result, a patient was left waiting for 1.5 hours. Dr. Diekman also did not document the calls and failed to sign out of her cases for the day.

53. On November 24, 2014, Dr. Diekman spoke to me to discuss the situation after visiting her doctor on November 20, 2014. Dr. Diekman discussed the potential of transferring residencies due to the workload because she did not think it would be as heavy as it was. At this time, Dr. Diekman confirmed with me that her parking issue had been solved. However, Dr. Diekman said that she has not been able to remain compliant with physical therapy ("PT") that she required to remain functional. Dr. Diekman said that if she did go to PT, it took her 2 days to recover before she could stand up.

54. Dr. Diekman stated that she is "too sick and can't catch up", that she "can't work extra hours" and that she has been "worried since the start of residency" that something like this would happen. She had told me in a previous conversation and re-confirmed today that even when she is on "lighter" rotations, she is not able to comply with her PT.

55. From what I recall, Dr. Diekman had also used all or nearly all of her paid leave. Normally, a resident gets 15 days of annual leave. They also will have 10 days of sick leave.

56. I suggested that she take a medical leave, as she had initially discussed, to allow her more time to concentrate on her recovery including going to PT on a regular basis so that she could come back to work in better physical health and hopefully better able to work to the necessary level. She also agreed to this. We discussed a plan in which she would begin her leave immediately in November and would be out until January 1.

57. I confirmed that the medical leave would be paid leave. At the time, I also discussed with Associate Dean, Dr. Michael Mahla, the potential of Dr. Diekman being offered part-time upon her return if she wanted more flexibility to accommodate her. For example, she could work for two weeks and then take off two weeks to re-cooperate as she needed. However, if residents are unable to work beyond typical leave, they must make up those hours before eligibility to graduate from the program. It is important for residents to gain the experience necessary to be an effective and competent doctor. Therefore, Dr. Diekman's residency would be extended.

58. On December 18, 2014, I checked in with Dr. Diekman by phone to see how she was doing. I offered Dr. Diekman the option of returning to the program part-time upon her return and asked her to consider it. Dr. Diekman responded the next day and declined my offer of part-time work saying she believed she could do the full-time schedule.

59.  Dr. Diekman returned full-time to the program in January 2015. Dr. Diekman requested permission to attend a conference her first week back from leave. However, I believed that she needed to return to work and not fall further behind by taking another week off at a conference. Likewise, due to her poor academic performance and clinical progress, I felt that she needed to

remain in the clinical setting to work to improve her performance rather than attending a conference. Furthermore, there would be future opportunities to attend a conference.

60. On February 15 and 16, 2015, Dr. Diekman copied and pasted two patient notes. This is a dangerous practice that can lead to errors in patient care. Dr. Diekman did not respond to phone calls from Dr. Chang concerning a meeting to discuss the issue. I was alerted of the issue through an email from Dr. Joseph Thornton on March 9, 2015.

61. On March 12, 2015, Dr. Eisner alerted me that Dr. Diekman's discharge summaries were once again tardy.

62. On March 17, 2015, Dr. Diekman failed to check her emails concerning patient who were waiting to meet with a doctor. One patient asked to speak with someone concerning the issue of not being able to meet with a doctor.

63. On March 21, 2015, Dr. Diekman had failed to complete a required administrative task concerning a training module. Dr. Diekman had received numerous reminders to complete the training module. I asked Dr. Diekman: "You seem to be struggling with administrative tasks. Can you please tell me what is preventing you from completing this and other items in a timely fashion?" She did not respond to my recollection.

64. On March 26, 2015, Dr. Diekman had failed to log over 500 of her patient cases into the system. This was a major deficiency in her file and another major issue.

65. On March 27, 2015, nurses complained concerning Dr. Diekman and her failure to complete discharge summaries within 48 hours. Dr. Diekman also ordered the wrong amounts of medication and vitamins for patients. Nurse, Gloria Jeanne Barker, wrote an email to me stating that "I have been here over a year and this is the first problem ever that I am aware of" concerning residents.

66. On March 30, 2015, Dr. Ginory sent me additional deficient patient notes entered by Dr. Diekman. I alerted Dr. Diekman that I needed to meet with her. The performance issues with Dr. Diekman had progressed to a point that they needed to be addressed for her benefit and the benefit of our patients.

67. The Clinical Competency Committee ("CCC") met and discussed Dr. Diekman. The CCC's duties include review of all resident evaluations at least semi-annually, preparing and assuring the reporting of Milestones evaluations of each resident semi-annually to Accreditation Council for Graduate Medical Education ("ACGME"), and advising the program director regarding resident progress, including promotion, remediation, probation, non-renewal, and dismissal.

