# Exhibit 31

## DECLARATION OF DR. KENNETH J. OSFIELD

I am Dr. Kenneth J. Osfield, a citizen and resident of Alachua County, Florida, over the age of 18. I am competent to testify to the facts below and do so from personal knowledge and under penalty of perjury.

1. I am currently retired.

2. Although under different titles, I served as the head of the ADA Compliance Office at the University of Florida ("UF") from 1989 until my retirement in 2019.

3. While at UF, the ADA Office and UF made it a priority to disseminate and promulgate its ADA accommodation policy.

4. In order to receive an accommodation, UF Health medical residents and employees are told to request an accommodation through the ADA office. The ADA Office makes an initial review of the accommodation requests and makes notes of any additional documentation that is needed to move forward.

5. A meeting should take place separately with all parties in order to engage in an interactive process to accommodate the student or employee.

6. A written response will be provided for each request once the interactive process is concluded. The disposition of each request will be either approved, modified, or, denied with reasons. Any denial of accommodation as unreasonable is reviewed by the ADA Office.

7. In order to be effective, the agreed upon accommodations must be signed by all parties involved.

8. I first came to know about Dr. Sarah Diekman on or about October 7, 2014. I was forwarded a concern by UF's General Counsel's office from Dr. Sarah Diekman concerning disabled parking at that time.

9. Dr. Diekman had been accommodated with a decal restricted disability parking space near the College of Medicine and Shands UF Hospital. Dr. Diekman wanted a closer spot to Shands UF Hospital.

10. UF students and employees seeking a disabled parking space are also given the opportunity to park in any disabled or decal-restricted space on campus. Students and employees seeking an accommodation are provided the disabled parking decal for the same price as the lowest cost decal available.

11. Parking issues are within the purview of Parking and Transportation Services, not the individual programs or colleges.

12. Within my role in the ADA Office, I would work with Parking and Transportation Services on accommodations if necessary.

13. Parking is notoriously difficult for all University of Florida students and employees. Many UF employees must park far from their offices and take the public transportation busses or walk a long distance to their offices. Most students must park their cars at a considerable distance from their classes or living arrangements if on campus. A large proportion of students take the public transportation busses or attempt to live within walking distance of campus.

14. I met with Dr. Diekman on October 9, 2014. I spoke to her about the opportunity to use the Gator Lift Service. Gator Lift provides a reliable, convenient and free shuttle service to accessible locations within the boundaries of the campus of the University of Florida for students, faculty, and staff with temporary or permanent mobility-related disabilities. As an accommodation, Gator Lift will take students or employees directly from their cars to the entrance of any UF building. Gator Lift is available only to students, faculty and staff with mobility-related disabilities as another accommodation and can be reserved and scheduled.

15. Dr. Diekman was not interested in Gator Lift. I also explained to Dr. Diekman that she could get an electronic wheelchair or scooter so she did not have to walk but Dr. Diekman expressed that she did not want to transport the wheelchair on her car.

16. It was my understanding that Dr. Diekman did not want other students or doctors to know that she was disabled.

17. I worked with the Transportation and Parking Services to move Dr. Diekman's disabled parking space slightly closer to an entrance of UF Shands Hospital. I offered Dr. Diekman a spot in Garage II which is a patient and visitor area for UF Shands Hospital across from the Dental Wing. I sent Dr. Diekman an email on Monday, October 13 with the option. I followed up on October 14, 2014.

18. Dr. Diekman was agreeable to her sparking space being moved to Garage II on October 14, 2014. I contacted Ronald Fuller at Parking and Transportation Services to help get the parking space changed. However, the new spot was also farther from the Psychiatry Department located in the McKnight Brain Institute Building.

19. By October 15, 2014, Plaintiff was able to park in the Garage II which was typically exclusively for patients and visitors. The parking space was directly next to an elevator. The garage attendant, who normally collects payment for visitors to enter the garage, was alerted of Dr. Diekman's new reserved parking space and allowed Dr. Diekman in the garage without payment.

20. After working with her on the parking accommodation in October 2014, I did not hear from Dr. Diekman again until she sent me an email on March 30, 2015. In her email, she stated, "I am a pyg 2 in the psychiatry department whom should have contacted you earlier per the advice of the HR department but I have been drowning under a mountain of paperwork and

27. I met with Dr. Hobbs on May 28, 2015, to discuss the ADA Grievance. I found her very professional, welcoming and understanding.

