Exhibit 34

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

---------------------------------x
SARAH DIEKMAN,
an individual,
      Plaintiff,
vs.                              CASE NO.:  1:19-cv-00227-AW-GRJ

UNIVERSITY OF FLORIDA,
a Florida municipal corporation,
      Defendant.
---------------------------------x


DEPOSITION OF SAN KUO CHANG, MD
(Conducted Via Videoconference)


DATE:              June 26, 2020
TIME:              1:00 p.m. to 2:25 p.m.

PURSUANT TO:       Notice by counsel for Plaintiff for
                   purposes of discovery, use at
                   trial or such other purposes as
                   are permitted under the Florida
                   Rules of Civil Procedure

REPORTER:          J. Gay Smith, RPR, RMR, FPR
                   Notary Public, State of Florida

Pages 1 - 50

Page 2

```
 1  APPEARANCES:
 2      ANDREW J. SALZMAN, ESQUIRE
         Unice, Salzman & Jensen, P.A.
 3       Patriot Bank Building, Second Floor
         1815 Little Road
 4       Trinity, Florida  34655
            Attorney for Plaintiff
 5
         DAVID E. CHAUNCEY, ESQUIRE
 6       Alexander DeGance Barnett
         1500 Riverside Avenue
 7       Jacksonville, Florida  32204
            Attorney for Defendant
 8
 9
10
11              I N D E X
12  DIRECT EXAMINATION BY MR. SALZMAN       Page   3
13  STIPULATION                              Page  48
14  CERTIFICATE OF OATH                      Page  49
15  REPORTER'S CERTIFICATE                   Page  50
16              E X H I B I T S
17  Plaintiff    Description              Marked
18  Exhibit 1    12-29-2014 email from Dr. Chang  Page  18
19  Exhibit 2    UF ADA Grievance Procedure      Page  43
20
21
22
23
24
25
```

Page 3

```
 1              P R O C E E D I N G S
 2         THE COURT REPORTER:  The attorneys participating
 3    in this deposition acknowledge that I, the court
 4    reporter, am not present with the witness and that I
 5    will be reporting the proceedings and administering
 6    the oath remotely.  This arrangement is pursuant to
 7    the Florida Supreme Court Administrative Order No.
 8    AOSC-20-23.  The parties and their counsel consent to
 9    this arrangement and waive any objections to this
10    manner of reporting.  Please indicate your agreement
11    by stating your name and your agreement on the record.
12         MR. SALZMAN:  Andrew Salzman, attorney for the
13    plaintiff, Sarah Diekman.  I agree.
14         MR. CHAUNCEY:  Dave Chauncey on behalf of the
15    University of Florida.  We agree.
16         DR. CHANG:  San Kuo Chang.  I agree.
17              SAN KUO CHANG, MD,
18    the witness herein, being first duly sworn on oath, was
19    examined and testified as follows:
20              DIRECT EXAMINATION
21  BY MR. SALZMAN:
22    Q   Please state your full name for the record.
23    A   San Kuo Chang.
24    Q   And you are a medical doctor?
25    A   Yes.
```

Page 4

```
 1    Q   And in what specialty?
 2    A   In psychiatry.
 3    Q   Doctor, have you ever had your deposition taken
 4  before?
 5    A   No.
 6    Q   Just a few general rules.  The court reporter
 7  that you were sworn in by will be taking down our
 8  conversation, so we need to make sure that we can make it
 9  clear on the record.  So, number one, you need to make sure
10  that you answer affirmatively.  People tend to say "Uh-huh,
11  huh-uh."  So we just need a "Yes" or "No," or however you
12  want to answer.
13        Also, I will try to not talk over you, so I'll
14  try to let you finish your answer, and just please let me
15  finish my question.
16        If you do not understand my question, please ask
17  me to rephrase it.  I'm not here to try to trick you.  I'm
18  just here to get some information.  Okay?
19    A   Okay.
20    Q   Thank you, Doctor.
21        Doctor, where are you currently employed?
22    A   I'm currently employed at BayCare Health Systems.
23    Q   And that's in Pinellas County?
24    A   Yes.
25    Q   And so how long have you been employed by
```

Page 5

```
 1  BayCare?
 2    A   Since end of 2016.
 3    Q   And what is your position with BayCare?
 4    A   I am a locum tenens psychiatrist.
 5    Q   And can you tell me what that means in lay terms?
 6    A   Basically I cover vacancies.  So if somebody is
 7  on vacation or they're short a doctor in a hospital, I
 8  cover that position.
 9    Q   So you -- and that's throughout Pinellas County?
10    A   Yes.  I've covered different hospitals.  There's
11  also -- I think it was Hillsborough, basically, where
12  they're also at, and I've covered there as well.
13    Q   And so, Doctor, are you considered a full-time
14  employee of BayCare, or are you an independent contractor?
15    A   I'm an independent contractor.
16    Q   How are you compensated for your time?
17    A   I am compensated by the hour.
18    Q   And what is your current hourly rate?
19    A   It is $185 an hour.
20    Q   Do you have what we would consider full-time
21  employment?  Meaning are you averaging 40 hours a week?
22    A   Yes.  I've been -- as of this month, I've been
23  doing basically around -- it's every other week.  So
24  basically it would average out to 40 hours a week, but it
25  would be something like 70-something hours a week, and then
```

Page 6

1  the next week I will be off.
2   Q   Gotcha. Okay.
3       Now, Doctor, before you worked for BayCare, where
4  were you employed?
5   A   I worked at North Florida Regional.
6   Q   And how long did you work there?
7   A   About a year and a half.
8   Q   And why did you leave that position?
9   A   I left that position because they were not
10 staffing the hospital, from my opinion, sufficiently, so I
11 left.
12  Q   So you -- you resigned that position?
13  A   Yes.
14  Q   So prior to North Florida Regional, where were
15 you employed?
16  A   I was a resident at the University of Florida.
17  Q   How long were you a resident at University of
18 Florida? During what time periods?
19  A   From 2011 to 2015.
20  Q   And during that time period of 2011 to 2015, did
21 you ever serve as the chief resident?
22  A   Yes.
23  Q   What time periods did you serve as chief
24 resident?
25  A   From the summer of 2014 to the spring of 2015.

Page 7

1   Q   Could you generally tell me what your duties were
2  as chief resident?
3   A   Generally administrative duties, like making
4  schedules, attending meetings.
5   Q   Did you work with any particular faculty member
6  when you served as chief resident?
7   A   So the chief residents were generally under the
8  supervision of the program director in terms of hierarchy.
9  So Dr. Hobbs.
10  Q   Dr. Hobbs. And was that during the whole time
11 that you served as chief resident?
12  A   Yes.
13  Q   As part of your position as chief resident, do
14 you supervise other residents?
15  A   Yes. Me and Adrienne, the other chief resident,
16 we supervised residents, yes.
17  Q   Do you know Sarah Diekman?
18  A   Yes.
19  Q   And could you tell me in what capacity do you
20 know her or did you know her?
21  A   When she was a resident at the University of
22 Florida.
23  Q   Was she one of the individuals that you would
24 have supervised during the time period that you were the
25 chief resident?

