Exhibit 35

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                  GAINESVILLE DIVISION
 3
 4
 5   --------------------------------x
     SARAH DIEKMAN,
 6   an individual,
 7          Plaintiff,
     vs.                        CASE NO.:  1:19-cv-00227-AW-GRJ
 8
     UNIVERSITY OF FLORIDA,
 9   a Florida municipal corporation,
10          Defendant.
     --------------------------------x
11
12
13
             DEPOSITION OF JOSEPH E. THORNTON, MD
14              (Conducted Via Videoconference)
15
16
17   DATE:                 June 25, 2020
18   TIME:                 3:30 p.m. to 4:25 p.m.
19
     PURSUANT TO:          Notice by counsel for Plaintiff for
20                         purposes of discovery, use at
                           trial or such other purposes as
21                         are permitted under the Florida
                           Rules of Civil Procedure
22
     REPORTER:             J. Gay Smith, RPR, RMR, FPR
23                         Notary Public, State of Florida
24
25                     Pages 1 - 35
```

Page 2

```
 1  APPEARANCES:
 2    ANDREW J. SALZMAN, ESQUIRE
      Unice, Salzman & Jensen, P.A.
 3    Patriot Bank Building, Second Floor
      1815 Little Road
 4    Trinity, Florida  34655
         Attorney for Plaintiff
 5
      DAVID E. CHAUNCEY, ESQUIRE
 6    Alexander DeGance Barnett
      1500 Riverside Avenue
 7    Jacksonville, Florida  32204
         Attorney for Defendant
 8
 9
10
11            I N D E X
12  DIRECT EXAMINATION BY MR. SALZMAN       Page   3
13  STIPULATION                             Page  33
14  CERTIFICATE OF OATH                     Page  34
15  REPORTER'S CERTIFICATE                  Page  35
16            E X H I B I T S
17  Plaintiff    Description              Marked
18  Exhibit 1    10-1-13 to 10-31-13 Consult    Page   9
             Liaison Rotation
19
    Exhibit 2    4-1-2014 to 4-30-2014 Consult  Page  13
20           Liaison Rotation
    Exhibit 3    Psychiatry Faculty Evaluation of  Page  17
21           Resident
22
    Exhibit 4    12-17-2014 CCC meeting minutes  Page  32
23
24
25
```

Page 4

 1  Psychiatry.
 2   Q   In what capacity?
 3   A   I'm associate professor of psychiatry.  I am the
 4  chief of psychiatric services at Shands Hospital.
 5   Q   And how long have you been an employee of the
 6  University of Florida?
 7   A   In this capacity, for just over two years.
 8  I've --
 9   Q   Go ahead.
10   A   I've been affiliated with the University of
11  Florida since April of 2010.  I was on faculty until
12  December 31st, 2013.  Then I was adjunct faculty from
13  January 1st, 2014, until June, 2018, when I came back full
14  time on faculty.
15   Q   Doctor, have you ever had your deposition taken
16  before?
17   A   Yes.
18   Q   Okay.  So I'm sure the rules you were told before
19  apply here.  If you have any questions or don't understand
20  my question, please ask me and I'll rephrase.
21       And let's -- these Zoom depositions are a little
22  different than we're normally used to.  So please wait
23  until I finish my question, and I'll try to wait until you
24  finish your answer so we don't talk over each other.
25   A   Okay.

Page 3

 1           P R O C E E D I N G S
 2       THE COURT REPORTER:  The attorneys participating
 3    in this deposition acknowledge that I, the court
 4    reporter, am not present with the witness and that I
 5    will be reporting the proceedings and administering
 6    the oath remotely.  This arrangement is pursuant to
 7    the Florida Supreme Court Administrative Order No.
 8    AOSC-20-23.  The parties and their counsel consent to
 9    this arrangement and waive any objections to this
10    manner of reporting.  Please indicate your agreement
11    by stating your name and your agreement on the record.
12       MR. SALZMAN:  Andrew Salzman on behalf of
13    plaintiff, Sarah Diekman.  I consent.
14       MR. CHAUNCEY:  Dave Chauncey on behalf of the
15    defendant, University of Florida.  We agree.
16         JOSEPH THORNTON, MD,
17  the witness herein, being first duly sworn on oath, was
18  examined and testified as follows:
19           DIRECT EXAMINATION
20  BY MR. SALZMAN:
21   Q   Please state your full name for the record.
22   A   I'm Joseph E. Thornton.
23   Q   And, Dr. Thornton, where are you currently
24  employed?
25   A   I'm with the University of Florida, Department of

Page 5

 1   Q   Great.  Thank you, Doctor.
 2       Doctor, in 2013, what was your position in regard
 3  to residents in the psychiatric department at the
 4  University of Florida?
 5   A   In 2013, I was on -- I was at the Malcom Randall
 6  VA Hospital.  I was a faculty with UF, but worked full time
 7  for the VA.  I was on the consultation liaison service.
