# Exhibit 36

Page 1

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF FLORIDA
2              GAINESVILLE DIVISION
3
4
5  ---------------------------------x
   SARAH DIEKMAN,
6  an individual,
7          Plaintiff,
   vs.                     CASE NO.:  1:19-cv-00227-AW-GRJ
8
   UNIVERSITY OF FLORIDA,
9  a Florida municipal corporation,
10         Defendant.
   ---------------------------------x
11
12
13
            DEPOSITION OF STEPHEN WELCH, MD
14          (Conducted Via Videoconference)
15
16
17  DATE:                June 25, 2020
18  TIME:                1:30 p.m. to 2:14 p.m.
19
    PURSUANT TO:         Notice by counsel for Plaintiff for
20                       purposes of discovery, use at
                         trial or such other purposes as
21                       are permitted under the Florida
                         Rules of Civil Procedure
22
    REPORTER:            J. Gay Smith, RPR, RMR, FPR
23                       Notary Public, State of Florida
24
25              Pages 1 - 31

Page 2

 1  APPEARANCES:
 2    ANDREW J. SALZMAN, ESQUIRE
      Unice, Salzman & Jensen, P.A.
 3    Patriot Bank Building, Second Floor
      1815 Little Road
 4    Trinity, Florida  34655
         Attorney for Plaintiff
 5
      DAVID E. CHAUNCEY, ESQUIRE
 6    Alexander DeGance Barnett
      1500 Riverside Avenue
 7    Jacksonville, Florida  32204
         Attorney for Defendant
 8
 9
10
11         I N D E X
12  DIRECT EXAMINATION BY MR. SALZMAN       Page   3
13  STIPULATION                             Page  29
14  CERTIFICATE OF OATH                     Page  30
15  REPORTER'S CERTIFICATE                  Page  31
16         E X H I B I T S
17           (None)
18
19
20
21
22
23
24
25

Page 3

 1           P R O C E E D I N G S
 2        THE COURT REPORTER:  The attorneys participating
 3    in this deposition acknowledge that I, the court
 4    reporter, am not present with the witness and that I
 5    will be reporting the proceedings and administering
 6    the oath remotely.  This arrangement is pursuant to
 7    the Florida Supreme Court Administrative Order No.
 8    AOSC-20-23.  The parties and their counsel consent to
 9    this arrangement and waive any objections to this
10    manner of reporting.  Please indicate your agreement
11    by stating your name and your agreement on the record.
12        MR. SALZMAN:  Andrew Salzman, attorney for Sarah
13    Diekman.  I consent.
14        MR. CHAUNCEY:  Dave Chauncey on behalf of the
15    University of Florida.  We agree.
16           STEPHEN WELCH, MD,
17  the witness herein, being first duly sworn on oath, was
18  examined and testified as follows:
19           DIRECT EXAMINATION
20  BY MR. SALZMAN:
21    Q   Please state your full name for the record.
22    A   Stephen James Phillip Welch.
23    Q   And you are a doctor?
24    A   Yes, sir.
25    Q   And where are you currently employed?

Page 4

 1    A   The North Florida, South Georgia Veterans Health
 2  System in Gainesville, Florida.  And I also work for the
 3  University of Florida as an adjunct clinical professor.
 4    Q   And, Doctor, how long have you been a licensed
 5  doctor in the state of Florida?
 6    A   Full license or training license?
 7    Q   Let's go with full license.
 8    A   Somewhere between eight and nine years now, I
 9  think.
10    Q   Doctor, have you ever had your deposition taken
11  before?
12    A   I believe I have.
13    Q   Okay.  Just general rules.  If you don't
14  understand the question, please ask me and I'll rephrase
15  it.
16        If we are -- if I've asked you a question, I will
17  pause and let you respond.  And please don't interrupt me
18  when I'm asking a question because the court reporter is
19  trying to take everything down, and when we cross over in
20  our conversations, she gets frustrated.
21        And please make sure that you either answer "Yes"
22  or "No," or an explanation answer.  No "Uh-huhs" or
23  "Huh-uhs," or shaking your head.  She can't take that down.
24  Is that okay?
25    A   Yes, sir.

