# Exhibit 37

Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF FLORIDA
2                  GAINESVILLE DIVISION
3
4    SARAH DIEKMAN, an individual,
5                Plaintiff,
6    vs.                                Case No.
                                        1:19-cv-00227-AW-
7    UNIVERSITY OF FLORIDA, a Florida   GRJ
     municipal corporation,
8
                 Defendant.
9    _____/
10
11            DEPOSITION OF ANA TURNER, M.D.
12          (Conducted Via Videoconference)
13
14
15   DATE:             June 22, 2020
16
     TIME:             2:30 p.m. to 3:05 p.m.
17
18   PURSUANT TO:      Notice by counsel for Plaintiff
                       for purposes of discovery, use at
19                     trial or such other purposes as
                       are permitted under the Federal
20                     Rules of Civil Procedure
21
     REPORTED BY:      Aaron T. Perkins, RMR, CRR, CRC
22                     Notary Public, State of
                       Florida at Large
23
24                     Pages 1 to 31
25

Page 2

```
 1  APPEARANCES:
 2
    ANDREW SALZMAN, ESQUIRE
 3  Unice Salzman Jensen, P.A.
    1815 Little Road
 4  Second Floor
    Trinity, Florida  34655
 5
        Attorney for Plaintiff
 6
 7
    DAVID E. CHAUNCEY, ESQUIRE
 8  Alexander DeGance Barnett
    1500 Riverside Avenue
 9  Jacksonville, Florida  32204
10
        Attorney for Defendant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  DIRECT EXAMINATION BY MR. SALZMAN    Page 4
 3  STIPULATION                          Page 29
 4  CERTIFICATE OF OATH                  Page 30
 5  REPORTER'S CERTIFICATE               Page 31
 6
 7
 8
 9
10
             E X H I B I T S
11
    Exhibit A   An e-mail from Karen     Page 9
12              Chin dated January 16,
                2014, with the subject
13              of "resident
                timesheets."
14
    Exhibit B   A document titled,       Page 20
15              Psychiatry Faculty
                Evaluation of
16              Resident.
17
18
19
20
21
22
23
24
25
```

Page 4

 1    THE REPORTER: The attorneys participating in
 2  this deposition acknowledge that I, the court
 3  reporter, am not present with the witness and that
 4  I will be reporting the proceedings and
 5  administering the oath remotely. This arrangement
 6  is pursuant to the Florida Supreme Court
 7  Administrative Order AOSC-20-23.
 8    The parties and their counsel consent to this
 9  arrangement and waive any objections to this manner
10  of reporting.
11    Mr. Salzman, do I have your consent?
12    MR. CHAUNCEY: Yes, you do have my consent on
13  behalf of the defendant, the University of Florida.
14    THE REPORTER: Mr. Salzman, do I have your
15  consent?
16    MR. SALZMAN: Yes, you have my consent on
17  behalf of the plaintiff, Sarah Diekman.
18        ANA TURNER, M.D.,
19  the witness herein, being first duly sworn on oath, was
20  questioned and testified as follows:
21    THE WITNESS: I do.
22        DIRECT EXAMINATION
23  BY MR. SALZMAN:
24    Q. Doctor, please state your full name for the
25  record.

Page 5

 1    A. Ana Turner.
 2    Q. And, Doctor, where are you employed?
 3    A. University of Florida.
 4    Q. And in what capacity?
 5    A. As a psychiatrist.
 6    Q. And how long have you been employed by the
 7  University of Florida?
 8    A. In this current role, for three years.
 9    Q. Previously, were you employed by the
10  university?
11    A. In a part-time role.
12    Q. And are you currently a contractual employee?
13    A. Kind of. I'm a UF employee and contracted
14  to the Sulzbacher Center.
15    Q. And what do you do there?
16    A. I'm a psychiatrist there.
17    Q. And what is your current salary that the
18  university is paying you?
19    A. Salary?
20    Q. Yes.
21    A. $160,000. And part of that is paid for
22  through different sources.
23    Q. Okay. So different sources pay you. Do they
24  pay the university, or do they pay you directly?
25    A. So I am employed by the University of Florida

