# Exhibit 38

```
                                                            Page 1
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                 GAINESVILLE DIVISION
 3
 4
 5   -------------------------------x
     SARAH DIEKMAN,
 6   an individual,
 7         Plaintiff,
     vs.                      CASE NO.:  1:19-cv-00227-AW-GRJ
 8
     UNIVERSITY OF FLORIDA,
 9   a Florida municipal corporation,
10         Defendant.
     -------------------------------x
11
12
13
            DEPOSITION OF ROBERT N. AVERBUCH, MD
14             (Conducted Via Videoconference)
15
16
17   DATE:                June 23, 2020
18   TIME:                3:40 p.m. to 5:00 p.m.
19
     PURSUANT TO:         Notice by counsel for Plaintiff for
20                        purposes of discovery, use at
                          trial or such other purposes as
21                        are permitted under the Florida
                          Rules of Civil Procedure
22
     REPORTER:            J. Gay Smith, RPR, RMR, FPR
23                        Notary Public, State of Florida
24
25                   Pages 1 - 47
```

Page 2

```
 1  APPEARANCES:
 2    AMIE K. DILLA, ESQUIRE
        Unice, Salzman & Jensen, P.A.
 3      Patriot Bank Building, Second Floor
        1815 Little Road
 4      Trinity, Florida  34655
           Attorney for Plaintiff
 5
      DAVID E. CHAUNCEY, ESQUIRE
 6      Alexander DeGance Barnett
        1500 Riverside Avenue
 7      Jacksonville, Florida  32204
           Attorney for Defendant
 8
 9
10             I N D E X
11
12  DIRECT EXAMINATION BY MS. DILLA       Page   3
13  STIPULATION                           Page  46
14  CERTIFICATE OF OATH                   Page  47
15  REPORTER'S CERTIFICATE                Page  48
16             E X H I B I T S
17  Plaintiff    Description              Marked
18
    Exhibit 1    9-3-2015 letter from Dr. Hobbs  Page 43
19
    Exhibit 2    6-3-2015 meeting minutes        Page 44
20
    Exhibit 3    May 28, 2015 letter             Page 45
21
22
23
24
25
```

Page 4

```
 1  quickly, especially seeing as how we are all appearing
 2  virtually.  So I would just request that you allow me to
 3  finish asking a question before you begin to answer.
 4       If at any point you don't understand a question
 5  that I've asked, then please let me know and I'll rephrase
 6  the question.
 7       And while it is easier being present by video, I
 8  would still request that you, when answering a question,
 9  verbalize yes or no instead of "Uh-huh" or "Huh-uh," as
10  that's hard to transcribe for the record.
11       And if you need a break at any time, just please
12  let me know.
13    A  Okay.
14    Q  All right.  Can we get your full name, please?
15    A  Robert Averbuch.
16    Q  And, Dr. Averbuch, what is your current address?
17    A  In terms of work?
18    Q  We can do work, and then your home address we can
19  go off the record.
20    A  Okay.  The department address is the main Shands
21  Hospital, 1600 Southwest Archer Road, Gainesville, Florida
22  32610.
23       MS. DILLA:  Okay.  And, Madam Court Reporter, if
24  we can go off the record for the home address.
25       (There was a discussion off the record.)
```

Page 3

```
 1            P R O C E E D I N G S
 2       THE COURT REPORTER:  The attorneys participating
 3   in this deposition acknowledge that I, the court
 4   reporter, am not present with the witness and that I
 5   will be reporting the proceedings and administering
 6   the oath remotely.  This arrangement is pursuant to
 7   the Florida Supreme Court Administrative Order No.
 8   AOSC-20-23.  The parties and their counsel consent to
 9   this arrangement and waive any objections to this
10   manner of reporting.  Please indicate your agreement
11   by stating your name and your agreement on the record.
12       MR. CHAUNCEY:  Dave Chauncey on behalf of the
13   University of Florida.  We agree.
14       MS. DILLA:  Amy Dilla on behalf of the plaintiff,
15   Dr. Sarah Diekman.  We agree.
16          ROBERT N. AVERBUCH, MD,
17  the witness herein, being first duly sworn on oath, was
18  examined and testified as follows:
19              DIRECT EXAMINATION
20  BY MS. DILLA:
21    Q  Hi.  Good afternoon, Doctor.
22    A  Good afternoon.
23    Q  Have you had your deposition taken before?
24    A  Yes.
25    Q  Okay.  I'll just go over some ground rules
```

Page 5

```
 1       MS. DILLA:  All right.  Thank you.  We can go
 2   back on the record.
 3  BY MS. DILLA:
 4    Q  Dr. Averbuch, have you taken any medications
 5  today that might impede your ability to testify?
 6    A  No.
 7    Q  Where are you currently employed?
 8    A  University of Florida College of Medicine.
 9    Q  What is your specific title?
10    A  I'm an associate professor of psychiatry, and I
11  am also the associate residency program director.
12    Q  How long have you held the title of associate
13  professor of psychiatry?
14    A  Since 2010.
15    Q  And the other title you hold, could you repeat
16  that one more time?
17    A  Associate director of residency training.
18    Q  How long have you been the associate director of
19  residency training?
20    A  I believe since 2002 or 2003.
21    Q  Can you briefly describe -- I apologize for the
22  sound going on my computer.
23       Can you describe your job duties as associate
24  professor of psychiatry?
25    A  Well, as an associate professor of psychiatry,
```

Page 6

1  the job duties vary from person to person.  My role is a
2  mixture of educational or teaching responsibilities that
3  include clinical educational responsibilities, and also
4  purely clinical work.
5     Q   Do any of your responsibilities include purely
6  academic setting as far as lectures?
7     A   Sure.
8     Q   And then with your job title, associate director
9  of resident training, could you please briefly describe
10 your duties associated with that?
11    A   A wide range of administrative and educational
12 duties that all center around delivering the educational
13 and clinical program to our residents.
14    Q   And is that limited to residents in the
15 psychiatric department, or is that just in general for the
16 medical school?
17    A   So that is limited to the psychiatry residents.
18    Q   Who is your supervisor -- actually, do you have
19 the same supervisor for both positions?
20    A   So I have, really, two supervisors.  For the
21 educational component, that would be Dr. Hobbs as the vice
22 chair of education.  And for my clinical duties, that would
23 now be Dr. Holbert.
24    Q   How long have you been employed at the medical
25 school?

