UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SARAH DIEKMAN,

     Plaintiff,

v.                                                  Case No.: 1:19-cv-00227-AW-GRJ

THE UNIVERSITY OF FLORIDA BOARD
OF TRUSTEES,

     Defendant.

_____/

## DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, Defendant, the University of Florida Board of Trustees ("UF"), respectfully moves this Court for final summary judgment as to all pending counts in Plaintiff's Amended Complaint.[1] The pleadings, affidavits, answers to interrogatories, admissions, depositions, and other materials as would be admissible in evidence show that there is no genuine issue as to any material fact and that Defendant is entitled to summary judgment against Plaintiff, as a matter of law. In support of the foregoing, UF states:

---

[1] Counts II, VII, VIII of the Amended Complaint were dismissed. *See* ECF No. 22. Plaintiff did not re-file these claims.

## **INTRODUCTION**

This case arises from Plaintiff's graduate medical education as a resident in the UF Department of Psychiatry. Because Plaintiff was primarily a medical resident student at UF, Plaintiff failed to exhaust administrative remedies and appeal to the Eighth Judicial Circuit Court as required under the Florida Constitution. Therefore, this Court lacks subject matter jurisdiction on these matters. Plaintiff makes claims of sex discrimination, disability discrimination and retaliation. However, claims for sex discrimination and retaliation are time barred as Plaintiff failed to file a Charge of Discrimination within 300 days concerning the allegations. Likewise, Plaintiff can provide no similarly situated comparators for her sex discrimination allegations. Instead, Plaintiff was terminated due to her poor performance in the residency program and safety concerns. There was no other "but-for" causation for her termination.

Furthermore, Plaintiff was provided reasonable accommodations through the interactive process by UF and even provided additional paid leave and an offer of part-time scheduling. Nevertheless, Plaintiff's poor performance and safety concerns caused her termination. In the end, Plaintiff was not a qualified individual under the law and could not meet the essential functions of the physically taxing and stressful medical residency. This put the safety of Plaintiff and her patients at risk.

## STATEMENT OF FACTS[2]

Plaintiff was a medical resident student at UF. Residents are required to "perform the essential functions of the specialty and meet the academic standards of the curriculum."[3] Plaintiff was very ill towards the end of her tenure in medical school with an "undiagnosed illness" that caused her to have trouble breathing and forced her to take a leave of absence.[4] Plaintiff was diagnosed with postural orthostatic tachycardic syndrome ("POTS").[5] As a result of POTS, Plaintiff was completely immobilized and bedridden towards the end of her medical school tenure failing her clinical rotation and final exam.[6] Plaintiff has "to do physical therapy all of the time to continue to function with POTS" and if she does not then "catastrophic things will happen to my health."[7] Nevertheless, after passing her clinical rotation and final test on her second attempt, Plaintiff was able to graduate from medical school.

Plaintiff began her residency at UF on July 1, 2013.[8] For her cohort, UF accepted five female residents and three male residents.[9] Plaintiff knew that the residency program was going to be very difficult because "all residency programs

---

[2] Defendant disagrees with many of Plaintiff's claims. However, for purposes of the Motion, Defendants have included the facts as alleged by Plaintiff and construed them in the light most favorable to Plaintiff.
[3] ECF No. 35-5 (hereafter "Offer Letter") at UF/Diekman-001608.
[4] ECF No. 35-1, June 17, 2020 Deposition of Sarah Diekman, MD (hereafter, "Plaintiff-Depo") at 30.
[5] Plaintiff-Depo at 31.
[6] ECF No. 35-2, June 19, 2020 Continued Deposition of Sarah Diekman, MD (hereafter, "Plaintiff-Depo-2") at 67-68; ECF No. 35-30, August 30, 2020 Declaration of Dr. Jacqueline Hobbs (hereafter "Hobbs-Dec") at ¶26.
[7] Plaintiff-Depo at 52-53.
[8] Plaintiff-Depo at 30.
[9] Plaintiff-Depo at 62; ECF No. 35-28 at UF/Diekman-002174.

are difficult."[10] Due to the stress, hours, training and emergency situations, it is common knowledge that medical residency programs are very difficult.[11] Plaintiff executed a "Letter of Offer to Residents" ("Offer Letter") which outlined many of the responsibilities, conditions of residency, leave, procedures for grievances and dismissal from the program.[12] The Offer Letter explicitly stated that a resident should contact the "UF ADA Office at 392-7056" if seeking "reasonable accommodations to the known physical and mental limitations of otherwise qualified individuals with disabilities."[13]

Plaintiff reviewed the Program Manual which provided more detail of the subjects discussed in the Offer Letter and a synopsis of the residency program curriculum.[14] On June 27, 2013, before starting the program, Plaintiff signed and agreed that she "received a copy" of the Program Manual and Graduate Medical Education policies "or are aware of where to locate this information AND that you are responsible for the contents."[15] The Program Manual explains:

> Graduate medical education is based on the principle of progressively increasing levels of responsibility in caring for patients, under the supervision of the faculty. Faculty members closely monitor the progress of each resident in acquiring the skills necessary for advancement to the next level of training…Upon achieving these standards, residents are afforded greater degrees of independence in

---

[10] Plaintiff-Depo at 63.
[11] Hobbs-Dec at. ¶28.
[12] Plaintiff-Depo at 107; ECF 35-4 at UF/Diekman-001613, 001620, 001627.
[13] ECF 35-4 (henceforth "Offer Letter") at UF/Diekman-001612, 001618, 001625.
[14] Plaintiff-Depo at 66; ECF 35-3 ("Manual"); ECF No. 35-28.
[15] Plaintiff-Depo at 67; Manual at UF/Diekman-000489.

patient care, at the discretion of the faculty. At all times, however, faculty remains ultimately responsible for all aspects of patient care.[16]

The Program Manual provides examples of the schedules that residents have, duty hours, on call requirements and the skill/knowledge/attitude objectives of the rotations.[17] Residents must attend lectures/didactic teaching and perform different types of clinical rotations under the supervision of faculty "built off of an apprenticeship model."[18] Nevertheless, the safety and ultimate responsibility of patients was with the faculty member which makes trust in the skills of a resident a key aspect.[19] Generally, the safety of physicians and patients is of primary importance. Much of the hands on learning occurs while "on call" where "residents are afforded greater autonomy and develop confidence in their acute management of psychiatric patients."[20] In the third year, residents also begin to supervise interns/students at the hospital.[21]

