Exhibit 2

Page 1

1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
2                   GAINESVILLE DIVISION
3
4   SARAH DIEKMAN, an individual,
5               Plaintiff,
6   vs.                    Case No.
                         1:19-cv-00227-AW-
7   UNIVERSITY OF FLORIDA, a Florida  GRJ
   municipal corporation,
8
               Defendant.
9   _____/
10
11         DEPOSITION OF JACQUELINE HOBBS, M.D.
12        (Conducted Via Videoconference)
13
14
15   DATE:           June 22, 2020
16
   TIME:           12:30 p.m. to 2:20 p.m.
17
18   PURSUANT TO:     Notice by counsel for Plaintiff
                    for purposes of discovery, use at
19                 trial or such other purposes as
                    are permitted under the Federal
20                 Rules of Civil Procedure
21
   REPORTED BY:     Aaron T. Perkins, RMR, CRR, CRC
22                 Notary Public, State of
                    Florida at Large
23
24                 Pages 1 to 71
25

Page 2

1 APPEARANCES:
2
  ANDREW SALZMAN, ESQUIRE
3 Unice Salzman Jensen, P.A.
  1815 Little Road
4 Second Floor
  Trinity, Florida 34655
5
    Attorney for Plaintiff
6
7
  DAVID E. CHAUNCEY, ESQUIRE
8 Alexander DeGance Barnett
  1500 Riverside Avenue
9 Jacksonville, Florida 32204
10
    Attorney for Defendant
11
12
13
14
15
16
17        I N D E X
18 DIRECT EXAMINATION BY MR. SALZMAN      Page 4
   STIPULATION              Page 69
19 CERTIFICATE OF OATH          Page 70
   REPORTER'S CERTIFICATE       Page 71
20
21
22
23
24
25

Page 3

1        E X H I B I T S
2
  Exhibit A   A three-page e-mail   Page 14
3           thread with an
            origination date of
4           November 16, 2014.
5 Exhibit B   A complaint letter.   Page 21
6 Exhibit C   A three-page document   Page 31
            titled, 3-31-15
7           Meeting with Sarah
            Diekman, M.D.
8
  Exhibit D   Notes from a CCC    Page 39
9           meeting dated June 3,
            2015.
10
  Exhibit E   A letter from      Page 43
11          Jacqueline Hobbs,
            M.D., to Sarah
12          Diekman, M.D., dated
            July 17, 2015.
13
  Exhibit F   An e-mail dated     Page 47
14          November 19, 2015.
15          (Not provided to
            reporter).
16
  Exhibit G   A letter with      Page 55
17          attachments from
            Jacqueline Hobbs,
18          M.D., to Sarah
            Diekman, M.D., date
19          September 3, 2015.
20 Exhibit H   A letter from      Page 61
21          Jacqueline Hobbs,
            M.D., to Sarah
22          Diekman, M.D., dated
            December 4, 2015.
23
24
25

Page 4

1        THE REPORTER:  The attorneys participating in
2 this deposition acknowledge that I, the court
3 reporter, am not present with the witness and that
4 I will be reporting the proceedings and
5 administering the oath remotely.  This arrangement
6 is pursuant to the Florida Supreme Court
7 Administrative Order AOSC-20-23.
8        The parties and their counsel consent to this
9 arrangement and waive any objections to this manner
10 of reporting.
11        Mr. Chauncey, do I have your consent to move
12 forward?
13        MR. CHAUNCEY:  Yes, you have my permission on
14 behalf of the defendants.
15        THE REPORTER:  Mr. Salzman, do you consent to
16 this arrangement?
17        MR. SALZMAN:  Yes, on behalf of the plaintiff
18 I consent.
19        JACQUELINE A. HOBBS, M.D.,
20 the witness herein, being first duly sworn on oath, was
21 questioned and testified as follows:
22        THE WITNESS:  I do.
23            DIRECT EXAMINATION
24 BY MR. SALZMAN:
25    Q.  Please state your full name for the record.

Page 5

1    A.  Jacqueline A Hobbs.
2    Q.  And, Dr. Hobbs, have you had your deposition
3 taken before?
4    A.  Yes.
5    Q.  Okay.  So the rules are probably the same.  If
6 you don't understand my question, please ask me and I
7 will rephrase it.  Let's try not to talk over each
8 other.  And if you answer correctly -- or if you answer,
9 I will assume that you understand the question
10 correctly.  But if you have any questions, just let me
11 know.
12    A.  Okay.
13    Q.  Can you tell me where you're currently
14 employed?
15    A.  The University of Florida.
16    Q.  In what capacity?
17    A.  I'm the vice-chair for education and residency
18 training director for the department of psychiatry.
19    Q.  How long have you been in that position?
20    A.  I have been the residency training director
21 for 11 years.
22    Q.  How long have you worked for the University of
23 Florida?
24    A.  It's been 14, 15 years.
25    Q.  Are you currently a contractual employee?

Page 6

1    A.   That's a good question.  I mean, I think the
2  way that faculty positions work is, you know, I had an
3  initial letter of offer, and then I just, you know, get
4  renewed each year.
5    Q.   What is your current salary?
6    A.   About 250, $250,000.
7    Q.   And can you tell me back in 2013, were you in
8  the same position that you are now?
9    A.   I was residency training director.  I was
10  not -- I'm trying to think.  I may have just become
11  vice-chair at the time.
12    Q.   Would your duties have been, roughly, the same
13  in 2013 through 2015, the time that Sarah Diekman was in
14  the program, as they are today?
15    A.   I probably had -- I was definitely training
16  director.  That has not changed.  I probably have a lot
17  more administrative duties now than I did then.
18    Q.   Do you know who Sarah Diekman is?
19    A.   Yes.
20    Q.   And how do you know her?
21    A.   She was my resident.
22    Q.   And was that from the time period of 2013
23  through her date of termination, roughly, the end of
24  2015?
25    A.   Yes.

Page 7

1    Q.   Were you aware of any medical conditions she
2  suffered from?
3    A.   At what point?
4    Q.   Well, let's ask it this way:  When was the
5  first time you became aware she had any medical
6  condition?
7    A.   I mean, I knew that, you know, from her
8  application that she had, you know, that she had
9  dyslexia, but I wasn't really aware of what -- you know,
10  other than that.
11    Q.   Have you had other residents that have had
12  dyslexia going through your program?
13    A.   Not that I can recall.
14    Q.   When you said from her application, are you
15  part of the -- or back then were you part of the review
16  process for selecting applicants?
17    A.   Yes.
18    Q.   My understanding from the previous testimony
19  is that you-all receive thousands of applications and
20  select, roughly, ten people per year?
21    A.   Over a thousand applications usually,
22  somewhere around a thousand, you know.  It could be a
23  little less to a bit more.  And, yes, roughly, at the
24  time it would have been around ten.
25    Q.   And when you became aware through the

Page 8

1  application from Sarah Diekman that she had dyslexia,
2  was there any concern as to whether or not she would be
3  able to go through the program as you currently had it,
4  the residency?
5    A.   No.
6    Q.   Was there any discussion about any potential
7  accommodations that would be available to her as a
8  result of her dyslexia condition?
9    A.   There was no discussion of any accommodations
10  that I can recall.
11    Q.   At some point did you become aware of any
12  request for accommodations by Sarah Diekman as a result
13  of her dyslexia?
14    A.   I believe it was -- I don't remember the exact
15  timing, but she was she was involved with the ADA
16  office, I believe, at that point.
17    Q.   Did you also become aware at some point that
18  she suffered from POTS?
19    A.   Yes.
20    Q.   But that was not at the time that she was
21  hired or accepted at the program?
22    A.   No, no.
23    Q.   When did you first become aware that she
24  suffered from POTS?
25    A.   I believe it was somewhere in the transition

Page 9

1  from, you know, her first to second year.  I don't
2  remember the date.  I don't know that she said it was
3  POTS but that she was something some sort of
4  difficulties.
5    Q.   Was that, roughly, around the time that she
6  brought up an issue regarding parking?
7    A.   The first I remember hearing about parking
8  was in -- I think it was October of 2014, and she had
9  contacted the general counsel's office, but there wasn't
10  much detail.  It was just that she was having
11  difficulties.  I don't recall it being about POTS, in
12  particular.
13    Q.   Do you recall what her -- I assume we're
14  talking about physical difficulties.
15      Do you recall what those physical difficulties
16  were?
17    A.   I believe that, you know, she had -- you know,
18  it was just difficult for her.  She would get fatigued,
19  was mainly -- you know, especially walking, you know, if
20  she had to walk from a parking lot or a parking space
21  that was far away.
22    Q.   Was there an avenue available to her or any
23  other resident to deal with that type of issue
24  internally with the department for which she would have
25  to go somewhere else within the school?

1   A.  So parking issues usually are dealt with by
2  transportation and parking, and we would normally refer
3  someone to parking and transportation.  If there was
4  added issues, we would ask the GME office to get
5  involved with that.
6   Q.  Did you have any discussions with Dr. Diekman
7  about the process she was going through for parking?
8   A.  Well, as I said, until October of 2014, I
9  believe, there was not a discussion about it.  Once she
10 had alerted the general counsel's office, I did make --
11 I let her know that I was working with the GME office,
12 and the GME office had also said that, you know, it had
13 been referred to the general counsel's office, and the
14 general counsel's office was handling the situation.  So
15 I think there was some exchange and some discussion
16 regarding that.
17  Q.  At any time did you or anybody else tell
18 Dr. Diekman that she shouldn't have gone above
19 your-all's heads regarding this issue?
20  A.  Not that I'm aware of.
21  Q.  Did you, or are you aware of anyone else, tell
22 Dr. Diekman to stop complaining about the parking issue
23 and acquire a better team attitude?
24  A.  No.
25  Q.  During this time period that we're talking

1  about that you became aware of the parking issue, was it
2  also brought to your attention that the heat was a
3  problem for Dr. Diekman?
4   A.  I don't remember, you know, the specifics
5  about that, whether that played a role at that point.
6   Q.  If you recall, how was Dr. Diekman's first
7  year in the program?
8   A.  It was not without issue.  I think that, you
9  know, there were some concerns at various points in the
10 first year brought to my attention.  I had some
11 residents who came to me, I would say probably about
12 midyear, and saying that they were just concerned about
13 her notes, how they were written, that she was using a
14 template that they didn't recognize, that she used some
15 kind of scales to delineate certain things like, you
16 know, to rate, you know, various parts of the mental
17 status, which is not a common thing that we would use,
18 that we used in the program, and that she might not have
19 been doing certain -- seeing certain patients, and
20 things like that.
21     So I was made aware of that.  And there had
22 been, I believe, some issues that other attendings
23 brought up as well in terms of her notes, the quality of
24 those, the amount of information she was conveying or
25 that the -- that it was useful information or, you know,

1  correct information.
2     So there were some issues in the first year.
3   Q.  Was Dr. Chang one of the individuals who had
4  issues or complaints about Dr. Diekman?
5   A.  I believe he had noted some things that were
6  probably in the same vein of what I just noted, but he
7  was not -- he was not the only one that had brought that
8  up.
9   Q.  Around the time of November of 2014, did you
10 have discussions with Dr. Diekman about her physical
11 problems she was having and, perhaps, her inability to
12 continue with the program without a leave of absence?
13  A.  Yeah, I did have -- sorry.  I did have some
14 conversations with her.  I think that, you know, she had
15 also brought it up to me even prior to that, that, you
16 know, she was concerned herself that she might not be
17 able to perform her duties, you know, because of her
18 physical illness.  And so, you know, I think that was
19 prior to then.  And then it just sort of got to a point
20 where she was really struggling by that November time.
21  Q.  And do you recall -- well, she went on a leave
22 of absence; is that correct?
23  A.  Yes.
24  Q.  And do you recall whose suggestion that was?
25  A.  I talked to her about it, you know, in

1  collaboration with the then designated institutional
2  official, the head of GME at the time, Dr. Mayla and
3  also with Sarah, and I believe also in talking with her
4  physician, that she had given me permission to talk to
5  her, you know.  She was just -- she was struggling at
6  that point.  And it just was -- you know, just in my
7  experience, sometimes residents need a reset.  And it's
8  very hard to do that sometimes in residency when
9  things -- it just keeps going, you know.  There's always
10 patients to take care of, and sometimes they just need
11 some time.
12  Q.  I hope you can see what I put on the screen.
13  A.  Yes.
14  Q.  Oh, thank God.
15     And if you could take a look at it, it appears
16 to be an e-mail from you to Sarah Diekman dated
17 November 16th, 2014.
18     Do you see that?
19  A.  Uh-huh (Indicates affirmatively).
20  Q.  Are you familiar with this e-mail?
21  A.  Yes.
22  Q.  One of the things you talk about or mention in
23 this e-mail is that her -- "we will need to extend your
24 residency for the time you missed."
25     Is that something that is normally done when

Page 14

1 people take a leave of absence?
2     A.  If they take leave beyond their allotted
3 leave, you know.  Normally, a resident would get 15 days
4 of annual leave.  They also will have ten days of sick
5 leave.  If they take over that amount, then, yes, the
6 residency can be extended.
7     Q.  And have you done that in the past with other
8 residents?
9     A.  Yes.
10     Q.  Is that your prerogative to do that in the
11 capacity of your position?
12     A.  Yes.  As the program director, I can extend
13 the residency.
14         MR. SALZMAN:  We will attach this as Exhibit A
15     to the deposition.
16         (Exhibit A was marked for identification.)
17 BY MR. SALZMAN:
18     Q.  Doctor, are you aware around that same type
19 period, roughly the summer of 2014 up to the point where
20 you authorized the leave of absence, as to whether or
21 not Dr. Diekman was constantly complaining about issues
22 concerning her health?
23     A.  I don't know about constantly complaining.  I
24 mean, I think there were definite episodes and moments
25 of her saying that she was having trouble and that she

Page 15

1 was struggling.  I mean, to get to that point of, you
2 know, considering a medical leave, you know, there had
3 to be, you know, some significant struggling.
4     Q.  Are you aware as to the relationship that
5 Dr. Diekman had with Dr. Chang?
6         MR. CHAUNCEY:  Object to form.
7         You can answer, Dr. Hobbs.
8         THE WITNESS:  I mean, the only relationship I
9     knew of is that he was a co-resident, chief
10     resident with her.
11 BY MR. SALZMAN:
12     Q.  Are you aware of Dr. Chang ever mentioning to
13 you that he felt he looked at Dr. Diekman as just a
14 complainer?
15     A.  Not that I'm aware of.
16     Q.  Are you aware of an incident -- well, first,
17 let me ask you to take a look at this e-mail dated
18 December 29th, 2014.
19         Do you see that?
20     A.  Uh-huh (Indicates affirmatively), yes.
21     Q.  Are you familiar with this e-mail?
22     A.  I mean, I have seen it in the exhibits, but,
23 you know, the e-mail was not sent to me.
24     Q.  Are you aware of Dr. Chang or any of the
25 residents discussing a policy that would, in essence,

Page 16

1 reward people that didn't call in sick?
2     A.  No.
3     Q.  Have you subsequently ever become aware of
4 that situation?
5     A.  I mean, I have heard that brought up as, you
6 know, throughout this process, but I'm not -- I was not
7 aware at that time.
8     Q.  Have you ever become aware that the chief
9 residents were taking a position that they needed to
10 deal with Dr. Diekman's poor attitude?
11         MR. CHAUNCEY:  Object to form.
12         You can answer it, Dr. Hobbs.
13         THE WITNESS:  No.
14 BY MR. SALZMAN:
15     Q.  Were you ever aware that Dr. Chang met with
16 Dr. Diekman for an hour-long discussion concerning her
17 attitude?
18     A.  No.
19     Q.  Did Dr. Diekman ever bring forward any
20 information to you that she felt that Dr. Chang was
21 trying to punish her for her ongoing parking issues?
22     A.  No.
23     Q.  How about, did you ever hear or were you made
24 aware that Dr. Chang in this meeting, basically, made
25 Dr. Diekman stand for an hour during the discussion?