68. Due to Dr. Diekman's performance issues, it was determined by the CCC that Dr. Diekman would begin Special Observation Status, also known as the pre-probation process, with the purpose of providing additional support and supervision to residents with performance issues but does not impact academic standing. The pre-probation process is implemented to help residents to improve due to significant performance deficiencies and errors, both inpatient and outpatient. Likewise, it was determined that Dr. Diekman should not progress to the full-time outpatient clinic experience in her third year. The CCC felt that the full-time outpatient experience required a much higher level of responsibility and independence for patient care than what Dr. Diekman was ready for and that she would benefit from further rotations on inpatient and consult-liaison psychiatry as well as the higher level of supervision afforded by these rotations (attending oversight, nursing, etc.).

69. In addition, the CCC decided that Dr. Diekman would rotate on other required rotations such as forensic and child psychiatry to further broaden her experience and knowledge base. The

CCC also decided that Dr. Diekman would continue to have a half-day per week outpatient clinic to sharpen her skills to better prepare her for the full-time outpatient experience that she was to pursue in in her final year in the program (PGY-4).

70. On March 31, 2015, I met with Dr. Diekman concerning her Special Observation Status. Dr. Diekman was upset about her reassignment of her rotation from the Veterans Administration Emergency Room ("VA ER") Service. Dr. Diekman did not seem to understand that the reassignment was directly related to patient care concerns. Dr. Diekman appeared very distressed, very anxious and said she needed to take time off from service the following day. She also expressed to me that she thought she had made the wrong decision to be a doctor of psychiatry because she did not feel cut out for the type and amount of work.

71. On April 1, 2015, Dr. Diekman once again had deficient patient notes and discharge summaries that were brought to my attention. However, I was alerted by Dr. Kenneth Osfield in the ADA Office that Dr. Diekman had made a formal request for accommodation.

72. On April 2, 2015, I met with Dr. Diekman, Dr. Osfield, and Dorothy McCallister concerning Dr. Diekman's accommodation requests. Dr. Diekman and I came to an agreement on the accommodations. This included switching her back to the VA ER rotation. This was the first time that Dr. Diekman ever formally requested an accommodation that I was aware of.

73. In an email sent on April 2, 2015, Dr. Diekman expressed that this "more than covers my problem."

74. On April 13, 2015, Dr. Richard Holbert sent me an email concerning Dr. Diekman not knowing the correct dosage of medication for a patient.

75. On April 29, 2015, I met with Dr. Diekman concerning a more in-depth plan related to her third and fourth years of residency.

76. On May 28, 2015, I met with Dr. Osfield concerning an ADA Grievance filed by Dr. Diekman. I agreed to do ADA trainings for our incoming chief residents and leadership in July at the suggestion of Dr. Osfield.

77. However, Dr. Diekman continued to have performance issues in the residency.

78. On July 15, 2015, Dr. Diekman had concerns about her schedule and ability to take her medications.

79. On July 17, 2015, I responded to Dr. Diekman about her concerns and accommodated her. On July 20, 2015, Dr. Diekman sent me an email thanking me for my "time and consideration you gave to orchestrate a plan regarding the medication issues I have in the context of the residency work program." Dr. Diekman said she had "confidence" in the plan and "appreciate your help."

80. I always attempted to support Dr. Diekman so that she may succeed in the program.

81. Following poor evaluations from Dr. Fayad, Dr. Ginory, and Dr. Stephen Welch for her rotations during July and August 2015, it was clear the Dr. Diekman's performance had not improved. Dr. Diekman was placed on probation on September 4, 2015. Evaluations stated that Dr. Diekman was a safety risk and was not functioning at the level of a third-year resident. On September 3, 2015, a remediation plan with terms of probation was provided to Dr. Diekman with her specific performance deficiencies and very detailed goals and expectations during the three-month probation period in order to stay in the program. There were also deadlines for the completion of certain tasks.

82. I wanted to support Dr. Diekman and help her to remediate her performance issues. However, to start her probation, Dr. Diekman failed to set a required meeting with Dr. Hobbs that was to occur weekly. She failed to review her clinic notes with Dr. Ginory. Dr. Diekman

failed to submit a pre-rounding checklist initially. When submitted, the checklist was over two weeks late.

83. Dr. Diekman failed to provide patient notes to review with me as required on September 30, 2015. Nurse, Patty Hedley complained to me that she had a lot of trouble reaching Dr. Diekman to see patients.

84. On October 13, 2015, Dr. Richard Holbert ("Dr Holbert") provided me feedback on Dr. Diekman's rotation with him saying that she is slow to accept feedback and inflexible in her thinking. She was a safety concern to him and did not follow directions to leave a workstation. Dr. Diekman had to be escorted out of the workstation for her own safety. She also did not see all of her patients to complete her work.