28. In my response to Dr. Diekman concerning her ADA Grievance on June 2, 2015, I explained that The Clinical Competency Committee ("CCC"), who oversees residents' progress in the psychiatry program, met on March 18, 2015 and it was determined by the faculty that due to "significant performance deficiencies and errors, both inpatient and outpatient, that Dr. Sarah Diekman will not progress to the full-time outpatient clinic experience this coming academic year. The CCC felt that the full-time outpatient experience requires a much higher level of responsibility and independence for patient care than what Dr. Diekman was ready for and that she would benefit from further rotations on inpatient and consult-liaison psychiatry as well as the higher level of supervision afforded by these rotations (attending oversight, nursing, etc.).

29. In addition, the CCC decided that Dr. Diekman would rotate on other required rotations such as forensic and child psychiatry to further broaden her experience and knowledge base. The CCC also decided that Dr. Diekman would continue to have a half-day per week outpatient clinic to sharpen her skills to better prepare her for the full-time outpatient experience that she was to pursue in in her final year in the program (PGY-4). Dr. Diekman was still set to progress July 1, 2015 to the PGY-3 level but was going to be delayed in the full-time outpatient clinic experience due to safety and performance issues. At the time, Dr. Diekman remained in good standing with the program.

30. Due to safety and performance concerns, it was within the rights of the Clinical Competency Committee to make this decision that Dr. Diekman needed more experience before advancing to outpatient clinics but that Dr. Diekman remained in good standing with the program.

31. Likewise, I explained to Dr. Diekman that it was within Dr. Hobbs' rights to deny Dr. Diekman a week of leave to attend the American Psychiatric Association conference because Dr. Hobbs, in January 2015, did not think Dr. Diekman could "afford to miss more work for a conference. Finally, Dr. Hobbs agreed to do an ADA Training Program on July 7, 2015 for all faculty and chief residents.

32. On July 15, 2015, Dr. Diekman was again concerned about her ability to physically function while completing her work rotation because of a change in the rotation timing which made it difficult for her to take her medications with food. The rotation timing was slightly changed due to construction at the hospital which moved the consult room. She said, "This is not a casual issue for me. It is a major issue of functioning." Dr. Diekman contacted Dr. Hobbs and me about the situation.

33. On July 17, 2015, Dr. Hobbs responded to Dr. Diekman and me about Dr. Diekman's concerns. On July 20, 2015, Dr. Diekman thanked Dr. Hobbs for her "time and consideration you gave to orchestrate a plan regarding the medication issues I have in the context of the residency work program." Dr. Diekman said she had "confidence" in the plan and "appreciate your help." Dr. Diekman said she would follow up with me about the issues.

34. However, I did not hear from Dr. Diekman again until October 8, 2015, when she asked for a copy of her accommodation request form from April 2, 2015.

35. On October 13, 2015, Dr. Diekman informed me that she had secured an attorney and wanted to "fill out a new ADA accommodations form." I responded the same day.

36. On November 12, 2015, Dr. Diekman sent an accommodation request form to me and Dr. Hobbs and asked to set a meeting about the requests. Dr. Hobbs responded the same day. I responded with my availability. A meeting time was agreed upon for November 18, 2015.

37. On November 18, 2015, a meeting took place in which we discussed the requested accommodations and agreed to accommodations for Dr. Diekman including set hours, set breaks and a time to eat during her rotations when she needed to take her medications, a rollator padded seat walker, and other accommodations. The accommodation agreement was sent to Dr. Diekman on November 23, 2015.

38. In order for an accommodation agreement to be implemented, all parties must execute the agreement. I signed the accommodation agreement on November 24, 2015. Dr. Hobbs signed the accommodation agreement on December 2, 2015. Although I followed up with Dr. Diekman on December 2, 2015 and January 19, 2016, Dr. Diekman failed to sign the accommodation agreement. As a result, the accommodations were never put into effect or implemented.

39. Likewise, on January 19, 2016, Dr. Diekman alerted me that she had been seriously injured and was no longer working. Likewise, Dr. Diekman alerted me that she had been dismissed from the program.

40. Throughout the period in which I worked with Dr. Diekman, I did not witness anything I perceived as discrimination against Dr. Diekman due to her sex or her disability. Furthermore, Dr. Hobbs was very professional and courteous in all of my interactions with her.

41. I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 20 day of August, 2020.

*Dr. Ken Osfield*