Page 8

1   A   Yes. In the capacity of chief resident, yes.
2   Q   Could you generally tell me what type of resident
3  she was?
4   A   So -- huh.
5   Q   And let me just say: What I'm trying to get at
6  is what did you think of her as a doctor; what did you
7  think of her as an employee; your interactions with her?
8   A   Okay. So I thought that -- my impression was
9  that she was very a intelligent resident, and that we were
10 having difficulty with scheduling with her.
11  Q   And when you talk about difficulty scheduling,
12 what were the issues regarding scheduling involving
13 Dr. Diekman?
14  A   So one -- one -- the first things that happened
15 was as a chief resident, there was -- I heard of an
16 allegation of an harassment complaint against a VA doctor,
17 and so we had to shift her off -- off some of the VA
18 rotations to try to avoid contact with this doctor.
19  Q   And was that a Dr. Syfert?
20  A   Yes.
21  Q   Could you briefly tell me what information you
22 had concerning the harassment complaint that Sarah Diekman
23 had at the VA?
24  A   The memory is vague right now. It was one of the
25 first things I dealt with as a chief resident. I just

Page 9

1  remember going to Sarah Diekman and asking her and be
2  supportive about it. But I didn't hear much either from
3  her or from other people after that. I just heard there
4  was a harassment complaint.
5   Q   Were you aware of Dr. Diekman requesting that
6  she not work with Dr. Syfert?
7   A   That might have been why I was told to change her
8  schedule.
9   Q   And do you know specifically if you were trying
10 to change her schedule so she did not work with Dr. Syfert?
11  A   I believe so. I remember trying to get her off
12 VA rotations. I -- beyond that, I don't remember the
13 details.
14  Q   Okay. You know who Dr. Thornton is; correct?
15  A   Yes.
16  Q   Did you ever hear any complaints that Sarah
17 Diekman may have made regarding interactions with
18 Dr. Thornton?
19  A   I don't recall.
20  Q   Okay. Other than the sexual harassment complaint
21 against Dr. Syfert, are you aware of any other complaints
22 regarding a sexual nature that Dr. Diekman may have
23 asserted?
24  A   I don't recall.
25  Q   Did you become aware at some point that

Page 10

1  Dr. Diekman suffered from several medical conditions?
2     A    When we met, I believe before I was a chief
3  resident, she relayed to me that she had something going on
4  with her autonomic nervous system, and that was when I
5  first heard about her having a medical condition.
6     Q    Did she ever or did you become aware that it was
7  actually diagnosed as POTS?
8     A    I don't recall.
9     Q    Are you familiar with the condition POTS?
10    A    Not -- not super familiar, but, yes.
11    Q    Did you hear from Dr. Diekman or from anyone else
12 that certain environmental factors could trigger someone
13 having POTS?
14    A    This I don't recall.  The most that I had was
15 seeing that she had a different chair that she sat in.
16    Q    Okay.  Were you ever made aware, since you were
17 in charge of scheduling, that Dr. Diekman asked for a set
18 schedule, meaning set hours, so she could leave at a
19 certain time to go to physical therapy or other needs she
20 may have had as a result of ongoing medical problems?
21    A    I don't remember this.
22    Q    Do you remember ever an issue involving
23 Dr. Diekman and her problems that she was experiencing
24 regarding parking?
25    A    So I remember hearing about it in passing, that

Page 11

1  there was a request for a parking accommodation.  And
2  that's all I remember.
3     Q    Do you recall ever having conversations with
4  Dr. Hobbs, concerning Dr. Diekman, where Dr. Hobbs made
5  mention of any of the medical conditions that Dr. Diekman
6  suffered from?
7     A    I don't remember these conversations.
8     Q    All right.  If somebody needed an accommodation
9  and you, serving as the chief resident, would you be the
10 one individual that would be required to deal with that
11 issue when you were scheduling?
12    A    So the answer is no.  I will go by what I am
13 asked for by the faculty, basically.
14    Q    So if there was an issue, hypothetically, that
15 somebody had from a scheduling perspective, would it be
16 Dr. Hobbs who would contact you and say, you know, Dr. X.
17 needs to only work Tuesdays and Thursdays, something
18 along --
19    A    Yeah.  Somebody -- I don't know if it would be
20 Dr. Hobbs or somebody else, but somebody would probably
21 contact me and say, hey, these are the limitations, this
22 needs to happen.  As it happens with, like, let's say,
23 maternity leave.
24    Q    Gotcha.
25         And you don't recall anything of that nature

Page 12

1  happening with Dr. Diekman?
2     A    I recall that at some point there were
3  accommodations made.  I don't remember the details.
4     Q    And that -- I'm sorry, Doctor.  Just so we're
5  clear, the accommodations that you remember were dealing
6  with scheduling accommodations?
7     A    So I -- I know that there were scheduling
8  accommodations made, but there were -- I think there's
9  different things that you're asking me, so --
10    Q    Okay.  Let's -- let me try to be clear.  You do
11 remember some kind of scheduling issue with Dr. Diekman?
12    A    Yes, I remember changing her schedule and -- yes.
13    Q    But you do not -- you don't recall whether it was
14 as an accommodation for a medical condition?
15         MR. CHAUNCEY:  Object to form.  But you can
16    answer, Dr. Chang.
17    A    I actually don't remember this.
18    Q    So --
19    A    I remember changing the schedule from off duty
20 because there was an harassment, but there were other
21 reasons at the time that I don't remember anymore.
22    Q    Okay.  Were you aware that Dr. Diekman was having
23 a problem with parking because she was being ticketed for
24 using the handicapped spots as an employee?
25    A    I was not aware of that.