 8   Q   So how would you interact with residents during
 9  that time period?
10   A   We generally had two residents working with us,
11  and two medical students.  The way the teaching service is
12  arranged, the residents were the primary physicians to
13  respond to consults and do the evaluations.  And as
14  faculty, we would round with them and follow up on their
15  assessments and plan of care.
16   Q   Would that be considered a rotation that the
17  residents were going through?
18   A   That's correct.
19   Q   And how long is the individual rotation that a
20  resident would go through for a period of time through your
21  oversight?
22   A   Typically was in one-month increments.
23   Q   And if I was a resident at the beginning of 2013,
24  throughout the whole year, how many times would I have a
25  rotation in which you would be my supervisor?

Page 6

1  A   Two or three times, maybe.
2  Q   And in your role, how would you review my
3  progress?  How would that normally occur?
4  A   The assessment or mental assessment would be
5  through our daily work, and then the guidance we would
6  provide as we're providing patient care.  Sometimes we had
7  little what we call mini lectures or just-in-time lectures.
8  But most of it was in the context of patient care.
9  Q   Doctor, are you familiar with Sarah Diekman?
10  A   Yes.
11  Q   And was that when she was a resident going
12  through the psychiatric department at the University of
13  Florida?
14  A   Yes.
15  Q   Can you -- do you recall her?
16  A   Yes.
17  Q   Can you generally tell me what kind of resident
18  or employee she was?
19  A   She -- things evolved over time.  So she seemed
20  interested in her work, or she expressed interest in her
21  work.  She had some challenges that were more evident the
22  second year than the first year, particularly in
23  consistency and dealing with feedback.
24  Q   In the -- is it fair to say, Doctor, that her
25  first year was fairly normal, a usual first year resident?

Page 7

1  A   I don't recall anything particularly unusual that
2  first fall for her level.  Of course, again, you know, a
3  beginning internship, there's a wide leeway of what's
4  considered normal.
5  Q   Doctor, do you see a document in front of you?
6  A   Yes.
7  Q   Okay.  That's the good part to start off with.
8      And it's entitled "Sarah Jean Diekman," and it is
9  you as the evaluator for the "Department of Psychiatry,
10  Consult Liaison Rotation."
11  A   Correct.
12  Q   Would this be the document you would prepare at
13  the end of a rotation?
14  A   Correct.
15  Q   And so just so as you said before, they're
16  usually for a one-month period, and this one is from
17  October 1st, 2013, to October 31st, 2013.  So that would be
18  a normal time period for a rotation?
19  A   Correct.
20  Q   Okay.  And you then had the ability to rate her
21  one through five unless it doesn't apply, and in this
22  particular case, I believe we see "Four, five" -- I just
23  want to get to your bottom notes.  "Four, four, four, NA,
24  four, NA."
25      Okay.  And then you -- you go through this and

Page 8

1  you typically, at the end, put in some notes, overall
2  comments; is that correct?
3  A   Correct.
4  Q   And in this case, if we see it says "Dr. Diekman
5  is rated based on her level of training in the first half
6  of the PG-1 year.  She performed well during her rotation
7  on the psychiatry consultation liaison service at the
8  Veterans Hospital."
9      What is that -- what entails in that particular
10  rotation?  Can you tell me generally what the resident goes
11  through?
12  A   There's two main parts to the consult rotation.
13  One is on medical surgical floors.  The patient comes in
14  for -- generally for some other condition, other than a
15  psychiatric disorder, so pancreatitis, chest pain,
16  something like that.  And in the course of that evaluation,
17  some psychiatric issues become apparent, either overt
18  symptoms of depression, expression of suicidality,
19  confusion.  Or the person has what we call concurrent
20  schizophrenia, may have symptoms of that disorder, or the
21  team may need recommendations for medications.  So that's
22  the consult part.
23      We also covered the emergency department where
24  patients may come in with a psychiatric complaint, and we
25  assess if they need to be admitted to the hospital or

Page 9

1  referred to outpatient, if they need involuntary admission
2  status.
3  Q   And you note, Doctor, in here, in your comments,
4  that: "Dr. Diekman demonstrated professionalism and good
5  work skills.  She received very high reviews for her
6  teaching for medical students, and we were -- we were --
7  are able to observe during the rotation her growth and
8  improvement in her ability to collect and organize
9  information.  I look forward to working with Dr. Diekman
10  again."
11      So it's fair to say that she had a pretty good
12  rotation?
13  A   Based on the evaluation as a first-year intern,
14  yes.