Page 5

 1    Q   Okay.
 2    A   Yes, sir.
 3    Q   Doctor, in the years 2013 through the end of
 4  2015, where were you employed?
 5    A   The same places I am now, the VA and the
 6  University of Florida.
 7    Q   Do you know Sarah Diekman?
 8    A   Through work.
 9    Q   And how did you know her through work?
10    A   She was a resident in psychiatry at the
11  University of Florida.  I was attending physician for the
12  VA consult liaison rotation.
13    Q   So what would your interaction be with her in the
14  years 2013 through 2015?
15    A   When she was on the rotation Mondays through
16  Fridays, we would have interacted to take care of patients
17  mornings and most afternoons.  And when we were on call
18  together, I would have been the attending physician talking
19  to her on the phone.
20    Q   Is it fair to say that you would have been
21  considered her supervisor?
22    A   Clinical supervision, yes.
23    Q   Were you required to report to anyone about her
24  job performance during that time period?
25    A   Yes.

Page 6

1  Q   Who would you be required to report to?
2  A   The psychiatry residency.  Mainly it was
3  Dr. Jackie Hobbs, as the residency director.  I also would
4  have interacted with Dr. Uma Suryadevara as kind of the --
5  I forget what her exact title is, but she is the liaison
6  between the psychiatry residency and the VA.
7  Q   In the rotation for a resident like Dr. Diekman,
8  how often in a -- let's start off with the first year.  How
9  often would she be in a rotation that you or the VA would
10 be a part of?
11 A   I'm sorry.  I missed the middle of that question.
12 It was breaking up.
13 Q   Oh, I'm sorry.  What I'm trying to find out is
14 during a given year of Dr. Diekman's residency, how often
15 would she have a rotation where you would be involved?
16 A   A lot of it would depend on whatever the schedule
17 set up by the chief residents and the residency would be,
18 but I imagine it would be once or twice.
19 Q   And how long is a given rotation?
20 A   Approximately one month.
21 Q   Would you say that you -- or could you give me an
22 approximate number of times you would have worked with
23 Dr. Diekman when she was a resident?
24 A   I'd have to look at the records.  I honestly
25 don't remember how often.  You know, if it was over the

Page 7

1  course of two and a half, three years, once or twice a
2  year, something like that.
3  Q   Do you feel you were able to -- or do you feel
4  you're able to give an opinion as to what type of resident
5  she was?  Meaning, how she was doing through the program?
6  A   Yes.  I would have enough time with the residents
7  during that particular rotation to be able to give an
8  opinion.
9  Q   And can you give that opinion now?
10 A   Based on my memory, a general opinion, yes.  For
11 more specifics, you'd have to go back and reference what I
12 wrote at the time.
13 Q   What is your general opinion as you recall it?
14 A   That she was not safe to practice medicine
15 independently.
16 Q   And do you recall what you based that opinion on?
17 A   The daily interactions while she was on the
18 consult rotation, and the staffing while on call, when that
19 happened.
20 Q   Do you recall or could you give me some of the
21 general deficiencies you felt that she had?
22 A   From memory, I -- without referencing the
23 specifics, she really wasn't able to understand what was
24 going on with her patients.  With consult liaison, we are
25 often asked to do safety assessments with regard to acute

Page 8

1  suicidal ideation, whether or not a patient is safe to be
2  discharged home with a plan, or whether or not they need to
3  be admitted for treatment to ensure that they don't die by
4  suicide, and she just wasn't able to adequately do that.
5  Q   At some point during your interactions with
6  Dr. Diekman, did you become aware that she suffered from
7  any medical conditions?
8  A   No.
9  Q   You had never heard that she suffered from POTS?
10 A   I don't remember hearing that.
11 Q   What about dyslexia?  Were you aware that she had
12 dyslexia?
13 A   No.
14 Q   And what about ADHD?
15 A   No.
16 Q   If you had been aware of any of those conditions,
17 would you have interacted with her any differently?
18 Meaning would you have looked at her performance any
19 differently?
20 A   No.  I try and look at everybody the same.
21 Q   Are you aware in your -- well, let me ask you
22 this way:  During the time that you have been a licensed
23 physician and then went through the residency program
24 yourself, have you ever dealt with any residents that
25 needed an accommodation?