2 (Pages 2 - 5)

Page 6

1  Jacksonville for one fourth of that and then the
2  University of Florida Gainesville for three fourths of
3  it, and Sulzbacher pays that.
4      Q.  Okay.  How long have you been a licensed
5  psychiatrist in the state of Florida?
6      A.  Since 2013 or 2014.  A licensed psychiatrist
7  in 2014.
8      Q.  And in 2013, what was your position with the
9  University of Florida?
10     A.  I was a resident physician.
11     Q.  And what do you do -- I'm sorry, go ahead.
12     A.  And chief resident of the psychiatry
13  department.
14     Q.  And how long had you been chief resident as of
15  2013?
16     A.  Well, it's a one-year position, so May of
17  2012 -- or May of 2013 through April of 2014.
18     Q.  And what are your duties, generally, as the
19  chief resident?
20     A.  To make various schedules, call schedules,
21  rotation schedules, to help residents when they need
22  help, and meet regularly with the residency director and
23  follow up on any concerns.
24     Q.  Approximately how many residents would be in
25  your group that you were scheduling or handling?

Page 7

1      A.  I think there were about, at the time, maybe
2  33 in total.
3      Q.  And when you do your scheduling, what do you
4  take into a consideration for deciding when to schedule
5  a resident to a particular location or time period?
6      A.  Mostly the year of training that they're in.
7  They're required to complete certain rotations
8  sequentially, so we have to make sure that they complete
9  various rotations before they do another.  And then we
10  keep track of how many times they've spent on one
11  service, and we try to make it even across the various
12  services.  We also allow for residents to have a
13  preference, so at the beginning of the year we ask if
14  they'd prefer to spend more time with UF or at the VA.
15     Q.  Speaking of the VA, was there any requirement
16  when a resident was going through the program there to
17  commit to a certain number of hours per week or?
18     A.  Probably the -- I think the UF and the VA have
19  some sort of agreement, but I can't remember when it was
20  at this point.
21     Q.  Are you aware if there's a requirement for a
22  certain amount of billing or time in order to meet the
23  funding component of the VA and the University of
24  Florida?
25     A.  I'm not certain about that.

Page 8

1      Q.  Let me --
2      A.  I know -- we did have to have a certain number
3  of residents at the VA each month, but I don't know
4  about hours.
5      Q.  Do you see the e-mail --
6      A.  Yes.
7      Q.  -- on the screen?
8      A.  Uh-huh (Indicates affirmatively), yeah.
9      Q.  Okay.  And let me just go to the top.  It
10  appears to be an e-mail dated February 26th, 2014, from
11  you.
12     A.  Yes.
13     Q.  Does this look familiar?
14     A.  Yes.
15     Q.  Okay.  And did you author this e-mail?
16     A.  Yes.
17     Q.  And let me go down a little further, if you
18  want to take a look at the actual e-mail.
19     A.  Okay.  Yes.
20     Q.  So you saw this e-mail for residents that were
21  going through the VA; is that correct?
22     A.  Yes.
23     Q.  All right.  And you wanted to make sure that
24  everybody got their time sheets in every Friday?
25     A.  Yes.

Page 9

1      Q.  Okay.  I believe it says, "Make sure you log
2  in at least 40 hours and be honest if you work more than
3  80."
4          So was there a requirement to work at least
5  40 hours a week when you were doing the residency
6  program at the VA?
7      A.  I guess so.
8      Q.  All right.  You don't have an independent
9  recollection of that?
10     A.  No.
11     Q.  Okay.  And under the parentheses, "i.e., we
12  lose resident funding at the VA if the time sheets are
13  late," do you see that?
14     A.  Yes.
15     Q.  And was that your understanding of what the
16  requirements were?
17     A.  Yes, I guess.  I don't really remember at the
18  time.
19     Q.  Sure.
20         MR. SALZMAN:  So we'll attach that as
21     Exhibit A to the deposition.
22         (Exhibit A was marked for identification.)
23  BY MR. SALZMAN:
24     Q.  Doctor -- and I don't know how familiar you
25  are with what the issues are here today, but I represent