Page 7

1     A   Almost 20 years.
2     Q   The positions that you hold, are they contract
3  positions?
4     A   I'm not sure I understand.
5     Q   As opposed to a tenured professor position.
6     A   So my position is not tenure accruing, so it's
7  the -- if the only other option is contract, then I guess
8  so.
9     Q   Do you recall signing a contract in relation to
10 accepting your job?
11    A   I do.
12    Q   As a part of your responsibilities, do you
13 undergo annual reviews yourself?
14    A   I do every year.
15    Q   And who conducts those?
16    A   My immediate supervisors.
17    Q   Are they done separately for each title?
18    A   They're usually done together.
19    Q   And how -- do they occur on an annual basis?
20    A   They do.
21    Q   Has there ever been a time during your employment
22 with the University of Florida that your review has
23 occurred due to concerns over your performance?
24    A   No.
25    Q   Turning our attention to the present case, are

Page 8

1  you familiar with the plaintiff, Dr. Sarah Diekman?
2     A   Yes.
3     Q   How are you familiar with her?
4     A   She was a resident in our program.
5     Q   Did you ever act as her direct supervisor?
6     A   The only opportunities I would have had to do
7  that would be either when she was on call, in my role as
8  resident duty overseeing the on-call resident, or the -- my
9  primary clinical responsibilities are in the outpatient
10 clinic.  So if I supervised a case that she was presenting
11 to me.
12    Q   Do you recall whether she was a resident in your
13 outpatient program?
14    A   I do.  I believe she was doing one-half day a
15 week in our outpatient clinic.
16    Q   You referenced her doing one-half day a week.  Is
17 there a specific schedule that residents usually keep in
18 rotation for the outpatient clinic?
19    A   Yes.
20    Q   And what would that be?
21    A   For several years now, the residents are assigned
22 to a particular attending for that afternoon that they're
23 in the clinic.
24    Q   Okay.  So it would just be -- they're in the
25 clinic just for a particular afternoon?

Page 9

1     A   Correct.
2     Q   Okay.  As opposed to presenting to the clinic
3  every day during that rotation?
4     A   Correct.
5     Q   Okay.  And can you provide some background on --
6  on how that works, just from a logistics standpoint?  Say,
7  for example, the outpatient clinic that you mentioned, what
8  would a day in the life of a resident look like?
9     A   So a resident would have an afternoon blocked for
10 scheduled patients in the outpatient clinic.  And they
11 would traditionally see each patient.  And then they would
12 report to their assigned attending, present the case, and
13 then return to the room with the patient and the attending
14 to discuss further.
15    Q   And that would just be for the one afternoon per
16 week, or half a day per week?
17    A   Correct.
18    Q   Okay.  How is their time spent during the rest of
19 the week?
20    A   When they're on other services, they spend the
21 rest of the time on that service.  By "service" I mean
22 something like an inpatient unit, or consult liaison
23 service.  And the outpatient is just a half day part of
24 that week.
25    Q   Okay.  So a resident can be involved with

Page 10

1  multiple units at a time, does that -- is that accurate?
2      A    It can be.  Mostly they're assigned to one
3  particular unit or service.  And they -- from the second
4  year on, they have a half day of outpatient clinic.
5      Q    Okay.  So that -- thank you.  I was just trying
6  to wrap my head around how the schedule would look, you
7  know, as opposed to a regular university-type setting.
8      A    Sure.
9      Q    So did you supervise her in any other capacity
10 other than the outpatient clinic?
11     A    Well, my recollection is that I don't think
12 she was my assigned resident.  So as I mentioned, for
13 several years now -- and I'd have to check if it went as
14 far back as when she was rotating in clinic, but for
15 several years now, we've had a resident assigned to a
16 particular attending to staff with.
17          I'm pretty sure she was not assigned to me.  And
18 I'm pretty sure I didn't do a lot of supervision of her
19 cases.
20     Q    And can you provide a brief background on how
21 that works?  So you mentioned that at least now there's --
22 residents are assigned to a particular attending physician.
23 Just in general, how does the program work?  Do -- as far
24 as assignment to physicians' rotations, how is all of that
25 orchestrated?

Page 11

1      A    So previous to whenever we started assigning
2  residents directly to an attending in terms of outpatient,
3  there were several faculty assigned to supervise several
4  residents in the clinic.  And so, for example, let's say
5  there were three attendings working an afternoon, there
6  might be six residents working that afternoon.  And they
7  would go to any of those attendings that were available to
8  supervise their case.
9           That changed when we started assigning residents
10 directly to a particular attending.
11     Q    Okay.  Do you know why that changed?
12     A    To make things easier for the resident, to not
13 have to go looking for three attendings, they were only
14 having to find one attending.  And to improve continuity
15 with their patients and the care.
16     Q    When a resident -- and I'm going to preface this
17 by saying I apologize if I'm not using the terms correctly
18 with how a residency is run.  But if a resident is assigned
19 a particular attending physician, is that essentially their
20 supervisor for the -- for their entire length of residency,
21 or does that change based on rotations?
22     A    So that can change as often as from month to
23 month.  So let's say they're assigned to an inpatient unit
24 for one month.  They may be working with a particular
25 attending that month, and then the next month working with

Page 12

1  a different attending on another service.
2      Q    Thank you.  Do you have independent recollection
3  of Dr. Diekman, when she was a part of your residency
4  group?
5      A    I do.  I remember her.
6      Q    What kind of employee would you describe her as?
7      A    It's difficult for me to say, because my
8  interactions with her clinically were very limited.  In
9  other words, I didn't supervise very many of her cases or
10 work with her very often.
11     Q    And did you have interactions -- I believe you
12 said your interactions with her clinically were limited; is
13 that correct?
14     A    That's correct.
15     Q    Okay.  Did you have interactions with her outside
16 of the clinical environment?
17     A    I did not.
18     Q    Were you aware -- strike that.
19          During the time that Dr. Diekman was working with
20 you during her residency, were you aware of her medical
21 conditions?
22     A    I was.
23     Q    Do you recall what she was suffering from?
24     A    The only thing I recall is POTS Syndrome.
25     Q    Are you familiar with POTS?