Two residents, in their fourth and final year, are appointed chief residents who are the primary liaison between the residents and administration.[22] Chief residents also assign residents to monthly rotations and on call schedules.[23] During Plaintiff's first year, she had one male and one female chief resident including Dr. Anna

---

[16] Plaintiff-Depo at 70-71; Manual at UF/Diekman-002352.
[17] Manual at UF/Diekman-002371-002405, 002410, 002413.
[18] Plaintiff-Depo at 68; Manual at UF/Diekman-002405.
[19] Hobbs-Dec at ¶28; Manual at UF/Diekman-002352.
[20] Plaintiff-Depo at 30; Hobbs-Dec at ¶16-17; Manual at UF/Diekman-002352.
[21] Hobbs-Dec at ¶20.
[22] Hobbs-Dec at ¶23; Manual at UF/Diekman-002411.
[23] Hobbs-Dec at ¶22-23; Manual at UF/Diekman-002411-002412.

Turner.[24] If a resident calls out sick when on call, another resident must fill in to provide the emergency care necessary.[25] All residents are required to do two years of call during their second and third years.[26]

In May 2014, while working in her resident program at the Veterans Administration ("VA") medical facility in Gainesville, Florida, a VA attending physician, Dr. Dale Syfert ("Dr. Syfert") made Plaintiff feel uncomfortable.[27] One night, Dr. Syfert came into the call room for on call doctors where Plaintiff was sitting which startled her although he immediately left.[28] Dr. Joseph Thornton ("Dr. Thornton") was the staff psychiatrist with the VA and the Consultation Liaison Service attending physician for UF during this period.[29] Around the same time in May 2014, Dr. Thornton was contacted by Dr. Syfert who alleged that Plaintiff was "writing notes without seeing the patient" and had "an issue with her seeing patients in the emergency department in her role as the on-call doctor."[30] Dr. Thornton spoke to Plaintiff about the complaint by Dr. Syfert.[31] In response, Plaintiff reported that she was uncomfortable being around Dr. Syfert for the reasons discussed.[32] Plaintiff

---

[24] ECF No. 35-37, June 22, 2020 Deposition of Ana Turner, M.D. (hereafter, "Turner-Depo") at 6.
[25] Manual at UF/Diekman-002353; ECF No. 35-34, June 26, 2020 Deposition of San Kuo Chang, M.D. (hereafter, "Chang-Depo") at 16-18, 31.
[26] Plaintiff-Depo at 170.
[27] Plaintiff-Depo at 40-41. Dr. Syfert was an employee of the VA, not the University of Florida.
[28] Plaintiff-Depo at 40-41. Plaintiff admits that she has "a history of sexual trauma, so maybe I misread the situation and overreacted."  Plaintiff's "trauma" is referring to being sexually assaulted while a student at Purdue University. Plaintiff-Depo at 40-41.
[29] ECF No. 35-35, June 23, 2020 Deposition of Joseph Thornton, MD (hereafter, "Thornton-Depo.") at 5.
[30] Thornton-Depo at 15-16.
[31] Thornton-Depo at 16.
[32] Thornton-Depo at 16.

informed residency program director, Dr. Jacqueline Hobbs ("Dr. Hobbs") and chief resident Dr. Turner.[33] In order to accommodate Plaintiff's desire to not be around Dr. Syfert, Plaintiff's schedule was changed by the incoming chief residents, Dr. San Chang ("Dr. Chang") and Dr. Adrienne Eisner ("Dr. Eisner"), giving her additional rounds at UF Shands in order to keep her from being on the same shift as Dr. Syfert.[34] Plaintiff explained it "seemed like he was on a different schedule" following her discussion with supervisors concerning the issue.[35]

Although Plaintiff was aware of her POTS and the procedure to get an accommodation, Plaintiff did not formally request a disability accommodation by contacting the ADA Office during her first year.[36] Plaintiff did get an approved accommodation of a reserved disability parking spot through the Parking and Transportation Office in or around June 2013.[37] Parking is notoriously difficult for all UF students, so the ability to reserve a parking spot, instead of first come first serve, without an additional fee is a reasonable accommodation that UF provides to students with disabilities.[38] According to Google maps, Plaintiff's parking spot was located roughly 500 feet from an entrance to the Shands UF Health complex.[39] UF

---

[33] Plaintiff-Depo at 40-41.
[34] Chang-Depo at 8-9.
[35] Plaintiff-Depo at 242.
[36] Plaintiff-Depo at 32-33, 206; ECF 35-31, August 22, 2020 Declaration of Dr. Kenneth J. Osfield ("Osfield-Dec") at ¶20.
[37] Plaintiff-Depo at 55, 121.
[38] Osfield-Dec at ¶13.
[39] See ECF No. 35-20.

students with a disability are also given the option of being picked up directly from their vehicle and dropped off at their building by Gator Lift van service.[40]

Nevertheless, after completing more than a year of the residency program with her assigned parking spot, Plaintiff wanted a parking spot that was closer to Shands UF Health Complex due to experiencing symptoms of POTS.[41] Parking issues are handled by UF's Parking and Transportation Department across campus and are not within the purview of the College of Medicine.[42] In October 2014, Plaintiff contacted the UF General Counsel's office concerning parking who directed her to the ADA Office along with Parking and Transportation.[43] Dr. Kenneth Osfield ("Dr. Osfield"), UF's ADA Compliance Officer, worked with Parking and Transportation to get Plaintiff's assigned spot moved to within 350 feet from an entrance to Shands UF Health complex on the second floor of "Garage II" which Plaintiff was pleased with.[44]

UF had a clearly promulgated policy that any UF Health medical resident or employee should contact the ADA office in order to seek an accommodation.[45] Nevertheless, even with a new parking spot, Plaintiff's health declined as did her performance. Plaintiff kept getting sick and "having a great deal of difficulty

---

[40] Osfield-Dec at ¶14-15.
[41] Plaintiff-Depo at 57, 120-123.
[42] Osfield-Depo at ¶11; Plaintiff-Depo-2 at 18.
[43] Plaintiff Depo at 122-123; Osfield Declaration at ¶10.
[44] Plaintiff Depo at 202-205; ECF No. 35-20; Osfield-Dec at ¶17-19; *see generally* ECF No. 35-21.
[45] Osfield-Dec at ¶3-4; Offer Letter at UF/Diekman-001612.