Page 17

1     A.  No.
2     Q.  Have you ever heard of any threats that
3 Dr. Chang made that, if Dr. Diekman didn't change how
4 she did things, he would take her to the CCC, the
5 Clinical Competency Committee?
6     A.  No.
7     Q.  Would you say that during this time period
8 right before she went on leave that Dr. Diekman was
9 calling out sick frequently?
10     A.  I'm sorry, could you repeat that?
11     Q.  Right before the time period that you
12 authorized the leave for Dr. Diekman, do you recall
13 whether or not she was calling in sick -- or calling out
14 sick frequently?
15     A.  I believe in review of some of her e-mails
16 that she had mentioned this herself, that she was
17 calling out or having to take off sick more than she
18 would like.  So I think, you know, I was aware at the
19 time that that was happening.
20     Q.  Did you feel at this time, when she went out
21 on this leave that you granted, that she was using too
22 much sick leave?
23     A.  I don't think it was -- it was just a matter
24 of she -- you know, again, I don't think she had a lot
25 left.  And so she was just, again, she was struggling.

5 (Pages 14 - 17)

Page 18

1 So, you know, to let her go on like that -- she said
2 that she was going to need -- that she was going to need
3 some time, that she was going to need, you know, several
4 appointments, and she was just physically not feeling
5 well, not feeling up to being able to perform her
6 duties. So it was more about, you know, again, giving
7 her some time to be able to do that.
8    Q.  Doctor, did you feel -- or let me ask you
9 this:  Was there a request by her for a change in her
10 schedule or a more set time period, like an 8:00-to-5:00
11 schedule?
12    A.  I believe at some point there was a discussion
13 about that with the ADA office, so I believe, you know,
14 there was some discussion of that.
15    Q.  Did you believe that that was a reasonable
16 accomodation for someone to be able to have a set
17 schedule going through the residency program?
18    A.  I discussed it, you know, with the ADA office,
19 you know. It's, you know, it's difficult, you know,
20 with medicine in general, the practice of medicine, to
21 be able to say, you know, your exact schedule is going
22 to be this time to this time.
23       We might be able to say, in general, that
24 might be what it is, but you can never guarantee that.
25 So, you know, again there was discussion, you know, back

Page 19

1 and forth about that.
2    Q.  Did you at any point make a determination that
3 Dr. Diekman would not be able to be a psychiatrist based
4 on her inability to -- let me rephrase it.
5       At any point did you make a determination
6 that, based on the physical problems Dr. Diekman was
7 having, that she would not be able to make it as a
8 psychiatrist through the program at the University of
9 Florida?
10    A.  No.
11    Q.  Did you become aware at this point -- we're
12 talking about the leave at the end of 2014 -- that
13 Dr. Diekman suffered from POTS?
14    A.  Yes. I believe that she talked about it at
15 that point and made it clear, you know, based on what
16 she had been talking about with her physician at the
17 time that it was POTS and that the symptoms were part of
18 that condition.
19    Q.  Did you become aware at this time that certain
20 environmental factors might trigger her POTS?
21    A.  That is what she said, yes.
22    Q.  And some of that included temperatures, like
23 heat?
24    A.  Yes.
25    Q.  And also that she needed to take her

Page 20

1 medications at set times?
2    A.  Yes. That is what she said.
3    Q.  Okay. And that she suffered from potential
4 fatigue?
5    A.  Yes.
6    Q.  And also that she needed to go through daily
7 physical therapy to keep her POTS under control?
8    A.  That's what she told me, yes.
9    Q.  Do you think any of those conditions would
10 render someone unable to make it through the residency
11 program at the University of Florida for psychiatric
12 medicine?
13    A.  No.
14    Q.  Do you believe there can be reasonable
15 accommodations that are given that would allow someone
16 to make it through the program successfully?
17    A.  I believe that was always the goal, was
18 reasonable accommodations. I mean, she was granted
19 several.
20    Q.  She was granted several accommodations, but
21 are you aware that she had asked for additional
22 accommodations that were not granted?
23    A.  I'm not sure to which ones you're referring.
24    Q.  Just in general, at least from her position,
25 that she did not receive all of the accommodations she

Page 21

1 requested?
2    A.  I believe she did. The process was that she
3 would delineate certain requested accommodations. It
4 was discussed, again, with the ADA office, and it was
5 determined which reasonable accommodations would be
6 granted.
7    Q.  Who has the final say as to what the
8 reasonable accommodations are going to be?
9    A.  In my estimation, it's ultimately with the ADA
10 office, you know. Again, I think that the, you know --
11 your client had input. We had input. And then,
12 ultimately, we have to rely on experts to help with us
13 that.
14       (Exhibit B was marked for identification.)
15 BY MR. SALZMAN:
16    Q.  Are you aware -- and if you'd look at
17 Exhibit 13, which is in front of you -- that Dr. Diekman
18 made a complaint with the ACGME?
19    A.  I'm not seeing the exhibit; I'm only seeing
20 the list.
21    Q.  Oh, sorry. Hold on.
22    A.  Sorry.
23    Q.  I'm not the best at this. How about now?
24    A.  Okay. I see it.
25    Q.  Yes.

1     First off, are you aware that Dr. Diekman made
2 a complaint with the ACGME?
3     A.  Yes.
4     Q.  And was that investigated by the university?
5     A.  I believe that the process is that the ACGME
6 sends our program this, plus, the GME office, the DIO,
7 and, I believe, Dr. Dixon at the time.  And, yes, there
8 was an investigation.  We have to respond to the ACGME
9 questions about the complaint, and that all is -- goes
10 through the GME office who, ultimately, signs off on
11 that.
12    Q.  And did you become aware -- or when did you
13 become aware that Dr. Diekman was the one who made the
14 complaint?
15    A.  I mean, I believe that -- assume they told me,
16 but I'm not -- I'm not sure.  I'm not sure when I was
17 made aware.
18    Q.  Now, you mentioned Dr. Dixon.  Did Dr. Dixon
19 do an investigation regarding this complaint?
20    A.  I believe she did.  I mean, again, the way
21 this usually works is that there are complaints that the
22 ACGME sends to us, and we have to respond, and so we
23 write a response to that, and then that goes to the GME
24 office to review and assure that, you know, it's
25 properly, you know, properly responded to, that

1 everything is complete, that sort of thing.
2     Q.  Are you aware that Dr. Dixon contacted
3 Dr. Diekman and, basically, told her that the issues
4 would be addressed internally?
5     A.  I'm not aware that I -- I don't think that I
6 was made aware of that.
7     Q.  Are you aware of what Dr. Dixon's findings
8 were?
9     A.  I don't think so.
10    Q.  Were you ever made aware that Dr. Dixon found
11 that there was some retaliation which was occurring
12 from -- or to residents?
13        MR. CHAUNCEY:  Object to form.
14        You can answer, Dr. Hobbs.
15        THE WITNESS:  I don't recall.
16 BY MR. SALZMAN:
17    Q.  Were you ever made aware that Dr. Chang spoke
18 to Dr. Diekman about this issue and that he basically
19 told her that she should not have gone above her
20 supervisor's head concerning these matters?
21        MR. CHAUNCEY:  Object to form.
22        You can answer, Dr. Hobbs.
23        THE WITNESS:  No.
24 BY MR. SALZMAN:
25    Q.  Did you have any discussions with any of your

1 subordinates concerning charges that were made?
2     A.  You're referring to residents?
3     Q.  Yes.  Anybody you supervised.
4     A.  I mean, not about the, you know, not about,
5 you know, like who did it or any of that sort of thing.
6 If there were issues, you know, questions that we had to
7 answer that, you know, required some resident input,
8 then we might have asked about that, you know.  It's not
9 uncommon that we get a complaint, that we wouldn't, you
10 know, have to talk to residents about certain things to
11 get input.  But we try to keep it very neutral and not,
12 you know, giving details of who did it, for instance,
13 who complained, or anything like that.
14    Q.  Was this an important issue that was going on
15 when you were -- excuse me, when this complaint came
16 out?
17    A.  I'm not sure what's the important issue.
18    Q.  Well, the complaint, that a complaint had been
19 filed with the ACGME.  Was that an important issue to
20 deal with?
21    A.  Absolutely.
22    Q.  And did you notify any of the residents that
23 this was kind of an issue, to don't worry about it,
24 we'll take care of it?
25    A.  I don't recall saying something like that.

1     Q.  Okay.  Were you aware that there was an issue
2 at this time that Dr. Diekman was raising concerning the
3 changing of her schedule?
4     A.  I'm sorry, could you repeat that?
5     Q.  Were you aware that Dr. Diekman was raising an
6 issue that there was a problem for her physically when
7 her schedule was being changed?
8     A.  As part of the complaint?
9     Q.  In general, her -- in general, did she come
10 forward and either make you aware or did you become
11 aware that scheduling changes were an issue for her
12 physically?
13    A.  I mean, I believe that there were times when
14 she said she was concerned about her schedule or a
15 particular rotation, that, you know, that there might be
16 some difficulties with it.  But at times, too, she was
17 a -- you know, she would weather through it and that,
18 you know, she -- you know, I recall that she said that,
19 you know, that -- and it's the way that schedules are.
20 Sometimes there are harder rotations than others.  There
21 are ones that are more taxing than others.  And she
22 would say at times, like, she was, you know, almost done
23 with a difficult rotation and she was looking forward to
24 something where she felt like, you know, she could kind
25 of, again, kind of reset.

1    Q.  Did she ever complain to you about Dr. -- is
2 it Ginory -- changing her schedule?
3    A.  I'm not sure exactly what that schedule -- I
4 mean, you know, I think she had some issues with
5 Dr. Ginory, but I think there was one issue with the
6 schedule of the -- it was, like, a one-day change in the
7 schedule that she was upset about because there were two
8 attendings on the service, Dr. Ginory and Dr. Fayad.
9 And one of them had their own doctor's appointments
10 those days, and so they had to switch up the rounding
11 schedule, which happens.  I mean, it happens even when
12 people don't have appointments, you know.
13        I mean, it's an academic center.  Attendings
14 need to have certain meetings at times, so they might
15 have to move the rounding schedule around at times.  So
16 I think there was one day where that happened, and she
17 was upset that -- or frustrated that the schedule had
18 been changed.
19    Q.  Were you aware that Dr. Ginory or any other
20 doctor was stating that Dr. Diekman was faking her
21 illness?
22    A.  No.
23    Q.  Were you ever informed or asked that
24 Dr. Diekman's medical condition be addressed with the
25 residents so that they knew how to schedule her?

1    A.  I don't recall that.
2    Q.  You had to respond to the complaint -- did you
3 have to respond to this complaint in writing?
4    A.  Yes.
5    Q.  Are you aware of an incident during the fall
6 of 2013 involving Dr. Diekman and a sexual harassment
7 claim by an attending physician at the VA?
8    A.  Not at that time, no.
9    Q.  When did you become aware of that?
10    A.  I believe through the process of, you know --
11 I think Dr. Diekman had made some public records
12 requests prior to this case, and she stated that she
13 had -- that there had been an incident, but not at the
14 time of 2013.
15    Q.  So she didn't reach out to you to report the
16 situation that had occurred?
17    A.  No.
18    Q.  Did she ever reach out to you and complain
19 about the harassment she was receiving from
20 Dr. Thornton?
21    A.  No.
22    Q.  Are you aware that Dr. Diekman filed a
23 harassment complaint against Dr. Chang?
24    A.  I was not aware of a complaint against
25 Dr. Chang.

1    Q.  You had mentioned that there were some
2 problems between them, but were you aware that
3 Dr. Diekman claimed that Dr. Chang was harassing her?
4    A.  I don't think I said there was a problem
5 between them.
6    Q.  Sorry.  Please clarify.
7    A.  I believe what I stated earlier is that he had
8 some issues with some of her notes, some of the things
9 she was doing on service.  It was not an interpersonal
10 thing.
11    Q.  So you were not aware that Dr. Diekman had a
12 claim of intimidation and retaliation against Dr. Chang?
13        MR. CHAUNCEY:  Object to form.
14        You can answer, Dr. Hobbs.
15        THE WITNESS:  No.
16 BY MR. SALZMAN:
17    Q.  Were you aware that Dr. Chang felt that
18 Dr. Diekman's medical condition was not real and that
19 she really just wanted, quote, vacay, v-a-c-a-y, closed
20 quote?
21        MR. CHAUNCEY:  Object to form.
22        If you can decipher that, you can answer.
23 BY MR. SALZMAN:
24    Q.  If you understand what I just said.
25    A.  No.

1    Q.  Did you ever hear Dr. Diekman referred to as a
2 malingerer?
3    A.  No.
4    Q.  Were you aware that Dr. Diekman at any point
5 was afraid to take off sick time because she would be
6 punished for using sick days?
7    A.  No.
8    Q.  When Dr. Diekman went to the ADA to ask for
9 accommodations, were you involved in that process?
10    A.  I think it depends on which time frame and
11 which accommodations she was going to them for.
12    Q.  Well, let me ask you this, Doctor:  Do you
13 recall having conversations or e-mail discussions with
14 Dr. -- is it Osfield from the ADA office?
15    A.  I do at some points, yes.
16    Q.  And what was Dr. Osfield's position regarding
17 the ADA?
18    A.  I don't remember his exact title, but I
19 believe he was the director, you know, the head of that
20 office, especially in terms of, I think, things that
21 were related to the college of medicine.
22    Q.  Okay.  And do you recall what kind of
23 discussions you had with Dr. Osfield concerning
24 Dr. Diekman and the accomodation requests she was
25 making?

8 (Pages 26 - 29)

Page 30

1    A. I mean, I believe we would -- we went over her
2 form, her requests, you know, that, you know, some
3 reasonable accommodations were warranted in that we
4 discussed what those requests were and whether or not
5 they were reasonable.
6    Q. And if you recall, do you remember any of them
7 that you felt were not reasonable or were unreasonable?
8    A. I mean, I don't recall the exact -- any exact
9 ones. I don't recall. I mean, I think whatever ended
10 up on -- you know, you could look at whatever was on the
11 original request and what was, you know, ultimately,
12 decided and you could see. But I don't recall, and I
13 don't have those documents in front of me.
14    Q. I'm trying to pull them up for you to see.
15 What do you-all see on your screen?
16    A. Your list of folders.
17    MR. CHAUNCEY: The files themselves, not the
18 actual document. Is it open on one of your
19 screens?
20    MR. SALZMAN: Oh, I've got it. I had to get
21 rid of something.
22    MR. CHAUNCEY: Okay.
23    MR. SALZMAN: I told you this is not an easy
24 for someone --
25    THE WITNESS: I'm glad I'm not the only one.

Page 31

1    MR. SALZMAN: Don't feel bad, then, Doctor.
2    (Exhibit C was marked for identification.)
3 BY MR. SALZMAN:
4    Q. So this should be on your screen.
5    A. Yes.
6    Q. "Reasonable accomodation," do you see that,
7 Doctor?
8    A. Yes.
9    Q. Okay. So this is March 31st, 2015. This is
10 the first -- did that just turn blue?
11    A. Yes.
12    MR. CHAUNCEY: You double clicked it. If you
13 click within time on it -- oh, there you go.
14    MR. SALZMAN: Thanks for the help.
15    MR. CHAUNCEY: No problem.
16 BY MR. SALZMAN:
17    Q. Doctor, are you aware that two separate
18 reasonable accomodation forms were done by Dr. Diekman?
19    A. I believe so, yes. I remember there were at
20 least a couple of different times, yes.
21    Q. And this one is dated March 31st, 2015. Are
22 you familiar with this one? And I will scroll down for
23 you to look at it.
24    A. Yes.
25    Q. Was this, as best you can recall, the first

Page 32

1 formal request in writing to the ADA office that
2 Dr. Diekman did?
3    A. As far as I know, yes.
4    Q. And are you aware as to whether the
5 accommodations that she requested were given?
6    A. If you can scroll back up, I can --
7    Q. Sorry?
8    A. That would help a little bit. I saw some of
9 it. So --
10    MR. CHAUNCEY: Andrew, I think there's a
11 document that has the accommodations requested and
12 then their decisions on it.
13    MR. SALZMAN: Is this not it?
14    MR. CHAUNCEY: This one has the accomodation
15 that she's requesting. I do think there's one that
16 has both. If not, you can just ask about it, of
17 course. This might be it.
18    MR. SALZMAN: Is this it? Yeah.
19    MR. CHAUNCEY: Yeah, this is it.
20    THE WITNESS: So --
21 BY MR. SALZMAN:
22    Q. These are the accommodations requested, and
23 this would be the response -- I'm sorry, Doctor, I
24 didn't mean to interrupt you, but would you be part of
25 the decision-making on the response?