85. On October 20, 2015, I spoke with Dr. Holbert who expressed that during Dr. Diekman's rotation with him that month, Dr. Diekman could not properly judge whether a patient was becoming more agitated or not. Often, we deal with unstable and potentially dangerous patients. As a result, Dr. Holbert had to round with her because Dr. Diekman was a major safety concern to him.

86. On October 23, 2015, a resident complained about Dr. Diekman passing work off to him. He asked that it be documented by the Chief Residents. Dr. Holbert emailed me explaining that Dr. Diekman did not have much work to do but was not meeting with all her patients as she should be.

87. Dr. Diekman continued to struggle writing consistent and adequate patient notes. Instead, Dr. Diekman would use a lot of boilerplate language that was not detailed enough to ensure patient care and safety.

88. On October 27, 2015, Dr. Diekman again failed to bring a note for us to review as required by her remediation plan. I reminded her to review her remediation plan frequently and ensure that she follows the plan consistently and completely.

89. Dr. Diekman continuously failed to report her time during her afternoon shifts and did not show up to work on September 9, September 23, October 5, October 20 and October 27 which resulted in the rescheduling of two of our meetings.

90. On October 29, 2015, Dr. Uma Suryadevara raised another safety concern for Dr. Diekman due to her handling of a patient. Dr. Diekman also wrote an email concerned for her own safety due to her interactions with that same patient. I was also worried about Dr. Diekman's safety and outlined some ways to make sure she was safe.

91. Dr. Diekman struggled to meet the expectations set out in her probation remediation plan. Dr. Diekman continued to be a safety concern for her faculty and attendings as they worried both for her safety and the safety of patients.

92. On November 12, 2015, Dr. Diekman made a second accommodation request and entered the interactive process. I met with Dr. Diekman and Dr. Osfield concerning her requests on November 19, 2015. We accepted nearly all of her requests for accommodation. However, Dr. Diekman sought to change her schedule permanently to 8 am to 5 pm with no on call. This was not deemed as reasonable because, in our academic opinion, Dr. Diekman would fall even further behind in her education as a result of reduced hours. It would also put an undue burden and fundamentally alter the learning experiences of the other residents.

93. I had previously offered the option of part-time work on several occasions to Dr. Diekman in which she could gain the experience necessary to complete the program while also having time to manage her disability. However, Dr. Diekman declined that accommodation. In

the end, the residency's goal is to prepare residents who can pass their residency board exams and become competent doctors who can safely treat patients. Dr. Diekman needed to work the necessary hours to be able to safely and effectively treat patients. To my knowledge, Dr. Diekman failed to follow up and sign the agreed accommodations.

94. On November 17, 2015, I met with Dr. Diekman and Dr. Ginory. Dr. Diekman continued to use boilerplate language in her notes which we again warned her about. There was also a lack of consistency in her notes and rationale.

95. On November 23, 2015, I met once again with Dr. Diekman and Dr. Ginory. I reviewed three of her clinical patient notes. On one patient evaluation note, Dr. Diekman had three entire sections missing without explanation. There were very few details concerning medication or tests done and the note lacked necessary information that could threaten the patient's health and safety. She also failed to properly code most of her notes.

96. At the meeting, I reminded her to carefully review her probation letter and her remediation checklist assignments to make sure she was completing all items in a timely fashion. Dr. Diekman did not appear to be particularly concerned about the probation letter and remediation items. Her lack of concern for the remediation plan was unexpected to me at the time but was that way throughout the three-month period.

97. Following this meeting, Dr. Ginory once again informed me that Dr. Diekman had never contacted her to review any of her notes as required in her probation letter and remediation plan. Likewise, after reviewing her notes during the probation period, her outpatient notes were late for 24 different notes.

98. On November 24, 2015, the CCC met and discussed Dr. Diekman. After reviewing the evaluations and Dr. Diekman's progress on her remediation plan, the CCC voted unanimously to

dismiss her from the residency program. The CCC determined that Dr. Diekman was operating at the same subpar level as pre-probation and that patient safety was the primary concern for her dismissal. The CCC further determined that Dr. Diekman could not perform at a level required of a resident assigned to the outpatient clinic because she requires full-time monitoring by attendings. The CCC also found that safety was also a factor for her in that her lack of competence and inability to recognize dangerous situation put her at risk of serious harm.

99. I drafted a dismissal letter dated December 4, 2015 and sent it to Dr. Diekman. The letter went through each of the outlined deficiencies and goals from the probation letter with its remediation plan. I discussed Dr. Diekman's performance on each of the goals and deadlines from the remediation plan in extensive detail.

100.    However, unfortunately, on December 3, 2015, our safety concerns for Dr. Diekman were realized as Dr. Diekman was seriously injured.