Page 13

1     Q    Were you ever present or did you hear Dr. Hobbs
2  telling Dr. Diekman that it was her responsibility to
3  resolve any parking issues she had?
4     A    I didn't see or hear of this.
5     Q    Okay.  Were you ever aware, or did you hear
6  Dr. Hobbs tell Dr. Diekman that she needed to change her
7  attitude and become a team player?
8     A    I don't recall.
9     Q    Do you recall ever any issues with Dr. Diekman
10 during -- let me just check the time period you told me --
11 when you were chief resident, that she was having a problem
12 with the heat in Gainesville?
13    A    I don't remember this conversation.
14    Q    All right.  Were you ever aware of anyone telling
15 Dr. Diekman that it is a mistake to bring any issues
16 outside the psychiatric department concerning any
17 accommodations she may have been trying to obtain?
18    A    No.
19    Q    Have you -- in the time that you were a resident,
20 not just chief, but the time that you were a resident, had
21 you ever heard Dr. Hobbs telling other residents that they
22 needed to deal with a particular resident's poor attitude?
23    A    No.
24    Q    Did you ever have any kind of meeting with
25 Dr. Diekman to discuss a need for her to have attitude

Page 14

1 improvement?
2  A  No. I don't recall.
3  Q  Okay. And, Doctor, I don't know if you had a
4 chance to look at the Complaint in this case. Have you?
5  A  I looked at the file that was sent to me by
6 Mr. Nellinger (Phonetic).
7  Q  Okay. As part of that, was it the -- when I
8 refer to the Complaint, that's the charging document that
9 we filed with the allegations, multiple pages. Was that
10 something you looked at?
11  A  Multiple pages, yes.
12  Q  Okay. So as part of that, you may have seen that
13 Dr. Diekman has alleged that she had an hour long
14 discussion with you concerning the fact that she was going
15 outside the department for making complaints. Based on
16 what you just said, you don't recall that happening?
17  A  I don't. And I believe she said that I made her
18 stand, in that Complaint.
19  Q  Yes.
20  A  And that's not something that I would do. I have
21 back pain myself, and I -- you know, in psychiatry, we
22 don't make people stand if you're sitting, or, you know,
23 somebody is lying down.
24  Q  Understood.
25      So she also said in that part of the Complaint

Page 15

1 that if she did sit down you were going to report her --
2 you were going to make a professionalism complaint and file
3 that with the Clinical Competency Committee.
4  A  I don't recall this.
5  Q  Okay. Doctor, do you recall, or as part of --
6 part of the time that you were the chief resident, did you
7 set any kind of policies concerning sharing those shifts or
8 covering of shifts?
9  A  Yes. That was -- that was something that we had
10 to address.
11  Q  So let me ask you: Is there a document on the
12 screen in front of you?
13  A  Yes. I see the top of an email.
14  Q  Okay. Great. So, Doctor, if you take a look at
15 this, it's -- it appears to be an email from you. Do you
16 see it?
17  A  Yes.
18  Q  Okay. And if you can just take a second and
19 review it.
20  A  Yes.
21  Q  Do you recall that email?
22  A  At this time vaguely.
23  Q  Okay. But that is an email that you prepared, is
24 that --
25  A  That I and Adrienne Eisner, the other chief

Page 16

1 resident, prepared together. That "Cc. UF Psychiatric
2 Chief Resident," it doesn't have her name, but that goes to
3 her email.
4  Q  Gotcha.
5  A  And policy issues, scheduling, I can't do
6 anything without her, so it was done together.
7  Q  So the two of you did this together, and this was
8 sent to the residents that both of you supervised?
9  A  Sorry. We disconnected for a second. I
10 missed --
11  Q  Oh, okay. So this was an email that was prepared
12 or discussed between you and the other chief resident, you
13 sent this to all the residents?
14  A  Yes.
15  Q  Could you explain what the problem was and what
16 you were addressing here?
17  A  Yes. So I believe this happened -- the date, I
18 believe, is soon after Christmas. So let me just start
19 from the top.
20  Q  Sure.
21  A  So basically when I was a third year resident, if
22 somebody called out sick on call, somebody needs to fill
23 that shift to see the patients, basically. And the chief
24 residents would then call around, and if somebody said,
25 "Yes, I will fill in. I will volunteer to take the shift

Page 17

1 to help you out," then this person who volunteered to cover
2 would then get multiple times on payback of -- basically
3 they will get -- let's say they cover one overnight call
4 somewhere at the VA. Then the chief resident will say,
5 "Okay, well, you get five of your VA overnight calls taken
6 away and given to somebody else as a reward for helping
7 us."
8      And so we thought that was unfair because it was
9 way too much. The exact number, I don't remember. It's
10 been a while. But it was a lot. And so we thought that
11 wasn't fair. So Adrienne and I said, "Hey, let's do
12 one-to-one." You know, if I cover your sick call one
13 night, I get one of mine off.
14      The problem was on holidays, such as Christmas, I
15 got a call at a Christmas holiday lunch somewhere.
16 Basically people called and said, "Hey, you know, I'm sick,
17 I can't cover this." And I'm scrambling to ask people to
18 get -- to change their holiday plans to cover somebody
19 else's sick day. And a one-to-one then, that clearly is
20 not going to incentivize people.
21      So I forgot who took the call, but, you know,
22 because it was a Christmas call and it was really
23 disruptive, you know, I remember being on the phone for a
24 long, long time calling lots of different people and, you
25 know, begging people because nobody wants to stop their