15      MR. SALZMAN:  And so just for the record, if we
16   could have that attached as Exhibit 1, and it's noted
17   as Exhibit 27 from the previous Dropbox.
18      (10-1-13 to 10-31-13 Consult Liaison Rotation
19   marked Plaintiff's Exhibit 1.)
20  BY MR. SALZMAN:
21  Q   I apologize, Doctor, I have difficulty with this
22  particular --
23      MR. CHAUNCEY:  It seems to be turning, so
24   hopefully it will pop up in a second.
25  Q   Do you see anything?

Page 10

1  A   It looks like an index file.
2      MR. CHAUNCEY:  Yeah.  We see your files, still
3  from the Dropbox that you have.
4      MR. SALZMAN:  Oh, Lord.  This is why I like
5  in-person depositions.
6      MR. CHAUNCEY:  If you could maybe -- yeah, right
7  there.
8      MR. SALZMAN:  Did anything come up?
9      MR. CHAUNCEY:  Nothing has popped up, no.  Has
10 something popped up on your other screens?
11     MR. SALZMAN:  Okay.  Here it is -- this should
12 work.
13     MR. CHAUNCEY:  There we go.
14 BY MR. SALZMAN:
15  Q   This is from April 1st, 2014, to April 30th,
16 2014, the Consult Liaison Rotation, and you are the
17 evaluator; is that correct, Doctor?
18  A   It looks like it, yes.
19  Q   Okay.  And, again, let's just go down to your
20 comments so we can see how she was doing at this time.
21 "Overall comments:  The ratings for Dr. Diekman are
22 anchored for her level of training.  She is a strong
23 advocate of patient care.  She had some changes this
24 rotation with organization and prioritizing that we
25 discussed elsewhere."

Page 11

1      And how would you overall rate that kind of
2  rotation?
3   A   Well, it looks like most of the evaluations were
4  three.  The word was:  "She had some challenges this
5  rotation with organization and prioritizing that were
6  discussed elsewhere."  So she was -- she was performing
7  generally well.  She had some areas to improve that were
8  discussed.  And, you know, we would see how the progress
9  would be on that.
10  Q   Dr. Thornton, at some point did you become aware
11 that Dr. Diekman suffered from several medical conditions?
12  A   She told me she had something called POTS.  I
13 don't recall exactly when she told me that, but it was on
14 one of the later rotations.
15  Q   What was your understanding of what POTS is?
16  A   I'm not real sure.  She said it -- I think it
17 stands for something related to postural orthostasis,
18 meaning that sometimes her blood pressure might drop, she
19 might get dizzy, so that she may not be able to function
20 fully during those episodes.
21  Q   Did you ever have -- did you ever notice any of
22 those kind of situations where she was, perhaps, fatigued,
23 or she was having some problems related to the POTS?
24  A   At the time of work, I can't recall any.
25  Q   So during the time that you were basically

Page 12

1  supervising her, you did not notice any of those issues?
2   A   Not that I recall, correct.
3   Q   Did she ever mention to you a need for any type
4  of accommodation as a result of the POTS?
5   A   Not that I recall.
6   Q   Were you aware that she suffered from dyslexia?
7   A   I don't remember that discussion.
8   Q   Are you aware of any other medical conditions
9  that she may have suffered from?
10  A   No, sir.
11  Q   Were you ever privy to any requests that she had
12 made for accommodations while she was a resident?
13  A   Not for accommodations, no.  Particularly in the
14 VA, that has a specific meaning, so I'd be sensitive to it.
15  Q   What about scheduling?  Were you aware of any
16 requests she may have made concerning having a certain type
17 of schedule?
18  A   No, sir.
19  Q   Physical therapy, are you aware whether or not
20 she had to undergo any type of physical therapy on a daily
21 basis?
22  A   No.
23  Q   Doctor, at any point did you become aware that
24 Dr. Diekman was going through a request for specific
25 parking when she was working as a resident?

Page 13

1   A   No, sir.
2   Q   Would you, as part of your supervising residents,
3  deal directly with Dr. Hobbs?
4   A   Yes.
5   Q   And how would you interact with Dr. Hobbs?
6   A   In a variety of ways.  I think I was -- I might
7  have been teaching some lectures at that time.  So her
8  office would call to schedule lectures.  Her office would
9  also be the ones to inform us of the resident rotations.  I
10 was probably on an education committee at that time.  So it
11 would be in those type of settings.
12     MR. SALZMAN:  Gay, did I attach the last exhibit?
13     THE COURT REPORTER:  I only have one exhibit
14 attached so far.
15     MR. SALZMAN:  Can we attach the last one as
16 Exhibit 2?
17     (4-1-2014 to 4-30-2014 Consult Liaison Rotation
18 marked Plaintiff's Exhibit 2.)