Page 9

1  A   I can't recall any particular residents that
2  required accommodations.  It's usually not something that I
3  would ask about unless I needed to know.
4  Q   Have you ever had a situation where you were
5  notified that a resident had an accommodation?  So, for
6  example, they needed to have a schedule where they didn't
7  work late because they would be fatigued?
8  A   Not that I can recall specifically.
9  Q   Would you be -- you feel that you would be
10 involved in rendering an opinion as to whether or not
11 somebody could go through the residency program if they
12 needed an accommodation?  Specifically a psychiatric
13 residency.
14 A   No.  In my position as a clinical supervisor, I
15 wouldn't be involved with the accommodation decision.  And
16 it just would have been if the residency program needed me
17 to do something differently, they would have let me know
18 and we would have gotten it done.
19 Q   So you would have received -- it's fair to say
20 you would have received direction from somebody else that
21 said this is the plan for this particular person, and this
22 is what we want you to do in accommodating them?
23 A   Yes.
24 Q   And were you ever aware of any problems or
25 concerns that Sarah Diekman had regarding parking while

Page 10

1  she was a resident in the psychiatric program?
2      A    No.
3      Q    Did you ever have discussions with Dr. Hobbs
4  concerning Sarah Diekman, where she -- she, meaning
5  Dr. Hobbs, mentioned that she did not believe that
6  Dr. Diekman could make it through the psychiatric program?
7      A    Specifically I don't -- I don't recall anything
8  like that.  Usually what I would do is report my concerns,
9  and then they would take it to a committee to review
10 resident progress.  And I wasn't involved with that
11 committee.
12     Q    That would be the CCC?
13     A    Yes.
14     Q    Did you have a -- well, in your interactions with
15 Dr. Diekman, did she appear to complain a lot to you?
16     A    It's been so long, I honestly don't remember.
17     Q    Is there anything about her personality that you
18 recall or that sticks out in your mind after this period of
19 time that you can assign to her?
20     A    I have some memories that I had the feeling that
21 she didn't take the feedback she was receiving to improve
22 as a physician seriously enough.  But other than that, no,
23 I don't recall anything about her personality.
24     Q    And I did ask you about whether or not you knew
25 about her medical conditions, and you said you did not.  Do

Page 11

1  you recall her ever complaining, or did you become aware of
2  her complaining or concerns regarding her own medical
3  conditions?
4      A    No.  As an attending physician, I try and respect
5  everybody's privacy, so, you know, unless I need to know
6  for some reason, it's not something I would have asked
7  about.
8      Q    Doctor, did you ever become aware that an
9  incident was alleged by Dr. Diekman where she was sexually
10 harassed at the VA?
11     A    No.
12     Q    Did you know a Dr. Syfert?
13     A    Yeah.  I knew him through work.  He was not the
14 pleasant individual, but to my recollection, he was a jerk
15 to everybody.
16     Q    So he was a general jerk, but you don't recall
17 any complaints being made about him either touching or
18 making inappropriate sexual comments towards other doctors?
19     A    Nothing like that was ever brought to my
20 attention.
21     Q    Thank you.
22          Are you aware of any comments being made to
23 Dr. Diekman in a sexual nature?
24     A    No.
25     Q    Do you know Dr. Averbuch?