Page 10

 1  Sarah Diekman.
 2        Do you know Sarah?
 3     A.  Yes.
 4     Q.  And how do you know her?
 5     A.  I was a resident with her and then also worked
 6  at the VA as an attending while she was a resident.
 7     Q.  And did you supervise her?
 8     A.  Yes.
 9     Q.  What kind of resident was she?
10     A.  Well, when I was chief resident, she was an
11  intern resident.  I would say she was a typical intern
12  resident.  And then when I worked with her -- I can't
13  remember if she was a third-year resident.  I know she
14  was starting to have a harder time -- or had a harder
15  time then.
16     Q.  Were you aware at any point that she suffered
17  from physical disabilities?
18     A.  I was made aware when she was in her third
19  year, when I was an attending, but not as a chief
20  resident.
21     Q.  So as chief resident, you are not aware that
22  she suffered from POTS?
23     A.  I don't believe so.
24     Q.  Were you aware that she had dyslexia back when
25  you were chief resident?

Page 11

 1     A.  Not that I'm aware of, not that I remember.
 2     Q.  Or that she also has ADHD?
 3     A.  No.  I wasn't privy to her diagnosis or
 4  anything.
 5     Q.  What was her reputation when you were chief
 6  resident?  And let me ask in this context:  Were there
 7  ever complaints by other residents that she appeared to
 8  be lazy?
 9     A.  I don't remember.  Not that I can recall, but
10  that's just probably because there's such a -- you know,
11  I didn't deal with those kind of issues.  I dealt with
12  more, like, attending to resident issues.
13     Q.  Let me ask during both time periods, then.
14  Did you ever become aware that there complaints made
15  about her that she appeared to be shirking her
16  responsibility?
17     A.  Probably at some point.  I don't remember if
18  that was when she was an intern or later.
19     Q.  What is it that you recall that was said?
20     A.  Just that, like later, that other attendings
21  struggled working with her, that she was difficult to
22  have on service because you had to really watch what she
23  did and make sure she did it correctly.
24     Q.  Were there ever complaints made that she was
25  making frequent typos or mistakes in terminology for her

Page 12

 1  notes?
 2     A.  Yeah.  Not so much about typos but just
 3  inconsistencies in general.  That was by the time I was
 4  an attending.  That's what I remember.
 5     Q.  Did you become aware while you were an
 6  attending that she had dyslexia?
 7     A.  Not that she was, you know, like, officially
 8  diagnosed or anything, no.
 9     Q.  Was there ever any discussions that you became
10  aware of that she was considered to be faking any type
11  of medical condition?
12     A.  No, uh-uh (Indicating negatively).
13     Q.  Are you aware of any issues she had concerning
14  requesting accommodations when she was going through the
15  residency program?
16     A.  No, uh-uh (Indicating negatively).
17     Q.  You never heard any issues regarding parking,
18  or anything regarding that?
19     A.  No.
20     Q.  Okay.  What about when you were a chief
21  resident, did you report to Dr. Hobbs?
22     A.  Yes.
23     Q.  Are you aware of any issues that Dr. Hobbs
24  either voiced in your presence or you were reading or
25  became aware of that she was having with Dr. Diekman?

Page 13

 1     A.  As chief resident, no, uh-uh (Indicating
 2  negatively).
 3     Q.  What about later on?
 4     A.  I mean, I think -- I don't know if it was from
 5  Dr. Hobbs directly, but I know we would -- as
 6  attendings, we would follow up on any residents that
 7  were having difficulties in general.
 8     Q.  Were you aware of an issue between Dr. Diekman
 9  and Dr. Thornton?
10     A.  No.  As chief resident, no.
11     Q.  This would be between the fall of 2013 and the
12  spring of 2014.
13     A.  So that would have been no.
14     Q.  Did you ever hear of Dr. Diekman complaining
15  that Dr. Thornton had -- was sexually harassing her?
16     A.  No, no, absolutely not.
17     Q.  Were you ever aware of any sexual comments or
18  degrading comments regarding her sexuality made towards
19  Dr. Diekman?
20     A.  From Dr. Thornton or --
21     Q.  Well, just in general.
22     A.  Just in general, no, nothing explicit like
23  that, no.
24     Q.  How about an incident at the VA involving
25  Dr. Diekman and a VA doctor coming in to where she was