Page 13

1      A    Very limited.
2      Q    Do you recall how the POTS would affect
3  Dr. Diekman as she was performing her duties?
4      A    Only in a very secondary or tertiary way, i.e.,
5  hearing from other folks administering the program, in
6  meetings, et cetera.
7      Q    Okay.  So you don't have any firsthand memory of
8  how it may have affected her work product?
9      A    No.  And I don't recall any instances when I was
10 in clinic where that came up.
11     Q    Okay.  And you led me right to my next point.
12 When she was in clinic with you, was there any time that
13 Dr. Diekman complained that she was suffering from symptoms
14 of POTS and needed accommodations?
15     A    Not that I recall.
16     Q    Were you aware that Dr. Diekman was also
17 suffering from dyslexia at the time of her residency?
18     A    No, I wasn't aware of that.
19     Q    Were you aware that she was suffering from ADHD
20 at the time of her residency?
21     A    It's possible I may have been, but at the present
22 time I don't recall that.
23     Q    Did Dr. Diekman make you aware of her POTS
24 diagnosis?
25     A    Not directly to me.

Page 14

1  Q   Do you recall how you became aware of it?
2  A   It would have been in hearing about the concerns
3  at various meetings, in administering the program.
4  Q   Did Dr. Diekman ever come to you directly
5  regarding any accommodations that she would need to perform
6  her duties, having POTS?
7  A   No.
8  Q   If a resident were to feel like they needed
9  accommodations to assist them in performing their duties,
10 do you know who they would speak to about that?
11 A   They would speak to Dr. Hobbs directly.
12 Q   Okay.  Do you recall ever having interaction with
13 other residents who have had POTS Syndrome?
14 A   I do not.
15 Q   Are you aware of any other -- strike that.
16     Have you had interaction with any residents that
17 have had dyslexia, to your knowledge?
18 A   Not to my knowledge.
19 Q   And I know that you had testified that your
20 clinical knowledge or memory of Dr. Diekman as a resident
21 was limited, but given that, is there anything that stands
22 out to you that she suffered from because of her POTS?
23 A   No.  I observed her presenting probably a limited
24 number of cases, and there was nothing that stood out to me
25 in those.

Page 15

1  Q   I'm going to briefly touch on this next subject
2  regarding billing requirements for residents.  Can you
3  explain to me -- or does that phrase mean anything to you,
4  "Billing requirements for residents"?
5  A   Sure.
6  Q   And can you explain what that means?
7  A   Well, the residents are made aware of what
8  elements of the visit in their note are important to
9  maintain compliance with university regulations and
10 insurance regulations.
11 Q   How do the residents come to know what's expected
12 to be contained in the notes?
13 A   We give them orientation sessions.
14 Q   Is it addressed any other time, other than
15 orientation?
16 A   It is re-approached throughout the year as
17 needed, sometimes in formal sessions and sometimes more by
18 curbside.
19 Q   Regarding the notes that go into the billing
20 after seeing the patients, are they always handwritten, or
21 is there a way to essentially dictate the notes?
22 A   Well, actually, neither.  They're -- they're
23 typed, because it's an electronic medical record, since
24 2011.  So the residents, for the most part, type the note,
25 along with whatever contribution the attending makes.

Page 16

1  Q   Are you aware of any resident that you may be
2  familiar with who has had an accommodation where they were
3  not able to actually type and would require the means to
4  auditorily record their notes?
5  A   I don't recall a situation like that.  I'm not
6  saying it isn't possible.  I'm pretty sure the system does
7  allow for dictation as well.
8  Q   Okay.  Do you have any knowledge if there was any
9  issue with Dr. Diekman regarding the notes that she kept
10 for billing?
11 A   I don't recall one.
12 Q   Do you recall Dr. Hobbs discussing that
13 particular issue with you?
14 A   I don't.  Again, it's certainly possible, but I
15 don't recall right now.
16 Q   And that's perfectly fine.  I know you've had
17 your deposition before, and you're aware of it, but I do
18 want to know what you know and not, you know, what you
19 speculate.  So I'm not trying to give you a hard time.  "I
20 don't know" is perfectly acceptable.
21 A   Sure.
22 Q   Regarding Dr. Diekman's accommodations, are you
23 aware that she required accommodations for parking?
24 A   Not offhand.
25 Q   If a resident requires an accommodation, how

Page 17

1  would they go about requesting that?
2  A   I would -- I would say they would approach the
3  residency training coordinator, or a house staff
4  administrator in the general hospital, either way.  And
5  then they would probably get directed to the program
6  director to follow up on that.
7  Q   Okay.  Are you -- is there any ADA contact
8  specifically that works with the medical school to
9  coordinate accommodations for residents?
10 A   Yes.
11 Q   Do you know who that person would be?
12 A   Well, I remember a gentleman coming and talking
13 to us.  I can't remember his name offhand.  But it was
14 probably several years back.
15 Q   Other than Dr. Diekman, do you recall any
16 residents requesting accommodations for disabilities that
17 they may have had?
18 A   I think through the years we've had folks with --
19 ADHD comes to mind.  I can't recall the specific
20 accommodations or what was requested.
21 Q   And as associate director of resident training,
22 would you be notified of residents who have requested
23 accommodations?
24 A   As associate program director, not necessarily.
25 The program director would certainly be aware.  I may or

Page 18

1 may not have been.
2  Q   And when you refer to program director, is that a
3 separate position than the residency training director?
4  A   No.  That's synonymous.
5  Q   Okay.  Thank you.
6      Are you aware of any other employees who required
7 use of a handicapped parking space?
8  A   No, I'm not.
9  Q   Do you recall receiving any training regarding an
10 application of the Americans with Disabilities Act to your
11 students and residents?
12  A   I recall it from the interaction with that
13 gentleman I mentioned before who came and spoke to us about
14 it.
15  Q   And was that -- in your recollection, did that
16 occur one time?
17  A   I think he had a meeting with more of us, and
18 then a more -- a smaller meeting with just the program
19 director and the associate program director.  I think it
20 was Ken -- Ken something, maybe.
21  Q   Are you aware that there was an issue related to
22 Dr. Diekman's ability to get a handicapped parking spot
23 that was close enough to allow her to get to her programs
24 on time?
25  A   No, I'm not aware of that.