functioning physically."[46] Plaintiff requested no additional accommodations during this period and "did not want to ask for any disability accommodations."[47] By November 2014, Plaintiff had used all of her allotted days of sick and vacation leave.[48] Plaintiff was struggling in her rotations and was receiving very negative reviews for her performance.[49] For example, Dr. Sarah Fayad ("Dr. Fayad") wrote in a July 2014 evaluation of Plaintiff that, "Her documentation is poor and she frequently did not come to rounds prepared, even when there were very few patients she was responsible for."[50] Dr. Almari Ginory ("Dr. Ginory") and Dr. Thornton also provided poor performance evaluations during the same period.[51]

Due to Plaintiff's performance struggles, her health, and her expended sick and vacation leave, Plaintiff spoke with Dr. Hobbs concerning her situation.[52] Dr. Hobbs provided Plaintiff the option of getting additional leave with pay for the month of December in order for Plaintiff to get healthy and complete some additional physical therapy.[53] However, taking a month of leave would put her behind her peers and force her to do an additional month in the program.[54] As a result, Plaintiff requested leave with pay for the month of December 2014 from Department of

---

[46] Plaintiff-Depo at 60.
[47] Plaintiff-Depo at 49.
[48] Plaintiff-Depo at 116-117.
[49] Hobbs-Dec at ¶¶33-42.
[50] ECF No. 35-5 (henceforth "Evaluations") at UF/Diekman-000533-000535.
[51] Evaluations at UF/Diekman 000536-000541; Thornton-Depo at 30-31.
[52] Plaintiff-Depo at 169-170, 141-145; ECF No. 35-10 (henceforth "Hobbs-Notes") at UF/Diekman 000373-376.
[53] Plaintiff-Depo at 141-145, 169-170; Hobbs Notes at UF/Diekman 000374-376.
[54] Plaintiff-Depo at 143-144; Hobbs-Dec at ¶57.

Psychiatry Chair Dr. Regina Bussing.[55] In her signed letter to Dr. Bussing, Plaintiff stated that she was requesting leave because she had "a prevailing medical condition that has worsened to the extent that I cannot perform my duties as a resident."[56] Plaintiff continued that, "Despite closely following medical recommendations, I have not regained functionality while working clinical rotations."[57] Thus, although Plaintiff did not work throughout December 2014, she was paid her full stipend.[58]

After discussing the issue with the Clinical Competency Committee ("CCC"), a committee of faculty within the College of Medicine that meets to oversee each resident's performance and academic standing, Dr. Hobbs offered Plaintiff the option of returning on a "part-time" basis in order for Plaintiff to remain healthy enough to successfully complete her work.[59] Plaintiff refused the offer and returned to work full-time.[60] Plaintiff continued to struggle with her job performance. On February 15 and 16, 2015, Plaintiff copied and pasted notes from one patient to another.[61] Plaintiff admitted that it was dangerous for patients.[62] Moreover, Plaintiff failed to update discharge summaries of patients.[63]

---

[55] Plaintiff-Depo at 141; ECF No. 35-7; ECF No. 35-32 August 24, 2020 Declaration of Dr. Regina Bussing (hereafter "Bussing-Dec") at ¶13.
[56] ECF No. 35-7.
[57] ECF No. 35-7.
[58] Plaintiff-Depo at 142-143; Hobbs-Dec at ¶57.
[59] Plaintiff-Depo at 172; Hobbs-Notes at UF/Diekman 000375-000376; Hobbs-Dec at ¶57-58; ECF No. 35-12 (hereafter "CCC Minutes") at UF/Diekman-000378.
[60] Plaintiff-Depo at 172; Hobbs-Notes at UF/Diekman-000376.
[61] Plaintiff-Depo at 158-159; ECF No. 35-9 (hereafter "Hobbs-Emails") at UF/Diekman-000168; Hobbs-Dec at ¶60.
[62] Plaintiff-Depo at 159.
[63] Hobbs-Dec at ¶61; Hobbs-Emails at UF/Diekman-000170.

On March 26, Plaintiff had not logged any of her patients' cases in the system which should have been around 500 cases.[64] Plaintiff ordered the wrong medication for a patient.[65] On March 27, Dr. Hobbs apologize to UF Shands Nurse Manager, Gloria Jeanne Barker ("Nurse Barker"), due to Plaintiff's performance issues.[66] March 30, 2015, Dr. Ginory complained to Dr. Hobbs of Plaintiff's bad note taking in patient records.[67] On March 30, Dr. Eisner emailed Dr. Hobbs complaining of Plaintiff failing to treat a patient and state the medications needed which may have caused the patient to be stuck with a bill rather than insurance.[68] Plaintiff was delinquent in her duty hour lists the weeks of January 19, February 9, February 16, March 2, and April 13.[69]

On March 18, 2015, the CCC met and reviewed Plaintiff's performance.[70] The CCC recommended that Plaintiff be put on "Special Observation Status" or "pre-probation" due to concerns over patient safety and lack of experience.[71] On March 29, 2015, Dr. Hobbs told Plaintiff that they would meet on March 31.[72] The next day, March 30, Plaintiff independently reached out to Dr. Osfield in the ADA Office for the first time.[73] On March 31, Plaintiff met with Dr. Hobbs, the Chief Residents

---

[64] Plaintiff-Depo at 164; Hobbs-Dec at ¶64.
[65] Hobbs-Dec at ¶65; Hobbs-Emails at UF/Diekman 000181-000183.
[66] Hobbs-Dec at ¶65; Hobbs-Emails at UF/Diekman 000185.
[67] Hobbs-Emails at UF/Diekman 000186-000187; Hobbs-Dec at ¶66.
[68] Hobbs-Emails at UF/Diekman 000190.
[69] ECF No. 35-6.
[70] CCC-Minutes at UF/Diekman-000379.
[71] CCC-Minutes at UF/Diekman-000379; Hobbs-Dec at ¶67-68.
[72] Hobbs-Emails at UF/Diekman-000184.
[73] Plaintiff-Depo at 205; Osfield-Dec at ¶20-21; ECF No. 35-22.

and Dr. Robert Averbuch ("Dr. Averbuch"), Associate Program Director, concerning her poor performance.[74] At this meeting, Plaintiff was told she would be placed in on "Special Observation Status."[75] In this pre-probation status, she continued as a resident in good standing, but was given the opportunity for extra supervision and available assistance to help her improve her performance.[76]