Page 33

1    A. Yes.
2    Q. Okay. And if you could look at the requests
3 that were made, if you could look at the one through
4 five, do you believe any of these are unreasonable?
5    A. Yeah. And if you could just scroll down just
6 a little bit more so I can see. Just a little bit more.
7 Yeah, that's good.
8    MR. CHAUNCEY: Actually, Andrew, if you could
9 keep going down just to see what the end of it is.
10 Okay. Great.
11 BY MR. SALZMAN:
12    Q. That's actually signed by you, Doctor,
13 correct?
14    A. Yes, yes, that's my signature. I think that
15 that's -- yeah.
16    Q. And all these accommodations would be ones
17 that would not impede Dr. Diekman's ability to continue
18 through the residency program?
19    MR. CHAUNCEY: Object to form.
20    You can answer, Dr. Diekman -- or Dr. Hobbs.
21    I'm sorry.
22    THE WITNESS: It should not -- should not
23 impede, correct.
24 BY MR. SALZMAN:
25    Q. Around this time period -- so, Doctor, you

Page 34

1  signed this on April 7th, 2015. What would you say, if
2  you can recall, what Dr. Diekman's status was going
3  through the residency program? And if I need to
4  rephrase the question, just tell me.
5      A.  No. I mean, I'm just -- I'm trying to think
6  in terms of dates. I have lots of dates to go through.
7  I mean, I think that, you know, obviously, she was also
8  having performance issues, so we were definitely trying
9  to work with her in terms of that, you know.
10      Again, there were -- throughout her time,
11  there were just issues with, you know, her notes, note
12  writing, knowing what templates to use, you know, being
13  able to take care of a certain patient caseload,
14  different things like that, that, you know, that we were
15  trying to work with her on.
16      Q.  Doctor, the Clinical Competency Committee, is
17  that a committee that you're a sitting member of?
18      A.  Yes.
19      Q.  Or were you back in -- I'm sorry, were you
20  back in 2013 through 2015?
21      A.  Yes.
22      Q.  And how often does that committee meet?
23      A.  It meets at least twice yearly. Typically,
24  it's twice yearly, as we have to rate the milestones.
25  We have to turn them in by the end of December and the

Page 35

1  end of -- approximately the end of December and the end
2  of June.
3      Q.  And are all residents discussed at that
4  meeting?
5      A.  Yes.
6      Q.  Those meetings that you --
7      A.  Yes.
8      Q.  Can you recall at December of 2014, at what
9  we'll call the CCC, that you made mention that Sarah
10  needed to improve her health and should be on medical
11  leave?
12      MR. CHAUNCEY: Object to form, but, of course,
13  you can answer, Dr. Hobbs.
14      THE WITNESS: I don't recall exactly if or
15  what I said. It would -- if it was documented as
16  such, I would have to see that to recall.
17  BY MR. SALZMAN:
18      Q.  What about in March of 2015 that you felt that
19  her medical condition could be the underlying factor for
20  her problems that she was having going through the
21  program?
22      A.  No. Typically, in CCC, we talk about
23  performance issues in terms of clinical performance,
24  academic performance.
25      Q.  So you don't believe you would have stated

Page 36

1  that you felt that her medical conditions could be one
2  of the problems she was having with her performance
3  issues -- or as a result of her performance issues --
4      MR. CHAUNCEY: Object to the form.
5  BY MR. SALZMAN:
6      Q.  -- resulting in her performance issue?
7      MR. CHAUNCEY: Object to form, but you can
8  answer, Dr. Hobbs.
9      THE WITNESS: Again, I'd have to see my, you
10  know, the notes from that. I don't recall.
11  BY MR. SALZMAN:
12      Q.  Did you ever feel that -- let me ask you this
13  question: Through 2015, when Dr. Diekman was put on
14  probation and, ultimately, terminated, did you have
15  frequent meetings with her discussing the problems she
16  was having through the program?
17      A.  I met with her fairly frequently to discuss
18  performance issues, yes.
19      Q.  Did you feel that in those meetings with her,
20  that she would take constructive criticism from you or
21  that she was -- always had an excuse?
22      A.  I think that in general, you know, she -- you
23  know, there were times when I think she, you know, would
24  take the -- she would be receptive and responsive to
25  feedback. At other times, you know, she might not have

Page 37

1  been as receptive or as responsive. I would not say
2  it's about excuses; it's just at times she was more
3  receptive than others.
4      Q.  Did you ever feel that her physical problems
5  in 2015 were impeding her ability to actually
6  successfully complete at least that year of the program?
7      MR. CHAUNCEY: I will object to form, but, of
8  course, you can answer, Dr. Hobbs.
9      THE WITNESS: I mean -- well, 2015 is, like,
10  two different years in terms of academics, but --
11  so I guess I'm just trying to figure out in my mind
12  the time line.
13      Can you repeat the question?
14      MR. SALZMAN: Aaron, can you read it back?
15      THE REPORTER: Sure.
16      (The portion requested was read back for
17  counsel.)
18      MR. CHAUNCEY: Andrew, I think she's asking
19  because the school years are different than the --
20      MR. SALZMAN: Oh, than the calendar year?
21      MR. CHAUNCEY: Yeah. So if you could try and
22  differentiate between the two school years. The
23  spring of one year is different than the fall of
24  the next.
25  BY MR. SALZMAN:

Page 58

1 seem to recall that she may have looked there after, but
2 I'm -- I can't remember that exact timeline.
3    Q.  Did you ever contact Dr. Cuffe regarding
4 Dr. Diekman's request to transfer?
5    A.  If he requested -- usually, the program, the
6 accepting program, would send and ask for a verification
7 and some of the information, so I would have to look at
8 my documentation to see if that was provided.  That
9 would have been the main way of communicating.
10    Q.  Do you recall whether or not you informed
11 Dr. Cuffe that Dr. Diekman's milestones were at zero?
12    A.  I don't recall that.
13    Q.  Do you recall whether or not there was ever
14 any change done to any of the scoring of tests that
15 Dr. Diekman had taken after she left?
16    A.  No.
17    Q.  You don't recall what Dr. Diekman's -- is it
18 PRITE, P-R-I-T-E? -- examination test results were?
19    A.  I don't remember the exact numbers.  I think
20 that, you know, some of them were, you know, maybe below
21 the 50th percentile.
22    Q.  Doctor, was there a requirement to meet any
23 kind of billing practice for residents?
24    A.  I mean, we trained residents on how to bill.
25 They have to, you know, place codes on, like, their

Page 59

1 clinic encounters, for instance.  Those are usually in
2 conjunction with the attending.  The attending,
3 obviously, has to, ultimately agree with or sign off on
4 that.
5    Q.  But there's no requirement that you have to
6 bill a certain amount?
7    A.  Residents, no, because residents don't bill
8 per se.  They participate in the process, but it's not
9 their result responsibility, but they need to learn how
10 to do that, and they need to learn how to, you know,
11 determine the work that they've done that leads to a
12 certain billing level.
13    Q.  What about with the rotation at the VA, is
14 there a minimum billing requirement or hours?
15    A.  There's not for residents.  Again, it may be
16 part of the teaching process, the learning process, you
17 know.  So documentation has to be appropriate, so that's
18 why we have bill templates that help the residents and
19 the attendings to be able to meet the compliance needs
20 for their documentation.  So, you know, residents, you
21 know, we have to teach them.  Like, you can't change the
22 template around; you can't remove things from the
23 template.
24    If you use the wrong template, then you may
25 not be in compliance.  So those are the things that, you

Page 60

1 know, residents have to be aware of and learn.
2    Q.  Doctor, do you see an exhibit dated
3 December 4th, 2015, in front of you?
4    A.  Yes.
5    Q.  And it's a long exhibit, but this is the
6 decision regarding probation.
7    A.  Uh-huh (Indicates affirmatively).
8    Q.  In essence, it's the termination letter,
9 correct?
10    A.  Yes.
11    Q.  And are you familiar -- do you recognize it or
12 do you want me to go all the way down for your
13 signature?
14    A.  I recognize it.
15    Q.  Okay.  And could you tell me, basically, in
16 the September 3rd letter we were looking at, putting her
17 on probation, and then three months later the
18 termination letter, were there any material changes that
19 the CCC found?
20    A.  I mean, the letter --
21    Q.  I'm not being clear.  Is it basically the same
22 issues that were determined in September that had not
23 been corrected by December?
24    A.  It's basically the same issues.  I think the
25 final letter adds any extra information in terms of

Page 61

1 observations or evaluation information.
2    MR. SALZMAN:  We'll attach this as the next
3 exhibit.
4    (Exhibit H was marked for identification.)
5 BY MR. SALZMAN:
6    Q.  I'm trying to quickly go through some of these
7 things, Doctor.
8    Were you aware -- is it Dr. Averbuch?
9    A.  Averbuch.
10    Q.  Averbuch?
11    A.  Uh-huh (Indicates affirmatively).
12    Q.  Are you aware that Dr. Dr. Diekman claimed
13 that Dr. Averbuch was making suggestive sexual comments
14 to her?
15    A.  Absolutely not.
16    Q.  Are you aware that she said he wrote her a
17 letter or e-mail hoping that she would be placed on
18 academic probation so they could spend more time
19 together?
20    A.  No.
21    Q.  Would you consider someone who has made a
22 sexual harassment complaint and then from that same
23 person they were complaining about they received a
24 negative review, would you state that that's
25 inappropriate?

Page 62

1      MR. CHAUNCEY: Object to form, but you can
2   answer, Dr. Hobbs.
3      THE WITNESS: That's a little convoluted.
4   BY MR. SALZMAN:
5      Q.   Yeah. Let me rephrase it. It was a
6   difficult -- a poorly asked question.
7      Does the department have a retaliation policy
8   that prohibits retaliation?
9      A.   We follow ACGME requirements about that, so no
10   retaliation.
11     Q.   So if someone made a complaint about sexual
12   harassment and subsequently they received a negative
13   review from that person, would you consider that
14   retaliation?
15     A.   Not necessarily. I mean, if it's a
16   constructive criticism of that person, of their work, I
17   should say, it doesn't -- it doesn't necessarily mean
18   that it's retaliation.
19     Q.   Well, let me ask you this question: Would you
20   normally allow someone who is the subject of a sexual
21   harassment complaint to continue to supervise the person
22   who made the complaint?
23     A.   If I was aware of it, I would most likely, you
24   know, try to make some kind of change so that that
25   person did not have to be supervised by them. But I was

Page 63

1   not aware of any such thing with Dr. Averbuch.
2      Q.   Understood.
3      Doctor, in the termination letter of
4   December 4th, 2015 -- and I know you haven't had a
5   chance to look at all of it, but was it the CCC's
6   concern that Dr. Diekman was using too many sick days
7   and that was a problem?
8      A.   No.
9      Q.   Okay. Was it ever told to Dr. Diekman that
10   her billing practices were not making enough money for
11   the University of Florida?
12     A.   No.
13     Q.   Are you aware of whether or not Dr. Diekman
14   ever failed a rotation when she was going through the
15   program?
16     A.   Not fail a rotation flat out. I mean, I think
17   that there were just -- again, there were times when she
18   was struggling and had some negative evaluations.
19     Q.   Doctor, would you --
20     A.   She got credit for the time and work that she
21   did.
22     Q.   Did you consider Dr. Diekman to be disabled
23   due to her medical issues?
24     A.   I honestly never thought of it that way.
25     Q.   Did you consider that, once the accommodations

Page 64

1   were in place for Dr. Diekman, that she had enough time
2   to successfully deal with the issues that the CCC had
3   raised?
4      A.   Yes. I felt like with the accommodations in
5   place, that she should be able -- and, plus, with our
6   supervision and our support of her -- that she would be
7   able to successfully complete her probations.
8      Q.   Did you consider her request for
9   accommodations special treatment?
10     A.   No.
11     Q.   When she originally asked for accommodations
12   prior to going to the ADA office, did you deny those
13   requests?
14     A.   I don't recall ever denying any of her
15   requests. I think it was, you know, just clear that,
16   you know, she needed to go through the proper procedure.
17     Q.   Doctor, towards the end of November 2015,
18   there was a discussion with Dr. Diekman about using a
19   walker.
20     Do you recall that?
21     A.   It was, I believe, a rollator.
22     Q.   A rollator.
23     And that was something that she was going to
24   begin to use on the 30th of November 2015. Do you
25   recall that?

Page 65

1      A.   I don't remember the exact date, but, yes, I
2   mean, she was -- that was part of the, I believe, the
3   discussed accommodations.
4      Q.   But then she was terminated four days later?
5      A.   I don't -- I thought that she actually -- that
6   this was discussed much earlier in the process, but I
7   don't recall the get dates.
8      Q.   Let me just ask a few questions on this issue
9   that we raised in our complaint. Were there other
10   employees who were not terminated for doing things such
11   as threatening to blow up the department? Do you recall
12   that?
13     A.   I don't recall someone threatening to blow up
14   the department, per se.
15     Q.   Dr. Thiatros, do you recall anything with
16   Dr. Thiatros threatening --
17     A.   Thiatros.
18     Q.   Thiatros, is it?
19     A.   Yeah.
20     Q.   Do you recall any threats that he made?
21     A.   There was an issue of him having an
22   interpersonal issue with one of the chief residents, but
23   I don't recall anything about blowing anything up.
24     Q.   Are you aware of three male doctors who were
25   promoted despite failing their national boards?

17 (Pages 62 - 65)

Page 38

1    Q. The second year -- let's go with the second
2  year of the program.
3    A. Okay. I mean, my feeling of it was -- or my
4  understanding of it, was that we had issues with her
5  performance. She would -- she would say that it was,
6  you know, very much impacted by her physical condition,
7  so it was really, I think, coming from her in terms of
8  how much her performance was affected by that.
9    Q. Well, Doctor, was it discounted what her
10 physical problems were related to her performance?
11   A. I mean, you never discount, you know. It's
12 very hard to, obviously, separate what -- you know, if
13 someone is having some sort of physical or mental
14 condition. But, you know, we really tried to set, you
15 know, no matter what it was, goals or schedules, or
16 whatever, to try to assist her in performing her duties.
17   Q. So, Doctor, what do you do think was the
18 reason why she was unsuccessful in doing that?
19   A. You know, I think that, you know, there were
20 definite deficiencies in terms of her ability to, you
21 know, take her medical knowledge into practical clinical
22 scenarios and utilize that to best take care of
23 patients.
24   Q. And is it fair to say you did not believe that
25 her impairment was -- or, excuse me, her disabilities

Page 39

1  were the reasons why she couldn't complete the task that
2  she was required to do?
3     MR. CHAUNCEY: Object to form, but you can
4    answer, Dr. Hobbs.
5     THE WITNESS: You know, again, I don't know.
6    I really tried to focus on her clinical
7    performance. And, you know, again we tried to give
8    her -- obviously, again, you can't separate
9    everything out. I tried to, you know, give her
10   opportunities to optimize her health by giving her,
11   you know, time off and, you know, to make that --
12   and, you know, if that was contributing in any way,
13   to help with that.
14 BY MR. SALZMAN:
15   Q. Do you-all see the CCC report from 6/3?
16   A. Yes.
17   Q. Excellent.
18     (Exhibit D was marked for identification.)
19 BY MR. SALZMAN:
20   Q. Doctor, if you could take look at this CCC
21 meeting from June 3rd, 2015, and it says you attended
22 this meeting.
23     Do you see that?
24   A. Yes.
25   Q. And do you recall this meeting?