101. Dr. Diekman was not discriminated against due to her sex at any time during her residency. Dr. Diekman's sex was never a consideration and we did not treat the male residents better than Dr. Diekman in any circumstance. Male residents were not scheduled for easier rotations. We are very proud of the female leadership in the UF Department of Psychiatry including myself and the Chair of the Department of Psychiatry, Dr. Regina Bussing. Dr. Diekman's sex was not a factor at all in her residency training.

102. Dr. Diekman's medical history was not discussed in detail with the CCC due to confidentiality, privacy and HIPAA issues. However, the purpose of the CCC is to evaluate the performance of residents whether they have accommodations or not.

103. Dr. Diekman alleges comparators in the program. She alleges that Dr. Daniel Pietras ("Dr. Pietras") was a comparator. However, Dr. Pietras' situation was not comparable at all to

Dr. Diekman. First, Dr. Pietras did not threaten to "blow up" a hospital. That is a rumor that circulated among residents. It is not true. However, Dr. Pietras did have some personal and mental health issues he needed to deal with. As a result, Dr. Pietras was referred to Professionals Resource Network ("PRN") to deal with those issues. However, Dr. Pietras returned from PRN, worked hard to overcome his issues, and had no issues that impacted his performance from that point on. Dr. Pietras was never placed on probation by the CCC. Dr. Pietras had good evaluations from his attendings after his return from PRN. Dr. Pietras performed well in the program following his return from PRN.

104. Dr. Diekman alleges that Dr. Wagdy Khalil ("Dr. Khalil") was a comparator. Dr. Khalil and Dr. Diekman's situations are not comparable at all. Although, Dr. Khalil did have medical students to do some notes for him, he was subsequently reprimanded for the act and warned not to do it again or risk going through formal disciplinary procedure. However, following this incident, Dr. Khalil had no further issues and did not make the mistake of allowing medical students to do his patient notes again. Dr. Khalil was never placed in pre-probation or probation by the CCC. Dr. Khalil performed well following the incident and, to my knowledge, did not violate any rules again.

105. Dr. Diekman also alleges that there were other comparators who did not pass the United States Medical Licensing Exam (USMLE) Step 3 exam. Although Dr. Diekman could not provide the names of any individuals, if an individual matriculated through our program they eventually passed all of their exams in order to become a licensed practitioner.

106. As for Dr. Vikram Vaka ("Dr. Vaka'), who Dr. Diekman mentions as a possible comparator, he had positive evaluations throughout his training in the program. Dr. Vaka never needed to be placed in pre-probation or probation by the CCC. Dr. Vaka never had any serious

performance issues and graduated from the program in good standing after passing his Step 3 exam.

107.  The alleged harassment complaints in this lawsuit had no impact upon the decision to remove Dr. Diekman from the program. Dr. Diekman's complaints about her disability had no impact upon the decision to remove Dr. Diekman from the program. I did not witness Dr. Chang ever treat Dr. Diekman poorly. I did not witness any other attending or resident harass or treat Dr. Diekman poorly. I was not aware of Dr. Diekman's allegations concerning Dr. Averbuch. Nonetheless, Dr. Averbuch was not even present to vote or discuss Plaintiff's performance at the CCC meeting in which Dr. Diekman was terminated.

108.  I never changed or altered Dr. Diekman's Milestone evaluations. Faculty enter their evaluations independently which could change the overall scores until all faculty have entered their evaluations.

109.  Psychiatric Resident In Training Examination (PRITE) is used as one factor, among many, for assessing the competency of a resident but the primary objective of the examination is to provide educationally useful feedback. Dr. Diekman did receive a score correlating to a passing score on one section (Psychiatry) of the PRITE but correlated to a failing score on the other section (Neurology). Both sections are required to be passed on board examinations.

110.  Dr. Diekman never raised concerns with me about billing. To my knowledge, there was no fraudulent billing by anyone involved with the residency program.

111.  The ACGME did not find there was any merit to her complaint and allegations filed on April 18, 2016, following her removal from the residency program. Dr. Diekman's ACGME complaints did not have any impact on the decision to remove her from the residency program.

112.  When making the decision to remove Dr. Diekman from the residency program on November 24, 2015, I was unaware that Dr. Diekman had filed a Charge of Discrimination with the Equal Employment Opportunity Commission. It is my understanding that no members of the CCC had knowledge that Dr. Diekman had filed a Charge of Discrimination. As a result, Dr. Diekman's Charge of Discrimination had no impact on the decision to remove her from the program.

113.  I declare under penalty of perjury that the foregoing is true and correct.


Executed on the __30__ day of August, 2020.


_____
Dr. Jacqueline A. Hobbs