|  |  |
|---|---|
| Page 18<br>1  holiday plans.<br>2     And so we would say, "Hey, we went to one-to-one<br>3  but it's not working, we might need to go back a little bit<br>4  to what the other chief residents had.  But we're going to<br>5  talk to Dr. Hobbs about what's fair.  You know, maybe it's<br>6  not five-to-one, maybe it's two-to-one or three-to-one."<br>7     And then we said, "Well, we can just bypass all<br>8  of this if you just, instead of calling us, you just find<br>9  your friend and say, hey, cover me today.  I'll cover you<br>10 tomorrow or next week."  And so that's what this email was<br>11 about.<br>12   Q   Did you ever become aware that Dr. Diekman, when<br>13 she read this email, felt that she would be punished<br>14 because she frequently called out sick?<br>15   A   I don't remember her telling me this.<br>16   Q   Was this policy actually implemented?<br>17   A   I honestly don't remember.  I would have to<br>18 review the emails and the call schedules on what happened.<br>19 I honestly don't remember.<br>20   Q   Do you --<br>21       MR. SALZMAN:  We'll go ahead and attach this as<br>22   Exhibit 1 to the deposition.  It is actually Exhibit 1<br>23   to the Dropbox.<br>24       (12-29-2014 email from Dr. Chang marked<br>25   Plaintiff's Exhibit 1.) | Page 20<br>1  that wasn't being done.  So you don't recall those requests<br>2  being made by her?<br>3    A   I don't recall.<br>4    Q   Were some of the rotations that residents go<br>5  through more -- require more physical aspects than others?<br>6    A   So --<br>7    Q   I'm sorry.  Were you able to hear that?<br>8    A   Yes.  What was that?  I'm sorry.<br>9    Q   I think -- I think somebody's phone went off.<br>10 But were you able to hear that question on the rotations?<br>11   A   I'm sorry.  Could you please repeat that?<br>12   Q   Sure.  Were certain rotations that residents went<br>13 through, were they more grueling physically than others?<br>14   A   So let me qualify the answer, because it depends.<br>15   Q   Okay.<br>16   A   There were ones that were busier, though some of<br>17 it depended on perspective.  I'll give you an example, my<br>18 co-chair, Adrienne, she preferred to rotate at UF.  And me,<br>19 I prefer to rotate at the VA.  She thought the VA was more<br>20 difficult.  I thought UF was more difficult.  I think it<br>21 depends on your style and your perspective.  But there were<br>22 schedules that had -- I mean, you know, there were<br>23 schedules that I'm sure had less patients, maybe.  Yeah.<br>24   Q   Was there a general attitude either by you or<br>25 Adrienne that people who do not complain are rewarded, as |
| Page 19<br>1  BY MR. SALZMAN:<br>2    Q   Are you aware of Dr. Diekman making any<br>3  complaints or concerns regarding having her schedule<br>4  changed in -- at the last minute?<br>5    A   So I don't remember her specifically.  But there<br>6  were last minute schedule changes throughout the year, and<br>7  it affected all residents.<br>8    Q   So is it fair to say that Dr. Diekman, at least<br>9  from your perspective, was -- well, let me rephrase that.<br>10      When you were the chief resident, did you<br>11 schedule everyone the same way?<br>12   A   So, no, I could not.  I believe we -- this is<br>13 vague.  I remember there were lots of different things that<br>14 would happen and we'd have to reschedule.  So some people<br>15 needed a leave -- hello?<br>16   Q   Yes.<br>17   A   Some people needed a leave of absence.  Somebody<br>18 had maternity leave.  So I could not schedule everyone the<br>19 same.  And as I gave you an example, I had to move Sarah<br>20 off some of the VA times.  So I could not schedule everyone<br>21 the same.<br>22   Q   So one of the things that you probably saw in the<br>23 Complaint is that Dr. Diekman said that she was having<br>24 physical problems, that she was making the chief residents<br>25 aware of that, and that she had to have a set schedule, but | Page 21<br>1  opposed to people who do complain?<br>2    A   That -- I don't remember that statement.<br>3    Q   Did you ever think that Dr. Diekman was a<br>4  complainer?<br>5    A   I don't believe I thought that.  I don't<br>6  remember.<br>7    Q   There is an allegation that Dr. Diekman said<br>8  around November 16th to the 17th of 2014, that she<br>9  complained to Dr. Hobbs that when you were doing her<br>10 schedule you kept making mistakes which resulted in<br>11 aggravating her health condition.  Were you ever made aware<br>12 of that?<br>13   A   I don't recall that.<br>14   Q   All right.  Were you ever present when Dr. Hobbs<br>15 stated that if Dr. Diekman could not do everything that<br>16 she was asked without becoming sick, then she should take a<br>17 leave of absence?<br>18   A   I don't recall this.<br>19   Q   Do you recall Dr. Diekman taking a leave of<br>20 absence?<br>21   A   That I recall.<br>22   Q   And what was your understanding of why<br>23 Dr. Diekman took a leave of absence?<br>24   A   I don't remember.<br>25   Q   Okay.  Do you recall whether it was for physical |

|  | Page 22 |
|---|---|
| 1 | problems, or any particular general issue? |
| 2 | A   I don't remember.  I'd only be guessing right |
| 3 | now. |
| 4 | Q   Okay.  Have you ever heard Dr. Hobbs state that |
| 5 | if a person -- meaning a resident -- that if a resident |
| 6 | couldn't -- if a resident needed accommodations or special |
| 7 | treatment, that they would not be able to make it through |
| 8 | the program? |
| 9 | A   No. |
| 10 | Q   Did you ever hear anyone reference Dr. Diekman as |
| 11 | suffering from a disability? |
| 12 | A   I'm trying to remember. |
| 13 | Q   Okay. |
| 14 | A   I believe I heard it because of the request that |
| 15 | was made.  For example, the parking request. |
| 16 | Q   Okay. |
| 17 | A   That I heard about.  I believe that was where I |
| 18 | heard about that. |
| 19 | Q   Were you -- so this particular allegation |
| 20 | occurred right towards the end of 2014.  So roughly on |
| 21 | December 29th, 2014, I believe it was the general schedule |
| 22 | we talked about before.  Were you ever aware or did you |
| 23 | ever say that anyone who called in sick would be considered |
| 24 | a -- have committed a professionalism violation? |
| 25 | A   I don't recall this. |

|  | Page 23 |
|---|---|
| 1 | Q   Okay.  Would you consider people frequently who |
| 2 | called in sick as really trying to -- either doing a |
| 3 | professional violation or trying to scam the system? |
| 4 | A   I'm thinking back. |
| 5 | Q   Sure. |
| 6 | A   I don't -- I don't recall this. |
| 7 | Q   Do you recall Dr. Diekman applying for FMLA |
| 8 | leave? |
| 9 | A   I don't recall that. |
| 10 | Q   All right.  Did you actually have a complaint |
| 11 | made against you by Dr. Diekman? |
| 12 | A   I was not -- I don't recall. |
| 13 | Q   Okay.  So you don't recall ever having any |
| 14 | investigation or inquiry involving you and Dr. Diekman |
| 15 | saying that you were harassing her? |
| 16 | A   I don't recall this. |
| 17 | Q   Okay.  Do you recall ever having Dr. Diekman or |
| 18 | anyone inquire about possible intimidation or retaliation |
| 19 | by you against Dr. Diekman? |
| 20 | A   I don't recall this. |
| 21 | Q   I mean, it would be something that if it occurred |
| 22 | you would probably recall; isn't that a fair statement? |
| 23 | A   I'm sorry.  Referring to which one? |
| 24 | Q   If somebody had filed a harassment complaint |
| 25 | against you, it would be something you would recall? |

|  | Page 24 |
|---|---|
| 1 | A   I hope so. |
| 2 | Q   Right.  Did you ever have any type of harassment |
| 3 | or any complaints made against you when you were a resident |
| 4 | at the psychiatric program? |
| 5 | A   I don't remember any. |
| 6 | Q   Okay.  There's an allegation that's in the |
| 7 | Complaint that said that certain people, including you, |
| 8 | felt that Dr. Diekman was lying about her medical |
| 9 | condition.  Do you recall that? |
| 10 | A   No. |
| 11 | Q   And that she just wanted to go on vacation? |
| 12 | A   I think that was related to a complaint that I |
| 13 | received from -- I don't remember which junior residents. |
| 14 | But there was a complaint that one of the days she called |
| 15 | out sick that she had posted pictures on Facebook that |
| 16 | she was on vacation somewhere, and it was complained to me. |
| 17 | That might have been -- |
| 18 | Q   Okay. |
| 19 | A   -- what she was referring to. |
| 20 | Q   Did you ever make -- or did you ever hear anybody |
| 21 | make the statement that other residents had greater |
| 22 | workloads because Dr. Diekman had a poor work ethic? |
| 23 | A   I don't recall. |
| 24 | Q   What about that she was a malingerer? |
| 25 | A   From -- no.  I don't recall. |