19 BY MR. SALZMAN:
20  Q   Doctor, do you see an exhibit in front of you
21 dated August 1st, 2014 to August 31st, 2014?
22  A   Yes.
23  Q   Okay.  And, again, you're the evaluator in this
24 particular psychiatric facility evaluation; correct?
25  A   Yes.

|  | Page 14 |
|---|---|
| 1 | Q   And this is for Dr. Diekman again? |
| 2 | A   Yes. |
| 3 | Q   And if we just scroll through it, at this point |
| 4 | there's some "Level one, level one, critical deficiency, |
| 5 | level one."  And if we look -- if we look under the |
| 6 | "Comments" -- I don't have the comment -- |
| 7 | A   I see a comment. |
| 8 | Q   Okay.  You see the comment right above where I |
| 9 | was scrolling? |
| 10 | A   Item eight. |
| 11 | Q   Okay.  "Dr. Diekman has good fund of information |
| 12 | and an interest of patients.  She has significant |
| 13 | challenges with organizational work habits and |
| 14 | interdisciplinary professional interactions.  Her coping |
| 15 | strategies and documentation needs close supervision."  So |
| 16 | she was having some difficulty with her documentation; is |
| 17 | that fair to say? |
| 18 | A   Yes, sir. |
| 19 | Q   And you did not become aware through any |
| 20 | discussions with Dr. Diekman or that -- or with Dr. Hobbs, |
| 21 | of any need for any kind of accommodation for her when |
| 22 | she was going through the rotation? |
| 23 | A   Not that I recall, no.  Again, by that time, I |
| 24 | was the acting chief of psychiatry in the VA, |
| 25 | administrative role.  Words like accommodation are pretty |

|  | Page 15 |
|---|---|
| 1 | significant, so if you -- you know, if that's declared, we |
| 2 | take steps to do it. |
| 3 | Q   And, Doctor, I haven't shown you all of your |
| 4 | evaluations.  But this is significantly different than the |
| 5 | two that occurred in her first year; is that fair to say? |
| 6 | A   Yes, sir. |
| 7 | Q   And so she was having some kind of problem, |
| 8 | really, going through with at least organizational work |
| 9 | habits and documentation; correct? |
| 10 | A   Correct. |
| 11 | Q   Okay.  Doctor, did you become aware or do you |
| 12 | recall Dr. Diekman making a complaint of an incident that |
| 13 | occurred while she was working at the VA concerning a |
| 14 | Dr. Syfert? |
| 15 | A   I remember at least one episode, yes. |
| 16 | Q   What do you recall regarding that incident? |
| 17 | A   I don't -- I don't recall exactly how it was |
| 18 | brought up.  But there was an issue with her seeing |
| 19 | patients in the emergency department in her role as the |
| 20 | on-call doctor.  So this is separate from being on the |
| 21 | consult service. |
| 22 |     So she would be responsible for seeing patients |
| 23 | after hours, sometimes evaluations in the emergency |
| 24 | department. |
| 25 |     Dr. Syfert had complained to me that he believed |

|  | Page 16 |
|---|---|
| 1 | she was writing notes without seeing the patient.  When I |
| 2 | talked with her about that, she stated that she would go |
| 3 | into the ER and try to minimize contact with Dr. Syfert, |
| 4 | and then he would call her and ask her to present in front |
| 5 | of him. |
| 6 | Q   Did she say why she wanted to minimize contact |
| 7 | with him? |
| 8 | A   She said she didn't feel comfortable with him. |
| 9 | Q   Did she make a specific complaint to you |
| 10 | regarding any kind of sexual harassment she felt she was |
| 11 | receiving from Dr. Syfert? |
| 12 | A   No. |
| 13 | Q   Are you ever -- were you ever made aware that she |
| 14 | had some concerns or complaints from a sexual nature |
| 15 | concerning Dr. Syfert? |
| 16 | A   I wasn't aware that it was Dr. Syfert.  In the |
| 17 | process of the complaints for this deposition, or whatever |
| 18 | this whole process is, I did see the -- that was one of the |
| 19 | complaints in the -- what this lawsuit is about. |
| 20 |     MR. CHAUNCEY:  I think he's referring to the |
| 21 |   actual Complaint that y'all filed as a lawsuit. |
| 22 |     MR. SALZMAN:  Yes.  Yeah, no, I got that.  And I |
| 23 |   was going to follow that up. |
| 24 | BY MR. SALZMAN: |
| 25 | Q   So that's really what your -- what your |

|  | Page 17 |
|---|---|
| 1 | understanding was was dealing with the Complaint that we |
| 2 | had filed? |
| 3 | A   Correct.  In terms of sexual harassment, that's |
| 4 | correct. |
| 5 | Q   So it's fair to say you were unaware of any kind |
| 6 | of claims or incidents that Dr. Diekman had regarding |
| 7 | Dr. Syfert, and any kind of sexual harassment? |