Page 12

1      A    Yes.
2      Q    And are you aware of any complaints being made
3  against Dr. Averbuch for making sexual -- suggestive sexual
4  comments to Dr. Diekman?
5      A    No.
6      Q    Are you aware of any retaliation that you
7  observed or were told of against Dr. Diekman as a result of
8  her complaints of sexual harassment?
9      A    No.
10     Q    And the same line of questions.  Are you aware of
11 any retaliation against Dr. Diekman, either personally
12 aware or being told as a result of her complaining of
13 failure to receive accommodations?
14     A    No.
15     Q    Were you ever present or did you hear Dr. Hobbs
16 make any comments that a person could not become a
17 successful psychiatrist if they needed accommodations?
18     A    I've never heard her say anything like that.
19     Q    Did you know a Dr. Chang?
20     A    What was his first name, or her first name?
21     Q    His.  And I want to say it began with an S.
22 Let's see.  I don't have it right in front of me.
23          MR. SALZMAN:  David, do you have his first name?
24          MR. CHAUNCEY:  San.
25     A    Yes.  He was one of the residents during that

Page 13

1  time period.  I'm not -- I don't remember exactly what year
2  he graduated.
3      Q    Did you have any interactions with him, or can
4  you render an opinion of what you thought of him?
5      A    I thought that he ended up being a good graduate
6  from the program.  I believe he went on to work at North
7  Florida.
8      Q    Were you aware, during the time period of roughly
9  2013 through 2015, as -- if there was any issue with
10 residents calling out sick?
11     A    I don't remember anything like that.
12     Q    Okay.  Do you recall, or were you aware of any
13 issues where people who called out sick were treated
14 differently than those that didn't call out sick?
15     A    No.  I don't recall any of that.
16     Q    Is it possible, in the rotation that you were
17 involved in with Dr. Diekman -- and assume for argument's
18 sake that she needed a set schedule, like, an 8:00 to
19 5:00 schedule.  Is that possible through that rotation?
20     A    Yes, with some exceptions.  I mean, you know, we
21 generally would meet at a specific time for morning rounds,
22 and I believe that was 9:30 or 10:00 or something.  It's
23 been a number of years, and I just don't remember those
24 details anymore.
25          And so folks would be expected to get there in

Page 14

1  time to prepare for the -- get to know their patients and
2  know what was different that day.
3       So I think most people -- if they'd shown up
4  7:30, 8:00, they would have been okay.  You know, the time
5  itself wasn't all that critical, so if we needed to move it
6  around by 15 or 30 minutes for a specific reason, we would
7  have been able to do that.
8       It was more that it needed to happen sometime
9  midmorning so that we would have time to go and see the
10 patients that needed to be seen, and communicate with the
11 primary teams about what our recommendations are before the
12 day was about half over.
13      And then in the evenings, you know, I believe the
14 cutoff time for new consults was 4:30.  But because
15 consults can be a little bit unpredictable, some days you
16 might get no new consults, or just one or two.  Other times
17 you might get a really complex patient five minutes before
18 it was time to leave for the day.  And in that case, you'd
19 have to -- we'd stay and take care of the patient.
20      But in general it would be possible to have a set
21 time frame for the consult rotation.
22   Q   Thank you.
23       Are you aware of anyone -- I guess -- let me
24 preface this by saying I understand you said that you
25 didn't know that Dr. Diekman had any kind of medical

Page 15

1  conditions.  Are you aware of anybody claiming or stating
2  that Dr. Diekman was faking and did not suffer from any
3  type of illness?
4    A   I don't recall hearing anything like that.
5    Q   Did you ever hear that Dr. Diekman was referred
6  to as lazy?
7    A   No.  Those sort of comments would be really
8  unusual for residents to talk about with attendings.
9    Q   Got you.
10       Are you aware of any complaint around May of
11 2015, made to the ACGME by a resident?
12   A   I remember that the ACGME looked into the
13 residency several years ago, but I -- to tell you the
14 truth, I'd have to look at the records as to what was going
15 on and what year it was.  But I can recall that after, I
16 think, a period of several months, they -- I believe that
17 they told us that they had done some interviews and looked
18 at the paperwork and everything, and said the residency was
19 fine.
20   Q   Is that a critical type of issue when somebody
21 files a complaint with the ACGME?
22   A   I -- we treat it very seriously, any concerns
23 that the ACGME would bring to us.
24   Q   What are the potential negative outcomes that
25 could occur if there's a complaint made to the ACGME?