Page 14

1  sleeping?  Is that familiar to you?
2      A.  No, not where she was sleeping.  That would
3  have been disturbing.
4      Q.  What do you recall?
5      A.  Well, I remember that I was asked to follow up
6  with her on a concern about one of her shifts in the ER.
7      Q.  Okay.
8      A.  And there was a concern that she didn't show
9  up for her shift.
10         So I went to talk to her, and I asked, Did you
11 show up for your shift?
12         And she said she did, but she didn't want to
13 stay in the ER because Dr. Cypher made her
14 uncomfortable.  And so we worked out a plan where she
15 would just check in with the ER nurses, but she didn't
16 have to stay there if she didn't want to be around him.
17     Q.  Did you say specifically what Dr. Cypher had
18 done to make her feel that way?
19     A.  No, not that I recall.
20     Q.  Do you recall any formal complaint that was
21 made concerning Dr. Cypher?
22     A.  No.  I think we all greatly disliked
23 Dr. Cypher and would've loved to have reported anything
24 we could about him, but I can't remember anything
25 specific.

Page 15

1      Q.  What were the concerns about Dr. Cypher?
2      A.  He was just never pleasant to be around.  He
3  was always difficult to work with, especially towards
4  psychiatry residents, and so we didn't get along with
5  him in general.
6      Q.  But you don't knowing anything about sexual
7  comment or making any suggestive sexual comments?
8      A.  No.
9      Q.  Are you aware of whether or not there was any
10 complaint made against Dr. Averbuch?
11     A.  No, no.
12     Q.  As far as you're aware, there was no
13 complaints that you knew that Dr. Diekman made about
14 sexual harassment or sexual discrimination?
15     A.  No, not that I'm aware of.
16     Q.  All right.  What about, are you familiar with
17 Dr. Chang?
18     A.  Yes.
19     Q.  Are you aware of any problems that Dr. Chang
20 had with Dr. Diekman?
21     A.  No.  He took over as chief resident from me,
22 so I know he would have had to deal with any residency
23 difficulties for that next year.
24     Q.  So once you're no longer chief resident, what
25 is your position?

Page 16

1      A.  You're back to a regular resident for the last
2  month or two and then you graduate.
3      Q.  So you're not involved any further in
4  scheduling, or things along those lines?
5      A.  No.
6      Q.  Did you ever hear any concerns that
7  Dr. Diekman had about how Dr. Chang was scheduling her?
8      A.  No.
9      Q.  At some point, you said you became aware of
10 issues that Dr. Diekman was having, maybe a rough time
11 going through the residency program; is that correct?
12     A.  Yeah.
13     Q.  And how did you become aware of that?
14     A.  It was the year she was scheduled to be on RVA
15 consult service when I was hired there.  And so any time
16 someone who is struggling comes onto the service, I
17 think probably the program director would reach out and
18 say, Hey, we need extra supervision over this resident.
19 And so we were just made aware to really watch her work
20 to make sure it was done correctly and to help her.
21     Q.  When did you become aware that she had some
22 potential medical conditions?
23     A.  It would have been around that time.  That was
24 just because she had, like, an exercise band she would
25 use during work, and, you know, so she was told that

Page 17

1  that's what it was for.
2      Q.  Did you ever become aware that she suffered
3  from POTS?
4      A.  Yeah.  She told me about it.
5      Q.  Were you aware of POTS prior to hearing that
6  from her?
7      A.  No.  I had to research it.
8      Q.  What did you determine from your research?
9      A.  I mean, it sounds like it's related to your
10 sympathetic and parasympathetic nervous system.  And,
11 you know, you can have blood pressure problems.  I don't
12 really remember all the details now, so that's why she
13 would work with her exercise band.  It would kind of
14 help with her blood pressure.
15     Q.  Did you ever become aware of issues that
16 Dr. Diekman was having regarding her attempts to have
17 accommodations made for her?
18     A.  Can you --
19     Q.  Let me make that a little clearer.
20     A.  Okay.
21     Q.  You found out that Dr. Diekman was suffering
22 from POTS.
23     A.  Uh-huh (Indicating affirmatively).
24     Q.  Were you aware that she was requesting certain
25 accommodations in the residency program?