Page 19

1  Q   Are you aware of any complaints or -- strike
2 that.
3      Are you aware of any issues that Dr. Diekman may
4 have had regarding the heat affecting her POTS?  And by
5 heat I just mean the outdoor temperature going to and from
6 the parking lot to the buildings.
7  A   I don't recall that.
8  Q   Are you aware that Sarah Diekman had to contact
9 the UF legal department regarding the parking issue because
10 it wasn't being handled by your superiors?
11  A   I don't recall that.
12  Q   Do you recall Dr. Hobbs ever speaking with you
13 about Sarah having made a mistake -- and by Sarah I mean
14 Dr. Diekman -- by going outside the psychiatry department
15 to obtain her accommodations?
16  A   No, I don't -- I don't recall anything like that.
17  Q   Did Dr. Hobbs ever speak with you about chief
18 residents that would need to be assigned to deal with
19 Dr. Diekman's poor attitude?
20  A   I don't recall anything like that.  Now, we do
21 assign either chief residents or a senior level resident on
22 occasion to help with someone that's struggling in some
23 area.  But I don't specifically recall anything in that
24 instance.
25  Q   Okay.  Do you recall if that was provided to

Page 20

1 Dr. Diekman?
2  A   I don't recall.
3  Q   And backing up, Dr. Hobbs, what is her position?
4  A   So she is the program director over the residency
5 training.
6  Q   Residency director.
7  A   (Nodding head.)
8  Q   Okay.  Thank you.
9      As your role -- in your role of assistant
10 director, do you work often with Dr. Hobbs?
11  A   Yes.
12  Q   And can you explain the nature of your work
13 relationship with her?
14  A   Can you rephrase in terms of what you're --
15  Q   Yes.
16  A   I don't understand what you're asking about.
17  Q   Absolutely.  No problem.  I apologize.
18      Your interactions with Dr. Hobbs on a
19 professional basis, what -- I understand she's your
20 supervisor; correct?
21  A   Correct.
22  Q   As associate director -- I'm sorry, assistant
23 director, and Dr. Hobbs being the director, how do your two
24 job titles interact with each other?
25  A   Our interaction is most of the time more on a

Page 21

1 collegial basis.  She asks for input from all of the
2 players involved in different situations.  So it has more
3 of a feel of collegial than supervisory.
4  Q   The associate directors -- and I'm sorry, it's
5 associate or assistant?
6  A   It's associate, but at one time it was assistant,
7 so --
8  Q   Okay.  How many associate directors are under
9 Dr. Hobbs?
10  A   So traditionally we had one, but about -- I'm
11 going to guess, four or five years ago, we had a second.
12 And so Dr. Suryadevara is an associate director also.
13  Q   Okay.  Is there a division of duties between the
14 two of you as associate directors?
15  A   Yeah.  One of the reasons we added a second is as
16 the program grew, we had need for more administrative
17 support.  And Dr. Uma oversees -- Uma is her first name.
18 She oversees the VA side of rotations and clinical work.
19  Q   Okay.  Do you have interactions with Dr. Hobbs
20 outside of the professional environment?
21  A   Limited, especially over the last several years,
22 to probably maybe a dinner at an annual meeting out of
23 town.  But everything else is pretty much associated with
24 the program.
25  Q   Are you familiar with a doctor in the department

Page 22

1  by the last name of Chang, Dr. Chang?
2    A   If you're referring to San Chang, he was a
3  resident of the program.
4    Q   He was a resident.
5        Would he have any supervisory capacity over
6  Dr. Diekman that you're aware?
7    A   He served as one of the chief residents in his
8  fourth year, so in that role he would have some supervisory
9  capacity.
10   Q   What type of supervisory capacity would the chief
11 residents have?
12   A   The chiefs help us to administer the program more
13 directly.  They are a liaison between the residents and the
14 administration.  They have various set duties that include
15 working on the rotation schedules, working on resident
16 leave and coverage.
17   Q   Do they address disciplinary issues with the
18 residents under their care?
19   A   Only with careful oversight from the program
20 director or associate.
21   Q   So when you say "oversight," it would essentially
22 be, perhaps, they were provided a statement or an issue
23 directly to address with the resident, is that accurate?
24   A   By oversight, I mean there's an ongoing dialogue
25 between the chief residents and the program director.

Page 23

1  There's regular meetings, and so if an issue comes up with
2  a particular resident, that's discussed ad nauseam and then
3  a plan is put into place that may involve the chiefs being
4  assigned a particular role.
5    Q   Would the chief resident have any ability to
6  change the procedures of a department?
7    A   Not the procedures.  They're given some leeway in
8  terms of how to communicate things, like in email or in
9  person.  But not specific procedures.
10   Q   If residents had a complaint about the way that a
11 particular chief was communicating with them, who would
12 they report that to?
13   A   So they could report it directly to the program
14 director or the associate program director.  They could
15 also report it to one of their faculty supervisors.  And
16 there's also an ombudsman that serves as liaison between
17 residents and the administration.  Don't ask me to spell
18 that word.
19   Q   I won't.  Don't worry.
20       Is Dr. Chang still with the program, to your
21 knowledge?
22   A   No.  He graduated several years ago.
23   Q   What is your understanding regarding sick leave
24 policy for residents?
25   A   I would be speaking out of turn, if I knew the

Page 24

1  very specifics.  They have a set number of days each year.
2  It varies whether there's carryover or not.  Because of the
3  current pandemic, some of those policies have changed, so
4  it's in flux right now.
5    Q   If a resident were to call in sick, who would
6  they notify?
7    A   I believe they would notify the residency
8  coordinator, the training office.  And I also think it's
9  their responsibility to alert the service that they're on.
10   Q   Would their request for specific time need to be
11 approved?
12   A   In real time?
13   Q   Yes.
14   A   I don't believe so.
15   Q   Regarding Dr. Diekman's history, are you aware
16 that during the fall of 2013 and spring of 2014, she raised
17 a sexual harassment complaint against an attending
18 physician at the VA?
19   A   No, I'm not aware of that.
20   Q   Are you aware of the department policy
21 prohibiting sexual harassment?
22   A   I am quite certain we have a policy in place.
23   Q   Are you aware regarding the allegations that I
24 mentioned that occurred in 2013 and '14, that Dr. Diekman
25 alleged an unwanted touching had occurred at the hands of a