On March 31, Plaintiff filed paperwork with the ADA office requesting an accommodation.[77] Consequently, Plaintiff, Dr. Osfield, and Dr. Hobbs met on April 2 to discuss the requests for accommodation in an interactive process.[78] Plaintiff made several requests including a "postponement of the change of April schedule to allow for previously scheduled doctor appointments."[79] UF agreed to nearly all of Plaintiff's requests.[80] In an email sent on April 2, 2015, Plaintiff expressed that this "more than covers my problem."[81]

After Plaintiff received poor performance evaluations over the summer, the Plaintiff was put on a three-month probation with a remediation plan that was provided to Plaintiff on September 3, 2015.[82] The remediation plan included clear objectives and standards for Plaintiff to comply with in order to remain in the

---

[74] Hobbs-Dec at ¶68-70; Hobbs-Emails at UF/Diekman 000196-000198.
[75] Hobbs-Dec at ¶68-70; Plaintiff Depo at 30.
[76] Hobbs-Dec at ¶68-70; Hobbs-Emails at UF/Diekman-00198
[77] ECF No. 35-23 (hereafter "Accommodations") at UF/Diekman-001566.
[78] Osfield-Dec at ¶20-21; Accommodations at UF/Diekman-001567-001568.
[79] Accommodations at UF/Diekman-001567-001568.
[80] Accommodations at UF/Diekman-001568.
[81] ECF No. 35-39; Osfield-Dec at ¶23; Hobbs-Dec at ¶73.
[82] Hobbs-Dec at ¶74-81; Evaluations at UF/Diekman-000576-000583.

program.[83] However, at the beginning of her probation, Plaintiff failed to set a required meeting with Dr. Hobbs that was to occur weekly.[84] Plaintiff failed to review her clinic notes with Dr. Ginory and failed to submit a pre-rounding checklist.[85] Plaintiff failed to report her time during her afternoon shifts and failed to show up to work on September 9.[86] Plaintiff struggled to meet the expectations set out in her probation remediation plan.[87] Plaintiff continued to be a safety concern for her faculty/attendings as they worried both for her safety and the safety of patients.[88] In fact, safety concerns were realized when Dr. Diekman was attacked by a patient in October 2015.[89] While struggling during the probation period, Plaintiff hired counsel.[90] On November 12, 2015, Plaintiff made a second accommodation request and entered the interactive process.[91] UF accepted many of her requests for accommodation.[92] Plaintiff also filed a Charge of Discrimination with EEOC on November 13, 2015. However, Dr. Hobbs and the CCC were unaware of the Charge

---

[83] *See generally* ECF No. 35-11 (hereafter "Probation Letter").
[84] Hobbs-Dec at ¶82; Hobbs-Notes at UF/Diekman-000390.
[85] Hobbs-Dec at ¶82; Hobbs-Notes at UF/Diekman-000390.
[86] Hobbs-Dec at ¶83; Hobbs-Notes at UF/Diekman-000391.
[87] Hobbs-Dec at ¶82-91, 94-97; See Hobbs-Notes at UF/Diekman-000390-000408; CCC-Minutes at UF/Diekman-000382-000384; Hobbs-Emails at UF/Diekman-000333-000371.
[88] ECF No. 35-30, August 31, 2020 Declaration of Dr. Richard C. Holbert ("Holbert-Dec") at ¶10-12; Hobbs-Dec at ¶90-91; ECF No. 35-36, June 25, 2020 Deposition of Dr. Stephen Welch at 7-8, 18-20 (stating Plaintiff "was not safe to practice medicine independently.")
[89] Plaintiff-Depo at 245-246; Hobbs-Dec at ¶90-91; ECF No. 35-26.
[90] Osfield-Dec at ¶35.
[91] Osfield-Dec at ¶36-37; Accommodations at UF/Diekman-000434.
[92] Accommodations at UF/Diekman-000435-000437.

until after Plaintiff's termination.[93] Plaintiff failed to follow up and sign the agreed accommodations which is required for implementation.[94]

After months of attempting to work with Plaintiff on her probation remediation, the CCC voted unanimously to dismiss Plaintiff from the program on November 24, 2015.[95] On December 3, 2015, Plaintiff experienced a serious injury at work that left her with post-concussive syndrome and unable to work through June 2016.[96] Plaintiff was provided a detailed termination letter with reasons for the decision on December 4, 2015.[97] Plaintiff appealed her dismissal to Dr. Bussing but the decision was upheld and then appealed the decision to Dr. Lisa Dixon, Designated Institutional Officer and Associate Dean, who also upheld Plaintiff's dismissal.[98] Finally, Plaintiff appealed to the Dean, Dr. Michael Goode, who upheld Plaintiff's dismissal as well.[99] Plaintiff filed a second Charge of Discrimination on May 14, 2018.[100]

## MEMORANDUM OF LAW

**A.      Plaintiff's claims related to sex discrimination and retaliation are time barred.**

---

[93] Hobbs-Dec at ¶112.
[94] Accommodations at UF/Diekman-000437; Osfield-Dec at ¶38.
[95] CCC-Minutes at UF/Diekman-000385-000387; Holbert-Dec at ¶12-13; Hobbs-Dec at ¶98.
[96] Plaintiff-Depo at 60-61; *See* ECF No. 35-27 at Jacksonville-Mayo-000006 ("She has been essentially 100% functionally disabled from the time of the accident on December 3, 2016, through June 1, 2016…")
[97] *See* ECF No. 35-13; Plaintiff-Depo at 184-185; Hobbs-Dec at 99.
[98] Plaintiff-Depo at 194; *See* ECF No. 35-17; ECF No. 35-29 September 1, 2020 Declaration of Dr. Lisa Dixon at ¶10-16; Bussing-Dec at ¶15-23.
[99] ECF No. 35-17 at Diekman/UF 000100.
[100] *See* ECF No. 35-19 at UF/Diekman 000017-000018.