Page 40

1    A. Yes.
2    Q. Okay. And there was some significant amount
3  of resident concerns dealing with Dr. Diekman. Do you
4  recall those? And let me know when you need me to
5  scroll down.
6     MR. CHAUNCEY: Could you repeat that question?
7  BY MR. SALZMAN:
8    Q. Yes.
9     Doctor, are you aware that at this meeting
10 there was resident concerns about Dr. Diekman?
11     MR. CHAUNCEY: Okay.
12     THE WITNESS: Okay. So I see so far "faculty
13   concerns." Can we scroll down?
14 BY MR. SALZMAN:
15   Q. Sure.
16   A. So I see lots of faculty concerns, not
17 resident concerns. Your question was about resident
18 concerns?
19   Q. So far there are faculty concerns about her
20 performance?
21   A. Uh-huh (Indicates affirmatively), yes.
22   Q. If we could go down, do you see where it says
23 "Dr. Tandon stated"?
24   A. Yes, I see that.
25   Q. And this is dealing with rumors of impairment.

Page 41

1  Do you remember there were rumors around concerning
2  Dr. Diekman's impairment?
3    A. I mean, obviously, that was stated there. I
4  was not aware that this was a general sentiment. I
5  mean, he may have made this statement, but I was not
6  aware of more generalized rumors.
7    Q. Was there any discussions -- I mean, it goes
8  on to say, "There was no specific information on hand to
9  know how to proceed with possible limitations, or if she
10 had any medical issues that could make it not safe for
11 her to be making clinical decisions."
12   A. So faculty may -- you know, if a faculty
13 member were to raise such an issue, it's not -- you
14 know, again, this committee is not specifically for such
15 issues; it's about clinical performance and academic
16 performance. That's why it's called the Clinical
17 Competency Committee, you know. If a faculty member
18 raised some concern, you know, it's not really for
19 general discussion.
20   Q. Well, Dr. Hobbs, what I don't understand is if
21 an individual like Dr. Diekman is stating that she has a
22 disability and needs accommodations and, as a result of
23 her disability and her need for accommodations, her
24 performance is not up to standards, isn't that something
25 that should be discussed at this meeting?

11 (Pages 38 - 41)

Page 42

1    MR. CHAUNCEY:  Object to form, but you can
2 answer, Dr. Hobbs.
3    THE WITNESS:  No.  That is not the -- that is
4 not, you know, what the CCC is about, you know.
5 Accommodations are discussed, you know, at the
6 supervisor and ADA levels.
7 BY MR. SALZMAN:
8    Q.  Okay.  At some point a decision was made to
9 put Dr. Diekman on probation.  I believe we kind of
10 mentioned that earlier.
11    A.  Uh-huh (Indicates affirmatively).
12    Q.  Are you aware of the circumstances and why
13 that decision was made?
14    A.  Yes.  I mean, for some of the same reasons
15 that have been discussed, you know, in terms of clinical
16 performance, and it's outlined in the probation letter.
17    Q.  And was it your -- or who, ultimately, makes
18 the determination to place somebody on probation?
19    A.  So it's a decision made by the CCC.
20    Q.  So it's the committee as a whole that makes
21 it?
22    A.  Yes.
23    Q.  Okay.  Let me show you, hopefully, an exhibit
24 dated July 17th, 2015.
25    Do you see that?

Page 43

1    A.  Yes.
2    (Exhibit E was marked for identification.)
3 BY MR. SALZMAN:
4    Q.  Doctor, do you recall -- let me first scroll
5 down so you can see.
6    Is this a document that you created?
7    A.  Uh-huh (Indicates affirmatively).
8    Q.  Are you familiar with it?
9    A.  I mean, it looks familiar.  I would have to
10 review it a bit.
11    Q.  I'm sorry, I didn't mean to keep moving it.  I
12 was just trying to get --
13    A.  That's okay.
14    I believe that it was documenting a meeting
15 that I had with her, with Dr. Diekman, and one of the
16 chief residents at that point, Dr. Ettensohn, because
17 she had had some issues with when she could take her
18 medications.
19    Q.  And the document has part of a -- it looks
20 like a part of an e-mail, and she wanted to follow up on
21 an e-mail that was sent earlier, so I assume this is her
22 e-mail from July 15th, 2015 --
23    A.  Uh-huh (Indicates affirmatively).
24    Q.  -- to administrators.  And this was concerning
25 her chronic medical condition, correct?

Page 44

1    A.  Yes.
2    Q.  And, like you said, she was concerned because
3 she wasn't able to take her medications at the correct
4 time?
5    A.  Uh-huh (Indicates affirmatively).
6    Q.  And that she was requesting a plan for her
7 medications and being able to somewhat have this
8 schedule so she could work around taking care of her
9 medications and when she needed to eat?
10    A.  Uh-huh (Indicates affirmatively).
11    Q.  So was that the issue?
12    A.  Yes.
13    Q.  And she was letting you know that she -- one
14 second.
15    Okay.  She was letting you know that she
16 continues to feel symptomatic and fears this is the
17 beginning of the spiral that will lead to decompensation
18 in her health?
19    A.  Uh-huh (Indicates affirmatively).
20    Q.  And then you followed this up by asking how
21 she was doing, and she told you the concerns she was
22 having, and that you referred her that she should
23 consult with the ADA office, correct?
24    A.  Yes.
25    Q.  And, again, there was concerns about -- there

Page 45

1 were concerns with her having a set schedule, which,
2 frankly from what you said, becomes difficult because of
3 the amount of patients someone sees or other issues that
4 arise.
5    Is that a fair statement?
6    A.  Yes.  And I believe that, you know, as
7 discussed in this that, you know, it's possible to still
8 work within certain parameters to, you know, find an
9 approximate time of when she would be able to take her
10 medications.
11    We did talk about that a lot in trying to help
12 her.  And, in general, she would tell us that, you know,
13 that she felt good about, you know, the discussions and
14 what we were trying to put in place.
15    Q.  Is it fair to say, Doctor, that in your
16 opinion that a strict reduction in her work schedule is
17 not a reasonable accomodation?
18    A.  I mean, we did talk about part time at one
19 point.  I know after her medical leave back in 2014 that
20 we could look at her coming back part time.  And I know
21 that around those times I was having some discussions
22 with leadership in the GME office about part time.  It's
23 not unheard-of.  And we even offered that to her, to
24 come back after her medical leave on some kind of
25 part-time basis.  And she -- she said that she did not

Page 46

1  need to come back part time.
2      Q.  So that is a possibility, that someone working
3  part time and that they could actually have their
4  residence extended?
5      A.  Yes, it is possible to do that, you know.  It
6  may be a little bit different than what some people
7  think of as part time.  There have been various
8  scenarios that people have done where they might -- they
9  might still work full time, like, for two weeks or four
10  weeks, and then they would take off, you know, the same
11  amount of time, kind of like -- there are lots of
12  schedules out there today for doctors where they work
13  seven days on, seven days off, that kind of thing.  So
14  there are ways to make that happen, but, yes, they would
15  then -- their time gets extended in residency depending
16  on that.
17      Q.  Does that affect their salary?
18      A.  Yes.  If they go -- if they go to part time --
19  like, if they completely went -- well, you know, I would
20  have to be careful what I say, because, you know, we
21  never really went into that scenario, so I never really
22  talked about that with the GME office at the time that I
23  remember, you know.  Ultimately, you know come down to,
24  you know, exactly how much time somebody is working.  I
25  don't know exactly.  It might have reduced the salary

Page 47

1  some, though.  But they would continue to get their
2  salary even in the extended period.
3      (Exhibit F was marked for identification.)
4  BY MR. SALZMAN:
5      Q.  Doctor, if you can look at the -- hopefully,
6  there's an exhibit in front of you that is from you
7  dated November 19th, 2015.
8      Do you see that?
9      A.  Uh-huh (Indicates affirmatively).
10      Q.  This is an e-mail from you to Dr. Osfield?
11      A.  Yes.
12      Q.  And this is discussing some of the additional
13  accommodations that Dr. Diekman asked for.
14      Do you recall that?
15      A.  Uh-huh (Indicates affirmatively).
16      Q.  And if you look at kind of the highlighted
17  part, it says, "After discussions with GME, house staff
18  are contracted to work for ACGME duty hour rules.  They
19  have the additional burden of their specialties" --
20  "specialty board requirements."
21      And then this sentence: "Reduction in the
22  work schedule and is an unreasonable accomodation."
23      Do you see that?
24      A.  Uh-huh (Indicates affirmatively).
25      Q.  So that was your opinion back on

Page 48

1  November 19th, 2015.
2      A.  Well, I think that was in reference to, for
3  instance, you know, having a reduced on a daily basis
4  sort of schedule.  I think that is what the reference
5  was to.  Again, if it were more of the working full time
6  for shorter periods of time and then taking time off,
7  that would be different.  We were not asked about that
8  in this particular instance.
9      Q.  Right.
10      Dr. Diekman was asking for a set schedule so
11  that she could come and go for set times, which I
12  believe you already stated is impractical because of the
13  amount of patients that come and the differing of when
14  those patients come in and who is covering.
15      MR. CHAUNCEY:  Object to form.
16      Is there a question?
17      MR. SALZMAN:  I thought I was asking a
18  question.  Was I not?
19      MR. CHAUNCEY:  Dr. Hobbs, if you understood,
20  you can answer.
21      THE WITNESS:  Yeah.  I thought it was more of
22  a statement.  Sorry.
23  BY MR. SALZMAN:
24      Q.  I'm sorry.  Let me ask it as a question.
25      Dr. Diekman had asked for a set schedule,

Page 49

1  correct?
2      A.  Yes.
3      Q.  And she gave the reason for wanting a set
4  schedule because she needed that for her physical
5  problems she was having as a result of the POTS; is that
6  right?
7      MR. CHAUNCEY:  Object to form, but you can
8  answer.
9      THE WITNESS:  Yes.  She was asking because --
10  yes.
11  BY MR. SALZMAN:
12      Q.  In fact, let me just bring you to the exhibit
13  so that you can look at it.
14      Do you recall when Dr. Diekman was put on
15  probation?
16      A.  I'm sorry, what was the question?
17      Q.  Do you recall when Dr. Diekman was put on
18  probation?
19      A.  September of 2015.
20      Q.  And are you aware that during that -- no.  Now
21  I see why.  Sorry.  I'm laughing at myself.  Sorry.
22      Are you aware that during that time period in
23  November Dr. Diekman was asking for additional
24  accommodations?
25      A.  I believe that there had been some requests

13 (Pages 46 - 49)

Page 50

1 that had gone to -- I believe that there had been some
2 requests to the ADA office. I don't recall exactly when
3 or if it had been completed or, you know, finalized.
4     Q. I'm trying to find the document. That's why I
5 have got to pause here. I apologize, because it's
6 mislabeled on the exhibit. Let me ask you some
7 questions while I'm trying to find this.
8         I think I asked you earlier, Doctor, but I
9 want to be clear that at no time did you state that
10 Dr. Diekman could not become a psychiatrist if she
11 needed special treatment?
12     A. No, I did not say that.
13     Q. And you did not say that her disability would
14 disqualify her from graduation or working as a
15 psychiatrist?
16     A. No, I did not say that.
17     Q. What was your basis for recommending
18 termination for Dr. Diekman?
19     A. Well, when the probation process began,
20 there's a letter that spells out the issues and
21 concerns, and there's a remediation plan that is built
22 for that, for each of those items. And there's -- if
23 those, you know, items are not completed, then there is
24 the -- it is likely that, you know, if the majority of
25 those are not completed, that termination could be

Page 51

1 recommended.
2         There are different outcomes. One could
3 either be returned to good standing or one can have an
4 extension. At the time there could be an extension of
5 another three months or termination.
6     Q. And as I was trying to allude to before and
7 wasn't able to find the document, you're aware that
8 accommodations were being requested by Dr. Diekman in
9 November, roughly, November 12th of 2015?
10     A. I don't recall the exact date, but I do know
11 that there was another round of requests.
12     Q. Yet, the recommendation was made to terminate
13 her a few weeks after that?
14     A. The termination was, I believe, in late -- the
15 recommendation was late November --
16     Q. Right.
17     A. -- but the process -- the process of probation
18 had begun in September.
19     Q. Well, Doctor, is the consideration of her need
20 for accomodation not taken into consideration before you
21 terminate somebody?
22         MR. CHAUNCEY: Object to form, but you can
23     answer.
24         THE WITNESS: Again, I don't know if that
25     process had been completed at that point. And,

Page 52

1     again, we focus in CCC on performance, clinical and
2     academic performance.
3 BY MR. SALZMAN:
4     Q. So it's fair to say, then, that based on what
5 you've said previously and just now, that CCC does not
6 look into the issue as to whether or not an accomodation
7 is being offered -- or that an accomodation is needed in
8 order for somebody to successfully complete the
9 competency issues?
10     A. Right. It's a separate process.
11     Q. So let me ask you this, Doctor: You were
12 aware of her continual request for accommodation,
13 Dr. Diekman's request, correct?
14         MR. CHAUNCEY: Object to form, but you can
15     answer.
16         THE WITNESS: I was aware that there was
17     another request.
18 BY MR. SALZMAN:
19     Q. And you were working on that with the ADA
20 office?
21     A. Yes.
22     Q. And you're part of the CCC that unanimously
23 recommended her termination, correct?
24     A. Yes, I'm part of the CCC.
25     Q. And it's not part of the CCC to discuss,

Page 53

1 before you terminate somebody, whether or not there
2 could be an accommodation to allow them to become
3 competent in the program?
4         MR. CHAUNCEY: Object to form, but you can
5     answer.
6         THE WITNESS: We don't discuss the -- we don't
7     discuss the accommodations, no.
8 BY MR. SALZMAN:
9     Q. So how does that factor into -- or who does it
10 factor into when somebody is terminated and they're
11 asking for reasonable accommodations to allow them to do
12 the essential functions of the program?
13     A. I think that she was -- she had already been
14 given many accommodations that would allow her to
15 perform, you know, and there were still performance
16 issues.
17     Q. Go ahead, Doctor.
18     A. So there were separate -- there are separate
19 processes.
20     Q. So let me try to understand. If somebody is
21 not meeting the competency requirements -- in this case,
22 Dr. Diekman was put on probation to correct those
23 problems, and she was given 90 days. Correct?
24     A. Correct.
25     Q. And that was, roughly, in September of 2015?

1 A. Uh-huh (Indicates affirmatively).

2 Q. I believe I might have asked you, but is there
3 a normal probation time period that is used by the CCC?

4 A. Three months.

5 Q. Three months is the normal one?

6 A. Yes.

7 Q. In your experience, has that been a time
8 period -- has that time period been less or more?

9 A. It's always been three months, in my
10 experience.

11 Q. And so the issues that were brought up by the
12 CCC were issues involving her ability to timely do her
13 notes; is that correct?

14 A. Timely do her notes. Some other things that
15 were brought up in terms of probation were her ability
16 to assess the risk of a patient in the situation, her
17 ability to determine if, you know, if a patient is safe
18 or not. There were issues with agitated and aggressive
19 patients, psychotic patients that she had difficulty
20 interacting with and really knowing that there are
21 potential dangerous situations.

22 Q. But you understood that she was going through
23 some severe issues with her fatigue and other complaints
24 concerning her POTS, correct?

25 MR. CHAUNCEY: Object to form, but you can

1 answer.

2 THE WITNESS: I mean, I don't remember the
3 exact timing of that, whether there was something
4 definitely during that time period. I just don't
5 remember off the top of my head.