|  | Page 25 |
|---|---|
| 1 | Q   Are you aware of anybody referring to Dr. Diekman |
| 2 | as just being lazy? |
| 3 | A   No. |
| 4 | Q   That Dr. Diekman didn't care about her patients? |
| 5 | A   No. |
| 6 | Q   Are you aware of any issue involving Dr. Diekman |
| 7 | where her schedule was -- she was being double booked for |
| 8 | her schedule so it made it impossible for her to meet her |
| 9 | requirements? |
| 10 | A   No. |
| 11 | Q   Doctor, are you aware of a complaint that was |
| 12 | made to the ACGME concerning program violations in the |
| 13 | psychiatric program? |
| 14 | A   I believe I heard of it. |
| 15 | Q   Were you ever aware of who made the complaint? |
| 16 | A   I believe -- I believe it was Sarah. |
| 17 | Q   Do you recall ever having a conversation with |
| 18 | Sarah after you became aware that she was the complainant, |
| 19 | that she shouldn't have gone over the head of the -- of |
| 20 | anyone in the department?  Meaning she shouldn't have made |
| 21 | a complaint outside the department? |
| 22 | A   I don't recall this. |
| 23 | Q   I'm sorry.  Did you ever -- |
| 24 | A   I don't recall this. |
| 25 | Q   That's fine.  Did you ever say that she would be |

Page 26
1  in trouble for doing that?
2    A   I don't recall this.
3    Q   Would that, again, be something you would
4  normally recall if you had a discussion with somebody about
5  a complaint that was made to the ACGME?
6    A   I don't know what to say.  It's been a long time.
7  I don't remember this conversation.
8    Q   During the time period that you were a resident
9  and chief resident, how many complaints were you aware of
10 that were made to the ACGME?
11   A   As of right now, only this one.
12   Q   Okay.
13       MR. CHAUNCEY:  Andrew, would you mind if we took
14 a five-minute break real quick?
15       MR. SALZMAN:  No.  Absolutely.
16       (A recess was taken.)
17 BY MR. SALZMAN:
18   Q   Doctor, I asked you about the ACGME
19 investigation.  Do you recall any findings that were made
20 as a result of that complaint --
21   A   I do not.
22   Q   -- that Dr. Diekman made?
23   A   I do not.
24   Q   All right.  Were you aware that Dr. Diekman
25 suffered from dyslexia?

Page 27
1    A   I was not.
2    Q   And she also had ADHD?
3    A   I don't recall this.
4    Q   Okay.  We briefly talked about this, and I maybe
5  want to ask a few more questions.  When you were the chief
6  resident, and you and the other chief resident were in
7  charge of scheduling, did you ever receive any direction
8  from Dr. Hobbs or anyone that a resident required
9  accommodations?
10   A   I don't remember this.
11   Q   In your opinion, could you accommodate a resident
12 if they needed a set schedule?  Meaning they needed to
13 be -- say, work from 9:00 to 5:00 because any time after
14 that they would have -- they would be fatigued or have some
15 other medical issue?
16   A   So the answer is I think all our schedules
17 were -- had time that's like that.  But just working at a
18 hospital, sometimes unexpected things happen.  So I think
19 the rotations were all like that.  There was a timing and a
20 schedule, so generally they were -- they were -- they had
21 hours to them.
22   Q   So it's fair to say it was difficult to schedule
23 somebody for specific hours because there might be some
24 emergency that happened?
25   A   Yeah.  It depends.

Page 28
1    Q   Are you aware of any residents, during the time
2  that you were a resident and chief resident, that worked
3  reduced hours?  Meaning, instead of working full time
4  through the residency program, they might work two-thirds
5  or half the time?
6    A   I was not.
7    Q   Were you ever aware of anyone who had their
8  residency extended so they could complete all the necessary
9  requirements?
10   A   Yes.
11   Q   And in what context were you aware of that?  What
12 were the factual basis?
13   A   I recall there was someone who, I believe, took a
14 year off for maternity leave and spent time with her
15 family, and to come back and finish later.
16   Q   If someone had a need for an accommodation, are
17 you familiar as to what process they would have to go
18 through when they were a resident in the psychiatric
19 program?
20   A   I am not.
21   Q   When you were a resident, did you ever become
22 aware of any issue where someone asserted that there were
23 fraudulent billing that was occurring through the
24 psychiatric department?
25   A   I was not.

Page 29
1    Q   Did you ever serve on the Clinical Competency
2  Committee?
3    A   I was not.
4    Q   Would you ever be present at any of the meetings,
5  since they were talking about residents that you were
6  the -- when you were the chief resident?
7    A   Thinking through the meetings that I remember
8  going to, I don't believe I went -- I did not go to the
9  Clinical Competency meetings.
10   Q   Did you at some point ever become aware that
11 Dr. Diekman was placed on probation?
12   A   I don't recall this.
13   Q   What about termination, did you become aware that
14 Dr. Diekman was terminated?
15   A   I don't think that happened while I was at the
16 university.
17   Q   Let me ask you, can you see the document in front
18 of you that says "ADA Grievance Procedure"?
19   A   Yes.  I'm sorry.  I see it.
20   Q   Oh, okay.  I want to make sure you see it.
21       You may be aware by reading the Complaint, maybe
22 not, but Dr. Diekman states that she had made a complaint
23 about you, and we had briefly discussed that, that you were
24 not aware of it.
25       Subsequently, she asserts in her Complaint that

8 (Pages 26 - 29)

866.258.8963   Riesdorph Reporting Group   www.veritext.com
               A Veritext Company             www.veritext.com

Page 30

1 she was told a better way of going was to file an ADA
2 Grievance Complaint. Are you aware that she filed one?
3   A   I was not.
4   Q   So it's fair to say you've never seen this
5 document before?
6   A   I don't recall seeing this before.
7   Q   Okay. I'm going to just ask you some of the
8 issues that are raised in here, and see if you have a
9 recollection. So we're going to move to the third page.
10 That's the third page, maybe fourth. Okay.
11        This is a timeline that I'm going to tell you
12 that was attached to the Complaint that was -- the timeline
13 was drafted by Dr. Diekman, for our discussion purposes.
14 And this is --
15        MR. SALZMAN: David, this is Bates stamp 002945
16    is where we're starting.
17 BY MR. SALZMAN:
18   Q   If you see the part that starts: "July, 2014,"
19 under the timeline, do you see that?
20   A   Yes.
21   Q   Okay. This is the -- she's making reference,
22 Dr. Diekman, to the email stating that: "Beneficial
23 schedules for those who do not call out sick."
24        Other than our brief discussion about the prior
25 email that you filed, do you recall any other discussions