| 8 | A   Correct. |
| 9 | Q   Were you aware of Dr. Diekman making any claims |
| 10 | of sexual harassment against anyone during the time that |
| 11 | she was a resident and working at the VA? |
| 12 | A   No. |
| 13 | Q   Doctor, would you have -- or did you consider |
| 14 | Dr. Diekman as someone who complained a lot? |
| 15 | A   As -- what would happen is we would give feedback |
| 16 | on performance.  It would be countered with a variety of |
| 17 | issues.  So that was really where the complaints -- the |
| 18 | complaints seemed to come along with feedback. |
| 19 |     MR. SALZMAN:  Just as an aside, Gay, can you |
| 20 |   attach the last document as Exhibit 3? |
| 21 |     (Psychiatry Faculty Evaluation of Resident marked |
| 22 |   Plaintiff's Exhibit 3.) |
| 23 | BY MR. SALZMAN: |
| 24 | Q   Doctor, and so you've seen the Complaint in this |
| 25 | case, and so one of the references in the Complaint is |

Page 18
1  Dr. Diekman has stated that you made a comment to her that
2  she reminded you of her -- of your ex-wife, in that she was
3  a complainer. Do you recall seeing that in the Complaint?
4      A   I saw that in the Complaint, yes, sir.
5      Q   Do you recall ever making that statement?
6      A   No.
7      Q   Did you ever tell her that she needed to learn to
8  get along better with others?
9      A   Not in any frame like that. It's a common
10 instruction for residents who are a role model and for
11 teaching that you have to have professional relationships.
12 I don't recall anything specific for her.
13     Q   Do you know of whether or not Dr. Diekman
14 actually made any formal complaint concerning any incidents
15 that occurred at the VA?
16     A   I'm not aware of any.
17     Q   Okay. Are you aware whether or not Dr. Diekman
18 requested a chaperone so she was never left alone with
19 Dr. Syfert?
20     A   I don't recall that, no.
21     Q   Would that be an unusual request?
22     A   Yes.
23     Q   That might be something, if you knew about it, it
24 would kind of -- you'd remember it; is that fair to say?
25     A   Right. Right. Because that would -- I mean, if

Page 19
1  you have to have a chaperone around a fellow staff person,
2  that's a significant problem. And, again, in the VA, these
3  things were dealt with pretty strictly.
4      Q   Understood. I'm trying to pull up a document and
5  see if I can get to the beginning of this.
6          Doctor, as part of your working with the
7  residents, did you attend CCC meetings?
8      A   There was a time I was on that committee, yes,
9  sir. I don't know when I made the transition off of it. I
10 don't recall.
11     Q   And what is the normal responsibility of the CCC?
12     A   To the best of my recall, it's to discuss the
13 progress of the residents.
14     Q   So is every resident that is going through at
15 that time -- roughly, I have been told about ten -- are
16 each one discussed at the CCC meetings?
17     A   Not at every meeting. But that would be the
18 oversight, yes.
19     Q   Doctor, do you see a document in front of you?
20 Let me get the date.
21     A   Exhibit 45?
22     Q   Yes. It should say "CCC Meeting of
23 December 17th, 2014." Do you see that?
24     A   Correct. Yes.
25     Q   And it has you attending by phone, I believe?

Page 20
1      A   Yes.
2      Q   And let me ask you to take a look at -- I'll try
3  to get it so that you can see it -- the first page. And in
4  this particular -- scroll up just a little so you can see
5  what I'm referring to.
6      A   Right. I saw my name up there.
7      Q   Yes. So this has you saying -- and we're talking
8  about Dr. Diekman. "She cannot function as a PGY-1.
9  Out -- she was out the month of December for medical leave
10 for POTS."
11         So you were made aware of that, at least by that
12 time; correct?
13     A   Correct.
14     Q   And then: "Dr. Hobbs met with her and relayed
15 that she needs to improve her health and should be on
16 medical leave."
17         Did you ever know whether or not she went on
18 medical leave?
19     A   I believe that says that she was.
20     Q   Okay. So you were made aware by this meeting,
21 but you wouldn't have independent conversations with anyone
22 about that?
23     A   Correct.
24     Q   Okay. What I want to really ask you is, there's
25 a section, do you see, that starts off with "Questions"?

Page 21
1      A   Okay. Yes.
2      Q   "Questions: Did her medical school make
3  accommodations for her? And should we make accommodations
4  for her?"