Page 16

1    A   For the specifics, because the administration of
2  the residency program is not something I ever got too much
3  involved in, so I would imagine that if the ACGME had
4  concerns, it would range from an in-depth look into a
5  program, all the way up to having your accreditation and
6  have their residency program revoked for specific
7  categories.  And I would imagine that they have a full
8  range in between those things.
9    Q   Were you ever aware right around the same time
10 period, and maybe a couple of months later, that a
11 complaint was made that there was fraudulent billing
12 occurring?
13   A   Through psychiatry?
14   Q   Yes.
15   A   No.  I don't remember anything like that.
16   Q   At some point did you become aware that
17 Dr. Diekman was placed on special observation prior to
18 being placed on probation?
19   A   I believe so.  I don't remember when I was
20 informed about that.  But that's the sort of thing that the
21 residency program would let attendings know so that we can
22 provide extra observation and support to residents.
23   Q   Did you -- and I think you mentioned it, but I
24 just want to be clear.  Did you attend any of the CCC
25 meetings?

Page 17

1    A   No.  I never attended a CCC meeting.
2    Q   Would you become aware of, either through
3  Dr. Hobbs or some other source, the results of a CCC
4  meeting?
5    A   Yeah.  If I needed to know something, then
6  probably Dr. Suryadevara would have been the one to tell me
7  about it.
8    Q   Did you know a Dr. Tandon, T-A-N-D-O-N?
9    A   Yes.
10   Q   And how did you know Dr. Tandon?
11   A   I first met him when I was a resident, when he
12 was hired to come here from Michigan.  Our main
13 relationship was he was the chief of psychiatry at the VA
14 when I was hired, and throughout a number of years.  And I
15 think it was about a year or two ago that he left to go
16 back to Michigan to take up a different position.
17   Q   Would you have had any regular interactions with
18 Dr. Tandon during the time period of 2013 through 2015?
19   A   Yes.
20   Q   At any point did Dr. Tandon mention to you that
21 he was -- he was concerned or questioning whether
22 Dr. Diekman needed some type of accommodation?
23   A   I don't remember any specifics.
24   Q   Generally do you recall any kind of discussion?
25   A   Generally, yeah.  You know, the attendings

Page 18

1  would -- will talk to each other about the different
2  residents, how folks are doing, if they have areas that
3  they need a little bit of extra help with, or if they're
4  particularly good at something, or if they're particularly
5  interested in something.  I think just like every other
6  teaching environment, we want to share news about who is
7  doing well, and who might need some extra help.
8      Q   But you don't recall anything specifically about
9  Dr. Diekman?
10     A   Just that a lot of folks were really worried
11 about her ability to practice safely.
12     Q   But nobody mentioned that she was having any kind
13 of physical problems?
14     A   No.  If -- if people have accommodations for a
15 disability, and I don't need to know, we really try very
16 hard to respect rights to privacy.  So if someone had
17 accommodations for physical or any other reasons, and I
18 didn't need to know, as a clinical supervisor, for that
19 particular rotation, I wouldn't expect to be informed about
20 it, unless the person told me directly.
21     Q   So as a clinical supervisor -- and let me just
22 give an example, I think we talked about briefly I gave you
23 a different example on scheduling.  But if someone suffered
24 from dyslexia, and, therefore, may have had some difficulty
25 making errors or typos in their notes, would that be

Page 19

1  something important for you to know as their supervisor?
2      A   If I needed to do something to provide a
3  reasonable accommodation while they were on my rotation,
4  then, yes.  But if there wasn't a reasonable accommodation
5  that needed to be made, or -- then I wouldn't expect to be
6  told about it, you know.
7          Lots of folks have dyslexia and it's not my
8  business unless they want to talk to me about it.
9      Q   Gotcha.
10         And is it your understanding that normally
11 accommodations are handled through the ADA office?
12     A   I actually don't know the specifics for the
13 University of Florida.
14         With the VA, we have enough policies and
15 procedures and things that it's hard enough to keep track
16 of the side of the street.  So, you know, if something like
17 that came up for UF, I would ask Dr. Hobbs and
18 Dr. Suryadevara, one of the other UF people, you know,
19 like, what do I need to do, or what's the -- whom does this
20 resident need to talk to about getting this taken a look
21 at.
22     Q   Doctor, during your supervision of Dr. Diekman,
23 or when she was going through your rotations, did she ever
24 fail any of those rotations?
25     A   Yes, she did.