5 (Pages 14 - 17)

Page 18

1  A. No.
2  Q. Were you ever aware that she requested certain
3 scheduling, set scheduling, so that she could deal with
4 her POTS?
5  A. Not that I can remember.
6  Q. How about requests to be in areas that didn't
7 have strong temperature changes?
8  A. Not that I can remember.
9  Q. Did you ever hear of anybody claiming that
10 Dr. Diekman was asking for special treatment?
11  A. No.
12  Q. After you were chief resident, did you have
13 frequent contact with Dr. Hobbs?
14  A. I mean, it wasn't nearly as frequent but maybe
15 regular contact.
16  Q. Were you part of the CCC?
17  A. No, uh-uh (Indicating negatively).
18  Q. Did you ever hear from any source that
19 Dr. Diekman's disability would disqualify her from
20 graduation?
21  A. No.
22  Q. Or working as a psychiatrist?
23  A. No.
24  Q. And I know I kind of asked you this, but are
25 you aware of any other residents referring to

Page 19

1 Dr. Diekman as just being lazy and making up her medical
2 condition?
3  A. No.
4  Q. What about while you were, roughly, in 2015,
5 were you aware of a complaint being made to the ACGME --
6  A. No.
7  Q. -- by a resident?
8  A. No. I wouldn't -- I was over at the VA, so I
9 was pretty separate from that.
10  Q. Were you ever responsible for reviewing
11 Dr. Diekman's notes or reports?
12  A. Yes, by the time I was an attending.
13  Q. And do you recall what you thought of those?
14  A. I don't remember them in detail. I just
15 remember there was always some kind of inconsistency, so
16 I really would have to read them very closely.
17  Q. You don't recall what the inconsistency was?
18  A. It would just -- something would be wrong in
19 different sections, you know. Some residents just keep
20 making the same mistakes over and over, but Sarah would
21 just different mistakes in different places.
22  Q. Could you relate any of her mistakes to
23 dyslexia?
24  A. I don't remember them in detail.
25  Q. Is there a faculty evaluation in front of you?

Page 20

1  A. Yes, uh-huh (Indicates affirmatively).
2     (Exhibit B was marked for identification.)
3 BY MR. SALZMAN:
4  Q. It's for Sarah Diekman, and it has the period
5 of April 1st, 2015, to April 30th, 2015 --
6  A. Okay.
7  Q. -- and a VA emergency; is that correct?
8  A. Yes.
9  Q. And you're the evaluator?
10  A. Uh-huh (Indicates affirmatively).
11  Q. Okay. I will briefly go through it, but I
12 think it's the notes at the end that really matter.
13  A. Okay.
14  Q. This is -- I'm sorry, let me go back a second.
15     Do you know what year Dr. Diekman is in at
16 this point?
17  A. It looks like PG-2, so the second year.
18  Q. All right. And at this stage, PG-2, what are
19 you looking for in their levels, or what you expecting?
20  A. Anywhere from a one to a two, maybe a three if
21 they're outstanding on something.
22  Q. Okay. And these are your notes, correct?
23  A. Correct.
24  Q. And you found that she was doing a thorough
25 interview and presentation?

Page 21

1  A. Yes.
2  Q. And she needed to work on her translating this
3 into documentation and orders. What do you mean by
4 that?
5  A. So that would be the inconsistencies in the
6 notes, that her notes wouldn't be as thorough as her
7 actual interviews would be, or she might forget. I
8 guess in the orders, you have all these different order
9 sets that you have to remember, and she might miss
10 orders that would be important for the patient.
11  Q. And during the time period that you mentioned,
12 that there were some issues, as you just talked about,
13 do you recall other specific issues regarding
14 Dr. Diekman that stick out in your mind?
15  A. During those years, the PGY-1 and 2 years.
16  Q. Yes.
17  A. No, not during the PGY-1 and 2 years.
18  Q. Okay.
19  A. I worked more closely with her in the PGY-3
20 year.
21  Q. Okay. In that year, can you tell me what you
22 recall?
23  A. That would just be more -- it wasn't typical
24 that she would be on the service that year. I forget
25 why they had her on that. So then I had to watch her