Page 25

1  VA physician?
2    A   No, I'm not aware of that.
3    Q   Regarding the sexual harassment policies that the
4  department has, are you aware if it includes unwanted
5  touching?
6    A   I'm quite certain it does.
7    Q   And do you know if the policies would be -- are
8  they uniform throughout the medical school, or how does
9  that work exactly?
10   A   I'd have to look at the actual policy, but I
11 would assume it's uniform throughout the medical school.
12   Q   Are you aware of what the reporting procedure
13 would be if a resident was experiencing sexual harassment?
14   A   I would have to look at the policy.
15   Q   Are you aware of any residents that have
16 complained, just generally, of experiencing sexual
17 harassment?
18   A   Offhand I can't think of anything right now.
19   Q   Are you aware that shortly after Sarah made that
20 initial complaint in 2014, that she received her first
21 negative review from Dr. Thornton?
22       MR. CHAUNCEY:  Object to form.  You can respond,
23 Dr. Averbuch, if you can.
24   A   No.  I'm not aware.
25

Page 26

1  BY MS. DILLA:
2     Q   Are you aware that when Sarah reported the sexual
3  harassment claim to the human resources department their
4  response was that it would not happen to the other
5  residents?
6        MR. CHAUNCEY: Object to form. You can answer,
7     Dr. Averbuch.
8     A   I'm not sure what you mean by "It would not
9  happen to other residents."
10 BY MS. DILLA:
11    Q   And I would elaborate, Doctor, but that's -- I
12 guess you would have to ask the human resources department,
13 because that's apparently what Dr. Diekman has alleged was
14 their response.
15       Are you aware that the incident was reported to
16 Dr. Turner and Dr. Hobbs, and that Dr. Diekman was told
17 that no action would be taken at that time?
18       MR. CHAUNCEY: Object to form.
19    A   No, I'm not aware of that.
20 BY MS. DILLA:
21    Q   Are you aware that Dr. Diekman has made -- strike
22 that.
23       Are you aware that Dr. Diekman has raised
24 allegations that you began making sexually suggestive
25 comments toward her?

Page 27

1     A   I am aware through these proceedings.
2     Q   Did you -- did you ever make such comments to
3  Dr. Diekman?
4     A   Absolutely not.
5     Q   Did you ever make comments to Dr. Diekman
6  regarding her needing a friend on the committee?
7     A   Absolutely not.
8     Q   Do you recall writing a letter wherein you
9  suggested that yourself and Dr. Diekman needed to spend
10 more time together?
11    A   Most certainly not.
12    Q   Is there -- do you recall ever having
13 interactions with Dr. Diekman where other residents,
14 physicians were present to have witnessed the interactions
15 between both you and Dr. --
16    A   Your last word cut out there.
17    Q   I apologize. Are you aware of any other of your
18 colleagues that may have witnessed interactions between you
19 and Dr. Diekman?
20       MR. CHAUNCEY: Object to form. But if you can
21    answer that, Dr. Averbuch, go ahead.
22    A   So the only one I can -- did you want --
23 BY MS. DILLA:
24    Q   Sorry. That was unclear.
25    A   Yeah.

Page 28

1     Q   Outside your association with Dr. Diekman as her
2  supervising physician, do you recall any physicians or
3  colleagues who may have been present during conversations
4  you had with Dr. Diekman?
5     A   I do. The one I recall -- the only one I recall
6  is Dr. Holbert. There were occasions where I would be
7  staffing some patients from his office, where we were both
8  in the workroom. And I do recall -- what I seem to recall
9  is she may have been assigned to him for her half day for
10 some period of time. So I do recall her staffing with him.
11       Now, as far as him witnessing our interactions,
12 I'm not sure.
13    Q   Has there ever been -- strike that.
14       Do you have any history of being accused of
15 sexual harassment during your positions?
16    A   I don't. I -- I held a fairly prominent role
17 working with medical students in psychiatry residency,
18 education -- psychiatry education for many years, and have
19 never heard of anything like that.
20    Q   Are you aware whether the department has a policy
21 regarding retaliation?
22    A   Yes.
23    Q   Are you aware of what that policy is?
24    A   Not the exact verbiage, but I do recall more than
25 one discussion about the importance of residents feeling

Page 29

1  comfortable coming to us, or anyone, with complaints
2  without any fear of retaliation. But that's been a point
3  of emphasis.
4     Q   Has any resident ever voiced a complaint to you
5  regarding fear of retaliation?
6     A   Not that I can recall.
7     Q   Were you aware -- or strike that.
8        Did you observe any interaction between Dr. Hobbs
9  and Dr. Diekman?
10    A   I did.
11    Q   How would you describe their interactions?
12    A   There's nothing that really jumps out at me. I
13 recall -- I recall a particular meeting where we were
14 discussing various outpatient prospects with Dr. Diekman,
15 but I don't -- there's nothing that jumps out at me. I've
16 observed Dr. Hobbs to conduct herself with professionalism
17 in any interaction with a resident.
18    Q   Are you familiar with the department's policy
19 regarding ADA accommodations?
20    A   Not the specific verbiage, but I'm well aware
21 that we have one.
22    Q   And you might have answered this earlier, so I
23 apologize if this is repetitive. But are you aware of
24 anybody, residency, or physician, currently receiving an
25 accommodation for their disability?