As an initial matter, Plaintiff did not file her Charge of Discrimination related to sex discrimination or retaliation within 300 days of the final allegations. "No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000), overruled on other grounds by *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). The charge must be filed with the EEOC within 300 days of the last alleged discriminatory act. 42 U.S.C. § 2000e–5(e)(1); *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir.2002). "[O]nly those claims arising within 300 days prior to the filing of the EEOC's discrimination charge are actionable." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1271. "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.*

Plaintiff dual-filed with the Florida Commission on Human Relations and the EEOC on November 13, 2015 in which Plaintiff alleges discrimination based upon disability.[101] Plaintiff was terminated following her probationary period on December 4, 2015. Plaintiff believes that she filed a second Charge of Discrimination in May 2016, after her final appeal, but the Plaintiff, nor the EEOC,

---

[101] *See* ECF No. 35-19 at UF/Diekman 000017-000018.

has any evidence of a Charge of Discrimination filed at that time.[102] During this period, Plaintiff suffered from post-concussive syndrome, "wasn't functioning well" and had trouble remembering when she visited the Mayo Clinic on May 24, 2016.[103] Plaintiff did file an amended Charge of Discrimination on May 14, 2018 when she included allegations of sex discrimination and retaliation.[104] However, the allegations in the 2018 Charge are barred since it was filed 300 days after the alleged discrimination or retaliation. Thus, UF is entitled to summary judgement on Plaintiff's counts III, IV, V, and VI which do not arise out of the initial Charge of Discrimination.

**B.   Because Plaintiff was primarily a medical resident student at UF, Plaintiff failed to exhaust administrative remedies and appeal to the Eighth Judicial Circuit Court as required under the Florida Constitution.**

Plaintiff was primarily a student under her Offer Letter which states, "During your residency you will be required to exhibit the qualifications and talents for the specialty to which you have been accepted for graduate medical education training."[105] Plaintiff describes the education as an "apprenticeship model" with lectures and teaching from faculty with progressively increasing levels of responsibility.[106] The Program Manual stated that the purpose of the residency

---

[102] *See* ECF No. 35-19 at Diekman-FOIA0000017-000006.
[103] Plaintiff-Depo at 232-233.
[104] *See* ECF No. 35-19 at UF/Diekman 000017-000018.
[105] Offer-Letter at UF/Diekman-001608.
[106] Plaintiff-Depo at 68-70.

program "is to provide an educational and scholarly environment that will train qualified and competent individuals in the field of psychiatry…"[107] The Program Manual provides an entire curriculum.[108] According to the Offer Letter, residents are given a "stipend to pursue the resident's graduate medical education in an amount appropriate to the resident's level in the program."[109]

Under Florida law, medical residents subject to academic decisions at institutions of higher education are treated as students and deference is given to those institutions by the Courts when making academic decisions such as accommodations. *Hussey v. Univ. of Fla. Bd. of Trs.*, 226 So. 3d 1081 (Fla. 1st DCA 2017) (holding that medical resident was student subject to procedures for appeal by judicial review rather than access to civil courts). Florida's Constitution has vested the State University System's Board of Governors and each university's board of trustees with the power and scope to "operate, regulate, control and be fully responsible for the management of the whole university system." Fla. Const. art. IX, section 7; *Rivera v. Univ. of S. Fla. St. Petersburg*, 176 So. 3d 363, 363-64 (Fla. 2d DCA 2015).

---

[107] Manual at UF/Diekman-002348.
[108] *See generally* Manual.
[109] Offer-Letter at UF/Diekman-001611.

Therefore, a university has constitutional jurisdiction in a quasi-judicial nature over any "matter arising in the course of the operation and management of the university." *Decker v. Univ. of W. Fla.*, 85 So. 3d 571, 574 (Fla. 1st DCA 2012).

This would include issues of accommodations in the program and discrimination. Where UF's action is taken under the powers derived from the Constitution, appeal of a final quasi-judicial decision by petition for *writ of certiorari* to the state circuit court is the appropriate mechanism. *Decker*, 85 So. 3d 571; *Rivera*, 176 So. 3d at 363-64.; *Hussey*, 226 So. 3d at 1081. "In the absence of a general law establishing a right to appeal, the order in this case is reviewable by certiorari." *Id.*

Plaintiff appealed the decision to Dr. Bussing, Dr. Dixon, and Dr. Goode. In Dr. Goode's letter to Plaintiff responding to her appeal, he states that, "You may seek judicial review of this final University decision pursuant to Florida Rules of Appellate Procedure 9.190, applicable to review of quasi-judicial decision of an administrative body not subject to the Administrative Procedure Act, by filing a petition for certiorari review within 30 day of the final University decision."[110]

Plaintiff's "proper remedy is to seek certiorari review in the circuit court." *Couchman v. Univ. of Cent. Fla.*, 84 So. 3d 445, 446–47 (5th DCA 2012); *Corbin v. Univ. of Fla.*, 147 So. 3d 7 (Fla. 1st DCA 2013). Plaintiff failed to complete this

---

[110] ECF No. 35-17 at Diekman/UF 000100.

final step. Instead, Plaintiff should have appealed any final decision, if one was provided, through judicial review to the state circuit court, which is the proper venue, in the Eighth Judicial Circuit of Florida. Certainly, "[a]s a general rule, parties are required to pursue administrative remedies before resorting to the courts to challenge agency action," *Cent. Fla. Invs., Inc. v. Orange County Code Enforcement Bd.,* 790 So. 2d 593, 596 (Fla. 5th DCA 2001), and "failure to exhaust the available administrative remedies may result in dismissal of the lawsuit." *MCZ/Centrum Flamingo II, LLC v. City of Miami Beach*, No. 08-22419-CIV, 2009 WL 10700922, at *13 (S.D. Fla. Aug. 12, 2009).

Thus, UF is entitled to summary judgment in its entirety for lack of subject matter jurisdiction.

**C.    UF is entitled to summary judgment on Count I for alleged disability discrimination.**

The Eleventh Circuit has recognized that Florida Civil Rights Act ("FCRA") claims are to be construed by the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Greenberg v. BellSouth Telecomm., Inc.,* 498 F.3d 1258, 1263–64 (11th Cir.2007). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination which includes a demonstration that: (1) she has a disability; (2) she is a "qualified individual;" and, (3) defendant unlawfully discriminated against her because of the disability.

*D'Angelo v. ConAgra Foods, Inc*., 422 F.3d 1220, 1225–26 (11th Cir.2005).

The burden then shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the challenged employment action and the burden shifts back to the plaintiff to prove that the reasons offered by the defendant are a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Joe's Stone Crabs*, 296 F.3d at 1273.