6 (Exhibit G was marked for identification.)

7 BY MR. SALZMAN:

8 Q. Doctor, can you see the document in front of
9 you that starts out "it may not appear"?

10 A. Yes, I see it.

11 Q. I want to scroll back up so you can see it.
12 This is, I believe, the letter that is written for
13 probation --

14 A. Yes.

15 Q. -- dated September 3rd, 2015. So this was the
16 letter that placed Dr. Diekman on probation?

17 A. Yes.

18 Q. Okay. And you're aware that Dr. Diekman wrote
19 a response regarding the probation, correct? Let me see
20 if I can get to it.

21 Do you see that?

22 A. I see it.

23 Q. "It's my belief that this probation is
24 retaliation and retribution for reporting the ADA
25 violations."

1 Are you familiar with this letter?

2 A. I'm not sure that -- I'm not. It doesn't look
3 familiar to me.

4 Q. Are you aware at all that Dr. Diekman did at
5 least appeal the probation?

6 A. I'm aware that she went through the grievance
7 process.

8 Q. So she went through the formal grievance
9 process. I'm bringing up another document. This is
10 dealing with, I believe, point by point with the letter.

11 Are you familiar with this document?

12 A. It doesn't look familiar to me.

13 Q. Okay. Are you aware of what the results were
14 of the grievance process concerning the probation?

15 A. I'm aware that it was upheld.

16 Q. Are you then aware of what occurred regarding
17 the termination as to whether or not it was appealed?

18 A. Oh, I think that was actually what I was
19 referring to, the termination. I know she went through
20 that grievance process.

21 Q. So you're unaware of whether she did it
22 through the probation process also?

23 A. I don't recall that.

24 Q. And you didn't have any discussions with
25 Dr. Bussing regarding any appeal she may have raised to

1 her?

2 A. About probation?

3 Q. Yes. I'm sorry. About probation.

4 A. No.

5 Q. During the time period of the 90 days from
6 September 3rd to December 4th of her termination, were
7 you able to determine whether or not any of the doctors
8 supervising Dr. Diekman had anything good to say about
9 her?

10 A. There were times when she had good
11 evaluations, you know. Even outside the probationary
12 period, you know, even I evaluated her at times, and I
13 think that there were times when she, you know, could
14 perform. It just was very inconsistent.

15 Q. Were you aware that Dr. Diekman was talking
16 about transferring to another PYG-3 program?

17 A. I know that she -- yes. I believe that she
18 had written to me at one point and stated that she -- I
19 don't remember if she wrote or if she talked to me. And
20 I documented that. But she had considered it, yes.

21 Q. Do you recall if there was a doctor -- is it
22 Cuffe, C-u-f-f-e? -- that she was speaking to?

23 A. I think, you know, she did consider the
24 Jacksonville program, which is where Dr. Cuffe is. I
25 don't recall if that's where she was looking, because I

Page 66

1    A.  Which national board?
2    Q.  I believe --
3    A.  And do you have the name of the residents?
4    Q.  Let me see if I have any names.
5        Vaca Patel, they were -- they failed their
6 PTY-3 national board --
7    A.  Step three.
8        MR. CHAUNCEY:  Was there a third name, Andrew?
9 Was there a third name?
10       MR. SALZMAN:  I don't have it.
11       MR. CHAUNCEY:  Okay.
12       MR. SALZMAN:  I would be happy to if I did.
13       THE WITNESS:  For those two residents, they
14 had difficulties passing the Step 3, the USMLE
15 Step 3 but eventually passed.
16 BY MR. SALZMAN:
17   Q.  But they were -- were they put on probation?
18   A.  No, they were not put on probation.  Failing
19 an exam is not -- usually not enough to be placed on
20 probation.  There usually has to be a constellation of
21 various deficiencies.
22   Q.  And what exactly is that exam needed for?  You
23 need to pass that for what?  To be promoted?
24   A.  You don't need to be promoted.  In some
25 institutions, yes.  In some institutions, you can be

Page 67

1 terminated for not passing that, but that's not the UF
2 institutional policy.  It's not every institution's
3 policy, and they don't get -- it's not about being
4 promoted.
5        One thing that the University of Florida does
6 is that they don't give the step increase in pay from
7 PGY-2 to 3 until that exam is passed.  But it's up to
8 the department to, you know, ultimately, get to the CCC
9 to determine whether the resident will be promoted or
10 not.
11   Q.  Did those doctors also have a problem in
12 missing their residency requirements for clinical hours?
13   A.  Not that I recall.
14   Q.  Has it ever been alleged that male residents
15 are given better rotations than female residents?
16   A.  Again, I have only heard it, I think, from
17 Dr. Diekman.
18   Q.  Okay.  What about Dr. Kaleel being accused of
19 having medical students forge notes for him, did that
20 occur?
21   A.  So there was a complaint about that, and what
22 we typically do is if -- if that's ever brought up --
23 because sometimes residents come from different
24 settings, different institutions if there are transfers,
25 things like that, they may have different ways of doing

Page 68

1 things, and so we give one warning.  And I believe I
2 gave him one warning that if I ever heard about it
3 again, then there was the possibility of some sort of,
4 you know, negative outcome.
5    Q.  Okay.
6    A.  And I don't recall it ever happening again.
7    Q.  And what about Dr. Qurushi?
8    A.  Qurushi?
9    Q.  Yes.
10   A.  What about him?
11   Q.  He left -- he just left work in the middle of
12 a shift claiming there was too much work.
13   A.  I don't recall anything exactly about that,
14 you know.  Sometimes residents get overwhelmed, and it's
15 possible that a resident gets upset and overwhelmed.
16 But with Dr. Qurushi, that would not be a trend for him.
17       MR. SALZMAN:  Doctor, thank you very much for
18 your time.  I appreciate it.
19       THE WITNESS:  All right.  Thank you.
20       MR. CHAUNCEY:  No questions.
21       MR. SALZMAN:  Read or waive?
22       MR. CHAUNCEY:  We'll waive.
23       (Deposition concluded at 2:20 p.m.)
24
25

Page 69

1        S T I P U L A T I O N
2
3        It is hereby stipulated and agreed upon by and
4 among the attorneys present and the witness that
5 reading and signing of the deposition by the
6 witness is waived.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 70

```
 1              CERTIFICATE OF OATH
 2
 3  STATE OF FLORIDA
 4  COUNTY OF HILLSBOROUGH
 5
 6       I, the undersigned authority, certify that
 7  JACQUELINE A. HOBBS, M.D., personally appeared remotely
 8  via videoconference before me and was duly sworn.
 9
10       WITNESS my hand and official seal this 7th day of
11  July, 2020.
12
13
14
15
16
17
18
19
```



```
20       _____
         Aaron T. Perkins, RMR, CRR, CRC
         Notary Public - State of Florida
21       My Commission Expires:  4/1/2024
         Commission No. GG975331
22
23
24
25
```

Page 71

```
 1          REPORTER'S CERTIFICATE
 2
    STATE OF FLORIDA
 3  COUNTY OF HILLSBOROUGH
 4
        I, Aaron T. Perkins, Registered Merit Reporter
 5  and Certified Realtime Reporter, certify that I was
    authorized to and did stenographically report the
 6  deposition of JACQUELINE A. HOBBS, M.D., (via
    videoconference); that a review of the transcript was
 7  not requested; and that the transcript is a true and
    complete record of my stenographic notes.
 8
 9
        I further certify that I am not a relative,
10  employee, attorney, or counsel of any of the parties,
    nor am I a relative or employee of any of the parties'
11  attorney or counsel connected with the action, nor am I
    financially interested in the action.
12
13
        Dated this 7th day of July, 2020.
14
15
16
17
18
19
20
21       _____
         Aaron T. Perkins, RMR, CRR, CRC
22
23
24
25
```

[00227 - alleged]                                                    Page 72

| 0 | | |
| --- | --- | --- |

**00227**  1:6

| 1 | | |
| --- | --- | --- |

**1**  1:24
**11**  5:21
**12:30**  1:16
**12th**  51:9
**13**  21:17
**14**  3:2 5:24
**15**  5:24 14:3
**1500**  2:8
**15th**  43:22
**16**  3:4
**16th**  13:17
**17**  3:12
**17th**  42:24
**1815**  2:3
**19**  3:14
**19th**  47:7 48:1
**1:19**  1:6

| 2 | | |
| --- | --- | --- |

**2**  67:7
**20-23**  4:7
**2013**  6:7,13,22 27:6
  27:14 34:20
**2014**  3:4 9:8 10:8
  12:9 13:17 14:19
  15:18 19:12 35:8
  45:19
**2015**  3:9,12,14,19
  3:22 6:13,24 31:9
  31:21 34:1,20
  35:18 36:13 37:5,9
  39:21 42:24 43:22
  47:7 48:1 49:19
  51:9 53:25 55:15
  60:3 63:4 64:17,24
**2020**  1:15 70:11
  71:13

**21**  3:5
**22**  1:15
**250**  6:6
**250,000**  6:6
**25002**  70:18 71:19
**29th**  15:18
**2:20**  1:16 68:23

| 3 | | |
| --- | --- | --- |

**3**  3:9,19 57:16 66:6
  66:14,15 67:7
**3-31-15**  3:6
**30th**  64:24
**31**  3:6
**31st**  31:9,21
**32204**  2:9
**34655**  2:4
**39**  3:8
**3rd**  39:21 55:15
  57:6 60:16

| 4 | | |
| --- | --- | --- |

**4**  2:18 3:22
**4/1/2024**  70:21
**43**  3:10
**47**  3:13
**4th**  57:6 60:3 63:4

| 5 | | |
| --- | --- | --- |

**50th**  58:21
**55**  3:16

| 6 | | |
| --- | --- | --- |

**6/3**  39:15
**61**  3:20
**69**  2:18

| 7 | | |
| --- | --- | --- |

**70**  2:19
**71**  1:24 2:19
**7th**  34:1 70:10
  71:13

| 8 | | |
| --- | --- | --- |

**8:00**  18:10

| 9 | | |
| --- | --- | --- |

**90**  53:23 57:5

| a | | |
| --- | --- | --- |

**aaron**  1:21 37:14
  70:20 71:4,21
**ability**  33:17 37:5
  38:20 54:12,15,17
**able**  8:3 12:17 18:5
  18:7,16,21,23 19:3
  19:7 34:13 44:3,7
  45:9 51:7 57:7
  59:19 64:5,7
**absence**  12:12,22
  14:1,20
**absolutely**  24:21
  61:15
**academic**  26:13
  35:24 41:15 52:2
  61:18
**academics**  37:10
**accepted**  8:21
**accepting**  58:6
**accommodation**
  52:12 53:2
**accommodations**
  8:7,9,12 20:15,18
  20:20,22,25 21:3,5
  21:8 29:9,11 30:3
  32:5,11,22 33:16
  41:22,23 42:5
  47:13 49:24 51:8
  53:7,11,14 63:25
  64:4,9,11 65:3
**accomodation**
  18:16 29:24 31:6
  31:18 32:14 45:17
  47:22 51:20 52:6,7

**accused**  67:18
**acgme**  21:18 22:2,5
  22:8,22 24:19
  47:18 62:9
**acknowledge**  4:2
**acquire**  10:23
**action**  71:11,11
**actual**  30:18
**ada**  8:15 18:13,18
  21:4,9 29:8,14,17
  32:1 42:6 44:23
  50:2 52:19 55:24
  64:12
**added**  10:4
**additional**  20:21
  47:12,19 49:23
**addressed**  23:4
  26:24
**adds**  60:25
**administering**  4:5
**administrative**  4:7
  6:17
**administrators**
  43:24
**affect**  46:17
**affirmatively**  13:19
  15:20 40:21 42:11
  43:7,23 44:5,10,19
  47:9,15,24 54:1
  60:7 61:11
**afraid**  29:5
**aggressive**  54:18
**agitated**  54:18
**agree**  59:3
**agreed**  69:3
**ahead**  53:17
**alerted**  10:10
**alexander**  2:8
**all's**  10:19
**alleged**  67:14

**allotted** 14:2
**allow** 20:15 53:2,11
  53:14 62:20
**allude** 51:6
**amount** 11:24 14:5
  40:2 45:3 46:11
  48:13 59:6
**andrew** 2:2 32:10
  33:8 37:18 66:8
**annual** 14:4
**answer** 5:8,8 15:7
  16:12 23:14,22
  24:7 28:14,22
  33:20 35:13 36:8
  37:8 39:4 42:2
  48:20 49:8 51:23
  52:15 53:5 55:1
  62:2
**anybody** 10:17
  24:3
**aosc** 4:7
**apologize** 50:5
**appeal** 56:5,25
**appealed** 56:17
**appear** 55:9
**appearances** 2:1
**appeared** 70:7
**appears** 13:15
**applicants** 7:16
**application** 7:8,14
  8:1
**applications** 7:19
  7:21
**appointments** 18:4
  26:9,12
**appreciate** 68:18
**appropriate** 59:17
**approximate** 45:9
**approximately**
  35:1

**april** 34:1
**arrangement** 4:5,9
  4:16
**asked** 20:21 24:8
  26:23 47:13 48:7
  48:25 50:8 54:2
  62:6 64:11
**asking** 37:18 44:20
  48:10,17 49:9,23
  53:11
**assess** 54:16
**assist** 38:16
**assume** 5:9 9:13
  22:15 43:21
**assure** 22:24
**attach** 14:14 61:2
**attachments** 3:17
**attended** 39:21
**attending** 27:7 59:2
  59:2
**attendings** 11:22
  26:8,13 59:19
**attention** 11:2,10
**attitude** 10:23
  16:10,17
**attorney** 2:5,10
  71:10,11
**attorneys** 4:1 69:4
**authority** 70:6
**authorized** 14:20
  17:12 71:5
**available** 8:7 9:22
**avenue** 2:8 9:22
**averbuch** 61:8,9,10
  61:13 63:1
**aw** 1:6
**aware** 7:1,5,9,25
  8:11,17,23 10:20
  10:21 11:1,21
  14:18 15:4,12,15
  15:16,24 16:3,7,8

16:15,24 17:18
19:11,19 20:21
21:16 22:1,12,13
22:17 23:2,5,6,7,10
23:17 25:1,5,10,11
26:19 27:5,9,22,24
28:2,11,17 29:4
31:17 32:4 40:9
41:4,6 42:12 49:20
49:22 51:7 52:12
52:16 55:18 56:4,6
56:13,15,16 57:15
60:1 61:8,12,16
62:23 63:1,13
65:24

**b**

**b** 3:1,5 21:14
**back** 6:7 7:15 18:25
  32:6 34:19,20
  37:14,16 45:19,20
  45:24 46:1 47:25
  55:11
**bad** 31:1
**barnett** 2:8
**based** 19:3,6,15
  52:4
**basically** 16:24
  23:3,18 60:15,21
  60:24
**basis** 45:25 48:3
  50:17
**began** 50:19
**beginning** 44:17
**begun** 51:18
**behalf** 4:14,17
**belief** 55:23
**believe** 8:14,16,25
  9:17 10:9 11:22
  12:5 13:3 17:15
  18:12,13,15 19:14
  20:14,17 21:2 22:5

22:7,15,20 25:13
27:10 28:7 29:19
30:1 31:19 33:4
35:25 38:24 42:9
43:14 45:6 48:12
49:25 50:1 51:14
54:2 55:12 56:10
57:17 64:21 65:2
66:2 68:1
**best** 21:23 31:25
  38:22
**better** 10:23 67:15
**beyond** 14:2
**bill** 58:24 59:6,7,18
**billing** 58:23 59:12
  59:14 63:10
**bit** 7:23 32:8 33:6,6
  43:10 46:6
**blow** 65:11,13
**blowing** 65:23
**blue** 31:10
**board** 47:20 66:1,6
**boards** 65:25
**bring** 16:19 49:12
**bringing** 56:9
**brought** 9:6 11:2
  11:10,23 12:7,15
  16:5 54:11,15
  67:22
**built** 50:21
**burden** 47:19
**bussing** 56:25