Page 31

1 about people receiving beneficial schedules if they did not
2 call out sick?
3   A   I don't remember. I mean, at the end of that
4 email that you did show me, I remember that generally we
5 were trying to encourage people to just find their own
6 coverage for when they are calling out sick, so that there
7 was no need to exchange or reward or et cetera. I don't
8 remember this particular.
9   Q   Is it fair to say, Doctor, that based on what you
10 said earlier about people calling in sick, or people having
11 to have last minute emergencies, that schedules could never
12 really be firm, that they had to fluctuate?
13   A   So when people called out sick on call, somebody
14 had to cover them. But we only had, you know, a handful of
15 residents that generally would offer to help. And there --
16 and, yes, those people who offered to help, yes, their
17 schedules would change because they're exchanging calls or
18 something is changing, correct.
19   Q   Okay. And you were never made aware that
20 Dr. Diekman may have had longstanding doctors scheduling
21 visits or physical therapy that she needed to go to on a
22 regular basis?
23   A   I was not told of these.
24   Q   Okay. If we go down to the paragraph that starts
25 with: "November, 2014. Holiday calls." Were the holidays

Page 32

1 set early, meaning in this case sometime in July, what
2 would be occurring in November and December would have been
3 set or scheduled?
4   A   I'm sorry, I didn't hear -- could you please
5 repeat?
6   Q   Sure. When you were doing the scheduling and you
7 had to deal with the holidays, Thanksgiving, Christmas, did
8 you set those schedules well in advance of that time
9 period?
10   A   Yes.
11   Q   And was there a particular way that you decided
12 who would be covering for certain holidays? Was there a
13 preference? Was there an order? I mean, how did you
14 determine that?
15   A   So Adrienne and I sat down and we looked at the
16 calls from the years before.
17   Q   Okay.
18   A   And if somebody had, for example, taken
19 Thanksgiving or Christmas call before, we would try to not
20 give them another one, and try to give that to somebody
21 else.
22   Q   So if somebody -- you would try to be fair in
23 that situation?
24   A   Yes.
25   Q   Let's look at this "Veterans Day call, 2014." In

Page 33

1 this particular situation, Dr. Diekman is saying that she
2 received a text message nine hours before Veterans Day
3 saying that she would be covering two hospitals.
4        First off, is a nine-hour change in schedule, was
5 that something that usually occurred, or was that something
6 that was, you know, different in this particular situation?
7   A   I no longer remember this.
8   Q   Okay.
9   A   I would only be guessing. I mean, changes happen
10 in the hospital from time to time. I don't remember what
11 the circumstance was.
12   Q   Were you ever made aware -- and maybe it would be
13 easier if I just gave you a moment to read that whole
14 paragraph before I ask you any follow-up questions.
15   A   Okay. I read it.
16   Q   Were you ever made aware that Dr. Diekman had
17 difficulty after this particular scheduling, and that she
18 actually had a health incident that arose when she was
19 driving home?
20   A   No.
21   Q   Do you recall her ever requesting a change in her
22 schedule so that she would not have this kind of work
23 assignment?
24   A   I don't recall.
25   Q   And you were not aware of any incidents that

Page 34

1 caused her to have to increase her medications?
2  A  No.
3  Q  If you look at this paragraph that start off with
4 "Thanksgiving holiday shift," and you go down a little
5 further, midway through the paragraph, it says, "The
6 program director responded that if she could not perform
7 every duty requested by the chiefs and Dr. Hobbs without
8 any accommodations, she cannot work at all."  Are you aware
9 of anyone making that statement?
10  A  What paragraph?  No.
11  Q  Who would have been the program director at that
12 time?
13  A  I thought the program director was Dr. Hobbs.
14  Q  Okay.  So that wouldn't be someone else, that you
15 recall?
16  A  No.
17  Q  Can you take a look at the next paragraph and
18 maybe read that and I'll ask you a couple of questions?
19  A  Okay.  So this paragraph where it starts:  "It
20 came to the attention"?
21  Q  Yes.
22  A  I -- I don't recall this incident.  But generally
23 speaking, I would not put people on a schedule to violate
24 workload rules.  That was something we deliberately tried
25 to avoid as much as possible.

Page 35

1  Q  And to be fair, Doctor, this may not be you as
2 the chief resident who did this.
3  A  Oh.  It said "He," so I assumed it was talking
4 about --
5  Q  I just wasn't clear if it was you or Adrienne.
6 But you don't recall doing this, nor do you -- and you said
7 your general practice would not be -- not to do this?
8  A  I mean, both Adrienne and I, we both had to
9 follow the same rules.  And she was referring to the
10 workload restrictions and everything on residents.  You
11 know, we all had to follow that, otherwise we could get in
12 trouble, so --
13  Q  Okay.  So that was something that you were trying
14 to do and you didn't want to violate that policy?
15  A  Uh-huh.
16  Q  Is that a yes?
17  A  Yes, yes.
18  Q  Do you recall ever being instructed by Dr. Hobbs
19 that this potential scheduling violation had to be
20 addressed?
21  A  I don't remember this.
22  Q  Do you recall ever having Dr. Hobbs or anyone
23 claim that the chiefs were -- were scheduling Dr. Diekman
24 in a way -- let me strike that.  Let me rephrase the
25 question.

Page 36

1  Q  Did you ever have anybody claim that the
2 scheduling involving Dr. Diekman was in retribution to
3 complaints she was making?
4  A  No.
5  Q  Were you present, or did you ever make any
6 comment that Dr. Diekman could not go to a physical therapy
7 appointment because you needed her to cover someone's
8 schedule?
9  A  No.
10  Q  And because this is here again, do you recall
11 Dr. Hobbs saying that:  "If Dr. Diekman could not perform
12 any and every duty requested by the residency chiefs, she
13 could not work at all"?
14  A  I don't recall -- are you referring to something
15 in the document?
16  Q  Yes.  I'm sorry.  It's under the -- it's the next
17 paragraph.  I'll scroll down for you.  If you could look at
18 that paragraph.
19  A  I don't think that happens.
20  Q  Okay.  Let's look at the next one.  This is --
21 starts off with:  "Defamation of character, 2014, 2015.
22 Dr. Diekman stating that she was told by multiple other
23 residents that are willing to provide statements that the
24 chief residents provided slanderous comments concerning her
25 medical condition was fictitious, and also discussed the

Page 37

1 medical condition she claimed to be suffering from."
2     Are you aware of, first off, any discussions
3 concerning the medical conditions she was suffering from?
4  A  No, I'm not aware.
5  Q  And then, again, you are not aware that anybody
6 said that she was lying or that she was making these --
7 these conditions up?
8  A  So there was -- there was a complaint, or
9 multiple complaints to me and Adrienne about her calling
10 out sick.  I don't even remember when it was.  And then
11 posting pictures later that she had taken a trip somewhere.
12 If that's what she's referring to, I did talk about that
13 with Adrienne.
14  Q  But did you talk to other residents about that
15 particular issue?
16  A  I don't recall.
17  Q  I mean, generally, I know it's a relatively small
18 group of people, and I'm certainly not saying that this
19 occurred, but at least in my experience, you know, people
20 talk about each other, so I don't know if that occurred
21 with you all as to whether or not somebody might say,
22 "Look, you know, she's claiming she has some kind of
23 condition, we don't believe it's true, we think she's just
24 lazy."  I mean, that's what I was trying to gather from --
25  A  Oh, okay.  So I think we talked about how that