5          So the earlier question I had asked, and you said
6  that you would normally remember if somebody was involved
7  with or requesting accommodations. It appears that there
8  was some discussion about that at this meeting. Would that
9  be fair to say?
10     A   It would appear to be that way.
11     Q   But you don't recall whether or not it was
12 determined whether any accommodations should be given to
13 her?
14     A   Right. And I don't believe it would be this
15 committee that would do that. Accommodations, at least in
16 the VA world, comes under ADA type of protections. And so
17 if a person makes a specific request for accommodations,
18 it's reviewed in conjunction with HR. And then there's an
19 agreement on what the accommodations are, and then you have
20 to provide those accommodations. And so that means you
21 have to communicate exactly what they are in order that you
22 can provide them.
23     Q   And that's a good point, Doctor. So when you are
24 supervising residents, and if a resident was receiving an
25 accommodation that would affect your supervision, would you

Page 22

1  expect to know what that accommodation was?
2     A    Generally, yes.
3     Q    Okay.  And that would -- that affects your
4  ability to supervise and know how to grade them on what
5  they're doing; is that a fair statement?
6     A    It sets a benchmark, yes.
7     Q    Okay.  And as far as you're aware, you never
8  received any formal information that Dr. Diekman had
9  requested accommodations?
10    A    No.  And I wouldn't receive information on a
11 request.
12    Q    Oh, you're right.  So if -- and I'm sorry.  I
13 misstated.
14         You didn't receive any information that
15 Dr. Diekman had been granted any accommodations?
16    A    To my recall, that's correct.
17    Q    Okay.  And in your experience, Doctor, since you
18 worked at the VA, and as you mentioned that accommodations
19 absolutely triggers certain information, certain things
20 that need to be done, any type of retaliation for somebody
21 requesting an accommodation would be prohibited; correct?
22    A    Correct.
23    Q    Did you ever have any conversations with
24 Dr. Hobbs regarding Dr. Diekman and Dr. Hobbs feeling that
25 anybody who requires accommodations cannot make it through

Page 23

1  the psychiatric program?
2     A    No.
3     Q    Did you ever hear Dr. Hobbs, either personally or
4  through anyone else, that she said that Dr. Diekman's
5  disability would disqualify her from graduating and working
6  as a psychiatrist?
7     A    Oh, no.
8     Q    Were you involved at all in the decision to put
9  Dr. Diekman on probation?
10    A    Not that I recall.  In review of this, I don't
11 see any place that I was.
12    Q    Okay.  Did you become aware at some point, other
13 than the Complaint that you reviewed, that she was put on
14 probation?
15    A    I know in the Complaint that she was, but I don't
16 recall the process or timing.
17    Q    And you don't recall having any conversations
18 with Dr. Hobbs in which she discussed with you whether or
19 not Dr. Diekman should be placed on probation?
20    A    I don't recall, no.
21    Q    Okay.  Is it -- in your opinion, Doctor, is it --
22 would it be impossible for someone to become a psychiatrist
23 if they needed accommodations generally?
24    A    The question is for my opinion --
25    Q    Yes, sir.

Page 24

1     A    -- about whether or not a person can become a
2  psychiatrist if they have accommodations?
3     Q    Yes.
4     A    Well, we have examples, I think, if someone is
5  visually impaired, hearing impaired, mobility impaired, we
6  have accommodations, and people have professional careers.
7     Q    And what about somebody who needed a set schedule
8  because they become fatigued after a certain period of
9  time, could that be accommodated?
10    A    I have to say that sounds hypothetical, so I'm
11 not sure how to answer it.
12    Q    Well, it is hypothetical, you are correct.
13         So let me ask it this way:  If someone is
14 suffering from POTS that results in their fatigue after a
15 schedule of, say, 9:00 to 5:00, and therefore, couldn't
16 work after 5:00, could they still be accommodated by that
17 schedule and graduate as a resident?
18         MR. CHAUNCEY:  I'm going to object to form.  But
19    if you can answer it, Dr. Thornton, you can.
20    A    I'll say that's outside my scope.  It's still a
21 bit hypothetical.
22 BY MR. SALZMAN:
23    Q    Well, you don't -- let me ask you it this way,
24 Doctor:  You don't believe that that would automatically
25 prohibit somebody from going through the residency program

Page 25

1  with a scheduling accommodation?
2         MR. CHAUNCEY:  Object to form, but go ahead,
3     Dr. Thornton.
4     A    Well, again, under the wording, there's very few
5  things that are absolute contraindications for anything.
6  We try to look at the situation and see what works for
7  patient care, patient safety, and professional development,
8  of course, legal compliance.
9  BY MR. SALZMAN:
10    Q    Doctor, are you aware of any residents receiving
11 an extended residency program due to either medical or
12 personal needs?