Page 20

1      Q   Do you recall how many?
2      A   One, maybe two.  I know the last time I worked
3  with her, she just was not able to successfully safely
4  complete it.  It was a really big concern since she was so
5  far into the residency.
6      Q   And so who makes the ultimate determination
7  whether or not -- or in this case that she failed the
8  rotation?
9      A   I think in that particular case, it would have
10 been me.  You know, I'm sure that there's the -- whether or
11 not someone needs to get repeated with their -- I'm sure
12 the residency has a policy for how that goes after an
13 attending says that this person didn't successfully pass.
14 I'd have to go look at what it is.
15     Q   And do you think that was --
16         Let me ask you this:  Do you recall what year
17 she was in at that time?
18     A   I think it was her third year.
19     Q   And so I don't have this as an exhibit, so I'm
20 just going to kind of go through it with you and to see
21 what you recall.
22         MR. SALZMAN:  And, David, just so you know, I'm
23     looking at an email from Dr. Welch dated August 6th,
24     2015, to Dr. Hobbs regarding "Resident issue feedback
25     today."

Page 21

1          MR. CHAUNCEY:  Is this -- this is in with the
2      exhibits that you have provided previously?
3          MR. SALZMAN:  I actually think -- it's actually,
4      I could identify it, it's an exhibit you provided.
5          MR. CHAUNCEY:  Okay.
6          MR. SALZMAN:  Under Bates stamp 000281.
7          MR. CHAUNCEY:  Okay.
8          MR. SALZMAN:  Are you pulling it up?
9          MR. CHAUNCEY:  I am.  Let's see.  Just give me
10     one second.  All right.  I'm there.
11         MR. SALZMAN:  Okay.  So this is actually just for
12     the court reporter, this is a three-page document
13     beginning with Bates stamp 000281, 282 and 283, which
14     have previously been provided to the plaintiff by the
15     defendant.
16 BY MR. SALZMAN:
17     Q   Doctor, so this starts off with:  "Hi, Jackie.
18 Anna and I spoke with Dr. Diekman today together.  The
19 verbal feedback session was approximately ten to twelve
20 minutes."  Who was Anna?
21     A   Dr. Anna Turner.  She was a co-attending on the
22 consult services for a couple of years.
23     Q   And just so as we start off, it says, "We do not
24 find she is working at a PGY-3 level, and would like to
25 discuss concerns and hear what she needs to be successful."

Page 22

1  So would this be that time period you were
2 talking about that you had concerns that she wasn't at the
3 level she should be?
4  A  Yes.
5  Q  And just generally, just so to try to familiarize
6 you with the document you're not seeing, some of the issues
7 brought up is -- "Consistency is a large issue. Following
8 directions from attending. Timeliness of documentation,
9 and time management." Do those sound like the issues --
10  A  Yes.
11  Q  -- you would have talked to Dr. Diekman about?
12  A  Yes.
13  Q  Do you recall -- do you independently recall that
14 meeting you had with her?
15  A  Just that it happened.
16  Q  Okay. Do you recall any of Dr. Diekman's
17 response?
18  A  No. Not independently.
19  Q  The -- towards the end of this email that you
20 wrote -- and the reason I said you wrote it, it's signed or
21 it's referenced, it says "Stephen" at the bottom.
22  A  Stephen.
23  Q  I'm sorry. I apologize. Stephen.
24  A  That's okay. Everybody does it to me.
25  Q  Which is very funny, because I have a very good