Page 22

1  much more closely. And she wasn't meeting the Level 3
2  expectations by then.
3    Q.  And what were those that you noted or recall
4  that she wasn't meeting?
5    A.  I'd have to look back at her evaluations, but
6  it would just be, again, probably her documentation. I
7  remember specifically that, you know, this triggered --
8  she does a good job when she's given a specific
9  checklist of items. And so when I knew she was coming
10 on my service interview, I created a new checklist just
11 for her to use to make sure we weren't missing things
12 and so kind of crafting that for her, but then she would
13 still forget parts of it.
14   Q.  At the time period or, I guess, at the
15 conclusion that you were overseeing her, would you feel
16 she was capable of continuing on with the program?
17   A.  I don't. I think she definitely needed more
18 work. I don't remember. I think the last time I worked
19 with her was maybe earlier in her third year.
20   Q.  Do you recall during the time period as to
21 whether or not Dr. Diekman was asking for accommodations
22 for her POTS?
23   A.  No.
24   Q.  And you never became aware of that?
25   A.  No.

Page 23

1    Q.  Were you aware that Dr. Diekman was put on
2  probation?
3    A.  I think so, yes.
4    Q.  Were there any discussions with you as to
5  whether or not that was appropriate or any issues
6  concerning --
7    A.  I think that would have been before she came
8  to my service.
9    Q.  Okay.
10   A.  That was just -- I was just aware that she was
11 on probation. That's why I made that checklist to kind
12 of help.
13   Q.  And what about -- you became aware that she
14 was terminated?
15   A.  Yeah.
16   Q.  How did you find out about that?
17   A.  I don't know. I think it was more like word
18 of mouth from other residents, maybe.
19   Q.  Were you surprised?
20   A.  Yeah, I was surprised because it is so rare
21 that it happens.
22   Q.  Is there anything else that you recall
23 concerning any accommodations that she may have required
24 or requested?
25   A.  No.

Page 24

1    Q.  How about treatment generally? Did you see
2  any difference or did you note any difference between
3  how female residents were treated versus male residents?
4    A.  No.
5    Q.  Let me ask you as soon as I find this.
6       During that time period you said it was year
7  to have a resident terminated. How often during this
8  time period, I guess 2013 through 2015, were you aware
9  of any residents being terminated?
10   A.  From the psychiatry department, none that I
11 was aware of.
12   Q.  Are you aware of any residents, male residents
13 first off, failing to pass third year test for
14 advancement?
15   A.  Not that I'm aware of, but I wouldn't have
16 been privy to that.
17   Q.  Are you aware of any resident threatening to
18 blow up the department?
19   A.  Oh, yes, uh-huh (Nodding affirmatively).
20   Q.  Can you tell me who that was?
21   A.  That was Dan Thiatros [phonetic].
22   Q.  And what do you recall about that incident?
23   A.  I don't remember when it was, but I think I
24 was a new attending. And I don't remember what
25 happened. I remember the VA made a very big deal about

Page 25

1  that because, you know, they take that stuff very
2  seriously.
3    Q.  Was he terminated, as far as you know?
4    A.  I don't know. Not that I -- I don't know.
5    Q.  Okay.
6    A.  I'm not aware of that.
7    Q.  Were you ever aware of Dr. Hobbs telling any
8  of the residents that they needed to punish Dr. Diekman
9  for complaining about her disability?
10   A.  No. That's not characteristic.
11   Q.  Were you aware of a doctor leaving in the
12 middle of his shift because he complained there was too
13 much work?
14   A.  No.
15   Q.  Are you aware of other residents that needed
16 accommodations when they were going through the
17 residency program?
18   A.  No, not that I recall.
19   Q.  Is it possible, if someone requested it, to
20 give them a set schedule? I know you weren't in charge
21 of scheduling, but, for example, if Dr. Diekman needed a
22 schedule between 8:00 and 5:00, could that be
23 accomplished?
24   A.  I don't remember. I mean, that's usually our
25 schedule; it's just sometimes you work a little later if