Page 30

1  A  Not in the program that I'm aware of.
2  Q  Do you recall any residents or physicians who
3 have received an accommodation in the past?
4  A  I don't offhand. That doesn't mean it hasn't
5 happened, but I just -- I don't recall.
6  Q  Are you aware that Dr. Hobbs had informed
7 Dr. Diekman that she could not become a psychiatrist if she
8 needed accommodations?
9    MR. CHAUNCEY: Object to form.
10  A  I'm not. And I can't imagine her saying
11 something like that.
12  Q  Were you made aware that Dr. Chang released --
13 I'll restate that.
14     Are you aware that Dr. Chang offered an email on
15 December 29th of 2014, stating that a new policy was in
16 effect to give an easier schedule and less work for people
17 who did not call in sick, stating that calling in sick
18 would amount to a professionalism violation?
19    MR. CHAUNCEY: Object to form.
20  A  I don't recall that email.
21 BY MS. DILLA:
22  Q  Would Dr. Chang have the authority to have
23 authored such an email?
24  A  It's a position that involves a learning process
25 through the year. It's an administrative role. And so

Page 31

1 there's a lot of dialogue back and forth, as I mentioned,
2 between the program directors and the chiefs.
3  Q  Do you recall if there were any complaints
4 regarding Dr. Chang's communication with the residents?
5  A  No. On the contrary, what I recall is he was
6 very amicable and not particularly adversarial when he was
7 serving in that role.
8  Q  Do you have any knowledge regarding Dr. Diekman's
9 use of sick days related to her POTS flare-ups?
10  A  I don't really.
11  Q  Do you have any knowledge regarding Dr. Diekman
12 applying for FMLA as a result of her POTS?
13  A  I may have heard about it in a meeting, but I'd
14 be speculating right now.
15  Q  Are you aware that Dr. Diekman did, in fact, file
16 a harassment complaint against Dr. Chang?
17  A  I think I'm aware of that through these
18 proceedings, but I don't remember anything in real time.
19  Q  When a resident would complain, or make a
20 complaint against a chief resident, is that something that
21 the associate directors would be informed of, or is that
22 solely the program director?
23  A  It's -- it's likely that we would be informed on
24 some occasions, but it's also likely it would be hard to
25 remember this far back.

Page 32

1  Q  Are you aware that Dr. Diekman filed an internal
2 ADA grievance regarding being harassed and retaliated for
3 asking for a reasonable accommodation?
4  A  I'm not aware of that.
5  Q  Are you aware of communication that occurred
6 between Dr. Osfield and Dr. Hobbs regarding to whom
7 Dr. Diekman should express her complaint to?
8  A  Not aware of the specifics, but I remember him
9 interacting with us.
10  Q  And what is Dr. Osfield's position?
11  A  As I best understood it, he was -- he was the --
12 some -- the medical director of the ADA at the time.
13  Q  Is that the gentleman that you were referring to
14 regarding the ADA training that you recalled?
15  A  Yes.
16  Q  Okay.
17  A  Yeah. That's Ken Osfield.
18  Q  Are you aware that in September of 2015
19 Dr. Diekman was placed on academic probation?
20  A  Vaguely.
21  Q  Are you aware that Dr. Diekman was given less
22 time to complete her notes than her peers?
23    MR. CHAUNCEY: Object to form.
24  A  I don't see how that would be possible or fair,
25 so I'm not aware of that.

Page 33

1 BY MS. DILLA:
2  Q  Is there a time limit or restriction associated
3 with the notes and billing required?
4  A  There are billing requirements in terms of how
5 quickly documentation needs to be completed to submit a
6 bill. And then we encourage prompt completion of
7 documentation, just for clinical purposes.
8  Q  Do you recall ever having any complaints
9 regarding Dr. Diekman's notes that she would make during
10 her clinical rounds?
11  A  I don't. But, again, my exposure to her was
12 limited because it would have been only on the half day,
13 and I don't even think I was her supervisor.
14  Q  Do you know whether or not Dr. Diekman ever
15 requested dictation software?
16  A  I don't.
17  Q  Are you aware that Dr. Diekman raised concerns
18 about fraudulent billing in July of 2015?
19    MR. CHAUNCEY: Object to form, but you can
20   answer.
21  A  I'm not aware of that.
22 BY MS. DILLA:
23  Q  Let's turn to the Clinical Competency Committee.
24 Are you a member of that committee?
25  A  I am.

Page 34

1   Q   And how many members comprise that committee?
2   A   I'd be guessing, but somewhere between ten and --
3  maybe ten to twelve.
4   Q   Do you know how they're selected?
5   A   Well, it certainly includes the program director,
6  the associate program directors, the program directors for
7  each subspecialty.  And from there, any other prominent
8  players in the administration of the residency program.
9   Q   How are the members selected?  Are they
10 approached and asked to join the committee?
11  A   So for those well-defined positions, it's kind of
12 automatic.  And so if you're an associate program director
13 or you're a director of a subspecialty program, then you
14 are a member.
15      I'm not positive about the additional membership.
16 But it will usually include someone who has a prominent
17 role in working with residents and administering the
18 program, teaching.
19  Q   And can you just briefly describe what the role
20 of the committee is?
21  A   So the committee oversees the progress of the
22 residents, their academic progress in terms of what we call
23 milestones, which is a standard we use to evaluate them on
24 at least a biannual basis.
25      And that committee will also address any issues

Page 35

1  that come up in between those biannual evaluations.
2   Q   When the committee addresses the issues that come
3  up in between the biannual evaluations, is it done on a
4  regular basis, let's say, monthly, or is it as-needed?
5   A   Well, as the program has grown, there's more
6  often need to meet.  So I'm not sure if it's become a
7  monthly basis, but it's more often.
8   Q   And what exactly occurs during the Clinical
9  Competency Committee meetings?
10  A   It varies, depends on -- depending on the issue
11 at hand.  So there's kind of standard operating procedures
12 for how we run through the evaluations of all the residents
13 on a biannual basis, and that's -- that's informed by the
14 milestones.  And then the procedure will vary depending on
15 the issue that's at hand.
16  Q   If a resident is failing to meet their
17 milestones, is there a certain graduated level of dealing
18 with it, or is that subjective based on how the committee
19 feels it should best be addressed?
20  A   Can you repeat that?
21  Q   Yes.  Are there guidelines that the committee
22 follows regarding how to address the concerns of a resident
23 not meeting their milestones?
24  A   So there's certainly guidelines.  But the
25 situation will vary from case to case about what specific

Page 36

1  plan is enacted.
2   Q   Are the guidelines written?
3   A   Well, they are written in our overall program
4  policies and procedures, so I'd say yes.
5   Q   Do you recall any instances where a resident
6  failed to meet their milestones and information was
7  presented regarding a disability that they may have to be
8  taken into consideration?
9   A   I don't recall an instance like that offhand.
10  Q   Does the committee -- strike that.
11      Is the committee aware of a resident's disability
12 when they are reviewing the allegations?
13  A   Well, I don't -- I don't recall an instance of
14 that, so I'm not sure I can speak to that.
15  Q   How is the committee informed of allegations that
16 would require a meeting to discuss a resident's failing to
17 meet their milestones?
18  A   They would be presented with that information in
19 the meeting.
20  Q   And how would that -- how would that occur?
21  A   Usually it would come from the program director.
22  Q   Is this something that the committee is aware of
23 beforehand?
24  A   Only if there's particular documentation that the
25 program director is asking us to review or be familiar with