### 1.   Plaintiff was not a qualified individual under the ADA.

A "qualified individual" is someone who can perform the essential functions of her job, with or without reasonable accommodation. 42 U.S.C. § 12111(8). An employee who is unable to perform an essential function of her job even with an accommodation is not a "qualified individual" covered under the ADA or FCRA. *McGuire v. United Parcel Serv., Inc*., 763 Fed. Appx. 890, 895 (11th Cir. 2019). Plaintiff failed to meet many of the rudimentary job duties of her position demonstrating that she was not meeting the essential functions. The UF College of Medicine had a policy that outlined the essential functions of its residency programs.[111] "In general, individuals must have abilities and skills in five categories:

---

[111] ECF No. 35-15 at 002851-002852.

observations, communication, motor, intellectual, behavioral and social."[112] The

policy describes in the section, Behavioral and Social Attributes, that:

> Candidates must be able to tolerate physically taxing
> workloads and to function effectively under stress. They
> must be able to adapt to changing environments, to display
> flexibility, and learn to function in the face of uncertainties
> inherent in the clinical problems of many patients.[113]

Furthermore, the Offer Letter for each of Plaintiff's years in the residency

program provides for "Resident Responsibilities" that include to "provide safe

effective…patient care", "to participate fully in the educational and scholarly

activities of their program", "Case Documentation", and "[t]o comply with duty

hours assignments."[114] Residents are tasked with treating patients in fast paced, high

intensity situations within hospital settings, emergency situations, and learn through

extensive experience working with faculty/attending doctors. This is especially true

for stressful on call situations, some of the most vital experiences, where a resident

can be called upon by being paged at any moment to deal with all types of emergency

trauma at the hospital. If a resident fails to work these long and taxing hours, lives

can be at stake. Plaintiff had issues answering pages. She was constantly taking days

---

[112] ECF No. 35-15 at 002851-002852.
[113] ECF No. 35-15 at 002851-002852; Plaintiff-Depo-2 at 63.
[114] Offer-Letter at UF/Diekman-001608-001609.

off where she was on call forcing chief residents to scramble to find another resident to respond to emergencies.

In December 2014, Plaintiff stated that her "prevailing medical condition…has worsened to the extent that I cannot perform my duties as a resident."[115] Plaintiff admits that she has to do "physical therapy all of the time to continue to function with POTS" and without it she becomes "immobilized."[116] Plaintiff was unable to do her physical therapy and got very sick.[117] She continued to be sick during the remainder of her time at UF.[118] Plaintiff was barely functioning during her second year of residency, although she could get out of bed and to the bathroom which she could not do during her final year of medical school.[119] However, Plaintiff could not complete the essential functions of her "physically taxing", high intensity and stressful medical residency. Even with accommodations, Plaintiff could not show up to work on time consistently or even show up to work to hone her skills. Plaintiff also blames her numerous performance issues, including her poor note taking, on her health. Poor note taking is a serious safety issue for patients. In fact, within the Offer Letter, "Residents who do not maintain accurate

---

[115] ECF No. 35-7.
[116] Plaintiff Depo at 52.
[117] Plaintiff Depo at 52.
[118] Plaintiff Depo at 59.
[119] Plaintiff Depo at 54-59.

case documentation may not advance to the next level of training or be allowed to complete their program until compliance is achieved."[120]

As a result, Plaintiff was also a safety concern to UF, for both herself and her patients. Faculty/attendings were worried for her safety with dangerous patients. Furthermore, after an accident on December 3, 2015, Plaintiff suffered from post-concussive syndrome that resulted in her unable to work through May 2016. Clearly, with or without an accommodation, Plaintiff was unable to perform the essential functions of her position and, therefore, was not a qualified individual at the time of her termination.

> **2.**    **UF engaged in an interactive process, reasonably accommodated Plaintiff's requests and UF was not required to fundamentally alter its program as a reasonable accommodation.**

"The duty to provide a reasonable accommodation is not triggered under the ADA unless a specific demand for an accommodation has been made by the employee." *Hudson v. Tyson Farms, Inc.,* 769 F. App'x 911, 918 (11th Cir. 2019). The employee bears the burden of identifying an accommodation that would allow her to perform the essential functions of her job, as well as the burden of persuasion with respect to showing that such accommodation is reasonable. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). An employer

---

[120] Offer-Letter at UF/Diekman-001615.

does not have to provide "the maximum accommodation or every conceivable accommodation possible." *Id.* at 1285–86 (11th Cir.1997). The employee is only entitled to a reasonable accommodation, not to the accommodation of her choice. *Id.* at 1286.

An employer *is not liable* where it did "not obstruct an informal interactive process; ma[de] reasonable efforts to communicate with the employee and to provide accommodations based on the information it possesse[d]..." *Id.* at 1287. Furthermore, "the use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires." *Id.* at 1285. According to the Eleventh Circuit, "[t]his is so because the word 'reasonable' would be rendered superfluous in the ADA if employers were required in every instance to provide employees 'the maximum accommodation or every conceivable accommodation possible.'" *Id.*

Other than being accommodated with a reserved parking spot, Plaintiff did not make a formal request for accommodation related to her disabilities until March 31, 2015, around the time she was placed on pre-probation for her poor performance and safety concerns. The record is clear that UF accommodated Plaintiff when requested. UF provided a parking accommodation and accommodations related to Plaintiff's schedule and physical issues. Plaintiff also was accommodated with

additional paid leave after expending all sick leave but was unable to continue working. Furthermore, without a request from Plaintiff, UF offered Plaintiff the ability to do a part-time schedule in order to provide a more accommodating schedule for her physical therapy and health, while also hoping for Plaintiff to meet the essential functions of the program and complete the required hours over an extended period of time.

Also, as an educational institution preparing residents for practice of medicine, "Where the purpose of an educational program is to train persons to serve their profession in all customary ways, an institution's refusal to make major adjustments to its program in order to accommodate the disabled does not amount to disability-related discrimination." *J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921, 926–27 (11th Cir. 2016). Residents must get the training and hours necessary to practice medicine safely and effectively in both routine and emergency situations. Thus, Plaintiff was provided and offered reasonable accommodations by UF.

### 3. Plaintiff cannot establish she was discriminated against due to a disability and was instead terminated for poor performance and safety concerns.

Plaintiff cannot establish that she was discriminated against for any reason under the FCRA. To establish a case of intentional discrimination, a plaintiff may rely on direct or circumstantial evidence. *Richio v. Miami-Dade Cty.*, 163 F. Supp. 2d 1352, 1360 (S.D. Fla. 2001). Plaintiff alleges no direct evidence of disability-

based disparate treatment. Plaintiff provided little evidence of specific comments or incidents which can be considered unambiguous examples of disability discrimination. Thus, there is no direct evidence of any discrimination. Likewise, Plaintiff does not provide any comparators or circumstantial evidence related to her claims. When asked if there were any comparators or anyone else with a disability at UF, Plaintiff could not provide any names and generally said "everyone" was treated better.[121] The record is clear that Plaintiff was terminated from the program for her poor performance and safety concerns. Thus, there is no circumstantial evidence of any discrimination against the Plaintiff.