**c**

**c** 3:6 28:19 31:2
  57:22
**calendar** 37:20
**call** 16:1 35:9
**called** 41:16
**calling** 17:9,13,13
  17:17

[capacity - corporation]                                                    Page 74

capacity  5:16 14:11
care  13:10 24:24
  34:13 38:22 44:8
careful  46:20
case  1:6 27:12
  53:21
caseload  34:13
ccc  3:8 17:4 35:9
  35:22 39:15,20
  42:4,19 52:1,5,22
  52:24,25 54:3,12
  60:19 64:2 67:8
ccc's  63:5
center  26:13
certain  11:15,19,19
  19:19 21:3 24:10
  26:14 34:13 45:8
  59:6,12
certificate  2:19,19
  70:1 71:1
certified  71:5
certify  70:6 71:5,9
chair  5:17 6:11
chance  63:5
chang  12:3 15:5,12
  15:24 16:15,20,24
  17:3 23:17 27:23
  27:25 28:3,12,17
change  17:3 18:9
  26:6 58:14 59:21
  62:24
changed  6:16 25:7
  26:18
changes  25:11
  60:18
changing  25:3 26:2
charges  24:1
chauncey  2:7 4:11
  4:13 15:6 16:11
  23:13,21 28:13,21
  30:17,22 31:12,15

32:10,14,19 33:8
  33:19 35:12 36:4,7
  37:7,18,21 39:3
  40:6,11 42:1 48:15
  48:19 49:7 51:22
  52:14 53:4 54:25
  62:1 66:8,11 68:20
  68:22
chief  15:9 16:8
  43:16 65:22
chronic  43:25
circumstances
  42:12
civil  1:20
claim  27:7 28:12
claimed  28:3 61:12
claiming  68:12
clarify  28:6
clear  19:15 50:9
  60:21 64:15
click  31:13
clicked  31:12
client  21:11
clinic  59:1
clinical  17:5 34:16
  35:23 38:21 39:6
  41:11,15,16 42:15
  52:1 67:12
closed  28:19
codes  58:25
collaboration  13:1
college  29:21
come  25:9 45:24
  46:1,23 48:11,13
  48:14 67:23
coming  38:7 45:20
comments  61:13
commission  70:21
  70:21
committee  17:5
  34:16,17,22 41:14

41:17 42:20
common  11:17
communicating
  58:9
competency  17:5
  34:16 41:17 52:9
  53:21
competent  53:3
complain  26:1
  27:18
complained  24:13
complainer  15:14
complaining  10:22
  14:21,23 61:23
complaint  3:5
  21:18 22:2,9,14,19
  24:9,15,18,18 25:8
  27:2,3,23,24 61:22
  62:11,21,22 65:9
  67:21
complaints  12:4
  22:21 54:23
complete  23:1 37:6
  39:1 52:8 64:7 71:7
completed  50:3,23
  50:25 51:25
completely  46:19
compliance  59:19
  59:25
concern  8:2 41:18
  63:6
concerned  11:12
  12:16 25:14 44:2
concerning  14:22
  16:16 23:20 24:1
  25:2 29:23 41:1
  43:24 54:24 56:14
concerns  11:9 40:3
  40:10,13,16,17,18
  40:19 44:21,25
  45:1 50:21

concluded  68:23
condition  7:6 8:8
  19:18 26:24 28:18
  35:19 38:6,14
  43:25
conditions  7:1 20:9
  36:1
conducted  1:12
conjunction  59:2
connected  71:11
consent  4:8,11,15
  4:18
consider  57:23
  61:21 62:13 63:22
  63:25 64:8
consideration
  51:19,20
considered  57:20
considering  15:2
constantly  14:21
  14:23
constellation  66:20
constructive  36:20
  62:16
consult  44:23
contact  58:3
contacted  9:9 23:2
continual  52:12
continue  12:12
  33:17 47:1 62:21
continues  44:16
contracted  47:18
contractual  5:25
contributing  39:12
control  20:7
conversations
  12:14 29:13
conveying  11:24
convoluted  62:3
corporation  1:7

**correct** 12:1,22
  33:13,23 43:25
  44:3,23 49:1 52:13
  52:23 53:22,23,24
  54:13,24 55:19
  60:9
**corrected** 60:23
**correctly** 5:8,10
**counsel** 1:18 4:8
  37:17 71:10,11
**counsel's** 9:9 10:10
  10:13,14
**county** 70:4 71:3
**couple** 31:20
**course** 32:17 35:12
  37:8
**court** 1:1 4:2,6
**covering** 48:14
**crc** 1:21 70:20
  71:21
**created** 43:6
**credit** 63:20
**criticism** 36:20
  62:16
**crr** 1:21 70:20
  71:21
**cuffe** 57:22,24 58:3
  58:11
**current** 6:5
**currently** 5:13,25
  8:3
**cv** 1:6

**d**

**d** 2:17 3:8 39:18
**daily** 20:6 48:3
**dangerous** 54:21
**date** 1:15 3:3,18
  6:23 9:2 51:10 65:1
**dated** 3:9,12,13,21
  13:16 15:17 31:21
  42:24 47:7 55:15

60:2 71:13
**dates** 34:6,6 65:7
**david** 2:7
**day** 26:6,16 70:10
  71:13
**days** 14:3,4 26:10
  29:6 46:13,13
  53:23 57:5 63:6
  65:4
**deal** 9:23 16:10
  24:20 64:2
**dealing** 40:3,25
  56:10
**dealt** 10:1
**december** 3:22
  15:18 34:25 35:1,8
  57:6 60:3,23 63:4
**decided** 30:12
**decipher** 28:22
**decision** 32:25 42:8
  42:13,19 60:6
**decisions** 32:12
  41:11
**decompensation**
  44:17
**defendant** 1:8 2:10
**defendants** 4:14
**deficiencies** 38:20
  66:21
**definite** 14:24
  38:20
**definitely** 6:15 34:8
  55:4
**degance** 2:8
**delineate** 11:15
  21:3
**deny** 64:12
**denying** 64:14
**department** 5:18
  9:24 62:7 65:11,14
  67:8

**depending** 46:15
**depends** 29:10
**deposition** 1:11 4:2
  5:2 14:15 68:23
  69:5 71:6
**designated** 13:1
**despite** 65:25
**detail** 9:10
**details** 24:12
**determination** 19:2
  19:5 42:18
**determine** 54:17
  57:7 59:11 67:9
**determined** 21:5
  60:22
**diekman** 1:4 3:7,12
  3:18,21 6:13,18 8:1
  8:12 10:6,18,22
  11:3 12:4,10 13:16
  14:21 15:5,13
  16:16,19,25 17:3,8
  17:12 19:3,6,13
  21:17 22:1,13 23:3
  23:18 25:2,5 26:20
  27:6,11,22 28:3,11
  29:1,4,8,24 31:18
  32:2 33:20 36:13
  40:3,10 41:21 42:9
  43:15 47:13 48:10
  48:25 49:14,17,23
  50:10,18 51:8
  53:22 55:16,18
  56:4 57:8,15 58:15
  61:12 63:6,9,13,22
  64:1,18 67:17
**diekman's** 11:6
  16:10 26:24 28:18
  33:17 34:2 41:2
  52:13 58:4,11,17
**different** 31:20
  34:14 37:10,19,23

46:6 48:7 51:2
  67:23,24,25
**differentiate** 37:22
**differing** 48:13
**difficult** 9:18 18:19
  25:23 45:2 62:6
**difficulties** 9:4,11
  9:14,15 25:16
  66:14
**difficulty** 54:19
**dio** 22:6
**direct** 2:18 4:23
**director** 5:18,20
  6:9,16 14:12 29:19
**disabilities** 38:25
**disability** 41:22,23
  50:13
**disabled** 63:22
**discount** 38:11
**discounted** 38:9
**discovery** 1:18
**discuss** 36:17 52:25
  53:6,7
**discussed** 18:18
  21:4 30:4 35:3
  41:25 42:5,15 45:7
  65:3,6
**discussing** 15:25
  36:15 47:12
**discussion** 8:6,9
  10:9,15 16:16,25
  18:12,14,25 41:19
  64:18
**discussions** 10:6
  12:10 23:25 29:13
  29:23 41:7 45:13
  45:21 47:17 56:24
**disqualify** 50:14
**district** 1:1,1
**division** 1:2

**dixon** 22:7,18,18
23:2,10
**dixon's** 23:7
**doctor** 14:18 18:8
26:20 29:12 31:1,7
31:17 32:23 33:12
33:25 34:16 38:9
38:17 39:20 40:9
43:4 45:15 47:5
50:8 51:19 52:11
53:17 55:8 57:21
58:22 60:2 61:7
63:3,19 64:17
68:17
**doctor's** 26:9
**doctors** 46:12 57:7
65:24 67:11
**document** 3:6
30:18 32:11 43:6
43:19 50:4 51:7
55:8 56:9,11
**documentation**
58:8 59:17,20
**documented** 35:15
57:20
**documenting** 43:14
**documents** 30:13
**doing** 11:19 28:9
38:18 44:21 65:10
67:25
**double** 31:12
**dr** 5:2 10:6,18,22
11:3,6 12:3,4,10
13:2 14:21 15:5,5,7
15:12,13,24 16:10
16:12,15,16,19,20
16:24,25 17:3,3,8
17:12 19:3,6,13
21:17 22:1,7,13,18
22:18 23:2,3,7,10
23:14,17,18,22

25:2,5 26:1,5,8,8
26:19,20,24 27:6
27:11,20,22,23,25
28:3,3,11,12,14,17
28:18 29:1,4,8,14
29:16,23,24 31:18
32:2 33:17,20,20
34:2 35:13 36:8,13
37:8 39:4 40:3,10
40:23 41:2,20,21
42:2,9 43:15,16
47:10,13 48:10,19
48:25 49:14,17,23
50:10,18 51:8
52:13 53:22 55:16
55:18 56:4,25 57:8
57:15,24 58:3,4,11
58:11,15,17 61:8
61:12,12,13 62:2
63:1,6,9,13,22 64:1
64:18 65:15,16
67:17,18 68:7,16
**due** 63:23
**duly** 4:20 70:8
**duties** 6:12,17
12:17 18:6 38:16
**duty** 47:18
**dyslexia** 7:9,12 8:1
8:8,13

**e**

**e** 2:7,17 3:1,2,10,13
13:16,20,23 15:17
15:21,23 17:15
29:13 43:2,20,21
43:22 47:10 57:22
58:18 61:17
**earlier** 28:7 42:10
43:21 50:8 65:6
**easy** 30:23
**eat** 44:9

**education** 5:17
**either** 25:10 51:3
**employed** 5:14
**employee** 5:25
71:10,10
**employees** 65:10
**encounters** 59:1
**ended** 30:9
**environmental**
19:20
**episodes** 14:24
**especially** 9:19
29:20
**esquire** 2:2,7
**essence** 15:25 60:8
**essential** 53:12
**estimation** 21:9
**ettensohn** 43:16
**evaluated** 57:12
**evaluation** 61:1
**evaluations** 57:11
63:18
**eventually** 66:15
**exact** 8:14 18:21
29:18 30:8,8 51:10
55:3 58:2,19 65:1
**exactly** 26:3 35:14
46:24,25 50:2
66:22 68:13
**exam** 66:19,22 67:7
**examination** 2:18
4:23 58:18
**excellent** 39:17
**exchange** 10:15
**excuse** 24:15 36:21
38:25
**excuses** 37:2
**exhibit** 3:2,5,6,8,10
3:13,16,20 14:14
14:16 21:14,17,19
31:2 39:18 42:23

43:2 47:3,6 49:12
50:6 55:6 60:2,5
61:3,4
**exhibits** 15:22
**experience** 13:7
54:7,10
**experts** 21:12
**expires** 70:21
**extend** 13:23 14:12
**extended** 14:6 46:4
46:15 47:2
**extension** 51:4,4
**extra** 60:25

**f**

**f** 3:13 47:3 57:22
57:22
**fact** 49:12
**factor** 35:19 53:9
53:10
**factors** 19:20
**faculty** 6:2 40:12
40:16,19 41:12,12
41:17
**fail** 63:16
**failed** 63:14 66:5
**failing** 65:25 66:18
**fair** 38:24 45:5,15
52:4
**fairly** 36:17
**faking** 26:20
**fall** 27:5 37:23
**familiar** 13:20
15:21 31:22 43:8,9
56:1,3,11,12 60:11
**far** 9:21 32:3 40:12
40:19
**fatigue** 20:4 54:23
**fatigued** 9:18
**fayad** 26:8
**fears** 44:16

**federal** 1:19
**feedback** 36:25
**feel** 17:20 18:8 31:1
 36:12,19 37:4
 44:16
**feeling** 18:4,5 38:3
**felt** 15:13 16:20
 25:24 28:17 30:7
 35:18 36:1 45:13
 64:4
**female** 67:15
**figure** 37:11
**filed** 24:19 27:22
**files** 30:17
**final** 21:7 60:25
**finalized** 50:3
**financially** 71:11
**find** 45:8 50:4,7
 51:7
**findings** 23:7
**first** 4:20 7:5 8:23
 9:1,7 11:6,10 12:2
 15:16 22:1 31:10
 31:25 43:4
**five** 33:4
**flat** 63:16
**floor** 2:4
**florida** 1:1,7,7,22
 2:4,9 4:6 5:15,23
 19:9 20:11 63:11
 67:5 70:3,20 71:2
**focus** 39:6 52:1
**folders** 30:16
**follow** 43:20 62:9
**followed** 44:20
**follows** 4:21
**forge** 67:19
**form** 15:6 16:11
 23:13,21 28:13,21
 30:2 33:19 35:12
 36:4,7 37:7 39:3

 42:1 48:15 49:7
 51:22 52:14 53:4
 54:25 62:1
**formal** 32:1 56:8
**forms** 31:18
**forth** 19:1
**forward** 4:12 16:19
 25:10,23
**found** 23:10 60:19
**four** 46:9 65:4
**frame** 29:10
**frankly** 45:2
**frequent** 36:15
**frequently** 17:9,14
 36:17
**front** 21:17 30:13
 47:6 55:8 60:3
**frustrated** 26:17
**full** 4:25 46:9 48:5
**functions** 53:12
**further** 71:9

**g**

**g** 3:16 55:6
**gainesville** 1:2
**general** 9:9 10:10
 10:13,14 18:20,23
 20:24 25:9,9 36:22
 41:4,19 45:12
**generalized** 41:6
**gg975331** 70:21
**ginory** 26:2,5,8,19
**give** 39:7,9 67:6
 68:1
**given** 13:4 20:15
 32:5 53:14,23
 67:15
**giving** 18:6 24:12
 39:10
**glad** 30:25
**gme** 10:4,11,12
 13:2 22:6,10,23

 45:22 46:22 47:17
**go** 8:3 9:25 18:1
 20:6 31:13 34:6
 38:1 40:22 46:18
 46:18 48:11 53:17
 60:12 61:6 64:16
**goal** 20:17
**goals** 38:15
**god** 13:14
**goes** 22:9,23 41:7
**going** 7:12 10:7
 13:9 18:2,2,3,17,21
 21:8 24:14 29:11
 33:9 34:2 35:20
 54:22 63:14 64:12
 64:23
**good** 6:1 33:7 45:13
 51:3 57:8,10
**graduation** 50:14
**granted** 17:21
 20:18,20,22 21:6
**great** 33:10
**grievance** 56:6,8,14
 56:20
**grj** 1:7
**guarantee** 18:24
**guess** 37:11

**h**

**h** 3:1,20 61:4
**hand** 41:8 70:10
**handling** 10:14
**happen** 46:14
**happened** 26:16
**happening** 17:19
 68:6
**happens** 26:11,11
**happy** 66:12
**harassing** 28:3
**harassment** 27:6
 27:19,23 61:22
 62:12,21