10 (Pages 34 - 37)

|   | Page 38 |   | Page 40 |
|---|---|---|---|
| 1 | the complaint, as it happened, we thought that that would | 1 | Q   Okay. |
| 2 | be inappropriate, but I don't think I used that as saying, | 2 | A   We -- I mean, I'm not saying there weren't other |
| 3 | "Hey, she doesn't have this." | 3 | meetings.  There likely were.  I just don't remember them. |
| 4 | Q   Okay. | 4 | The only one I remember is the one with Dr. Uma. |
| 5 | A   You know, I think we discussed about whether, you | 5 | Q   Gotcha. |
| 6 | know -- and it wasn't -- I don't even know if it was her | 6 |     Do you recall ever being present with Dr. Hobbs |
| 7 | that I was talking about.  You know, there were -- people | 7 | expressing that no accommodations could or would be made |
| 8 | called out sick in the residency, I mean. | 8 | for Dr. Diekman's health conditions? |
| 9 | Q   Well, I'm sure -- I'm sure, Doctor, through your | 9 | A   I don't remember that.  And I don't remember that |
| 10 | experience, like with anyone, there might be someone who | 10 | statement. |
| 11 | people consider is trying to skate through the system, or | 11 | Q   Did you ever have any discussion -- well, first |
| 12 | trying to, you know, get around some of the rules, so I | 12 | let me ask you, do you know who Dr. Osfield is? |
| 13 | just didn't know if Dr. Diekman was looked at that way | 13 | A   No. |
| 14 | also. | 14 | Q   If I told you he was the ADA compliance officer, |
| 15 | A   I don't know about the exact circumstances back | 15 | or with the ADA Compliance Office, does that help you |
| 16 | then because it's vague, but as of right now, I'm not -- | 16 | recall him? |
| 17 | that's not my perspective right now sitting here. | 17 | A   No. |
| 18 | Q   Okay.  If you could look at this next paragraph, | 18 | Q   Do you remember ever having any discussions with |
| 19 | it starts off: "March, 2015.  Sarah experienced a death in | 19 | anyone from the ADA Compliance Office concerning |
| 20 | her family in which she took emergency leave for two days." | 20 | Dr. Diekman? |
| 21 |     Do you recall that occurring? | 21 | A   No. |
| 22 | A   Since it happened -- I'm sorry.  I no longer | 22 | Q   Let me show you -- this is a letter dated |
| 23 | remember.  Let me read this.  Does it continue? | 23 | June 2nd, 2015, to Dr. Diekman.  And let me just take you |
| 24 | Q   Yes.  Let me give you the whole paragraph, | 24 | to the last page.  This is from Dr. Osfield, the ADA |
| 25 | because it talks about a meeting. | 25 | Compliance Office.  So you don't recall ever having any |

|   | Page 39 |   | Page 41 |
|---|---|---|---|
| 1 | A   This is pretty detailed, but I actually don't | 1 | conversations with Dr. Osfield? |
| 2 | remember this anymore. | 2 | A   Scrolling up. |
| 3 | Q   Okay.  So let me just go through, briefly, parts | 3 | Q   You want me to scroll up? |
| 4 | of it that you don't -- you may or may not recall any of | 4 | A   No.  It's scrolling up by itself. |
| 5 | this.  Do you recall whether or not Dr. Diekman was ever | 5 | Q   Sorry. |
| 6 | asked to leave a -- asked to leave the brain stimulation | 6 | A   You're continuing to go up.  I can't see it. |
| 7 | unit prior to the end of a rotation? | 7 | Q   I want to -- let me -- |
| 8 | A   I don't remember this. | 8 |     MR. CHAUNCEY:  Click one more time. |
| 9 | Q   Do you recall ever considering that Dr. Diekman | 9 |     MR. SALZMAN:  I know you -- |
| 10 | was having performance issues? | 10 |     MR. CHAUNCEY:  Click one more time, like, up |
| 11 | A   I don't remember this. | 11 | toward -- |
| 12 | Q   All right.  Do you recall ever being involved in | 12 |     MR. SALZMAN:  It's going back and forth. |
| 13 | a meeting with Dr. Diekman, Dr. Hobbs, I think it's Dr. -- | 13 |     MR. CHAUNCEY:  There you go. |
| 14 | the assistant program director, Dr. Averbuch, to talk | 14 |     MR. SALZMAN:  All right.  Thanks.  I need all the |
| 15 | about -- and I believe that would be Dorothy McCallister, | 15 | help I can get. |
| 16 | to talk about issues that Sarah was having? | 16 | BY MR. SALZMAN: |
| 17 | A   So like I said, this is a very detailed account. | 17 | Q   I want to take you just to one section.  Okay. |
| 18 | I just -- I don't remember this. | 18 | If you could read this paragraph that says, "I also |
| 19 | Q   Okay.  Do you ever recall a situation where | 19 | discussed." |
| 20 | Dr. Diekman -- well, let me ask it this way:  Do you ever | 20 | A   I don't -- I don't recall this. |
| 21 | recall having any kind of meeting with Dr. Diekman and | 21 | Q   Okay.  You don't recall having any conversations, |
| 22 | Dr. Hobbs and additional individuals? | 22 | obviously, with Dr. Osfield or somebody from the ADA; |
| 23 | A   So the -- the one memory that I still have of a | 23 | correct? |
| 24 | meeting was with a Dr. Uma, myself, and Sarah Diekman at | 24 | A   I just don't remember.  I mean, if it happened -- |
| 25 | the VA. | 25 | like I said, I just don't remember this. |

Page 42

1  Q  Do you ever remember going through an ADA
2  training program in 2015?
3  A  I don't remember.
4  Q  All right. Do you remember ever having any kind
5  of harassment training, specifically on harassment?
6  A  Yes.
7  Q  Okay. And did that also include training on
8  medical confidentiality?
9  A  Yes. I believe we had to have that -- I don't
10 know if every year, but we had that regularly.
11 Q  So you regularly had that kind of training? You
12 don't recall -- and I'll just take you down to what I'm
13 talking about. It starts off with, "As to your reparation
14 requests, I have the following responses," if you see one,
15 two and three?
16 A  Okay. I've read it.
17 Q  Do you recall this kind of training?
18 A  I -- I don't recall.
19 Q  Would this be the general training that you had
20 received that you were referencing before? Would this be
21 something that you would normally get every year?
22 A  So I get training every year in different things.
23 Sexual harassment, medical confidentiality. I just
24 remember having to do that every year or every other year.
25 It was regular. I don't remember this specific date. I