13    A    I think we have residents who have been out on
14 repeated maternity leave who extended their time.
15    Q    Are you aware of any residents that have received
16 or gone through the residency program in a reduced basis?
17 Meaning, instead of working full time, they work half time?
18    A    I don't recall any.
19    Q    What about any reduction at all in their
20 schedule, again, instead of say, half time, they're working
21 three-quarters of the time?
22    A    I don't recall any like that.
23    Q    In your opinion, would --
24    A    You have to make up -- there's a certain amount
25 of time that has to be done.  It may not be all done in

Page 26

1 four years, but eventually all that time has to be
2 accomplished.
3  Q  So somebody could have their residency extended
4 for a period of time that would allow them to maybe work
5 less hours, but the residency would just be extended?
6  A  I don't know the specifics on that, but, yeah.
7  Q  I mean --
8  A  I can't say.
9  Q  Just so we're --
10  A  I've not had to make those decisions, so I've
11 made decisions on other types of things, but not that
12 particular type.
13  Q  And just so we're clear as to what you said
14 before that, is that there's a certain amount of time and a
15 certain amount of experiences that a resident has to have
16 in order to eventually graduate from the program?
17  A  Correct.
18  Q  Okay.  And how that time period occurs may not be
19 something that you deal with specifically?
20  A  That's correct.
21  Q  Okay.  Were you ever made aware that Dr. Diekman
22 consistently used all of her sick days?
23  A  No.
24  Q  Were you aware that Dr. Diekman had applied for
25 Family Medical Leave?

Page 27

1  A  I don't recall that.
2  Q  Were you ever made aware that Dr. Diekman had
3 filed a grievance with the ADA office concerning her claim
4 that she was entitled to accommodations she didn't receive?
5  A  Not during her residency.
6  Q  You became aware by reviewing the Complaint?
7  A  There -- there's two -- there was another
8 complaint afterwards, I believe.
9  Q  After she left the program?
10  A  Correct.
11  Q  Were you aware of a complaint that was made
12 roughly May of 2015, with the ACGME about allegations of
13 violations of education, safety and retaliation in the
14 psychiatric program?
15  A  I don't recall that.  By that time I was in a
16 different role, so I may not have been in the loop for that
17 type of thing.
18  Q  Were you subsequently ever made aware that an
19 investigation was done for complaints made to the ACGME in
20 the psychiatric program?
21  A  There was a time, right, there was some type of
22 review or complaint after her residency, I believe.
23  Q  Do you recall the outcome of that review or
24 complaint?
25  A  I think this lawsuit is the outcome of that.  I'm

Page 28

1 not sure.
2  Q  Any internal outcome of the complaint in the
3 department?
4  A  I don't -- I don't know.
5  Q  Were you ever made aware of an allegation that
6 Dr. Diekman was faking her illness?
7  A  No.
8  Q  That Dr. Diekman was considered lazy?
9  A  That's a vague statement.  There were concerns
10 about her work ethic that second year.  I think my
11 evaluation might have reflected that.
12  Q  And when you talk about her work ethic, can you
13 be a little broader in what concerns you may have had?
14  A  Seeing patients, going to see patients.  That was
15 the main thing.
16     And then there was an issue did she see patients
17 where she documented that she had seen the patient.
18  Q  And she hadn't seen them?
19  A  I don't recall that we could prove that.
20  Q  Were you aware as to whether or not Dr. Diekman
21 used a dictation software?
22  A  No.
23  Q  Did you ever hear directly from Dr. Diekman or
24 from anyone else that Dr. Diekman was not allowed access to
25 educational materials while she was a resident?

Page 29

1  A  No.  I don't see how that's -- well --
2  Q  I'm sorry?
3  A  I don't see how you can keep any -- I mean, I
4 don't see how it's physically possible.
5  Q  Yeah, let me be a little more specific.  Were you
6 ever aware that Dr. Diekman was prohibited from attending
7 certain lectures when she was a resident, by Dr. Hobbs?
8  A  No.
9  Q  Were you ever aware of any allegations made while
10 Dr. Diekman was a resident that there were some fraudulent
11 billings that were occurring through residents in the
12 program?
13  A  Oh, no.  Residents don't do the billing.
14  Q  Who does the billing?
15  A  Faculty.
16  Q  Has there ever been any accusations that the
17 faculty was doing fraudulent billing?
18  A  Not that I'm aware of.  That's a pretty serious
19 charge, and so it gets a lot of attention.
20  Q  Yes, sir.  Other than the Complaint, were you
21 made aware that Dr. Diekman was going to be terminated from
22 the program?
23  A  Not that I recall.
24  Q  As a general question, Dr. Thornton, do you
25 believe that there is any difference in how female

Page 30

1  residents are treated than male residents in the program?