Page 23

1 friend named Stephen. So that's my fault.
2     So, Doctor, you wrote: "Dr. Turner and I will
3 send the -- a full weekly review tomorrow." And then it
4 states: "Has Dr. Diekman been given accommodations," with
5 a question mark.
6     So did you have a concern that she might have
7 some type of need for accommodations?
8  A  You know, I honestly don't remember why I would
9 have asked that question.
10  Q  Well, let me tell you what the follow-up -- let
11 me read you that whole short paragraph. "Has Dr. Diekman
12 been given accommodations? We have given her the same
13 workload as we would any other resident." And then
14 parentheses, capped "At four follow-ups a day, new evals
15 managed as appropriate." And then: "Tuesday, which was
16 extremely busy, resulted in attending doing four new evals
17 with two passed to short call. Are those accommodations we
18 are unaware of?"
19     So does that trigger anything that you were
20 concerned that she might have been in need of some type of
21 accommodation?
22  A  No. I think it was more I wanted to know if
23 there were some that had been granted that I should be
24 aware of.
25  Q  Okay. What do you think would have triggered you

Page 24

1 to make that kind of comment or request to know that
2 information?
3  A  It probably would have been something that she
4 said to me during that meeting.
5  Q  Okay. Do you recall -- and, actually, it's
6 listed as the next day -- kind of having an issue between
7 yourself, Dr. Turner, and Dr. Diekman regarding exchanging
8 information back and forth on how to handle some new
9 patients?
10  A  Oh, I'd have to look at the email.
11  Q  Okay. Just to see if this refreshes your
12 recollection, Dr. Diekman said that -- well, let me ask
13 this: Did you and Dr. Turner work the same schedules?
14  A  Yes.
15  Q  Or did you at some point?
16     And during the time of, say, August of 2015, were
17 you -- you and Dr. Turner at the same level, or was one of
18 you the supervisor of the other?
19  A  I wasn't her supervisor. I would have been
20 what's called a team lead in the VA or the federal
21 government. And what that means is I wouldn't have
22 anything to do with her yearly performance or approving
23 leave officially or anything like that. But in terms of
24 day-to-day workload assignments, kind of giving general
25 guidance, that's what a team lead does.

Page 25

1  Q  Do you ever recall having an incident with
2 Dr. Diekman where she at least said that you and Dr. Turner
3 were both giving her different directions on how to handle
4 patient care?
5  A  I'd have to look at any documents to recall the
6 specifics of that.
7  Q  It doesn't ring a bell to you?
8  A  Not specifically.
9  Q  And let me just ask you a couple of more
10 questions on it, see if it brings any kind of recollection.
11 At some point she claims you got frustrated with her and
12 hung up the phone on her. Do you recall that?
13  A  No. That doesn't sound like something I would
14 ever want to do with a resident.
15  Q  Do you recall her ever making a complaint against
16 you on how she was treated?
17  A  I'm not aware of any complaints like that.
18  Q  I don't think I asked you, but did you become
19 aware at some point that Dr. Diekman was placed on
20 probation?
21  A  I believe I did.
22  Q  Do you recall how you became aware of that?
23  A  Not specifically. I think I said before that
24 Dr. Saryadevara probably would have told me either through
25 in person or through email.

Page 26

1  Q  And what about termination, did you become aware
2  that Dr. Diekman had been terminated?
3  A  After it happened, yeah, I heard that at some
4  point.
5  Q  Did you ever hear why she was terminated?
6  A  Not specifically.  I mean, once I heard, I pretty
7  much knew that -- well, I -- I didn't think that she was a
8  safe physician.
9      MR. SALZMAN:  David, if you would look at Bates
10     stamp 000315.
11     MR. CHAUNCEY:  Okay.
12 BY MR. SALZMAN:
13  Q  And, Doctor, this is not an email regarding --
14 you know, from you, or you didn't receive this.  But this
15 happens to be an email from Dr. Diekman dated August 27th,
16 2015 to Dr. Hobbs regarding a meeting that Dr. Diekman had
17 with Dr. Hobbs.  But the discussion was false
18 documentation, and supposedly that Dr. Diekman had been
19 involved in some false documentation.  Are you aware of any
20 incident like that?
21  A  I vaguely recall being concerned about something,
22 but it's been so many years, I'd have to look at the
23 specifics of the emails or forms to kind of jog my memory.
24  Q  One of the things, just so you know, that
25 Dr. Diekman put in the email is she states:  "Additionally,