Page 26

1  you have to.
2    Q.  So if somebody put on -- if hypothetically
3  somebody had a condition or a need to work a schedule
4  between 8:00 and 5:00, could that have been accomplished
5  when you were scheduled?
6       MR. CHAUNCEY:  Object to form.
7       You can answer, Dr. Turner.
8       THE WITNESS:  I don't -- I don't know if
9    that's possible.
10 BY MR. SALZMAN:
11   Q.  Do you believe that that's a reasonable
12 accomodation for somebody to be able to go through the
13 program?
14   A.  I think it would prolong your education,
15 because we tend to put in a lot of hours in certain
16 parts of our training.
17   Q.  So it could extend the residency program?
18   A.  Yeah, maybe.
19   Q.  Is there any problem with scheduling somebody
20 so they had time to take medications or eat during a
21 certain period of time during their daily schedule?
22   A.  I don't --
23       MR. CHAUNCEY:  Object to form.
24       THE WITNESS:  I'm not sure.  I don't know.  I
25    think it would be doable.

Page 27

1  BY MR. SALZMAN:
2    Q.  Were you aware of any type of e-mail or policy
3  that went out that basically said that people who didn't
4  call out sick would be rewarded?
5    A.  No, no, uh-uh (Indicating negatively).
6    Q.  What about people who called out sick, were
7  they punished in any way?
8       MR. CHAUNCEY:  Object to form, but you can
9    answer, Dr. Thornton.
10      THE WITNESS:  Not that I'm aware of.
11 BY MR. SALZMAN:
12   Q.  Was there a problem with people calling out
13 sick when you were the chief resident?
14   A.  Not that I can recall.  I mean, people would
15 call out sick.
16   Q.  Would that cause a problem for the other
17 people that had to work?
18   A.  It would just depend.  It would be more work,
19 but I think we were all used to doing that for a
20 colleague.
21      MR. SALZMAN:  Just give me a second here.  I
22   have no further questions.  Thank you, Doctor.
23      THE WITNESS:  Okay.
24      MR. CHAUNCEY:  I have no questions, and she'll
25   waive.

Page 28

1    (Deposition concluded at 3:05 p.m.)

Page 29

S T I P U L A T I O N

    It is hereby stipulated and agreed upon by and
among the attorneys present and the witness that
reading and signing of the deposition by the
witness is waived.

8 (Pages 26 - 29)
866.258.8963  Riesdorph Reporting Group  www.veritext.com
A Veritext Company  www.veritext.com

Page 30

1          CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6      I, the undersigned authority, certify that
7  ANA TURNER, M.D., personally appeared remotely via
8  videoconference before me and was duly sworn.
9
10     WITNESS my hand and official seal this 7th day of
11  July, 2020.
12
13
14
15
16
17
18
19
            _____
20          Aaron T. Perkins, RMR, CRR, CRC
            Notary Public - State of Florida
21          My Commission Expires:  4/1/2024
            Commission No. GG975331
22
23
24
25

Page 31

1        REPORTER'S CERTIFICATE
2
   STATE OF FLORIDA
3  COUNTY OF HILLSBOROUGH
4
       I, Aaron T. Perkins, Registered Merit Reporter
5  and Certified Realtime Reporter, certify that I was
   authorized to and did stenographically report the
6  deposition of ANA TURNER, M.D., (via videoconference);
   that a review of the transcript was not requested; and
7  that the transcript is a true and complete record of my
   stenographic notes.
8
9
       I further certify that I am not a relative,
10 employee, attorney, or counsel of any of the parties,
   nor am I a relative or employee of any of the parties'
11 attorney or counsel connected with the action, nor am I
   financially interested in the action.
12
13
       Dated this 7th day of July, 2020.
14
15
16
17
18
19
20
       _____
21     Aaron T. Perkins, RMR, CRR, CRC
22
23
24
25



866.258.8963   Riesdorph Reporting Group   www.veritext.com
                A Veritext Company           www.veritext.com

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.