Page 37

1  before we meet.  So there may be evaluations or other
2  materials that we're asked to review beforehand.
3   Q   During the committee meeting, if it's determined
4  that more information is needed, how is that addressed?  Is
5  the issue then just continued and then --
6      THE COURT REPORTER:  You froze there for a
7   second.
8      MS. DILLA:  I apologize.  Hold on one moment.
9      (There was a discussion off the record.)
10     MS. DILLA:  I'm so sorry.  This setup -- my
11  battery was running low, and came unplugged, so I
12  apologize.
13 BY MS. DILLA:
14  Q   Doctor, did you hear my last question?
15  A   Can you repeat it?  I missed the last part of it.
16     MS. DILLA:  Madam Court Reporter, can you read
17  back the question?
18     (The question was read by the reporter.)
19  A   So --
20 BY MS. DILLA:
21  Q   Actually, go ahead, Doctor.
22  A   So a plan is usually formulated with input from
23 the group about how to proceed.  And often that involves
24 gathering more information, having more points of data, and
25 observing that person in real time to get more information

10 (Pages 34 - 37)

Page 38

1  to bring back to the committee.
2     Q   When the committee is addressing complaints about
3  a resident, is there any way to ensure that the committee
4  has, in fact, received all of the necessary information to
5  make that determination?
6     A   By -- I'm not sure by whose standard that would
7  be.
8     Q   Well, let me explain.  Say, perhaps, you're
9  informed as a committee member that there's going to be a
10 meeting to address a resident, and the concerns regarding
11 this resident.  Do the committee members have the ability
12 to do any sort of independent investigation to make sure
13 that all of the facts, communication and documents are
14 being presented during the committee meeting?
15    A   Sure.  They can ask for additional input.  They
16 can -- any committee member can ask to review a particular
17 piece of data, or suggest further inquiry or investigation.
18    Q   Is it commonplace to contact the resident to
19 allow them a chance to present their own information to the
20 committee?
21    A   It's commonplace for the program director and/or
22 associate program director to meet with the resident and,
23 certainly, ask for their input and their side of the story,
24 if you will, whenever there's an ongoing concern.
25    Q   Would that be prior to the issue being presented

Page 39

1  to the committee?
2     A   It could be prior to.  It could be after.
3  There's -- my experience is there's a very regular dialogue
4  back and forth.
5     Q   Do you recall being involved in committee
6  meetings where Dr. Diekman's performance was addressed?
7     A   In the CCC meeting?
8     Q   Yes.
9     A   Honestly, I don't.  We do these meetings so often
10 that, you know, the ones that come to mind are the most
11 recent.
12    Q   Are you aware that on December 17th, 2014,
13 Dr. Hobbs, during a committee meeting, stated that
14 Dr. Diekman needed to improve her health and should be on
15 medical leave?
16    A   No, I don't recall that.
17    Q   Are you aware that during a March 8th, 2015
18 committee meeting it was noted that Dr. Diekman's medical
19 condition could be the underlying factor to her problems?
20    A   I don't recall that.
21    Q   Do you recall during a June 3rd, 2015 committee
22 meeting, that regarding allegations of errors and
23 impairment, Dr. Tandon indicated that he needed to know
24 more about accommodations for Dr. Diekman?
25    A   I don't recall.

Page 40

1     Q   Do you recall Dr. Merlo asking for more
2  information on Dr. Diekman's condition?
3     A   I don't recall.
4     Q   Do you recall, during a committee meeting of
5  September 22nd, 2015, Dr. Hobbs stating that Dr. Diekman
6  was going through the grievance process with Dr. Bussing?
7     A   No.
8     Q   Do you recall during an October 27th, 2015
9  committee meeting that postprobation Dr. Diekman had to
10 call out sick and it was noted that her accommodations were
11 not being met?
12    A   I don't recall that.
13    Q   Do you recall during the November 24th, 2015
14 meeting addressing the termination of Dr. Diekman due to
15 typos and errors that she was responsible for?
16    A   I don't recall.
17    Q   Do you recall whether the December 10th, 2015
18 termination proceedings were hampered by Dr. Diekman's
19 workers' compensation claim?
20    A   I don't recall that.
21    Q   Are you aware that on November 12th of 2015, so
22 two weeks prior to the committee meeting, that Dr. Diekman
23 requested and received accommodations for her disability?
24    A   I'm not aware.
25    Q   Would that have been something that the committee

Page 41

1  would have taken into account in addressing her continued
2  issues?
3     A   Would that have been something they've taken into
4  account, meaning what, the --
5     Q   Meaning that she was provided accommodations for
6  her disability, but she was terminated before given the
7  opportunity to have those accommodations applied?
8     A   I'm not sure how to answer that, because I don't
9  remember that situation.
10    Q   Do you have any knowledge of whether Dr. Diekman
11 took any FMLA leave during her residency?
12    A   I don't offhand.
13    Q   Do you know if she requested FMLA leave during
14 her residency?
15    A   I don't know offhand.
16    Q   And, Doctor, we're almost done.  In fact, it
17 might be easiest if we take a quick break off the record.
18 I just have three documents to show you, and I just want to
19 get those ready and pulled up so that we can save some
20 time.
21    A   Okay.
22        MS. DILLA:  Can we go off the record?
23        (A recess was taken.)
24 BY MS. DILLA:
25    Q   Okay.  Doctor, I'm going to show you a document,