Because Plaintiff was not a qualified individual, was provided reasonable accommodations, and provides no direct or circumstantial evidence of disability discrimination to meet her burden, Plaintiff's Count I must fail.

### D.   UF is entitled to summary judgment on Plaintiff's claims alleging disparate treatment based on sex in Counts III and IV

In Count III, Plaintiff alleges a claim of disparate treatment based upon her sex against UF pursuant to the FCRA. In Count IV, Plaintiff alleges an identical claim against UF pursuant to Title VII. Plaintiff's claims in Counts III and IV are based on the same allegations and are evaluated under the same analytical

---

[121] Plaintiff-Depo. at 231.

framework.  See *Thomas v. Seminole Elec. Coop. Inc.*, 775 Fed. Appx. 651, 654 –

55 (11th Cir. 2019).

Plaintiff's sex discrimination claims in Counts III and IV are based upon

circumstantial evidence.  Where, as here, a plaintiff seeks to establish sex

discrimination through circumstantial evidence, courts apply the *McDonnell*

*Douglas* burden-shifting framework. *Williams v. Gallup, Inc.*, 709 Fed. Appx. 567,

570 (11th Cir. 2017).  "This requires the plaintiff to establish that (1) he is a member

of a protected class; (2) he suffered an adverse employment action; (3) his employer

treated similarly-situated employees outside of his protected class more favorably;

and (4) he was qualified for the job." *Id.*  If a plaintiff successfully establishes a

*prima facie* case, the burden then shifts to the employer to proffer legitimate,

nondiscriminatory reasons for its decision which is an "exceedingly light" burden.

*Jones v. RS & H, Inc.*, 775 Fed. Appx. 978, 986 n. 4 (11th Cir. 2019).  "If the

employer successfully meets this burden of production, then the burden shifts back

to the plaintiff to show that the employer's proffered reasons were pretext for

discrimination." *Id.*

### 1.    Plaintiff cannot establish a *prima facie* case of discrimination.

Plaintiff cannot establish a *prima facie* case of discrimination because she

cannot establish that UF treated similarly-situated employees outside of her

protected class more favorably.  The Eleventh Circuit has recently clarified that "a

plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019).

A similarly situated comparator (a) will have engaged in the same basic conduct (or misconduct) as the plaintiff; (b) will have been subject to the same employment policy, guideline, or rule as the plaintiff; (c) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and (d) will share the plaintiff's employment or disciplinary history. *Id.* at 1227–28. "[A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Id.* at 1228 (internal quotations omitted). "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—e.g., who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.*

Here, there is no appropriate comparator. As discussed, Plaintiff's performance was unsatisfactory from an assortment of female and male faculty, including Plaintiff's female program director. Unlike all the comparators mentioned by Plaintiff in her deposition, Plaintiff was put on pre-probation, probation, and a

remediation plan before the CCC made the decision to end her residency.[122]
Plaintiff's claim is essentially that other male residents violated other rules at
different times and that UF treated the male residents more favorably. This does not
suffice to establish a valid comparator.

"Employees who have committed multiple policy violations are not similarly
situated to employees who committed only one such violation." *Bush v. Houston
Cty. Comm'n*, 414 F. App'x 264, 267 (11th Cir. 2011); *Brown v. Jacobs Eng'g, Inc.*,
572 F. App'x 750, 752 (11th Cir. 2014) (holding that other managers were not
similarly situated who did not have formal complaints); *Silvera v. Orange Cnty. Sch.
Bd.*, 244 F.3d 1253, 1259 (11th Cir.2001) (holding that employees were not similarly
situated because the plaintiff had been arrested two to four more times than his
would-be comparator); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir.1999)
(holding that a female plaintiff who committed at least four policy violations was
not similarly situated to employees who each committed a single policy violation);
*Stephens v. Bd. of Trustees of Auburn Univ.*, 774 F. Supp. 2d 1202, 1212 (M.D. Ala.
2011) (holding that alleged comparators were not similarly situated because none
were on probation during the same time at Plaintiff).

---

[122] Hobbs-Dec at ¶103-106.

Plaintiff alleges a resident was Plaintiff's comparator because she heard rumors that he "threatened to blow up the VA and his boss."[123] Likewise, he had gotten "spotty reviews" from other residents.[124] However, Plaintiff has no evidence of her allegations and is , nevertheless, not a comparator in all material respects. The resident that Dr. Diekman referred to went through the professional resource program ("PRN") due to a mental health issue, but he was never on pre-probation or probation.[125] The resident returned from PRN and never had any further issues in the program.[126]

Plaintiff mentions another potential comparator who was "forcing medical students to write his notes for him."[127] This resident was warned about this incident and never had any further disciplinary issues while in the program.[128] Plaintiff struggled to provide any other names of comparators, loosely tossed around some unrelated issues she found unfair, but could not provide another individual who was similarly situated in all material respects, including being placed on probation, and treated better.[129]

Because Plaintiff cannot establish a comparator in "all material respects," she has failed to establish a *prima facie* case of discrimination.

---

[123] Plaintiff-Depo at 171.
[124] Plaintiff-Depo at 222.
[125] Hobbs-Dec at ¶103.
[126] Hobbs-Dec at ¶103.
[127] Plaintiff-Depo at 224.
[128] Hobbs-Dec at ¶104.
[129] Hobbs-Dec at ¶105-106.

**2.     UF has provided a legitimate and non-discriminatory reason for Plaintiff's dismissal.**

Even assuming Plaintiff can successfully meet her burden of establishing a *prima facie* case, UF has established a legitimate and non-discriminatory reason for its actions. Indeed, a review of the record including Plaintiff's performance evaluations, CCC minutes, meeting notes, probation remediation plan, and termination letter demonstrate a developing pattern of poor performance and safety concerns.