**hard** 13:8 38:12
**harder** 25:20
**head** 13:2 23:20
 29:19 55:5
**heads** 10:19
**health** 14:22 35:10
 39:10 44:18
**hear** 16:23 29:1
**heard** 16:5 17:2
 67:16 68:2
**hearing** 9:7
**heat** 11:2 19:23
**help** 21:12 31:14
 32:8 39:13 45:11
 59:18
**highlighted** 47:16
**hillsborough** 70:4
 71:3
**hired** 8:21
**hobbs** 1:11 3:11,17
 3:20 4:19 5:1,2
 15:7 16:12 23:14
 23:22 28:14 33:20
 35:13 36:8 37:8
 39:4 41:20 42:2
 48:19 62:2 70:7
 71:6
**hold** 21:21
**honestly** 63:24
**hope** 13:12
**hopefully** 42:23
 47:5
**hoping** 61:17
**hour** 16:16,25
 47:18
**hours** 59:14 67:12
**house** 47:17
**huh** 13:19 15:20
 40:21 42:11 43:7
 43:23 44:5,10,19
 47:9,15,24 54:1

**i**

**identification** 14:16 21:14 31:2 39:18 43:2 47:3 55:6 61:4
**illness** 12:18 26:21
**impacted** 38:6
**impairment** 38:25 40:25 41:2
**impede** 33:17,23
**impeding** 37:5
**important** 24:14,17 24:19
**impractical** 48:12
**improve** 35:10
**inability** 12:11 19:4
**inappropriate** 61:25
**incident** 15:16 27:5 27:13
**included** 19:22
**inconsistent** 57:14
**increase** 67:6
**indicates** 13:19 15:20 40:21 42:11 43:7,23 44:5,10,19 47:9,15,24 54:1 60:7 61:11
**individual** 1:4 41:21
**individuals** 12:3
**information** 11:24 11:25 12:1 16:20 41:8 58:7 60:25 61:1
**informed** 26:23 58:10
**initial** 6:3
**input** 21:11,11 24:7 24:11

**instance** 24:12 48:3 48:8 59:1
**institution's** 67:2
**institutional** 13:1 67:2
**institutions** 66:25 66:25 67:24
**interacting** 54:20
**interested** 71:11
**internally** 9:24 23:4
**interpersonal** 28:9 65:22
**interrupt** 32:24
**intimidation** 28:12
**investigated** 22:4
**investigation** 22:8 22:19
**involved** 8:15 10:5 29:9
**involving** 27:6 54:12
**issue** 9:6,23 10:19 10:22 11:1,8 23:18 24:14,17,19,23 25:1,6,11 26:5 36:6 41:13 44:11 52:6 65:8,21,22
**issues** 10:1,4 11:22 12:2,4 14:21 16:21 23:3 24:6 26:4 28:8 34:8,11 35:23 36:3 36:3,18 38:4 41:10 41:15 43:17 45:3 50:20 52:9 53:16 54:11,12,18,23 60:22,24 63:23 64:2
**items** 50:22,23

**j**

**jacksonville** 2:9 57:24
**jacqueline** 1:11 3:11,17,20 4:19 5:1 70:7 71:6
**jensen** 2:3
**july** 3:12 42:24 43:22 70:11 71:13
**june** 1:15 3:9 35:2 39:21

**k**

**kaleel** 67:18
**keep** 20:7 24:11 33:9 43:11
**keeps** 13:9
**kind** 11:15 24:23 25:24,25 29:22 42:9 45:24 46:11 46:13 47:16 58:23 62:24
**knew** 7:7 15:9 26:25
**know** 5:11 6:2,3,18 6:20 7:7,8,9,22 9:1 9:2,17,17,19,19 10:11,12 11:4,9,16 11:16,25 12:14,16 12:17,18,25 13:5,6 13:9 14:3,23 15:2,2 15:3,23 16:6 17:18 17:24 18:1,3,6,13 18:18,19,19,19,21 18:25,25 19:15 21:10,10 22:24,25 24:4,5,6,7,8,10,12 25:15,17,18,18,19 25:22,24 26:4,12 27:10 29:19 30:2,2 30:10,11 32:3 34:7

34:9,11,12,14 36:10,22,23,23,25 38:6,11,12,14,15 38:19,19,21 39:5,5 39:7,9,11,11,12 40:4 41:9,12,14,17 41:18 42:4,4,5,15 44:13,15 45:6,7,8 45:12,13,19,20 46:5,10,19,20,23 46:24,25 48:3 50:3 50:23,24 51:10,24 53:15 54:17 56:19 57:11,12,13,17,23 58:20,20,25 59:10 59:17,20,21 60:1 62:24 63:4 64:15 64:16 67:8 68:4,14
**knowing** 34:12 54:20
**knowledge** 38:21

**l**

**l** 69:1
**large** 1:22
**late** 51:14,15
**laughing** 49:21
**lead** 44:17
**leadership** 45:22
**leads** 59:11
**learn** 59:9,10 60:1
**learning** 59:16
**leave** 12:12,21 14:1 14:2,3,4,5,20 15:2 17:8,12,21,22 19:12 35:11 45:19 45:24
**left** 17:25 58:15 68:11,11
**letter** 3:5,10,16,20 6:3 42:16 50:20 55:12,16 56:1,10

[letter - obviously]                                                                 Page 79

60:8,16,18,20,25
61:17 63:3
**letting** 44:13,15
**level** 59:12
**levels** 42:6
**limitations** 41:9
**line** 37:12
**list** 21:20 30:16
**little** 2:3 7:23 32:8
33:6,6 46:6 62:3
**long** 5:19,22 16:16
60:5
**look** 13:15 15:17
21:16 30:10 31:23
33:2,3 39:20 45:20
47:5,16 49:13 52:6
56:2,12 58:7 63:5
**looked** 15:13 58:1
**looking** 25:23
57:25 60:16
**looks** 43:9,19
**lot** 6:16 9:20 17:24
45:11
**lots** 34:6 40:16
46:11

**m**

**m.d.** 1:11 3:7,11,12
3:18,18,21,21 4:19
70:7 71:6
**mail** 3:2,13 13:16
13:20,23 15:17,21
15:23 29:13 43:20
43:21,22 47:10
61:17
**mails** 17:15
**main** 58:9
**majority** 50:24
**making** 29:25
32:25 41:11 61:13
63:10

**male** 65:24 67:14
**malingerer** 29:2
**manner** 4:9
**march** 31:9,21
35:18
**marked** 14:16
21:14 31:2 39:18
43:2 47:3 55:6 61:4
**material** 60:18
**matter** 17:23 38:15
**matters** 23:20
**mayla** 13:2
**mean** 6:1 7:7 14:24
15:1,8,22 16:5
20:18 22:15,20
24:4 25:13 26:4,11
26:13 30:1,8,9
32:24 34:5,7 37:9
38:3,11 41:3,5,7
42:14 43:9,11
45:18 55:2 58:24
60:20 62:15,17
63:16 65:2
**medical** 7:1,5 15:2
26:24 28:18 35:10
35:19 36:1 38:21
41:10 43:25 45:19
45:24 63:23 67:19
**medications** 20:1
43:18 44:3,7,9
45:10
**medicine** 18:20,20
20:12 29:21
**meet** 34:22 58:22
59:19
**meeting** 3:7,9
16:24 35:4 39:21
39:22,25 40:9
41:25 43:14 53:21
**meetings** 26:14
35:6 36:15,19

**meets** 34:23
**member** 34:17
41:13,17
**mental** 11:16 38:13
**mention** 13:22 35:9
**mentioned** 17:16
22:18 28:1 42:10
**mentioning** 15:12
**merit** 71:4
**met** 16:15 36:17
**middle** 68:11
**midyear** 11:12
**milestones** 34:24
58:11
**mind** 37:11
**minimum** 59:14
**mislabeled** 50:6
**missed** 13:24
**missing** 67:12
**moments** 14:24
**money** 63:10
**months** 51:5 54:4,5
54:9 60:17
**move** 4:11 26:15
**moving** 43:11
**municipal** 1:7

**n**

**n** 2:17 69:1
**name** 4:25 66:3,8,9
**names** 66:4
**national** 65:25 66:1
66:6
**necessarily** 62:15
62:17
**need** 13:7,10,23
18:2,2,3 26:14 34:3
40:4 41:23 46:1
51:19 59:9,10
66:23,24
**needed** 16:9 19:25
20:6 35:10 44:9

49:4 50:11 52:7
64:16 66:22
**needs** 41:22 59:19
**negative** 61:24
62:12 63:18 68:4
**neutral** 24:11
**never** 18:24 38:11
46:21,21 63:24
**normal** 54:3,5
**normally** 10:2
13:25 14:3 62:20
**northern** 1:1
**notary** 1:22 70:20
**note** 34:11
**noted** 12:5,6
**notes** 3:8 11:13,23
28:8 34:11 36:10
54:13,14 67:19
71:7
**notice** 1:18
**notify** 24:22
**november** 3:4,14
12:9,20 13:17 47:7
48:1 49:23 51:9,9
51:15 64:17,24
**numbers** 58:19

**o**

**o** 69:1
**oath** 2:19 4:5,20
70:1
**object** 15:6 16:11
23:13,21 28:13,21
33:19 35:12 36:4,7
37:7 39:3 42:1
48:15 49:7 51:22
52:14 53:4 54:25
62:1
**objections** 4:9
**observations** 61:1
**obviously** 34:7
38:12 39:8 41:3

59:3
occur 67:20
occurred 27:16
  56:16
occurring 23:11
october 9:8 10:8
offer 6:3
offered 45:23 52:7
office 8:16 9:9 10:4
  10:10,11,12,13,14
  18:13,18 21:4,10
  22:6,10,24 29:14
  29:20 32:1 44:23
  45:22 46:22 50:2
  52:20 64:12
official 13:2 70:10
oh 13:14 21:21
  30:20 31:13 37:20
  56:18
okay 5:5,12 20:3
  21:24 25:1 29:22
  30:22 31:9 33:2,10
  38:3 40:2,11,12
  42:8,23 43:13
  44:15 55:18 56:13
  60:15 63:9 66:11
  67:18 68:5
once 10:9 63:25
ones 20:23 25:21
  30:9 33:16
ongoing 16:21
open 30:18
opinion 45:16
  47:25
opportunities
  39:10
optimize 39:10
order 4:7 52:8
original 30:11
originally 64:11

origination 3:3
osfield 29:14,23
  47:10
osfield's 29:16
outcome 68:4
outcomes 51:2
outlined 42:16
outside 57:11
overwhelmed
  68:14,15

**p**

p 58:18 69:1
p.a. 2:3
p.m. 1:16,16 68:23
page 2:18,18,19,19
  3:2,2,5,6,6,8,10,13
  3:16,20
pages 1:24
parameters 45:8
parking 9:6,7,20
  9:20 10:1,2,3,7,22
  11:1 16:21
part 7:15,15 19:17
  25:8 32:24 43:19
  43:20 45:18,20,22
  45:25 46:1,3,7,18
  47:17 52:22,24,25
  59:16 65:2
participate 59:8
participating 4:1
particular 9:12
  25:15 48:8
parties 4:8 71:10
  71:10
parts 11:16
pass 66:23
passed 66:15 67:7
passing 66:14 67:1
patel 66:5
patient 34:13 54:16
  54:17

patients 11:19
  13:10 38:23 45:3
  48:13,14 54:19,19
pause 50:5
pay 67:6
people 7:20 14:1
  16:1 26:12 46:6,8
percentile 58:21
perform 12:17 18:5
  53:15 57:14
performance 34:8
  35:23,23,24 36:2,3
  36:6,18 38:5,8,10
  39:7 40:20 41:15
  41:16,24 42:16
  52:1,2 53:15
performing 38:16
period 6:22 10:25
  14:19 17:7,11
  18:10 33:25 47:2
  49:22 54:3,8,8 55:4
  57:5,12
periods 48:6
perkins 1:21 70:20
  71:4,21
permission 4:13
  13:4
permitted 1:19
person 61:23 62:13
  62:16,21,25
personally 70:7
pgy 67:7
physical 9:14,15
  12:10,18 19:6 20:7
  37:4 38:6,10,13
  49:4
physically 18:4
  25:6,12
physician 13:4
  19:16 27:7

place 42:18 45:14
  58:25 64:1,5
placed 55:16 61:17
  66:19
plaintiff 1:5,18 2:5
  4:17
plan 44:6 50:21
played 11:5
please 4:25 5:6
  28:6
plus 22:6 64:5
point 7:3 8:11,16
  8:17 11:5 12:19
  13:6 14:19 15:1
  18:12 19:2,5,11,15
  29:4 42:8 43:16
  45:19 51:25 56:10
  56:10 57:18
points 11:9 29:15
policy 15:25 62:7
  67:2,3
poor 16:10
poorly 62:6
portion 37:16
position 5:19 6:8
  14:11 16:9 20:24
  29:16
positions 6:2
possibility 46:2
  68:3
possible 41:9 45:7
  46:5 68:15
potential 8:6 20:3
  54:21
pots 8:18,24 9:3,11
  19:13,17,20 20:7
  49:5 54:24
practical 38:21
practice 18:20
  58:23

practices  63:10
prerogative  14:10
present  4:3 69:4
previous  7:18
previously  52:5
prior  12:15,19
   27:12 64:12
prite  58:18
probably  5:5 6:15
   6:16 11:11 12:6
probation  36:14
   42:9,16,18 49:15
   49:18 50:19 51:17
   53:22 54:3,15
   55:13,16,19,23
   56:5,14,22 57:2,3
   60:6,17 61:18
   66:17,18,20
probationary
   57:11
probations  64:7
problem  11:3 25:6
   28:4 31:15 63:7
   67:11
problems  12:11
   19:6 28:2 35:20
   36:2,15 37:4 38:10
   49:5 53:23
procedure  1:20
   64:16
proceed  41:9
proceedings  4:4
process  7:16 10:7
   16:6 21:2 22:5
   27:10 29:9 50:19
   51:17,17,25 52:10
   56:7,9,14,20,22
   59:8,16,16 65:6
processes  53:19
program  6:14 7:12
   8:3,21 11:7,18

12:12 14:12 18:17
   19:8 20:11,16 22:6
   33:18 34:3 35:21
   36:16 37:6 38:2
   53:3,12 57:16,24
   58:5,6 63:15
prohibits  62:8
promoted  65:25
   66:23,24 67:4,9
proper  64:16
properly  22:25,25
provided  3:15 58:8
psychiatric  20:11
psychiatrist  19:3,8
   50:10,15
psychiatry  5:18
psychotic  54:19
pty  66:6
public  1:22 27:11
   70:20
pull  30:14
punish  16:21
punished  29:6
purposes  1:18,19
pursuant  1:18 4:6
put  13:12 36:13
   42:9 45:14 49:14
   49:17 53:22 66:17
   66:18
putting  60:16
pyg  57:16

q

quality  11:23
question  5:6,9 6:1
   34:4 36:13 37:13
   40:6,17 48:16,18
   48:24 49:16 62:6
   62:19
questioned  4:21
questions  5:10 22:9
   24:6 50:7 65:8

68:20
quickly  61:6
quote  28:19,20
qurushi  68:7,8,16

r

r  58:18
raise  41:13
raised  41:18 56:25
   64:3 65:9
raising  25:2,5
rate  11:16 34:24
reach  27:15,18
read  37:14,16
   68:21
reading  69:5
real  28:18
really  7:9 12:20
   28:19 38:7,14 39:6
   41:18 46:21,21
   54:20
realtime  71:5
reason  38:18 49:3
reasonable  18:15
   20:14,18 21:5,8
   30:3,5,7 31:6,18
   45:17 53:11
reasons  39:1 42:14
recall  7:13 8:10
   9:11,13,15 11:6
   12:21,24 17:12
   23:15 24:25 25:18
   27:1 29:13,22 30:6
   30:8,9,12 31:25
   34:2 35:8,14,16
   36:10 39:25 40:4
   43:4 47:14 49:14
   49:17 50:2 51:10
   56:23 57:21,25
   58:1,10,12,13,17
   64:14,20,25 65:7
   65:11,13,15,20,23