Page 43

1  don't remember that month much. I'm sorry. I don't
2  remember this.
3     MR. SALZMAN: Okay. We'll go ahead and attach
4     this as Exhibit No. 2, which is Dropbox 53.
5     (UF ADA Grievance Procedure marked Plaintiff's
6     Exhibit 2.)
7  BY MR. SALZMAN:
8  Q  Doctor, let me ask you some general questions
9  about some other employees, and if you recall any of these
10 incidents.
11    Do you recall a Dr. Daniel Pietras or Pietras,
12 P-I-E-T-R-A-S?
13 A  Vaguely, yes.
14 Q  Do you recall an incident where Dr. Pietras
15 allegedly threatened to blow up the department?
16 A  No.
17 Q  That Dr. Pietras threatened to kill people in the
18 department?
19 A  No.
20 Q  Walked off from his job duties because there was
21 too much work?
22 A  No.
23 Q  Are you aware of any residents, when you were
24 going through the residency program that were terminated
25 from the program?

Page 44

1  A  I'm sorry, could you repeat that?
2  Q  Were you aware of any residents that were
3  terminated from the program when you were going through the
4  program?
5  A  No.
6  Q  Were you ever aware of any promotions of
7  residents who failed their national board exams for their
8  third year?
9  A  I don't recall this.
10 Q  Do you ever recall any residents that were --
11 first off, do you know what the PASS, P-A-S-S, program is?
12 A  I don't recall what that is.
13 Q  Do you recall any kind of program that residents
14 would go to in Illinois for six to eight weeks?
15 A  I don't recall it.
16 Q  Is there a particular requirement for residents
17 to have a certain number of clinical hours every year of
18 their residency program?
19 A  I no longer remember this. I don't recall.
20 Q  Well, you may not recall the number. Was there
21 a -- is clinical hours required?
22 A  I mean, right now I'm imagining things, so, like,
23 I imagine, yes, but I --
24 Q  Do you know -- or do you recall a Dr. Werner?
25 A  Yes.

Page 45

1  Q  And where was Dr. Werner in line of, say, you?
2  Was that somebody who was on the same year as you? Above?
3  Behind?
4  A  Dr. Werner?
5  Q  Yes.
6  A  Is this --
7  Q  A faculty member.
8  A  Yes. That's a faculty member.
9  Q  And did you work with Dr. Werner?
10 A  Briefly, yes.
11 Q  Were you ever aware or did Dr. Werner tell you
12 that she was told by Dr. Hobbs to punish Dr. Diekman for
13 complaining about her disability?
14 A  No.
15 Q  Doctor, do you believe that male residents were
16 given better rotation than female residents?
17 A  Oh, definitely not. Anyone can tell you,
18 definitely not.
19 Q  Were you aware of any allegations that a doctor,
20 and in this case, Dr. Khalil, K-H-A-L-I-L, forced medical
21 students to forge notes for him?
22 A  Dr. Khalil?
23 Q  Yes.
24 A  Is this a faculty? Who is this? I don't
25 remember this name.

Page 46

1  Q  And you may not remember who the doctor is.  Are
2  you ever aware of any allegations that a doctor forced
3  medical students to forge notes for them?
4  A  I was not aware of this.
5  Q  Just give me a minute, Doctor.
6     Doctor, are you aware of -- you're aware that
7  milestone scores are required through the residency
8  program?
9  A  I remember that there were milestones.  I no
10 longer remember the policies around them.
11 Q  Were you ever -- did you ever hear of faculty
12 changing individual residents' milestone scores?
13 A  No.
14 Q  Are you aware whether or not a faculty could
15 change anyone's milestone scores?
16 A  No.
17 Q  Doctor, do you feel through your experience with
18 Dr. Diekman that she was treated differently than other
19 residents?
20 A  So she was treated differently.  I mean, we had
21 to, for example, earlier on had to change her schedule to
22 take her out of the VA.
23 Q  Okay.  With the harassment complaint, yes.
24 A  Uh-huh.  And there were numerous changes and
25 things done throughout the year, I no longer remember them

Page 47

1  all, for different residents at different times.  I mean,
2  so we tried to be as fair as possible.
3  Q  Do you have any independent knowledge that you
4  feel that Dr. Diekman was discriminated against during your
5  working with her through the psychiatric program?
6  A  No.  I don't think so.
7  Q  What about that she was retaliated against?
8  A  No.
9     MR. SALZMAN:  Doctor, I have no further
10 questions.  I want to thank you very much for your
11 time.
12    THE DEPONENT:  All right.  Thank you.
13    MR. SALZMAN:  David, any questions?
14    MR. CHAUNCEY:  No questions.
15    MR. SALZMAN:  Okay.  Read or waive?
16    MR. CHAUNCEY:  He'll waive.
17    MR. SALZMAN:  Doctor, thank you so much for your
18 time.  And I hope you have a pleasant weekend.
19    THE DEPONENT:  Thank you.  You too.
20
21    (Deposition concluded at 2:25 p.m.)
22
23
24
25

Page 48

1                S T I P U L A T I O N
2
3     It is hereby stipulated and agreed by and among
4  the attorneys present and the witness that reading and
5  signing of the deposition by the witness is waived.

Page 49

1            CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5     I, the undersigned authority, certify that the
6  witness named herein personally appeared before me and was
7  duly sworn.
8     Witness my hand and official seal this 6th day
9  of July, 2020.
10
11
12
13
14    _____
15    J. Gay Smith, RPR, RMR, FPR
       Notary Public - State of Florida
16    My Commission Expires: 2/18/2021
       Commission No.: GG 041811

13 (Pages 46 - 49)

Page 50

1          REPORTER'S CERTIFICATE
2   STATE OF FLORIDA      :
3   COUNTY OF HILLSBOROUGH :
4        I, Jolyn Gay Smith, RPR, RMR, FPR, certify that I
5   was authorized to and did stenographically report the
6   deposition of SAN KUO CHANG, MD; that a review of the
7   transcript was not requested and that the transcript is a
8   true and complete record of my stenographic notes.
9         I further certify that I am not a relative,
10  employee, attorney, or counsel of any of the parties, nor
11  am I a relative or employee of any of the parties'
12  attorneys or counsel connected with the action, nor am I
13  financially interested in the outcome of the foregoing
14  action.
15         Dated this 6TH day of JULY, 2020, IN THE CITY OF
16  TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.
17
18
19
20
21
22         _____
23         JOLYN GAY SMITH, RPR, RMR, FPR
           Registered Merit Reporter
24         Florida Professional Reporter
25

14 (Page 50)

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.