2  A  Not to my knowledge, no.
3  Q  Have you ever heard of any complaints regarding
4  that?
5  A  In the course of this lawsuit.
6  Q  Other than the lawsuit?
7  A  No, sir.
8  Q  At any point through Dr. Diekman's residency,
9  would you -- did you personally think that she was
10 disabled?
11 A  Now, I don't tend to frame -- that's not a
12 framework I look at.  That's a clinical assessment.  From a
13 performance assessment, I felt that she wasn't -- that
14 she was, you might say, dysfunctional, not working well.
15 And so then again in our --
16 Q  Go ahead, Doctor.
17 A  So in our world, when you run into that, then
18 it's a different mechanism as you sort what the origin of
19 that dysfunction is.
20 Q  So let's take it that Dr. Diekman was determined
21 to be dysfunctional.  Were you able to make a determination
22 as to cause of why she was dysfunctional?
23 A  No.
24 Q  Would that be normally something that you would
25 make that determination?

Page 31

1  A  No.
2  Q  And what do you normally do in that situation
3  where you find somebody who might be dysfunctional as a
4  resident?
5  A  Well, as a resident or employee or peer, you
6  address the behaviors, and then in the course of trying to
7  correct that, it falls upon the person to sort of declare
8  where the difficulty is.  Is it a lack of training?  Is it
9  a lack of tools?  Is it a lack of understanding what the
10 rules are?  Or is there some medical condition which
11 interferes with it?
12     Either way, once you identify what the obstacle
13 is, it has to be corrected.  So if it's a medical
14 condition, you'd identify it.  Or sometimes it's, you know,
15 our level, sometimes there's other, you know, conditions
16 that interfere.  The person has to declare it and get it
17 addressed.
18 Q  So if I'm understanding you correctly, Doctor, in
19 that situation, it would normally be the resident's
20 responsibility to bring those issues forward so that they
21 can deal with them appropriately; correct?
22 A  Generally yes.  Some people, for various reasons,
23 don't want to address their medical personal things in
24 their work environment, so they choose to not do that.
25 Q  And during the time period that we're talking

Page 32

1  about, 2013 through 2015, it would be the resident's
2  responsibility to bring that forward to Dr. Hobbs?
3  A  I believe so.
4  Q  And there's also, as we've received testimony
5  before, there is an HR department that they would contact,
6  and also an ADA component department?
7  A  At the VA, I know that's the case.  I don't know
8  the specific organization on the campus side.
9  Q  Okay.  So at the VA, that would be what the
10 person would do, and you're just unaware of whether or not
11 they had the same thing at the university?
12 A  Well, they'd have something, I just don't know
13 what it is.
14 Q  Gotcha.
15     Doctor, is there anything else you can tell me
16 about Dr. Diekman, either things that you observed, or
17 things that you heard that would have affected her ability
18 to go through the residency program that we haven't
19 discussed?
20 A  No.
21     MR. SALZMAN:  Gay, let's attach that last
22 exhibit.  That should be Dropbox No. 45.
23     (12-17-2014 CCC meeting minutes marked Plaintiff's
24 Exhibit 4.)
25     MR. SALZMAN:  Dr. Thornton, I have no further

Page 33

1  questions.  Thank you very much for your time.
2     THE DEPONENT:  Thank you.  Do I sign off?
3     MR. SALZMAN:  One second.  David, go ahead.
4     MR. CHAUNCEY:  No questions.
5     MR. SALZMAN:  And read or waive?
6     MR. CHAUNCEY:  He'll waive.
7     MR. SALZMAN:  Thank you, Dr. Thornton.  You're
8  done.
9     (Deposition concluded at 4:25 p.m.)
10
11        S T I P U L A T I O N
12
13     It is hereby stipulated and agreed by and among
14 the attorneys present and the witness that reading and
15 signing of the deposition by the witness is waived.

Page 34

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that the witness named herein personally appeared before me and was duly sworn.

Witness my hand and official seal this 6th day of July, 2020.

_____
J. Gay Smith, RPR, RMR, FPR
Notary Public - State of Florida
My Commission Expires: 2/18/2021
Commission No.: GG 041811

Page 35

REPORTER'S CERTIFICATE

STATE OF FLORIDA    :
COUNTY OF HILLSBOROUGH :

I, Jolyn Gay Smith, RPR, RMR, FPR, certify that I was authorized to and did stenographically report the deposition of JOSEPH THORNTON, MD; that a review of the transcript was not requested and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the foregoing action.

Dated this 6TH day of JULY, 2020, IN THE CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.

_____
JOLYN GAY SMITH, RPR, RMR, FPR
Registered Merit Reporter
Florida Professional Reporter

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.