Page 27

1 I would like the record to show that this error occurred as
2 the fallout of the ethics complaint being against Dr. Welch
3 personally by the primary team."  Were you ever subject of
4 any ethics complaints?
5  A  No.  No.  I can't even think of anything that
6 would be close to an ethics complaint in the VA.  I mean,
7 we're the federal government.  There would be lots of
8 records about something like that, so --
9  Q  So as far as you're aware, there's been no ethics
10 complaints made against you?
11  A  No.  That's something that we would, as a
12 provider here, would be informed about.
13  Q  Have you ever been subject of any type of
14 investigation?
15  A  Just the normal peer review.
16  Q  But nothing like been accused of harassment,
17 hostile work environment, anything like that?
18  A  No.
19  Q  When you were concerned about Dr. Diekman's
20 ability to adequately care for the patients, if that's a
21 fair way of putting it, did you follow up with any of those
22 issues with anyone?
23  A  Yes.  Quite a bit with Dr. Hobbs.
24  Q  And do you recall how Dr. Hobbs dealt with that
25 situation or told you about the situation?

Page 28

1  A  She would generally ask for more information, and
2 then let me know that it was being brought to the
3 committee.  And, you know, that was one of those things
4 where since they were looking at a picture of an entire
5 residency, not just one rotation, I left it up to whatever
6 the committee decided.  Because, you know, it's certainly
7 possible that I was getting a -- not a full picture, but I
8 had some really significant concerns when she was on the
9 consult service that patients would die.
10  Q  And just -- Doctor, just so we're clear on a
11 couple of things, because you -- were you ever aware that
12 Dr. Diekman filed a grievance for an ADA complaint?
13  A  No.
14  Q  Were you ever aware that Dr. Diekman, on two
15 separate occasions, filed for formal reasonable
16 accommodations with the university?
17  A  No.
18  Q  Are you -- were you ever made aware of any
19 discussions that were held regarding accommodations for
20 Dr. Diekman?
21  A  No.
22     MR. SALZMAN:  Doctor, thank you so much.  I
23 appreciate your time.  I have no further questions.
24     MR. CHAUNCEY:  I have no questions.
25     MR. SALZMAN:  Want to put him down for a read or

Page 29

1 waive?
2     MR. CHAUNCEY:  We'll waive.
3     (Deposition concluded at 2:14 p.m.)
4
5      S T I P U L A T I O N
6
7     It is hereby stipulated and agreed by and among
8 the attorneys present and the witness that reading and
9 signing of the deposition by the witness is waived.

Page 30

```
 1            CERTIFICATE OF OATH
 2
 3  STATE OF FLORIDA
 4  COUNTY OF HILLSBOROUGH
 5        I, the undersigned authority, certify that the
 6  witness named herein personally appeared before me and was
 7  duly sworn.
 8        Witness my hand and official seal this 6th day
 9  of July, 2020.
10
11
12
13
14        _____
15        J. Gay Smith, RPR, RMR, FPR
           Notary Public - State of Florida
16         My Commission Expires: 2/18/2021
           Commission No.: GG 041811
17
18
19
20
21
22
23
24
25
```

Page 31

```
 1            REPORTER'S CERTIFICATE
 2  STATE OF FLORIDA      :
 3  COUNTY OF HILLSBOROUGH :
 4        I, Jolyn Gay Smith, RPR, RMR, FPR, certify that I
 5  was authorized to and did stenographically report the
 6  deposition of STEPHEN WELCH, MD; that a review of the
 7  transcript was not requested and that the transcript is a
 8  true and complete record of my stenographic notes.
 9        I further certify that I am not a relative,
10  employee, attorney, or counsel of any of the parties, nor
11  am I a relative or employee of any of the parties'
12  attorneys or counsel connected with the action, nor am I
13  financially interested in the outcome of the foregoing
14  action.
15        Dated this 6TH day of JULY, 2020, IN THE CITY OF
16  TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.
17
18
19
20
21
22        _____
23        JOLYN GAY SMITH, RPR, RMR, FPR
           Registered Merit Reporter
24         Florida Professional Reporter
25
```

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.