|  | Page 42 |  | Page 44 |
|---|---|---|---|
| 1 | and I'll give you an opportunity to review it. Okay? Is | 1 | A   I don't. |
| 2 | it on the screen? Can you see it okay? | 2 | Q   Regarding the rumors of impairment, the minutes |
| 3 | A   Yeah. | 3 | go on to state that: "There is no specific information on |
| 4 | Q   Okay. | 4 | hand to know how to proceed with possible limitations, or |
| 5 | A   Do you mind if I just answer one text real quick? | 5 | if she had a medical issue that could make it not safe for |
| 6 | Q   Absolutely. | 6 | her to be making clinical decisions." Do you recall |
| 7 | A   Okay. Sorry about that. | 7 | whether the committee did anything to investigate |
| 8 |     Okay. It's on the screen. Do you want me to | 8 | Dr. Tandon's concerns? |
| 9 | read this? | 9 | A   I don't recall. |
| 10 | Q   I'm going to scroll so you can review it. For | 10 | Q   If there were issues that were raised during a |
| 11 | the record, this is a September 3rd, 2015 correspondence | 11 | committee meeting that were unable to be resolved, would |
| 12 | drafted by Dr. Hobbs. Does it look familiar to you? | 12 | there be any indication of that in the minutes? For |
| 13 | A   Can you scroll down to the top again? | 13 | example, any notation stating that this issue will be |
| 14 | Q   Yes. | 14 | addressed at the next meeting? |
| 15 | A   Okay. Okay. It looks pretty standard for | 15 | A   I would think so. |
| 16 | documentation of meetings we have with residents. It | 16 |     MS. DILLA: And if we could please label this as |
| 17 | triggers vague recollection about the concerns she | 17 |     Exhibit 2. |
| 18 | expressed about the reading assignment, but I don't | 18 |     (6-3-2015 CCC meeting minutes marked Plaintiff's |
| 19 | remember much more than that. | 19 |     Exhibit 2.) |
| 20 | Q   Okay. Regarding the concern that Dr. Diekman | 20 | BY MS. DILLA: |
| 21 | expressed about the reading requirement, do you recall | 21 | Q   And we're down to the last one, Doctor. Turning |
| 22 | Dr. Diekman explaining to you that she had dyslexia? | 22 | your attention to a May 28th, 2015 correspondence that was |
| 23 | A   I don't. | 23 | authored by Dr. Hobbs. |
| 24 | Q   And that's -- we are -- I'm going to put this | 24 |     Specifically, I'll be turning your attention to |
| 25 | exhibit away. | 25 | this paragraph that begins, "Other issues." |

|  | Page 43 |  | Page 45 |
|---|---|---|---|
| 1 |     MS. DILLA: If we could please mark it as | 1 | A   Okay. |
| 2 |     Exhibit 1. | 2 | Q   If you could please take time to familiarize |
| 3 |     (9-3-2015 letter from Dr. Hobbs marked Plaintiff's | 3 | yourself with that. |
| 4 |     Exhibit 1.) | 4 | A   Okay. |
| 5 | BY MS. DILLA: | 5 | Q   There is a -- there's an incident that is |
| 6 | Q   Okay, Doctor, do you see on your screen CCC | 6 | referenced in there regarding an: "Allegation that a chief |
| 7 | meeting notes from June 3rd of 2015? | 7 | resident was talking about Dr. Diekman's medical condition |
| 8 | A   I do. | 8 | with other residents resulting -- where they may have said |
| 9 | Q   And I'll allow you -- we're going to scroll | 9 | some uncomplimentary things about her," meaning |
| 10 | through it, but are there minutes that are taken during the | 10 | Dr. Diekman. Do you recall discussing that incident with |
| 11 | committee meetings? | 11 | Dr. Hobbs? |
| 12 | A   Yes. | 12 | A   Very vaguely. |
| 13 | Q   And to be clear, I'm not asking you to make an | 13 | Q   The chief resident that is referenced, would that |
| 14 | opinion as far as the truth or veracity of the statements. | 14 | be Dr. Chang? |
| 15 | Just generally, is this the form that the minutes would | 15 | A   Well, it could have been Dr. Chang or the other |
| 16 | take? | 16 | chief resident. |
| 17 | A   Yes. | 17 | Q   Do you know if anything was done to address |
| 18 | Q   Okay. And, specifically, I'm going to call your | 18 | Dr. Diekman's concerns? |
| 19 | attention to the paragraph on the second page starting | 19 | A   I can only speculate based on what our usual |
| 20 | with: "Dr. Tandon stated there were rumors of impairment." | 20 | procedure is with that, which is to counsel the chiefs on |
| 21 | A   Okay. | 21 | being careful with all of those proceedings, and give them |
| 22 | Q   If you could take a moment just to review that. | 22 | advice on how to -- how to be more discreet with things. |
| 23 | A   Okay. | 23 |     (5-28-2015 letter marked Plaintiff's Exhibit 3.) |
| 24 | Q   Do you have independent recollection of what | 24 |     MS. DILLA: I don't have any further questions. |
| 25 | Dr. Tandon is referencing in that paragraph? | 25 |     MR. CHAUNCEY: No questions. |

Page 46

1  THE COURT REPORTER: Read or waive?
2  MR. CHAUNCEY: We'll waive.
3  (Deposition concluded at 5:00 p.m.)
4
5      S T I P U L A T I O N
6
7      It is hereby stipulated and agreed by and among
8  the attorneys present and the witness that reading and
9  signing of the deposition by the witness is waived.

Page 47

1      CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5      I, the undersigned authority, certify that the
6  witness named herein personally appeared before me and was
7  duly sworn.
8      Witness my hand and official seal this 6th day
9  of July, 2020.
10
11
12
13
14      _____
15      J. Gay Smith, RPR, RMR, FPR
        Notary Public - State of Florida
16      My Commission Expires: 2/18/2021
        Commission No.: GG 041811

Page 48

1      REPORTER'S CERTIFICATE
2  STATE OF FLORIDA     :
3  COUNTY OF HILLSBOROUGH :
4      I, Jolyn Gay Smith, RPR, RMR, FPR, certify that I
5  was authorized to and did stenographically report the
6  deposition of ROBERT N. AVERBUCH, MD; that a review of the
7  transcript was not requested and that the transcript is a
8  true and complete record of my stenographic notes.
9      I further certify that I am not a relative,
10 employee, attorney, or counsel of any of the parties, nor
11 am I a relative or employee of any of the parties'
12 attorneys or counsel connected with the action, nor am I
13 financially interested in the outcome of the foregoing
14 action.
15      Dated this 6TH day of JULY, 2020, IN THE CITY OF
16 TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.
17
18
19
20
21
22      _____
23      JOLYN GAY SMITH, RPR, RMR, FPR
        Registered Merit Reporter
24      Florida Professional Reporter
25

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.