The documentation and testimony in this case supports UF's legitimate and non-discriminatory reasons and Plaintiff has offered no evidence to show such reasons were a pretext for discrimination. *See Jones,* 775 Fed. Appx. at 986 n. 4. The summary judgment evidence clearly demonstrates that the CCC evaluated Plaintiff's performance and safety concerns before ultimately terminating Plaintiff's residency. In fact, Plaintiff's direct supervisor, Dr. Hobbs, was a female.  Dr. Hobbs was directly supervised by Dr. Bussing, a female. Finally, Dr. Bussing was directly supervised by another female, Dr. Dixon. Dr. Bussing and Dr. Dixon both reviewed Plaintiff's allegations before denying her appeals. There is simply no evidence suggesting that Plaintiff's sex played any role in UF's decision-making process regarding Plaintiff.  Thus, Plaintiff's Count III and IV must fail.

**D. UF is entitled to summary judgment on Plaintiff's claims alleging retaliation in Counts V and VI because Plaintiff's alleged protected activity was not the "but-for" cause of her termination.**

In Count III, Plaintiff alleges a retaliation claim pursuant to the FCRA.  In Count VI, Plaintiff alleges an identical claim against UF pursuant to Title VII. Plaintiff's claims in Counts V and VI are based on the same allegations and are evaluated under the same analytical framework.  *See Smith v. City of Fort Pierce, Fla.*, 565 Fed. Appx. 774, 776 (11th Cir. 2014).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims based on circumstantial evidence.  *Hilliary v. FlightSafety Int'l, Inc.*, 778 Fed. Appx. 835, 840 (11th Cir. 2019).  "To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).  "A causal link between protected expression and the materially adverse action arises where the defendant was aware of the protected expression and took materially adverse action as a result." *Kocsis v. Fla. State Univ. Bd. of Trustees*, 788 F. App'x 680, 686 (11th Cir. 2019).

The Supreme Court has clarified that to sustain a retaliation claim, a Title VII plaintiff must demonstrate "but-for" causation between the participation in the protected activity and the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  "This requires proof that the unlawful retaliation would not

have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.; see also McQueen v. Alabama Dep't of Transportation*, 769 F. App'x 816, 824 (11th Cir. 2019).

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transp.*, 229 F.3d 1012, 1025 (11th Cir. 2000).

Here, it is undisputed that Plaintiff made complaints during her employment. Plaintiff complained about Dr. Syfert to Dr. Thornton and Dr. Turner. [130] Plaintiff alleges that Dr. Averbuch would complement Plaintiff about her clothes and ask for hair advice.[131] Plaintiff alleges that Dr. Averbuch offered to help her in the CCC

---

[130] Plaintiff did not plead a distinct claim of harassment or hostile work environment in the Amended Complaint. Claims for harassment or hostile work environment have distinct elements that are not pled or addressed by Plaintiff. However, even if the Court did consider a cause of action for harassment or hostile work environment, Plaintiff could not establish that alleged harassment "permeated [her workplace] with discriminatory intimidation, ridicule, and insult that are sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *See Thomas v. Seminole Elec. Coop. Inc.*, 775 Fed. Appx. 651, 654 – 55 (11th Cir. 2019); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 n.4 (11th Cir. 2010).
[131] Plaintiff-Depo. at 217.

while on probation if she would agree to "spend more time together" but Plaintiff refused him saying she had a boyfriend.[132] Plaintiff alleges she spoke to Dr. Hobbs about Dr. Averbuch's statement on a single occasion.[133] Yet, even if Plaintiff did engage in statutorily protected activity by way of her complaints, Plaintiff is unable to show "but-for" causation between the alleged protected activity and the adverse action. *Nassar,* 570 U.S. at 360.

First, the issue with Dr. Syfert occurred in May 2014, nearly a year and seven months before her termination.[134] Plaintiff surmises, but "not positive," that Dr. Thornton gave her a negative review due to her complaint about Dr. Syfert although she has no evidence of that.[135] Likewise, Dr. Thornton was one of many faculty, nurses, and other doctors to complain about Plaintiff's job performance over a two-year period. Plaintiff admits that her complaint about Dr. Syfert was not the "but-for" cause of her termination but was only a "contributing factor" but "I couldn't tell you the motivations or anything."[136] In the same way, when asked if Dr. Averbuch's asking Plaintiff to spend more time together and her rejection caused her termination, Plaintiff responded that it was not the cause but a "contributing factor."[137]

---

[132] Plaintiff-Depo. at 217.
[133] Plaintiff-Depo. at 234.
[134] Plaintiff-Depo. at 331.
[135] Plaintiff-Depo at 124.
[136] Plaintiff-Depo. at 257.
[137] Plaintiff-Depo. at 235-236; Dr. Averbuch was not at the final CCC meeting. Hobbs-Dec at ¶107.

Similarly, Plaintiff alleges that "the largest contributor was my disability" but "I mean, I think they all contributed."[138]  Plaintiff is unable to show that any of the complaints she made were the "but-for" cause of her termination. Plaintiff was terminated by the CCC because of her poor performance and safety concerns. It is clear from the record that UF would have made the same decision regardless of Plaintiff's complaints. UF's decision was objective, legitimate, non-discriminatory and there is no evidence of pretext that a reasonable factfinder could conclude otherwise. Accordingly, summary judgment should be granted in favor of UF as to Counts V and VI.

## CONCLUSION

Defendant, The University of Florida Board of Trustees, requests this Court enter summary judgment in favor of UF and against Plaintiff on all claims in the Amended Complaint.

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 56.1(B), Local Rules, United States District Court, Northern District of Florida, "a party who moves for summary judgment must file…a memorandum of up to 8,000 words...."  Therefore, in accordance with Local Rule 7.1, I hereby certify that this document contains 7,982 words.

---

[138] Plaintiff-Depo. at 236.

Dated this 4th day of September, 2020.

Respectfully submitted,

ALEXANDER DEGANCE BARNETT P.A.

By: _____

Mark G. Alexander
Florida Bar No. 434078
E-mail: mark.alexander@adblegal.com
David E. Chauncey
Florida Bar No. 0119497
E-mail: david.chauncey@adblegal.com
E-mail: mailbox@adblegal.com
1500 Riverside Avenue
Jacksonville, FL 32204
(904) 345-3277 Telephone
(904) 345-3294 Facsimile

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2020, a copy of the foregoing was furnished by email to Andrew J. Salzman, Unice, Salzman, Jensen, P.A., 1815 Little Road, Trinity, Florida 34655 (asalzman@unicesalzman.com, service@unicesalzman.com, cposs@unicesalzman.com)

_____
ATTORNEY