67:13 68:6,13
receive  7:19 20:25
received  61:23
   62:12
receiving  27:19
receptive  36:24
   37:1,3
recognize  11:14
   60:11,14
recommendation
   51:12,15
recommended  51:1
   52:23
recommending
   50:17
record  4:25 71:7
records  27:11
reduced  46:25 48:3
reduction  45:16
   47:21
refer  10:2
reference  48:2,4
referred  10:13 29:1
   44:22
referring  20:23
   24:2 56:19
regarding  9:6
   10:16,19 22:19
   29:16 55:19 56:16
   56:25 58:3 60:6
registered  71:4
related  29:21 38:10
relationship  15:4,8
relative  71:9,10
rely  21:12
remediation  50:21
remember  8:14 9:2
   9:7 11:4 29:18 30:6
   31:19 41:1 46:23
   55:2,5 57:19 58:2
   58:19 65:1

remotely  4:5 70:7
remove  59:22
render  20:10
renewed  6:4
repeat  17:10 25:4
  37:13 40:6
rephrase  5:7 19:4
  34:4 62:5
report  27:15 39:15
  71:5
reported  1:21
reporter  3:15 4:1,3
  4:15 37:15 71:4,5
reporter's  2:19
  71:1
reporting  4:4,10
  55:24
request  8:12 18:9
  30:11 32:1 52:12
  52:13,17 58:4 64:8
requested  21:1,3
  32:5,11,22 37:16
  51:8 58:5 71:7
requesting  32:15
  44:6
requests  27:12
  29:24 30:2,4 33:2
  49:25 50:2 51:11
  64:13,15
required  24:7 39:2
requirement  58:22
  59:5,14
requirements
  47:20 53:21 62:9
  67:12
reset  13:7 25:25
residence  46:4
residency  5:17,20
  6:9 8:4 13:8,24
  14:6,13 18:17
  20:10 33:18 34:3

46:15 67:12
resident  6:21 9:23
  14:3 15:9,10 24:7
  40:3,10,17,17 67:9
  68:15
residents  7:11
  11:11 13:7 14:8
  15:25 16:9 23:12
  24:2,10,22 26:25
  35:3 43:16 58:23
  58:24 59:7,7,15,18
  59:20 60:1 65:22
  66:3,13 67:14,15
  67:23 68:14
respond  22:8,22
  27:2,3
responded  22:25
response  22:23
  32:23,25 55:19
responsibility  59:9
responsive  36:24
  37:1
result  8:8,12 36:3
  41:22 49:5 59:9
resulting  36:6
results  56:13 58:18
retaliation  23:11
  28:12 55:24 62:7,8
  62:10,14,18
retribution  55:24
returned  51:3
review  7:15 17:15
  22:24 43:10 61:24
  62:13 71:6
reward  16:1
rid  30:21
right  17:8,11 48:9
  49:6 51:16 52:10
  68:19
risk  54:16

riverside  2:8
rmr  1:21 70:20
  71:21
road  2:3
role  11:5
rollator  64:21,22
rotation  25:15,23
  59:13 63:14,16
rotations  25:20
  67:15
roughly  6:12,23
  7:20,23 9:5 14:19
  51:9 53:25
round  51:11
rounding  26:10,15
rules  1:20 5:5
  47:18
rumors  40:25 41:1
  41:6

**s**

s  3:1 69:1
safe  41:10 54:17
salary  6:5 46:17,25
  47:2
salzman  2:2,3,18
  4:15,17,24 14:14
  14:17 15:11 16:14
  21:15 23:16,24
  28:16,23 30:20,23
  31:1,3,14,16 32:13
  32:18,21 33:11,24
  35:17 36:5,11
  37:14,20,25 39:14
  39:19 40:7,14 42:7
  43:3 47:4 48:17,23
  49:11 52:3,18 53:8
  55:7 61:2,5 62:4
  66:10,12,16 68:17
  68:21
sarah  1:4 3:7,11,18
  3:21 6:13,18 8:1,12

13:3,16 35:9
saw  32:8
saying  11:12 14:25
  24:25
says  39:21 40:22
  47:17
scales  11:15
scenario  46:21
scenarios  38:22
  46:8
schedule  18:10,11
  18:17,21 25:3,7,14
  26:2,3,6,7,11,15,17
  26:25 44:8 45:1,16
  47:22 48:4,10,25
  49:4
schedules  25:19
  38:15 46:12
scheduling  25:11
school  9:25 37:19
  37:22
scoring  58:14
screen  13:12 30:15
  31:4
screens  30:19
scroll  31:22 32:6
  33:5 40:5,13 43:4
  55:11
se  59:8 65:14
seal  70:10
second  2:4 9:1 38:1
  38:1 44:14
see  13:12,18 15:19
  21:24 30:12,14,15
  31:6 33:6,9 35:16
  36:9 39:15,23
  40:12,16,22,24
  42:25 43:5 47:8,23
  49:21 55:8,10,11
  55:19,21,22 58:8
  60:2 66:4

seeing  11:19 21:19
    21:19
seen  15:22
sees  45:3
select  7:20
selecting  7:16
send  58:6
sends  22:6,22
sent  15:23 43:21
sentence  47:21
sentiment  41:4
separate  31:17
    38:12 39:8 52:10
    53:18,18
september  3:19
    49:19 51:18 53:25
    55:15 57:6 60:16
    60:22
service  26:8 28:9
set  18:10,16 20:1
    38:14 45:1 48:10
    48:11,25 49:3
settings  67:24
seven  46:13,13
severe  54:23
sexual  27:6 61:13
    61:22 62:11,20
shift  68:12
shorter  48:6
show  42:23
sick  14:4 16:1 17:9
    17:13,14,17,22
    29:5,6 63:6
sign  59:3
signature  33:14
    60:13 70:18 71:19
signed  33:12 34:1
significant  15:3
    40:2
signing  69:5

signs  22:10
sitting  34:17
situation  10:14
    16:4 27:16 54:16
situations  54:21
somebody  42:18
    46:24 51:21 52:8
    53:1,10,20
somewhat  44:7
sorry  12:13 17:10
    21:21,22 25:4 28:6
    32:7,23 33:21
    34:19 43:11 48:22
    48:24 49:16,21,21
    57:3
sort  9:3 12:19 23:1
    24:5 38:13 48:4
    68:3
space  9:20
speaking  57:22
special  50:11 64:9
specialties  47:19
specialty  47:20
specific  41:8
specifically  41:14
specifics  11:4
spells  50:20
spend  61:18
spiral  44:17
spoke  23:17
spring  37:23
staff  47:17
stand  16:25
standards  41:24
standing  51:3
starts  55:9
state  1:22 4:25 50:9
    61:24 70:3,20 71:2
stated  27:12 28:7
    35:25 40:23 41:3
    48:12 57:18

statement  41:5
    45:5 48:22
states  1:1
stating  26:20 41:21
status  11:17 34:2
stenographic  71:7
stenographically
    71:5
step  66:7,14,15
    67:6
stipulated  69:3
stipulation  2:18
stop  10:22
strict  45:16
struggling  12:20
    13:5 15:1,3 17:25
    63:18
students  67:19
subject  62:20
subordinates  24:1
subsequently  16:3
    62:12
successfully  20:16
    37:6 52:8 64:2,7
suffered  7:2 8:18
    8:24 19:13 20:3
suggestion  12:24
suggestive  61:13
summer  14:19
supervise  62:21
supervised  24:3
    62:25
supervising  57:8
supervision  64:6
supervisor  42:6
supervisor's  23:20
support  64:6
supreme  4:6
sure  20:23 22:16,16
    24:17 26:3 37:15
    40:15 56:2

switch  26:10
sworn  4:20 70:8
symptomatic  44:16
symptoms  19:17

**t**

t  1:21 3:1 58:18
    69:1,1 70:20 71:4
    71:21
take  13:10,15 14:1
    14:2,5 15:17 17:4
    17:17 19:25 24:24
    29:5 34:13 36:20
    36:24 38:21,22
    39:20 43:17 44:3
    45:9 46:10
taken  5:3 51:20
    58:15
talk  5:7 13:4,22
    24:10 35:22 45:11
    45:18
talked  12:25 19:14
    46:22 57:19
talking  9:14 10:25
    13:3 19:12,16
    57:15
tandon  40:23
task  39:1
taxing  25:21
teach  59:21
teaching  59:16
team  10:23
tell  5:13 6:7 10:17
    10:21 34:4 45:12
    60:15
temperatures
    19:22
template  11:14
    59:22,23,24
templates  34:12
    59:18

| | | | |
|---|---|---|---|
| **ten** 7:20,24 14:4 | 37:18 38:7,17,19 | 57:10,12,13 63:17 | **type** 9:23 14:18 |
| **terminate** 51:12,21 | 46:7 48:2,4 50:8 | **timing** 8:15 55:3 | **typically** 34:23 |
| 53:1 | 53:13 56:18 57:13 | **title** 29:18 | 35:22 67:22 |
| **terminated** 36:14 | 57:23 58:19 60:24 | **titled** 3:6 | |
| 53:10 65:4,10 67:1 | 63:16 64:15 67:16 | **today** 6:14 46:12 | **u** |
| **termination** 6:23 | **third** 66:8,9 | **told** 20:8 22:15 | **u** 57:22 69:1 |
| 50:18,25 51:5,14 | **thornton** 27:20 | 23:3,19 30:23 | **uf** 67:1 |
| 52:23 56:17,19 | **thought** 48:17,21 | 44:21 63:9 | **uh** 13:19 15:20 |
| 57:6 60:8,18 63:3 | 63:24 65:5 | **top** 55:5 | 40:21 42:11 43:7 |
| **terms** 11:23 29:20 | **thousand** 7:21,22 | **trained** 58:24 | 43:23 44:5,10,19 |
| 34:6,9 35:23 37:10 | **thousands** 7:19 | **training** 5:18,20 | 47:9,15,24 54:1 |
| 38:7,20 42:15 | **thread** 3:3 | 6:9,15 | 60:7 61:11 |
| 54:15 60:25 | **threatening** 65:11 | **transcript** 71:6,7 | **ultimately** 21:9,12 |
| **test** 58:18 | 65:13,16 | **transfer** 58:4 | 22:10 30:11 36:14 |
| **testified** 4:21 | **threats** 17:2 65:20 | **transferring** 57:16 | 42:17 46:23 59:3 |
| **testimony** 7:18 | **three** 3:2,6 51:5 | **transfers** 67:24 | 67:8 |
| **tests** 58:14 | 54:4,5,9 60:17 | **transition** 8:25 | **unable** 20:10 |
| **thank** 13:14 68:17 | 65:24 66:7 | **transportation** | **unanimously** 52:22 |
| 68:19 | **time** 1:16 6:11,13 | 10:2,3 | **unaware** 56:21 |
| **thanks** 31:14 | 6:22 7:5,24 8:20 | **treatment** 50:11 | **uncommon** 24:9 |
| **therapy** 20:7 | 9:5 10:17,25 12:9 | 64:9 | **underlying** 35:19 |
| **thiatros** 65:15,16 | 12:20 13:2,11,24 | **trend** 68:16 | **undersigned** 70:6 |
| 65:17,18 | 16:7 17:7,11,19,20 | **trial** 1:19 | **understand** 5:6,9 |
| **thing** 11:17 23:1 | 18:3,7,10,22,22 | **tried** 38:14 39:6,7,9 | 28:24 41:20 53:20 |
| 24:5 28:10 46:13 | 19:17,19 22:7 25:2 | **trigger** 19:20 | **understanding** |
| 63:1 67:5 | 27:8,14 29:5,10 | **trinity** 2:4 | 7:18 38:4 |
| **things** 11:15,20 | 31:13 33:25 34:10 | **trouble** 14:25 | **understood** 48:19 |
| 12:5 13:9,22 17:4 | 37:12 39:11 44:4 | **true** 71:7 | 54:22 63:2 |
| 24:10 28:8 29:20 | 45:9,18,20,22,25 | **try** 5:7 24:11 37:21 | **unheard** 45:23 |
| 34:14 54:14 59:22 | 46:1,3,7,9,11,15,18 | 38:16 53:20 62:24 | **unice** 2:3 |
| 59:25 61:7 65:10 | 46:22,24 48:5,6,6 | **trying** 6:10 16:21 | **united** 1:1 |
| 67:25 68:1 | 49:22 50:9 51:4 | 30:14 34:5,8,15 | **university** 1:7 5:15 |
| **think** 6:1,10 9:8 | 54:3,7,8 55:4 57:5 | 37:11 43:12 45:11 | 5:22 19:8 20:11 |
| 10:15 11:8 12:14 | 61:18 63:20 64:1 | 45:14 50:4,7 51:6 | 22:4 63:11 67:5 |
| 12:18 14:24 17:18 | 68:18 | 61:6 | **unreasonable** 30:7 |
| 17:23,24 20:9 | **timeline** 58:2 | **turn** 31:10 34:25 | 33:4 47:22 |
| 21:10 23:5,9 26:4,5 | **timely** 54:12,14 | **twice** 34:23,24 | **unsuccessful** 38:18 |
| 26:16 27:11 28:4 | **times** 20:1 25:13,16 | **two** 26:7 31:17 | **upheld** 56:15 |
| 29:10,20 30:9 | 25:22 26:14,15 | 37:10,22 46:9 | **upset** 26:7,17 68:15 |
| 32:10,15 33:14 | 31:20 36:23,25 | 66:13 | **use** 1:18 11:17 |
| 34:5,7 36:22,23 | 37:2 45:21 48:11 | | 34:12 59:24 64:24 |

**useful** 11:25
**usmle** 66:14
**usually** 7:21 10:1
  22:21 58:5 59:1
  66:19,20
**utilize** 38:22

**v**

**v** 28:19
**va** 27:7 59:13
**vaca** 66:5
**vacay** 28:19
**various** 11:9,16
  46:7 66:21
**vein** 12:6
**verification** 58:6
**vice** 5:17 6:11
**videoconference**
  1:12 70:8 71:6
**violations** 55:25
**vs** 1:6

**w**

**waive** 4:9 68:21,22
**waived** 69:6
**walk** 9:20
**walker** 64:19
**walking** 9:19
**want** 50:9 55:11
  60:12
**wanted** 28:19
  43:20
**wanting** 49:3
**warning** 68:1,2
**warranted** 30:3
**way** 6:2 7:4 22:20
  25:19 39:12 58:9
  60:12 63:24
**ways** 46:14 67:25
**weather** 25:17
**weeks** 46:9,10
  51:13

**went** 12:21 17:8,20
  29:8 30:1 46:19,21
  56:6,8,19
**witness** 4:3,20,22
  15:8 16:13 23:15
  23:23 28:15 30:25
  32:20 33:22 35:14
  36:9 37:9 39:5
  40:12 42:3 48:21
  49:9 51:24 52:16
  53:6 55:2 62:3
  66:13 68:19 69:4,6
  70:10
**work** 6:2 34:9,15
  44:8 45:8,16 46:9
  46:12 47:18,22
  59:11 62:16 63:20
  68:11,12
**worked** 5:22
**working** 10:11 46:2
  46:24 48:5 50:14
  52:19
**works** 22:21
**worry** 24:23
**write** 22:23
**writing** 27:3 32:1
  34:12
**written** 11:13
  55:12 57:18
**wrong** 59:24
**wrote** 55:18 57:19
  61:16

**x**

**x** 2:17 3:1

**y**

**y** 28:19
**yeah** 12:13 32:18
  32:19 33:5,7,15
  37:21 48:21 62:5
  65:19

**year** 6:4 7:20 9:1
  11:7,10 12:2 37:6
  37:20,23 38:1,2
**yearly** 34:23,24
**years** 5:21,24 37:10
  37:19,22

**z**

**zero** 58:11

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.